**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>vs.<br><br>**DAVID OQUENDO-RIVAS**<br>Defendant. | Criminal No. 09-427(JAF) |

<u>**MOTION TO SUPRESS DEFENDANT'S STATEMENTS**</u>

**COME NOW**, the defendant David Oquendo-Rivas, through his undersigned attorney, who respectfully alleges and prays as follows:

<u>FACTUAL BACKGROUND</u>[1]

1.      On October 17, 2009, a shoot-out occurred in the bar known as La Tombola located in Sabana Seca Ward, Toa Baja, Puerto Rico. During this shoot-out, several people were killed.

2.      On October 20, 2009, PRPD Lieutenant Rolando Trinidad- Hernández was at a meeting where information was received that there were various wounded individuals who had participated in the shoot-out at La Tombola, located at a house at Sector 26 of the Sabana Seca Ward in Toa Baja. Said house was located in the immediate area of the home of an individual known as "Cheo".

3.      Lt. Trinidad-Hernández proceeded to provide this information to PRPD Agent Carlos Rodríguez-Negrón.   Together with Lt. Trinidad-Hernández, and PRPD

---

[1]      The factual background recited herein has been distilled from the following documents: (1) Discovery reports in Crim. # 09-355 (GAG) of P.R.P.D. Carlos Rodríguez-Negrón, Lt. Rolando Trinidad-Hernández, ATF S/A Julio Torres and other discovery documents, De Novo Bail hearing and trial transcripts pertaining to Crim. # 09-355 (GAG). Should the Honorable Court deem it necessary to review these documents, the defense will immediately provide the same to the Court.

Agents Luis Vázquez-Torres and Roberto Cruz-Rivera, Agent Rodríguez-Negrón went to the house indicated, in civilian clothes and in an allegedly marked patrol car.  On the way to the residence, another police vehicle with agents followed Agent Rodríguez-Negrón and his fellow officers to the residence.

4.      Upon arriving at the house, Agent Carlos Rodríguez-Negrón alleged that he saw three individuals, two of which were later identified as Christian Ortiz-Rivera and the defendant, David Oquendo-Rivas (the third individual ran away and was never found).  According to Agent Rodríguez-Negrón, upon seeing the agent, defendant raised his shirt and extracted a pistol.  Agent Rodríguez-Negrón then allegedly took out his firearm, identified himself as a police officer, and ordered Defendant to drop his weapon and to remain where he was.  Instead, according to Agent Rodríguez-Negrón, the defendant ran off up the stairs which gives access to the second floor of the residence, followed by Christian Ortiz-Rivera, who Agent Rodríguez-Negrón observed, also had a weapon in his hand.  Agent Rodríguez-Negrón, gun in hand, and Agent Roberto Cruz-Rivera then ran after defendant and Christian Ortiz-Rivera.

5.      Upon reaching the residence located on the second floor level Agent Rodríguez-Negrón allegedly observed Defendant enter a room where he saw Defendant throw out his pistol though a gap located between the top of the wall and the zinc roof.  Upon throwing away the pistol, the Defendant walked towards Agent Rodríguez-Negrón who grabbed him, and with the help of Agent Cruz-Rivera threw him on the floor.  During the process of arresting David Oquendo-Rivas Agent Rodríguez-Negrón alleges that he heard Lt. Trinidad-Hernández indicating from the first floor that he was in custody of the firearm which David Oquendo-Rivas had thrown away.

2

6.     Agent Rodríguez-Negrón then went into the room where he had seen Christian Ortiz-Rivera enter and saw that he was trying to hide something in a hamper. Agent Rodríguez-Negrón grabbed him, put him on the floor and arrested him.  In the hamper, Agent Rodríguez-Negrón found two gun magazines and two pistols, one of which being the same that he had seen Christian Ortiz-Rivera carrying when Christian Ortiz-Rivera ran up the stairs.

