IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>v.<br><br>**DAVID OQUENDO-RIVAS,**<br>Defendant. | Criminal No. 09-427 (JAF) |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS**

**TO THE HONORABLE COURT:**

    **COMES NOW**, the United States by and through the undersigned counsel respectfully states and prays as follows:

**I. INTRODUCTION**

1. On October 12, 2012, defendant David Oquendo-Rivas ("Oquendo-Rivas") filed a motion to suppress incriminating statements made by him to law enforcement officers on October 20, 2009. (Docket No. 562).

2. In his motion, defendant Oquendo-Rivas alleges that his incriminating statements regarding his illegal possession of firearms were illegally obtained by POPR Officer Carlos Rodríguez-Negrón ("Rodríguez-Negrón") inasmuch as he was already under custody and had not been furnished Miranda v. Arizona, 384 U.S. 436 (1966) warnings prior to interrogation.

3. Defendant Oquendo-Rivas also contests the legality of his spontaneous comments to POPR Officer Rodríguez-Negrón denying involvement in La Tombola Bar's massacre, but accepting responsibility for the possession of firearms, as fruit of the

poisonous tree.

4. Further, defendant alleges that his declination to provide a statement to PRPD Officer Rodriguez-Negrón was clear. Thus, according to defendant, ATF Special Agent Julio Torres' attempt to interrogate defendant twenty (20) minutes after his initial declination to provide a statement to Officer Rodríguez-Negrón, was a violation of his Constitutional rights.

5. Lastly, defendant claims that his written statement "I do not understand that my lawyer speaks" in the second admonishment of Constitutional rights form provided by SA Torres, was an unambiguous assertion of his Miranda rights.

6. The government submits that defendant Oquendo-Rivas' contentions are without merit and a rehash of allegations previously adjudicated against him in Crim. No. 09-355 before Hon. Judge Gustavo A. Gelpi, after a suppression hearing and trial where defendant had an opportunity to confront the same evidence and witnesses at issue in the instant case.

7. The government hereby respectfully requests from the Court to review Docket Entries No. 39-2, 175 & 176 (*de novo* bail hearing and trial transcripts containing the testimony of POPR Officer Rodríguez-Negrón), 176 & 177 (trial transcripts containing the testimony of SA Julio Torres), in Crim. No. 09-355 (GAG), as corroborating evidence of the government's affirmation that the issues raised in defendant's motion to suppress were already adjudicated by another federal Judge, in a criminal proceeding where defendant's Constitutional rights were exercised and properly preserved. The Court can also verify through said transcripts the substance

of defendant's allegations, which are patently meritless. Thus, the government respectfully requests that defendant's motion to suppress statements be summarily denied without the benefit of another suppression hearing that could only serve to further delay proceedings and promote the waste of judicial resources.

## II.     FACTUAL BACKGROUND[1]

8.   On the 20th of October, 2009, Puerto Rico Police Officers were conducting an investigation into a massacre perpetrated at La Tombola Bar on the 17th of October, 2009, in Toa Baja, Puerto Rico. (Exhibit 1, at 9-10; Exhibit 2, at 60-61).

9.   As part of the investigation, Puerto Rico Police Officers arrived in two (2) marked police vehicles in the area of "Sector 26," Toa Baja, Puerto Rico and observed, amongst other persons, defendant Oquendo-Rivas and Christian Ortiz-Rivera ("Ortiz-Rivera") standing in front of a residence on Road 867 (the "residence"). (Exhibit 1, at 9-14; Exhibit 2, at 65, 108-109). Defendant Oquendo-Rivas brandished (adjusted around his waist) a firearm and took a defensive stance when he noticed Officer Rodriguez exit his marked police vehicle. (Exhibit 1, at 16-17; Exhibit 2, at 67, 109).

