1  UNITED STATES DISTRICT COURT
2  DISTRICT OF PUERTO RICO

3  UNITED STATES OF AMERICA,

4      Plaintiff,                                    Criminal No. 09-427 (JAF)

5      v.

6  DAVID OQUENDO-RIVAS (05),

7      Defendant.

8

9  **O R D E R**

10      Before the court is a "Motion to Suppress Defendant's Statements" filed by

11  Defendant David Oquendo-Rivas ("Oquendo-Rivas" or "Defendant").  (Docket No. 562.)

12  In his motion, Defendant seeks to suppress statements he made to law enforcement

13  authorities on October 20, 2009.  (Docket No. 562.)  The government opposes.  (Docket

14  No. 601.)  On December 3, 2012, we held a hearing on the matter.  (Docket No. 677.) At the

15  hearing, Investigating Officer Carlos Rodríguez-Negrón ("Officer Rodríguez") of the Puerto

16  Rico Police Department and Special Agent Julio Enríquez-Torres ("Agent Torres") of the

17  Bureau for Alcohol, Tobacco and Firearms both testified on direct and cross-examination.

18  (Id.)  A full transcript of our hearing is available at Docket No. 678.  For the following

19  reasons, Defendant's motion will be denied.

20      In his briefing papers and at our hearing on the matter, Defendant seeks to suppress

21  the statements he made to Officer Rodríguez and to Agent Torres.  We deal with each set of

22  statements separately.

23      First, Defendant argues for suppression of the statements he gave to Officer

24  Rodríguez.  He argues that a statement he gave regarding a gun license should be suppressed

Criminal No. 09-427 (JAF)                                                                          -2-

1    because of the officer's alleged failure to advise him of his rights under <u>Miranda v. Arizona</u>,

2    384 U.S. 436, 444 (1966).   (Docket No. 562 at 7.)   Defendant next argues that each

3    statement after that should be suppressed as the product of an illegal arrest.   (<u>Id.</u>)   Finally,

4    Defendant argues that his post-<u>Miranda</u> statements to Officer Rodríguez should be

5    suppressed, because Defendant did not make a "knowing and intelligent" waiver of his

6    <u>Miranda</u> rights.   For the reasons explained below, we reject each of these arguments.

7          With respect to his statements to Agent Torres, Defendant argues these statements

8    should be suppressed because the government did not honor his expressed invocations of the

9    right to remain silent and to speak with an attorney.   For the reasons that follow, we reject

10   each of these arguments as well.

11                                                   **I.**

12                                                <u>**Facts**</u>

13         We have reconstructed the following factual account based largely on the

14   uncontradicted testimony of Officer Rodríguez and Agent Torres.   We begin by noting our

15   favorable credibility assessments of both agents.   Throughout their testimony, both agents

16   exhibited a calm, composed, and professional demeanor.   Their accounts of the relevant

17   events flowed naturally and appeared straightforward and honest.   Both agents have several

18   years of experience and professional training, which were on display in our courtroom.

19         Following an October 17 multi-victim shooting at La Tómbola Bar in Toa Baja, the

20   Puerto Rico Police Department ("PRPD") opened an investigation.   They received

21   information that three or four individuals involved in the La Tómbola shooting were hiding

22   in a nearby neighborhood known as Sector 26.

Criminal No. 09-427 (JAF)                                                                    -3-

1    Shortly after 2:00 P.M., the Puerto Rico Police Department dispatched members of

2    their Bayamón Strike Team, a joint PRPD-Federal task force, to conduct interviews in the

3    neighborhood and to perform a preliminary investigation.  Six members of the strike team,

4    including Officer Rodríguez, deployed to the area in two marked police vehicles.

5    Upon arriving in Sector 26, officers observed four or five individuals standing

6    outside a residence along Road 867.  Two of the individuals were Defendant and Christian

7    Ortiz-Rivera ("Ortiz-Rivera").  As Officer Rodríguez exited his vehicle, he observed

8    Defendant remove a firearm from underneath his shirt and brandish it to his side.  Officer

9    Rodríguez removed his own firearm, identified himself as a law enforcement officer, and

10   ordered the entire group to stop moving.

