IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

_____

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA**, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | CRIMINAL NO.  09-427 (JAF) |
| | § | |
| [1] **ALEXIS CANDELARIO-SANTANA**, | § | |
| and [5] **DAVID OQUINDO-RIVAS** | § | |
| Defendants. | § | |
| | § | |

_____

## GOVERNMENT'S MOTION *IN LIMINE* REGARDING DEFENDANTS ALEXIS CANDELARIO-SANTANA'S AND DEFENDANT DAVID OQUINDO-RIVAS' EYEWITNESS IDENTIFICATION EXPERT WITNESSES

**TO THE HONORABLE COURT:**

The United States of America, by and through its attorney, the United States Attorney for the District of Puerto Rico, hereby moves *in limine* (hereinafter "Motion") to exclude the testimony of defendant Alexis Candelario-Santana's ("Mr. Candelario's") [Document # 499][1] and defendant David Oquindo-Rivas' ("Mr. Oquindo's") [Document # 725; *and see* Document # 523] proposed experts regarding eyewitness identifications ("EW-IDs") and requests that the Court enter an order precluding the testimony of such witnesses.

_____

[1]  Mr. Candelario filed an 8-page Motion is titled: "Motion, With Incorporated Memorandum, For a Hearing Regarding Impermissibly Suggestive Eyewitness Procedures Utilized With Regard to the Individual Identified as "Witness G." [Candelario Notice (Document No. 499), page 1] Attached to Mr. Candelario's Motion are three documents.  The first is a 17-page document titled: "Eyewitness Identification Expert Report Prepared by Dr. Jennifer Dysart...." [*See* Document No. 499-1]  The second document is the 16-page Curriculum Vitae of Jennifer E. Dysart. [*See* Document No. 499-2] The third attachment is are six pages (marked "ATTACHMENT C - Page __"), that are redacted FBI 302 reports (related to identification procedures in which Mr. Candelario was identified), photos, and an interpreter's certificate. [*See* Document No. 499-3]  The Government thanks Mr. Candelario's attorney for highlighting for the Government's successor counsel on December 18, 2012 (as a result of Mr. Oquendo's filing on that date) that these attachments had been appended to the earlier-filed Motion.

_____

Because, as more fully explained below, a resolution of this Motion may implicate

matters that will only become public during the course of the trial, the Government recommends

that the Court hold its Motion in abeyance until after the close of the Government's evidence in

the trial of this cause.  Both Mr. Candelario and Mr. Oquendo join in the Government's

recommendation that the Motion be held in abeyance until the Government has concluded its

case-in-chief.

## Abbreviated Factual and Procedural History

As this Court is well aware, and as more fully set forth in the Third Superseding

Indictment in this case, this is now a two co-defendant case arising out of the alleged long-term

Racketeer Influenced and Corrupt Organizations ("RICO") enterprise, conspiracy, and behavior

of defendant [1] Alexis Candelario-Santana, also known as "Congo."  Both Mr. Candelario and

and defendant [5] David Oquendo-Rivas, also known as "Gordo," are charged with various

additional counts including, *inter alia*, conspiracy, nine (9) counts of murder, twenty (20) counts

of assault with intent to commit murder, and related offenses, within this District arising from the

armed assault they (in concert with each other and with others) carried out on or about October

17, 2009 without and within an establishment known as La Tombola (the "La Tombola

Massacre.")

Both Mr. Candelario and Mr. Oquendo were identified by eyewitnesses to the La

Tombola Massacre.  Both Mr. Candelario and Mr. Oquendo has now provided notice that he

desires to call at trial an expert witness in the field of eyewitness identification.

It is to those Notices, and to the proposed testimony of the expert witnesses, that this Motion is directed.

### Defendants' Notices of Intent to Call EW-ID Experts Are Defective And the Witnesses Should Be Barred From Testifying at Trial

In order to evaluate the efficacy of the Notices filed by Mr. Candelario and Mr. Oquendo, we will first identify the requirements of Federal Rule of Evidence 702 and Federal Rule of Criminal Procedure 16, and the purposes behind these (and related) Rules. We will then compare each of the defendants' Notices with those requirements. As will be seen, neither of the defendants' Notices fulfills the requirements of Rule 16 or Rule 702. As a result, if not properly amended, the Court should not permit either of the experts to testify at trial.

### The Requirements of Fed. R. Evid. 702 and Fed. R. Crim. Pro. 16

Federal Rule of Evidence 702 ("Testimony by Expert Witnesses") states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education my testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or toehr specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

[Id.][2]

---

[2] Federal Rules of Evidence 703 and 705 are related to Rule 702. Fed. R. Evid. 703 ("Bases of an Expert's Opinion Testimony") provides: "An expert may base an opinion on facts

In turn, Federal Rule of Criminal Procedure 16(b)(1)(C) provides:

> **Expert witnesses.--** *The defendant must*, at the government's request, *give to the government a written summary of any testimony that the defendant intends to use* under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if –
>
> > (i) the defendant requests disclosure under subdivision (a)(1)(G) and the government complies; or
> >
> > (ii) the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition.
>
> *This summary must describe **the witness's opinions, the bases and reasons for those opinions,** and the witness's qualifications.*

[Id. (emphasis provided)][3]

The provisions of Rule 16 are "intended to meet [the need for counsel to learn that an expert is expected to testify] by first, requiring notice of the expert's qualifications which in turn

---

or data in the case that the expert has been made aware of or personally observed.  If experts in a particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion must disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."

Fed. R. Evid. 705 ("Disclosing the Facts or Data Underlying an Expert's Opinion") states:  "Unless the court orders otherwise, an expert may state an opinion – and give reasons for it – without first testifying to the underlying facts or data.  But the expert may be required to disclose those facts or data on cross-examination."

[3]  With regard to scientific reports or reports of examinations and tests, Rule 16 also provides that the Government is permitted "to inspect and to copy or photograph the results or reports ... of any scientific test or experiment if ... the defendant ... intends to call the witness who prepared the report and the report relates to the witness's testimony."  Fed. R. Crim. Pro. 16(b)(1)(B); *and see United States v. Naegele*, 468 F. Supp.2d 175, 176 (D.D.C.), *appeal dismissed*, 2007 WL 1760484 (D.C. Cir. 2007).

will permit the requesting party to determine whether in fact the witness is an expert within the definition of Federal Rule of Evidence 702." Fed. R. Crim. Pro. 16 (Advisory Committee's Note) "The primary purpose of Rules 16(b)(1)(B) and (C) is to prevent unfair surprise at trial and to permit the government (or in cases where the government is derelict in its duty, the defendant) to prepare rebuttal reports and to prepare for cross-examination at trial." *United States v. Naegele*, 468 F. Supp.2d 175, 176 (D.D.C.), *appeal dismissed*, 2007 WL 1760484 (D.C. Cir. 2007). Indeed, the Advisory Committee Note expressly provides that Rule 16(b)(1)(C) is "intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. Pro. 16 (Advisory Committee's Note) The requirement that a written summary of an expert's testimony must be provided "is intended to provide more complete pretrial preparation by the requesting party." Id. A failure to comply with these Rules may result in the exclusion of the proffered evidence. Fed. R .Crim. Pro. 16(d); *United States v. Nacchio* 555 F.3d 1234, 1237 & 1258-59 (10th Cir.) (*en banc*), *cert. denied*, ___ U.S. ___, 130 S.Ct. 54 (2009) (emphasis original; affirming trial court's exclusion of defendant's expert witness because of deficiencies in Rule 16 disclosures and under Rule 702)*; United States v. Barile,* 286 F.3d 749, 758-59 (4th Cir. 2002); *United States v. Day,* 433 F. Supp.2d 54, 57 (D.D.C. 2006).

