UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALEXIS CANDELARIO-SANTANA (1),<br>DAVID OQUENDO-RIVAS (5),<br><br>Defendants. | Criminal No. 09-427 (JAF) |

**MEMORANDUM ORDER**

Rule 17 of the Federal Rules of Criminal Procedure provides a clear framework for the use of the court to compel the appearance of witnesses and the production of documents in federal court.  Rule 17 does not authorize the government or the defense to subpoena a witness and require him to report at some time or place other than where a trial proceeding is to be held at which the witness is to testify.  In this case, federal prosecutors violated Rule 17 recurrently.  As a result, sanctions will be imposed.

**I.**

On the fifth day of jury selection in this capital case, counsel for one of the defendants orally moved this court to investigate the possibility that an announced defense alibi witness had been harassed or intimidated by an order compelling him to attend an interview with federal prosecutors.  The court held a hearing on Saturday, February 2, 2013, and learned that, in the midst of concluding an unrelated law enforcement operation at a public housing project, over twenty police officers visited the home of the witness, telling him that he had to appear two days later at the United States

Attorney's Office for a pretrial interview. The defense witness spoke by phone to a member of the Joint F.B.I.-Puerto Rico Police Task Force, who claimed to be reading from a court-issued subpoena. No documentation was ever shown to the witness, although a subpoena had indeed been prepared.

The timing of this interaction with the witness was certainly imprudent. A legion of officers visited the home of a private citizen during a major law enforcement operation in an area known for its violent crime. The witness, and his family, had cause for concern: People saw him interacting with police officers, potentially leading some in his community to assume that he may have cooperated with or assisted the authorities in the arrests of others. In this way, the government endangered the witness and his family. However, after expressing his security concern and what he described as an express warning that failure to appear at the interview could end in his arrest, the witness asserted in court that he would voluntarily speak with attorneys for any party.

While inquiring into this disturbing incident, the court unearthed a far more pernicious wrong: The misuse of the court's subpoena power to lure witnesses to the United States Attorney's office for the sole purpose of trial preparation. For example, during the hearing, defense counsel produced a subpoena issued to "Luis Vázquez," identifying him as "Custodian of Records." Issued by the Clerk's Office in the name of this court, the subpoena commanded Vázquez to appear for trial on February 1, 2013, at 9:00 A.M. At the bottom of the subpoena, however, appeared a handwritten note with instructions contrary to the official language of the document: Vázquez was to contact Carlos Barreiro, the F.B.I. case agent, to arrange a pretrial interview at the United States Attorney's Office. (Exh. 3.) The subpoena was signed by José Ruiz-Santiago, Chief of the Criminal Division, on behalf of Julia Díaz-Rex, one of the Assistant United States

Criminal No. 09-427 (JAF)                                                                                           -3-

Attorneys assigned to this case. Id. At the hearing, the government roughly estimated that as many as forty such subpoenas had issued. (Docket No. 820.)

Following that hearing, the court quashed all similarly-situated subpoenas and ordered the immediate production of a detailed audit cataloging: The number of subpoenas issued; the date of their issuance; the name of the AUSA that appears on each printed subpoena; the name of the signature authorizing the subpoena; the date of service; the date of the interview if held; the name of each witness; and whether the witness attended the scheduled interview with the government. (Docket No. 810.) The court ordered that the audit also include the names of the government attorneys that participated in the process of preparing and issuing the respective subpoenas. Id. A subsequent Order required that the audit indicate, for each person subpoenaed by the government, their status as a "willing" or "unwilling" witness and the purpose of the interview in general terms. (Docket No. 812.)

On Monday, February 4, 2013, the government produced an audit in compliance with our Orders. (Docket No. 815.) The government's audit was accompanied by a binder containing all of the subpoenas issued. The court marked this binder as "Court's Exhibit A." The materials produced by the government indicate that one-hundred and seven Rule 17 subpoenas were issued. Over seventy-two of these subpoenas commanded the named party to appear before the court on a specific date, followed by countermanding instructions, typed or handwritten, diverting the witness to a private interview for pretrial preparation at the United States Attorney's Office. The vast majority of the subpoenas were issued to law enforcement personnel. Except for the defense alibi witness who testified on February 2, no defense witness appears on the list of improperly-issued subpoenas.

Criminal No. 09-427 (JAF)                                                                                                -4-

The court canceled the jury voir-dire session scheduled to take place on Monday, February 4, 2013, in order to review the materials submitted by the government during a hearing with both parties present. (Docket No. 811.) At this hearing, the court learned that Luis Vázquez, who the government had identified on an issued subpoena as a "Custodian of Records," was actually an individual with a potential personal connection to this case. Vázquez had previously been acquitted in a local murder prosecution. (Docket No. 826.) Vázquez is not a custodian of any records.

