```
 1            UNITED STATES DISTRICT COURT

 2               DISTRICT OF PUERTO RICO

 3

UNITED STATES OF AMERICA,
 4
                    Plaintiff,
 5   v.                                 Docket No. 09-427

 6                                      San Juan, Puerto Rico
     ALEXIS CANDELARIO SANTANA, and     February 21, 2013
 7   DAVID OQUENDO RIVAS,

 8               Defendants.
     _____

 9

10                      JURY TRIAL

11      BEFORE THE HONORABLE JUDGE JOSÉ A. FUSTÉ,

12            UNITED STATES DISTRICT JUDGE.

13   _____

14   APPEARANCES:

15   For the Government:      Mr. Bruce Hegyi, AUSA
                              Ms. Maria Dominguez Victoriano, AUSA
16                            Ms. Marcela Mateo, AUSA

17

18
     For the Defendants:      Mr. David Arthur Ruhnke, PHV
19                            Mr. Francisco Rebollo Casalduc, Esq.
                              Mr. Jose R. Aguayo, Esq.
20

21

22

23

24

25   Proceedings recorded by stenography.  Transcript produced by
     CAT.
```

```
 1                          I N D E X

 2   WITNESSES:                                       PAGE

 3       EVELYN MEDINA
         Direct examination by Ms. Mateo               92
 4
         JANNETTE MAYSONET NEGRON
 5       Direct examination by Ms. Dominguez           98
         Cross-examination by Mr. Rebollo             127
 6       Cross-examination by Mr. Aguayo              140

 7       CARMEN MARIA GARCIA SANTIAGO
         Direct examination by Ms. Dominguez          169
 8       Cross-examination by Mr. Rebollo             178

 9

10   EXHIBITS:

11       Government Exhibits One through Five          94
         Government Exhibits Six through Eight        119
12       Defendant Oquendo Exhibit One               141
         Joint Exhibits I and II                     146
13

14

15

16

17

18

19

20

21

22

23

24

25
```

| 1 | San Juan, Puerto Rico |

1                                          San Juan, Puerto Rico

2                                          February 21, 2013

3                                          At or about 9:01 AM

4                          *       *       *

5              THE COURT:  Please be seated.

6              Let me discuss a couple things with you first before

7    we bring the jury panel in.  About the lectern, the lectern

8    cannot be turned, because under that lectern, you have a box

9    of wires that is wide.  It's a square as big as the lectern.

10   We have tried that before, and what we have done is screw up

11   the cables.

12             It has happened before, and the last time it happened

13   it took me three days to get them fixed, because they had to

14   dismantle the whole thing and find the cables.  So I'm not

15   going to take any chances with that.

16             When the case is actually proceeding, it's easy,

17   because you are in the lectern and you are basically facing

18   the witness stand.  So that's easier.  There is no big deal

19   with that.

20             As to the opening statements and closing arguments,

21   what we can do is use the microphone, the portable.  And I

22   would prefer that you stay in the area of the lectern.

23             When you have to give a paper to the witness, you

24   don't have to be asking permission, can I approach, because

25   any kind of normal, expected approach is okay, you know.  We

1    don't have to get permission for that.  That rule usually is

2    implemented for lawyers who are aggressive and they come

3    running to the witness and things of the sort.  We don't have

4    that here, so there's no issue.

5         The other thing I would like to do is to tell you

6    that I personally don't like -- the same way that in the

7    instructions you proposed, if you find a juror in the hallway,

8    whatever, you have to stay away, which is normal, of course.

9    It's not only to protect the jury integrity but to protect the

10   case more than anything else.

11        I would prefer that when we are dealing in court,

12   that we just -- I don't like this Puerto Rican thing of

13   getting up and saying good morning, members of the jury, good

14   morning, Judge.  It sounds as if you are going to have coffee

15   or something.  I don't like that.  It's better to say if

16   you're going to come to the podium, to say, members of the

17   jury, may it please the Court.

18        You don't have to call me Your Honor.  Call me Judge.

19   Call me Jose.  Call me whatever.  I don't care about me, see?

20   But I want to keep these things flowing in a way that is

21   extremely respectful and formal, especially because of the

22   kind of case.  That's all I'm asking.

23        The use of the microphones is extremely important.  I

24   was asking this morning when I arrived early with Mr. Ruhnke

25   and your assistant, whose name is -- I'm sorry.

1          MR. RUHNKE:  Howe, Dr. Julie Howe.

2          THE COURT:  That the microphone system is extremely

3     good, but how you hear the sound in this courtroom is these

4     little speakers you hear now.  There are no speakers in the

5     ceiling operational now, because they put in a new system and

6     these are the speakers.

7          You see there is one in the witness stand.  There is

8     one next to the court reporter.  And every two or three seats

9     there is one on the wall in the jury box.  This is -- I love

10    the other system we had before, which the sound would come

11    from the ceiling and it would be a lot easier to hear.  This

12    requires -- the sound is not the same, and it requires

13    adjusting the volume in each one of the speakers as you go

14    along.  And that's a real pain sometimes.

15         That's why we have to keep ourselves close to the

16    microphones, so that everything can be understood.

17    Especially, especially when we have a jury that is mainly

18    Spanish speaking obviously.  I'm mainly Spanish speaking, too,

19    myself.  My English is a second language.  There is no

20    question about it.  And sometimes when you have stateside

21    attorneys, it is extremely important that every word is

22    understood.

23         And for that reason, for that reason, I'm going to

24    beg you to be very conscious of the use of the microphone.  If

25    it sounds loud, don't worry about it.  We are loud people here

1    in Puerto Rico, so don't worry about it.  If it sounds loud,

2    don't worry about it.  That's a Latin thing.  It's loud.  It's

3    okay.

4            I know, I've tried cases in the states, and people

5    are more soft spoken and whisper in the courtroom.  That's

6    fine.  You have to speak louder here, because that's the way

7    we deal with things.

8            We are going to bring the jury now.  We have them in

9    numerical order, as we promised.  And then we are going to do

10   the strikes.  After we do the first 20 and 20, we have some

11   extras, and I'll figure out how to divide them.  It's five and

12   three I remember.  Correct?

13           MR. HEGYI:  Yes.

14           MR. RUHNKE:  Yes.

15           THE COURT:  So let me see.  If it's five and three,

16   we could actually do one by one, and then we could do two and

17   one, two and one, and one and one.  We can do that, and even

18   it out.  Then the alternates of course are going to be done in

19   the usual manner, one and one.

20           What else?  Once we do that, we're going to swear

21   them in, and we will proceed.

22           MR. AGUAYO:  Your Honor, may I say something?

23           THE COURT:  Questions.  This is the moment for

24   questions, Mr. Aguayo.

25           MR. AGUAYO:  First I want to tell the Court I'm

1    sitting here because when we do the peremptories --

2           THE COURT:  I don't care.  That's fine.  I would not

3    expect you to be facing me when you participate in jury

4    selection.  You can turn around and do whatever you have to

5    do.  I don't care about that.

6           MR. AGUAYO:  The other thing, Your Honor,

7    concerned -- can you hear me, sir?  Yes?  I'm having concerns

8    in regards to the discovery.

9           THE COURT:  Why?

10          MR. AGUAYO:  Well, yesterday, while we were preparing

11   for today, I get a call or an e-mail approximately 4:00, 4:30

12   in the afternoon advising me that there's more discovery.  As

13   you can obviously think, Your Honor, you know, I'm working on

14   something, and then I have to go get discovery.  It's about --

15   as I understood it, it was about 40 items.  I sent my

16   secretary to get them, because I wasn't going to leave the

17   office.

18          We have to go through all that.  And this morning

19   again they give us another disc of discovery.  In that

20   discovery of yesterday, it turns out there's another

21   government witness against Mr. Alexis Candelario and Mr. David

22   Oquendo.  The point being, I think the Court was very clear

23   that 72 hours prior to trial this information had to be in our

24   hands.

25          Now the Government is saying, well, this is not

1    really Jencks, because the witness did not write this report.

2    However, my understanding was, and in fact the government did

3    give us 72 hours before the unredacted 302s, and to use that

4    excuse now I think, you know, kind of stretches --

5            THE COURT:  Well, let me ask.  There must be a

6    reason.  There could be many reasons.  Could be they're

7    playing around with you or there's a reason.  They gave you a

8    reason for that?

9            MR. AGUAYO:  Well, this particular 302, the interview

10   was in December of --

11           THE COURT:  Does it pertain to the first witness?

12           MR. AGUAYO:  It doesn't pertain to the first witness,

13   Your Honor.  But my point is that this is a lot of documents,

14   not only this thing, but other things that are on the

15   discovery disc.  It's a lot of documents to review.

16           We're obviously in trial all day.  When we leave

17   here, they're going to give us the witness list, so we have to

18   prepare for the next day.

19           THE COURT:  But you know, you know that in real cases

20   in all courts sometimes when somebody's reviewing paperwork

21   and preparing, things are found that for whatever reason,

22   perhaps omission, or good faith omission, doesn't necessarily

23   have to be anything wrong, they find something and they

24   immediately do it.

25           If it's proven that they had it and that it was right

1    there in front of their face for 20 days and they wait until

2    the last moment, that's one thing.  But I need to hear,

3    because it's extremely possible that sometimes, when you are

4    reviewing and making certain that you have complied, you

5    discover new things or find something.  My God, I didn't give

6    this.

7         MR. AGUAYO:  I understand, Your Honor.

8         THE COURT:  So we have to play that around.  I'm not

9    going to exclude that.  I have to know what the reason was.

10   Let me hear.

11        MR. REBOLLO:  May I, Your Honor?

12        THE COURT:  Yes.

13        MR. REBOLLO:  Judge, I hear what you're saying, and I

14   agree, but the problem we're having is the discovery we got

15   this morning particularly, there is yet to be seen an amount

16   of Jencks that was provided today, at least that's what the --

17   that's what the cover letter states.  It's a couple hundred

18   pages of Jencks.  And our problem is we're going to open

19   without having reviewed that Jencks.

20        And what we request is 45 minutes to an hour to be

21   able to review it.  It's not -- Judge, it's not our fault.  We

22   just got it this morning.

23        THE COURT:  Wait a minute.  Wait a minute.  Let me

24   hear the other side first, because I am going to resolve this

25   amicably.

1          Mr. Hegyi, what is the reason for this barrage of

2  papers at the last minute?

3          MR. HEGYI:  It is what Your Honor is saying.  When

4  the Government was going through its stuff for preparation for

5  trial and to make sure everything was out, we realized that

6  the FBI had never reduced to writing a 302 for this one

7  individual.  And so a request was specifically made to the FBI

8  to prepare a 302.  It didn't exist.  And we asked them to

9  prepare it.  It was delivered to us yesterday.  We provided it

10  to the defense yesterday.

11          THE COURT:  I see.

12          MR. HEGYI:  And with regard to the --

13          THE COURT:  Were you aware of those papers before

14  yesterday?

15          MR. HEGYI:  What papers?

16          THE COURT:  The papers that were disclosed.  When did

17  you become aware that they were -- the material that had to be

18  turned over.

19          MR. HEGYI:  Okay.  I was not involved directly in

20  that.

21          THE COURT:  Who was?  Who was?

22          MS. MATEO:  The other material that was provided was

23  also provided to us yesterday.  So right away is when we

24  provided it to defense.

25          THE COURT:  Okay.  Let me say this.  Remember that

1   opening statements under the definition is an outline or

2   summary of the nature of the case, sometimes anticipated

3   proof, not necessarily, presented by an attorney to the jury

4   at the start of the proceeding.  The purpose is to give

5   general advice to the jury on issues involved and to give the

6   jury a general idea as to what may be the factual situations

7   that the jury may be facing so that they can understand better

8   the evidence.

9          No opening statement will contain, will contain a

10  complete recital of the facts and will not discuss the

11  testimony of every particular witness, because doing that,

12  doing that, he or she that does that is trapping him or

13  herself into a corner, because you never know what the

14  evidence is going to come out or how is it going to come out.

15         So I just don't see the prejudice.  We're going to

16  start the case, and this is it.  Simple as that.

17         MR. AGUAYO:  Your Honor, I have one more request, and

18  again it's with regard to opening statements.  And I don't

19  want hopefully any objections to my opening statement.

20         THE COURT:  It's simple.  If you don't want any

21  objections, don't do anything wrong in the opening

22  statement.

23         MR. AGUAYO:  Precisely.  This is why I'm asking this

24  now.  Throughout the qualification of the jurors, it's been

25  mentioned that Alexis Candelario is eligible for the death

1    penalty, or has been certified for the death penalty, whereas

2    David Oquendo has not.  However, to the jurors that were being

3    qualified, it was mentioned it's going to be death or life.

4              THE COURT:  Yes.

5              MR. AGUAYO:  My client is looking at life now.  I

6    know normally, normal cases that are not presented with this

7    situation of a death eligible candidate and a non-death

8    eligible candidate I would not be allowed to talk about

9    possible sentences.  But since the jurors heard death or life,

10   I would like to bring out that this case is equally important

11   to my client, because he's looking at life.

12             And I would like your comments on that, if I would be

13   allowed to say so.

14             THE COURT:  Yes?

15             MR. HEGYI:  Your Honor, here's our concern.  The jury

16   is not supposed to even worry about the sentence.  His

17   sentence will be up to Your Honor.

18             THE COURT:  The best way for me to do this is

19   reinstating to the jury, as part of the preliminary charge,

20   how is the case standing?  The case is the case.  We're going

21   to do the guilt phase now.  That, as to your client, is a

22   regular felony case, regular felony case.

23             MR. AGUAYO:  Yes.

24             THE COURT:  And as to the other gentleman, there may

25   be a second phase, which you have told the jury basically

1    during the thing.  And that's it.  And then we'll take it from

2    there.  I don't think that you -- I don't know.

3            MR. AGUAYO:  Well, as I said, my concern is, Your

4    Honor, that they obviously see the importance of this trial as

5    to Alexis Candelario, and as does he, that it's death or life.

6    And I want to bring up this is equally important to my client,

7    because he's looking at life.

8            THE COURT:  Well, it may be life.  What if he's not

9    convicted of some of the mandatory life charges?  Is there

10   anything there manditorily not life?

11           MR. AGUAYO:  Well, from the way I've seen this thing,

12   it looks like we're talking --

13           THE COURT:  All of them are?

14           MR. AGUAYO:  Yes.

15           THE COURT:  Well, let me try.  I think I can be good

16   at that.  I can actually restate to the jury the fact that

17   there is a difference between the case of one and the case of

18   the other, see?

19           MR. AGUAYO:  But mentioning that even though Alexis

20   Oquendo (sic) is looking at death or life, he's looking at

21   life.

22           MS. MATEO:  No, it can't be.

23           MR. HEGYI:  Your Honor.

24           MR. AGUAYO:  That's what we've been talking about.

25           MR. HEGYI:  That's where we have a problem.

```
 1                  THE COURT:  One at a time.
 2                  MR. HEGYI:  The jury's not supposed to consider
 3        punishment.  The only person they're supposed to consider
 4        punishment is against Mr. Candelario Santana.
 5                  THE COURT:  But there is a reality.  During the jury
 6        selection we have been discussing very serious punishments.
 7        Nobody ever mentioned as to this gentleman, Mr. Oquendo,
 8        nobody ever said life.
 9                  MR. HEGYI:  And it isn't --
10                  THE COURT:  Nobody said it.  And we were
11        concentrating basically as to Mr. Candelario.
12                  MR. HEGYI:  Uh-huh.
13                  THE COURT:  Now, let me -- let me figure a way to
14        deal with this.  And I'll try to figure out a way in which I
15        can stress that there is a difference, and that at this stage,
16        they should not be concerned with penalties either, because
17        the truth of the matter is that is what the instructions ask
18        you to do in the context of the guilt phase.
19                  MR. HEGYI:  And, Your Honor, that's what we would
20        propose.
21                  THE COURT:  Right.
22                  MR. HEGYI:  You indicate Mr. Candelario has death or
23        life.  Don't worry about Mr. Oquendo.  He's not facing the
24        death penalty, and his punishment should be reserved for the
25        Court.
```

1        THE COURT:  Not only that, in his case, I don't know

2   what he's going to get convicted of, if anything, and his

3   Presentence Report may suggest something that may be different

4   from life.  I don't know.  So why should we label him a life,

5   life, for sure?  Maybe he is.  And probably he will --

6        MR. AGUAYO:  Yes.

7        THE COURT:  But not necessarily so.  Don't you think?

8        MR. AGUAYO:  Well, can you say that --

9        THE COURT:  Well --

10       MR. AGUAYO:  -- it could be that?

11       THE COURT:  Why don't you let me say what I think I

12  should say.  And I'll try to be fair as to that.  I'll try to

13  be, you know, balanced as to that.

14       MR. AGUAYO:  That's why I wanted to anticipate

15  that.

16       THE COURT:  But I don't think you should include that

17  in your opening.  Let me deal with those issues.  And believe

18  me, I'm going to be stressing throughout the trial certain

19  things that are extremely important.

20       MR. AGUAYO:  Yes, Your Honor.

21       THE COURT:  Because I want to do this right, and I

22  want everybody to feel that no matter what happens, this was

23  done right, as correct as we can do it as human beings.

24       MR. AGUAYO:  All right.

25       MR. RUHNKE:  A couple of minor things, Your Honor.

```
 1              THE COURT:  Yes.

 2              MR. RUHNKE:  We asked for four particular --

 3              THE COURT:  I'm going to give them.

 4              MR. RUHNKE:  That's fine.  Thank you.

 5              THE COURT:  I'm going to give them.  Of course I'm

 6     going to give them.

 7              Okay.  So why don't we bring the panel in.  This

 8     gentleman who is in the blue shirt has to get out of there now

 9     for the time being.  Let's bring the panel in, and then we're

10     going to do some introductions, repeat -- is anybody else from

11     your office going to be here?

12              MR. HEGYI:  Not for the jury selection, but as soon

13     as we're done, Ms. Dominguez will be here.

14              THE COURT:  Okay.  She's the only other Assistant

15     that's coming?

16              MR. HEGYI:  That's the only other Assistant that's

17     coming.

18              Your Honor, may I ask one question?  I know in this

19     jurisdiction Batson is not a big issue.  In D.C. we always

20     were required to put down the race and gender of the person we

21     struck.

22              THE COURT:  We don't do that here.

23              MR. HEGYI:  Right.  Understood.

24              THE COURT:  The only issue that could happen here,

25     that could happen here is that, for example, you strike 20
```

1    women.

2            MR. HEGYI:  Right.

3            THE COURT:  Then we have to deal with that

4    situation.

5            MR. HEGYI:  But we don't need to put down female or

6    male next to the strike?  We can unscramble the egg, because

7    we'll know who it was.

8            THE COURT:  No, I don't ask that you do that.

9            MR. HEGYI:  Okay.  Thank you, Your Honor.

10           THE COURT:  And once again, those of you who are not

11   locals are not aware that sometimes in the context of Latin

12   culture sometimes women can be as hard or worse than men.  Let

13   me tell you that.

14           MR. AGUAYO:  Your Honor, lastly, I just want to

15   inform the Court I'll be presenting Victor Chico Luna.

16           THE COURT:  Yes, of course.  I want this jury to

17   fully respect each one of you as attorneys, and I want to live

18   with the understanding that this was a first class tried case.

19   That's all I want.  And luckily, I'm sure that that will

20   happen.

21           (At 9:21 AM, jury panel entered the courtroom.)

22           THE COURT:  You can turn your chairs around.  I have

23   no problem with that at all.  You have to actually be able to

24   see who is who.  And if you want to put your chairs on this

25   other side for the time being, I don't care either, or get a

1   couple folding chairs and do that.  I don't care.

2           Oh, I don't know if I have a coin in my pocket.  If

3   not, somebody has to give me a coin.  And who wants to be

4   heads and who wants to be tails?  Or should I --

5           MR. RUHNKE:  We'll be heads, Your Honor.

6           THE COURT:  You'll be heads.  Okay.

7           (Coin tossed by Judge.)

8           THE COURT:  Tails.

9           Counsel, I'm going to try to see if I can adjust the

10  lights here so we can make better use of the board.

11          MR. REBOLLO:  Okay.

12          THE COURT:  Let me try.  I don't promise anything.

13  That's as much as we can do.

14          Okay.  So the lawyers can sit.  We are ready to

15  start.

16          Members of the jury panel for this case, you are the

17  ones who were pre-qualified to be in this larger panel.  And

18  out of this group, we're going to select a jury for this case,

19  12 regular jurors and four alternates.

20          The process works this way.  The law provides for a

21  number of what we call peremptory challenges, which are

22  challenges that do not have to be explained to anybody.  It's

23  just the lawyers doing them, because you have to reduce the

24  group from 77, I think we have here, to the number that we

25  need.  And this is done by striking on a one to one basis on a

1    list.

2           You saw that the lawyers, some of them, are turning

3    their chairs around to be able to look at you.  I don't mind

4    that they move around, because they don't have a photo.

5    Remember we have been doing this jury selection for days.  We

6    started on January 28, actually.  So this is the moment when

7    they have the questionnaire, the notes they made when they

8    interviewed you, and they have to put sometimes a face to the

9    questionnaire to be able to remember who you are basically.

10          So don't think that if they are staring at you or

11   something or looking around it's because they are being

12   disrespectful.  That is not the issue.  The issue is they have

13   to be very sure what they're going to do, and they want to

14   make certain for example if they are looking at juror 700,

15   juror 700 is a woman and not the man they thought.  They have

16   to just figure that out.

17          So in that sense, I give them full liberty of

18   movement around.  They can sit facing that way.  They can sit

19   facing this way.  Because what we do is they do this job

20   properly, and as expediently as possible.

21          We have -- you saw me toss a coin.  The coin is to

22   decide who starts.  And the Government starts basically.  So

23   we're going to go one by one.  The Government will make one

24   challenge, and you will pass the piece of paper to the other

25   table.  They will make one challenge.  It returns until we

1   have done the 20 and 20.

2           And after that, I already told you what we're going

3   to do with the rest, okay?  So we're ready to start.

4           MR. RUHNKE:  Yes.

5           MR. HEGYI:  Yes, Your Honor.

6           THE COURT:  So Ms. Villavicencio will give you the

7   official list.  We're striking now for regular jurors,

8   basically.

9           THE COURT:  Let me say one thing before we continue.

10  These lawyers are totally committed as a group to try a first

11  class case in every sense of the word.  So it's extremely

12  important that you know that all of us together as a team of

13  professionals are really trying to do the right thing here.

14  Make it correctly, everything correctly, the proper way.  So

15  in that sense we hope to give you the best of each one of you

16  under the circumstances.

17          Mr. Hegyi, you can start.  Any question, ask Diana

18  how she wants them marked.

19          MR. RUHNKE:  Your Honor, could we see you at side bar

20  a moment?

21          THE COURT:  Sure.

22          (Bench conference held.)

23          THE COURT:  So what is the deal?

24          MR. RUHNKE:  I just noticed the Government exercised

25  a strike in the alternate pool, and I thought we were just

1   striking against --

2          THE COURT:  We're going to strike now strictly until

3   -- now we're striking only for the --

4          MR. RUHNKE:  Main panel.

5          THE COURT:  -- the main panel.

6          MS. MATEO:  There's no line on the list.

7          THE COURT:  Once you have done your 20, 20, five and

8   three, we'll make a line, okay?

9          MR. RUHNKE:  But the line has got to be 65, right?

10  68?  The line is at 68?

11         MS. MATEO:  That's the problem.  We don't know.

12         MR. RUHNKE:  There's only 68 strikes against the main

13  panel.

14         COURTROOM DEPUTY:  You exercise all your strikes.  I

15  will count 12 jurors.  Then I will draw the red line, and

16  below that line you will select the alternates.

17         MR. REBOLLO:  But if they exercise their strike very

18  low, like they did, now they're effectively striking the

19  alternates.

20         THE COURT:  No, no, no, not necessarily.  You can

21  start anywhere on the list.

22         MR. RUHNKE:  All right.  Fine.  That was just a

23  ground rule issue.  That's fine.

24         THE COURT:  Once we have done the 20, 20, five and

25  three, then what remains in the list is the pool for

1    alternates.

2              MR. RUHNKE:  Okay.

3              (Bench conference concluded.)

4              COURTROOM DEPUTY:  Your Honor, the attorneys are done

5    with the first group of challenges.  They are going to

6    exercise now the additional.  With the first 20.  They are

7    going to exercise now the additional.

8              THE COURT:  They're going to start that now.  Okay.

9              MR. RUHNKE:  I understand that to be one, two, one,

10   two, one, one.

11             THE COURT:  Right.  Exactly.

12             MR. RUHNKE:  Your Honor, can we just approach?

13             THE COURT:  Sure.  Bring the list when you finish.

14             (Bench conference held.)

15             MR. RUHNKE:  We've now exercised all the strikes

16   against the main panel.

17             THE COURT:  Uh-huh.

18             MR. RUHNKE:  We'd like is to take about ten minutes

19   and look at what has happened to see if there are any things

20   we have a problem with.  And I want to make this suggestion,

21   that we just send all these jurors back to the other

22   courtroom.

23             THE COURT:  No, no.

24             MR. RUHNKE:  And not bring them back.  And not bring

25   them back here.

1          THE COURT:  No.  I'll give you the ten minutes, and

2   we'll stay here.  I'll watch something on my iPad.  I don't

3   want to move jurors around.

4          MR. RUHNKE:  Okay.

5          THE COURT:  I'll give you ten minutes.

6          MR. REBOLLO:  Could we step out of the courtroom?

7          THE COURT:  Of course you can step out of the

8   courtroom.  It's fine with me.

9          MR. AGUAYO:  Can we go to the attorney's lounge?

10         THE COURT:  I'll give you the ten minutes.  I'll stay

11  here.  Diana, you're going to do the red line.

12         COURTROOM DEPUTY:  Yes.

13         THE COURT:  Make sure you're in agreement with her

14  how you're going to do the mechanics of this.