7.     There is an issue as to whether Agent Rodríguez-Negrón immediately "detained" or "arrested" Defendant and Christian Ortiz-Rivera upon throwing them to the floor.  According to Agent Rodríguez-Negrón's report dated October 21, 2009 he first states that he arrested Defendant (and Christian Ortiz-Rivera) and then subsequently states that at the moment of their "detention", he asked them if they had any license to have or possess firearms to which they both indicated "no"; whereupon, he arrested both of them.  In addition to this inconsistency, there are two reports written by Lt. Rolando Trinidad and ATF S/A Julio Torres concerning the same incident which do not mention any "detention", but rather that they were chased into the residence and both "arrested". In order to shed light on this issue, the defense requested any report written by Agent Roberto Cruz who helped Agent Rodríguez-Negrón throw Defendant to the floor and subdued him, but was informed by the government that none existed.

8.     After having arrested Christian Ortiz-Rivera and Defendant, Agent Rodríguez-Negrón alleged that he verbally gave Christian Ortiz-Rivera and Defendant their <u>Miranda</u> Rights.  Again, according to Agent Rodríguez-Negrón, once Mirandized, both Christian Ortiz-Rivera and Defendant "freely and voluntarily without asking them", told Agent Rodríguez-Negrón, in essence, "that they were clear, that the weapons that

had been seized at the place were 'theirs', that they were clear on that, but that they had nothing to do with the massacre which occurred on Progreso Street in the La Tombola business at Sabana Seca of Toa Baja".   In addition, Agent Rodríguez-Negrón asked Defendant if he knew that Christian Ortiz-Rivera had two firearms and one of them had a serial number obliterated, and the Defendant said "yes".

9.      Christian Ortiz-Rivera and Defendant were subsequently taken to the Puerto Rico Police Station located in Bayamón, Puerto Rico.  While at the police station, Agent Rodríguez-Negrón read the Defendant his <u>Miranda</u> Rights and provided Defendant with a written copy of said rights.   Defendant clearly indicated on the form that he understood his rights, but did <u>not</u> wish to declare.  The defendant and Agent Rodríguez-Negrón signed the form, and said form is dated October 20, 2009 at 4:50 pm.

10.      Twenty minutes later, ATF S/A Julio Torres again read the <u>Miranda</u> Rights to Defendant and provided him with a copy of the same.  After reading his rights, Defendant wrote in the waiver section "I do not understand that, my lawyer speaks". ("No entiendo eso mi abogado habla")

11.      According to S/A Julio Torres, he then asked Defendant what part of the <u>Miranda</u> Warnings he did not understand and Defendant replied that he was willing to speak with him without the presence of counsel, but he did not want to speak about anything else regarding La Tombola massacre.

12.      During the interrogation by ATF S/A Julio Torres, Defendant allegedly admitted possession of the .45 pistol that was recovered outside the residence, and claimed that he paid $1,300.00 for the pistol and ammunition.  In addition, Defendant

allegedly explained that he knew that one of the firearms in possession of Christian Ortiz-Rivera had the serial number obliterated but that he did not do it.

13.     As a result of the aforementioned factual scenario Defendant was indicted in Criminal Case # 09-355 (GAG) for aiding and abetting in the possession of a firearm with a obliterated serial number in violation of 18 U.S.C. § 922 (k) and 2.   The government has announced that it will try to admit Defendant's statements in its case-in-chief in the instant case.   The defense, however, argues that these statements should be suppressed for the reasons provided below.

## LEGAL ARGUMENT

### STATEMENTS ALLEGEDLY MADE BY DEFENDANT TO P.R.P.D. AGENT CARLOS RODRÍGUEZ-NEGRÓN

Pursuant to Miranda v. Arizona, 384 U.S. 436 (1966) before questioning suspects in custody, law enforcement officials must inform them, in some manner, that: (1) they have a right to remain silent; (2) their statements may be used against them at trial; (3) they have the right to the presence of an attorney during questioning; and (4) if they cannot afford an attorney, one will be appointed to them. Id. at 478-79.