---

[1] The following facts are derived from Criminal Case No. 09-355 (GAG): (1) the testimony of Puerto Rico Police Officer Carlos Rodriguez, given on November 1, 2009 at *De Novo* hearing **(Exhibit 1)**; (2) the testimony of Puerto Rico Police Officer Carlos Rodriguez, given on January 24, 2011 at Jury Trial **(Exhibit 2)**; (3) the testimony of Puerto Rico Police Officer Carlos Rodriguez, given on January 26, 2011 at Jury Trial and (4) the testimony of Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Julio E. Torres ("Special Agent Torres"), given on January 25, 2011 at Suppression Hearing **(Exhibit 3)**; and (5) the testimony of Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Julio E. Torres ("Special Agent Torres"), given on January 26, 2011 at Jury Trial **(Exhibit 4)**. A courtesy copy of Exhibits 1 through 4 will be provided to the Court on this date. The parties can access the Exhibits directly through the CM/ECF system.

10. Officer Rodriguez, while stepping out of the marked police vehicle, brandished his own firearm and yelled for Oquendo-Rivas and Ortiz-Rivera, along with others standing with them, to stop. He identified himself as a law enforcement officer.[2] (Exhibit 1, at 15-17; Exhibit 2, at 66-67).

11. In flagrant defiance of Officer Rodríguez' command, defendant Oquendo-Rivas and Ortiz-Rivera fled up a flight of stairs to the second story of the residence.[3] (Exhibits 1, at 17-19; Exhibit 2, at 68-70). Officer Rodríguez followed both individuals up the stairs and found them in separate rooms, attempting to discard and/or conceal the firearms and ammunition in their possession. (Exhibit 1, at 19-26; Exhibit 2, at 68-72).

12. Officer Rodriguez witnessed defendant Oquendo-Rivas throw a loaded firearm through the gap between the residence's zinc roof and a structural wall. (Exhibit 1, at 22-23, 60; Exhibit 2, at 70, 93-94; Exhibit 3, at 67). He also witnessed Ortiz-Rivera attempting to conceal two (2) loaded firearms and two (2) additional magazines inside a container full of clothes. (Exhibit 1, at 27).

13. After tossing the firearm, defendant Oquendo-Rivas walked towards Officer Rodriguez instead of going to the ground as instructed, and once he was close enough Officer Rodriguez put him on the ground. (Exhibit 2, at 71). Officer Rodríguez, also neutralized Ortiz-Rivera by putting him on the ground. At that point, Officer

---

[2] Officer Rodriguez was not dressed in uniform, but displayed his Police of Puerto Rico identification on the front of his shirt. (Exhibit 1, at 15-17; Exhibit 2, at 66-67; Exhibit 3, at 53).

[3] At least two (2) other individuals present were not apprehended. (Exhibit 1, at 14, 40, 42, 81).

Rodriguez asked both Oquendo-Riveas and Ortiz-Rivera if they had a license to possess and carry firearms. (Exhibit 1, at 30; Exhibit 2, at 73). They said "no". Thus, Officer Rodríguez placed both suspects under arrest by placing handcuffs on them, and advised them of their Constitutional rights. (Exhibit 1, at 30; Exhibit 2, at 73).

14. Defendant Oquendo-Rivas then spontaneously uttered "that they were clear, that the weapons that had been seized at that place were theirs, that they were clear in that, but that the weapons didn't have anything to do neither did they with the massacre that took place on October 17th." (Exhibit 1, at 30; See, also, Exhibit 2, at 80; Exhibit 3, at 78-79). Defendant did not request an attorney. (Exhibit 1, at 33; Exhibit 2, at 79).

15. Despite not having requested counsel, within approximately twenty (20) minutes of arresting both defendants, attorney Jorge L. Armenteros-Chervoni ("Armenteros-Chervoni") appeared on the scene and loudly stated that he represented defendants Oquendo-Rivas and Ortiz-Rivera and wanted to speak with them immediately. (Exhibit 1, at 32-34).

16. After being denied entrance into the crime scene, attorney Armenteros-Chervoni protested that defendants Oquendo-Rivas and Ortiz-Rivera had the right to speak with an attorney. (Exhibit 1, at 34). Puerto Rico Police Lt. Orlando Trinidad ("Lt. Trinidad") asked attorney Armenteros-Chervoni who he represented, at which point attorney Armenteros-Chervoni stated that he represented the two (2) individuals in the residence. (Exhibit 1, at 34).

17. When asked by Lt. Trinidad if he knew the names of the arrested individuals, attorney Armenteros-Chervoni could not provide their names. Attorney Armenteros-Chervoni was not permitted to access the crime scene. (Exhibit 1, at 34).