11   Defendant and Ortiz-Rivera turned and fled up a flight of stairs to the second story of

12   the residence.  Officer Rodríguez pursued them.  He found the pair in a small area separated

13   into two rooms by a makeshift partition: Defendant was to the left of the partition and Ortiz-

14   Rivera was to the right.

15   Officer Rodríguez witnessed Defendant throw a firearm through a gap between the

16   residence's zinc roof and a structural wall.  He also witnessed Ortiz-Rivera attempt to

17   conceal two loaded firearms and two magazines of ammunition in a clothes hamper.

18   Officer Rodríguez demanded that Defendant and Ortiz-Rivera drop their weapons

19   and get on the ground.  Defendant ignored the instructions and walked towards Officer

20   Rodríguez.  With his firearm in one hand, Officer Rodríguez subdued Defendant and placed

21   him on the ground.  At this time, Officer Roberto Cruz ("Officer Cruz") joined Officer

Criminal No. 09-427 (JAF)                                                         -4-

1    Rodríguez and assisted him in subduing Defendant.  Officer Rodríguez then turned to Ortiz-

2    Rivera and laid him down on the ground.  The officers handcuffed Defendant and Ortiz-

3    Rivera and moved them to a small sofa at the rear of the room.  This all happened in a

4    matter of seconds.  Officer Rodríguez asked both men if they possessed a license to carry

5    the firearms.  Defendant and Ortiz-Rivera said they did not.  Officer Rodríguez then placed

6    both men under arrest and advised them of their constitutional rights.

7         Upon finishing the recitation of the <u>Miranda</u> warnings, both Defendant and Ortiz-

8    Rivera, without prompting, said they understood the warnings and they told officers the

9    weapons belonged to them, but that neither they nor the weapons had anything to do with

10   the shooting at the La Tómbola bar.  In the original Spanish, the declaration was, "Estamos

11   claros, las armas son de nosotros pero no tenemos nada que ver con la Tómbola."

12        While waiting for technical services to complete a survey of the residence, Officer

13   Rodríguez retrieved two firearms—one with an obliterated serial number—and two

14   ammunition clips from the clothes hamper upstairs in the residence.  Officer Rodríguez also

15   collected a firearm from a paved driveway alongside the residence—the same weapon

16   Defendant had thrown between the zinc roof and a structural wall.

17        Approximately forty minutes after officers arrested Defendant and Ortiz-Rivera,

18   attorney Jorge L. Armenteros-Chervoni ("Armenteros") appeared at the residence.  At that

19   time neither Defendant nor Ortiz-Rivera had requested counsel.  Because he was unable to

20   identify the names of either of the two men he said he represented, the officers denied

21   Armenteros entrance to the scene.

Criminal No. 09-427 (JAF)                                                    -5-

1    Officers informed Defendant and Ortiz-Rivera that an attorney had arrived at the

2  residence and asked whether this attorney represented them.  They both said that they had

3  not contacted an attorney.  While they were in the custody of PRPD at the residence, neither

4  Defendant not Ortiz-Rivera asked to contact an attorney.[1]

5    ATF Special Agent Julio Enríquez-Torres ("Agent Torres") arrived at the

6  residence. Officer Rodríguez gave a general overview of what had occurred at the

7  residence, including the names of Defendant and Ortiz-Rivera and descriptions of the

8  firearms and ammunition that he had collected at the residence.  Officer Rodríguez

9  instructed Special Agent Torres to meet him at the Bayamón Headquarters.

10    Officer Rodríguez maintained custody of Defendant and Ortiz-Rivera, taking them to

11  headquarters in Bayamón approximately two hours after their initial detention. Upon

12  arriving at the headquarters, Officer Rodríguez gave both Defendant and Ortiz-Rivera

13  written Miranda warnings translated into Spanish. Defendant indicated on his document

14  that he did not wish to speak.  He signed the form at 4:50 in the afternoon. After receiving

15  the signed form from Defendant, Officer Rodríguez did not ask Defendant any questions.

16    Around this time Agent Torres ("Agent Torres") arrived at the Bayamón

17  headquarters.  Officer Rodríguez left defendant in a detention room and went to speak with

18  Agent Torres. Officer Rodríguez and Agent Torres spoke briefly about whether Defendant

19  and Ortiz-Rivera should be charged under state or Federal laws.

---

[1] We are troubled by the sudden appearance of this attorney at the scene of the arrest at Sector 26.  The circumstances are quite suspicious.  The arrestees did not have a professional relationship with the attorney and the attorney had no idea who the arrestees were.