When faced with violations of Rule 16, trial courts have the discretion to weigh various options in deciding how to address a party's violation of a discovery rule. "If a sanction is thought necessary [under Rule 16], it is for the court to decide whether to order a continuance, or

to prohibit the party from introducing in evidence the material not disclosed, or to make whatever other order it deems just under the circumstances." C. A. Wright, 2 Federal Practice & Procedure: Criminal § 260, at 196-201 (3d ed.2000) (footnotes omitted). Indeed, the Supreme Court has held that exclusion of evidence and testimony can be a proper sanction, even against a criminal defendant. *Taylor v. Illinois,* 484 U.S. 400, 414-16 (1988). Courts may properly exclude the non-compliant evidence and testimony without the need to conduct "some sort of 'least restrictive alternative' analysis," *Michigan v. Lucas,* 500 U.S. 145, 152 (1991), *Taylor v. Illinois*, 484 U.S. at 417; *United States v. Johnson,* 970 F.2d 907, 911 (D.C. Cir. 1992), nor need the Court find that the noncomplying counsel acted in "bad faith." *United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008); *and see Taylor v. Illinois*, 484 U.S. at 416.

A District Court's resolution of a Rule 16 violation is reviewed for an abuse of discretion. *See United States v. Day*, 524 F.3d at 1367; *United States v. Johnson*, 970 F.2d at 910.[4]

---

[4] Addressing the standard of review for a District Court's decision to exclude expert testimony, in *United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008), the District of Columbia Circuit observed:

Under Federal Rule of Evidence 702, "*[a] district court has broad discretion regarding the admission or exclusion of expert testimony, and reversal of a decision on these matters is appropriate only when that discretion has been abused*." *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 567 (D.C. Cir. 1993). This standard of review complies with the Supreme Court's admonition that in reviewing challenges to the admissibility or exclusion of expert testimony, appellate courts must afford trial judges great discretion. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142-43 (1997). The Court has also made it clear that, under *Daubert,* trial judges have "broad latitude to determine" the "reliability" of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 153 (1999). Even when a trial court's decision to exclude expert testimony is based on a party's failure to comply with rules of discovery, the matter still requires "an exercise of discretion by the trial court." *United States v. Johnson,* 970 F.2d 907, 910

As will be addressed more fully, *infra*, under the related Rules of Evidence 702[5] and

703,[6] courts have a duty to "ensure that any and all scientific testimony or evidence admitted  ...

is reliable."  *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589 (1993).  In

discharging this burden, courts enjoy wide latitude in determining how to assess an expert's

reliability, and they are not limited to the specific factors outlined in *Daubert* or any other case.

(D.C. Cir. 1992).

Id. at 1367 (emphasis provided.)  In *United States v. Nacchio*, 555 F.3d 1234 (10th Cir. 2009), the Tenth Circuit sitting *en banc* voiced a slightly different standard, which, in practical application, may amount to a difference without a distinction:

> We review *de novo* "whether the district court employed the proper legal standard and performed its gatekeeper role" in determining whether to admit or exclude expert testimony. *United States v. Rodriguez–Felix,* 450 F.3d 1117, 1122 (10th Cir. 2006). We review for abuse of discretion the manner in which the district court performs this gatekeeping role. *Dodge [v. Cotter Corp.],* 328 F.3d [1212] at 1223 [(10th Cir. 2003)]("Though the district court has discretion in *how* it conducts the gatekeeper function, we have recognized that it has no discretion to avoid performing the gatekeeper function.")  *Provided the district court performs the role, this Court's review is deferential: we will not disturb the ruling "unless it is arbitrary, capricious, whimsical or manifestly unreasonable," or "we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances*." Id. (internal quotation marks omitted).

Id. at 1241 (emphasis provided.)

[5]  Rule 702 provides that if "the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," a witness "qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise."  Fed. R. Evid. 702; *see also Shay*, 57 F.3d at 132.

[6]  Rule 703 provides:  "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."  Fed. R. Evid. 703.

---

*See Kumho Tire Co., Ltd. v. Michael*, 526 U.S. 137, 138 (1999); *United States v. Shay*, 57 F.3d

126, 132 (1st Cir. 1995) ("A district court's decision to admit or exclude expert testimony is

entitled to great deference."); *United States v. Brien*, 59 F.3d 274 (1st Cir. 1995) ("[T]rial judges

have traditionally been afforded wide discretion to admit or exclude expert evidence.");*United*

*States v. Candelario-Santana*, 2013 WL 101615, at *10 (D.P.R. Jan. 8, 2013).

It is with these principles in mind, that we turn to the Notices provided by Mr. Oquendo

and Mr. Candelario.  As will be seen, each Notice is grossly defective.

<u>Mr. Oquendo's Notice</u>

On December 18, 2012, Mr. Oquendo provided filed his Notice of Expert Witness.

[Document # 725]  In his Notice, Mr. Oquendo states, *inter alia*:

> Given the above, the defense gives notice that it will have Dr. Steven D. Penrod, an
> expert in Eyewitness Identification testify at the trial of this case. His Curriculum Vitae
> is attached. Dr. Penrod's will testify as to the following issues: (1) error rates of
> identification both in experimental studies and field testing; (2) factors that influence
> accuracy, such as, witness age, witness intoxication, illumination, weapon focus,
> tracking the identity of multiple individuals, probative value of non-identifications,
> stress, stress amnesia, duration of viewing and ability to subsequently identify; and (3)
> the effects of suggestive identification procedures. Dr. Pendrod's testimony and
> opinions will be based on the information elicited from government's witnesses,
> including "C", "D" and "E" during direct and cross-examination at the trial of this case.

[<u>Oquendo Notice</u>, ¶ 5]

Stated differently, what Mr. Oquendo's Notice essentially indicates is that (1) Dr. Penrod

has various theories that may or may not have application to the facts of this case, and (2) Dr.

Penrod is unable to identify what his "opinions will be based on" until after the information has

been "elicited from government's witnesses, including 'C', 'D' and 'E' during direct and cross-examination at the trial of this case." [Id.]

Although certainly more lengthy, as will be seen, Mr. Candelario's Notice eventually dissolves into a similar lack of substance.

<u>Mr. Candelario-Santana's Notice</u>

On August 27, 2012, Mr. Candelario-Santana filed his "Motion, With Incorporated Memorandum, For a Hearing Regarding Impermissibly Suggestive Eyewitness Procedures Utilized With Regard to the Individual Identified as "Witness G." [<u>Candelario Notice</u> (Document No. 499)]  At the same time, Mr. Candelario filed as Document Nos. 499-1, 499-2, and 499-3, respectively, (1) the"Eyewitness Identification Expert Report Prepared by Dr. Jennifer Dysart....," and (2) the curriculum vitae of Jennifer E. Dysart, and (3) a conglomeration of six pages (marked "ATTACHMENT C - Page __"), that consists of redacted FBI 302 reports (related to identification procedures in which Mr. Candelario was identified), photos, and an interpreter's certificate.[7]   Turning to Dr. Dysart's Report, among other things, the Report provides:

**V. Proposed Testimony in Current Case**

As outlined in Section II above, the following factors have been identified in this case as potentially affecting the accuracy of the witnesses identification of Alexis Candelario-Santana and will be the basis for my testimony:

1. Effects of brief exposure on eyewitness accuracy;

---

[7]  As indicated in a prior footnote, the Government thanks Mr. Candelario's attorney for affirmatively drawing successor Government counsels' attention, on December 18, 2012, to the unrelated attachments to Document No. 499.