Attempting to explain its behavior, the government cited a variety of excuses. A legal assistant, who is "relatively new and has been in the office for only 5 months," prepared the subpoenas "erroneously." (Id. at 5.) The witness list was cumbersome and lengthy, raising concerns about the ability "to locate and serve witnesses" in time for trial. (Id. at 6.) The Assistant United States Attorneys who signed the subpoenas failed to "catch the mistake" because they neglected their oversight duties. (Id. at 5.) And F.B.I. Agent Barreiro instructed other agents to serve the subpoena as a request for a pretrial interview as a way of ensuring "maximum efficiency," thus "avoiding the need to contact [witnesses] on two occasions." (Id. at 6.)

## II.

Rule 17(a) requires a subpoena to "state the court's name and the title of the proceeding, include the seal of the court, and command the witness to attend and testify at the time and place the subpoena specifies." Fed. R. Crim. P. 17(a). "The subpoena power is a substantial delegation of authority … and those who invoke it have a grave responsibility to ensure it is not abused." Theofel v. Farey-Jones, 359 F.3d 1066, 1074 (9th Cir. 2004). Using "the court's subpoena power to compel witnesses to attend ex-parte interviews is improper" because Rule 17(a) permits subpoenas "**only to compel**

**attendance at formal proceedings such as hearings and trials**." <u>United States v. Villa-Chaparro</u>, 115 F.3d 797, 804 (10th Cir. 1997) (emphasis added); <u>see</u> <u>also</u> <u>United States v. LaFuente</u>, 991 F.2d 1406, 1411 (8th Cir. 1993) ("The government may not use trial subpoenas to compel prospective trial witnesses to attend pretrial interviews with government attorneys."); <u>United States v. Keen</u>, 509 F.2d 1273, 1274 (6th Cir. 1975) ("[N]o question" that the government's use of trial subpoenas to compel witnesses to attend an interview was "highly improper."); <u>United States v. Hedge</u>, 462 F.2d 220, 222-23 (5th Cir. 1972) (government abused the subpoena power by requiring "witnesses to appear for interviews at the office of the United States Attorney … before trial.").

The U.S. Attorney's Manual recognizes that "[s]ubpoenas in Federal proceedings … are governed by Rule 17 of the Federal Rules of Criminal Procedure." U.S. ATTORNEY'S MANUAL §§ 9-11.140. The Department of Justice's Grand Jury Manual further solidifies the law: The government may not use "its subpoena power after indictment of a defendant for the gathering of evidence, or, otherwise, for pretrial discovery or trial preparation for a trial against that defendant." U.S. DEPARTMENT OF JUSTICE GRAND JURY MANUAL §§ III.A.1.b.

States that have adopted the Federal Rules of Criminal Procedure consider the misuse of the subpoena power in criminal proceedings to be an ethical violation. <u>E.g.</u>, Colo. Bar Assoc. Comm. on Prof'l Ethics & Grievances, Formal Op. 102 (1998). The opinion states that it is "unethical to obtain information from a witness" through a Rule 17 subpoena if a letter attached to the subpoena suggests that "the witness need not appear at the criminal proceeding if the witness will simply deliver to the attorney by mail or otherwise the documents, records, or other information requested." <u>Id.</u>

Rule 17 specifically imposes limitations on the defense that it does not impose upon the government. See Fed. R. Crim. P. 17(b) (certain restrictions are noted as being imposed only upon defendants). However, the rule imposes obligations on all parties, as case law has made clear. United States v. Nixon, 418 U.S. 683, 699 (1974) (in order to require pretrial production under subpoena a moving party must satisfy a four-prong test). Here, despite its inherent advantage under Rule 17 and the clear directive of case law, the government abused its discretionary authority to gain a tactical advantage over the defense, both by improperly calling witnesses and by violating the Nixon rule regarding the pretrial production of documents.

An individual summoned by a subpoena—whether a bus driver, a plumber, a grocery store clerk, a Ph.D, or the head of the most powerful corporation in the world—understands that he has received a court order that must be obeyed. The subpoena is an illustration of the government's limited but coercive power, and the prosecution assumes an awesome responsibility when it brings that power to bear on the lives of average citizens. Here, the United States Attorney's Office has manifestly abused this extraordinary coercive power. That is particularly disturbing because,

> [t]he United States Attorney's [Office] is the representative not of an ordinary party to a controversy but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, it is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. [The office] may prosecute with earnestness and vigor—indeed, [it] should do so. But, while [it] may strike hard blows, [it] is not at liberty to strike foul ones. It is as much the [office's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88 (1935).

Misconduct of this magnitude has no place in this or any other federal court. That the government would openly flout a clear rule of procedure and then pretend to excuse the abuse by citing "efficiency" and low-level employee mismanagement is shocking. It is doubly shocking that it occurs in a case of this importance: A multiple-murder capital case.

The court has often reminded the attorneys on both sides to bring the best of their professional acumen to bear on this matter. Yet, as the parties were engaged in jury selection this misconduct flourished. A case of this difficulty, with its allegations of cruelty and vice, requires the officers of the court to have clean hands—free from the stain of any sort of misconduct.