15         MR. RUHNKE:  Yes.

16         THE COURT:  You can leave the room.  I'll stay here.

17  You can do whatever you want, okay?

18         (Bench conference concluded.)

19         (At 10:37 AM, defense attorneys left the courtroom.)

20         (At 10:41 AM, defense attorneys entered the

21          courtroom.)

22         THE COURT:  All set?

23         MR. RUHNKE:  We're all set, Your Honor.  We can

24  proceed.

25         THE COURT:  Very well.  So we're going to proceed in

1    the same order, three each side, one and one.

2              COURTROOM DEPUTY:  Below the red line.

3              THE COURT:  Below the red line, of course.

4              As your numbers are called, please stand up.

5              Proceed to call the jury.

6              COURTROOM DEPUTY:  Juror number four.

7              Juror number 193.

8              THE COURT:  One nine three.

9              COURTROOM DEPUTY:  Juror 252, two five two.

10             THE COURT:  Wait.  There is a -- check it out.

11             COURTROOM DEPUTY:  193.

12             It's two five two.

13             Juror number 297, two nine seven.

14             Juror number 352, three five two.

15             Juror number 356, three five six.

16             Juror number 360, three six zero.

17             Juror number 395, three nine five.

18             Juror number 553 -- 55 -- I'm sorry.  453.  Juror

19   number 453.

20             Juror number 459, four five nine.

21             Juror number 482, four eight two.

22             Juror 491, four nine one.

23             And for alternates, juror number 583.

24             THE COURT:  He's here in the back.

25             COURTROOM DEPUTY:  Five eight three.

```
1              Juror number 594.

2              Juror number 610, six one zero.

3              Juror number 512 -- I'm sorry.  612.

4              Juror number 616, six one six.

5              And juror number 626, six two six.

6              THE COURT:  Okay.  Those of you who are in the jury

7    box --

8              MR. HEGYI:  Wait one second, one moment, Your Honor.

9              THE COURT:  Review the numbers, please.

10             COURTROOM DEPUTY:  I'm sorry, Your Honor.  The last

11   juror is not 626.

12             THE COURT:  Which is it?

13             COURTROOM DEPUTY:  It's 638.

14             THE COURT:  Who is 638?

15             COURTROOM DEPUTY:  638.

16             THE COURT:  Okay.  Very well.  Those of you who are

17   not standing, who are sitting in the jury box, would you be so

18   kind as to exit and sit in the back and sit in the general

19   area again?

20             THE COURT:  And, Diana, you can proceed to seat them

21   accordingly.

22             COURTROOM DEPUTY:  Yes.

23             Juror number two -- I'm sorry, number four.  193.

24             THE COURT:  One nine three.

25             COURTROOM DEPUTY:  Yes.  252.  297.  352.  356.  360.
```

```
 1  395.  453.  459.  459.

 2          THE JUROR:  Here.

 3          COURTROOM DEPUTY:  Ah.  482.  491.

 4          Alternates, 583.

 5          THE JUROR:  Over here.

 6          THE COURT:  He's the first alternate.

 7          COURTROOM DEPUTY:  Yes.

 8          THE COURT:  First alternate.

 9          COURTROOM DEPUTY:  Here.  594.

10          THE COURT:  Second alternate.

11          COURTROOM DEPUTY:  610.

12          THE COURT:  Third alternate.

13          COURTROOM DEPUTY:  612.  616 --

14          MS. AGOSTINI:  612.  That's the fourth.

15          COURTROOM DEPUTY:  612 is the fourth, yes.  616,

16  alternate five.  And 638, alternate six.

17          THE COURT:  Everybody's in agreement that these are

18  the jurors you selected?

19          MR. HEGYI:  The Government is, Your Honor.

20          MR. RUHNKE:  Yes, Your Honor.

21          THE COURT:  Very well.  We're going to proceed to

22  take their oath.  Everybody stand up.

23          COURTROOM DEPUTY:  All jurors, please raise your

24  right hand.

25          You and each of you do solemnly swear that you will
```

1  well and truly try and true deliverance make in the case now

2  on trial, and render a true verdict according to the law and

3  the evidence?

4          THE JURORS:  (Answered affirmatively.)

5          COURTROOM DEPUTY:  So help you God.

6          COURT SECURITY OFFICER:  You may be seated.

7          THE COURT:  Those of you who were not selected, let

8  me say that I thank you, I thank you, I thank you again for

9  your patience and for your availability so that we could

10  actually select a jury for this case.

11          I think that you're going to take them back to the

12  jury assembly room, Becky?

13          MS. AGOSTONI:  Yes, Your Honor.

14          THE COURT:  So you should follow Ms. Agostini.  She's

15  going to follow you back to the jury selection room and give

16  you instructions there.  Thank you very much.

17          (At 10:59 AM, jury panel left the courtroom.)

18          THE COURT:  Very well.  Members of the jury, now that

19  you have been selected for this case, I will give you some

20  instructions, additional instructions, more instructions, to

21  guide you in your participation during the guilt phase of this

22  case.

23          You remember that this case is going to be tried in

24  two phases.  We're going to concentrate on the first phase and

25  forget about the second phase for the time being.

1          Let me give you some initial advice, if you will.

2     First of all, we have an Assistant U.S. Attorney sitting now

3     on the prosecution table, who was not here during jury

4     selection.  She's the first assistant, Ms. Maria Dominguez.

5          MS. DOMINGUEZ-VICTORIANO:  Good morning.

6          THE JURORS:  Good morning.

7          THE COURT:  Then we have on the other side the same

8     lawyers which you had before which you met during the jury

9     selection process.  I should tell you that the attorneys that

10    are representing these defendants, who are for Mr. Candelario,

11    Mr. Ruhnke and Mr. Rebollo, and Mr. Aguayo for Mr. Oquendo,

12    have been appointed by the Court.  And the Court will

13    compensate them for their services under a law that we know as

14    the Criminal Justice Act.

15         In the case of Mr. Candelario, Congress requires,

16    because he's a death penalty eligible defendant, that he be

17    entitled to the services of two appointed attorneys.  That is

18    the reason why Mr. Candelario has two attorneys.  I tell you

19    this to avoid any speculation about the source of the money

20    that is being used to pay for the defense in this case.

21    Actually, the Government funds that.

22         This is a relatively small community, and it may

23    happen that a member of the jury recognizes a witness as

24    someone he or she knows or is otherwise familiar with.  If

25    that were to happen, please alert a member of my staff,

1   Mr. Villavicencio or Diana about the fact that you recognize a
2   witness so that I can have the opportunity to deal with that
3   situation at best -- at the first opportunity.

4           The fact that you know a witness doesn't mean,
5   doesn't mean necessarily that you cannot be a juror in this
6   case.  Of course not.  But it's something that I should get to
7   know so I can find out what are the circumstances, okay?

8           Please do not discuss this issue or any issue with
9   any of your fellow jurors until I have had a chance to decide
10  how to proceed.  And I'm talking about the possibility that
11  one of you may have known one of the witnesses.

12          Since this is a small community and this is not a
13  huge courthouse, in the event that you run into any of the
14  lawyers at any time during the trial, lawyers or prosecutors,
15  of course, or you may run into them at a shopping center or
16  somewhere while you are having dinner or breakfast or
17  whatever, please do not think that they are being rude if they
18  do not greet you or say hello and simply turn back and walk
19  away.  That is what I have instructed them to do to avoid any
20  suggestion of improper contact with any member of the jury.

21          They are not being rude.  They are simply following
22  my instructions and doing exactly what lawyers in an ongoing
23  trial are supposed to do.

24          I also asked the lawyers earlier today that in --
25  that during the sessions, we should -- we should avoid every

1   time that a lawyer gets up saying for example, good morning,

2   members of the jury; good morning, Judge; this kind of thing.

3   I don't like that personally.  It's not because I don't like

4   to say hello to people.  It's simply this is a very formal

5   proceeding, and I prefer that matters be addressed properly,

6   members of the jury, Honorable Court or Court, whatever.  And

7   that's it, you know.  No salutations of any kind of that

8   nature.

9          Another thing that I should tell you is that both

10  Mr. Candelario and Mr. Oquendo, although tried together on

11  this first guilt phase, you have to give them complete

12  separate consideration as defendants and on each particular

13  charge which they are facing, because in truth and in fact,

14  each one is entitled, if you will, to a separate consideration

15  as if they were independently on trial.  But they are not.

16  They are together, because we don't want to try the case

17  twice.  But that's the rule, independent consideration of each

18  defendant.

19          As you will see, as we proceed, it may happen that

20  some evidence is allowed to -- as to a particular defendant

21  and not to the other.  If I instruct you at some point in time

22  that a particular piece of evidence, this pencil, for example,

23  is allowed against X and not against Y, you have to follow

24  that instruction of course.

25          Very well.  Well, let me continue now.  It will be

1  your duty to find from the evidence that will be presented in

2  this case what the facts of this case are.  You and you alone

3  are going to be the judges of the facts.  You will decide the

4  facts of the case.  To those facts, you will have to apply the

5  law as I will explain it to you, give it to you, at the end of

6  the case.

7          We always say that judges and jurors must follow the

8  law even if we personally do not agree with how the law reads.

9  There's a reason for that, and I'll tell you why there is a

10  reason for that.  The law in a case like this one is given to

11  us by Congress, that is, the Federal legislature.  Maybe some

12  principles of law may come from Puerto Rico law, also.  Also,

13  these principles of law may come from judicial decisions

14  entered either by the Federal appellate courts and the Supreme

15  Court or even in some cases by the Puerto Rico Supreme Court,

16  depending upon circumstances.

17          We live in organized society, and we have some rules

18  to follow.  The law is the law.  We cannot change it here

19  arbitrarily.  That's why we say we have to follow it

20  irrespective of whether we would make it different if we were

21  sitting in the legislature or in Congress.

22          So that is an extremely important principle.  The law

23  must be followed irrespective of whether you agree with it or

24  not.  I am here to preside over this case.  I am not a passive

25  observer.  I am the presiding Judge.  Call me the case manager

1    if you will.  My mission is to get this case tried in an

2    orderly fashion, following some rules, as fast as possible, as

3    I told you, without sacrificing quality.

4         That means that I will have to make some

5    interventions as we go along.  I will have to make rulings.  I

6    will have to tell the lawyers what to do or what not to do,

7    things of the sort.

8         Don't think for a minute that by doing that I am

9    trying to tell you what to do or what not to do.  That is not

10   the purpose of my interventions.  The purpose of my

11   interventions is simply to get the case going and have

12   decisions made according to my best judgment under some rules.

13   That's extremely important.  Nothing that I do or say should

14   be taken by you as indicating what your verdict should be on

15   this guilt phase.

16        I always say that the role of the Judge is very much

17   like the role of the master sergeant in the Army or the

18   lieutenant or the captain, or even the teacher in the

19   classroom.  Somebody has to be in charge.  So I'm the one who

20   is in charge in that sense.

21        So I have to give -- tell the lawyers what to do and

22   what not to do, and make rulings, and give decisions.  Take it

23   just like that.  That's what it is.

24        Let's talk about the evidence.  The evidence from

25   which you will find the facts will consist of the testimony of

1    witnesses.  That is, people who are going to come and testify

2    before you under oath.  It may consist of documents that the

3    Court may receive in evidence, may consist of objects that the

4    Court may receive in evidence, may also consist of facts that

5    the lawyers agreed to.

6              If the lawyers agree that this pencil that's going to

7    be received in evidence is a yellow pencil, branded Dixon, and

8    it's a number two, why should we present evidence about the

9    fact that this pencil is yellow, is a Dixon, is a number two.

10   If they agree to it, we will make a stipulation, and that's a

11   fact in the case.  That's what stipulations are.

12             So you're going to consider testimony of witnesses,

13   documents received in evidence, exhibits or objects that the

14   Court may receive, and also agreements or stipulations that

15   the lawyers make and that I accept.

16             Certain things are not evidence, and I will tell you

17   now what they are.  On two major occasions during the trial,

18   at the beginning and at the end, the lawyers will be able to

19   address you directly.  At the beginning, they will give you

20   what we call the opening statement.  Think of it as an index

21   to the case, as an introduction to a situation that is going

22   to develop here, a view that the lawyer has of what this case

23   is about.

24             At the end of the case, these same lawyers will come

25   and argue a case before you on the basis of the evidence

1    received.  That's what we call the closing statement.  Those

2    instances are extremely important to hear, to follow, to try

3    to understand fully, but the statements of the lawyers are not

4    evidence in the case.  Lawyers are not here to testify or to

5    give evidence of any kind.  So remember, opening statements

6    and closing arguments are extremely helpful, but they are not

7    evidence in the case at all.  Okay?

8         Questions posed by lawyers, standing alone, are never

9    evidence in the case.  Why is that?  Because if we allow a

10   question by a lawyer to be evidence, what are we doing?  We

11   are allowing the lawyer to testify through the question.

12   That's why we say the question is never evidence.

13        What is evidence is what the witness responds, what

14   the witness tells you happened or did not happen.  In this

15   case there are going to be objections, like in any other case.

16   A case without objections is a boring case, believe me.

17        Lawyers have an obligation under the law to make

18   objections when they believe that evidence is being offered

19   against the Rules of Evidence or against the Rules of Criminal

20   Procedure or any other law.  If an objection is made, I will

21   have to make a ruling.  The ruling can be sustaining the

22   objection, that means granting it, or overruling the

23   objection, that means denying it.

24        You should never be influenced by any objection or by

25   any ruling that I may make.  If I deny the objection, overrule

1   the objection, the evidence will come in.  If I sustain it,

2   the evidence at that point in time under those circumstances

3   will not come in.  There should be a reason in evidentiary law

4   that moves me to do that.  Whether I do it right or wrong is a

5   different story, because I can commit mistakes of course.  But

6   the ruling is the ruling, and the ruling has to be taken by

7   the parties and the jury.

8        You should never be influenced by, as I said before,

9   any objection or by any ruling that I make.  Another category

10  of things that are not evidence, testimony that the Court --

11  the Court excludes, doesn't allow, or tells you to disregard,

12  if you heard it or if you were able to figure it out, is not

13  evidence and cannot be considered.

14       This case is not rehearsed.  I have no idea what the

15  witnesses are going to say.  It is entirely possible, entirely

16  possible that we may be examining a witness and five minutes

17  down the road after we have heard a couple of things there may

18  be a valid objection about something that you may have heard

19  or seen which could not be posed before, and then I have to

20  make a ruling.

21       And if I exclude that evidence and tell you you have

22  to disregard what you heard just a minute ago about this and

23  that, you have to make that mental exercise of excluding that

24  from the evidence in your head.  Because the case is not

25  rehearsed.  I don't know what can happen.  And I don't have a

1  black ball that tells me here everything that's going to

2  happen or how I'm going to rule on things.  So it is entirely

3  possible that that is a situation that can occur.  So

4  remember, testimony that the Court excludes or tells you to

5  disregard is not evidence and cannot be considered.

6          And of course this rule is extremely logical.

7  Anything you see outside the courtroom is not evidence in the

8  case.  The evidence in the case consists solely of the

9  evidence received here, in this courtroom, all of us present,

10 you sitting there, the witnesses sitting there, everybody

11 together.  What may happen in the hallway, what may happen in

12 the cafeteria, what may happen in the street, what the papers

13 may publish is not evidence in the case at all, cannot be

14 considered, period.

15          Remember what I told you when I gave you the original

16 instructions, the press has all the right in the world to

17 publish about the case.  But the press are not sitting in this

18 jury.  You are the ones who are going to be receiving the

19 evidence.  You're going to be the ones who are going to be

20 qualifying this evidence, receiving it, and eventually

21 deciding on it.  So you're going to go by what happens here,

22 and not what happens outside of the courtroom.

23          There are two kinds of evidence that we all deal with

24 in any case, direct evidence and circumstantial evidence.  I'm

25 going to advance to you that the law is very wise, and the law

1    says that both direct evidence and circumstantial evidence

2    have the same value before the law.

3        What is direct evidence?  Direct evidence is direct

4    proof of a fact.  I was present when something happened.  I

5    participated in the signing of a document.  I took a

6    photograph of something.  I saw somebody.  And I come here to

7    court and I tell you about it.  It has nothing to do with

8    credibility, has nothing to do with the weight of the

9    evidence.  It's simply direct evidence by a person.  I was

10   there, Judge, and I saw what happened.  Direct evidence.

11       Then you have circumstantial evidence, proof of a

12   chain of circumstances from which you can make an inference

13   that another fact indeed exists, proven.  This is the way I

14   see it.  In life, in human life, things don't happen always in

15   a black and white fashion.  We humans operate at a human

16   level, with a lot of gray.  A lot of gray.  There may be

17   black.  There may be white.  There may be gray.

18       So in order for us to make or construct a picture of

19   what happened in any case, you have to definitely look at the

20   direct evidence and the circumstantial evidence.  And the

21   circumstantial evidence is the one that allows you to make

22   inferences as to something that may have occurred

23       I'm going to give you an example.  I am standing in

24   front of this courthouse because I had an intention of

25   crossing the street to go to Subway and have a tuna wrap.  And

an accident occurs, two cars crash in front of the courthouse

here right in front of the Subway.  I am standing right there

ready to cross the street, and I see the accident happen.

        Two cars, a Buick and a Chevrolet, they collide, and

there are injured people, the whole bit.  I decide to walk to

the cars to see if there is anything I can do to help, because

I see there is somebody injured there, okay?  I am going to

call -- I am going to come here to court and tell the jury, I

was standing in the sidewalk.  I was about to go to Subway.  I

saw an accident occur.  My perception was that the red car was

coming too fast, and made a zigzag and hit the blue car for

example.  I tell the jury that.  It may be a wrong perception

of mine, but it's circumstantial evidence, okay?

        Then the story goes on like this.  I come close, and

I open the door of the car who I thought was the one who

caused the accident.  And the gentleman who is in the car is

kind of in a daze, and I try to pick him out of the car, get

him out of the car, and he gives me a very strong smell of

liquor.

        I could tell a mile away that there is liquor in his

breath.  And I look in the car, and I see two rum canecas (ph)

on the floor, okay, empty.  I never saw this man drink.  I

don't know whether those canecas were the ones he drank, but I

could make an inference on the basis of that circumstantial

evidence that it's entirely possible that alcohol had to do a

1    bit with this accident.  You see?  Circumstances made me,

2    allowed me to make the inference that perhaps alcohol was

3    involved.  And I am brought to court to give that evidence,

4    too.

5         So you have examples of direct and circumstantial

6    evidence, okay?  Remember, both kinds of evidence have the

7    same value before the law, and you have to give both kinds of

8    evidence the same value before the law.  In life things don't

9    always happen in a black and white fashion.  You have direct

10   and you have circumstantial.

11        You will be the sole judges of the credibility of the

12   witnesses.  That means that the jury decides what to believe

13   and what not to believe, how much of a given witness'

14   testimony you're going to accept and how much you're going to

15   reject.

16        And how is it that you go about deciding credibility?

17   Well, there are some ingredients that are needed.  First, you

18   have to be of legal age, have lived long enough in life, have

19   experience in life, be mature.  All of you are.  That's why we

20   don't have -- that is why we don't have here people sitting in

21   this jury who are A plus students out of high school who have

22   no experience in life.  We have citizens who have lived long

23   enough to figure out things.  So that's an ingredient.

24        Then you look at the witness or the person that is

25   coming before you, and you are entitled to assess the demeanor

1    of the person.  Demeanor means how is this person projecting

2    himself or herself to you?  What impression are you receiving?

3        What kind of answers is he giving?  Is he giving you

4    the impression or is she giving you the impression that the

5    answers are truthful?  Is it the kind of thing that you're

6    willing to believe?  Is that the way things happen according

7    to your experience?  Is the story consistent?  Is the story

8    inconsistent?  Is the consistency all throughout?  Is there

9    some inconsistency but the inconsistency is minor, that it

10   really doesn't effect it?

11       You look at all that, and out of that you have to

12   decide how much of that given witness's testimony you're going

13   to accept and you're going to reject.  So there are a lot of

14   factors.  The interest of the parties, who is who?  The

15   relationship a party may have with another party.  All those

16   things, like you do in your daily lives when you make a

17   credibility decision.

18       When I talk to my -- one of my children, and to make

19   a credibility decision as to what happened, that's exactly

20   what I do, and you do the same.  You hear their story.  You

21   look into their eyes, and you figure out, this kid is not

22   telling me the truth or this kid is really telling me the

23   truth.  Simple as that.

24       No precise science.  We don't have an instrument that

25   measures credibility.  You have to use your experience as

1    adult human beings, okay?

2         Some rules about criminal cases that are unique, I

3    told you about these already.  I will repeat them again.

4    First, each defendant is presumed innocent until proven

5    guilty.  That is a constitutional protection.  The Indictment

6    brought by the Government is not evidence of guilt or of

7    anything else.  It's simply a piece of paper that contains a

8    written accusation.  Nothing more.  It is not proof of guilt

9    or of anything.  Each defendant starts a trial with a clean

10   slate, that is, with no evidence against him.

11        Second, the burden of proof is on the Government

12   until the very end of the case.  The defense has no burden to

13   prove innocence or to present any evidence or to testify.

14   That is another constitutional provision, mandate.

15        The silence of the accused is sacred.  Since the

16   defendants have the right to remain silent, the law prohibits

17   you from arriving at your verdict by considering that a

18   particular defendant or both defendants have not testified.

19        Third, the government must prove the defendant's

20   guilt on every particular count in that Indictment beyond a

21   reasonable doubt.  Separate consideration of defendants.

22   Separate consideration of counts.

23        Beyond a reasonable doubt is the standard.  The

24   standard is different from that used in civil cases.  In civil

25   cases we use a lesser standard, proving that something is more

1   likely true than not true, or more likely so than not so.  So

2   if you sat in a civil case, take that off your head.  Here it

3   is proving beyond a reasonable doubt.  Proving what?  Proving

4   guilt beyond a reasonable doubt.

5        You remember during the questioning that we had on a

6   one to one with you that the issue of penalty and whether life

7   or death or whatever, all these things were discussed.

8   Remember that that is not to be considered in this first

9   phase.  This is simply what we refer to as the guilt phase for

10  lack of a better name, okay?  So take that issue of punishment

11  off your head now.  Don't even let it come into your

12  deliberations, because we are concentrating on something that

13  is preliminary in nature.  To decide whether the government

14  can prove a case beyond a reasonable doubt or not.  Okay?

15       So in that sense, the major talk about penalty was

16  regarding Mr. Candelario, because he was a death penalty

17  eligible defendant.  And I bet you that nobody, nobody

18  mentioned, I don't remember anybody mention what kind of

19  penalty may apply as to the other defendant.

20       But my instruction to you is not to be concerned with

21  that, because that is a matter that has no importance

22  whatsoever at this stage.  And it's a matter that eventually

23  as to the other defendant is for me to decide, okay?  Not even

24  the jury.  For me to decide, okay?

25       A few words about your conduct as jurors.  During the

 1   trial, during the deliberations, during all the time that you

 2   are with us, you are not to discuss this case with anyone or

 3   allow anybody to discuss this case with you.  That is an

 4   obvious rule.  I told you why.

 5          You should never, ever allow any outside inference to

 6   come into play.  That includes your family and your friends.

 7   Your family, your friends, your work associates, whomever.

 8   Don't discuss it.  The same way that nobody would stop me in

 9   the street to ask me, hey, Judge, how is the case going?  The

10   same way nobody can do that with you, okay?  Is that clear?

11          You are not going to talk about this case until you

12   retire to the jury room at the end of the case to deliberate

13   after I tell you that you're ready to deliberate.  Remember

14   that outside influences, family, friends, whatever, are not

15   part of the jury, okay?

16          Don't forget that prohibition that I mentioned when

17   I instructed you every day as you came in regarding other

18   forms of communication over the internet, such as e-mail,

19   instant messaging, use of web sites or consulting blogs and

20   things of the sort.  It is improper, illegal, wrong for any

21   juror to access information about any part of this case or

22   anything about this case from those sources.  You cannot do

23   that.  It's as simple as that.  Cannot be done.  Cases must be

24   decided solely upon the evidence received here, and nothing

25   else.

1          Regarding text messaging, sending messages or audio

2    recording and things of the sort, remember that you are not

3    allowed to do that either.  Of course you're going to have

4    your cell phones, so many times you can call your wife, call

5    your children to see how they're doing in school, that kind of

6    stuff; but never to communicate about the case or receive

7    information or consult with anybody about this case.  Nothing

8    of that is going to happen here.  Is that clear?

9          Okay.  Do not read or listen to anything touching

10   upon this case in any way.  I told you what I do with these

11   things.  I'm not asking you not to read the newspaper, because

12   that would be unfair.  You have to know what's going on in the

13   community.  But you have to have the discipline not to read

14   about the case.

15         Read about the Governor.  Read about the president of

16   the Senate.  Read about the hassle with the legislature.

17   Read about sports.  Read about what's going on in Syria, or

18   in -- or about the meteor in Russia.  Whatever you want to

19   read about.  But on this case you are not going to read,

20   period, nothing of the sort.  You are here.  You don't have to

21   allow any third party to influence you by what they publish.

22   Okay?

23         Remember, and this is in a sense repetition, no

24   research or investigation of any kind on your own.  If there

25   is a need for research, I'll take care of it.  Or the lawyers

1   will tell me, and I'll take care of it.  If there's a need for

2   investigation, believe me we'll take care of it.  As simple as

3   that.

4           And finally, it's extremely important, do not form an

5   opinion until all the evidence is in.  You have to keep an

6   open mind until the very end of the case.  The Government

7   starts, and we're going to be weeks hearing the Government.

8   And the defendants have no burden to present any evidence at

9   all.  They don't have a burden.  They can remain silent.  You

10  know that.  It's sacred, their silence.  But if they want to

11  present evidence, of course we have to hear it, too, see?

12          So you cannot, you cannot under any circumstance

13  engage in mini deliberations as we go from day-to-day.  The

14  process is receiving evidence, receiving evidence, receiving

15  evidence.  And when I instruct you on the applicable law and

16  tell you you are ready to go out there and make a decision

17  through the deliberation process, only then can you do that.