In order to trigger the Miranda rights, a defendant must be in custody and about to be subjected to government interrogation. Rhode Island v. Innis, 446 U.S. 291, 297 (1980); Ill v. Perkins, 496 U.S. 292, 297 (1990); Thompson v. Keohane, 516 U.S. 99 (1995).

The test for whether a person is in "custody" and Miranda warnings required is an objective one: whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a

formal arrest. Miranda v. Arizona, 384 U.S. 436, 444 (1966), United States v. Bengienga, 845 F.2d 593 (5Th Cir. 1985); California v. Beheler, 463 U.S. 1121 (1983).

In Berkemer v. McCarty, 468 U.S. 420 (1984), the Supreme Court identified two factors as particularly relevant to determining whether investigatory stops involves restraints generally associated with a formal arrest.  The first is whether a reasonable person in the suspect's shoes has understood that his detention was not likely to be temporary and brief.  The second is whether a person stopped under the circumstances at issue would feel that he was completely at the mercy of the police. Id. at 437-48.

According to the facts as recited above, upon having thrown to the floor of the residence and subdued and restrained by Agent Cruz and Agent Rodríguez-Negrón, who had an unholstered gun, any reasonable person, including Defendant, would have felt that he was not at liberty to get up and leave the premises, and that, in fact, he was completely at the mercy of the police.

Independent of whether Agent Rodríguez-Negrón describes his actions as having "detained" Defendant, the fact is that given the circumstances as stated above, the Defendant was under custody; and as such, Agent Rodríguez-Negrón should have provided Defendant with the Miranda warnings prior to asking him if he had a license for the weapon which he alleges he saw Defendant carrying. Berkemer v. McCarty, 468 U.S. 420, 440 (1984) ["It is settled that the safeguards prescribed by Miranda became applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest"]; Oregon v. Mathiason, 429 U.S. 492, 495 (1977) [If a suspect who has been detained pursuant to an investigatory stop is thereafter subject to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of

protections prescribed by <u>Miranda</u>]; <u>United States v. Perdue</u>, 8 F.3d 1455 (10th Cir. 1993) [If police officers are going to take highly intrusive steps to protect themselves from danger during a <u>Terry</u> stop, they must similarly provide protection to suspects by advising them of their Constitutional Rights.]  Having not provided the Defendant with the required <u>Miranda</u> Warnings, the next inquiry is whether the question asked by Agent Rodríguez-Negrón was an "interrogation".  To do so we must ask whether the question was "reasonably likely to illicit an incriminating response" <u>Rhode Island v. Irnis</u>, 466 U.S. 291, 301 (1980).  Agent Rodríguez-Negrón's initial question was ostensibly to confirm or dispel his suspicion that Defendant did not possess a license to carry or possess a firearm.  Given the facts that Agent Rodríguez-Negrón (1) allegedly saw Defendant extract a firearm from his waist, (2) turn and run-away when told to stop, and (3) saw when Defendant threw the pistol through the gap between the wall and the zinc roof, this question, "Do you have a license to possess the firearm?" is the essence of interrogation, and definitely reasonably likely to illicit an incriminating response.  Consequently, Agent Rodríguez-Negrón should have informed Defendant of his <u>Miranda</u> Rights after neutralizing him but before commencing with the interrogation.  The failure to do so constitutes a violation of <u>Miranda</u>. <u>United States v. Perdue</u>, 8 F.3d 1455, 1465 (10th Cir. 1993).

Having not furnished the Defendant with his <u>Miranda</u> Rights, the statement allegedly made by Defendant in response to the agent's question was illegally obtained; and therefore, his arrest was an exploitation of the illegality in violation of his Fourth Amendment Right.  Consequently, any subsequent statements made by the Defendant, even after allegedly being Mirandized , are suppressible as fruit of the poisonous tree.