18. When defendant Oquendo-Rivas and Ortiz-Rivera were informed that an attorney had arrived, and asked if he represented them, they said that they had not contacted an attorney. (Exhibit 1, at 35). While under the custody of the police officers, the defendants did not try to contact an attorney. (Exhibit 1, at 33).

19. Officer Rodriguez took defendant and Ortiz-Rivera to the headquarters in Bayamon, where he gave them written Miranda warnings. (Exhibit 3, at 82-88). Defendant Oquendo-Rivas indicated in writting that he understood his rights and did not wish to provide a statement. (Exhibit 3, at 83). Officer Rodriguez immediately stopped the interview.

20. Approximately 20 to 30 minutes later, defendant Oquendo-Rivas was interviewed by ATF Special Agent Torres. (Exhibit 3, at 136, & 144). SA Torres gave the warnings form to Defendant for him to read (Exhibit 3, at 138). Defendant read the waiver form and wrote: "I do not understand that my lawyer speaks". (Exhibit 3, at 140). SA Torres then "asked defendant" ... "what part of the Miranda warning he didn't understood [sic]. Id. Defendant "explained to me that he was willing to speak with me without the presence of counsel, but he didn't want to speak about anything else regarding La Tombola massacre." SA Torres then asked defendant "whether he wanted an attorney present." (Exhibit 3, at 140-141). Defendant Oquendo-Rivas "never mentioned that he wanted an attorney. He just mentioned that he did not want

to speak about La Tombola.." Id. Defendant then provided incriminating statements regarding his illegal possession of a firearm and aiding and abetting Ortiz-Rivera in the possession of a firearm with an obliterated serial number.

21. As a result of the foregoing, on the 23rd of October, 2009, defendant Oquendo-Rivas was charged by Indictment with aiding and abetting Ortiz-Rivera in knowingly possessing a firearm with an obliterated serial number in violation of Title 18, United States Code, Sections 922(k) and 2. (Criminal Case No. 09-055 (GAG), Docket No. 9).

22. In the middle of the trial in said case, the Court held a suppression hearing to address the issue of (1) whether defendant's assertion that he would not provide a statement on the waiver form provided by Officer Rodriguez invalidated his subsequent interview, shortly thereafter, by SA Torres, and the issue of (2) voluntariness of the waiver of rights provided to SA Torres, in light of defendant's written statement "I do not understand that my lawyer speaks". (Exhibit 3, at 124-125).

23. The Court did not suppress any of defendant's statements. The Court found that defendant's rights were not violated by the federal agent's interview after defendant had expressed that he did not want to make any statements in the PRPD's waiver form: "It is clear that when a defendant says 'I don't want to speak,' that the interrogation should end. But that per se does not entitle him to an attorney because he has not required an attorney." The Court reasoned that under these circumstances, once the questioning ends, the government can nonetheless resume questioning at some other point as set forth in Michigan v. Mosley, 423 U.S. 96 (1975), and United

States v. Andrade, 135 F.3d 104 (1st Cir. 1998). (Exhibit 3, at 164-165).

24. Furthermore, the Court also found that the ambiguity of defendant's request for counsel reasonably allowed SA Torres to inquire about his intentions, and that led to a voluntary waiver of his rights where defendant's request not to speak about La Tombola was not violated. (Exhibit 3, at 165-167).

## III. DISCUSSION

**A. Defendant's temporary detention under Terry for questioning did not amount to custodial interrogation**

25. It is well settled, that "'[a] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' Such an investigatory stop requires only reasonable suspicion, based on 'specific and articulable facts', that viewed through the eyes of a prudent police officer, warrant the intrusion." United States v. Snyder, 134 F.3d 361, *1 (1st Cir. 1998) (unpublished) (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968) regarding the legality of an investigatory stop prior to an arrest). This approach requires from the courts to evaluate the context and totality of the circumstances, and recognizes the value of corroboration of an informant's tip through independent police work. Id.

26. The reasonable suspicion test has been described as an intermediate standard requiring more than unfounded speculation but less than probable cause. At a minimum, the officer must have a "particularized and objective basis for suspicion." Id. at 21. When determining the legitimacy of an investigative stop, a Court must

        undertake a contextual analysis using common sense and a degree of deference to the expertise that informs a law enforcement officer's judgments about suspicious behavior.  See United States v. Cook, 277 F. 3d 82, 85 (1st Cir. 2002) (quoting, United States v. Chhien, 266 F. 3d 1, 6 (1st Cir. 2001)).