Criminal No. 09-427 (JAF)                                                                                                    -6-

1    Following this conversation, Agent Torres arranged to speak with Defendant and

2    Ortiz-Rivera. Agent Torres spoke with Defendant first.  He introduced himself to Defendant

3    as an ATF special agent working for the federal government.  Agent Torres gave Defendant

4    a copy of ATF Form 3200, an advisement of rights and waivers.[2]  The document contains

5    <u>Miranda</u> warnings.  Defendant read the document and made a notation: "No entiendo eso.

6    Mi abogado habla."   This is translated as: "I don't understand that. My lawyer

7    speaks."  Agent Torres then asked Defendant what part of the waiver he didn't understand.

8    Defendant responded that he wanted to speak about the events of that day, but not about La

9    Tómbola.

10    Agent Torres then asked Defendant to circle the part of the form indicating his

11    willingness to speak without the presence of the lawyer.  With Agent Torres and a witness

12    present, Defendant did circle that portion of the waiver and then signed the document.

13    Agent Torres then signed the document and continued with the interview.

14    Defendant then proceeded to tell Special Agent Torres that the 45 pistol found

15    outside the residence belonged to him.  Defendant told Agent Torres that he had paid $3,100

16    for the pistol and that it was loaded with ten rounds of ammunition. Defendant also told

17    Agent Torres that Ortiz-Rivera had been in possession of two firearms.   Agent Torres asked

18    Defendant if he knew that one of the firearms in Ortiz-Rivera's possession had an

19    obliterated serial number and Defendant said he did.

---

[2] A copy of this document, in its original Spanish, was admitted into evidence as Government's Exhibit 10.

Criminal No. 09-427 (JAF)                                                                    -7-

1    Agent Torres' interview of Defendant lasted approximately ten to fifteen minutes.

2    After speaking with Defendant, Special Agent Torres asked to speak with Ortiz-Rivera.

3    Agent Torres conducted an interview with Ortiz-Rivera several hours later, sometime

4    around 6:30 in the evening.  When he finished speaking with Ortiz-Rivera, Agent Torres

5    spoke with Assistant United States Attorney Warren Vázquez, who instructed Agent Torres

6    to take custody of Defendant and Ortiz-Rivera.

7                                                    **II.**

8                                               **Analysis**

9    **A.      Statements to Agent Rodríguez**

10    Defendant argues that the statements he gave to Agent Rodríguez should be

11    suppressed because the officer failed to notify him of his Miranda rights.  (Docket No. 562

12    at 6-7.)  The government responds that all of Defendant's statements are admissible because

13    Defendant spoke during a lawful Terry-type intervention, during which the Constitution

14    does not require an officer to give a Miranda warning.  (Docket No. 601 at 10-11.)  We

15    agree with the government.

16    "Miranda warnings must be given before a suspect is subjected to custodial

17    interrogation." United States v. Trueber, 238 F.3d 79, 90 (1st Cir. 2001) (quoting United

18    States v. Ventura, 85 F.3d 708, 710 (1st Cir.1996)). A Terry-type intervention, however, is

19    not a custodial interrogation.  Under Terry v. Ohio, an officer may "stop and briefly detain a

20    person for investigative purposes," and "diligently pursue a means of investigation . . . likely

21    to confirm or dispel their suspicions quickly." Trueber, 238 F.3d at 92, quoting United

22    States v. Sokolow, 490 U.S. 1, 7 (1989). "As a general rule, Terry [interventions] do not

1    implicate the requirements of Miranda because 'Terry [interventions], though inherently

2    somewhat coercive, do not usually involve the type of police dominated or compelling

3    atmosphere which necessitates Miranda warnings.'" Trueber, 238 F.3d at 90 (internal

4    citations omitted).   Miranda warnings are required, however, if a Terry intervention

5    "escalate[s] into a formal arrest." United States v. Nishnianidze, 342 F.3d 6, 8 (1st Cir.

6    2003).

7          Here, there is no dispute that Officer Rodríguez initially detained Defendant in a

8    valid Terry-type intervention after Defendant fled with a firearm.  See Terry v. Ohio, 392

9    U.S. at 22 (courts should ask first whether an officer's actions were justified at their

10   inception).  The question concerns what happened next:  Whether Defendant's encounter

11   with Officer Rodríguez had become a formal arrest by the time Officer Rodríguez

12   questioned Defendant about his gun license.  If so, the Constitution requires Miranda

13   warnings, which the Defendant did not receive.  If not, Officer Rodríguez's question was

14   constitutionally permissible as part of an investigative Terry-type intervention.