2. Weapon focus effect;
3. The effects of stress/fear on memory;
4. The effect of delay on memory;
5. Use of a showup rather than a sequential lineup;
6. The use of non-blind administration procedures;
7. Pre-identification instruction bias;
8. Unconscious transference and commitment effects;
9. Witness confidence and accuracy; and
10. The post-identification feedback effect.

       \*       \*       \*       \*

## VI. Summary

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness' memory, the reliability of the identification and the reliability of the in-court testimony. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be.

In this particular case, there exist many factors that have been shown to affect witness accuracy: the (***likely***) brief opportunity the witnesses had to see the perpetrators, the fact that multiple weapons were used by multiple perpetrators during the attack, the effects of stress/fear, the use of a suggestive non-blind showup procedure, no evidence that a pre-identification warning was given informing the witness that the actual perpetrator may or may not be shown, the possibility of unconscious transference and commitment effects for the identification of the defendant, and the tenuous relationship between witness confidence and accuracy that has been shown to be affected by feedback provided to witnesses after their identification decision. *In addition, I have been provided with little information about the intoxication level of the witnesses and therefore the issue of alcohol intoxication may also be relevant to the witnesses' ability to correctly perceive and recall events in this case.*

[*See* Document No. 499-1, pages 5-6 (Paragraph V) & 17 (Paragraph VI) (emphasis provided)]

On careful review, Dr. Dysart's Report is little more than a regurgitation of what is likely

her standard boilerplate, into which she sprinkles sparkling *speculations and suppositions* about

_____

what the facts in this case *might* – or might not – actually be.  Indeed, as is seen on close

inspection of  Dr. Dysart's Report, and the representative portions quoted above, all of her

opinions are singularly – if almost invisibly -- qualified by her careful insertion of the word

"(likely)" at the outset of her lengthy and seemingly impressive-sounding claims.

However, when restated more transparently, and with infinitely greater brevity, Dr.

Dysart's 17-page Report is saying the same thing as is her more experienced and traveled

colleague at John Jay College (Dr. Steven Pendrod) is saying:   she *cannot actually say* what her

opinions will *really* be, because she actually does not know what the facts are.  [*See generally*

Document No. 499-1]

As is readily seen, neither of these Notices meets the requirements of Federal Rule of

Criminal Procedure 16 or Federal Rule of Evidence 702.  Among other things, they fail to provide

the actual opinions of the experts, nor the facts or bases for their opinions, nor are their opinions

(defective as they are) tied to the facts of this case, nor do they allow the Government fairly to

prepare for cross-examination or to determine whether it should hire expert witnesses of its own.

As such, the Notices do not begin to discharge the requirements of Rule 16.  Moreover, the

Notices fail to educate the Court or the Government as to how and why the information about

which these experts propose to testify is beyond the ken of the average juror, or that the testimony

their propose to provide "will help the trier of fact to understand the evidence or to determine a

fact in issue."  Fed. R. Evid. 702(a).  Nor do either of the Notices enlighten the Court or the

Government as to how whatever marginal relevance they might possess will not be substantially

outweighed by a danger of unfair prejudice, a confusion of the issues, the potential for misleading

the jury, causing undue delay, or constituting a waste of time.  Fed. R. Evid. 403.

      For these reasons, as well as others, neither expert should be permitted to testify at trial.

**The Parties Agree That**
**<u>This Motion Should Be Held in Abeyance</u>**

      Plainly, the Notices provided by both Mr. Candelario and Mr. Oquendo do not satisfy the

strictures of Rule 16; nor do they satisfy the requirements of Rule 702/*Daubert*.  In fairness, it

seems clear that part of the reason the Notices are not more comprehensive is that defendants do

not have access to all of the information their EW-ID experts may require.  In turn, as the

Government has repeatedly established for this Court, it has significant *bona fide* witness security

concerns.  As a result, at this time, the parties (and the Court) find themselves in a "Catch-22,"

where the Government cannot reasonably provide the defendants with additional witness-specific

information and the defendants' experts cannot provide the specificity of and for their opinions

that is required by Rule 16 and *Daubert*.  It is for that reason that Mr. Oquendo's Notice stated

candidly: "Dr. Pendrod's testimony and opinions will be based on the information elicited from

government's witnesses, including 'C', 'D' and 'E' during direct and cross-examination at the

trial of this case." [<u>Id</u>.]

      As a result, the Government  – joined by Mr. Candelario and Mr. Oquendo for this *limited*

purpose[8] – recommends that the Court hold its Motion in abeyance until after the Government has

---

      [8]  The agreement by Mr. Candelario and Mr. Oquendo that the Court should hold the Government's Motion in abeyance until the close of the Government's case-in-chief should not be construed as a general agreement by either defendant to other representations or arguments in the Government's Motion.  Indeed, both defendants reserve all other potential objections and

rested its case-in-chief, when its witness security concerns will have been resolved and the

defendants will be in possession of the specifics their experts claim to require.

In the event the Court is disinclined to hold the Government's Motion in abeyance, the

Government urges the Court to find that neither Mr. Candelario nor Mr. Oquendo has discharged

his obligation under Rule 16 or Rule 702/*Daubert* and, for the reasons set forth below, should

exclude both EW-ID experts from testifying at the trial of this cause.

**THE COURT SHOULD PRECLUDE THE TESTIMONY
OF THE EW-ID EXPERTS**

The Court should preclude the testimony of the EW-ID witnesses for at least three

reasons.  *First*, its expert notice is insufficient to permit the Government the opportunity to

prepare for any meaningful cross examination.  *Second*, the proposed testimony is improper under

*Daubert* and will undermine and invade the principal functions of the jury.  *Third*, the testimony

of the EW-ID experts (which are not tied to the specifics of this case) would tend to confuse the

jury and the  probative value of such testimony, if any, is substantially outweighed by its unfairly

prejudicial effect.

---

intend in due course to file Responses to this Motion.

---

### The Standard of Review For Expert Witnesses

Courts serve as "gatekeepers" for expert testimony because it "can be both powerful and quite misleading[.]"  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993); *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 147 (1999) (noting that district judges have a "special obligation" when considering expert testimony).  It is well-settled that the party offering the expert's testimony has the burden of establishing by a "preponderance of proof" that it is both relevant and reliable.  *Daubert*, 509 U.S. at 592 n.10; *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *Amorgianos v. National RR Passenger Corp*., 303 F.3d 256, 270 (2d Cir. 2002). Federal Rule of Evidence 702 makes clear that an expert may only testify if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

"Expert testimony should not be considered in a case unless the expert has genuine expertise and the testimony will assist the trier of fact to understand or determine a fact in issue." *McReynolds v Sodexho Marriott Services*, 349 F. Supp.2d 30, 34-35 (D.D.C. 2004).  Thus, "the twin requirements for expert testimony are relevance and reliability."  Id. at 35. (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149–50 (1999).  In order to discharge its "gatekeeping function," the Court must examine the expert's qualifications, the methodologies used, and the relevance of the final results to the issues confronting the jury.  *See, e.g., Adams v. Ameritech Servs., Inc.,* 231 F.3d 414, 423 (7th Cir. 2000).  *Daubert* and *Kumho Tire* require that the trial judge, under the Federal Rules of Evidence, ensure that an expert's testimony "both rests on a

reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597 (*quoted in*

*Kumho Tire,* 526 U.S. at 141); *see also* Fed.R.Evid. 702 & advisory committee's note (amended

in response to *Daubert* and *Kumho Tire* ); *United States v. Lopez-Lopez*, 282 F.3d 1, 14 (1st Cir.),

*cert. denied*, 536 U.S. 949 (2002).[9]  In order to be relevant, the expert's testimony must assist the

trier of fact to understand or determine a fact in issue.  *Raynor v. Merrell Pharm., Inc.*, 104 F.3d

1371, 1375 (D.C. Cir. 1997).  That is, the "proffered expert testimony" must be "sufficiently tied

to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute."  *Ambrosini*

*v. Labarraque*, 101 F.3d 129, 133-34 (D.C. Cir. 1996).  The *Daubert* Court described this as an

issue of "fit" for the particular case.  509 U.S. at 591.