**III.**

The court has addressed this kind of violation in the past. See generally United States v. Santiago-Lugo, 904 F.Supp. 43 (D.P.R. 1995). In Santiago-Lugo, the misconduct was caused, to some extent, by defense counsel's ignorance. There, the command was clear: "Unauthorized or illegal use of the subpoena power of this court under Fed. R. Crim. P. 17 … is strictly prohibited and the bar is advised that misuse of the subpoena power of this court will carry disciplinary sanctions." 904 F.Supp at 48.

In Santiago-Lugo, this court cautioned that with the increased power of attorneys to issue criminal subpoenas, "the liability of the attorney for misusing the subpoena rules is greater" because abuse of the subpoena power "directly implicates the court itself and creates an embarrassment for the institution." Id.

Here, the abuse was far more extensive and was carried out, in clear violation of published precedent, by those who should have known better. Dozens of people were

Criminal No. 09-427 (JAF) -8-

improperly commanded to appear at the United States Attorney's office, when there was no authority for the prosecution to order such a thing. Before addressing a remedy, this court must explore whether this abuse caused material prejudice to the defense.

## IV.

Defendants did not make any claim that the government's misconduct prejudiced them in any manner, other than in the case of the defense witness already discussed here. The vast majority of the subpoenas were served on law enforcement personnel— Puerto Rico Police Department officers, forensic technicians, and corrections officers. These individuals were perhaps not hostile to the government and nothing in the record indicates they would not have cooperated with the government absent the subpoenas. Nothing prohibits the government from speaking with its own witnesses prior to trial. Also, the list of witnesses indicates that only six of those who received improper subpoenas from the government were "civilians." Of those, the government has said that only one is likely to testify in its case-in-chief. (Docket No. 815 at 4.) Moreover, no identifiable instance exists in which the government intimidated or pressured a defense witness. Great consideration was given to whether the improper use of the subpoena power might have prejudiced the defendants' due process rights. See United States v. Hall, 432 F.3d 42, 55 (1st Cir. 2006) (recognizing "that a due process violation can occur where the government intimidates or harasses potential defense witnesses to discourage them from testifying."). Fortunately, although the prosecution abused the court's subpoena power in a way that the defense did not, Defendants have suffered no prejudicial harm.

Criminal No. 09-427 (JAF)                                                                                              -9-

That we find no harm to the Defendants is, in no way, approval of the government's abuse of process. To preserve the rule of law, the court must impose the following sanctions.

First, the U.S. Attorney's Office shall draft a written protocol articulating the process by which Rule 17 subpoenas are to be prepared, issued, and returned. This written protocol will be accompanied by notice to all staff of the U.S. Attorney's Office, citing the impropriety of the illegal practice employed in this case. The government will supply the court with the documents they develop to comply with this sanction.

Second, because the record persuasively indicates that Assistant U.S. Attorney Julia Díaz-Rex was the lead actor behind the abusive Rule 17 practice, the court disqualifies her from this case.

Third, the court will notify the Department of Justice, Office of Professional Responsibility, of this misconduct. The Attorney General has spoken extensively about his intention to create a renewed culture of prosecutorial responsibility. The misconduct at issue here falls short of the standard expected of United States Attorneys and is certainly worth the Attorney General's attention. The court strongly encourages the Office of Professional Responsibility to investigate whether and to what extent any other prosecutors in this district have engaged in this practice as a matter of routine. This recommendation is not meant to impugn the integrity of the Office of the U.S. Attorney, but rather to ensure that any additional abuse of Rule 17 ceases.

Finally, the government will disclose all Jencks and Giglio material no later than seventy-two (72) hours before opening statements. See 18 U.S.C. § 3500 ("Jencks Act"); Giglio v. United States, 405 U.S. 150 (1972). This modifies our previous order, (Docket No. 796), which ordered disclosure of this material seventy-two (72) hours

before each respective witness is called to testify. Additionally, the government will complete the disclosure of its witness list seventy-two (72) hours before opening statements. This modifies our previous order, (Docket No. 787), which ordered the disclosure of this information seventy-two (72) hours before the witness was called to testify. The government has the resources to protect these witnesses' safety if the need arises. This sanction is necessary to restore the balance of power between the parties. The government has asked repeatedly to delay the disclosure of this information, but the government has sought a tactical advantage through illegal practice, while the defense has not. This sanction will repair the imbalance between the parties.

## V.

Misconduct of this kind strikes at the foundation of the court's integrity and its impartiality. As a result, the court has imposed these sanctions not only as punishment for misconduct, but as deterrence: If advocates will not protect the institution of the court, then the court must do so itself.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 7th day of February, 2013.

                                         s/José Antonio Fusté
                                         JOSE ANTONIO FUSTE
                                         United States District Judge