18          And remember the analogy that I made to the baseball

19  game.  A case is like a baseball game.  It's not over until

20  the ninth inning is called, and the last out is called.

21  That's it.  You cannot engage in mini deliberations ever in

22  the case.

23          Very well.  With that in mind, what happens next is

24  that I will ask the lawyers whether they have any objection to

25  the preliminary charge for a guilt phase case.

```
 1            MS. DOMINGUEZ:  None from the Government, Your

 2   Honor.

 3            MR. RUHNKE:  No, sir, not from us.

 4            MR. AGUAYO:  No, sir.

 5            THE COURT:  Very well.  Now what will happen is we

 6   will hear -- we're going to give you a five minute recess or

 7   six or seven minute recess.  And then we're going to come back

 8   and start hearing the opening statements.

 9            The opening statements, as you already know, are the

10   chance that the lawyers have to address you directly and tell

11   you what they think their case is about.  A dictionary

12   definition of an opening statement.  Outline or summary of the

13   nature of the case.  Perhaps of the anticipated proof, not

14   necessarily.  They don't have to even say that.  To let the

15   jury have an idea what this case is about.

16            The purpose is to advise the jury of facts relied

17   upon, and to give the jury a general picture of the facts and

18   of the case.  It's like an outline of facts which both sides,

19   prosecution and defense, bring before the jury, with the

20   expectation that they can actually prove it or disprove it,

21   okay?  That's what it is.  Nothing else.  And remember that

22   that's what it is.

23            We'll take a short recess and be back in five or ten

24   minutes.

25            COURT SECURITY OFFICER:  All rise.
```

```
 1                    (At 11:31 AM, recess taken.)

 2                    (At 11:48 AM, proceedings reconvened.)

 3                    (At 11:48 AM, bench conference held.)

 4              MR. AGUAYO:  My question is, my client's parents, can

 5    they be allowed to have earphones so they can hear?  I've

 6    spoken to the translators.

 7              THE COURT:  What did they say?

 8              MR. AGUAYO:  They said they have two extra pairs.

 9              THE COURT:  I don't mind if you have extras, if you

10    have batteries that won't compromise the use of the

11    defendants.  I don't mean that --

12              THE INTERPRETER:  I need to meet Hilda halfway.

13              THE COURT:  Well, as soon as you get extras, we'll

14    let them have --

15              THE INTERPRETER:  Judge, what if we have other

16    persons asking, like the two persons -- like the other

17    parents?

18              MR. AGUAYO:  I don't think the other parents will.

19              THE COURT:  I cannot give it to everybody.

20              MR. AGUAYO:  No, no.

21              THE COURT:  Why don't we wait until this afternoon

22    and see what happens, because otherwise it's a hassle.

23              MR. AGUAYO:  I don't think Alexis' parents are going

24    to be here, frankly.

25              THE COURT:  Well, you never know.
```

1              (Bench conference concluded.)

2              THE COURT:  Okay.  Remember the rule that I have for

3    openings and closings is as short as possible without

4    sacrificing quality, and no repetition.  That's all.

5              Very well.  Let's bring the jury in.  You can do it

6    from there if you want.  There's no issue.  That's fine.

7              MS. MATEO:  Thank you.

8              MS. DOMINGUEZ:  Your Honor, we prepared a trial

9    notebook for you.

10             THE COURT:  I have it.  I have it.  Thank you.

11             Ms. Mateo, you can make your opening statement.

12             (At 11:55 AM, jurors entered courtroom.)

13             MS. MATEO:  October 17, 2009, was supposed to be a

14   festive day.  That afternoon, members of a small community

15   gathered together with family and friends to celebrate the

16   grand opening of a local bar called La Tombola.  People

17   dressed up, some people bought new outfits, and gathered

18   together that afternoon and evening at La Tombola.

19             You will hear testimony that fliers were distributed

20   to promote the event.  There was a calbagata in the afternoon,

21   earlier that night.  There was a band playing, La Bomba swing.

22   The atmosphere was festive, joyful, friends and family

23   enjoying themselves in this small community, many of which

24   grew up together, knew each other, and were even related.

25             By 11:30 that night, the small establishment was

1  crowded with people.  Outside even more people were there.

2  There was a fritura stand, and families were there, children,

3  elders, all together for this joyful celebration.  Dancing,

4  laughter.

5        At approximately 11:45 PM that evening, everything

6  changed.  The joy turned into terror, the laughter into

7  screams, and panic gripped the crowd as they tried desperately

8  to survive.  Men with automatic and semi-automatic rifles

9  stormed towards La Tombola.  Some of these hitmen began to

10  shoot in the crowded streets outside, and the shots continued

11  with deafening force, with a slight pause, only to resume

12  again.  A deadly storm of bullets.

13        Inside La Tombola, people took cover and hid wherever

14  they could.  It was like a nightmare, except that it was real.

15  And in this small building, there was no escape.  No back

16  door.  No side door.

17        Desperate to survive, some people hid in the

18  bathroom, some under the pool table, some perhaps behind a

19  column, all trying to seek sanctuary.  The shooting continued.

20  Some people were killed, and others were injured.

21        Blood and gun smoke filled the air.  Some of those

22  who were alive played dead, laying motionless in the chaos,

23  hoping that it would maybe save their lives.  One woman, who

24  was shot nine times, lay there still as a gunman stood over

25  her and kicked her foot to see if she was still alive.

1          People desperately tried to protect their loved ones.

2    One man covered his wife's body, not evening realizing she was

3    already dead.   To the victims, it seemed like an eternity.

4    But in reality, it was over in a few minutes.   The armed men

5    calmly left.   The shots finally stopped.   But death, horror,

6    and devastation remained.

7          In this trial, you'll learn that eight people died,

8    and a full term baby was killed in her mother's womb.   A baby

9    who would never have the opportunity to be born.   20 people

10   were physically injured.   Many more suffered emotional trauma.

11         And you will have the opportunity to hear from many

12   of the victims that survived that night of terror.   And they

13   will tell you, firsthand, what they saw and what they heard.

14   And they will tell you about the loved ones they had lost that

15   tragic night.

16         The evidence will show that Alexis Candelario and

17   David Oquendo Rivas were two of the shooters at La Tombola

18   that night.   You will learn that Alexis Candelario Santana was

19   the architect of this unimaginable mayhem.   And you will learn

20   why.   Why?   The evidence will show that Alexis Candelario

21   Santana was the leader of a drug trafficking organization

22   described in the Indictment as an enterprise.

23         And you will learn that the enterprise began in or

24   approximately around 1993.   And it was staffed by a close

25   group of individuals who were involved in the business of

1  processing, packaging, and distributing various illegal drugs

2  in the area of Sabana Seca, Toa Baja, Puerto Rico.

3        Over time, some of the members of this enterprise

4  changed.  Some died.  Some went to prison.  The roles changed.

5  New members were added.  But the enterprise continued.  The

6  enterprise operated mainly in this area surrounding this

7  native palo de goma tree.

8        As such, their primary drug point was called palo de

9  goma in Sabana Seca, Toa Baja.  But although that was their

10  primary area of distribution, you will also learn that there

11  were other areas as well.

12        Now, from approximately 1993 to approximately 2003,

13  Alexis Candelario Santana was the undisputed leader of this

14  organization, this enterprise.  And Alexis, who's also known

15  as Congo, would purchase large quantities of raw drugs, some

16  of which would be processed in home laboratories.

17        And, for example, powder cocaine would be processed

18  into crack cocaine.  And these drugs would be packaged into

19  quantities, sizes and amounts, and would be ready, sold to

20  users and addicts.

21        Alexis had various lieutenants under him and numerous

22  sellers, runners, and enforcers, who all worked for him.  You

23  will learn from an expert that specializes in these drug

24  trafficking organizations, that's normal and typical for an

25  organization to be organized and run precisely in this manner.

1   Purchasing drugs in bulk, processing and packaging the drugs,

2   and then selling them at these drug points, palo de goma.

3        The evidence will show that Alexis' enterprise sold

4   crack cocaine, heroin and marijuana, and it often grossed

5   between 8,000 to $10,000 a week.

6        Now, you'll learn that between 1995 and 2001, in

7   order to defend and promote his enterprise, Alexis personally

8   murdered or ordered the murders of some 13 people.  Some that

9   Alexis felt were disloyal employees.  Some of the people were

10  people he thought were rivals to his enterprise, or his role

11  within the enterprise.  Some of them he thought were

12  associated with others who could cause him harm or cause his

13  organization harm.  This was Alexis' war.

14       You will learn that at some point, realizing that his

15  lieutenants had been arrested or might be cooperating with the

16  Government, Alexis decided to relocate from Puerto Rico to

17  Detroit, Michigan.  And from Michigan he continued to control

18  the enterprise in Puerto Rico.

19       However, he expanded his reach of the enterprise to

20  Michigan.  And eventually he even brought his brother,

21  Wilfredo Candelario Santana from Puerto Rico to be his

22  lieutenant there.

23       Now, you'll learn that in 2003, Alexis pled guilty to

24  11 murders in local court, and he was tried and convicted of a

25  12th.  You will learn that prison did not stop Alexis from

1    participating or attempting to participate in the operations

2    of this enterprise.  And you will learn that being in prison

3    certainly did not change him.

4         Carmelo Rondon Feliciano, also known as Panzon or

5    Omi, and Wilfredo Semprit Santana, also known as Rufo, were

6    left in control of the enterprise while Alexis was in jail.

7    Rufo is Alexis' cousin.

8         Now, Alexis tried to maintain his control of the drug

9    organization while he was still in prison.  So for a time,

10   Alexis went to prison and Omi and Rufo would continue to share

11   some of the profits of the drug organization with him in

12   prison.  You'll learn that eventually, disputes over money

13   happened and separated these three.

14        You're also going to hear about two seizures, one in

15   2006 in Puerto Rico, and one in 2007 in Michigan.  Now, the

16   seizure in 2006, in Puerto Rico, results from a wire tap.  So

17   one of the lieutenants who Alexis had left in charge to run

18   the drug trafficking organization while Alexis was in prison

19   was involved.

20        And this seizure involved various weapons, including

21   various AK-47 type of weapons, drums of ammunition that would

22   allow the firing of over a hundred rounds without having to

23   reload, numerous extended clips, semi-automatic pistols,

24   ammunition, and a substantial amount of narcotics and

25   packaging materials.

You will hear some of these wire tapped conversations from 2006, between some of the members of the drug trafficking organization, which will give you an insight to the operation of this illegal enterprise.  Omi was one of the people, excuse me, arrested in 2006.  And you will hear Omi's voice on some of these calls.  You'll also learn that Omi supplied the drugs to Alexis' organization.

After the arrest of Omi, Rufo became the one to take over the day-to-day operations of the Puerto Rico branch of the drug trafficking organization.

And remember I told you earlier that Alexis had moved to Michigan earlier to get away from some of the heat in Puerto Rico, and that he expanded his drug trafficking organization to Michigan, and even brought his brother, Wilfredo, there to be his lieutenant?  Well, the evidence there will show that Wilfredo continued to operate this Michigan branch of Alexis' drug trafficking organization, and that was while Alexis was in prison in Puerto Rico.

Now, you'll learn that the 2007 seizure involved a brick of cocaine that was mailed to Detroit, Michigan from Sabana Seca, Puerto Rico.  And that Wilfredo Candelario Santana was collecting the cocaine, and he was arrested in the parking lot of an apartment building with a package containing the cocaine.

Eventually, the payments of the profits of the drug

1  organization, the drug trafficking organization, stopped as

2  disputes over money heated up.  Enraged, Alexis threatened to

3  kill his cousin, Rufo, upon his release from prison in order

4  to regain his position as the undisputed leader of this drug

5  trafficking organization.

6          You will hear from Rufo about the threats that he

7  received from Alexis while he was in prison.  And you'll also

8  hear from a fellow inmate of Alexis, who will tell you about

9  how Alexis threatened to kill his cousin upon release.

10          In February, 2009, Alexis was released from prison,

11  and he had one thing on his mind.  Revenge.  Alexis continued

12  to threaten Rufo to regain control of the drug points.

13          Meanwhile, Rufo rented a pub, this local bar called

14  La Tombola.  He scheduled the grand opening for October 17th,

15  2009.  And this event was promoted with fliers.

16          And it was revenge that led to the tragic events of

17  October 17, 2009.  Alexis wanted to reclaim his position of

18  leadership in his drug trafficking organization, and he wanted

19  to send a clear message that he would not be betrayed.

20          And the evidence will show that Alexis is not a

21  forgiving person.  Things had to be done his way.  And whoever

22  stood in his way, would pay a high price.  Their life.

23          La Tombola was a battle in Alexis' war, and the

24  victims of La Tombola paid with the highest price imaginable,

25  they paid with their lives.  Eight people dead, one unborn

1 baby dead, 20 injured, and over 300 spent casings.

2       The evidence will show that one of the firearms used

3 during the La Tombola shooting was recovered by the Police of

4 Puerto Rico.  On October 20th, 2009, police officers went to

5 Sector 26 in Toa Baja, Puerto Rico, to investigate a tip that

6 suspects or people injured from La Tombola were there.  And

7 as the officers arrived to that location, they observed

8 David Oquendo Rivas and another individual in front of a

9 residence.

10       Three firearms were recovered that day.  After being

11 caught, David accepted that the three firearms were his, but

12 quickly added that the firearms had nothing to do with La

13 Tombola.

14       You will learn that that statement made by David was

15 far from the truth, because one of those firearms was a

16 positive match to 20 projectiles recovered from the La Tombola

17 scene.

18       La Tombola was only one of the battles in Alexis'

19 war.  You will hear from one of Alexis' soldiers, Braulio

20 Ortiz, also known as Menor, who will tell you about the inside

21 of this drug trafficking organization, and what it was like to

22 be a soldier in Alexis' war.  He will talk to you about the

23 other murders committed by Alexis or the murders that were on

24 Alexis' orders.

25       You will also hear from some of the law enforcement

1   officers who arrived to those scenes.  More casualties of

2   Alexis's war.  More terror.  More loss.  There are some things

3   that will not be disputed in this trial.  What will not be

4   disputed in this trial is Alexis Candelario Santana was

5   convicted to one of those murders and pled guilty to 11 of

6   those prior murders.

7           The evidence will show that each one of those murders

8   was somehow related to Alexis' drug business, to Alexis' war.

9   Each murder, a battle in his war.

10          Now, let me briefly address the Indictment in this

11  case.  Count One of the Third Superseding Indictment describes

12  an enterprise, which is this drug trafficking organization

13  explained before.  Count One is a RICO conspiracy, and RICO is

14  short for Racketeering Influence and Corrupt Organizations

15  Act.

16          Now, the purpose of this enterprise include enriching

17  the members and associates of the enterprise through the

18  distribution of narcotics, preserving and protecting the

19  power, territory and profits of this enterprise through the

20  use of intimidation, through the use of violence, threats of

21  violence, assaults, and murder.  Another purpose was keeping

22  victims in fear of the enterprise, and in fear of its members

23  and associates through threats of violence and murder.

24          Count One, this racketeering conspiracy, is between

25  approximately 1993 and October 2009.  And Alexis Candelario

1    Santana and others being a part of this enterprise, this drug

2    trafficking organization, did participate directly and

3    indirectly in multiple acts in connection with their operation

4    of this illegal business.  So this includes narcotics

5    trafficking, and murder.

6         Count One also lists overt acts that were in

7    furtherance of the conspiracy.  And each prior murder, each

8    one of those casualties of Alexis' war is listed as an overt

9    act.

10        And there's 13 victims of the prior murders:  Javier

11   Martinez Ramos, Julio Angel Martinez Santana, Andres Torres

12   Oquendo, Melvin Medina Arce, Jimmy Nelson Velez Matos, Orlando

13   Cardona Ortiz, Saul Padin Orozco, Silvestre Gonzalez Santos,

14   Richard Matias Negron, David Nieves Carmona, Zuly Santana

15   Frances, Harry Santiago Santiago, Erick Morales Alvarez.

16        Murder after murder.  All these prior murders.  And

17   also, all the murders of La Tombola and all the attempted

18   murders of La Tombola are all listed as overt acts in Count

19   One.  And Alexis Candelario Santana is charged in Count One.

20        Both defendants are charged in Counts Two through 10,

21   and these counts represent violent crimes in aid of

22   racketeering activity, explained in Count One.  And these are

23   also called VICARs.  Now, the counts represent not only a

24   violent crime in aid of this racketeering activity, but also

25   victims, lives lost at La Tombola.

1          Count Two, murder of Joan Manuel Class Guzman.

2          Count Three, murder of Pedro Semprit Santana.

3          Count Four, murder of Jose Angel Hernandez Martinez.

4          Count Five, murder of John Henry Garcia Martinez.

5          Count Six, murder of Elisa Del Carmen Ocasio.

6          Count Seven, murder of Samuel Ruiz Martinez.

7          Count Eight, murder of Rafael Angel Ramos Rivera.

8          Count Nine, murder of Tina Marie Rodriguez Otero.

9          Count 10, murder of unborn child.

10          Counts 11 through 19 are firearms charges.  The

11   counts charge both defendants with having carried and used a

12   firearm in relation to a crime of violence, during and in

13   relation.  So specifically, murder.

14          And these Counts 11 through 19, the firearms charges

15   are relating to La Tombola.

16          Counts 20 through 28 charge both defendants with drug

17   related murders relating to victims of La Tombola.

18          Counts 29 to 49 charge both defendants with

19   additional violent crime in aid of racketeering activity,

20   VICARs.  Counts 29 through 49 are the attempted murders from

21   La Tombola.

22          Count 29, attempted murder of Carmen Maria Garcia

23   Santiago.

24          Count 30, attempted murder of O.F.M., a minor.

25          Count 31, attempted murder of Wilfredo Semprit

1    Santana.

2             Count 32, attempted murder of Amarilys Fonseca

3    Martinez.

4             Count 33, attempted murder of victim number two,

5    Melissa Fonseca.

6             Count 34, attempted murder of victim number three,

7    Jose Amezquita Semprit.

8             Count 35, attempted murder of victim number four,

9    Miriam Figueroa Robles.

10            Count 36, attempted murder of victim number five,

11   Jose Oquendo Semprit.

12            Count 37, attempted murder of victim six, Jose David

13   Carmona Santos.

14            Count 38, attempted murder of victim number seven,

15   Carmen Semprit Santana.

16            Count 39, attempted murder of victim number eight,

17   Adalino Amezquita Semprit.

18            Count 40, attempted murder of victim number nine,

19   Felix Rivera Rivera.

20            Count 41, attempted murder of victim 11, Caleb Castro

21   Renta.

22            Count 43 (sic), attempted murder of victim 13,

23   Roselyn Rosado Miranda.

24            Count 44, attempted murder of victim 14, Oscar Gomez

25   Miranda.

1          Count 45, attempted murder of victim 15, Richard
2  Ramos Figueroa.
3          Count 46, attempted murder of victim 16, Erick
4  Delgado Garcia.
5          Count 47, attempted murder of victim 17, Angel Rios
6  Santos.
7          Count 48, attempted murder of victim 18, Juan Ramos
8  Vazquez.
9          Count 49, attempted murder of victim 19, William
10 Ramos Vazquez.
11         There were 20 attempted murders the night of La
12 Tombola.
13         Count 50 is charging Alexis with conspiracy with
14 intent to distribute controlled substances from approximately
15 1993 through October 2009.
16         Counts 52 and 51 are firearms charges,and
17 specifically possession of a firearm by someone with a prior
18 conviction.  And counts -- charging Alexis.
19         Count 41 is for La Tombola.  And Count 52 -- excuse
20 me.  Count 51 is for La Tombola.
21         And Count 52 is for possession of a firearm on or
22 about November 4th, 2009.
23         Now, at the conclusion of this case, after you've
24 heard all the evidence, including the eyewitness testimony of
25 La Tombola victims, the testimony of Alexis' soldiers, the

1  forensic and scientific testimony of the experts in this case,

2  we will come back before you and ask you to return verdicts of

3  guilty against Alexis Candelario Santana and David Oquendo

4  Rivas, at each count of the Third Superseding Indictment.

5          And by your verdict, we will ask you to send a clear

6  message to Alexis Candelario --

7          MR. RUHNKE:  Objection, Your Honor.

8          THE COURT:  Sustained.  Sustained.  No message.  Go

9  ahead.

10         MS. MATEO:  To the defendants that their last battle

11 has been lost, and that the war stops here.

12         THE COURT:  Thank you.  Thank you very much.

13         Mr. Rebollo.

14         MR. REBOLLO:  All right.  May I have a second, Your

15 Honor?

16         THE COURT:  Please.

17         MR. REBOLLO:  May it please the Court?

18         THE COURT:  Please.

19         MR. REBOLLO:  Members of the jury, let me try to

20 summarize for you in one sentence what this case is really

21 going to be about.  This is a case where the Government will

22 try to convince you that Alexis committed crimes and murders

23 which he, in fact, did not commit.  Did not commit.

24         Alexis was not there the night of October 17, 2009,

25 at La Tombola.  He was not.  He didn't plan it.  He did not

1    organize it.  He did not carry it out.  He was not the

2    architect of it, as he has been referred.

3          As he sits here today, he's an innocent man who has

4    been wrongfully accused of these murders.  And we are here to

5    make sure he is not wrongfully convicted.

6          Let me remind you again, my name is Francisco Rebollo

7    Casalduc.  And together with attorney David Ruhnke, we are

8    here to prevent the conviction of an innocent man, but we

9    cannot do it without you, because it will be your views of the

10   evidence that matter in this case.  My views don't matter.

11   The prosecutor's views don't matter.  The Court doesn't have

12   an opinion.  And even if he did, your views would prevail over

13   his.  It is your views that will decide this case.

14         Now, you just heard sister counsel summarize for you

15   their views of the evidence, but the prosecutors and the

16   agents were not there.  You and I were not there.  By the way,

17   Alexis was not there either.  All the Government and the

18   prosecutors and the agents know is what other people have told

19   them.

20         And you will learn in this case that the people that

21   the Government has spoken to are people who will not be worthy

22   of your credibility, will not be worthy of your trust.  They

23   will be people with reasons to lie, people with reasons to

24   misidentify, to point the finger to others and away from them.

25         They will be confessed and convicted drug

1    traffickers, and confessed and convicted murderers.  That is

2    the type of evidence on which the Government -- or which the

3    Government has listened to and on which they have based these

4    charges.  In the end, they will not be worthy of your trust.

5           But let me step back and talk about what the

6    evidence will show happened in this case, and let me start

7    with the night of La Tombola.  First thing you should know

8    about La Tombola, like I already stated, Alexis was not there.

9    But here's what we know about La Tombola.

10          On that night, October 17, 2009, a group of heavily

11   armed individuals arrived at La Tombola.  And a group of

12   heavily armed men were there waiting for them.

13          The owner of La Tombola, the one who was having this

14   big party, was the owner of the drug points in Sabana Seca at

15   the time.  Him and his family members ran those drug points.

16   Him and his lieutenants were opening this bar, and they were

17   in constant fear.  You've seen this in the news every day in

18   Puerto Rico, of warring drug gangs coming over and trying to

19   take their place.

20          The group that arrived opened fire.  The group of the

21   men who were there, fired back.  A crossfire developed.  And

22   when the shooting had stopped, six people were dead at the

23   scene.  One died approximately two weeks later, and two died

24   that night at an area hospital, including unfortunately the

25   unborn child of Carmen Maria Santiago.

1          Let me pause for a second and talk briefly about the

2    unborn child of Carmen Maria.  No one will ever know who fired

3    the bullet that struck her unborn child.  No expert evidence,

4    you will not hear any firearm evidence, no ballistics evidence

5    that will answer that question.

6          In fact, nobody will ever answer the question of who

7    fired the bullets that killed any of the victims at La

8    Tombola.  The truth of the matter is bullets were flying

9    everywhere, and one of them struck Carmen Maria and ended a

10   life that had not yet begun.

11         So let me tell you something else about Carmen Maria

12   Santiago.  Carmen Maria was from Sabana Seca or is from Sabana

13   Seca.  She has known Alexis her entire life.  She will tell

14   you, she will come here and tell you that if she had seen him

15   there, she would recognize him.

16         And she will tell you she saw four of the shooters,

17   and she did not see Alexis there that night.  In fact, witness

18   after witness from Sabana Seca who knew Alexis, because they

19   grew up together, were there and will tell you they did not

20   see Alexis there that night.

21         Now, members of the jury, we live in a period and in

22   times of great technological advances.  Great advances in

23   scientific evidence.  But you will not hear any of that

24   evidence here.  The greatest law enforcement agency in the

25   world, the FBI, will ask you to convict Alexis, and not

1  present to you any of the evidence that doesn't lie, any of

2  the evidence that does not make a mistake.

3          If you saw a video, you would know.  If scientific

4  evidence was presented to you showing Alexis was there, you

5  would know.  If there was a taped confession, you would know.

6  You will not hear, you will not be presented ever with any of

7  that type of evidence.

8          The evidence on whose basis you'll be requested or

9  asked to convict my client is the type of evidence I described

10 before, convicted drug traffickers, murderers, liars, cheats,

11 witnesses with reasons to point the finger at Alexis.

12         In fact, let me be more specific about that.  The

13 Government, as you may expect, combed that area of La Tombola

14 after that night, searched every inch of that area for any

15 evidence of the shooters, any evidence that would tie Alexis

16 to that night.

17         And they were able to find no one that tied Alexis to

18 that.  You will not hear, you will not hear -- they even, they

19 even occupied a vehicle in which the evidence will show or

20 they believe the shooters arrived.  And they examined that

21 vehicle for everything, blood, hair samples, anything that

22 could be tested through DNA, fingerprints, everything.

23         They found fingerprints, the evidence will show, of

24 other individuals, but not one fingerprint tying Alexis to the

25 scene was found.  There will not be evidence of any blood of

Alexis at the scene.  There will not be any hair samples of Alexis in the vehicle, at the scene, anywhere.