Brown v. Illinois, 422 U.S. 590 (1975); Dunaway v. New York, 442 U.S. 200 (1979). As stated by the Supreme Court in Taylor v. Alabama, 457 U.S. 687 (1982), it is "firmly established that the fact that (a) confession may be voluntary for purposes of the Fifth Amendment … is not by itself sufficient to purge the taint of an illegal arrest."  It appears that Defendant's alleged statement concerning the firearm seized and his comments about La Tombola was separated from his illegal arrest by a short period of time, if not minutes, and therefore in short temporal proximity. There was also no intervening event of significance whatsoever between the time of the illegal arrest and the alleged statements.

For Agent Rodríguez-Negrón to say that both defendant and Christian Ortiz-Rivera, out of the blue, spontaneously and repeatedly told him that the guns seized belonged to them, but that they did not have anything to do with the massacre that took place on October 17, 2009, quite frankly stretches credibility.  On October 20, 2009 the PRPD agents went to the residence where Defendant was found for one reason and one reason only: to seek and find wounded individuals who had participated in the shoot-out at La Tombola.  The fact that two police vehicles filled with agents went together to that location corroborates that fact.

There is no evidence or any indication in any of the reports or transcripts related to this case [Crim. # 09-355 (GAG)] that the Defendant (and Christian Ortiz-Rivera for that matter) had absolutely any idea that the police officers were coming to the residence, and much less that the police were going there with the specific goal of investigating a tip that in that residence they would find wounded participants of La Tombola shoot-out. Given this scenario, why would Defendant even mention that the firearm were "theirs" but not related to La Tombola?  The only logical explanation is that the Defendant's (and

Christian Ortiz-Rivera's) alleged statement was in response to questions made by Agent Rodríguez-Negrón concerning the events of La Tombola.  Based on <u>Brown</u>, <u>Dunaway</u>, and <u>Taylor</u>, <u>infra</u> these statements should be suppressed.

An additional reason for suppression of Defendant's statements once he allegedly was verbally Mirandized at the residence is the fact that at no time did Agent Rodríguez-Negrón inquire as to whether Defendant understood his verbalized rights in order to voluntarily and intelligently waive the same.

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) the Supreme Court held that "the defendant may waive effectuation of his rights conveyed in the warnings provided the waiver is made voluntarily, knowingly and intelligently". Id. at 444.  See also <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). A review of Agent Rodríguez-Negrón's report dated October 21, 2009, his testimony at the De Novo Bail hearing, dated November 12, 2009, and his testimony at the trial dated January 24, 2011 in Crim. # 09-355 (GAG) do not reflect in any fashion that after allegedly giving the <u>Miranda</u> warnings to Defendant he inquired of Defendant if he understood his rights. As such, any statement made by Defendant while at the residence should be suppressed.

### <u>STATEMENTS ALLEGEDLY MADE BY DEFENDANT TO ATF S/A JULIO TORRES</u>

In addition to the aforementioned arguments for suppression of statements made by Defendant to Agent Carlos Rodríguez-Negrón, there are further arguments to sustain a suppression of the specific statements made to ATF S/A Julio Torres.

According to Agent Carlos Rodríguez-Negrón, Defendant was transferred from the residence to the Bayamón Police station.  While at the Bayamón Police station, Defendant was provided with a written form reflecting his <u>Miranda</u> Rights.  Immediately

after said rights there is a question which asks "Have you understood your rights?". The Defendant put a check mark indicating that he did understand his rights. Underneath that inquiry is the question "Do you wish to declare" to which Defendant used a checkmark to clearly reply "NO". The form was then signed by Defendant and Agent Carlos Rodríguez-Negrón and dated October 20, 2009, hour:  4:50 (pm).