27. Moreover, in Chhien, the First Circuit Court of Appeals rejected the idea that probable cause is needed for an officer to act upon "reasonable suspicion". 266 F.3d 1, 6.

> Reasonable suspicion, as the term implies, requires more than a naked hunch that a particular person may be engaged in some illicit activity. By the same token, however, reasonable suspicion does not require either probable cause or evidence of a direct connection linking the suspect to the suspect crime. Reasonable suspicion, then is an intermediate standard, and one that defies precise definition. Its existence must be determined case by case, and the determination entails broad-based consideration of all the attendant circumstances.

> (Internal citations omitted).

28. Chhien also recognizes that while the officers actions must bear some relation to the purpose of the original stop, the officer may shift focus and increase the scope of the investigation by degrees of suspicion during the course of the detention. Id. at 6.

29. As to the scope of an officer's inquiry during a Terry stop, Chhien specified that an officer is not prohibited from inquiring, upon reasonable suspicion, into the nature of an object that might appear to be, for example, a weapon, if the officer's questions are reasonable in scope and directly related to the suspicion at issue. Id. at 8-9.

30. When evaluating the reasonableness of the scope of an investigatory stop the totality of the circumstances should be carefully examined. United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011). "This means weighing, among other things, 'the length

of the detention, the restrictions placed on an individual's personal movement, the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion.' United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998). See, United States v. Teemer, 394 F.3d 59, 66 (1st Cir.2005) (even pre-arrest questioning at a police station is not automatically deemed custodial). An inquiring court must bear in mind that "'it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.'" United States v. Taylor, 162 F.3d 12, 18 (1st Cir. 1998) (quoting Terry, 392 U.S. at 23, 88 S.Ct. 1868).

31. In the instant case, PRPD Officer Rodríguez based on reasonable suspicion had the authority to perform a Terry stop to question the defendant as to the legal possession of a firearm. Defendant's action of brandishing a firearm, running into a residence, ignoring Officer Rodríguez' command to stop, and then discarding the weapon in his possession, gave the Officer reasonable suspicion that defendant was in the illegal possession of a weapon.[4] Based on the totality of the circumstances surrounding defendant's detention, the Officer had the required level of suspicion for a Terry stop. Furthermore, the Officer's question as to whether the defendant had a license to possess and carry a firearm was reasonable in scope and directly related to the agent's suspicion. At the time, there were a few police officers present at the scene

---

[4] Pursuant to Puerto Rico law, individuals are not permitted to carry a firearm without a valid license to do so. See, 25 L.P.R.A. § 458c. 25 L.P.R.A. § 458c states in part: "Any person who transports any firearm or any part thereof without having a weapons license, or carries any firearm without the corresponding permit to carry weapons, shall be guilty of a felony and upon conviction shall be punished with a penalty of imprisonment for a fixed term of ten (10) years."

(approximately four (4) in total)[5], the defendant was not handcuffed and he was asked only one question.

32. We must emphasized that the detention and level of intrusion was brief and narrow in scope. Once defendant answered that he did not have a license to possess and carry a firearm the defendant was immediately handcuffed and advised of his Constitutional rights. Thus, defendant's admission pertaining to his failure to have a license for the firearm occurred early in the period of detention. Pursuant to United States v. Parker, 549 F.3d 5, 9-10 (1st Cir. 2008) (quoting United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001), Miranda warnings are not required for "a brief period of detention" during which the police seek "by means of a moderate number of questions to determine [defendant's] identity and to obtain information confirming or dispelling their suspicions."

33. In light of the above, Officer Rodríguez' actions were reasonable and legal under Terry and other legal precedent cited herein, such that defendant's statement about not having a license to possess and carry firearms was not the product of custodial interrogation which would have required the admonishment of Constitutional rights.