15         To determine whether Defendant was in formal custody at the time of the relevant

16   questioning, we ask "how a reasonable man in the suspect's position would have understood

17   his situation" based on "all of the circumstances surrounding the interrogation." United

18   States v. Nishnianidze, 342 F.3d 6, 8 (1st Cir. 2003) (quoting Stansbury v. California, 511

19   U.S. 318, 322 (1994)).   We consider several factors, including "whether the suspect was

20   questioned in familiar or at least neutral surroundings, the number of law enforcement

21   officers present at the scene, the degree of physical restraint placed upon the suspect, and

22   the duration and character of the interrogation."   Id. (quoting United States v. Masse, 816

23   F.2d 805, 809 (1st Cir.1987)).

1    Applying those factors to the testimony before this court, we conclude that Officer

2  Rodríguez's gun-license question did not constitute a custodial interrogation requiring him

3  to give Defendant <u>Miranda</u> warnings.  Officer Rodríguez asked the gun-license question

4  while Defendant was in a familiar setting:  A residence into which he had voluntarily run.

5  <u>See</u> <u>id</u> (not a formal arrest where agents questioned defendant in a familiar location).  Only

6  two officers were present, a number equal to the number of suspects being detained and

7  hardly an overwhelming display of force.  <u>See</u> <u>id</u> (not a formal arrest where three agents

8  interviewed a single individual).  Although Defendant wore handcuffs, that fact is not

9  inconsistent with a <u>Terry</u>-type intervention, particularly as here, where officers justifiably

10 used handcuffs to ensure their safety while investigating suspects known to be armed.  <u>See</u>

11 <u>United States v. Rabbia</u>, 699 F.3d 85 (1st Cir. 2012).  And certainly, the duration and

12 character of the interrogation does not indicate a formal arrest:  Officer Rodríguez asked a

13 single question, which took no more than a few seconds to both ask and answer.  <u>See</u> <u>United</u>

14 <u>States v. McCarthy</u>, 77 F.3d 522, 531 (1st Cir. 1996) (seventy-five minute detention in

15 police vehicle was not a de-facto arrest).

16    Defendant's counterarguments are to no avail.  Defendant claims that he must have

17 been under arrest when questioned because, later at the suppression hearing, Officer

18 Rodríguez himself said that he had "arrested" Defendant at that point.  But that is irrelevant:

19 "The subjective intent of the agents . . . has no bearing on determining whether police

20 conduct transformed an investigative stop into a de facto arrest."  <u>Trueber</u>, 238 F.3d at 92

21 (citing <u>Berkemer</u>, 468 U.S. at 442 (1985).

22    Defendant also claims that the presence of a weapon and the use of handcuffs

23 indicate that he was formally under arrest when questioned.  But although these coercive

1   tactics may be suggestive of custody, see United States v. McCarty, 475 F.3d 49, 55 (1st

2   Cir. 2007) (defendant was in custody because he was in handcuffs), they are not dispositive

3   standing alone.  United States v. Verdugo, 617 F.3d 565, 570 (1st Cir. 2010) ("neither the

4   use of handcuffs nor the drawing of a weapon necessarily transforms a valid Terry

5   [intervention] into a de facto arrest") (quoting United States v. Fornia-Castillo, 612 F.3d 24,

6   32 (1st Cir. 2005)).  Here, we find that there were clear threats to the officer's safety that

7   compelled his decision to draw his weapon and use handcuffs.  Officer Rodríguez was

8   outnumbered, in unfamiliar territory, in the presence of two armed suspects.  Under these

9   circumstances, it was a perfectly reasonable decision to raise his weapon, and then restrain

10  both defendants in handcuffs.  See Fornia-Castillo, 612 F.3d at 32 (noting the "reasonable

11  safety concerns" that drove police officer's decisions to use handcuffs and weapons).

12  Moreover, the conduct of the agents was not "bellicose" or "confrontational;" to the

13  contrary, the officer described repeatedly that that he avoided using any excessive force or

14  shows of authority.  Id.  For example, the officer stated that he subdued Defendant without

15  landing any blows, and that he kept his gun at a 45-degree angle when he was attempting to

16  subdue Ortiz-Rivera.