Trial courts must make certain that an expert "employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*

*Co.,* 526 U.S. at 152.  Plainly, expert testimony that rests solely on "subjective belief or

unsupported speculation" is not reliable.  *Daubert,* 509 U.S. at 590.  Nor should expert testimony

be admitted if it will simply confuse the trier of fact.  *United States v. Day*, 524 F.3d 1361, 1370

(D.C. Cir. 2008).

To be sure, "the law grants a district court the same broad latitude when it decides *how* to

determine reliability as it enjoys in respect to its ultimate reliability determination."  *Kumho Tire,*

---

[9]  While vesting the trial courts with substantial discretion in discharging their
"gatekeeping" obligations, *Daubert* suggested a number of factors that the court might consider:
(1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review
and publication; (3) the known or potential error rate of the theory or technique; and (4) whether
the theory or technique enjoys general acceptance within the relevant scientific community.  509
U.S. at 592–94; *and see United States v . Hankey,* 203 F.3d 1160, 1167 (9th Cir. 2000).

_____

526 U.S. at 142 (emphasis original); *United States v. Lopez-Lopez*, 282 F.3d at 14.  Ultimately,

"nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  Depending

on the circumstances presented, a court may properly conclude that there is simply too great an

analytical gap between the data and the opinion proffered."  *General Elec. Co. v. Joiner*, 522 U.S.

136, 146 (1997).

### The Defendants' Notices Are Insufficient Under Federal Rule
### of Criminal Procedure 16

As previously indicated, Rule 16 requires:

> **Expert witnesses.--** *The defendant must*, at the government's request, *give to
> the government a written summary of any testimony that the defendant intends to use*
> under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial,
> if –

> > (i) the defendant requests disclosure under subdivision (a)(1)(G) and the
> > government complies; or

> > (ii) the defendant has given notice under Rule 12.2(b) of an intent to present
> > expert testimony on the defendant's mental condition.

> *This summary must describe* **the witness's opinions, the bases and reasons for those**
> **opinions,** *and the witness's qualifications*.

[Id. (emphasis provided)] Among other things, Rule 16 "is to prevent unfair surprise at trial and

to permit the government (or in cases where the government is derelict in its duty, the defendant)

to prepare rebuttal reports and to prepare for cross-examination at trial."  *United States v.*

*Naegele*, 468 F. Supp.2d 175, 176 (D.D.C.), *appeal dismissed*, 2007 WL 1760484 (D.C. Cir.

2007); *and see* Advisory Committee Note (Rule 16(b)(1)(C) is "intended to minimize surprise

that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.")  The requirement that a written summary of an expert's testimony must be provided "is intended to provide more complete pretrial preparation by the requesting party."  Id.

As is readily apparent, neither Mr. Oqendo's nor Mr. Candelario's Notices are woefully inadequate.  Plainly, as established above, Dr. Dysart's Report is based on speculation and conjecture as to what the actual facts may have been that surrounded the eyewitness' experiences.  Mr. Oquendo's Notice with regard to Dr. Pendrod's future opinions candidly acknowledged the same.  As a result, neither expert can currently illuminate for the Government or the Court what his or her actual opinions will be or the bases or reasons for those opinions.[10] The Government is entitled to more than a general listing of topics and notations of these experts' areas of expertise.   Clearly, neither Notice discharges its burden to "prevent unfair surprise at trial and to permit the government ... to prepare rebuttal reports and to prepare for cross-examination at trial."  *United States v. Naegele*, 468 F. Supp.2d 175, 176 (D.D.C.), *appeal dismissed*, 2007 WL 1760484 (D.C. Cir. 2007); *and see* Rule 16 Advisory Committee Note.

As previously established, the failure to comply with these Rules may result in the exclusion of the proffered evidence.  Fed. R .Crim. Pro. 16(d); *United States v. Nacchio* 555 F.3d at 1237 & 1258-59*; United States v. Barile,* 286 F.3d at 758-59; *United States v. Day,* 433 F.

---

[10]  The Government reiterates that a logical basis for at least a portion of this vacuum arises from a lack of information due to the witness security issues.  As a result, the Government is reciting the current state of affairs, but does not mean to be unfairly critical.

Supp.2d at 57.  Because the Notices of Mr. Candelario and Mr. Oquendo fail to comply with the

requirements of Rule 16 and Rule 702/*Daubert*, Drs. Dysart and Penrod should not be permitted

to testify at the trial of this cause.

We next in our analysis to a series of reported cases that analyze whether or not

eyewitness identification experts should be permitted to testify and, if permitted, under what

conditions.

EYEWITNESS IDENTIFICATION EXPERT WITNESS CASES

In recent years, the treatment by courts of eyewitness identification experts, and whether

they should generally be permitted to testify, has been in flux.  *See, e.g., United States v.

Brownlee,* 454 F.3d 131, 140–44 (3d Cir. 2006) (reversing conviction because of exclusion of

eyewitness identification expert testimony); *Minor v. United States,* 2012 WL 6617802, at *11-

12 (D.C. 2012) (reversing armed carjacking conviction for exclusion of eyewitness identification

expert in case where entirety of Government's evidence was identifications by persons who were

"strangers" to the defendant; distinguishing *Heath v. United States*, 26 A.2d 266, 284 (D.C.

2011), where "stranger" identification was reinformed by "non-stranger" identification); *State v.

Guilbert*, 49 A.3d 705, 715 (Conn. 2012) (in death penalty case, overruling prior opinions

precluding introduction of eyewitness identification expert testimony and permitting such

testimony "upon a determination by the trial court that the expert is qualified and the proffered

testimony is relevant and will aid the jury" – but finding exclusion of such testimony was

harmless error);[11] *State v. Holmes*, 2012 WL 4097296, at * 2 (Del.Super. 2012); *State v. Clopten*, 223 P.3d 1103, 1112-17 (Utah 2009); *People v. LeGrand*, 867 N.E.2d 374, 379 (NY 2007);[12] *State v. Copeland*, 226 S.W.3d 287, 300 (Tenn. 2007).