Flesh, saliva, anything that could be tested that could place Alexis at the scene, you will not see that, because it doesn't exist.  In fact, the absence of such evidence will lead you to conclude that Alexis wasn't there that night.

You heard sister counsel tell you that Alexis also ran a drug organization from 1993 up to 2009, but let me tell you about some more evidence that you will not hear in this case and the evidence in this case will not show.  The evidence will not show that Alexis was ever, ever arrested in possession of an ounce of narcotics.  Ever, in all those years in which he supposedly ran this drug empire, not one ounce of marijuana was seized from him.  Not one ounce of cocaine, heroin, nothing.

Alexis was never arrested in possession of a weapon.  This killer that they have described, never, ever arrested in possession of a weapon.

There was never any search warrant conducted of his vehicles, his homes, nothing that would tend to indicate that he was involved in drug trafficking.  It was never found.  You're never going to hear any evidence.  No scales, the typical paraphernalia of the drug trade.  No scales, no ledgers, no accounting bills, nothing, ever, ever found.

1          The Government will claim that during all those

2     years, this drug point that he supposedly managed generated

3     tens of thousands of dollars a day, millions of dollars a

4     year.  The evidence will not show, and you can be sure they

5     looked, the evidence will not show that Alexis ever spent any

6     significant amount of money buying anything.

7          They never found him purchasing vehicles, purchasing

8     jewelry, purchasing homes.  Nothing.  He didn't have bank

9     accounts, nothing.  Nothing that would suggest he was indeed

10    receiving the benefits of the drug trade, drug empire that he

11    supposedly ran.

12         So you will be asked to conclude, you will be asked

13    to conclude that he ran this drug empire with all this

14    evidence nonexistent.  In fact, you heard sister counsel tell

15    you that there were wire taps of this organization in Sabana

16    Seca, in the drug trafficking organization in Sabana Seca,

17    that the FBI conducted or the DEA conducted.  They recorded

18    the drug trade there.

19         You will not hear that Alexis was ever once recorded

20    in a drug conversation, even though they were wire tapping the

21    phones of the drug traffickers in the area.  And he was never

22    even talked about in any of those conversations.  Some drug

23    trafficker.  Some kingpin.

24         You will be asked to conclude that he was always

25    these things.  Based on what?  Well, let me tell you based on

what.  You heard sister counsel refer to Wilfredo Semprit
Santana, also known as Rufo, as the owner of the bar.  The
bar, La Tombola, was opening that night.

Well, in Sabana Seca circles, he wasn't just known as
the owner of the bar.  He was known as the owner of the drug
points in the area.  Him, his brother Pedro, who was one of
his lieutenants, and a number of other individuals.  You'll
learn in this case that he had reasons to falsely accuse
Alexis of having done this.

In fact, we will bring you evidence of affirmative
efforts by members of the Semprit Santana family to convince
the people who were there at La Tombola that night to falsely
say that they saw Alexis there that night.

That night Rufo -- I will refer to him as Rufo for
easy reference.  That night Rufo, who in addition to what I
have told you had a criminal record, a long criminal record,
and that night he was serving a 27 year probation sentence for
kidnapping and attempted murder of two police officers.
These are the people they're going to ask you to believe, to
base the important decisions that you have to make in this
case.

He was on probation that night, and yet he'll admit
to you that he was running the drug point.  He was also a drug
trafficker.  And he was carrying weapons.

So every day of that probation, he was violating

1    state law and violating Federal.  This is Rufo.  And that very

2    night of La Tombola, he brought to La Tombola two of his

3    weapons, a nine millimeter Smith and Wesson and a .40 caliber

4    Ruger, with extra clips.

5         In fact, he had so many clips he had to give some to

6    his wife.  His wife was carrying some of the clips for him.

7    And as you know, carrying ammunition in Puerto Rico without a

8    license is a crime, too.  You should ask yourself why would

9    there be a need for Rufo, when he's opening, having this party

10   on this joyous occasion, to have -- to be armed like that?

11        Well, but not only was he armed.  He had his posse

12   there.  He had his crew there.  He had his henchmen, his

13   triggermen, his lieutenants.  One of them, his brother Pedro,

14   also armed.  And there were three additional individuals.  All

15   armed.

16        And he will tell you that when he got there that

17   night, the first thing he asked them was, are we ready?  And

18   he will tell you that by that he meant, are we ready, are we

19   armed, are we locked and loaded, are we ready for whoever

20   comes?

21        Those were the people who were there that night.  And

22   Rufo will be the one who would point the finger at Alexis, for

23   reasons that you will know later.

24        Now, in addition, in addition to Rufo, there may be

25   another individual who will claim that he saw Alexis there

1   that night.  But this is a person who the evidence will show

2   did not come forward until well over a year later.  Did not

3   come forward until he had seen Alexis' picture in the

4   newspaper, after he had been arrested.  And this is a person

5   who lived in the precise area where Rufo's family was trying

6   to influence people to try to convince them to testify falsely

7   that Alexis was there that night.

8         Let me set the scene for you, because one of the

9   things you will have to decide in this case is if the

10  circumstances were such that eyewitness identifications like

11  this witness will come to say, could be possible.

12        Let me take you back inside La Tombola that faithful

13  night.  It was a Saturday night.  Almost midnight.  This is a

14  pub.  It's dark outside, dark inside.  There were by many

15  estimates close to or even over a hundred people in this

16  little area.  So this was a crowded place, very crowded place.

17  Imagine a bar in San Sebastian Street in January.  Imagine

18  that crowd.

19        There was also, like sister counsel said, a horse

20  ride that took place that night, calbagata.  So there were

21  horses, over 20 horses tied up to cars and fences around the

22  area.

23        At some point that night, close to midnight, some

24  armed men arrived wearing baseball caps kept low, and masks

25  covering their faces.  By the way, Alexis was not one of

those.  He was not there.

Masked, armed men arrived and opened fire, and all hell broke loose.  You can imagine the scene.  Horses going crazy.  People running for their lives.  Smoke filling the air from the bullets.  People running for cover.  And under those circumstances, there will be people here who will come and say, one or two persons, that they were able to identify Alexis.

Now, remember, I told you already, of the majority of the people there, they're all from Sabana Seca.  They grew up with Alexis.  They would recognize him if they saw him, and they didn't see him that night.  But the armed men went in.

There's two more things you should know about Rufo and his role that night.  Rufo will admit to you that he was inside the bar when the shooters came in.  He will admit to you that he took out one of his guns, hid behind a column, and blindly emptied his gun into the people inside the bar.

I told you no one will ever know who fired the bullet that killed them, but Rufo will admit to you that he emptied a gun blindly, not knowing who he was firing at.  And now he wants to point the finger at Alexis.

Rufo will also tell you that his brother Pedro and another individual who were inside the bar were firing back also.  That was the scene at that bar that night.

And finally, with regard to Rufo, you heard sister

1    counsel tell you that theory is something to the effect that

2    while -- at some point Alexis got mad at him, so he wanted to

3    settle the score, and he was coming that night to kill him.

4    Well, guess what the evidence is going to show?  The shooters

5    walked right past Rufo.  They didn't kill him.  That's why

6    he's going to be here alive to tell us about that night.

7           Does that evidence make any sense to you?  Or will

8    there be something else?

9           MS. DOMINGUEZ:  Objection, argument.

10          THE COURT:  Sustained.  Argument.  Sustained.

11          MR. REBOLLO:  Yes, sir.

12          The man that, according to the Government's theory

13   was there to be killed, lived that night.  The shooters, the

14   evidence will show, walked right past him.

15          Now, you may be wondering or asking yourself, well,

16   why Alexis?  Why point the finger at Alexis?  And that will be

17   a fair question.

18          And here's the answer.  In 2009, Alexis was an easy

19   target, an easy scapegoat for anybody trying to divert

20   attention away from them.  Why?  Well, for that I have to take

21   you back a few more years and talk to you about another

22   individual that sister counsel mentioned and who you will meet

23   in this case, and his name is Braulio Ortiz-Rodriguez, also

24   known as Menor.

25          And Menor, the evidence will show, was really a

1   killer.  You're going to meet a killer in this case.  He's

2   going to be called by the Government to testify.  Cold-blooded

3   killer.  And in the early 2000s, he was the suspect in

4   several -- many murders in Sabana Seca.

5          And he got arrested with a weapon, and he began to

6   fight his case.  And at one point, he will have to admit to

7   you that his attorney told him, look, the state authorities

8   are getting ready to file murder charges against you on one,

9   two, three, four, five, I don't know how many cases.

10          And at that point, he realized he was guilty of those

11   and he was going to be convicted of those.  And he had to do

12   something quick, otherwise he would spend the rest of his life

13   in prison, which he, of course, did not want to do.

14          So what does he do?  He decides at that point to

15   become a government cooperator, to become a witness, in

16   exchange of course for as lenient a sentence for getting back

17   out on the street, which he already is, by the way.  And guess

18   who the evidence will show he blamed for all 13 murders he was

19   asked about?  You guessed it.  He blamed Alexis.

20          He admitted that he killed, but when he killed, he

21   said it was on Alexis' orders.  His word against the rest of

22   the world.  He involved Alexis in every murder he was asked

23   about.  Alexis knew he was not guilty of these murders, and he

24   started to fight those murders.  The evidence will show he

25   went to trial.

1          MS. DOMINGUEZ:  Objection, Judge, as to what the

2   defendant knew.

3          THE COURT:  Sustained.

4          MR. REBOLLO:  Yes, sir.  And the evidence will show

5   that he went to trial on the first murder, with -- remember,

6   the witness in all of the murders was the same individual and

7   only that individual.  He goes to trial on that first murder

8   in state court in Bayamon.  You'll see the transcript of that

9   particular hearing, and you will see that the Judge --

10          MS. DOMINGUEZ:  Objection.

11          THE COURT:  Sustained.

12          MR. REBOLLO:  Yes, sir.

13          THE COURT:  Improper opening.

14          MR. REBOLLO:  Yes, sir.

15          You will see that the case was not going well for the

16   Government.  For the state government I'm talking about, the

17   fiscalia de Bayamon.  And at that point, Alexis is presented

18   with an offer, not his fault --

19          MS. DOMINGUEZ:  Judge, I have to renew my

20   objection.

21          THE COURT:  Sustained.  Absolutely sustained.

22   Sustained.

23          MR. REBOLLO:  May I be heard?  I can proffer,

24   Judge.

25          THE COURT:  Side bar.

```
 1            (Bench conference held.)

 2            THE COURT:  Yes.

 3            MR. REBOLLO:  Your Honor, what I intend to tell the

 4   jury is that the facts will show that Alexis, at that point,

 5   is presented with an offer.  The offer is for him to plead

 6   guilty to all murders in exchange for a 12 year sentence.  And

 7   essentially that was an offer he couldn't refuse.

 8            The evidence will show that if he fought the cases

 9   and lost even one, he would do life in prison.  But if he

10   accepted this, and -- he was presented with that choice, and

11   that's why he accepts the plea.  He has since disavowed that

12   plea, and I say that, he disavowed it in prison records which

13   Your Honor has seen, also.

14            And, Your Honor, in your ruling, you entered an Order

15   saying that you -- the fact that he pled guilty does not mean

16   that he's guilty.  It's just one fact to be considered in the

17   determination that the jury has to make, among all other

18   circumstances.

19            So I want to present the other circumstances.  I want

20   to say that he pled guilty, and they have to decide, and in

21   the end they will understand that it was a plea of

22   convenience.  That's my argument.

23            MS. DOMINGUEZ:  Judge, my argument is not because

24   Alexis even pled guilty because of the -- of a deal, that's

25   the evidence in this case.  My objection is counsel is
```

1   spinning the evidence, that he was being acquitted because the

2   quality of the evidence was poor.  That is not the case.

3        In fact, counsel himself has indicated the only

4   witness was Braulio, and the fact is Alexis was convicted on

5   Braulio's testimony.  And so that is what I have an objection

6   to.  He is attempting to characterize the evidence in this

7   case, attempting to testify for his client, because this is

8   opening statement, Judge, and this is not evidence in this

9   case.

10        He has got to have a good faith basis for proffering

11  this evidence to the jury, and how is he going to sustain that

12  burden?  The judge's comments made during the trial are

13  hearsay.  They're inadmissible.  And the judge's testimony has

14  no probative value in this case.  And there have been numerous

15  misstatements of fact throughout this opening statement that I

16  have sat patiently by, but the fact is, for example, Alexis

17  has pled guilty to a multitude of firearm charges.  The

18  suggestion -- I'm sorry.  I'm sorry.

19        MR. RUHNKE:  Microphone is on.

20        THE COURT:  He's not being heard.  He's not.

21        MS. DOMINGUEZ:  The suggestion that he has never been

22  convicted of a firearm offense or never been found with a

23  firearm on is completely false, as many other misstatements of

24  fact have been.  So I would suggest to the Court that I have

25  no problem with his proffering to the jury what the facts are.

1          The facts are that he pled guilty.  That he was

2  offered a deal to 12 years, for 12 murders.  I have no problem

3  with that.  But to the extent that he is attempting to

4  characterize the quality of the case, the sentiments of the

5  Judge, and the reasons that the prosecution had to offer him

6  the deal, I object to that because he cannot sustain that

7  burden and it's inadmissible.

8          THE COURT:  And those convictions have not been

9  collaterally attacked.

10          MR. HEGYI:  Never, never.

11          THE COURT:  Sustained.  I will not allow that in the

12  opening.

13          MR. REBOLLO:  Judge, just so the record is clear,

14  when I referred to the Judge, in the -- the state court judge,

15  in the transcript while Braulio Ortiz-Rodriguez is testifying,

16  the judge calls him a liar.  He says he doesn't believe him.

17          MS. DOMINGUEZ:  How is that admissible?

18          MR. REBOLLO:  I am going to ask Braulio Ortiz about

19  that.

20          THE COURT:  I'm sustaining the objection.  I'm not

21  going to collaterally try those cases in this Court.

22          MR. REBOLLO:  Can I say the guilty plea is only one

23  factor that they have against him?

24          THE COURT:  If you want to say it, you can say that,

25  but believe me, I will not let you collaterally attack those

1    convictions.  So take it from there.

2              (Bench conference concluded.)

3              MR. REBOLLO:  May it please the Court?

4              THE COURT:  Please.

5              MR. REBOLLO:  Members of the jury, as I was saying,

6    we will present evidence to you to place this guilty plea in

7    perspective.  You will see that it was an offer he couldn't

8    refuse at the time.  You will see that it was a plea of

9    convenience.

10             MS. DOMINGUEZ:  Objection.

11             THE COURT:  Sustained.

12             MR. REBOLLO:  And His Honor, Judge Fuste, will tell

13   you that the fact that he pled guilty does not mean in and of

14   itself that that means he was guilty of those offenses.  He

15   will be --

16             THE COURT:  I am not going to let you make that

17   statement in front of this jury.  If you continue with that

18   line, I'm going to ask you to sit down.

19             MR. REBOLLO:  Yes, sir.

20             THE COURT:  Simple as that.

21             MR. REBOLLO:  Yes, sir.

22             Now, members of the jury, in closing, the evidence

23   that you're about to hear starting today, it's going to be

24   horrible.  You're going to hear about the most horrible facts

25   you're ever going to hear in your life.  It's going to impact,

1    it's going to be horrific to you.  It's going to move you to

2    tears.

3          You're going to hear about victims.  You're going to

4    hear about surviving family members.  You're going to hear

5    about the wounded who survived.  It's going to be horrible.

6          And I can tell you right now that the Government will

7    prove that those murders, in fact, took place.  Those crimes

8    occurred.  Those crimes were committed.  But that will not be

9    the end of the inquiry.  That does not carry the day.  Because

10   what the Government has to do, in addition to proving that

11   those murders occurred, is to prove that Alexis was the one

12   who committed them.  And that, members of the jury, they will

13   not be able to do, for two reasons.

14         One, because he did not commit them.  And, two,

15   because the evidence on which they will ask you to make that

16   conclusion will not be the credible, trustworthy evidence that

17   you will require in order to so conclude.  It will be evidence

18   based on the testimony of convicted drug traffickers,

19   murderers, liars and cheats.  People who will not be worthy of

20   your credibility.

21         And, members of the jury, when the Government brings

22   charges against an individual, particularly charges this

23   serious, it is entering into a contract in a way.  They're

24   part of the contract.

25         MS. DOMINGUEZ:  Objection.

```
 1              THE COURT:  Sustained.  There's no contract.
 2    Sustained.  No contract.
 3              MR. REBOLLO:  Yes, sir.
 4              If they don't prove, if they don't prove what they
 5    have committed to proving, in other words, that Alexis was the
 6    person behind these murders, your duty, your obligation, the
 7    oath that you took this morning will be to find Alexis not
 8    guilty of these charges.  I trust that in the end, you will do
 9    so as well.  Thank you for your attention.
10              THE COURT:  Thank you very much.  Mr. Aguayo.
11              MR. AGUAYO:  Yes, sir.
12              THE COURT:  Mr. Aguayo, I have a question for you.
13              MR. AGUAYO:  I'm sorry?
14              THE COURT:  Would you please approach side bar a
15    minute?  I have a question for you.
16              (Bench conference held.)
17              MR. AGUAYO:  Yes, sir.
18              THE COURT:  The jury's lunch is here.  I need to know
19    whether you prefer to do it now or after lunch.
20              MR. AGUAYO:  We can do it after.
21              THE COURT:  Is that okay?
22              MR. AGUAYO:  Yes.  No problem.  No problem.
23              (Bench conference concluded.)
24              THE COURT:  I was informing Mr. Aguayo that the
25    jury's lunch is here, and I asked him if he preferred to do
```

1    his opening now or after lunch.  Might as well do it after

2    lunch.  It's one o'clock.  Let's reconvene at 2:00 PM.  Okay.

3    Thank you.

4            (At 12:54 PM, recess taken.)

5            (At 2:01 PM, proceedings reconvened.)

6            MR. RUHNKE:  Your Honor.

7            THE COURT:  Please, Mr. Ruhnke.

8            MR. RUHNKE:  I don't know when you want these kind of

9    objections to be made, but the prosecution is about to play a

10   series of 911 tapes that were recorded from La Tombola that

11   evening.  I don't object to most of them.  This is not a

12   Crawford objection.  I know the difference between a Crawford

13   911 call and a non-Crawford 911 call.  But there's one call

14   that lasts about two minutes that's nothing but a woman

15   basically screaming hysterically that her mother has been

16   shot.  Someone else has been shot.

17           To me, it has no probative value.  I don't know what

18   we're proving, and I'd ask it be excluded as overly emotional.

19   And then there's a series of emotional, but not over-the-top

20   calls that we don't object to.

21           THE COURT:  Well, let's do something.  There are a

22   bunch of them you don't object to?

23           MR. RUHNKE:  Yes.

24           THE COURT:  And there's one you object to?

25           MR. RUHNKE:  Yes.

1          THE COURT:  I'll listen to it and let you know.

2          MR. RUHNKE:  It's going to be the first witness.

3          MS. MATEO:  It's the first witness, Your Honor.

4          THE COURT:  You should have told me this.

5          MR. RUHNKE:  Well, we just got it.  We've been in

6   court every day.  We've gotten thousands of pages of

7   discovery.

8          THE COURT:  Well, perhaps you should just skip that

9   one.

10          MS. MATEO:  Your Honor, we turned over the 911 calls

11  a while ago with the transcripts.  There are over 20 911

12  calls, and I've only selected five that add up to less than

13  three minutes of calls.

14          THE COURT:  Why don't you play the one for me before

15  about the jury comes in.

16          MS. MATEO:  Yes, Your Honor.

17          MR. RUHNKE:  Just by reason of background, we didn't

18  bring it earlier because the Government was planning on

19  bringing one in opening, then decided not to do that.  So we

20  didn't have a chance to bring it to you.

21          THE COURT:  How long are these calls?

22          MS. MATEO:  There's five calls, that will all total

23  up to about three minutes.

24          THE COURT:  Well, why don't you play them all, so I

25  can get a sense.

1        MS. MATEO:  Okay.

2        THE COURT:  Go ahead.  Any time.

3        MS. MATEO:  It's loading, Your Honor.

4        (At 2:03 PM, recording played into the record.)

5        MS. MATEO:  Do you want me to restart it?

6        MS. DOMINGUEZ:  Louder.

7        MS. MATEO:  All right.  Okay.

8        (At 2:04 PM, recording played into the record.)

9        THE COURT:  That's one.

10       COURTROOM DEPUTY:  No.  Now.

11       (At 2:05 PM, recording played into the record.)

12       THE COURT:  Is that the one?

13       MR. RUHNKE:  Yes.

14       THE COURT:  Let's hear the other ones.

15       MS. MATEO:  Yes, Your Honor.

16       I'm going to put them in the order that they are in

17  the binder.

18       (At 2:06 PM, recordings played into the record.)

19       THE COURT:  Mr. Ruhnke, I find that all of them are

20  more or less along the same vein.  If you do not object to the

21  other ones, why should you object to the first one?

22       MR. RUHNKE:  I think the one where the woman is over

23  the top and screaming and hysterical about her mother and all

24  of that is just over the top.

25       THE COURT:  I don't think it's over the top.  All of

1    them are very scared and extremely confused.  They can't even

2    remember where the place is.  They are all along the same

3    vein, all of them.

4             MR. RUHNKE:  Yes, sir.

5             THE COURT:  Very well.  Bring the jury in.

6             And of course this is not being received for the

7    veracity of any content.  Is that clear?

8             MS. MATEO:  (Nodding head up and down.)

9             THE COURT:  A limited purpose.  Whether true or not,

10   this is the 911 calls.

11            MS. MATEO:  (Nodding head up and down.)

12            THE COURT:  I'll give a limiting instruction to the

13   jury in that sense.  What is the name of the first witness?

14            MS. MATEO:  Ms. Evelyn Medina.

15            (At 2:13 PM, jury entered courtroom.)

16            THE COURT:  Mr. 16, I'm going to ask you if you can

17   see the witness from there?  If not, that chair has an

18   adjustment, and we'll do it as soon as we can.

19            Call your witness, please.

20            MR. AGUAYO:  I have to do an opening.

21            THE COURT:  I'm sorry, Mr. Aguayo.  I'm very sorry.

22            MR. AGUAYO:  No problem, Your Honor.

23            THE COURT:  Opening statement, please.  You should

24   have reminded me before.

25            MR. AGUAYO:  May I begin?

1          THE COURT:  Be my guest.

2          MR. AGUAYO:  Ladies and gentlemen, my name is Jose

3     Aguayo, and I will be representing David Oquendo Rivas --

4     David, would you please stand up -- during the trial of this

5     case.  And together with me, assisting me, will be Victor

6     Chico Luna, who is a young and upcoming attorney, and he'll be

7     helping me out in the defense of this case.  Some days you'll

8     see him here, other days not.  He'll be working out of the

9     office on various tasks and various things related to this

10    case.

11         David Oquendo Rivas, ladies and gentlemen, is

12    innocent.  The evidence is going to show that he's innocent

13    of, not guilty of the accusations which are contained in

14    pieces of paper that the Honorable Court has told you is an

15    Indictment.  Just pieces of papers that contain accusations,

16    nothing more.  It's not evidence.

17         As the Judge says, this is the way that the trial

18    begins.  Now, why is the evidence going to show that he's

19    innocent?  It's because we're going to bring you evidence to

20    prove that he's been misidentified as having participated in

21    the events of La Tombola.  Misidentified of having been

22    involved in these events, when, in fact, he was not at La

23    Tombola on that horrific night of October 17, 2009.

24         Now, the Government will undoubtedly bring witnesses

25    that were at La Tombola before you to say that David Oquendo

1    participated in these events.  And as you listen to these

2    witnesses, I want you to picture in your mind the absolute

3    chaos, the incredible madness, that surrounded them during the

4    night of these events.

5          The prosecutor, Ms. Mateo, mentioned to you some of

6    the things that were happening.  It was dark.  It was a

7    multitude of people inside and outside La Tombola.  There were

8    cars and horses all over the place.

9          There were deafening shots as she said being fired,

10   horrendous sounds of gun fire.  Gunfire smoke in the air.

11   People running, running, running into each other, and

12   scattering in order to find a place to protect themselves and

13   take themselves out of harm's way.

14         Keep all this extreme chaos in mind when you listen

15   to these witnesses and you evaluate whether you should give

16   credibility or whether you should give belief to the

17   identifications, given the circumstances that are surrounding

18   them at that moment.  And not just any beliefs, but beliefs

19   beyond a reasonable doubt.

20         Now, on the other side of the coin, as the Court has

21   told you, our Constitution makes clear that a defense does not

22   have to present any evidence at all.  The principles of our

23   Constitution are clear.  It's the Government that accuses and

24   therefore, the Government must prove its accusations beyond a

25   reasonable doubt.  That's the way it works.

1              The defense, we do not have to do absolutely

2    anything.  Absolutely nothing.  The Government accuses.  The

3    Government has to prove it and prove it beyond a reasonable

4    doubt.  However, even though the Constitution does not require

5    it, we will bring you evidence that David Oquendo was not

6    involved in these events and was not present on that night.

7              The defense will bring you four witnesses.  The first

8    are the wife, Joanna, the mother-in-law, Angela, and his

9    sister-in-law, Claribel.  Now, I'm not going to give you all

10   the details as to what they're going to be saying, because as

11   the Judge says, the opening statement is not evidence.

12             You'll hear that when they take the stand.  But in

13   essence, I just want to give you a preview.  In essence, what

14   they'll be telling you and testifying at this trial is that

15   although David sometimes lived with his parents, in actuality,

16   he lived at the home with Joanna and his baby.  And they live

17   in a small community, a small urbanization that's gated, that

18   has a security entrance.

19             That house belongs to David's mother-in-law, Angela,

20   who lives there with Joanna, with her daughter, and also her

21   other daughter, Claribel.

22             That night of October 17, 2009, David arrived at

23   approximately 9:00, 9:30.  He parks his vehicle in front of

24   the residence.  He goes inside, and there are the family

25   members.  They talk for a while, and then David, his wife and

the baby go to their room where they retire.  While in the

room, they watch TV.  They use their computers.