Twenty minutes later at 5:10 pm, ATF S/A Julio Torres provided the Defendant, who was still at the Bayamón Police station, with another written <u>Miranda</u> Rights form. After reviewing the same, Defendant wrote "I do not understand that **my lawyer speaks**" [Emphasis Ours]. Defendant's request for an attorney was unambiguous, especially when combined with his written affirmation that he did not waive his <u>Miranda</u> Rights only twenty minutes earlier. <u>Davis v. United States</u>, 512 U.S. 452 (1994). Examples of ambiguous request for attorney are: <u>United States v. Posada-Rios</u>, 158 F.3d 832, 867 (5th Cir. 1998): holding a suspect's statement that she "might have to get a lawyer then, huh" was not a clear request; <u>United States v. Cherry</u>, 733 F.2d 1124, 1130 (5th Cir. 1984): "why should I not get an attorney" was also not a clear request; <u>Davis v. United States</u>, 512 U.S. 452, 462: "maybe I should talk to a lawyer" was not a clear invocation, as was not the defendant's statements in <u>Barnes v. Johnson</u>, 160 F.3d 218, 225 (5th Cir. 1998): "should I get an attorney", "how can I get and attorney" and "how long it would take to have an attorney appointed". All of these cited cases are in stark contrast to the instant case where Defendant clearly wrote "my lawyer speaks", obviously indicating that his lawyer would speak for him. Once Defendant invoked his right to an attorney, all further interrogations should have ceased. <u>Davis v. U.S.</u>, 512 U.S. 452 (1994). <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981). (holding that a criminal Defendant, "having

expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him…")

Finally, another potent and cogent reason to suppress any statements made by Defendant to ATF S/A Julio Torres is because ATF S/A Julio Torres commenced his interview of Defendant in violation of United States v. Andrades, 135 F.3d 104 (1st Cir. 1998) and Michigan v. Mosley, 423 U.S. 96 (1975).  In United States v. Andrades, the First Circuit Court of Appeals held that a federal agent did not act improperly by resuming questioning of a suspect in custody after the suspect refused to speak with other law enforcement officers.  In that case, at the outset of the second interview, the agent reminded the suspect of the earlier Miranda warnings and the defendant confirmed that he remembered the same.  In addition, and more importantly, "a reasonable interval (of four hours) separated the two periods of questioning".  Id. at 107.

In Michigan v. Mosley, 423 U.S. 96 (1975), the Supreme Court held that the admissibility of statements obtained after the person in custody has decided to remain silent depends on whether his "right to cut off questioning was scrupulously honored". Id. at 104. In the Mosley case a significant period of time – two hours – had elapsed before the start of the second interrogation.

In contrast to above-cited cases, Defendant Oquendo-Rivas was provided with written Miranda Rights by PRPD Carlos Rodríguez-Negrón, which includes the right to remain silent and right to have counsel present before answering any questions.  He refused to waive these rights as clearly indicated on said form.  Notwithstanding the Defendant's exercise of his right to remain silent, only twenty minutes transpired before ATF S/A Julio Torres commenced his attempt to interview the Defendant, this in

violation of <u>Andrades</u> and <u>Mosely</u>, <u>infra</u>. That being the case, any statements made to ATF S/A Julio Torres by the Defendant should be suppressed.

**Wherefore**, for the reasons stated above, Defendant's statements which were made to PRDP agent Carlos Rodríguez-Negrón and ATF S/A Julio Torres should be suppressed and precluded from being used at the trial of the instant case.

**Respectfully submitted.**

In San Juan, Puerto Rico this 12th day of October, 2012.

**Certificate of Service:** I hereby certify that on this date, October 12th, 2012, the instant motion has been filed with the Clerk of the Court through the CM/ECF system which will send copy to **AUSA Julia Díaz-Rex and AUSA Ilianys Rivera-Miranda** and notification of filing to other all parties.

*/s/ José R Aguayo Caussade*
**José R Aguayo Caussade, Esq.**
USDC-PR # 123301
569 Tnte. Cesar González St.
Urbanización Baldrich
San Juan PR 00918-3712
Telephone (787) 765-0814
Facsimile (787) 274-0071
E-Mail: joseraguayo@gmail.com;
      jracaussade@aol.com