**B. Defendant's spontaneous post arrest statements are not the product of interrogation and, thus, not subject to suppression**

34. The Fifth Amendment protects an individual's right to be free from compelled self-incrimination. Thus, the government may use at trial only those confessions that are voluntarily made. Malloy v. Hogan, 378 U.S. 1 (1964). The introduction into

---

[5] (Exhibit 1, at 60-64).

evidence of an involuntary confession requires reversal of any subsequent conviction. Mincey v. Arizona, 437 U.S. 385, 398 (1978). While the ultimate test of admissibility of a confession is its voluntariness, there are many factors and circumstances that interact in enabling a court to reach that determination. The test is the totality of the circumstances. Arizona v. Fulminante, 496 U.S. 903 (1991). It is the government's burden to prove the voluntariness of a confession at least by a preponderance of the evidence. Missouri v. Seibert, 542 U.S. 600 (2004); and United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000). "A waiver is voluntary when 'it [is] the product of a free and deliberate choice rather than intimidation, coercion, or deception." United States v. Bezanson-Perkins, 390 F.3d 34 (1st Cir. 2004) (quoting Moran v. Burbine, 475 U.S. 412, 421, (1986)). "A waiver is knowing and intelligent when 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Id. Both inquiries require that the court look at the totality of the circumstances surrounding the interrogation. Id. The First Circuit will uphold "the district court's denial of the motion to suppress if it is supported by any reasonable view of the evidence." United States v. Burns, 15 F.3d 211, 216 (1st Cir. 1994). Some of the factors to be considered include the type and length of the interrogation, the defendant's past criminal experience, and the defendant's physical and mental capabilities. United States v. Barone, 968 F.2d 1378, 1384 (1st Cir. 1992); United States v. Browne, 891 F.2d 389, 393 (1st Cir. 1989).

35. In the instant case, defendant Oquendo-Rivas volunteered statements shortly after being arrested and verbally advised of his Constitutional rights by Officer Rodríguez-

Negrón. Defendant admitted to owning the firearm that he had thrown from the residence and stated that neither them or the weapons seized had anything to do with La Tombola's massacre.

36. **Volunteered statements are not the product of interrogation and are not subject to suppression, even if warnings have not been provided**. United States v. Jackson, 544 F.3d 351, 357 (1st Cir. 2008). See, Miranda, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.")

37. "Miranda has never been held to apply to statements voluntarily made by defendants." United States v. Edwards, 885 F.2d 377, 387 (7th Cir. 1989). Spontaneously volunteered information, either before or after being given the Miranda warnings, need not be suppressed. Id. See, Oregon v. Elstad, 470 U.S. 298, 305 (1985); Rhode Island v. Innis, 446 U.S. 291, 301-03 (1980); Miranda, 384 U.S. at 478.

38. Consequently, defendant's spontaneous statements to Officer Rodríguez as set forth herein are admissible against defendant at trial.[6]

---

[6]

The government also notes that the consequences of a Miranda violation, however, are limited. For instance, the Miranda rule is not subject to the "fruits of the poisonous tree" doctrine. This doctrine requires the exclusion "not only [of] illegally obtained evidence itself, but also ... other incriminating evidence derived from the primary evidence." Nix v. Williams, 467 U.S. 431, 441 (1984). See, United States v. Patane, 542 U.S. 630, 642 (2004) (plurality opinion); see also Elstad, 470 U.S. at 307. ("[T]he Miranda presumption ... does not require that the [unwarned] statements and their fruits be discarded as inherently tainted."). Contrary to defendant Oquendo-Rivas' assertions, "[a]n earlier 'simple failure to administer the [ Miranda] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will [does not] so taint[ ] the [later] investigatory process that a subsequent voluntary and informed waiver is

**C. Defendant's alleged assertion of right to an attorney was ambiguous, and did not taint his final waiver of rights to SA Torres**

39. Defendant asserts that upon Officer Rodríguez-Negróm furnishing him with the written waiver form, the defendant indicated that he understood his rights and did not wish to provide a statement. There is no issue as to this point. The Government agrees the defendant (merely) invoked his right to remain silent with Officer Rodríguez-Negróm.

40. Defendant then claims that his subsequent interrogation by FBI SA Torres, about 20 to 30 minutes, after his declination to provide a statement to Officer Rodríguez-Negrón, was a violation of his Constitutional rights. We disagree.