17       Therefore, we conclude that the pre-Miranda statement regarding the gun license

18  occurred during a permissible Terry-type intervention.  The case law is clear that "Miranda

19  warnings are not required for 'a brief period of detention' during which the police seek 'by

20  means of a moderate number of questions to determine a suspect's identity and to obtain

21  information confirming or dispelling their suspicions.'"  Parker, (quoting Trueber, 238 F.3d

22  at 93).  As in Parker, we find that Defendant's admission that he lacked a license for the gun

1  "occurred early in the period of detention and, under the Terry line of cases, it was not the

2  result of a 'custodial line of interrogation of the kind requiring Miranda protection.'"  Id.

3        Next, we turn to the Defendant's spontaneous declaration ("Estamos claros, las armas

4  son de nosotros pero no tenemos nada que ver con la Tómbola."),[3] which occurred after

5  Officer Rodríguez read Defendant his Miranda rights.  Defendant argues there are two

6  reasons why this statement should be suppressed.  Neither argument is persuasive.

7        First, Defendant argues that this statement ("Estamos claros . . . ") should be

8  suppressed because it was obtained pursuant to an illegal arrest triggered by Defendant's

9  answer to the impermissible gun-license question.  We have already explained, though, that

10  the gun-license question was permissible under Terry, and could not have rendered

11  Defendant's arrest illegal.  Even if the gun-license question were impermissible and thus not

12  grounds for arresting Defendant, Officer Rodríguez had probable cause to arrest Defendant

13  for having fled while brandishing a firearm, which he later attempted to dispose.

14        Next, Defendant argues that Officer Rodríguez's account of Defendant's spontaneous

15  statement is not credible.  In the words of defense counsel, it "quite frankly stretches

16  credibility" to think that Oquendo-Rivas would blurt this statement out after being read his

17  rights.  (Docket No. 562 at 8.)  As we explained during the hearing, we disagree with

18  defense counsel's interpretation.  We think that such a statement could easily be seen as

19  revealing a guilty conscience and an intense desire to dissuade police at the outset from

20  linking an individual to an ongoing investigation.  Officer Rodríguez's account is plausible,

21  and as we stated earlier, we have no reason to doubt the veracity of Officer Rodríguez's

22  statements, including his recounting of this spontaneous declaration.

---

[3] "We are clear, the weapons are ours, but we have nothing to do with la Tómbola."  (Translation ours.)  In colloquial, informal Spanish, "estamos claros" is the equivalent of saying "Ok, Ok, understood."

Criminal No. 09-427 (JAF)                                                    -12-

1    Defendant separately argues that his post-<u>Miranda</u> statements to Officer Rodríguez

2    should be suppressed, because Officer Rodríguez failed to inquire whether Defendant

3    understood his rights.   (Docket No. 562 at 9.)   Defendant has made very little legal

4    argument in support of this theory, placing it in danger of waiver.   <u>See</u> <u>United States v.</u>

5    <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) (arguments not developed are waived).

6    Nevertheless, we will construe Oquendo-Rivas' argument as alleging that his waiver of his

7    <u>Miranda</u> rights was not "knowing and voluntary."   <u>See</u> <u>United States v. Mejia</u>, 600 F.3d 12,

8    16 (1st Cir. 2010) ("any waiver of the <u>Miranda</u> rights to silence and access to an attorney

9    must be both knowing and voluntary") (citing <u>United States v. Rojas-Tapia</u>, 446 F.3d 1, 4

10   (1st Cir. 2006)).

11   The case law is clear that "while courts must presume that a defendant did not waive

12   his <u>Miranda</u> rights absent an express waiver, 'that does not mean that the defendant's

13   silence, coupled with an understanding of his rights and a course of conduct indicating

14   waiver, may never support a conclusion that a defendant has waived his rights.'" <u>Id.</u>

15   (quoting <u>United States v. Butler</u>, 441 U.S. 369, 373 (1979)).   Thus, an implied waiver can be

16   "inferred from the actions and words of the person interrogated." <u>Id.</u> (quoting Butler, 441

17   U.S. at 373).   To make such a finding, "we must examine the 'totality of the circumstances

18   surrounding the interrogation' to determine whether the defendant made both an 'uncoerced