Yet, the First Circuit, along with many other courts, retain what was, and may still be, the majority rule –  generally, eyewitness identification experts may be excluded in instances where such testimony is unnecessary (as the potential for eyewitness errors were within the common ken of jurors), because such testimony impermissibly commented on the credibility of witnesses, because the proffered testimony is not sufficiently tied to the facts of the case, for Rule 403 considerations, or because of a combination of these factors.  *See, e.g., United States v. Rodríguez–Berríos*, 573 F.3d 55, 70–72 (1st Cir. 2009), *cert. denied,* ___ U.S. ___, 130 S.Ct. 1300 (2010); *United States v. Brien,* 59 F.3d 274, 277 (1ˢᵗ Cir.), *cert. denied*, 516 U.S. 953 (1995); *and see United States v. Bartlett*, 567 F.3d 901, 905–07 (7th Cir. 2009), *cert. denied,* ___U.S. ___, 130 S.Ct. 1137 (2010); *United States v. Lumpkin,* 192 F.3d 280, 288–89 (2d Cir. 1999); *Commonwealth v. Robinson*, 5 A.3d 339, 342-44 (Pa.Super. 2012) (adhering to Pennsylvania Supreme Court's determination that expert testimony in field of eyewitness identification infringes upon the role of the jury); *Bomas v. State,* 987 A.2d 98, 112 (Md. 2010) ("[T]he effects of stress or time are generally known to exacerbate memory loss and, barring a

---

[11] *But see, e.g., State v. Outing,* 3 A.3d 1, 50 (Conn. 2010) (noting that expert may not opine on the credibility of a particular eyewitness); *State v. Henderson,* 27 A.3d 872, 925 (N.J. 2011) (same).

[12] *But see, e.g., Smith v. Graham*, 2012 WL 2428913, at *4 (S.D.N.Y 2012) (distinguishing *LeGrand*).

specific set of facts, do not require expert testimony for the layperson to understand them in the

context of eyewitness testimony"); *State v. Day*, 898 A.2d 698, 707 (R.I.  2006) ("[I]t is now

well settled in this jurisdiction that the trustworthiness of eyewitness observations is 'not beyond

the ken of the jurors'"); *State v. Gaines*, 926 P.2d 641, 649 (Kan. 1996) (holding that expert

testimony regarding eyewitness identification should not be admitted at trial.)

Amidst the confusion of the recent pique, what seems generally clear is that Courts retain

broad discretion to exclude or permit ED-ID testimony and, prior to exercising that discretion,

they are carefully examining the unique facts of each situation that is presented before they

determine whether to exclude or permit EW-ID testimony, and if permitted, under what

parameters.

In this regard, the recent opinion in *United States v. Jones*, 689 F.3d 12 (1ˢᵗ Cir. 2012), is

particularly instructive.  In *Jones*, the defendant sought unsuccessfully to introduce at trial the

testimony of eyewitness identification expert, Steven Penrod, Ph.D., J.D.  Id. at 15.  Among

other things, Dr. Penrod sought to testify about the decreased accuracy of cross-racial (as

compared to same-race) identifications, which cross-racial composition existed in Mr. Jones'

case.  Id. at 16.  The District Court, however, declined to permit Dr. Penrod's testimony and

chose, rather, to address the identification "issues" in carefully-crafted jury instructions.  Id. at

15-16.  Following his conviction, Mr. Jones argued on appeal that the District Court erred in

refusing to suppress [eyewitness] Patterson's identification of Jones and in excluding Jones'

proffered expert witness, Dr. Penrod.  Id. at 17.  In assessing Jones' twin claims on appeal, the

First Circuit noted: "The first issue is fact-specific and need not detail us long; the second

involves a matter of continuing importance.  The standard of review depends, as usual, on the

precise issue or issues and not on the general topic."  Id. at 17.  Turning to the exclusion of Dr.

Penrod's proffered testimony, the Court carefully identified, weighed, and analyzed the

competing considerations, which analysis bears quotation at length:

> The standard being applied is meant to screen out only evidence that is clearly unreliable and not to supplant the jury's ordinary function of weighing what the witness says and choosing the weight to accord it. It is for this reason that "it is only in extraordinary cases that identification evidence should be withheld from the jury." *United States v. de Jesus–Rios,* 990 F.2d 672, 677 (1st Cir.1993) (citations and internal quotation marks omitted). Whether the jury was given the right tools to assess the evidence is a separate question.

> *Penrod's testimony is urged by Jones to be one of those tools*, and at the outset we note that the government did not challenge Penrod's qualifications or the reliability of the information that he sought to offer, *see* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993), but instead focused on whether his proposed testimony was within the common understanding of the jury and had the potential to confuse or mislead the jury, *see* Fed. R. Evid. 403, 702.

> Relevant lay testimony, unless it fails the tests of Rule 403, is presumptively admissible; but expert testimony is another story. The expert is rarely a percipient witness to the events, and *sometimes (as here) expert testimony is at best helpful rather than essential; jurors cannot perform DNA analyses in the jury box but can usually make reasonable judgments about eyewitness identifications*.  And there can be close cases in determining the need for or importance of expert advice.  *See, e.g., United States v. Shay,* 57 F.3d 126, 133–34 (1st Cir.1995).

> *The use of experts creates costs of its own: distraction, multiplication of cost, and the loss of valuable time in stand-offs of dueling experts operating at a high level of generality*. *See United States v. Brien,* 59 F.3d 274, 277 (1st Cir.), *cert. denied,* 516 U.S. 953 (1995). *Understandably, trial judges tend to be cautious about opening the door to "identification" experts who, if allowed without adequate justification, would* **likely lead both sides to seek expert testimony in every case involving identification issues**.

Still, it is untenable to argue that expert identification evidence is always and in every situation superfluous. The threshold for potential expert testimony is merely whether expert evidence can *help* the jury, Fed. R. Evid. 702, and while several of Penrod's basic points could be made by counsel in argument ( *e.g.,* the effects of stress), this might not be true of all.  Anyway, there is obviously a difference between an attorney's appeal to common experience in closing argument and a blow-by-blow presentation by an impressive expert.

The question whether such expert evidence should be admitted has become a recurring one;  and, as circumstances vary from case to case, this court has declined to lay down a general rule. *Brien,* 59 F.3d at 277. The importance of the identification matters (it may be central, cumulative, or somewhere in between); so, too, the nature of the proposed expert testimony; and, as the district court noted, the possibilities include alternative means of providing helpful information to the jury, including the use of jury instructions.

In this instance, ***we agree that the identification by Patterson was of central importance****; that his opportunity to see the first visitor to the car was brief and attended by some distraction and perhaps anxiety; and that information bearing on the effects of stress, witness confidence and cross-racial identification would be helpful to the jury in the present case (if supported by the relevant studies, as the district judge believed to be true).* ***Indeed, the district judge had little hesitation in concluding that the jury would be helped by the information****.*

*However,* ***it was within the district court's province to provide this information through instructions rather than through dueling experts.****  Penrod's proposed testimony aimed at providing background information—not an opinion about facts at issue here like the identification of a particular fingerprint or firearm.* ***<u>The judge was fully entitled to conclude that this general information could be more reliably and efficiently conveyed by instructions rather than through dueling experts</u>****.*

698 F.3d at 19-20 (emphasis provided; footnotes omitted).

Similarly, in the instant case, the Court should resolve the competing interests by avoiding an extended, distracting, and confusing battle of "dueling experts," and, to the extent, any matters may need additional emphasis or illumination, to address those issues with jury appropriate instructions.

However, the Government would be remiss if it did not alert the Court to what could be described as "fracture lines" or "pivot points," in various decisions, that it may wish to consider in its overall analysis of this admittedly uncertain arena.  In particular, we will examine cases that turn on (1) whether the identification was made by an acquaintance of the defendant or whether the defendant was identified by a stranger to him; (2) whether the identification was made by someone of the same race as the defendant as opposed to a cross-racial identification; and (3) whether the eyewitness identification is corroborated by other evidence of the defendant's guilt, or if the eyewitness identification is the sole evidence of the defendant's guilt.