At approximately 12:00 AM, 11:58, 12:00 AM, they hear

sounds, what sounds to them at first as fireworks.  They get

up.  They leave the room.  And in the pasillo, in the hallway,

they meet the other family members who are discussing what

they have heard.

They go outside to see what's happening.  And then

nothing's happening, so eventually some of the family members

go back inside.  But David stays back outside with some of the

family members.  And there they're talking, and he's smoking a

cigarette.

Now, I can understand that when you're talking about

family members and loved ones, you'll probably view them with

caution.  Thankfully, there's another objective and unbiased

witness of great credibility who's going to give credence and

cooperation to what these family members are saying.  This

person, his name is Luis Malave Garcia.

The evidence is going to show that Luis Malave is a

security guard at La Gaviotas, the Urbanization, the gated

community where David and Joanna live.  He's not related to

David in any way, shape or form.

On November 17, 2009, he was working the night shift.

He'll testify that approximately 9:00, 9:30 PM, he sees David

Oquendo Rivas drive through the security gate.  They speak

1  briefly, and he sees that David heads towards his residence.

2          Subsequently, Luis Malave does rounds around the

3  Urbanization, security rounds.  Each time he does his rounds,

4  he sees David's car parked in front of the residence in

5  exactly the same spot.  Around 12:00 AM, he also hears what he

6  first thinks are firearms, and then realizes that they're

7  bullets, that there's gunfire.

8          Shortly after that, he does his rounds again, and

9  while doing his rounds, he sees David, David's vehicle in the

10 same place, but more importantly he sees David and a family

11 member outside talking.  He stops.  They speak together

12 concerning what they had heard.  And then shortly after that,

13 Malave continues with his security rounds of the Urbanization.

14 That's what the evidence is going to show.

15          At the end of the trial, it will only be you, not the

16 prosecutor, not me, not even this Honorable Court, it will be

17 you that will decide who to believe.

18          The defense is confident that at the end of this

19 trial, you'll weigh the testimony of both the Government

20 witnesses and the defense witnesses, and in so doing, come to

21 the conclusion that, in fact, David Oquendo was not -- did not

22 participate in the events of La Tombola and was not at La

23 Tombola on that horrific night of October 17, 2009.

24          And as a result of that, at the end of the case,

25 you'll find David not guilty of the accusations that are

1  contained in these pieces of paper, that as I said before is

2  called an Indictment.

3          I thank you for your patience, and I look forward to

4  seeing you again at the end of this case so I can address you

5  again.  Thank you.

6          THE COURT:  Thank you.  First witness, Evelyn

7  Medina.

8          MS. MATEO:  Yes, Your Honor.  The Government calls

9  Evelyn Medina.

10          THE COURT:  Very well.  Where is she?

11          MS. MATEO:  She's in the witness room in the back.

12  They are going to get her now.

13          THE COURT:  Okay.

14          MS. MATEO:  Here she is.

15          THE COURT:  Very well.

16          (At 2:24 PM, witness took the stand.)

17          COURTROOM DEPUTY:  Please stand up and raise your

18  right hand.

19          Do you solemnly swear that the testimony you are

20  about to give in the case now before the Court would be the

21  truth, the whole truth, and nothing but the truth, so help you

22  God?

23          THE WITNESS:  I do.

24          THE COURT:  Ms. Mateo.

25          MS. MATEO:  Thank you, Your Honor.

1              E V E L Y N   M E D I N A,

2       called as a witness by the Government, having been sworn,

3       testified as follows:

4                          DIRECT EXAMINATION

5    BY MS. MATEO:

6    Q.   Please state your full name and spell your last name for

7    the record.

8    A.   Evelyn Medina Conde.

9    Q.   And where are you currently working?

10   A.   The governing board of the 911 service.

11   Q.   And what is your title?

12   A.   Document administrator.

13   Q.   And what are your responsibilities in that position?

14   A.   To ensure that all documents and all recordings that come

15   out of our agency are true and exact copies.

16   Q.   And what is the function of your agency?

17   A.   To transfer emergency calls.

18   Q.   And are you familiar with how the calls are kept and

19   maintained for your agency?

20   A.   Yes.

21   Q.   And are these calls recorded and kept in the regular

22   course of business for your agency?

23   A.   Yes.

24   Q.   And is the call that's recorded maintained a genuine call

25   or is it modified in any way?

```
 1    A.    No, it's genuine.
 2    Q.    And are the recordings made near or at the time of the
 3    call as it's received?
 4    A.    At the time the call is received.
 5    Q.    Is every call recorded?
 6    A.    Every call is recorded.
 7    Q.    I'm now going to hand you what's been premarked as
 8    Government's ID T-C-1, C-2, C-3 and C-5.  And I ask you,
 9    Ms. Medina, do you recognize them?
10    A.    Yes.
11    Q.    How?
12    A.    They have my initials.
13    Q.    And for each CD, can you tell us if the calls on that CD
14    are maintained in the regular course of business for your
15    agency?
16    A.    Yes.
17    Q.    And are these recordings or calls a true and accurate
18    copy of the original call maintained in your office in the
19    system?
20    A.    That is correct.
21    Q.    And were they modified in any way?
22    A.    No.  No, you can't -- no.  I mean, the system does not
23    allow that.
24          MS. MATEO:  At this time, Your Honor, the Government
25    moves these into evidence.
```

1          THE COURT:  Any objection to the calls other than the

2   one that we discussed?

3          MR. RUHNKE:  No objection.

4          THE COURT:  Thank you very much.  They are going to

5   be received.

6          (At 2:29 PM, Government Exhibit Numbers One through

7           Five admitted into evidence.)

8          THE COURT:  Mark them as exhibits, with the numbers,

9   Diana.

10          COURTROOM DEPUTY:  Yes.

11          THE COURT:  Numbers what?

12          COURTROOM DEPUTY:  One through Five.

13          THE COURT:  One through Five.  Go ahead.

14   BY MS. MATEO:

15   Q.   Now, Ms. Medina, before handing them back, can you tell

16   us the dates of all those calls?

17   A.   The dates?  Yes.  I mean, well, I have the -- well, the

18   dates of the calls, per se.  It's -- they're registered by me.

19   So, I mean, the evidence here is genuine.  I mean --

20   Q.   Yes, but what date did those calls -- what date were

21   those calls received to the system?

22   A.   Right now, how can I say?  I mean, I just don't -- I

23   would have to review the documents to tell you.

24   Q.   Do you have those documents with you?

25   A.   Yes, I do have them.

1          THE COURT:  Please do.

2          THE WITNESS:  Okay.  This was on October 17.

3          THE COURT:  Year?

4          THE WITNESS:  2009.

5     BY MS. MATEO:

6     Q.   And also can you tell us, starting with the first CD,

7     which is marked one, can you tell us what time the calls were

8     made?

9     A.   At 11:48 PM.  Number two was at 11:48.  Number four was

10    at 11:47.  Number five at 11:47.  And at 11:48.

11    Q.   And is this AM or PM?

12    A.   PM.

13    Q.   And did you have a chance to review transcripts relating

14    to these calls?

15    A.   That is correct.

16    Q.   I'm now handing the witness what's been marked as T1.

17    It's T1 through T5.

18    A.   Yes, I compared them.

19    Q.   And are they fair transcriptions of the Spanish heard on

20    the calls?

21    A.   Yes, that is correct.

22         MS. MATEO:  Permission to publish at this time.  Your

23    Honor, we have transcripts for the jury that at this time, if

24    we could hand them out?

25         THE COURT:  Please.

1          MS. MATEO:  And Your Honor, at this time we're moving

2    what's been marked Government's ID T-1 through five into

3    evidence.

4          THE COURT:  Any objection to the transcripts?

5          MR. RUHNKE:  No objections.  They're coming in, I

6    assume, as an aid to the jury, not substantive evidence.

7          THE COURT:  Right.

8          Ladies and gentlemen of the jury, let me explain how

9    we do this.  What is really in evidence is the CDs that have

10   the recordings, the calls, okay?  The transcripts are a tool

11   that we're going to use in open court to hear the tapes.

12         Any discrepancy between the tape and the transcript,

13   you're going to go by what the tape says.  The tape is the one

14   that is in evidence.  You understand that?

15         Those transcripts are simply an aid.  They will not

16   be evidence as such in the case.  It's the tapes.  Very well.

17         MS. MATEO:  Also, Your Honor, I'm handing a binder to

18   the interpreter.

19         THE COURT:  And you will notice also that those

20   transcripts have Spanish on one side and English translation

21   on the other.  If there is any discrepancy between the English

22   and the Spanish, we go by the Spanish, because the recordings

23   were made in Spanish.  Is that clear?

24         All of you are fully bilingual, so you have to

25   understand it in the context and the language in which they

```
 1  │ were spoken.
 2  │          Question.
 3  │          MS. MATEO:  At this time we're publishing -- well,
 4  │ Government's Exhibit One.
 5  │          (At 2:35 PM, recording played into the record.)
 6  │          THE COURT:  That's Exhibit One.
 7  │          MS. MATEO:  Yes, Your Honor.
 8  │          THE COURT:  Very well.
 9  │          MS. MATEO:  Moving now to Exhibit Two.
10  │          (At 2:36 PM, recording played into the record.)
11  │          MS. MATEO:  Now publishing Exhibit Three.
12  │          (At 2:37 PM, recording played into the record.)
13  │          MS. MATEO:  Now publishing Government Exhibit Four.
14  │          (At 2:38 PM, recording played into the record.)
15  │          MS. MATEO:  Now publishing Government's Exhibit
16  │ Five.
17  │          (At 2:41 PM, recording played into the record.)
18  │          MS. MATEO:  No more questions for this witness.
19  │          THE COURT:  No questions.
20  │          Members of the jury, I'm receiving this not for the
21  │ veracity of the content, because these persons are not here to
22  │ testify, the ones who were called, but simply as evidence of
23  │ the calls that were received.  From whether the description
24  │ there contained is true, correct, incorrect is a matter that
25  │ we just simply don't know.  These were the calls that were
```

1    received, period.  Okay?

2          Any cross?

3          MR. RUHNKE:  Not from us, Your Honor.

4          MR. AGUAYO:  No, Your Honor.

5          THE COURT:  Thank you very much, ma'am.  You are now

6    excused.

7          (At 2:42 PM, witness excused.)

8          THE COURT:  Next witness.

9          MS. DOMINGUEZ:  Your Honor, the Government calls

10   Jannette Maysonet.  She's outside.

11         (At 2:43 PM witness took the stand.)

12         COURTROOM DEPUTY:  Please raise your right hand.

13         Do you solemnly swear that the testimony you are

14   about to give in this case is the truth, the whole truth and

15   nothing but the truth, so help you God?

16         THE WITNESS:  Yes.

17         MS. DOMINGUEZ:  May I proceed, Your Honor?

18         THE COURT:  Please.

19      J A N N E T T E   M A Y S O N E T   N E G R O N,

20       called as a witness by the Government, having been sworn,

21       testified as follows:

22                         DIRECT EXAMINATION

23   BY MS. DOMINGUEZ:

24   Q.   Good afternoon.  Please state your name.

25   A.   Jannette Maysonet Negron.

1    Q.    Ms. Maysonet, back in 2009, where did you live?

2    A.    Sabana Seca.

3    Q.    And did you grow up in Sabana Seca?

4    A.    Yes.

5    Q.    Are you married?

6    A.    I live with somebody.

7    Q.    And do you have any children?

8    A.    Yes.

9    Q.    How many?

10   A.    Four.

11   Q.    Ma'am, when you were growing up in Sabana Seca, did you

12   ever meet an individual by the name of Wilfredo Semprit

13   Santana, also known as Rufo?

14   A.    Yes.

15   Q.    And could you tell us how it is that you came to know

16   him?

17   A.    Well, I've known him since my youth, because he was from

18   there, from the same ward.

19   Q.    And did Rufo also live in Sabana Seca?

20   A.    Yes.

21   Q.    And did you know what line of work Rufo was in?

22   A.    The underworld.

23   Q.    And what do you mean by underworld?

24   A.    That he worked in drugs.

25   Q.    Now, let me ask you, Ms. Maysonet, did you ever have a

1  drug addiction problem?

2  A.    Yes.

3  Q.    And could you tell us when that was?

4  A.    Well, it was 13 years ago.

5  Q.    And could you tell us what kind of drugs you're addicted

6  to?

7  A.    Cocaine, heroin, and crack.

8  Q.    And do you still have a drug addiction problem?

9  A.    No.  I've been rehabilitated for 13 years now.

10  Q.    Now, when you were suffering from your drug addiction,

11  did you also on occasion sell drugs?

12  A.    Yes.

13  Q.    And why did you do that?

14  A.    To be able to pay for my addiction problem.

15  Q.    And did you ever sell drugs for Rufo?

16  A.    No.

17  Q.    Did you ever buy drugs from him?

18  A.    No.

19  Q.    Now, during the time that you were growing up in Sabana

20  Seca, did you have occasion to know a person by the name of

21  Alexis Candelario Santana?

22  A.    Yes.

23  Q.    And was this person known by any nickname?

24  A.    I knew him as Alexis.

25  Q.    And how is it that you knew him?

1    A.   Because when I was studying in junior high school, I met

2    his cousins, Yanet Martinez and Neida Martinez.  And I was

3    their best friend, and I would go to his house.

4    Q.   And in a given week, how many times would you say you

5    visited Alexis' house?

6    A.   Every day, and until late at night.

7    Q.   And as you grew up, did you maintain that friendship with

8    Alexis' cousins?

9    A.   Yes.

10   Q.   And did you continue to see Alexis?

11   A.   No.  I stopped seeing him for a couple years.

12   Q.   Do you remember when that was?

13   A.   No.

14   Q.   And did you know what type of business Alexis was in in

15   Sabana Seca?

16   A.   Drugs.

17   Q.   And how did you know that he was in the drug business?

18   A.   Because he was the owner of the point, drug point.

19   Q.   Ms. Maysonet, when was the last time that you saw Alexis,

20   if you can recall?

21   A.   I don't remember.

22   Q.   Has it been years?

23   A.   Years, yes.

24   Q.   If you saw him again, do you think that you'd be able to

25   recognize him?

```
 1   A.   Yes.

 2   Q.   Well, could you tell the members of the jury whether you

 3   see Alexis Candelario Santana in the courtroom here today?

 4   A.   Yes.

 5   Q.   Would you please point him out by describing an article

 6   of his clothing?

 7   A.   He's wearing a white shirt and like a blue jacket.

 8            THE COURT:  Go ahead.

 9            MS. DOMINGUEZ:  May the record reflect that the

10   witness has made the identification?

11            THE COURT:  Sure.

12   BY MS. DOMINGUEZ:

13   Q.   Now, Ms. Maysonet, were you familiar with a business in

14   Sabana Seca by the name of La Tombola?

15   A.   Yes.

16   Q.   And what was that business?

17   A.   It was an establishment where you played pool, listened

18   to music, beers were sold.  It was like a pub.

19   Q.   And where was it located?

20   A.   At the corner of Los Bravos, which is adjacent to

21   Progreso Street.

22   Q.   And was that an area that was familiar to you?

23   A.   Yes.

24   Q.   Now, let me ask you if on October the 17th, 2009, you

25   visited La Tombola?
```

1    A.    Yes.

2    Q.    And for what purpose did you visit La Tombola?

3    A.    There was an inauguration of the establishment.

4    Q.    And did you know who the owner of La Tombola was?

5    A.    Well, we only -- well, we all knew La Tombola as the

6    owner being Rufo.  That's how I know him.

7    Q.    And before the date of the grand opening, on October the

8    17th, 2009, can you tell us, if you know, how long that

9    business had been open and operating under the name La

10   Tombola?

11   A.    About two weeks.

12   Q.    Do you recall, Ms. Maysonet, approximately what time you

13   arrived?

14   A.    On the day of the events?

15   Q.    On October the 17th, 2009.

16   A.    It was like 8:00 something.

17   Q.    At night?

18   A.    Yes.

19   Q.    And did you go alone or was someone with you?

20   A.    I went with my twins.

21   Q.    And how old were your twin daughters at that time?

22   A.    Eight, nine, I don't remember well.

23   Q.    And when you arrived at approximately 8:30 PM, can you

24   tell us how many people were in the outside area of the

25   business?

```
 1  A.    There were several people, about a hundred, more or less.

 2  Q.    Now, when you say -- when you refer to the number 100,

 3  are you referring only to the people outside or to people

 4  inside the establishment as well?

 5  A.    The entire place.

 6  Q.    And did you also enter the business?

 7  A.    Yes.

 8  Q.    Now, when you first arrived at 8:30, what did you do?

 9  A.    I said hi to my comadre, my child's godmother, Carmen

10  Maria.  She was in the alleyway in her parents-in-law's house.

11  Q.    Now, so that we get a sense of where that is in relation

12  to the business, can you explain to us how far from La Tombola

13  you two were speaking?

14  A.    There was a street between us.

15  Q.    So could you say that that was across the street from La

16  Tombola?

17  A.    Right in front.

18  Q.    Immediately across the street?

19  A.    Yes.  I can explain more or less.

20  Q.    Go ahead.

21  A.    In example, this is the alley where the street is.  And

22  the road was here, and more or less where the jury is, that's

23  where La Tombola was located.

24        MS. DOMINGUEZ:  Indicating, Your Honor, the witness

25  is pointing to the back wall and then to the jury wall.
```

```
 1  BY MS. DOMINGUEZ:
 2  Q.   Now, did you know a person by the name of Carmen Semprit
 3  Santana?
 4  A.   Yes.
 5  Q.   Do you know her by any name?
 6  A.   Minie.
 7  Q.   And who is she?
 8  A.   Rufo's sister.
 9  Q.   And did you see her that evening at La Tombola?
10  A.   Yes.
11  Q.   Where did you see her?
12  A.   She's the one who was selling fritters at this little
13  establishment they set up next to La Tombola outside.
14  Q.   Okay.  Now, if you were facing La Tombola, the building,
15  would the fritura stand be to the right or the left of the
16  building?
17  A.   My right.
18  Q.   Now, how long did your daughters remain with you that
19  evening in La Tombola?
20  A.   They left around 11:00, about three hours.
21  Q.   And what did you do when they left?
22  A.   I ordered some fritters from Minie, and after I ordered
23  those, I then crossed the street to where Carmen Maria was.
24  Q.   And then what happened?
25  A.   Minie signaled to me that the fritters were ready, and I
```

1  told Carmen Maria the fritters are ready.  And she asked me to

2  bring them over to her, her fritters.  And I asked her to come

3  with me to go buy the fritters, because she was pregnant and

4  not invalid --

5            THE COURT:  Disabled.

6            THE WITNESS:  Disabled.  Thank you.  Corrected.

7            MS. DOMINGUEZ:  Ms. Maysonet, may I offer you some

8  water?  May I, Your Honor?

9            THE COURT:  Yes.

10            THE WITNESS:  Yes.  Gracias.

11  BY MS. DOMINGUEZ:

12  Q.   Are you okay to continue, Ms. Maysonet?

13  A.   Yes.

14  Q.   And after you told Carmen Maria to go pick up the

15  frituras with you, what happened?

16  A.   She just started laughing and came with me.

17  Q.   And do you remember approximately what time that was?

18  A.   Around 11:50.  I don't know.

19  Q.   And did you and Carmen Maria, in fact, go and pick up the

20  frituras?

21  A.   Yes.  The both of us actually went to the place where

22  they were selling the fritters.

23  Q.   And tell us what happened.

24  A.   Okay.  So well, we got to the place where the fritters

25  were sold, and Minie handed over to me the pastelillo.

```
 1              THE COURT:  Turnover.

 2              THE WITNESS:  Turnover.  And so I gave Carmen Maria

 3   her turnover, when I heard somebody running behind me.  And

 4   when I looked behind me, I saw this man with a long rifle

 5   running behind me.  And when I observed him, I yelled, Maria,

 6   careful.

 7   BY MS. DOMINGUEZ:

 8   Q.   To your comadre?

 9   A.   Yes.  So when I looked and saw this guy coming, running

10   with this long rifle, and told Maria to be careful, I ran off.

11   And so when I started running off, I ran into this boy in

12   front of me.

13   Q.   Did you know who the boy was?

14   A.   Yes.

15   Q.   Who was he?

16   A.   Pedro's son.

17   Q.   And who was Pedro?

18   A.   Rufo's brother.

19   Q.   So Rufo's nephew?

20   A.   Yes.

21   Q.   And how old was this child at the time, if you know?

22   A.   He was little, three, four.  I don't remember.

23   Q.   And what did you do when you saw the child?

24   A.   The boy was lying face down.  And running, I grabbed him

25   beneath his arms and kept running with him.
```

1  Q.   And where did you run to?

2  A.   To the other street on which Tombola was.

3  Q.   To a street adjacent to it?

4  A.   The thing is that I was born and raised on the street

5  that's behind La Tombola.  So when -- so when the events took

6  place, I knew more or less where I could run to, where I could

7  go to get away.  And that was the street behind La Tombola

8  where my foster mother lived.

9  Q.   And where did you end up with this child?

10  A.   I arrived at my aunt's house, my foster mother's house.

11  Q.   And then what happened?

12  A.   I stayed there until I stopped hearing shots, and I

13  stayed there until I heard no more shots and I started hearing

14  the sirens of ambulances and police cars.

15  Q.   And when you heard the ambulances, what, if anything, did

16  you do?

17  A.   I didn't understand.  Could you repeat?

18  Q.   What did you do after you heard the ambulance?

19  A.   Okay.  I left my aunt's house and headed over to hand

20  over the boy that I had in my hands.

21  Q.   Okay.  And at that time were you able to see Carmen

22  Maria, your comadre?

23  A.   Yes.  She was on her way to an ambulance with the father

24  of her children.

25  Q.   And what did you do?

```
1    A.    I handed the boy that I had in my hands over to his mom.

2    And I went with Carmen Maria in the ambulance, because on that

3    day, they had also killed at the same place my stepfather's

4    compadre.

5              THE INTERPRETER:   Compadre's stepfather.

6    BY MS. DOMINGUEZ:

7    Q.    Your compadre's stepfather?

8              THE INTERPRETER:   The interpreter stands corrected.

9    My compadre's stepfather.   Thank you.

10   BY MS. DOMINGUEZ:

11   Q.    So Carmen's stepfather had been killed?

12   A.    Yes.

13   Q.    And because of that, her husband couldn't accompany her?

14   A.    Because his mom got very bad, bad, and he had to stay

15   there with her.

16   Q.    And so you went to the hospital with Carmen Maria?

17   A.    Yes.

18   Q.    Now, let me take you back to the moment in time at

19   approximately 11:50 PM, when you felt this person behind you

20   and you told us that you turned.   First of all, could you tell

21   us how far you were from this individual when you saw him, if

22   you can estimate in feet?

23   A.    About five feet, six feet from where I was.

24   Q.    Now, you've told us that this happened late at night.

25   Was there lighting in the area?
```

1    A.    Yes.

2    Q.    Where was the light coming from in relation to where you

3    were at the fritura stand?

4    A.    It was right there in the front, like on top, like above

5    the house, do you call it, the display window of where the

6    fritters were.

7    Q.    And when you turned to look at this individual, could you

8    tell us whether you were able to see his face?

9    A.    Yes.

10   Q.    Did you make eye contact with the person?

11   A.    Yes.

12   Q.    Can you describe to us how that person was dressed that

13   evening?

14   A.    He wore a black cap, a black shirt, jeans.  And this was

15   so quick that I can't be sure if these were black colored or

16   blue jeans, but I -- what I noticed most was the long rifle he

17   had, and his face when he looked toward where I was, when he

18   heard me shout out to Maria, be careful.  He looked to where

19   we were and started heading over to where we were.

20   Q.    And after he looked at you, when you say Maria, be

21   careful, what happened?  What did this individual do, if

22   anything?

23   A.    He turned over to where we were and started shooting.

24   Q.    Now, we've asked you to describe the person's clothing.

25   Can you also describe for the members of the jury the person's

1   face that you saw that evening?

2   A.   This was a white-skinned person.  He was white and a --

3   quite a wide nose, and kind of a wide face, like a wide face.

4   Q.   Now, when you turned to look at that individual, were you

5   able to see if Carmen turned to look as well?  When you turned

6   to look at this individual, were you able to tell if Carmen

7   Maria turned as well?

8   A.   I didn't pay attention.

9   Q.   Now, I'd like to go back for the moment to the hospital

10  where you accompanied Carmen Maria that evening.

11          MS. DOMINGUEZ:  Your Honor, I'd like to flag a

12  potential issue for the Court, if I might.

13          THE COURT:  Yes.

14          (Bench conference held.)

15          MS. DOMINGUEZ:  Judge, this has been flagged in

16  discovery to the defense, but I proffer to the Court that this

17  witness will testify that another Government witness by the

18  name of Yanet Martinez called her that evening at the

19  hospital.

20          And that that person asked her about the incident of

21  whether her son was alive, and also told her, it was Alexis,

22  wasn't it?  It was Alexis.  Suggesting to her that it was

23  Alexis.  And uttered words to the fact that, we have to get

24  him for this.

25          MR. RUHNKE:  What?

1          MS. DOMINGUEZ:  We have to get him for this.

2          MR. AGUAYO:  Who was saying this?

3          MR. DOMINGUEZ:  Yanet Martinez called Jannette

4   Maysonet.  This was turned over in discovery.  While I

5   understand there may be hearsay implications, I fully

6   understand counsel will go into this in cross-examination.  So

7   I wanted to flag this for the Court and make sure it does not

8   draw an objection.

9          MR. RUHNKE:  It will not draw an objection.  And has

10  anyone moved to have sequestration?

11         MS. DOMINGUEZ:  Our witnesses are not here, but we'd

12  be happy to join in that.

13         THE COURT:  Well, if you are going to stipulate

14  sequestration of witnesses, since I don't know who is who, you

15  have to get these people and tell them they can't be in this

16  courtroom and they have to be somewhere else.