41. When only the right to remain silent is invoked, as in the present case, there is no requirement that questioning cease until an attorney is present. (Exhibit 3, at 164). See Michigan v. Mosley, 423 U.S. 96, 102, 104 n. 10 (1975) (there is no *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.) See also Edwards v. Arizona, 451 U.S. 477, 485 (1981). Rather, **questioning may properly be resumed** by the government at a later time. United States v. Andrade, 135 F.3d 104 (1st Cir. 1998); Michigan v. Mosley, 423 U.S. at 105-107.

42. In the instant case, SA Torres furnished defendant with a waiver of rights form for

---

ineffective for some indeterminate period.'" Jackson, 544 F.3d at 360, quoting, Elstad, 470 U.S. at 309 . Thus, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id.; see also United States v. Byram, 145 F.3d 405, 409 (1st Cir. 1998).

his reading. Defendant wrote in the <u>Miranda</u> waiver form: "I do not understand that my lawyer speaks" ("No entiendo eso mi abogado habla"). Defendant alleges that this remark constituted an unambiguous request for an attorney and SA Torres should have ceased all further interrogation at that point.

43. Defendant is incorrect on both points. Defendant's statement was not an unequivocal invocation of defendant's right to an attorney nor was the Government required to cease all further interrogation. Defendant's assertion was equivocal, ambiguous and warranted further inquiry from SA Torres as to what exactly did defendant not understand. In this case, after asking defendant what was it that he did not understand, defendant clarified that he was willing to talk to the Agent without an attorney, but defendant did not wish to talk about La Tombola. Defendant then underlined the portion of the waiver form indicating he wished to answer questions without an attorney, and signed the waiver form. Thereafter, defendant was interviewed only about his illegal possession of firearms. Defendant's request not to talk about La Tombola was honored by the Agent.

44. To be sure, after an accused has invoked his Fifth Amendment right to counsel, <u>Edwards v. Arizona</u> does, indeed, set forth restrictions on police-initiated contact with him. Specifically, <u>Edwards</u> provides that once "an accused ... ha[s] expressed his desire to deal with the police *only through counsel*" he should "not [be] subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversation with the police." <u>Edwards</u>, 451 U.S. at 484-85 (emphasis provided); and

15

see, Michigan v. Mosley, 423 U.S. 96, 104 n.10 (1975); Patterson v. Illinois, 487 U.S. at 291. Of its earlier decision in Edwards, the Supreme Court later observed: "Preserving the integrity of an accused's choice to communicate with the police *only through counsel* is the essence of *Edwards* and its progeny...." Patterson, 487 U.S. at 291 (emphasis provided.)

45. In Davis v. United States, 512 U.S. 452 (1994), the Supreme Court held that "after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect *clearly* requests an attorney." Id. at 461 (emphasis provided.) However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect **might** be invoking the right to counsel, our precedents do not require the cessation of questioning." Davis, 512 U.S. at 459. (emphasis added). "Invocation of the Miranda right to counsel requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Id. (internal citations omitted). See, also, United States v. Teleguz, 492 F.3d 80, 88 (1st Cir. 2007); James v. Marshall, 322 F.3d 103, 108 (1st Cir. 2003). "The test is an objective one: whether the suspect has 'articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" Obershaw v. Lanman, 453 F.3d 56, 64 (1st Cir.2006) (quoting Davis, id at 459.)

46. Thus, to be valid, a defendant's invocation of his Fifth Amendment right to counsel

16

must be clear and unambiguous. In <u>United States v. Brown</u>, 287 F.3d 965 (10th Cir. 2002), a defendant who was presented with a *Miranda* waiver form indicated *both* that he would answer questions without an attorney present *and* that he wished to speak with an attorney. Under such circumstances, the Tenth Circuit held the defendant had not clearly invoked his right to counsel. <u>Id</u>. at 972-73. In <u>United States v. Davis</u>, <u>supra</u>, a defendant who was being interrogated stated: "Maybe I should talk to a lawyer." The Supreme Court held this statement by the defendant was neither a clear nor an unambiguous request for an attorney. <u>Id</u>. at 458-59. Similarly, an invocation was not found, when a defendant requested to make a call about possible representation, *see* <u>Flamer v. Delaware</u>, 68 F.3d 710, 725 (3d Cir. 1995), nor when the defendant said, "So if I requested a lawyer, there would be one that would come right now?" <u>See</u>, <u>United States v. Bezanson-Perkins</u>, 390 F.3d 34, 36, 40 (1st Cir. 2004); and <u>see</u>, <u>Connecticut v. Barrett</u>, 479 U.S. 523, 529–30 & n. 3 (1987) (holding defendant's agreement to answer oral questions, but not to give any written statement without counsel present, was not an unequivocal invocation of defendant's right to counsel).