19   choice' and had the 'requisite level of comprehension' such that a court may properly

20   conclude that the defendant waived his <u>Miranda</u> rights." <u>Id.</u> (quoting <u>Moran v. Burbine</u>, 475

21   U.S. 412, 421 (1986)).

22   Here, based on the totality of the circumstances, we conclude that Defendant waived

23   his <u>Miranda</u> rights when he spontaneously spoke to Officer Rodríguez after being read his

Criminal No. 09-427 (JAF)                                                          -13-

1   rights.  Defendant's statement ("We are clear.  The guns are ours but we had nothing to do

2   with la Tómbola.")   sufficiently indicates that Defendant understood his rights and was

3   waiving them.  Defense counsel argues that Oquendo-Rivas' statement that "We are clear"

4   relates to the clause that follows, rather than to his understanding of his <u>Miranda</u> rights.

5   But, defense counsel has provided no developed argument about why this interpretation is

6   more correct than Officer Rodríguez's interpretation.   Based on the testimony we heard

7   from Officer Rodríguez, and based on this court's own understanding of common usage, we

8   believe that Officer Rodríguez's interpretation was sound: Defendant's declaration that he

9   was "clear" indicated he understood his rights.  Nor is there any indication, based on the

10  circumstances here, of any coercion or lack of understanding.  Officer Rodríguez's actions

11  and his handling of the Defendants were free of any untoward pressure or deception.  His

12  explication of the <u>Miranda</u> rights was straightforward, in Defendant's native language, and

13  we can infer from his description that the Defendant waived his rights by speaking

14  spontaneously to Officer Rodríguez.

15  **B.    <u>Statements to Agent Torres</u>**

16         Defendant's final argument is that he had successfully invoked his rights to counsel,

17  and that Officer Rodríguez and Agent Torres violated that right when they continued to

18  interrogate him.  In support of his argument, Defendant cites <u>Michigan v. Mosley</u>, 423 U.S.

19  96 (1975), and <u>United States v. Andrade</u>, 135 F.3d 104 (1st Cir. 1998).  Neither argument

20  prevails.

21         In <u>Mosley</u>, the Supreme Court held that the admissibility of a suspect's statements

22  under <u>Miranda</u> depends on whether a person's "right to cut off questions" was "scrupulously

Criminal No. 09-427 (JAF)                                                          -14-

1   honored." 423 U.S. at 104.    There, the Supreme Court also identified four factors that

2   should inform this analysis:

3       (1) whether a significant amount of time lapsed between the suspect's
4       invocation of the right to remain silent and further questioning; (2) whether
5       the same officer conducts the interrogation where the suspect invokes the right
6       and the subsequent interrogation; (3) whether the suspect is given a fresh set
7       of Miranda warnings before the subsequent interrogation; and (4) whether the
8       subsequent interrogation concerns the same crime as the interrogation
9       previously cut off by the suspect.

10

11  United States v. Lugo Guerrero, 524 F.3d 5, 9 (1st Cir. 2008) (citing Mosley, 423 U.S. at

12  104-06).  Moreover, the First Circuit has instructed that courts should look at the "totality of

13  the circumstances," and that the "key inquiry remains whether the defendant was in charge

14  of the decision whether and to whom he would speak." Id. (internal quotations and citations

15  omitted).

16      Following these instructions, we first apply the four factors identified by the court in

17  Lugo Guerrero, 524 F.3d at 9.  On the first score, we must ask whether the time elapsed

18  between the first and second interrogations was "significant." Id.  This can be a difficult

19  question to answer, because in Mosley, the Supreme Court did not state a per-se rule of a

20  minimum amount of time required to be "reasonable."  423 U.S. at 105-106.  See also

21  Weeks v. Angelone, 176 F.3d 249, 268 (4th Cir. 1999) ("A significant period of time

22  between interrogations does not require a durational minimum . . . Instead, a 'significant

23  period of time' is a function of to what degree the police 'persist[ed] in repeated efforts to

24  wear down [the suspect's] resistance and make him change his mind.'") (quoting Mosley,

25  423 U.S. at 105, 106).  Although twenty minutes is shorter than the two hours deemed

26  reasonable in Mosley, there is no reason to think this was an unacceptably short time, given

27  the circumstances here and the absence of any signs of pressure or coercion.