Eyewitness Identifications by Strangers

Various courts have determined that eyewitness identifications by persons who knew the defendant are much less likely to render a mistaken identification, and therefore a defendant's alleged need for an eyewitness identification expert is *de minimus*.  *See, e.g., State v. Clopten,* 223 P.3d 1103, 1113 (Utah 2009) ("The research on eyewitness identifications, for example, almost exclusively focuses on individuals who are attempting to identify a stranger.  If the eyewitness is identifying someone with whom he or she has been acquainted over a substantial period of time, then expert testimony is not likely to assist the jury in evaluating the accuracy of a [witness'] testimony"); *Hager v. United States,* 856 A.2d 1143, 1148–49 (D.C. 2004), *amended in part on other grounds,* 861 A.2d 601 (D.C. 2004), *cert. denied,* 547 U.S. 1035 (2006) ("the studies on which [the expert witness] would have relied concern the reliability of a stranger identification, not an identification of a person known to the witness, as in this case.  Thus, it is highly questionable on this record whether the existence or state of scientific knowledge in the

area of psychological studies relating to the correlation between witness confidence and accuracy

of non-stranger identifications would have permitted a reasonable opinion to be asserted by [the

expert witness], and hence, as the trial court declared, it is also doubtful that [his] testimony

would have been helpful to the jury"); *Commonwealth v. Christie,* 98 S.W.3d 485, 491 (Ky.

2002) ("the particular facts of this case—that (a) eyewitness identification by strangers of a

different race was the main and most compelling evidence against [the defendant], (b) there was

no other direct evidence against [the defendant], and (c) the circumstantial evidence against [the

defendant] was weak—make exclusion of [the eyewitness expert's] testimony ... an abuse of

discretion.")

Thus, for instance, *State v. Guilbert*, 49 A.3d 705 (Conn. 2012), involved a defendant

who was defendant was convicted, *inter alia*, of capital murder.  Id. at 714.  On appeal, the

defendant claimed the trial court improperly excluded his proffered eyewitness identification

expert from testifying on his behalf at trial.  Id. at 717.  After first reversing long-standing

precedent that generally rejected eyewitness identification expert testimony, the supreme court

examined the five identifying eyewitnesses in the case to determine if the trial court erred in

excluding the proffered testimony in the capital trial.  Id. at 736.  The Court's analysis

proceeded:

> The state contends that [eyewitness identification expert] Morgan's testimony was
> not applicable to the specific facts of this case and would not have been helpful to
> the jury because most of the eyewitnesses knew the defendant and were therefore
> much less likely to render a mistaken identification. *We agree with the state that,*
> *although there are exceptions, identification of a person who is well-known to the*
> *eyewitness generally does not give rise to the same risk of misidentification as*
> *does the identification of a person who is not well-known to the eyewitness. We*

*also agree that four of the five eyewitnesses in the present case—Robinson, Olivero, Baldwin, and Gomez—were familiar enough with the defendant that the risk of misidentification was small.  **Accordingly, we conclude that the trial court did not abuse its discretion in precluding Morgan from testifying on the reliability of the identification testimony of these four witnesses**.*  Because the state's case concerning the murders of Ross and Williams was predicated on the testimony of three of those eyewitnesses, Olivero, Baldwin and Gomez, the defendant's claim must fail with respect to the two murder charges and the related capital felony charge.

*Unlike the other eyewitnesses, however, Lang, who testified that he had observed the defendant shoot Robinson, was not so familiar with the defendant that the risk of misidentification was insignificant.  In fact, **Lang did not know the defendant at all**.*  Moreover, according to Lang, he had been standing next to the shooter at the time of the shooting and saw the defendant's photograph in the newspaper before identifying him as the shooter. *We conclude that, with respect to Lang, Morgan's proposed testimony* on the effect of stress on memory, the risk of retrofitting based on postevent information, and the relationship, or lack thereof, between confidence and accuracy, *was relevant and would have been helpful to the jury. **The trial court therefore abused its discretion in precluding Morgan's expert testimony insofar as it pertained to Lang's identification of the defendant as Robinson's assailant***.

49 A.3d at 736-37 (emphasis provided; footnotes omitted).  However, because the other four

eyewitnesses knew the defendant, the Connecticut Supreme Court found the error harmless, id.

at 739-40, and affirmed the capital verdict against the defendant.  Id. at 744.

Likewise, in the instant case, unless Mr. Candelario and Mr. Oquendo can establish the

eyewitnesses who identify them were previously unacquainted with them, the Court should

determine that the testimony of eyewitness identification experts is unnecessary because there is

no need for specialized knowledge to "help the trier of fact to understand the evidence or to

determine a fact in issue," Fed. R. Evid. 702(a), and because the probative value of such

evidence is substantially outweighed by a danger of unfair prejudice, a confusion of the issues,

the potential for misleading the jury, causing undue delay, and a wasting of the Court's and the jury's time.  Fed. R. Evid. 403.

Cross-Racial Identifications

Some courts have permitted (or encouraged) EW-ID expert testimony in cases where the eyewitness(es) are of one race and the defendant is of another race.  *See, e.g., United States v. Brownlee*, 454 F.3d 131, 140, 144 n.13 (3d Cir. 2006) (reversing conviction, in part, because, under facts presented, District Court abused its discretion in not permitting EW-ID expert to testify about cross-racial identification errors); *United States v. Smith*, 621 F.Supp.2d 1207, 1215 (M.D. Ala. 2009) (permitting EW-ID testimony in part due to fact of cross-racial identification); *United States v. Graves*, 465 F.Supp.2d 450, 456 (E.D. Pa. 2006) (same); *United States v. Lester*, 254 F.Supp.2d 602, 611-12 (E.D. Va. 2003) (same); *and see People v. McDonald*, 690 P.2d 709, 720-21 (Cal. 1984) (reversing conviction, *inter alia*, for abuse of discretion by trial court in not permitted EW-ID testimony in case of cross-racial identification.)

In the instant case, unless Mr. Candelario or Mr. Oquendo can establish that the eyewitnesses identifications of them are by persons who are a race different from their own, the Court should exclude the proffered testimony because the testimony will not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), and because the probative value of such evidence is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time.  Fed. R. Evid. 403.

<u>Uncorroborated Eyewitness Identification is Sole Evidence of Guilt</u>

Other courts have concluded that it is not an abuse of discretion for a trial court to

exclude EW-ID expert testimony in cases where the eyewitness' testimony is corroborated by

other evidence of the defendant's guilt.  *See e.g.*, *United States v. Davis*, 690 F.3d 226, 257 (4th

Cir. 2012); *United States v. Smithers,* 212 F.3d 306, 317 (6th Cir. 2000); *United States v. Moore,*

786 F.2d 1308, 1312–13 (5th Cir.1986); *State v. Wright,* 206 P.3d 856, 863-64 (Idaho App.

2009); *People v. Young,* 850 N.E.2d 623, 627 (N.Y. 2006).  Generally, the rationale of these

courts is that, if the eyewitness identifications are corroborated by other evidence of the

defendant's guilt, then the possibility of a mis-identification is geometrically reduced and,

therefore, the EW-ID testimony is not truly needed to assist the trier of fact in its resolution of

the issues, and the various exclusory principles of Rule 403 are of greater weight and concern.

In *United States v. Davis*, 690 F.3d 226 (4th Cir. 2012), the defendant was convicted of

various offenses arising from the armed robbery and murder of an armored car employee and a

subsequent carjacking.  Id. at 228.  On appeal, the defendant urged that the District Court erred

in excluding expert testimony proffered by him intended to undermine an eyewitness

identification of him.  Id. at 229.  In affirming the defendant's convictions, the Fourth Circuit

held:

> We have reviewed Dr. Neuschatz's report and his testimony at the *Daubert*
> hearing, and find that *the district court did not abuse its discretion in concluding*
> *that the proffered evidence was not "scientific knowledge" that would be of*
> *benefit to the jury.*  This is consistent with our prior decision in *United States v.*
> *Harris,* 995 F.2d 532 (4th Cir.1993).  In *Harris,* we recognized the "trend in
> recent years to allow such testimony under [narrow] circumstances," but
> nonetheless concluded that *"jurors using common sense and their faculties of*

> *observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination.*" Id. at 534–35.