17         MS. DOMINGUEZ:  Absolutely.  Just for the Court's

18  information, the only witness present in the courtroom is our

19  case agent.

20         MR. RUHNKE:  That's fine.

21         THE COURT:  That's fine.

22         MR. RUHNKE:  And sequestration is not just being in

23  the courtroom, it's not discussing the case, et cetera, et

24  cetera.

25         MS. DOMINGUEZ:  Absolutely.

```
 1              THE COURT:  Absolutely.

 2              MS. DOMINGUEZ:  Absolutely.

 3              THE COURT:  I agree with that.

 4              MR. RUHNKE:  Okay.  Thank you.

 5              (Bench conference concluded.)

 6              THE COURT:  Well, let's proceed.

 7              MS. DOMINGUEZ:  Thank you, Your Honor.

 8   BY MS. DOMINGUEZ:

 9   Q.    When you were in the hospital, did you receive a call

10   from a person by the name of Yanet Martinez?

11   A.    Yes.

12   Q.    Who is Yanet Martinez?

13   A.    Alexis' cousin and Rufo's cousin.

14   Q.    So are Rufo and Alexis cousins as well?

15   A.    Yes.

16   Q.    And could you tell us as to the best of your recollection

17   what Yanet told you over the phone that evening?

18   A.    They killed Cayon.

19   Q.    And who was Cayon?

20   A.    Her son.

21   Q.    Did she say anything else to you?

22   A.    She told me that they had killed her Cayon, and I

23   guaranteed to her that Cayon was alive.

24   Q.    Why did you think Cayon was alive?

25   A.    Because Cayon and Wichi (ph) were ahead of me when I was
```

1    running.

2    Q.    And did Yanet Martinez say anything else to you with

3    respect to who may have been responsible for that incident and

4    the death of her son?

5    A.    She told me, Alexis killed my son.

6    Q.    Do you recall what else she told you?

7    A.    Not that day, no.

8    Q.    And did there come a time when Yanet called you again to

9    discuss the events of La Tombola?  Or did you have an

10   opportunity to speak to her face-to-face?

11   A.    Yes.

12   Q.    When was that?

13   A.    I can't specify a date.  It was several days after the

14   guys had been buried and all those people had been buried.

15   Q.    Would you say more or less a week after the incident at

16   La Tombola?

17   A.    What was the question again?

18   Q.    Was it within the week after the La Tombola shooting?

19   A.    More or less that happened -- can I explain?

20   Q.    Sure.

21   A.    I went several days, I mean a week, two weeks after to

22   visit Yanet as I always did.  And around those dates, there

23   had been an article in the newspaper indicating that Rufo had

24   given a statement against Alexis and saying that it had been

25   Alexis who had committed these acts.  So she started asking me

what had happened that day.

Q.   And by she, you're referring to Yanet?

A.   Yes, there was her and Neida Martinez, her sister.

Q.   And what did she tell you?

A.   She was asking me why I had guaranteed to her at all times that Cayon was alive.  So I explained to her at that point, what I had told her before, that he was ahead of me running.  And she asked me if I saw Alexis that day.

Q.   And what did you tell her?

A.   That I had not seen Alexis, at least me, I didn't see Alexis that day.  I saw another person.  And she told me, she made a comment to me that I shouldn't be afraid of Alexis, that he was in jail already, and that I had to tell the truth. Because in all this she thinks I'm saying I didn't see Alexis because I am afraid of him.

Q.   And did you see Alexis that night at La Tombola?

A.   Well, I did not see him.

Q.   Now, how many people did you see either shooting or holding any type of firearm on the evening of October 17, 2009?

A.   I heard several shots, but I only saw one person.

Q.   When you say several shots, can you try to be more precise?  Tell us what you heard and for how long you heard the shots ring out.

A.   It was several minutes.  I could hear boom, boom.  Ta,

```
 1    ta, ta, ta, ta.
 2    Q.    So were the shots in close succession or were they -- was
 3    there a pause between them?
 4    A.    No.   This was horrible.   Ever since they started
 5    shooting, they kept shooting nonstop.   A lot.
 6    Q.    Do you know the difference between the way an automatic
 7    weapon shoots and the way, let's say, a pistol shoots, a
 8    non-automatic pistol?
 9    A.    Yes.
10    Q.    What's the difference?   Your understanding.
11    A.    That automatic weapons shoot more quickly, and discharge
12    more bullets than the other ones that shoot more slowly.
13    Q.    And based on what you heard, are you able to tell us
14    whether you feel that what you heard was automatic weapons
15    firing or non-automatic?
16    A.    There were all kinds.   You could hear all kinds.
17    Q.    And what, if anything, did that indicate to you with
18    respect to the number of people that were shooting?
19    A.    There were several people.
20    Q.    So did that indicate to you that there was more than the
21    one shooter that you had seen?
22    A.    Yes.
23    Q.    But you didn't see any of those people?
24    A.    No.
25    Q.    And therefore, you don't know who they were?
```

```
 1   A.   No.
 2   Q.   Now, do you know if Alexis was there that evening at La
 3   Tombola?
 4   A.   I don't know.
 5   Q.   Now, let me show you --
 6           MS. DOMINGUEZ:  May I approach, Your Honor?
 7   BY MS. DOMINGUEZ:
 8   Q.   Government's Identifications T-L1-2 through L-8.  Take a
 9   look at those and let me know when you're done.  Are you done?
10   A.   Yes.
11   Q.   Now, ma'am, in 2011, were you interviewed by special
12   agents of the Federal Bureau of Investigation near the Federal
13   correction facility, MDC?
14   A.   Yes.
15   Q.   In an office that was near to the jail?
16   A.   Yes.
17   Q.   And when you spoke with the agents, did you tell them,
18   did you share with them your knowledge about the events of La
19   Tombola?
20   A.   Did I explain to them what happened that day?
21   Q.   Yes.
22   A.   What I saw that day?  Yes.  Yes.
23   Q.   And did you tell them that you got a look at one of the
24   shooters?
25   A.   Yes.
```

1   Q.   Now, I'd ask you to take a look at the three documents

2   that are in front of you that are marked as T-LU-2, 2-A and

3   2-B.  And let me ask you whether you recognize each one of

4   those documents as a document that you've seen before and are

5   familiar with?

6   A.   Yes.

7   Q.   And could you tell us generally what those documents are?

8   A.   These are pictures of several people.

9   Q.   Okay.  And did the agent show you those photos as part of

10  their interview in 2011?

11  A.   Yes.

12  Q.   Now, are each one of those documents in substantially the

13  same condition as when the agents showed them to you?

14  A.   I was shown a picture previously that looked dark.  These

15  are the pictures that I identified.

16  Q.   But the picture -- the photo that you had been shown

17  which you say was dark, was it by Federal agents or by the

18  local police?

19  A.   Local police.

20  Q.   I'm not asking you about that for the moment, although

21  we'll get to that.  My question is whether those were, in

22  fact, the photos that the agent showed you in the condition

23  that they are in court today?

24  A.   Yes.

25          MS. DOMINGUEZ:  Your Honor, we move for the

1   admissibility of --

2          MR. AGUAYO:  No objection, Your Honor.

3          THE COURT:  Very well, no objection.  They're going

4   to be exhibits.

5          COURTROOM DEPUTY:  6, 7 and 8.

6          THE COURT:  6, 7 and 8.

7          (At 3:27 PM, Government Exhibits 6, 7 and 8 admitted

8           into evidence.)

9          THE COURT:  Would you please put a 6, 7 and 8 on the

10  corner there so we can know what we're referring to

11  afterwards?

12         MS. DOMINGUEZ:  Yes, Your Honor.

13         MS. DOMINGUEZ:  Your Honor, may we publish?

14         THE COURT:  Please.

15  BY MS. DOMINGUEZ:

16  Q.   Now, I'd ask you to look at the monitor that's in front

17  of you.  Are you able to see Exhibit 7 that's projected there?

18  A.   Yes.

19  Q.   And this was one of the documents that they showed you

20  that has six photographs; is that correct?

21  A.   Yes.

22  Q.   And now projecting eight.  Was this also a series of six

23  photos that they showed you in a separate document?

24  A.   Yes.

25  Q.   Now, when the agents showed you those two documents,

1    seven and eight, what, if anything, did you say to them, if

2    you can recall?

3    A.    That I wanted to see the picture more clearly, a bit

4    larger, because it's small.

5    Q.    And when you made that request, did they then show you

6    what's marked now in evidence as six?

7    A.    Yes.

8    Q.    And were you able to select someone from the five

9    photographs on that page?

10   A.    Yes.

11   Q.    Who did you select?  The person --

12   A.    The one that's marked and has my initials next to it.

13   Q.    And the circle around the person's face, do you know who

14   placed that there?

15   A.    I did.

16   Q.    And did you write anything next to the picture?

17   A.    Excuse me?

18   Q.    Did you write anything to where I'm pointing?

19   A.    That's my handwriting.

20   Q.    And what does that say?

21   A.    He had a long rifle.

22   Q.    Now, this individual that you picked out as the person

23   who you saw shooting at La Tombola on October 17, 2009, had

24   you ever seen him before?

25   A.    No.

```
 1   Q.   Did you know his name?

 2   A.   No.

 3   Q.   Did you have any reason to implicate him in that event,

 4   other than the fact that you saw him?

 5   A.   No.

 6   Q.   Now, I'm going to ask you, Ms. Maysonet, to tell us

 7   whether in this courtroom, here today, you see the person that

 8   you picked out, that you selected in Government's Exhibit 6,

 9   in the courtroom here today, as the person whom you saw on the

10   evening of October the 17th, 2009, with the long firearm, the

11   long rifle, who shot at you?

12   A.   Yes.

13   Q.   Could you point to the person and describe an article of

14   his clothing?

15   A.   A striped, long sleeve shirt.

16        MS. DOMINGUEZ:  May the record reflect that the

17   witness has identified the defendant, David Oquendo Rivas.

18        THE COURT:  Very well.

19   BY MS. DOMINGUEZ:

20   Q.   Now, before you were interviewed by the FBI in 2011, do

21   you recall whether you were also interviewed by local police

22   from the Police of Puerto Rico with respect to the Tombola

23   incident?

24   A.   What was the question again?

25   Q.   Did the Police of Puerto Rico also interview you
```

1    regarding the events at La Tombola?

2    A.    Yes.

3    Q.    And was that before or after the FBI interviewed you?

4    A.    Before.

5    Q.    And can you tell us to the best of your recollection,

6    approximately how close to the incident of La Tombola, how

7    close was the incident of October 17, 2009, to that interview?

8    A.    It was several weeks after when Carmen Maria was

9    discharged.

10   Q.    Okay.  And did you also share with the Police of Puerto

11   Rico what you knew about that night at La Tombola?

12   A.    Yes.

13   Q.    And did you also tell them that you had seen the face of

14   one of the shooters?

15   A.    Yes.

16   Q.    And did the Police of Puerto Rico show you some booking

17   photos?

18   A.    I was shown -- I was shown a binder similar to the one on

19   the table here that contained a series of pictures.

20   Q.    Okay.  And do you recall how many pictures you saw or how

21   many photos of, pages of photos you saw?

22   A.    This was a -- had quite a lot -- this was quite big, this

23   photo album.

24   Q.    Could you indicate with your hand how wide that notebook

25   was?

1    A.   (Witness indicating.)

2    Q.   Indicating for the record --

3    A.   And each page had about six pictures.

4          MS. DOMINGUEZ:  Indicating for the record about, I

5    would say, about two or three inches.

6          MR. RUHNKE:  Fair enough.

7          THE COURT:  More or less.

8    BY MS. DOMINGUEZ:

9    Q.   Okay.  Now, were you able to identify from the

10   photographs you were presented with a photograph of the person

11   who shot at you on October 17, 2009?

12   A.   No, I started by looking over the book.  And at some

13   point I told them -- I pointed to a -- I pointed to a picture

14   in the book and told them that that person looked a lot like

15   the person I saw that night.  He looked very much like the

16   person, but that was not him because he was dark skinned and

17   the guy I saw was white.

18   Q.   Now, the person that you selected on Government's Exhibit

19   6 that you circled his face, as the person who shot at you

20   that evening in La Tombola, was that person's photograph

21   included in the photographs that the Police of Puerto Rico

22   showed you?

23   A.   No.

24   Q.   Now, let me ask you, Ms. Maysonet, whether you have ever

25   had occasion of being interviewed by an investigator

1    associated with the defense in this case?

2    A.   Yes.

3    Q.   And did that happen once or more than once?

4    A.   More than once.

5    Q.   Would you tell us an estimate of how many times?

6    A.   Countless times.  I can't remember how many times.

7    Eight, seven.

8    Q.   Now, during those interviews -- do you remember the name

9    of the investigator?

10   A.   Yes.

11   Q.   Could you share with us his name?

12   A.   Mr. Carlos Eliezer.

13   Q.   And during those interviews, in one or more of those

14   interviews, did this investigator ever ask you or present to

15   you a photo lineup and ask you to identify the person that you

16   saw shooting at La Tombola on October 17, 2009?

17   A.   Yes.

18   Q.   How many times did that happen, once or more than once?

19   A.   That he showed pictures to me?

20   Q.   Yes.

21   A.   Once.

22   Q.   And can you tell us whether the photograph of the person

23   that you have identified as the shooter, as one of the

24   shooters that night that you circled his face here in

25   Government's Exhibit 6, whether that photograph was included

1    in the series of photographs that he showed you?

2    A.    Can I explain?

3    Q.    Well, could you -- absolutely you can explain, but could

4    you tell us first whether a photo of that person was included

5    in the photos that he showed you?

6    A.    Yes.

7    Q.    And did you select that person upon being shown the photo

8    array?

9    A.    No.

10   Q.    Why not?

11   A.    Because we were getting close to the date where I had to

12   come here, and I had had so many interviews with the attorney

13   already.  And for security reasons, I didn't want to tell him

14   that he was included in those pictures, because he was Alexis

15   Candelario's investigator.

16   Q.    But you weren't identifying Alexis Candelario.  You were

17   identifying someone else who was the person that you saw

18   shooting at you that evening.

19   A.    I was afraid for my security, my safety.

20   Q.    You know, I just have a couple more questions, and then

21   I'll be done with my direct examination.  Your comadre, Carmen

22   Maria, who you accompanied to the hospital, was she injured on

23   October -- the evening of October the 17th?

24   A.    Carmen Maria?

25   Q.    Yes.

1    A.    Yes.

2    Q.    Do you know where she was injured?

3    A.    She received two bullet impacts on her gluteus, which one

4    of the bullets caused the death of her baby girl.  The other

5    bullet injured her uterus, her bladder.

6              THE COURT:  Intestines.

7              THE WITNESS:  And the intestines.

8    BY MS. DOMINGUEZ:

9    Q.    And how about you, Ms. Maysonet, were you injured at all

10   on that evening of October the 17th?

11   A.    No.  I mean, I received -- and this is according to the

12   nurse, because I didn't treat myself.  But I guess the very

13   powder, kind of scratched my leg, but I didn't get treated for

14   any wound.

15             THE INTERPRETER:  Gun powder.

16             THE WITNESS:  Gun powder.

17             MS. DOMINGUEZ:  I have no further questions.

18             MR. RUHNKE:  Could we take our afternoon break, Your

19   Honor?

20             THE COURT:  Yes.  Let's take a five, six minute

21   recess.

22             (At 3:44 PM, recess taken.)

23             (At 3:59 PM, proceedings reconvened.)

24             THE COURT:  We're going to mark the transcripts as a

25   court exhibit.  It doesn't go to the jury, of course.

1          MR. RUHNKE:  Thank you, Your Honor.  Your Honor, can

2     I flag another issue that's coming up?

3          THE COURT:  Yes.

4          MR. RUHNKE:  Apparently the next person to testify

5     will be the woman who lost her child at La Tombola.  I had

6     asked yesterday whether the Government was going to use any

7     photographs.  They weren't sure yesterday.  Now I'm told they

8     want to use a photograph of the dead baby in a casket, and we

9     just think that's over the top.

10          THE COURT:  I really don't want to allow this.  I

11     don't even want to look at it myself.  When we get to the

12     autopsy, we'll deal with it, but not now.  I don't want to see

13     a baby in a casket.

14          COURT SECURITY OFFICER:  All rise.

15          (At 4:01 PM, jury entered courtroom.)

16          COURT SECURITY OFFICER:  Please be seated.

17          THE COURT:  Any cross, Mr. Rebollo, please?

18          MR. REBOLLO:  Yes, your Honor.  Thank you.  May it

19     please the Court.

20          THE COURT:  Please.

21                         CROSS-EXAMINATION

22     BY MR. REBOLLO:

23     Q.   Ma'am, you and I had a chance to meet in person.  Let me

24     start again.  Ma'am, you and I had a chance to meet in person

25     once before; is that correct?

1   A.   Yes.

2   Q.   And that's because you were kind enough to come to my

3   office to talk about the facts that you have discussed with

4   the jury today?

5   A.   Yes.  It was not inconvenient at all for me to cooperate.

6   Q.   Right.  In fact, you came voluntarily to my office here

7   in Capital Center across from this courthouse, correct?

8   A.   Yes.

9   Q.   And we discussed everything that you remembered about the

10  events?

11  A.   Yes.

12  Q.   Present there was also the investigator, the private

13  investigator assigned to the case, Mr. Carlos Eliezer.  Do you

14  remember that?

15  A.   Yes.

16  Q.   All right.  And among the things we discussed were that

17  you told me that you had known Alexis since he was 12 or 13

18  years of age?

19  A.   Yes, we were all young at the time.

20  Q.   And you told me that you had not seen Alexis anywhere in

21  or around La Tombola on October 17 of 2009 at any time.  Do

22  you remember that?

23  A.   Yes, the same thing I said now.

24  Q.   Right.  And that is still true today?

25  A.   Yes.

1   Q.   It's not that you're afraid to say it, it's that you

2   really didn't see him that night at all?

3   A.   Can I speak?

4   Q.   Yes, of course.

5   A.   I'm here present in this case testifying and I'm afraid

6   for my safety, because I had -- it's clear to me that the

7   people I'm testifying about here today are people from the

8   underworld.  And still I have now identified a gentleman here,

9   and I'm risking my life doing this.  But I can't testify I saw

10  Alexis Candelario, because I didn't see him.

11  Q.   Fair enough.  Now, we -- do you remember that at the time

12  that we met in my office it was on November of 2011?  More or

13  less?  Do you remember that?

14  A.   I've had so many interviews that I don't remember the

15  date.

16  Q.   But if it was in November 2011, it would have been well

17  over a year from before today, right?

18  A.   Yes.

19  Q.   All right.  And another of the things that we discussed

20  was that you had been interviewed by both state and Federal

21  authorities on a number of occasions by that time, right?

22  A.   Yes.

23  Q.   And you had told them in detail everything you remember

24  seeing that night?

25              THE INTERPRETER:  The interpreter needs a

1   repetition.

2   BY MR. REBOLLO:

3   Q.   And that you told them in detail everything you remember

4   seeing that night?

5   A.   Yes.

6   Q.   And you made clear to them that you had not seen Alexis

7   there that night?

8   A.   I've said that from the very beginning.

9   Q.   You also advised me that the Federal or the state agents

10  had never shown you a picture of Alexis, right?

11  A.   Could you repeat the question?

12  Q.   Certainly.  That you also told me that you had never been

13  shown a photograph of Alexis by the Federal or state

14  authorities?

15  A.   No.

16  Q.   But you didn't need one because you know Alexis, you've

17  known him for almost 30 years, right?

18  A.   That's right.

19  Q.   All right.  And the other thing, among the other things

20  we discussed, was that you had seen the face of an individual

21  that night, that October 17, 2009 night, who was carrying a

22  long weapon?

23  A.   Yes.

24  Q.   And you told me, my office, back in November of 2011,

25  that you could not identify that person in any way?

1    A.   Excuse me?

2    Q.   The question is do you remember that you told me, in my

3    office, that the person that you had seen the face of with the

4    long weapon, you could not identify?  You could not tell

5    anybody who he was?

6    A.   From the very moment these events took place, I saw the

7    person who shot at me, toward me.  But I never -- and I never

8    told anybody, except for the Feds, that I had seen him, and I

9    repeat, I fear for my life.

10   Q.   All right.  But let me try to get back to the question so

11   we can be specific.  The question was that you told me in that

12   meeting in my office that that person that you had seen, you

13   could not identify, you did know who he was?

14   A.   Yes.

15   Q.   And one of the things we did was when you told me that

16   day, we put it down in a peace of paper.  Do you remember

17   that?

18   A.   Yes.

19   Q.   And I gave you the chance then to review the document,

20   which said all these things?  Do you remember that?

21   A.   (No audible response.)

22   Q.   And I gave you a chance to make any changes to it that

23   you thought were applicable?

24   A.   I think so.  I can't remember very well.

25   Q.   Okay.  Do you remember that then we went before an

1   attorney, and notary public, and you swore to that document,

2   you put an oath to that document as true and accurate?

3   A.   Yes, that I had not seen Alexis, yes.

4   Q.   And what about the part that you could not identify the

5   person you had seen?  Do you remember that part?

6   A.   No.

7   Q.   All right.  Now, among other of the things that we

8   discussed was the contacts that you had had with Yanet

9   Martinez and Neida Martinez Santana, Rufo's cousins.  Do you

10  remember that?

11  A.   Yes, about Yanet Martinez and Neida Martinez, yes.

12  Q.   Earlier today you told the jury that the night of the

13  events, you had received a call from Yanet Martinez who had

14  asked you to say that you had seen Alexis at the Tombola.  Do

15  you remember that?

16  A.   She told me to say the truth, that I had seen Alexis.

17  Q.   But that wasn't the truth, right?

18  A.   I didn't see him.

19  Q.   So she was asking you, in effect, to lie?

20  A.   The thing is that she had read something in the

21  newspapers about Rufo identifying him, and to this day, three,

22  more than three years later, she still thinks I'm covering up

23  for Alexis Candelario.

24  Q.   But the question was that in effect by asking you to say

25  falsely that you had seen Alexis there, she was asking you to

1    lie?  And you wouldn't lie?

2           MS. DOMINGUEZ:  Your Honor, I object to the question

3    based on the precedent that's been introduced that the witness

4    actually asked her to tell the truth and thought that that was

5    the truth.

6           THE COURT:  Well, she has told us, she has explained

7    the circumstances of the situation whereby this woman reads a

8    paper and says whatever.  And she has told us what she did or

9    did not do.  I think we should leave it at that.

10          MR. REBOLLO:  All right.  Yes, sir.

11          THE COURT:  Yes.  Go ahead.

12   BY MR. REBOLLO:

13   Q.   Now, ma'am, that was not the only time, that night of La

14   Tombola, that was not the only time that Yanet Martinez had

15   asked you to say falsely that you had seen Alexis at La

16   Tombola, right?

17   A.   Several times.

18   Q.   Okay.  In fact, you told me at that meeting we had in my

19   office, you told me that that had happened very frequently,

20   since the day of La Tombola, she was continuously asking you

21   to say falsely that you had seen Alexis that night?

22          MS. DOMINGUEZ:  Again, Your Honor, same objection.

23          THE COURT:  Well, I think that she has admitted that

24   the woman asked her.

25          MR. REBOLLO:  But this --

1    THE COURT:  Subsequently.  Subsequently and several

2   times.

3    MR. REBOLLO:  The frequency.

4    THE COURT:  Yes.

5    MS. DOMINGUEZ:  It's the falsity, because it requires

6   her to speculate on the intent of Yanet.

7    THE COURT:  I will allow that.  I will allow that.

8    MR. REBOLLO:  Okay.

9    THE WITNESS:  Which was the question?

10   BY MR. REBOLLO:

11   Q.  The question was that, in fact, since the day of the

12   events, Yanet -- you told me that Yanet Martinez had

13   continuously been asking you to say that you had seen Alexis

14   at La Tombola that night?

15   A.  The first weeks it was very continuous, and our

16   relationship as friends since that date on has changed.

17   Q.  Because you don't feel comfortable with this pressure put

18   on you to say something you know is not true?

19   A.  It's not so much because of that.  It's just that I used

20   to visit her every day from the morning to the afternoon, and

21   ever since this happened, our friendship has been put to the

22   side somewhat because to this day she still thinks that I'm

23   covering up for Alexis, because I have heard comments from

24   other people that it was Alexis -- correction to the

25   translation.  Because of comments she heard from other people,

1   that Alexis committed these acts.

2   Q.   And not only has Yanet done this to you, but her sister,

3   Neida Martinez Santana has done the same, albeit to a lesser

4   degree?

5   A.   Neida did this like once.

6   Q.   All right.  And you had told them both no, you had

7   rejected those requests, right?

8   A.   Whenever we've touched upon this topic, I tell them.  I

9   said I didn't see him.  I can't say otherwise.  I didn't see

10  him.  But they don't believe that.

11  Q.   And you've told them both the same.  You've told them as

12  you've related to me, you've told them whatever problems they

13  have among their family, that's their problem and you don't

14  want to get involved?

15  A.   Yes.  This is a family problem.  Rufo, Alexis, Yanet,

16  Neida, all of them are family.  They're all cousins and they

17  were all raised to together.  First cousins.  And they were

18  raised together.

19  Q.   And the other thing that Yanet Martinez has told you as

20  you related to me was that if she had been at La Tombola, she

21  would say that she had seen Alexis, but the reason she doesn't

22  do it is that since she was not there, nobody's going to

23  believe her, but you were there, you can do it.  Right?

24  A.   Yes.

25  Q.   All right.  And --

1           MR. REBOLLO:  Excuse me.  Court's indulgence, Your

2  Honor.

3           Your Honor, for identification purposes I would like

4  this marked, if I can.

5           THE COURT:  Defendant's One.

6           COURTROOM DEPUTY:  One, yes.

7           THE COURT:  Defendant Candelario One.

8           MR. RUHNKE:  We actually have them premarked starting

9  at 100 since we used exhibit numbers earlier.

10          THE COURT:  We use exhibit numbers on both sides.  So

11 it will be Defendant's One, Defendant Candelario's One.