47. Based on the above cited legal precedent, the Agent's inquiry to clarify defendant's ambiguous request for an attorney was reasonable – indeed generous – and was well within legal boundaries. Prior to proceeding with the interview, the Agent directly asked defendant whether he wanted an attorney, but defendant never asked for an attorney.

48. Because defendant did not unequivocally invoke his right to counsel, his Motion to Suppress is without merit and should be denied.

49. Additionally, we note it is similarly well-settled that a suspect's *limited* invocation of his Fifth Amendment right to counsel does not lead to the suppression of the defendant's subsequent confession, provided the police honored the limitation(s) set forth by the suspect. Thus, in Connecticut v. Barrett, 479 U.S. 523 (1987), the Supreme Court held that a suspect's statement that he wanted to speak with an attorney before he would be willing to make any *written* statement did not preclude further *oral* questioning of the defendant by the police, nor of the later introduction at trial of his oral confession. Id. at 529. Similarly, a defendant's statement that he would not take a polygraph examination without consulting with an attorney did not prevent the further *non-polygraph* interrogation of the defendant, which statements were properly admissible at trial. See, Lewis v. Miller, 220 F.3d 485, 489-90 (7th Cir. 2000); United States v. Jacobs, 97 F.3d 275, 280 (8th Cir. 1996) (same). Likewise, the fact that a defendant stated that he wanted to consult with an attorney before he would sign a written waiver allowing an X-ray did not preclude the police from questioning him further about non-X-ray matters. See United States v. Oba, 978 F.2d 1123, 1130 (9th Cir. 1992); see also, United States v. Eaton, 890 F.2d 511, 514 (1st Cir 1989) (quoting Barrett, 479 U.S. at 529-30 (finding defendant's agreement to give oral, but not written, statements was unequivocal waiver of right to counsel during oral interrogation)); Bruni v. Lewis, 847 F.2d 561, 563–64 (9th Cir. 1988) (defendant waived right to counsel during interrogation when, even though defendant had just asked for an attorney, he then said "[w]ell, ask your questions and I will answer those I see fit."); United States v. Thierman, 678 F.2d 1331, 1335 (9th Cir.1982) (defendant waived rights when he told police they could ask questions and

he would respond to those he wanted to answer).

50. At a minimum, in his questioning of the defendant, Agent Torres honored defendant's request not to speak specifically about the La Tombola shootings. Because Agent Torres honored the limitation placed on the interview by the defendant, the interview was perfectly proper and the statements made by the defendant in the course of that interview are admissible at trial. For this reason, as well, defendant's Motion is without merit and should be denied.

51. In light of the above, both defendant Oquendo-Rivas' non-custodial and custodial statements are admissible against him at trial. As such, the government requests from the Honorable Court to DENY defendant's motion to suppress statements.

**WHEREFORE**, the United States respectfully requests that this Honorable Court summarily DENIES defendant's motion to suppress statements without any further consideration of this matter.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 26th of October, 2012.

ROSA EMILIA RODRIGUEZ-VELEZ
United States Attorney

s/Ilianys Rivera-Miranda
Ilianys Rivera-Miranda - 223006
Assistant U. S. Attorney
Criminal Division
Torre Chardón, Suite 1201
350 Carlos Chardón Street
Hato Rey, Puerto Rico  00918
Tel. (787) 766-5656
Fax (787) 771-4050
Email: ilianys.rivera@usdoj.gov

## **CERTIFICATION**

I HEREBY CERTIFY that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all a parties in this case. A courtesy copy of Exhibits 1 through 4 will be provided to the Court on this date to be filed as they are too large to scan and include as PDF attachment.

<pre>
                                    s/Ilianys Rivera-Miranda
                                    Ilianys Rivera-Miranda
                                    Assistant United States Attorney
</pre>