1    Regarding the second and third factors identified in Lugo Guerrero, both point in

2    favor of a finding of admissibility.  The agent that reinitiated questioning of Defendant

3    (Agent Torres) was a different agent than the one to whom Defendant had invoked his right

4    to remain silent (Officer Rodríguez).  Furthermore, as an agent of the Federal government,

5    Agent Torres' interrogation was at the behest of an entirely separate sovereign.

6    Additionally, Agent Torres provided Defendant with a new set of Miranda warnings in the

7    ATF 3200F form he provided. The fourth Lugo Guerrero factor, however, favors Defendant,

8    since the crime that Agent Torres asked about—the gun violation—was the same one that

9    had been the subject of the earlier interrogations.  So, viewing the first factor of time elapsed

10   in the light most favorable to the defendant, the first four factors are somewhat inconclusive.

11   But, as the court stated in Lugo Guerrero, this is far from the end of the matter; the

12   "key inquiry remains whether the defendant was in charge of the decision whether and to

13   whom he would speak." Id.  Here, the evidence suggests Defendant did remain in charge of

14   those decisions.  The environment in which Defendant was interrogated at the Bayamón

15   police station, as described by both Officer Rodríguez and Agent Torres, was free from any

16   coercion or efforts to wear down Defendant's will.  Based on the testimony provided to us,

17   we have no problem concluding that Defendant remained in charge at all times of "the

18   decision whether and to whom he would speak."  Id.  Agent Torres was the only officer who

19   interviewed the suspect other than Officer Rodríguez, and his treatment of Defendant was

20   respectful and even-handed.

21   Nor does Andrade provide any help to Defendant.  That case simply restated

22   Supreme Court precedent to the effect that "where the suspect asserts that he wants to

23   consult with counsel, questioning must cease until counsel is provided . . . . But when a

1   defendant invokes his right to remain silent, Mosley makes clear that the police are not

2   automatically forbidden from later resuming interrogation." (internal citations and

3   quotations omitted).  Here, Defendant did not assert to Officer Rodríguez that he wished to

4   consult with counsel; therefore, the police were not "automatically forbidden" from

5   reinitiating interrogation after later providing him with new Miranda warnings.  See Lugo

6   Guerrero, 524 F.3d at 12 (construing Andrade in same way).

7          Finally, Defendant argues that he unambiguously invoked his right to counsel, which

8   Agent Torres failed to honor.  (Docket No. 562 at 10.)  Again we disagree.  "[A]fter a

9   knowing and voluntary waiver of the Miranda rights, law enforcement officers may

10  continue questioning until and unless the suspect clearly requests an attorney."  Davis v.

11  United States, 512 U.S. 452, 461 (1994).  Here, we find that Defendant made a knowing and

12  voluntary waiver.  When Defendant initially indicated that he did not understand something,

13  Agent Torres asked Defendant what he did not understand.   The Defendant explained that

14  he was willing to talk about the events of the day without a lawyer present, but not about La

15  Tómbola.   Agent Torres then confirmed this understanding with the Defendant and asked

16  him to sign the waiver and clearly indicate his willingness to speak without an attorney

17  present.   Defendant agreed and circled the line indicating his waiver of his rights to remain

18  silent.   Defendant then signed the waiver.  This was a "knowing and voluntary waiver" of

19  his rights to remain silent.  Davis, 512 U.S. at 461.  The interview then lasted only ten or

20  fifteen minutes, with Agent Torres honoring Defendant's wish not to discuss La Tómbola

21  without a lawyer present.  There is no evidence that, at any point during the interview,

22  Defendant indicated he wished to speak with a lawyer.  The first notation that he made, "Yo

23  no entiendo, mi abogado habla," was not an unambiguous statement of his desire to speak

Criminal No. 09-427 (JAF)                                                                    -17-

1   with counsel, especially given his explanation of his wish to speak only about the events of

2   that day, but not about La Tómbola.  See id. (requiring clear statement).

3                                                   **III.**

4                                               **Conclusion**

5          For the foregoing reasons, Defendant's motion is hereby **DENIED**. Neither

6   Defendant's statements made to Agent Torres nor the ones to Officer Rodríguez will be

7   suppressed.

8          **IT IS SO ORDERED.**

9          San Juan, Puerto Rico, this 18th day of December, 2012.

10                                     s/José Antonio Fusté
11                                     JOSE ANTONIO FUSTE
12                                     United States District Judge