> The district court also did not abuse its discretion when concluding that, *even if it qualified as a proper subject of expert testimony, the probative value of the testimony, which was low, was outweighed by the danger of prejudice or confusing the jury.* Accordingly, it was not an abuse of discretion to exclude the evidence on Rule 403 grounds.

690 F.3d at 257 (emphasis provided.)

In *State v. Wright*, 206 P.3d 856 (Idaho App. 2009), the court of appeals surveyed cases

from various jurisdictions concerning the efficacy of expert testimony concerning eyewitness

identifications and determined:

> Of those trials that include some form of eyewitness identification, *many do not turn primarily on the accuracy of the eyewitness's observation and memory because other substantial evidence corroborates the identity of the perpetrator or because the eyewitness was acquainted with the perpetrator.* **In these circumstances, it can reasonably be concluded that expert testimony would not materially "assist the trier of fact to understand the evidence or to determine a fact in issue." I[daho]R[ules of] Evidence 702.** In other instances, inconsistencies in or unreliability of an eyewitness identification can be adequately exposed through avenues other than expert testimony, such as cross-examination. Finally, any standard for use of such expert testimony should allow room for the trial court's exercise of discretion on the matter. In short, a standard that allows the balancing of a variety of considerations is necessary.

> We conclude that the appropriate standard was well articulated by the Supreme Court of California in *People v. McDonald,* 690 P.2d 709, 727 (Cal. 1984), where the Court said:

> > When an *eyewitness identification of the defendant is a key element of the prosecution's case* **but is not substantially corroborated by evidence giving it independent reliability**, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be

fully known to or understood by the jury, it will ordinarily be error to
exclude that testimony.

*See also generally State v. Chapple,* 660 P.2d 1208, 1217–24 (Ariz. 1983).  In
other words, when the circumstances specified in *McDonald* are present, expert
testimony so plainly "will assist the trier of fact to understand the evidence or to
determine a fact in issue," I.R.E. 702, that refusal of the evidence would
constitute an abuse of the court's discretion.  Note that the *McDonald* formulation
does not suggest that it would be error to *admit* the expert testimony in
circumstances other than those described, but only that it would ordinarily be
error to *exclude* it when those circumstances are extant.  Thus, considerable
discretion is vested in the trial court.

Applying this standard to the case before us, we conclude that the district court
did not abuse its discretion by excluding Dr. Malpass's testimony. We
acknowledge that eyewitness Russell's identification of Wright as the person who
shot Preston Gilmer was an important component of the State's case, and that
much of Dr. Malpass's proffered testimony would have identified specific factors
that could have affected the accuracy of Russell's identification of Wright. The
proffered testimony about the effect of weapon focus, cross-racial identification,
the influence of exposure to post-event information, distortions that can arise
from methods of presenting photo lineups, and the absence of correlation between
the witness's confidence in an identification and its accuracy all had a bearing
here. Nevertheless, ***because there was other substantial, corroborative evidence
of Wright's identity as the shooter, we hold that the exclusion of Dr. Malpass's
testimony was not an abuse of discretion***.

206 P.3d at 863-64 (emphasis provided.)

Similarly, in *People v. Young,* 850 N.E.2d 623 (N.Y. 2006), the Court of Appeals held

that the existence of corroborating evidence:

[S]*ignificantly diminishes the importance of the proffered [eyewitness
identification] expert testimony in this case*—as it did in *Lee,* where we affirmed
a conviction arising out of a carjacking, despite the exclusion of expert testimony
like that proffered here, in part because the defendant had been arrested driving
the car in question.  Here, stolen property was found in possession of two of
defendant's acquaintances; neither of them could have been the robber, since both
were women; and one of them pointed to defendant as the person from whom she
got the property.  *It was reasonable, under the circumstances, for the trial court*

_____

> *to conclude that Mrs. Sykes's identification was quite unlikely to be mistaken, and*
> *that [expert] Brigham's testimony would be an unnecessary distraction for the*
> *jury.*

850 N.E.2d at 627 (emphasis provided; citations omitted.); *but see State v. Guilbert*, 49 A.2d at

738 & n.44 (rejecting rationale underlying these decisions.)

   Similarly, in the case at bar, unless Mr. Candelario and Mr. Oquendo are able to establish

that the eyewitness identifications of them are without other credible corroboration, the Court

should exclude the proffered testimony because the testimony will not "help the trier of fact to

understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), and because the

probative value of such evidence is substantially outweighed by a danger of unfair prejudice,

confusing the issues, misleading the jury, undue delay, and wasting time.  Fed. R. Evid. 403.

   Moreover, even if the EW-ID Expert's Reports are substantially supplemented, the

Government believes that the testimony should be excluded because it will confuse and mislead

the jury.

### The EW-ID Testimony Will Confuse and Mislead the Jury

It cannot reasonably be disputed that psychologists continue to disagree on the results of studies testing eyewitness memory and perception.  Because Dr. Dysart and Dr. Pendrod's testimony will inevitably[13] be based on controlled studies using mock "eyewitnesses" -- rather than eyewitnesses to actual crimes – the reliability of applying experimental data obtained in controlled studies to eyewitnesses who are directly involved in crimes is highly questionable. Although much has been written about psychological studies of eyewitness identification and the implications of those studies in the legal community, psychological researchers continue to have differing opinions on the interpretation of this research.  *See* Elizabeth A. Loftus, Psychologists in the Eyewitness World, 48 Am. Psychologist 550, 551 (1993).

Moreover, psychologists question the use of experimental studies to simulate the conditions of real eyewitnesses who are victims of crime.  *See* Debra A. Bekerian, *In Search of the Typical Eyewitness*, 48 Am. Psychologist 574 (1993).  In almost all studies testing eyewitness memory and perception, only mock eyewitnesses --  potential jurors and students -- participated in the studies.  John C. Yuille, *We Must Study Forensic Eyewitnesses to Know About Them*, 48 Am. Psychologist 572 (1993).  This is problematic as noted by psychologist John C. Yuille:

> [The] typical research witness observes an event that has little or no consequences.
> How often are experimental witnesses physically assaulted or threatened by the
> person they are later asked to identify? . . . [T]here are many important ways that a

---

[13]  *See generally* Dr. Dysart's Report.  The list of factors and studies in Dr. Dysart's Report are virtually identical to those used by her colleague, Dr. Penrod, in published opinions reporting on his testimony in other cases.

> real crime can differ from a simulated event. In particular, real crimes can have very
> different emotional and personal consequences. Do these factors affect eyewitness
> identification? We don't know, but at present it is an unacceptable assumption to
> claim that they do not.

Id.; *see also* Howard Egeth, *Expert Psychological Testimony About Eyewitnesses: An Update*,

Psychology, Science and Human Affairs: Essays in Honor of William Bevan 151 (1995). A

mock "eyewitness" does not perceive events in the same manner as a true eyewitness who is the

victim of a crime. Id. "At best, given the current type of research, it could be claimed only that

the research findings can be applied to unaffected bystander witnesses, although even that is an

assumption." John C. Yuille, *supra*, 48 Am. Psychologist at 572.