12 BY MR. REBOLLO:

13 Q.  Ma'am, I'm going to hand you what's been marked as

14 Defendant's ID One.  I want you to go to the second page and

15 tell me if this is your signature on this?

16 A.  Yes.

17 Q.  That is your signature, right, no doubt?

18 A.  Yes, that's my signature.

19          MR. REBOLLO:  Your Honor, I would offer Defendant's

20 ID One into evidence at this point.

21          MS. DOMINGUEZ:  We have a hearsay objection.

22          THE COURT:  May I see it, please?

23          MR. REBOLLO:  We have a translation, also.

24          THE COURT:  That's okay.  Let me take a look at it.

25          Please approach the side bar.

```
 1              (Bench conference held.)

 2              THE COURT:  She has basically stated almost exactly

 3   what it says here.

 4              MS. DOMINGUEZ:  That's the basis of our objection.

 5   It's not inconsistent with her testimony.

 6              THE COURT:  Well, it's not inconsistent.  It's not

 7   inconsistent.  The fact that it's not inconsistent makes it

 8   inadmissible?

 9              MR. HEGYI:  Yes, because a prior inconsistent

10   statement is hearsay.

11              MR. RUHNKE:  It was sworn.

12              THE COURT:  She said almost exactly this.

13              MR. REBOLLO:  Except one point which I think

14   Mr. Aguayo would touch on.

15              THE COURT:  Well, let him deal with it first, because

16   she hasn't been inconsistent with this at all.  She said

17   exactly, I said it.  Which point?

18              MR. RUHNKE:  Number seven, Your Honor.

19              THE COURT:  Which she admitted it, too.

20              MR. REBOLLO:  She identified his client as the person

21   she saw.

22              THE COURT:  Right.

23              MR. REBOLLO:  But here she says --

24              THE COURT:  Right, but you're not his attorney.

25              MR. REBOLLO:  Exactly.
```

```
1              THE COURT:  What she testified is totally consistent

2    with the sworn statement, so let's leave it at that, okay?

3              MR. REBOLLO:  Very well.

4              (Bench conference concluded.)

5              THE COURT:  Is there anything else for her?

6              MR. REBOLLO:  I just have two more.

7              THE COURT:  Yes, please.

8              MR. REBOLLO:  May I, Judge?

9    BY MR. REBOLLO:

10   Q.   Ma'am, just two more things.  You told us that you

11   returned after the events and after the shooters had left.

12   You told us that you returned to the Tombola area, and that's

13   where you got into the ambulance that took you to the

14   hospital.  Do you remember that?

15   A.   Yes.

16   Q.   Do you remember also telling me that you had -- when you

17   returned, before you got into the ambulance, when you

18   returned, you had seen some weapons, some firearms laying on

19   the ground among the bodies there?

20   A.   Yes.

21   Q.   All right.  So that is true, right?  You saw firearms

22   laying around right before you got into the ambulance?

23   A.   As I was -- as I was running, I saw like a type of pistol

24   or something like that next to the -- close to the gate.

25   Q.   All right.  And finally, could you tell us the names of
```

1   the people you remember seeing there that night?  Not the

2   people who arrived, the people who were there at the activity

3   while you were there with your friends.

4   A.   Okay.  I was surprised by the question, because there

5   were so many people and I don't know them all.

6   Q.   Understood.  I just want the people you know.

7   A.   There was Carmen Maria, her mother-in-law, Mary.  And I'm

8   going to mention these people by nicknames, because in the

9   neighborhood, we know people by their nicknames and I don't

10   know their names very well.

11   Q.   That's good enough.

12   A.   Okay.  So there was Mary, Rosita, Carmen Maria, Willy,

13   Nalo, Don Samuel, David, David's wife, whose name I can't

14   remember.  I can't remember the name of the girl who died

15   right now very well.

16   Q.   If you can't, that's okay.  Give us the names you

17   remember.

18   A.   Cayon, Joshi, Minie, Minie's husband, Minie's daughter.

19   I don't know their -- the people by their names.  Her son, her

20   daughter.  I mentioned Joshi, right?

21   Q.   Yes, you did.

22   A.   Countless people.  And almost at the end, well, before

23   the events took place, I had gone into the establishment.  I

24   went in there several times to buy us cheese sticks and buy

25   things for me.  And I had not seen Rufo arrive there yet.

1          Let me see how I can say this.  Rufo arrived there a

2   couple minutes before that chaos took place there.  There was

3   his sister-in-law, his niece, his wife got there.  Almost all

4   of them arrived at the same time.

5          Wow, there was countless people there.  For me to

6   remember all their names right now, because there was also a

7   cavalcade that arrived there, a bunch of people that arrived

8   on horses there.

9   Q.   Anyone else you saw in La Tombola, in the bar when you

10  went out to buy your drinks?

11  A.   Minutes before the events?

12  Q.   At any point.

13  A.   Well, minutes before Rufo had arrived, Minie, Amarilis,

14  Amarilis, who's Rufo's wife, Pedro was there.  That's Rufo's

15  brother.  There was this gray haired man who was the one who

16  was at the bar at the time.  Correction.  Correction.  Blond,

17  blond, a blond guy who was at the bar.  There was Mickey, I

18  saw him on two occasions that I saw Mickey.  He was also

19  helping the blondish guy who was at the bar.

20          MR. REBOLLO:  That's it?  All right.  Thank you very

21  much, ma'am.  I have nothing else, ma'am.

22          THE COURT:  Mr. Aguayo, anything?

23          MR. AGUAYO:  Yes, sir.

24                         CROSS-EXAMINATION

25  BY MR. AGUAYO:

```
 1   Q.   Good afternoon, Ms. Maysonet.

 2   A.   Good afternoon.

 3   Q.   Before I get into further questions, when you were asked

 4   by fellow counsel who were at La Tombola, you mentioned David.

 5   You mentioned the name David.  Who is David and his wife?

 6   A.   The last names or what?

 7   Q.   No, no.  Just who is David.

 8   A.   David lives on Los Magos Street.  Well, I should say his

 9   family.  He was raised there.

10   Q.   Okay.  Was David there?  That's my question.

11   A.   Yes.

12   Q.   All right.  Let's go back to that night.  You stated that

13   you arrived at La Tombola at approximately, I believe it was

14   around 8:30, 8:45; is that correct?

15   A.   Yes.

16         MR. AGUAYO:  Your Honor, if we can mark this, well,

17   actually it's a stipulation between the parties.  It's a

18   croquis of La Tombola.

19         MS. DOMINGUEZ:  We have no objection, Judge.

20         THE COURT:  Well, mark it.  Mark it in evidence

21   without objection Defendant's --

22         MR. AGUAYO:  Oquendo One.

23         THE COURT:  Oquendo One, yes.

24         (At 4:33 PM, Defendant Oquendo Exhibit One admitted

25          into evidence.)
```

1    MS. DOMINGUEZ:  Your Honor, I note that document has

2    some writing in Spanish.  However, the Government will be

3    introducing one that has a translation.

4    THE COURT:  So you'll put them together afterwards?

5    MS. DOMINGUEZ:  Yes.

6    BY MR. AGUAYO:

7    Q.   Now, do you have -- can you see this document?

8    A.   Yes.

9    Q.   Now, the Government and I have stipulated as to this

10   croquis, that this is a croquis of the area of La Tombola.

11   Can you see that?

12   A.   Yes.

13   Q.   Okay.  And you recognize that as La Tombola, correct?

14   The area?

15   A.   Yes.

16   Q.   Okay.  Now, going back, you see you arrived at

17   approximately I believe it was 8:30, 8:45, correct?

18   A.   Yes.

19   Q.   And while you were there, you went inside La Tombola on

20   various occasions to purchase beer, correct?

21   A.   Not only beer, refreshments, chips, because I was with my

22   daughters.

23   Q.   Okay.  But as to you, you went inside on various

24   occasions to buy beer, correct?

25   A.   Yes.

1  Q.   Okay.  And you were there from approximately 8:30, 8:45,

2  until the events of that night, which was approximately close

3  to 12:00 AM.  How many times did you go in?  How many of these

4  various occasions to purchase beer, how many times did you go

5  in to get beer?  More or less?

6  A.   How many times did I go in to buy beer?

7  Q.   Yes.

8  A.   (Remarks in Spanish.)

9  Q.   All right.  All right.  But my -- I'm sorry.?

10  A.   I went in several times, but not just to buy beer for

11  myself, because when we go out as a group, one person buys one

12  round and the next person buys the next round.  I don't have

13  problems with alcoholism.  I had addiction problems.

14  Q.   All right.  That's fine, ma'am.  And about how many

15  rounds were bought between the group, more or less?  No, no.

16  The whole group.  The whole group.

17  A.   About four.

18  Q.   All right.  Now, you stated that the shooting occurred at

19  approximately 11:58, correct?

20  A.   Something like that, yes.

21  Q.   All right.  And prior to the shooting, you had ordered

22  food from Minie's fritura stand, correct?

23  A.   (Remarks in Spanish.)

24  Q.   Okay.  Now looking at -- I'm sorry.

25  A.   Okay.  At one point I went inside the establishment to go

```
 1    to the bathroom.  And when I came out, I asked Minie what she
 2    was selling, what fritters she was selling.  And I went to see
 3    Maria.  When she told me what she wanted, I ordered it and sat
 4    next to her.
 5    Q.   All right.  Now, looking at this croquis, would you tell
 6    us where the food stand was located?
 7    A.   Here or here.
 8    Q.   If you could stand up and show the ladies and gentlemen
 9    of the jury.
10    A.   It's easier for me over here.
11    Q.   Yeah, but we can't see that.
12              THE COURT:  Yes.
13              MR. AGUAYO:  Oh, you can?
14              THE COURT:  She can mark it with her finger.
15    BY MR. AGUAYO:
16    Q.   Okay.  Wonderful.  If you could mark it.
17    A.   Now?
18    Q.   Yes.  If you can mark it.
19    A.   It's in like a tarp in a tent there, and there was a
20    booth.
21              THE COURT:  Make a circle around the area.
22              THE WITNESS:  (Witness indicated.)
23              THE COURT:  Okay.
24    BY MR. AGUAYO:
25    Q.   Ma'am, isn't that the billiard table inside of La
```

```
 1 | Tombola, or am I mistaken?
 2 | A.    I don't know.  I can't see it.  Okay.  It looks so small
 3 | here, you can't see very well.  There's a house there that's a
 4 | residence.
 5 | Q.    Yes.
 6 | A.    Can I explain?
 7 | Q.    Yes, of course.
 8 | A.    Okay.  This is La Tombola.  There are two doors, and
 9 | there are two doors here up front.  These were the only two
10 | entrance doors to the establishment.  Because in the back,
11 | there was another entrance, but at the time it was --
12 |         THE INTERPRETER:  Boarded up.
13 |         THE WITNESS:  Boarded off.  And this is a residence
14 | here.  And here in this corner here, sorry, I thought that
15 | --because I thought that that was the tent that was next to
16 | it.  But there's a tent or a tarp and there's a table.
17 |         And here at this house there's a balcony, and there's
18 | an entrance door around there.  There are some stairs -- there
19 | are some stairs here around the door that leads to this house.
20 | I was here where the -- where the tent was close to the gate,
21 | very close to the gate.
22 |         MR. AGUAYO:  Can we stipulate to this?
23 |         MS. DOMINGUEZ:  Yes.
24 |         THE COURT:  Why don't you put them together or you
25 | want to substitute?
```

```
 1              MR. AGUAYO:  Well, I'm going to need this, also.
 2              THE COURT:  Okay.
 3              MR. AGUAYO:  But we can stipulate the photographs
 4    here, if we can.
 5              THE COURT:  What are those?  Let me see them.  Why
 6    don't you mark them as joint exhibits.
 7              MR. AGUAYO:  That's fine.
 8              THE COURT:  Joint Exhibits I and II.
 9              (At 4:41 PM, Joint Exhibits I and II admitted into
10               evidence.)
11    BY MR. AGUAYO:
12    Q.   Now, is this -- is there a way we can take away the --
13    okay.  Does this look better for you in terms of where Minie
14    had her fritura stand?
15    A.   Yes.
16    Q.   Okay.  Now, after you ordered it, you stated -- where did
17    you go -- where did you go with Carmen Maria?  Were you across
18    the street or where were you standing prior to Minie telling
19    you the frituras are ready?
20    A.   Minie yelled out to me, like made signals to me to tell
21    me that the fritters were ready.  I was on the other side of
22    the road in an alleyway where we had some chairs there.
23    Q.   Okay.  Now, there were cars in front of La Tombola, were
24    there not?
25    A.   Yes.
```

```
 1  Q.   As a matter of fact, there were cars everywhere because
 2  there were so many people that have come to La Tombola?  They
 3  were on both sides of the street, correct?
 4  A.   Repeat the question.
 5  Q.   All right.  You had stated that there were many, many, I
 6  don't know the number, but there were a multitude of people
 7  both inside and outside La Tombola.  Do you remember?
 8  A.   Cars, horses, yes, all that.
 9  Q.   Okay.  And the cars, they were on both sides of the
10  street?
11  A.   Yes.
12  Q.   Okay.  And there were cars in front of La Tombola,
13  correct?
14  A.   You mean like blocking the entrance?
15  Q.   No.
16  A.   The entrance to the premises?
17  Q.   That's my question.  Were there cars in front of La
18  Tombola, the front entrance?  The front of the bar that's
19  called La Tombola, were there cars there?
20  A.   (Remarks in Spanish.)
21  Q.   Of course.
22  A.   Yes, but not right in front of the doors per se, no, but
23  yes, there were cars.
24  Q.   And were there at least five cars in the front there?
25  A.   Yes, there were several.  I don't know if there were
```

1   five, but yes, there were several.

2   Q.   And you also stated that there was a cabalgata?  I'm

3   sorry.  I don't know the --

4           THE INTERPRETER:  Cavalcade.

5   BY MR. AGUAYO:

6   Q.   Cavalcade.  How many horses were in that cavalcade, if

7   you recall?

8   A.   Well, I don't know.  But there were a lot of people.

9   There were like -- there were children, there were more than

10  20 people, children, adults.

11  Q.   What about horses?  About how many horses?

12  A.   Right, that's what I'm telling you.

13  Q.   So about --

14  A.   Yes, there were maybe like 15 or something like that,

15  because sometimes there were two people on the same horse.

16  Q.   And where were the horses tied up?

17  A.   Oh, I don't know where -- I mean, there were horses

18  around with their owners next to them.  Like that.

19  Q.   Okay.  Let's put this croquis back on.  Let me see if I

20  have it right here.  If you're looking at La Tombola, you

21  mentioned there were at least five cars, maybe more, as shown

22  in that croquis, correct?

23  A.   Looking where?  I don't understand.

24  Q.   Look at the croquis that's on the screen.  And you see

25  these vehicles?  There are at least five vehicles on the

1   screen, correct?

2   A.   Yes.

3   Q.   All right.  And you stated that there were vehicles in

4   the front of La Tombola, near La Tombola, in front of La

5   Tombola, and there could have been more, correct?

6   A.   When I say that, I'm not sure how many cars there were, I

7   mean in front of the door.  But, yes, in front of where the

8   fritters were sold, there were several cars.

9   Q.   Okay.  Now, the horses, were they in this -- where were

10  the horses hitched up?  In this area here between the house

11  and La Tombola?

12  A.   Not where the fritters were.  They were further.

13  Q.   Can you point to where those horses were hitched up,

14  please?

15  A.   (Witness indicating), like over here on this side.  Well,

16  there were some on this side, and there were also others on

17  the other side.

18        MR. AGUAYO:  May the record reflect, Your Honor, that

19  she's pointing to the right side of the croquis and the left

20  side of the croquis.

21        MR. HEGYI:  She's pointing off the croquis.

22        MR. AGUAYO:  Yeah.

23        MR. HEGYI:  She's pointing to off the croquis.

24  BY MR. AGUAYO:

25  Q.   Ma'am, would you please just stand up and show us where

```
 1    the horses were tied up?
 2    A.    (Witness indicating).  This here is a fence, and it
 3    was -- and it was over to this side that the horses were close
 4    to the fence.  Not on this side where the house is.  And there
 5    were about two or three, like two tied up.  The others were on
 6    the street, on the road.
 7    Q.    Now, to the right, the street coming down, this street
 8    here, ma'am, this is called Los Bravos, correct?
 9    A.    Yes.
10    Q.    And this is Calle Progreso, correct?
11    A.    Yes.
12    Q.    Okay.  Please.  Now, you ordered the food and as I
13    understand it, Minie signals you that the food is ready,
14    correct?
15    A.    Yes.
16    Q.    And you crossed the street with Carmen Maria Garcia
17    Santiago?
18    A.    Yes.
19    Q.    I see.  Now, you've stated that you felt a person behind
20    you and you turned.  Do you remember saying that?
21    A.    Yes.  I felt somebody running behind me.
22    Q.    Okay.  Now, if we look at this picture of the fritura
23    stand, you would be, would I be correct in saying that you
24    would be around this area here?
25    A.    I was right here.
```

1    Q.   All right.  Could you point it out on the screen so that

2    the jurors can see it, please?

3    A.   (Witness indicating.)

4    Q.   All right.  Fine.  So that would be in front of you.

5    That's Progreso, the street, correct?

6    A.   Oh, excuse me.  What was your question?

7    Q.   If the street that's in front was Progreso Street.

8    A.   You mean in front of me where I was standing at the time?

9    Q.   I'm sorry.  I'm referring to this street here.

10   A.   Okay.  Yes, yes.

11   Q.   That's not Bravo Street?

12   A.   (Remarks in Spanish.)

13   Q.   All right.

14   A.   No, Bravo Street is the one on the side.

15   Q.   Now, and your testimony was that you felt somebody behind

16   you at a distance of five to six feet, so we're talking about

17   the fritura stand, Progreso Street, correct?  Yes?

18   A.   You mean from where I was standing?

19   Q.   Yes, ma'am.

20   A.   And using this yellow line on the sidewalk, more or less

21   that's where he ran.

22   Q.   All right.  And that sidewalk is on Progreso Street,

23   correct?

24   A.   Yes.

25   Q.   Okay.  Now, hold on one second, please.  All right.  Now,

1    do you remember that you were interviewed by Federal agents on

2    February 4th, 2011?

3    A.    I've been summoned so many times that I just can't --

4    Q.    All right.  Do you recall the name Christopher Pagan, FBI

5    Agent?

6    A.    Yes, Pagan.  Pagan.

7    Q.    All right.  And do you recall the name FBI Task Force

8    Agent Antonio Nunez Fox?  Fox.

9    A.    I don't -- I can't remember that one.

10   Q.    All right.  But you were interviewed by Federal agents,

11   correct?

12   A.    Yes.

13   Q.    Did you not tell them that what you saw, that you

14   observed an individual carrying a long weapon coming from Los

15   Bravos Street, which would be this street?  This street here.

16   A.    I can't remember having said that he was coming from Los

17   Bravos Street, because I didn't see from where he was coming.

18   He was coming from between the cars.

19   Q.    Okay.  So it's your testimony, just to be clear, that he

20   was on Progreso Street and not coming from Los Bravos?

21   A.    When I realized this person was behind me, I didn't know

22   what area he was coming from.

23   Q.    Okay.  Now, let's continue.  Now, you stated that you

24   felt somebody behind you, and that when you looked around,

25   that you saw a person with a black hat, a black shirt, and

1    jeans that you don't know whether they were blue or black.  Do

2    you remember that?

3    A.   I didn't say hat.  I didn't say hat.  I said cap.  I said

4    a black cap, a black shirt, and the pants, I wasn't sure if

5    they were blue or black.

6    Q.   Okay.  It's black cap, yes?

7    A.   Yes.

8    Q.   Okay.  Now, so you feel somebody behind you, you turn

9    around and you see a long rifle, correct?

10   A.   I feel a person running.  I feel a person running behind

11   me and yes, I turned around.

12   Q.   All right.  And you turned around and you quickly see a

13   person with a long rifle?

14   A.   He was coming from the side with a long rifle.  And when

15   I yelled out to my comadre, Maria, Carmen Maria, careful.

16   That's when he turned around and shot at those of us who were

17   there.

18   Q.   So could you just, if you would, madam, would you please

19   just stand up and show the jurors how that happened?  How you

20   turned around and came back and called Maria and what did you

21   do?

22              THE COURT:  I don't think she has to do that.

23              MR. AGUAYO:  All right.

24   BY MR. AGUAYO:

25   Q.   My point is you turned around very quickly, you see a man

1   with a long rifle, you yell to Maria, and then you take off,

2   correct?

3   A.   Yes.

4   Q.   All right.  So it was basically a glimpse.  You turn

5   around, you see this, you're shocked, and you start taking

6   off?

7   A.   Yes.

8   Q.   Now, you said that the person turned around and starting

9   shooting.  Approximately how many shots did you hear?

10  A.   I heard countless shots because as I was running toward

11  the back of the establishment, you could hear different shots

12  and just many.  I don't know how many.  And screaming.

13  Q.   Okay.  And you were, of course, frightened?  You were

14  scared?

15  A.   Yes.

16  Q.   You felt you might get shot?

17  A.   Yes, because they were shooting -- and this might sound

18  cruel what I'm going to say, I love Carmen Maria, but I saved

19  my life.

20  Q.   Okay.  That's understandable, ma'am.  So you basically

21  went away from the shooter, not looking at the shooter but

22  running for your life, which is normal, yes?

23  A.   When I looked back and saw this person with a long rifle,

24  I yelled out careful and right then, real quickly when I

25  yelled out to my comadre, right then and there he turned

```
 1   around.  And I saw him several seconds.  If I told you I
 2   was -- if I told you I stood there looking at him for five
 3   minutes, I'd be lying, because in a moment like this one, I
 4   wasn't going to stay there looking at him.
 5   Q.   I appreciate your honesty.  We all do.
 6        Now, let's go back to -- you stated that you were
 7   interviewed -- well, let's go.  When you were interviewed by
 8   the Federal agents and you did the exhibit concerning the
 9   photos, the ID photos.
10        MS. DOMINGUEZ:  6, 7 and 8.
11        MR. AGUAYO:  6, 7, and 8.  Thank you.  May I?
12   BY MR. AGUAYO:
13   Q.   I'm showing you these.  All right.  This was on February
14   4th, 2011.  That's approximately one year and three months
15   after October 17th, 2009, correct?
16   A.   Yes.
17   Q.   Okay.  Now, when you went to the interviews with these
18   agents, what did the agents tell you, if anything, concerning
19   before they showed you the photos?  What, if anything, did
20   they tell you?
21        THE INTERPRETER:  Before they showed you?
22   BY MR. AGUAYO:
23   Q.   Before.
24   A.   Well, they told me they were going to show me some
25   pictures to see if I could identify anybody that was involved
```

1    in La Tombola.  And they showed me several pictures, not just

2    these.  They showed me several pictures.

3    Q.   And how many did they show you, ma'am?  How many?

4    A.   About 16, 18, more or less.  Several, several pictures

5    they showed me.

6    Q.   Photos or -- I'm sorry, or like --

7    A.   On paper.

8    Q.   Okay.  But there were several photos that they showed

9    you, right?

10   A.   Yes, several.

11   Q.   Okay.  Now, you, in fact, did not recognize anybody at

12   first, correct?

13   A.   I don't know which interview you're talking to me about.

14   Q.   I'm talking about the day that's indicated in the photo

15   array of February 4th, 2011 when you said you circled David

16   Oquendo's picture.  Is that the day that the agent showed you

17   a lot of photographs or is that before?

18   A.   No.  They showed me several pictures.  The day that I

19   identified him on one of the papers, there were several

20   pictures.

21   Q.   Okay.  Now, it's correct, is it not, that you did not

22   recognize the shooter at first; isn't that correct?

23   A.   No, at all times I gave the description of the person.

24   Q.   All right.  But did -- all right.  And you gave them the

25   description of the person?

1  A.   Yes.   I mean, from the first time I was interviewed by, I

2  call him the state authorities over there at the Bayamon

3  courthouse, that's where I provided descriptions.

4  Q.   Okay.   But Ms. Maysonet, I would like you to focus on

5  this particular day when you identified David Oquendo Rivas

6  and you circled his picture.   I want you to focus on that day.

7  We'll talk about the local police later on, but right now,

8  please, focus on that particular day, okay?

9          Are you saying that on that particular day, before

10  you were shown these photos, that you described the person

11  that you saw to the agents?

12          THE INTERPRETER:   The person or the persons?   I

13  didn't hear.

14  BY MR. AGUAYO:

15  Q.   Okay.   Prior to being shown those photos, did she

16  describe the individual that she saw as a shooter to the

17  agents at the FBI prior to showing the photos to her?

18  A.   I don't remember.   I've had so many -- I can't remember.

19  Q.   Do you recall in that particular day that you only told

20  them, I saw a person with long blue jeans, a black shirt and a

21  black baseball cap, and didn't say anything about how

22  physically they looked?

23  A.   I don't remember.

24  Q.   Okay.   Now, is it correct that you did not recognize the

25  shooter from those pictures, the first ones they showed you?

```
 1  A.   That were presented by who?
 2  Q.   All right.  Again, please focus, madam.  On the day that
 3  you marked and circled that photo array, okay?  I'd just like
 4  you, please, just to focus on that.
 5  A.   Okay.
 6  Q.   Now I forgot the question.
 7          MS. DOMINGUEZ:  You weren't able to identify.
 8          MR. AGUAYO:  I'm sorry.  What was the question?
 9          MS. DOMINGUEZ:  You weren't able to identify the
10  shooter.
11          MR. AGUAYO:  Thank you.
12  BY MR. AGUAYO:
13  Q.   On that particular day, when they showed you these
14  photos, you were not able to recognize the photo of David
15  Oquendo or of anyone, for that matter?  When they first showed
16  you that photo array?
17  A.   I identified him.
18  Q.   Okay.  So it would be -- okay.  I just want to be clear
19  on this.  That you did not say to the agents that you could
20  not recognize anybody in those photos; is that correct?  That
21  you never said that to the agent?
22  A.   When they showed me these pictures?
23  Q.   When they showed you those photos, yes.
24  A.   I quickly identified him.
25  Q.   You quickly identified him?
```

1  A.   I really didn't know, I didn't know if this person -- I

2  didn't know if this person -- if this person was a friend or

3  in any way related to Alexis.  I didn't know that.  I

4  recognized this person as the person I saw the day of the

5  events.  I won't forget that face.