   Thus, the application of research based on such controlled experiments involving individuals

who were not in any real danger is particularly problematic. In addition, the application of these

controlled studies to real cases can differ depending on the type of crime involved. For example,

studies show that fraud victims behave more like mock eyewitnesses -- they retain little information

and are unlikely to identify the culprit -- whereas robbery victims tend to perform better than the

results shown in the controlled studies.[14]  John C. Yuille, <u>supra</u>, 48 Am. Psychologist at 573.

------

   [14] Interestingly, archival research has shown far superior accuracy rates for actual
eyewitnesses and victims of emotionally involved crimes than experimental or simulated studies
found in their subjects. This type of research involves using video of actual crimes and
comparing what is on that video to what actual witnesses remembered about the event, See
Woolnough, P. & MacLeod, M. (2001) *"Watching the Birdie Watching You: Eyewitness memory
for Actions Using CCTV Recordings of Actual Crimes"* Applied Cognitive Psychology, Vol. 15,
P. 395-141, as well as recreating actual crime scenes through reports and eyewitness statements
and measuring the accuracy of each eyewitness's recollections to the recreated scene, See Yuille,
J.C. & Cutshall, J. (1986) *"A Case Study of Eyewitness Memory of a Crime"* Journal of Applied
Psychology, Vol. 71, p. 291-301. These studies reinforce the argument that the research
underlying the proposed expert testimony does not accurately portray the ability of actual crime
victims and witnesses to recall and identify details concerning their experience.

Because the scientific studies do not establish a generally accepted area and given the differences of opinions among the experts themselves, the state of the science is not such that defendants' experts can present a reasonable opinions that will truly aid the jury in its search for the truth. *See United States v. Rodriguez-Felix*, 450 F.3d 1117 (10th Cir.), *cert. denied*, 549 U.S. 968 (2006) (proffered expert testimony inadmissible where submission does not assess reasoning and methodology and fails to reference specific scientific research); *United States v. Moonda*, 2007 WL 1875861 (N.D. Ohio 2007) (because mock studies were distinguishable from real life application, expert testimony inadmissible).

Jurors are invested with their own life experiences, which necessarily include knowledge that people's memories and identifications can be flawed and mistaken. In the course the approaching trial, the jurors will be called upon to evaluate the credibility -- and accuracy – of *every* witness who testifies. To allow the defendants to each introduce an EW-ID expert who will attempt to cast doubt on the *general* veracity of eyewitness identifications, would tend to confuse and mislead the jury in this case. Absent the existence of unusual facts or occurrences in relation to the eyewitness identifications *in this case*, the introduction of such evidence will tend to invade the province of the jury to unfairly inject *artificial* doubt where none exists or belongs, all of which will tend to confuse and mislead the jury.

Moreover, should the Court decide to permit the testimony of one or both of the EW-ID experts identified by Mr. Candelario and Mr. Oquendo, then fairness would dictate that the Government be permitted to present EW-ID expert testimony of its own. At that point, the jury

would be faced with precisely the confusing and time-consuming "dueling experts" scenario of which the First Circuit warned against in *United States v. Jones*, 689 F.3d 12, 20 (1ˢᵗ Cir. 2012).

The Spectacle of "Dueling Experts" Will Cause the Potential Prejudice
<u>That Far Outweighs Any Minimal Probative Value</u>

Unless the eyewitness identifications in this case are found to present unusual facts or scenarios, the Court should exclude the proposed testimony of Drs. Dysart and Penrod for the additional reason that the unfair prejudice to the Government far outweighs its probative value. Plainly, the probative value of the proposed testimony in general is minimal. This is so, because most, if not all, of the proposed testimony is within the common sense and experience of the average juror. As a result, counsel for Mr. Candelario and Mr. Oquendo can each highlight in their arguments to the jury the exact same issues they are seeking to present through these expert witnesses. However, to allow Mr. Candelario and Mr. Oquendo to bolster those arguments with controversial "science" based on staged college students, rather than real witnesses and events, would be to unfairly place a prejudicial imprimatur on those arguments that science does not reliably support. *See, e.g.,United States v. Purham*, 725 F.2d 450 (8th Cir. 1984) (upholding trial court's denial of indigent's request for services of eyewitness identification expert because, in part, "the unfair prejudice which might have resulted because of the aura of reliability and trustworthiness that surrounds scientific evidence outweighed any small aid the expert testimony would have provided.")

Moreover, in this case, the jury will be instructed that it should consider the factors that might affect the accuracy and reliability of an eyewitness's identification, including opportunity

to observe, the length of the encounter, the distance between the witness and the perpetrator, the

lighting conditions, the witness's state of mind during the offense, and all other circumstances

bearing on the witness's ability to observe the events in question.  Simply put, cross-examination

and jury instructions will allow the defense to make all the arguments it seeks to make regarding

eyewitness identification without relying on Dr. Penrod's testimony, which would only add an

unjustified scientific validation to what essentially amounts to arguments based on common

sense.  *See United States v. Christophe*, 833 F.2d 1296, 1299 (9th Cir. 1987) (citing Michael

McCloskey & Howard Egeth, Eyewitness Identification: What Can A Psychologist Tell A Jury?

38 Am. Psychologist 550, 551 (May 1983) ("there is virtually no empirical evidence that [jurors]

are unaware of the problems with eyewitness testimony")).

As recently cautioned by the First Circuit in *United States v. Jones*, 698 F.3d 12 (1st Cir.

2012):

> *The use of experts creates costs of its own: distraction, multiplication of cost, and the loss of valuable time in stand-offs of dueling experts operating at a high level of generality. See United States v. Brien,* 59 F.3d 274, 277 (1st Cir.), *cert. denied,* 516 U.S. 953 (1995). Understandably, trial judges tend to be cautious about opening the door to "identification" experts who, if allowed without adequate justification, would likely lead both sides to seek expert testimony in every case involving identification issues.

Id. at 19 (emphasis provided.)

Because, as established above, the testimony of Drs. Dysart and Penrod is unnecessary

for the jury's resolution of the facts and issues in this case, and because it would lead to unfair

prejudice, would cause a confusion of the issues, would potentially mislead the jury, and would

cause an undue delay and would waste the time of the Court and the jury, the Court should

exclude the testimony of Drs. Dysart and Penrod.

## CONCLUSION

WHEREFORE, for each of the independent reasons set forth above, the Govenrment

urges the Court to preclude the testimony of Dr. Dysart and Dr. Penrod at the trial of this cause.

RESPECTFULLY SUBMITTED,

In San Juan, Puerto Rico, this 16th day of January, 2013.

ROSA EMILIA RODRIGUEZ
UNITED STATES ATTORNEY

s/  *Julia Diaz-Rex*
Julia Diaz-Rex (PR Bar # G00308)
Assistant U.S. Attorney
Torre Chardón Bldg.
350 Chardón Avenue, Room 1201
Hato Rey, Puerto Rico, 00918
Tel. (787) 766-5656
www.julia.diaz-rex@usdoj.gov

s/  *Bruce R. Hegyi*
Bruce R. Hegyi (PR Bar # G01603)
Trial Attorney
Capital Case Unit
Criminal Division
United States Department of Justice
1331 F Street, N.W., Third Floor
Washington, D.C.  20530
Tel. (202) 616-4582
Cell (703) 536-4774
www.bruce.hegyi@usdoj.gov

## CERTIFICATE OF SERVICE

---

      **I HEREBY CERTIFY** that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel for all of the defendants.


                                     s/   *Bruce R. Hegyi*

                                     Bruce R. Hegyi
                                     Trial Attorney