6  Q.   That's fine.  That's fine.  But I'm asking you, is it

7  correct or not that you first said that you did not recognize

8  any photo there of the shooter?  That's all I'm asking, ma'am.

9  A.   I don't remember.

10  Q.   And then they showed you some bigger photos, if you

11  recall, and that's when you recognize David Oquendo?

12  A.   This is the first picture of him that they showed me.

13  And I stayed looking at the picture.

14          THE COURT:  Exhibit number?

15          MS. DOMINGUEZ:  I believe it's Number Seven.

16          THE COURT:  Seven.

17          MR. AGUAYO:  Seven, Your Honor.

18          THE COURT:  What is the number?

19          THE INTERPRETER:  Eight.

20          THE COURT:  Eight.

21          THE WITNESS:  So they showed me a series of pictures,

22  and when I saw this picture, when I saw this picture, they

23  showed this picture to me, I stayed looking at it, because

24  this was the person I saw on the day of the events.

25          MS. DOMINGUEZ:  Your Honor, if the translation could

1   accurately reflect that she pointed to the photo of David

2   Oquendo.

3              THE COURT:  The thing is she was shown two photo

4   arrays at least.

5              MR. AGUAYO:  Two.

6              THE COURT:  And we're mixing them.  We should go one

7   by one.  This photo array, did you identify someone?  This

8   photo array, did you identify them?  If we mix them --

9              MR. AGUAYO:  No problem, Your Honor.  No problem.

10  May I approach?

11             THE COURT:  Okay.

12  BY MR. AGUAYO:

13  Q.   Ms. Maysonet, let me put this here.  They showed you this

14  photo array, correct?

15             THE INTERPRETER:  What?

16  BY MR. AGUAYO:

17  Q.   They showed you this photo array?

18  A.   And along with this one, two or three more, yes.

19  Q.   But let's concentrate on this one for now, please.

20  A.   Okay.

21  Q.   They showed you this photo array, correct?

22  A.   Yes.

23  Q.   Okay.  And at the time that you saw this photo array, you

24  stated to them that you could not recognize the shooter,

25  correct?

```
1   A.   I don't remember that.

2   Q.   Okay.  And then subsequent they showed you these bigger

3   photos, and that's where you said it was David Oquendo,

4   correct?

5   A.   (Remarks in Spanish.)

6   Q.   This one here, ma'am?

7   A.   When they showed me the previous pictures --

8   Q.   That would be this one, Exhibit Eight?

9   A.   I asked them.  I focused on his picture, because I

10  recognized him on the spot.  And I asked them, I asked them if

11  they could do me the favor of making this picture larger.

12  Q.   Okay.  And then --

13  A.   And then they brought another picture of him, this same

14  person, but with other people.

15  Q.   All right.  And is this --

16  A.   And there again, I identified him.

17  Q.   And you also told them that you recognized the shooter

18  when you saw his picture in the newspaper after he was

19  arrested in October of 2009?  You said that to the agent, did

20  you not?

21  A.   When I saw the picture, the photograph, I told them that

22  I had seen that person before.

23  Q.   Did you tell them that you saw, recognized the shooter,

24  when you saw his picture in a newspaper after he was arrested

25  in October of 2009?
```

1  A.   Ask the question again.

2  Q.   All right.  You told them that you recognized the shooter

3  as being David Oquendo Rivas when you saw a picture in the

4  newspaper after he was arrested in October of 2009?

5  A.   Yes.

6  Q.   Okay.  Now, let's go back to -- do you recall what

7  newspaper you saw that in?

8  A.   No.

9  Q.   All right.  At that time I believe that there was El

10  Nuevo Dia, correct?

11  A.   I can't remember, because this was in all the newspapers.

12  Q.   His photo was in all the newspapers after his arrest,

13  that's what you're saying?

14  A.   No.  I know that it was in one newspaper, but right now I

15  can't tell you which newspaper it was.

16  Q.   Okay.  Do you recall, if I'm correct, that the newspapers

17  that existed for that time, was El Nuevo Dia, Primera Hora and

18  El Vocero?

19  A.   Yes.

20  Q.   Okay.  Now, let's go back to when you were interviewed by

21  the local police.  Did you -- you said that they showed you a

22  binder of photographs, many photographs.

23  A.   That's right.

24  Q.   Okay.  And that you couldn't find -- and that this

25  occurred, let's see now, that this occurred several weeks

1  after Carmen Maria was discharged from the hospital.  Do you

2  remember saying that?

3  A.   (Remarks in Spanish.)

4  Q.   Okay.  So you went --

5  A.   Yes.  And they had actually given me a citation before

6  Carmen Maria was discharged from the hospital, but since I was

7  the one in charge of Carmen Maria, of visiting her at noon and

8  all that, they decided to wait and give us a citation to both

9  of us at the same time.

10 Q.   Okay.  But that was -- so you actually were interviewed

11 by the local police several weeks after Carmen Maria was

12 discharged, yes?

13 A.   Yes.

14 Q.   So would that -- I'm sorry.  Would that have been in

15 November, the early part of November, middle part of November

16 of 2009?

17 A.   More or less.  I don't remember the date, but more or

18 less, yes.

19 Q.   Okay.  Now, when you went to the local police and they

20 showed you this binder of many, many, many, many pictures that

21 you looked through, you did not recognize any of them?

22 A.   No, because he wasn't there.

23 Q.   Okay.  Did you tell the local police, listen, we don't

24 have to look any further?  I saw his picture in the newspaper?

25 Let's go get the newspaper?

```
1   A.   But the picture I saw after.

2   Q.   The picture in the newspaper you saw after November?

3   A.   I think so.

4   Q.   You stated that you saw the picture after David Oquendo

5   was arrested in October of 2009.  He was arrested on -- I'm

6   sorry; is that correct?

7   A.   I didn't understand the question very well.

8   Q.   All right.  You stated to the agents that you recognized

9   the shooter when you saw his picture in the newspaper after he

10  was arrested in October of 2009?

11  A.   No.

12  Q.   You didn't tell that to the agent?

13  A.   No.

14  Q.   Do you realize he was arrested in October --

15  A.   I identified him first.  And after I identified him,

16  that's when I realized that he was in the newspaper.  And I

17  called the officer and told him, he's in the newspaper.

18  Q.   This officer would be the Federal agents?

19  A.   No, no, no, because you told me we were talking about the

20  ones from Bayamon.

21  Q.   All right.  That's fine.  My question to you, madam --

22  all right.  Let's see if I have this straight.  You're taken

23  to the police station and you're asked to look at binders full

24  of pictures, correct?

25  A.   Yes.
```

1    Q.   And you don't recognize any of them?

2    A.   Okay.  I looked over the book.  And at one point I stayed

3    looking at one picture, and he asked me why I was observing

4    this picture so much.  And I told him, because this gentleman

5    here looks a lot --

6             THE INTERPRETER:  Too much to him.

7             THE WITNESS:  -- like the person who shot at me.  And

8    he asked me, is that him?  Can you identify him?  And I said,

9    no, no.  I said he fits all the descriptions, but the guy I

10   saw was white.

11   BY MR. AGUAYO:

12   Q.   All right.  Let's go back to the interview with the

13   Federal -- when you had that interview, when you circled a

14   picture of David, okay?  Let's put your mind back in February

15   of 2011, if you will, please.

16   A.   Okay.

17   Q.   Did you or did you not tell the agent that you recognize

18   the shooter, in other words, David Oquendo, when you saw his

19   picture in the newspaper after he was arrested in October of

20   2009?  Did or did you not say that to him?

21   A.   I identified him first, and then I told him, I had seen

22   his picture in the newspaper.  When this happened, when all

23   this at La Tombola happened, I barely even looked at

24   newspapers.  This is something that I experienced.  I know

25   what happened there.

1            And when I found out, after I had identified him,

2    after I had -- after I had already identified him, I found

3    out, I was told that he was one of the arrestees, one of the

4    people arrested.  A couple days after I had identified him.

5    That's when I decided to pick up a newspaper, to look through

6    it to see if it was true that he was in there.  And yes, he

7    was there.

8    Q.   All right.  So just to be clear, on that date that you

9    identified David Oquendo, on February 4th of 2011, all you did

10   was identify him.  And then subsequently you read the

11   newspaper and you see his picture.  Is that what you're

12   testifying to?

13   A.   Yes, it was in the newspapers.

14   Q.   All right.  But that's --

15   A.   And on the internet.

16   Q.   All right.  But, please, madam, my question, please focus

17   on my question.  My question is that particular day you

18   identified him, subsequently, subsequently after you

19   identified him, a date subsequent to that interview, you see

20   his picture in the newspaper and that's when you realize that

21   it's him?  That you recognize him?  I just want to be clear.

22           Are you telling me, are you telling us, the jury

23   here, that you first identify him, and then subsequent to the

24   identification is when you see his picture and you recognize

25   him as the shooter when you see him in the newspaper?  Is that

1   what you're saying?

2   A.   Look, Counselor, I identified him, and after I identified

3   him, I found out that the person I had identified was one of

4   the people arrested.

5   Q.   Okay.

6   A.   He was one of the people arrested, but it's my

7   understanding he was not arrested at the same time Alexis was,

8   when they caught Alexis' group.  He was arrested and he was

9   with other people at the time.  I don't know who.

10  Q.   Go ahead and interpret.

11  A.   And they were transporting him in the vehicle, according

12  to the newspapers, firearms that were related to the La

13  Tombola massacre.

14  Q.   Okay, ma'am.  That's fine.  I'll ask you one more time,

15  and then I won't ask you again.

16          THE COURT:  You've asked her plenty of times.  How

17  many times are you going to ask the same story?  I understood

18  it this way, that she identified him with the agents.

19  Subsequently she saw the man in the paper.  That's what she

20  said.

21          MR. AGUAYO:  And she did not tell the agent on this

22  particular day.

23          THE COURT:  I wasn't there.  I can't tell you.

24          MR. AGUAYO:  That's what I want to pin down.

25          THE COURT:  You haven't asked her.

 1  BY MR. AGUAYO:

 2  Q.   Did you or did you not on the date that you identified

 3  David Oquendo in that photo array, did you or did you not on

 4  that particular day tell the agent that you recognized the

 5  shooter when you saw his picture in the newspaper after he was

 6  arrested in October of 2009?  Yes or no?

 7  A.   No.

 8          MR. AGUAYO:  Thank you.  That will be all, Your

 9  Honor.

10          THE COURT:  Thank you very much.  Anything else?

11          MS. DOMINGUEZ:  No redirect, Your Honor.

12          THE COURT:  No redirect.  Thank you very much, ma'am.

13  You are excused.

14          (At 5:29 PM, witness excused.)

15          THE COURT:  We should call somebody else before we

16  leave.  Is that okay with you, jurors?

17          MS. DOMINGUEZ:  This will be a fairly short witness,

18  Judge.

19          THE COURT:  Go ahead.

20          MS. DOMINGUEZ:  Carmen Maria Garcia Santiago.

21          (At 5:31 PM, witness took the stand.)

22          COURTROOM DEPUTY:  Please raise your right hand.

23          Do you solemnly swear that the testimony you are

24  about to give in this case is the truth, the whole truth, and

25  nothing but the truth, so help you God?

```
 1              THE WITNESS:  Yes, I do.

 2              MS. DOMINGUEZ:  May I proceed, Judge?

 3              THE COURT:  Please.

 4    C A R M E N   M A R I A   G A R C I A   S A N T I A G O,

 5         called as a witness by the Government, having been sworn,

 6         testified as follows:

 7                          DIRECT EXAMINATION

 8    BY MS. DOMINGUEZ:

 9    Q.   Please state your full name.

10    A.   Carmen Garcia Santiago.

11    Q.   Do you have any children?

12    A.   Yes.

13    Q.   How many?

14    A.   Four, and one I lost.

15    Q.   And what do you do for a living?

16    A.   Homemaker.

17    Q.   Now, on October the 17, 2009, ma'am, where did you live?

18    A.   Sabana Seca.

19    Q.   I'm sorry.  Could you --

20    A.   Sabana Seca.

21    Q.   -- get up a little closer to the microphone?  Okay.  And

22    how long had you been living in Sabana Seca?

23    A.   My whole life.

24    Q.   And who did you live with?

25    A.   At the time, my mother-in-law's.
```

1    Q.    And were you familiar with a pub called La Tombola?

2    A.    Yes.

3    Q.    And where was that pub in relation to where you lived at

4    your mother-in-law's house?

5    A.    There's an alleyway in front of the road.

6    Q.    So it would be across the street?

7    A.    Yes.

8    Q.    And on October 17, 2009, did you visit La Tombola?

9    A.    I only went there to buy and where the fritters were

10   sold.

11   Q.    Okay.  And the frituras were being sold where in relation

12   to the pub?

13   A.    Outside.

14   Q.    But was it nextdoor to the business or somewhere further?

15   A.    Right next to it.

16   Q.    And why did you visit the pub that evening?

17   A.    I was just there looking at the movement of the music,

18   but I wasn't there partying.  I was pregnant.

19   Q.    And was there any particular event that was taking place

20   at La Tombola that evening?

21   A.    The -- the opening of this place.

22   Q.    Okay.  And do you recall approximately what time you

23   arrived?

24   A.    Around 8:00 PM.

25   Q.    And did you go alone or was someone with you?

1    A.    No.  I was with my comadre, my child's godmother in

2    front.

3    Q.    And who was your child's godmother?

4    A.    Jannette Maysonet.

5    Q.    And when you arrived that evening, approximately how many

6    people were there?  And when I say there, I'm referring to the

7    outside area where you were.

8    A.    About 30 people approximately.

9    Q.    Did you go inside the business or did you remain outside

10   through the night?

11   A.    I went in, but I just bought a soda and came right back

12   out quickly.

13   Q.    And do you remember approximately how long after you

14   arrived you went back in?

15   A.    Around 8:30.

16   Q.    And at that time, could you tell us approximately how

17   many people were inside?

18   A.    Maybe 40, 50 people.

19   Q.    And at approximately 11:30 that night, were you still in

20   the outside area of La Tombola?

21   A.    Yes.

22   Q.    And what were you doing at that time?

23   A.    I crossed over to order a shrimp turnover, and then I

24   went back to where I was sitting to wait until the turnover

25   was cooked.

1    Q.   And was Jannette still with you or was she somewhere

2    else?

3    A.   Yes, she came with me.

4    Q.   Okay.  And at that time, around 11:30 when you ordered

5    the turnover or the pastelillo, could you tell us

6    approximately how many people you observed in the outside

7    area?

8    A.   There were quite a lot.

9    Q.   Okay.  Are you able to put a number, more or less than 50

10   people?

11   A.   Outside, I think there were around 40, 50 people.

12   Q.   And did you eventually get up to retrieve your empenada?

13   And did Jannette go with you or did she stay behind?

14   A.   She came with me.

15   Q.   And tell us what happened.

16   A.   There, when Carmen Semprit was giving us the turnover and

17   I was paying her, and then at that point my comadre, Jannette,

18   told me, run, they're shooting.

19   Q.   And were you able to observe what she did when she told

20   you this?

21   A.   She looked, but then she ran off.  She kept running and I

22   ran behind her.

23   Q.   And she was in front of you?  You were running behind

24   her?  What happened to you?

25   A.   I received a shot in my left gluteus, fell on my knees.

1   And I got up, and at that point I ran into Omaris Fonseca, a

2   nine year old girl, and we stayed in back of the establishment

3   in part taking cover behind the establishment.

4   Q.   Now, was Omaris -- had she been injured that you could

5   tell?  Omaris.

6   A.   In the thigh.

7   Q.   Now, Carmen Marie, before you ran in back to take cover

8   with Omaris, can you tell me whether you had occasion to see

9   any of the shooters?

10  A.   No.

11  Q.   You have to answer verbally.

12  A.   I did not have the opportunity to see anybody.

13  Q.   You did not see anybody firing?

14  A.   No.  No.  I mean, they were like, the people who were

15  coming over, but I didn't get to see their physical

16  appearance.

17  Q.   Okay.  Let's take this by steps.  The first thing I want

18  to establish is whether you had occasion to see anyone firing.

19  I'm not asking you at this point whether you were able to

20  identify their face, but were you able to see anyone firing?

21  A.   (Nodding head up and down.)

22  Q.   Or carrying a weapon?

23  A.   Yes.

24  Q.   Tell us what you saw.

25  A.   Like three people walking with long rifles.

1    Q.   And at what point in this chronology, did you actually

2    see them?

3    A.   What do you mean, chronology?

4            THE COURT:  Before or after being shot, you saw them?

5            THE WITNESS:  Before.

6    BY MS. DOMINGUEZ:

7    Q.   And was it before or after you began running to the back

8    of the building?

9    A.   Repeat the question.

10   Q.   When you saw these three armed men, had you already

11   started running to the back of the building?  Yes or no?

12   A.   No.

13   Q.   Okay.  And when you saw these men, do you know where

14   Jannette was?

15   A.   Jannette had already run.

16   Q.   Now, could you tell us, understanding your testimony that

17   you could not identify their faces, could you tell us how

18   these people appeared to you?  What you were able to observe?

19   A.   It's just that this happened so quickly that what I was

20   doing was protecting my life.

21   Q.   I understand that.  And you indicated there were three

22   individuals; is that correct?

23   A.   Yes.

24   Q.   Were you able to observe generally how they were dressed?

25   A.   No.  I don't remember.

1  Q.   Were you able to see what weapons, if any, they were

2  carrying?

3  A.   Long rifles.

4          THE INTERPRETER:  Weapons.

5          THE WITNESS:  Weapons.

6  BY MS. DOMINGUEZ:

7  Q.   And did you see them simply carrying the weapons or did

8  you see them actually firing the weapons?

9  A.   By the time Jannette told me run, they were shooting.

10  Q.   Okay.  Now, when you went back to the back side of the

11  building with the nine year old girl, what did you do?

12  A.   (Remarks in Spanish.)

13  Q.   And from where you were -- oh, I'm sorry.

14  A.   I stayed there and I called 911.  And they asked me

15  several questions.  And I answered and said I was pregnant and

16  wounded.  And I stayed there until they arrived and the girl

17  said that I was back there.

18  Q.   Now, from where you were hiding with Omaris, could you

19  tell us whether you were able to hear what was going on at La

20  Tombola?

21  A.   A lot of screaming by the people who were inside and,

22  well, the shots.

23  Q.   And are you able to place a number on the shots that you

24  heard while you were in the back part of the building?

25  A.   Several, many.

1    Q.    Well, several, more than ten?

2    A.    Yes.

3    Q.    More than 50?

4    A.    (Nodding head up and down), yes.

5    Q.    More than a hundred?

6    A.    I don't know.

7    Q.    But a lot?

8    A.    But there were a lot.

9    Q.    And the shots that you were hearing, were they in close

10   succession or were there pauses inbetween them?

11   A.    There were pauses.

12   Q.    And when you heard shots, one after the other, were they

13   in close succession between pauses or were there pauses

14   between every shot?  Let me rephrase.

15          THE INTERPRETER:  Interpreter needs a repetition of

16   the question.

17   BY MS. DOMINGUEZ:

18   Q.    Understanding your testimony that there were pauses, in

19   the time there were not pauses and shots were being fired, can

20   you tell us whether the shots were being fired in close

21   succession one after another or one shot, pause, one shot,

22   pause?

23   A.    No, it was in a row.

24   Q.    Now, how long did the shots last?

25   A.    About four or five minutes.

1  Q.   And what happened when the shots finally stopped?

2  A.   Well, by then the police arrived, the ambulance.

3  Q.   And what happened with you?

4  A.   Well, at that point, the girl Omaris told a police

5  officer that I was there, but then the police officer took

6  her.  And at that point the father of my children comes out,

7  because he had been at the house with my kids.  And he found

8  me in the back and took me out to where the ambulances were.

9  From there I was taken to the hospital.

10  Q.   And did anyone accompany you in the ambulance?

11  A.   Yes.

12  Q.   Who?

13  A.   Jannette Maysonet.

14  Q.   You know, Carmen Maria, let me ask you, as a result of

15  the injuries that you have told us about, that you sustained

16  on that evening of October 17, 2009, did anything happen to

17  your baby?

18  A.   The bullet came in through my gluteus and reached the

19  uterus and bladder.  Uterus, bladder, and intestines.  And it

20  reached the baby's head, came down to the pallet, and became

21  embedded in her little hand.

22  Q.   And as a result of those injuries, did your baby die?

23  A.   Yes.

24  Q.   How many months were you pregnant at the time of those

25  injuries?

1    A.   Eight months.

2    Q.   And what about you?  Tell us about the injuries you

3    sustained.

4    A.   Well, they opened me to reconstruct my uterus, bladder

5    and intestines.  I was at the hospital for five days.  And

6    then three months of recovery.

7    Q.   Now, let me ask you, Carmen Maria, did you name your

8    baby?

9    A.   Yes.  Yes.

10   Q.   What was her name?

11   A.   Daneshka Rios Garcia.

12        MS. DOMINGUEZ:  I have nothing further.

13        THE COURT:  Any cross?

14        MR. AGUAYO:  Not from me, Your Honor.

15        MR. REBOLLO:  Just a few, Judge.  May it please the

16   Court.

17        THE COURT:  Please.

18                    CROSS-EXAMINATION

19   BY MR. REBOLLO:

20   Q.   Ma'am, you told us you were a lifelong resident of Sabana

21   Seca; is that correct?

22   A.   Yes.

23   Q.   Okay.  You know Alexis from growing up in that area?

24   A.   I did not grow up with him.

25   Q.   But you know him from the area?  You were both residents

1  of that area?

2  A.   Yes.

3  Q.   That night, you didn't see him there at La Tombola,

4  right?

5  A.   I didn't see him.

6  Q.   Okay.  You mentioned that you had seen three individuals

7  with long weapons, with firearms, correct?

8  A.   Yes.

9  Q.   Okay.  Do you remember that -- today you don't remember

10  the description of the individuals, you told us that earlier,

11  right?

12  A.   No, I don't.

13  Q.   Do you remember that when you spoke to FBI agents, you at

14  that point, you had it more fresh in your mind and you were

15  able to give the description of at least one of those persons?

16  A.   No.

17  Q.   You don't remember at all?

18  A.   (Shaking head from side to side.)

19  Q.   Don't remember telling them that one of the persons had

20  white skin and was wearing a light green shirt?

21  A.   No.

22       MR. REBOLLO:  No?  Don't remember?  Okay.  All right.

23  Thank you.  That's all I have, Judge.

24       THE COURT:  Anything else?

25       MS. DOMINGUEZ:  Just one question, Judge.  Thank

```
 1  you.
 2          THE COURT:  One question.
 3                      REDIRECT EXAMINATION
 4  BY MS. DOMINGUEZ:
 5  Q.   Carmen Maria, Mr. Rebollo just asked you whether you had
 6  seen Alexis there on the evening of October 17, 2009 at La
 7  Tombola.
 8  A.   (Nodding head up and down.)
 9  Q.   You've already told us that the three people you saw, you
10  were not able to see their faces?
11  A.   Uh-huh.
12  Q.   So, in fact, you can't tell us who they were or were not?
13  A.   Exactly.
14          MS. DOMINGUEZ:  Nothing further.
15          THE COURT:  Thank you very much.  You are you now
16  excused.
17          (At 5:55 PM, witness excused.)
18          THE COURT:  Well, members of the jury, I would really
19  like to start tomorrow at 8:30, if possible.  Is that possible
20  for all of you?
21          THE JURORS:  (Nodding heads up and down.)
22          THE COURT:  Can we do it?  So try to be here a few
23  minutes before that hour so that we can start promptly.
24  Remember that you are not to discuss this case with anyone, or
25  allow anybody to discuss this case with you.  You cannot read
```

1    or listen to anything touching upon this case.  Remember that.

2    No research or investigation on your own.

3              You have to keep an open mind.  We're just barely

4    starting.  And remember no blogging, no Googling, no internet

5    searches, nothing of that sort.

6              So with that in mind, I want to thank you for the

7    long day you gave us today, and I will see you tomorrow

8    morning hopefully.  Thank you.

9              (At 5:56 PM, jury excused.)

10             MS. DOMINGUEZ:  Excuse me, Your Honor, may we inquire

11   if tomorrow is a half day, so we may have witnesses ready?

12             THE COURT:  We should stop tomorrow around 1:00,

13   1:30, okay?

14             MR. RUHNKE:  Perfect.  Thank you.

15             THE COURT:  I have about three or four sentences

16   tomorrow.

17             MR. HEGYI:  Your Honor, may I also explain to you,

18   the first witness we are going to start with is going to be

19   the person from the institute who was responsible for the

20   scene.  That may run us the whole day.  But the only way that

21   I'm able to do this is with the videos.  They had to break the

22   scene up into zones, so we're going to run through them, but

23   it's going to take a while.  We'll have the sound off.

24             And the other thing I wanted to alert the Court to is

25   my expectation with all of the shell casings, there's over 300

1   shell casings, that I will just have them laid out here.

2            THE COURT:  Sure.

3            MR. HEGYI:  To have them identified.

4            MR. AGUAYO:  Your Honor, can we have daily copy

5   regarding the witnesses?

6            THE COURT:  I think I already authorized that.  As

7   long as Amy can do it, I have no problem with that.

8            MR. AGUAYO:  All right.  Thank you very much.

9            (At 5:58 PM, proceedings concluded.)

10                            *     *     *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    U.S. DISTRICT COURT     )

2    DISTRICT OF PUERTO RICO)

3

4        I certify that this transcript consisting of 183 pages is

5    a true and accurate transcription to the best of my ability of

6    the proceedings in this case before the Honorable United

7    States District Court Judge José Antonio Fusté on February 22,

8    2013.

9

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25