```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF PUERTO RICO

 3

    UNITED STATES OF AMERICA,
 4
                      Plaintiff,
 5    v.                                   Docket No. 09-427

 6                                         San Juan, Puerto Rico
    ALEXIS CANDELARIO SANTANA, and         March 6, 2013
 7  DAVID OQUENDO RIVAS,

 8                   Defendants.
    _____

 9

10                           JURY TRIAL

11          BEFORE THE HONORABLE JUDGE JOSÉ A. FUSTÉ,

12                UNITED STATES DISTRICT JUDGE.

13    _____

14  APPEARANCES:

15  For the Government:      Mr. Bruce Hegyi, AUSA
                            Ms. Maria Dominguez Victoriano, AUSA
16                          Ms. Marcela Mateo, AUSA

17

18
    For the Defendants:      Mr. David Arthur Ruhnke, PHV
19                          Mr. Francisco Rebollo Casalduc, Esq.
                            Mr. Jose R. Aguayo, Esq.
20

21

22

23

24

25  Proceedings recorded by stenography.  Transcript produced by
    CAT.
```

```
1

2                                      San Juan, Puerto Rico

3                                      March 6, 2013

4                                      At or about 9:02 AM

5                        *     *     *

6          (At 9:02 AM, jury entered the courtroom.)

7          THE COURT:  So, Mr. Aguayo.

8          MR. AGUAYO:  Yes, sir.

9          THE COURT:  Let me say this.  As we proceed on this

10   stage, if for example you have a witness that he doesn't have,

11   you can present your witness ahead.  I have no problem with

12   that.  Okay?

13          MR. RUHNKE:  Yes, Your Honor.

14          THE COURT:  Okay.

15          MR. AGUAYO:  May I begin, Your Honor?

16          THE COURT:  Yes.  Go ahead.

17          MR. AGUAYO:  The defense of David Oquendo calls Dr.

18   John C. Brigham.  If I could just tell him to come in.

19          (At 9:03 AM, witness took the stand.)

20          COURTROOM DEPUTY:  Raise your right hand.

21          Do you solemnly swear that the testimony you are

22   about to give in this case is the truth, the whole truth, and

23   nothing but the truth, so help you God?

24          THE WITNESS:  I do.

25          MR. AGUAYO:  May I proceed, Your Honor?
```

```
 1          THE COURT:  Please.
 2               D R.   J O H N   C.   B R I G H A M,
 3      called as a witness by the Government, having been sworn,
 4      testified as follows:
 5                         DIRECT EXAMINATION
 6  BY MR. AGUAYO:
 7  Q.   Sir, could you state your name for the record?
 8  A.   Dr. John C. Brigham.
 9  Q.   And, Dr. Brigham, could you tell us your educational
10  background, sir?
11  A.   Yes.  I have a Bachelor's Degree from Duke University in
12  1964.  Master's Degree and Ph.D. Degree from University of
13  Colorado.  The Ph.D. was received in 1969.
14  Q.   And what about your employment, sir?
15  A.   I began as an assistant professor at Florida State
16  University in 1969.  I stayed with Florida State, and retired
17  from teaching in 2004.  But I remain an emeritus professor of
18  psychology.
19  Q.   Sir, can you explain what an emeritus professor is?
20  A.   Yes.  It's an honorary title given by the University to
21  some retired faculty indicating that the University would like
22  them to stay in contact with the University.  In my case, I
23  still have an office in the psychology building where I go in
24  to keep current and check on research.
25  Q.   And what courses did you teach while you were at Florida
```

1    State University, sir?

2    A.   The two courses I taught most often were psychology and

3    law and social psychology.

4    Q.   Okay.  Sir, what is your primary area of research?

5    A.   My primary area of research since about 1975 was studying

6    the factors that effect the accuracy of eyewitness memory.

7    Q.   And do you have publications relating to eyewitness

8    reliability?

9    A.   Yes.  I've published about 55 articles and book chapters

10   on the subject.

11   Q.   Are these publications in peer-reviewed journals?

12   A.   Yes, they are.

13   Q.   And what exactly is a peer-reviewed journal?

14   A.   A peer-reviewed journal is one that uses the so-called

15   peer review technique to evaluate research papers that are

16   submitted to it.  So when a scientist does a study, analyzes

17   the data, writes it up, he or she then submits it to the

18   journal.

19          The editor reads it, sends it out to two or three

20   experts in the area.  They evaluate it very carefully.  Each

21   of them prepares a lengthy review saying the strong points and

22   the weak points of the research and of the write up.

23          The editor then uses these reviews along with his or

24   her own opinion to decide what happens to the article, the

25   paper.  Occasionally it's accepted right then, but almost

1    never.   More often, the author is told if you revise this

2    article according to what the reviewers have said, it may be

3    acceptable.   We will then send it out for review again.   Or

4    they may say if you revise the article and gather more data,

5    do another study, we might find it acceptable.   Or they may be

6    told that the article is rejected.

7                Eventually about 80 percent, that is four out of

8    five articles that are submitted, are rejected.   The idea

9    being that only the very best of the articles are accepted for

10   publication.   So it's a quality control kind of procedure to

11   assure that the best articles, best studies, most well done

12   studies are published.   But other studies that have some

13   defects are not published.

14   Q.   And in your case, approximately 55 publications?

15   A.   Yes.

16   Q.   All right.   Now, have you received any research grants,

17   sir?

18   A.   Yes, I have.

19   Q.   And what kind?

20   A.   I've received research grants from the National Science

21   Foundation in Washington, and the National Institute of

22   Justice, several research grants supporting studies to study

23   eyewitness memory.

24   Q.   How did you obtain these grants, sir?   What's the

25   process?

1   A.   The process is somewhat similar to writing an article.

2   You create a grant proposal in which usually you propose doing

3   several related studies on a single issue or several issues.

4   You then submit that proposal to the granting agency.  They

5   then -- it is read by the head of that division of the

6   granting agency.

7           It is sent out to reviewers much like a paper would

8   be.  They evaluate the proposal, make suggestions for

9   improvement, note any deficiencies, and then for each granting

10  agency, there is a panel that meets.  And they look at all the

11  grant proposals, look at all the reviews of the grant

12  proposals, and come up with recommendations about which

13  proposal should be accepted and which are not acceptable.

14          And again here, for the National Science Foundation

15  and the National Institute of Justice, the two places that I

16  received grants from, about 80 percent or more of the

17  proposals that are submitted to them are not accepted.  But my

18  proposals were accepted.

19  Q.   Are you a member of any professional organization, sir?

20  A.   Yes, I am.

21  Q.   Which one, sir?

22  A.   The main ones are the American Psychological Association

23  and the American Psychology Law Society.

24  Q.   Have you held any offices?

25  A.   Yes.  I was secretary treasurer, then treasurer, then

1    president of the American Psychology Law Society.  I've also

2    served on the governing counsel of the American Psychological

3    Association.

4    Q.   And, sir, have you attended or presented papers at

5    professional meetings?

6    A.   Yes, I have.

7    Q.   What kind of papers are these?

8    A.   Papers most often on eyewitness memory and the research

9    that I have done on the things that effected eyewitness

10   memory.  And I've presented those at conferences in the United

11   States and Canada, and England, Scotland, Whales, Italy and

12   Australia.

13   Q.   And how many presentations have you done?

14   A.   Well over a hundred.  I'm not sure of the exact number.

15   Q.   And have you attended professional presentations by other

16   researchers on eyewitness memory?

17   A.   Yes, I have.

18   Q.   How many, sir?

19   A.   Again, well over -- that would be several hundred, but I

20   don't have an exact count.

21   Q.   Have you been a member of a general editorial board?

22   A.   Yes, I have been.

23   Q.   Which one, sir?

24   A.   The journal Law and Human Behavior, also the journal

25   Basic and Applied Social Psychology, and the Journal of

1  Personality and Social Psychology.

2  Q.   And what were your responsibilities there, sir?

3  A.   As a member of the editorial board, the editor sends to

4  you a number of pages that have been submitted and you serve

5  as the first reviewer of these papers.

6  Q.   Sir, how much research is there on the factors effecting

7  eyewitness liability?

8  A.   There's been a great deal of research since about 1970.

9  Q.   And the nature of that research, sir?

10  A.   It's been experimental research.  There's also been

11  correlational research.  There's been what's called archival

12  research.  There's also been survey research.

13  Q.   Sir, let's try to break this down.  What exactly is

14  experimental research?

15  A.   Experimental research means you do experiments using the

16  scientific method where you gather data very precisely and

17  without bias.  You analyze that data with the appropriate

18  statistics.  You then draw conclusions relating to the

19  hypotheses that you started out with, what you predicted would

20  happen, and then you write up that study in article form, and

21  submit it for publication.

22  Q.   And what is correlational research?

23  A.   Correlational research is when you look at the

24  relationship between two or more factors.  You don't

25  experimentally change those factors, but you look at how much

1    they are associated with each other.

2    Q.    And how about survey research, sir?

3    A.    Survey research is when you survey groups of people for

4    their attitudes or beliefs on a particular issue.  In this

5    case, for example, I did surveys of law enforcement and

6    attorneys in Florida on their evaluations of eyewitness

7    evidence and eyewitness testimony.

8    Q.    And archival research, sir?

9    A.    Archival research refers to looking at actual cases and

10   trying to draw some conclusions from looking at a series of

11   cases.  This research is good for identifying potential

12   problems.  It's less valuable for answering those questions,

13   because every situation is different.  Every case is

14   different.

15          So it's very hard to find enough cases that are

16   similar enough that you can draw a general conclusion from

17   what happened in all those cases.

18   Q.    And, sir, how familiar are you with these types of

19   research that you mentioned?

20   A.    Very familiar.

21   Q.    All right.  And how do you stay familiar?

22   A.    By reading the research, keeping up, reading the relevant

23   scientific journals.

24   Q.    Sir, have you been qualified as an expert on eyewitness

25   issues?

```
1    A.    Yes, I have been.

2    Q.    How often, sir?

3    A.    Well, I've been qualified as an expert for hearings and

4    so forth probably more than a hundred times.  I've actually

5    testified in front of a jury at trial six times in Federal

6    Court, 37 times in state court, and twice at military court

7    martials.

8    Q.    And which jurisdiction was this, sir?

9    A.    Well, in the Federal court was in Baltimore, Nashville,

10   Memphis, Dulthen, Alabama and Philadelphia.  State courts have

11   been in 11 different states.

12   Q.    Sir, have you ever been hired by the government to advise

13   them in the area of eyewitness identification?

14   A.    Yes, I have been.

15   Q.    How many times, sir?

16   A.    I've been contacted and worked with the Government on two

17   cases.

18   Q.    Okay.  And have you ever testified for the Government?

19   A.    No, I did not testify in those cases.

20          MR. AGUAYO:  All right.  Your Honor, I would tender

21   Dr. Brigham to the government.

22          MR. HEGYI:  No objection.

23          THE COURT:  No objection.  No voir dire?

24          MR. HEGYI:  No voir dire at this point.

25          THE COURT:  Very well.
```

                          DIRECT EXAMINATION

BY MR. AGUAYO:

Q.   Now, Dr. Brigham, first of all, what do you see or what
is your role here in testifying before the jury?

A.   My role as I see it is to provide the jury members with
information, that is, summaries of what's been shown by this
40 years of scientific research.  And many of the things that
have been found are things not within people's every day
knowledge.  And the idea is to provide this background
information that jurors might find useful and applicable to
the situations of any particular case.

Q.   So you're basically giving them an overview concerning
eyewitness identification?

A.   Yes.

Q.   Not specifics, just an overview so they can use that in
their deliberations if you will?

A.   Exactly.

Q.   Okay.  Sir, has there been much research over eyewitness
testimony in the last several decades?

A.   Yes.  There have been several thousand studies published
since 1970.

Q.   All right.  Now, this would be about different factors
concerning eyewitness identifications?

A.   Yes.

Q.   All right.  Would those factors be like stress?

1  A.   That would be one, yes.

2  Q.   Weapon focus?

3  A.   Yes.

4  Q.   Retention intervals?

5  A.   Yes.

6  Q.   Post event information?

7  A.   Yes.

8  Q.   Lineup instructions that should be given by officers when

9  they're giving a lineup?

10  A.   Yes.

11  Q.   Or photo arrays?

12  A.   Yes.

13  Q.   Unconscious transfers?

14  A.   Yes.

15  Q.   All right.  Let's talk a little bit about each one at

16  this time, all right?  In terms of stress, what information do

17  you have that could help the jury?

18  A.   Well, what we know from surveys is that many people

19  believe that stress enhances memory, that it makes it better.

20  Many people believe that a traumatic event is burned on

21  somebody's memory.  They say, I'll never forget that event or

22  I'll never forget that face.  And a lot of the people who are

23  witnesses to crimes feel that way.

24        What research shows, however, is that extreme stress

25  interferes with memory.  That is, it interferes with what gets

1   encoded into memory.  It interferes with how things are

2   perceived, and it interferes with how they're stored in the

3   brain.  So high stress is actually associated with poor

4   memory, although many people aren't aware of this.  And there

5   have been dozens of studies showing this is the case.

6   Q.   All right.  So stress interferes with the encoding in the

7   memory, correct?

8   A.   Yes.

9   Q.   What about weapons focus, sir?

10  A.   What research has shown when a weapon is involved in the

11  crime, that has two effects.  One is it raises the level of

12  stress even higher for victims or potential victims or

13  witnesses.  Secondly, people's attention tends to be focused

14  on the weapon rather than on the face of the person holding

15  that weapon.

16          So when there's a weapon involved, people quite

17  understandably focus on that weapon, want to see where it's

18  pointed and so forth.  And they therefore spend less time

19  looking at the face of the person holding that weapon, so

20  they're less able to encode a memory of that face, and

21  therefore less able to identify them later on.

22  Q.   What about duration, the time they have to view the

23  person?

24  A.   The longer they have to view, the better the memory that

25  will be encoded.  This simple fact becomes a little more

14

1    complicated, because it's also been shown people tend to

2    exaggerate how long a stressful event took.  That is, people

3    tend to see, remember it as taking two or three times as long

4    as it really did.

5            So if they say, they think it took a minute, more

6    likely it took 20 or 30 seconds.  If they say it took 30

7    seconds, more likely it took ten or 20 seconds.  So that's a

8    very human tendency to exaggerate the length of time that a

9    traumatic event lasts.

10   Q.   Okay.  And you mentioned lineup instructions.  Could you

11   explain to the jury what you mean by that?

12   A.   Yes.  There's been a lot of work, research and legal work

13   on what instructions should be given to a witness before he or

14   she is shown a photograph lineup or in some cases a live

15   lineup.  The concern is that people may be biased

16   intentionally or unintentionally by instructions that are

17   given to them or by the procedures that are used.

18           So the U.S. government in 1999, the Department of

19   Justice published what they call a guideline for eyewitness

20   evidence.  And in those guidelines, they said there were five

21   or six factors that ought to be included in the instructions

22   that are given to anybody before they view a lineup.  These

23   include telling them they will view a lineup, that the person,

24   the suspect may or may not be in this lineup, telling them

25   that appearances may change, particularly hair and facial

1    hair, between when a photograph is taken and when a person is

2    observed committing a crime.  Telling them that it is just as

3    important to clear innocent persons as it is to convict guilty

4    persons.  I'm leaving one out.

5         MR. HEGYI:  Investigation will continue.

6         THE WITNESS:  Thank you very much.

7         MR. HEGYI:  You're welcome.

8         THE WITNESS:  Yes.  The other one would be the

9    investigation will continue regardless of whether you identify

10   anybody or not, because people sometimes worry, if I don't

11   pick somebody out, they will stop the investigation.  And if

12   you're a witness or particularly a victim, you don't want that

13   investigation to stop.

14        So this tells people that the investigation will

15   continue whether or not they pick somebody, so they won't feel

16   pressured that they have to pick somebody.

17   Q.   And these instructions, sir, you said that it was the

18   Department of Justice.  You're talking about the Federal

19   Department of Justice?

20   A.   Yes.

21   Q.   And that would include FBI agents and ATF agents, Federal

22   agents?

23   A.   Federal agents, yes.

24   Q.   Okay.  Now, what about the area of unconscious transfer?

25   A.   Yes, that's a fancy term that's been developed by --

```
 1   Q.   The sound --
 2             MR. RUHNKE:  I think we lost sound.
 3             THE WITNESS:  She asked me to move away a little
 4   bit.
 5             THE INTERPRETER:  It was the feedback.
 6   BY MR. AGUAYO:
 7   Q.   Could you speak loudly, sir?
 8   A.   Okay.  Unconscious transference is a term sometimes
 9   describing memory blending or source confusion from the fact
10   that it's easier to know that you've seen somebody than to
11   remember the conditions under which you saw them, and in every
12   day life that's trivial.  People may remember, I heard
13   somewhere, or somebody said something, and not remember the
14   source.  Or you may remember that somebody told you something,
15   and it turned out it was somebody else who told it to you.  Or
16   you saw a person in one situation, you thought that you'd seen
17   them in another.
18             In the criminal justice system, unconscious
19   transference becomes more of a potential problem in that
20   people may see a person in one situation, yet remember that
21   they've seen him in a different situation.  Or they see two
22   people in two different situations and think it's the same
23   person.  So the two images are blended in their mind.
24             Again, when this happens, people are not aware of
25   it, but research shows that it's a common phenomenon that is
```

1    ordinary.  People with ordinary memory have this happen to

2    them.

3    Q.   What about the area of blind administration?  What is

4    that?

5    A.   That has to do with recommended procedure for how a

6    lineup should be administered, in addition to the obstructions

7    which I've already talked about.  It's recommended that the

8    person who administers the lineup, that is, the law

9    enforcement person who shows the lineup to the witness, should

10   not know who the suspect is, should not know which lineup

11   member is the suspect.

12        Usually of course the person does know who the

13   suspect is.  It may be the detective whose case it is, and he

14   or she knows that, for example, the suspect is number three.

15   The problem is that knowing that, that person, the law

16   enforcement officer may completely, unintentionally or

17   sometimes intentionally lead witnesses to identify that

18   person.

19        And again, research has shown that even non-law

20   enforcement people, but ordinary people put in a situation of

21   showing a lineup to somebody else, they tend to lead

22   unintentionally, to lead that person to picking out who they

23   want them to pick out.  So blind would mean that you give the

24   lineup to someone else to administer to the witness, so the

25   person who hands the lineup to the witness doesn't themselves

1    know who the suspect is.  So that there's no way they can bias

2    the subject's responses.

3            So it's a fairly simple change, but one that can

4    have very important consequences in taking away that possible

5    source of bias.

6    Q.   And what about divided attention?

7    A.   That refers to the situation when in any kind of -- any

8    kind of, say, crime situation your attention may be divided

9    between if there's more than one perpetrator, between the two

10   or more perpetrators.  If there are other things going on,

11   I've already mentioned attention to the weapon, if there are

12   avenues of escape, things happening to other people,

13   everything that divides a person's attention means that they

14   can spend less time looking at the face of the central

15   perpetrator, making it harder for them later to be able to

16   identify that person.

17   Q.   What about the effect of alcohol?

18   A.   Research has shown that the effect of alcohol is to mess

19   up encoding basically, so what gets into memory, when a person

20   has been drinking, is there's -- less gets into memory and

21   it's more distorted.

22           MR. AGUAYO:  That would be all, Your Honor.

23           THE COURT:  Thank you.  Mr. Ruhnke, anything else?

24           MR. RUHNKE:  Yes, Your Honor.

25           THE COURT:  Please.

1                              EXAMINATION

2    BY MR. RUHNKE:

3    Q.    Doctor, good morning.

4    A.    Good morning.

5    Q.    I'm standing here with a laptop computer behind me.  On

6    that laptop computer I've got family photographs.  Some of

7    them are ten years old.  Some of them are a month ago.  If I

8    want to look at a ten-year-old photograph of my kids, all I

9    can do is call it up on the laptop.  And I look at it, and

10   there it is.  Is that how memory works?

11   A.    No.  A lot of people think that memory is like a computer

12   or a video camera that you perceive something, put it in a

13   memory, and then can easily retrieve it later on.  In fact,

14   there are three different stages of memory, and what gets in

15   is never complete.  It's never totally accurate.  And the more

16   conditions are difficult, the less accurate it's going to be

17   when it gets in.

18            Then there's the retention stage, where it's held in

19   memory, and everything that happens during that retention

20   stage can effect that memory and change it.  So it doesn't

21   stay stable like a computer file.  Rather, it keeps being

22   modified by everything that happens subsequently that's at all

23   relevant to it without the person being aware that the

24   memory's being changed.

25   Q.    So when we get to the retrieval stage, is what you're

1    saying that events can change the actual memory, and the

2    person just doesn't even realize that their memory has

3    changed?  And they're doing their best to be truthful, but in

4    fact they're mistaken?

5    A.   Yes.  What we're talking about is honest errors, people

6    trying to do the best they can under very difficult

7    situations.

8    Q.   Most crime situations are very difficult, very stressful,

9    other factors that -- it makes it very hard to encode a fairly

10   accurate memory even.  And then the longer the time period

11   between that crime and the identification, the more forgetting

12   occurs, but also other information which we sometimes call

13   post event information can come in and change the memory.

14          So by the time the person gets the identification

15   situation, what's in memory is often not very similar to what

16   entered memory in the first place.  It's been changed by

17   forgetting and by other information.

18   Q.   So the person is doing their honest best to describe what

19   they describe, doing their honest best to make an accurate

20   identification, but are simply wrong?

21   A.   Yes.

22   Q.   Why have there been so much studies of this field?

23          MR. HEGYI:  Objection, Your Honor.

24          THE COURT:  I will allow it.  I will allow you to

25   cross-examine of course.  Go ahead.

1           MR. RUHNKE:  Thank you.

2           THE WITNESS:  There are two main reasons.  One is the

3   study of memory is a central issue of psychology anyway.

4   Psychology is the study of behavior, and you can't have

5   behavior without memory.

6           But secondly, there's been a realization over the

7   past 40 years that eyewitness mistakes have lead to more

8   miscarriages of justice, more convictions of innocent people

9   than has any other factor.

10  BY MR. RUHNKE:

11  Q.   And does the psychology study, in essence, good faith

12  errors and what goes in to make up good faith errors?

13  A.   Yes.  Exactly.  There have been some people that have

14  studied lying and so forth, but that's a whole different area.

15  For eyewitness memory, we're talking about people doing the

16  best they can in a difficult situation.

17  Q.   Obviously if a witness decides they're going to lie about

18  what they've seen, these factors don't come into play?

19  A.   Right.  That's a whole different issue, yes.

20  Q.   And why do general rules of thumb in terms of percentages

21  of accuracy by people attempting to make a good faith

22  identification --

23  A.   What's been estimated are the American Psychological

24  Association submitted a brief to the Supreme Court a few years

25  ago in a case involving eyewitness testimony, and based on

1  their study of archival studies, that is actual crimes, they

2  estimated that about one-third of all identifications are

3  incorrect.

4  Q.   Good faith mistakes?

5  A.   Right.  Not people lying, but people doing the best they

6  can to make an accurate identification.

7  Q.   Often witnesses will be asked, how certain are you that

8  that's the person that you saw?  And a witness will say, I'm a

9  hundred percent confident in my identification.

10        Have there been studies and has that issue been

11 looked at?  Is there a relationship between accurate

12 identification and level of confidence expressed by the

13 witness?

14 A.   Yes.  There have been a lot of studies of that issue,

15 some of which I did in my lab.  There are two main findings.

16 One is that overall there is only a weak relationship between

17 somebody's certainty that they're correct and the actual

18 correctness of their eyewitness identification.  For most

19 kinds of memory, that is a strong relationship.  Certainty is

20 a good indication of accuracy.  For eyewitness memory,

21 however, because of all these complicated factors, the

22 relationship between confidence and accuracy is not strong.

23 So what I'm --

24 Q.   I'm sorry.

25 A.   What I would tell my classes is confidence is in a sense

1    a false cue.  Something that for most kinds of memory, if a

2    person says they're certain, you can be pretty sure they're

3    right.  For eyewitness memory, that's not the case.  It

4    becomes more complicated, because you may remember what I

5    mentioned in the instructions, or I should have mentioned is

6    you ask the person are they certain immediately after they

7    make the identification, because another thing that's been

8    found is so-called confidence hardening.  That is, once

9    somebody's committed themselves to a position saying yes, for

10   example, it's number three, they will attempt to justify that

11   position to themself and others, and become increasingly more

12   confident as time goes by.

13        This tendency becomes even stronger if they're in a

14   situation where they feel they have to be certain to be a good

15   witness, or other people are telling them, you need to be

16   certain or you'll get torn apart on the witness stand.  So for

17   this combination of reasons, people become more and more

18   certain if they were not certain initially.

19        So by the time they get to be in court, they may

20   genuinely feel completely certain when that's not how they

21   felt when they made the identification.

22   Q.   You mentioned before the effect of time that passes

23   between the actual observation and a report of the

24   identification or an actual identification procedure, and that

25   during that period of time memory can actually change?

A.    Yes.

Q.    Suppose hypothetically somebody observes an event and after the event is repeatedly exposed to newspaper publicity and photographs of an individual who's alleged to have been the person who did what they claim to have seen?  Could that have an effect on memory changing?  Could it actually change the person's memory?

A.    Yes, it certainly could.  Again, if there have been pictures in the newspaper, then when they later see a lineup and somebody looks familiar, they may think it looks familiar because that's the guy I saw committing the crime.  When in fact they may be -- maybe he looks familiar because that's the person whose picture you saw in the newspaper.  And again, the witness is not able to distinguish those things.  There's no way to go back and take apart those memories and say okay, I'm only identifying him because that's the person I saw at the crime.  And I'm ignoring what I saw in the paper, because people can't do that.

Q.    Take another hypothetical situation where someone is somewhat familiar with an individual, witnesses a chaotic -- witnesses a very traumatic event, and then begins to see photographs of that person with whom they're familiar with in the newspapers and on television for many months.  Could unconscious transference occur under that set of the circumstances?

1    A.    Yes, it could.   Again, particularly if there are repeated

2    photographs.   You have the one memory encoded at the crime

3    under probably very difficult situations, so it's a very

4    tentative memory anyway.   And then if there's exposure to all

5    these photographs, that could certainly change the person's

6    memory without their being aware of it such that they

7    misremember the face they saw in the photographs as being also

8    the face they saw at the crime.

9    Q.    Have there been studies of what is called ear witness

10   identification, meaning voice recognition?

11   A.    Yes, there have been.

12   Q.    And generally speaking, in terms of eyewitness

13   identification versus ear witness identification, which is

14   more accurate, if either?

15   A.    Studies have shown that ear witness identification, that

16   is voice identification, is even more difficult than

17   eyewitness identification.   Probable cause people's voices can

18   change so much in terms of loudness and tone and so forth.

19   People in experiments where they're trying to identify a

20   person whose voice they've heard before and pick it out of

21   several other voices in a kind of ear witness lineup, tend to

22   do very poorly.   It's a very difficult situation to identify

23   somebody's voice.

24   Q.    And have there been studies done on the effect that

25   baseball caps have on the accuracy of eyewitness

1    identification?

2    A.    There have been studies of various forms of disguise or

3    anything that -- and the general finding is that anything that

4    covers up part of the face or the head will make it more

5    difficult to remember that face, because there's less

6    information that comes in.  You know, a full mask would be of

7    course the extreme case, but anything that covers hair or

8    ears, forehead, anything like that, makes it more difficult to

9    identify the person than if there was no hat.

10   Q.    I'm going to put on this baseball cap, and if you'll tell

11   me what features then are not available to make an eyewitness

12   identification, with the Court's permission.

13          Okay.  Now I've got this New York Yankees baseball

14   cap on.  What's different?

15   A.    It's difficult for me, because I was a Brooklyn Dodgers

16   fan.

17   Q.    Okay.  I wouldn't have put a Mets hat --

18   A.    Okay.  I can't see your hair color.  If you turn your

19   head to the side, I may be able to see it.  But it takes away

20   from my vantage point your hair color, how your hairline is,

21   how low or high it is, and characteristics of the forehead.

22   Q.    And again, have there been studies done with precisely

23   that issue?

24   A.    Yes.  And as I said, people have a harder time

25   identifying somebody when any part of their face is covered up

 1 | or obscured.

 2 | Q.   I want to describe the situation where various witnesses

 3 | have described the scene as chaotic, pandemonium, shots being

 4 | fired back and forth, music blaring from a DJ speaker system,

 5 | people screaming, people being shot and wounded, people being

 6 | killed, horses tied up outside panicking, dim lighting, people

 7 | and witnesses afraid for their lives, people who are terrified

 8 | as to what is going on around them.  Is that a situation that

 9 | is conducive to accurate eyewitness identifications or

10 | inaccurate eyewitness identifications?

11 | A.   That would be a very, very difficult situation for

12 | anybody to encode a good facial memory of anybody else in that

13 | situation.  You have all kinds of factors making it very, very

14 | difficult to encode a good memory.  So that would be -- would

15 | seem to me about the extreme of the most difficult situation

16 | you could try to remember.  Maybe that and war time would be

17 | the two most extreme situations.

18 |           MR. RUHNKE:  Okay.  May I just have a moment, Your

19 | Honor?

20 |           THE COURT:  Yes.

21 |           MR. RUHNKE:  Thank you, Doctor.

22 |           THE COURT:  Mr. Hegyi.

23 |                      CROSS-EXAMINATION

24 | BY MR. HEGYI:

25 | Q.   Good morning, Doctor.

1   A.    Good morning.

2   Q.    Mr. Ruhnke in his hypotheticals to you a minute ago asked

3   you is this possible, is this possible, is this possible, is

4   this possible.  Doctor, we can agree that virtually anything

5   is possible, right?

6   A.    I suppose so, yes.

7   Q.    Okay.  Now, you told Mr. Aguayo that every case is

8   different, right?

9   A.    Yes.

10  Q.    And that you can't draw conclusions based on archival

11  evidence, because there really isn't enough archival evidence

12  to come up scientifically with reliable conclusions, right?

13  A.    There's a lot of evidence, but the cases are so different

14  from one another, it's hard to find cases that are similar

15  enough.

16  Q.    Right.  And even, even in archival evidence -- now, by

17  archival, so we understand what you're talking about, we're

18  talking about a guy who or woman who's working at a service

19  station who is minding his own business, and it's dark

20  outside, and somebody comes in, you know, maybe a Stop-N-Go,

21  and puts a gun in their face, and grabs the money, threatens

22  to kill them.  Grabs the money, and then runs out into the

23  dark, right?  And then later they take the videotape, and they

24  analyze it, and they compare that to what the clerk ended up

25  doing with an identification, correct?

1            That's the kind of thing we're talking about?

2    A.   Well, any kind of case could be archival.

3    Q.   Okay.  But what we're really talking about there is

4    stranger on stranger IDs for the most part, correct?

5    A.   For the most part, yes.

6    Q.   Okay.  And even in those stranger on stranger ID

7    situations, what you've told us is that in the vast majority

8    of times, about two-thirds of the time, the victim gets it

9    right, correct?

10   A.   That's correct, yes.

11   Q.   Okay.  And we know or I think you'll tell us that

12   something that seems fairly commonsensical, at least to me, if

13   that's a word, that if I'm asked to pick out somebody I don't

14   know that I've only seen for a fraction of a second, that it

15   might be more difficult than if it's somebody I do know, fair

16   enough?

17   A.   Fair enough, yes.

18   Q.   And if it's somebody that is -- if I'm African American

19   and I'm trying to pick out a Caucasian person or if I'm a

20   Caucasian person and I'm trying to pick out an African

21   American person, that might be more difficult for me than

22   picking out someone from my own race?  Is that what studies

23   show?

24   A.   Yes, that's what the research has shown, yes.

25   Q.   Okay.  So if we're now talking about situations where it

1    is people of the same race, the concerns out there are reduced

2    fairly dramatically?

3    A.    Reduced if they've been -- if they've been of different

4    races?

5    Q.    Correct.

6    A.    Correct, there's more chance of success if they're of the

7    same race than of different races.

8    Q.    All right.  And if people know one another, the chances,

9    theoretical chances of being incorrect are reduced, correct?

10   A.    I would think so, although the research is all -- pretty

11   much all been on stranger recognition, so --

12   Q.    And so what you're telling us here, you're talking about

13   stranger on stranger things, correct?

14   A.    Yes.

15   Q.    And a lot of that research has to do with instances where

16   mock studies are done, in a classroom perhaps like yours at

17   Florida State where you have students that are college

18   students, maybe out partying the night before, maybe bleary

19   eyed.  And they happen to sit there, and you have somebody run

20   into the room with a pretend gun and do something, and then

21   run back out again; is that right?

22   A.    Some studies.  I've never used a pretend gun in any of my

23   studies, but I have had people steal something.

24   Q.    Okay.  Run in, steal something, and run out.  And then

25   you've asked them, when these students were sitting laughing

1    and talking about what they did the night before or whatever,

2    and then someone comes in running in, steals something, and

3    runs back out again, not even using a pretend gun, just run in

4    and grab a Monte Blanc pencil and/or pen out of the drawer and

5    run out again, and even in those studies the majority of the

6    time the students get it right?

7    A.    Well, in some studies the majority get it right.  In some

8    studies the majority don't get it right.  It depends on how

9    difficult the situation is.

10   Q.    And one of the things that get criticized -- your studies

11   get criticized, right?

12   A.    Occasionally, yes.

13   Q.    And one of the things they get criticized for is in fact

14   when you take a 19-year-old college student and you ask them,

15   you know, is this the guy or can you identify the person, it

16   has no consequence to them.  It's a pretend thing.  They know

17   it's a pretend thing.  So what difference does it make?

18   That's him right?

19   A.    Sometimes they know it's a pretend thing.  Sometimes they

20   don't.  Sometimes in some of my studies we've had police

21   officers give the photo lineup so they thought it was still

22   real.  It's true they don't know that anybody's going to be

23   arrested or anything like that.

24   Q.    Okay.  Let's get real for a minute.  You're talking about

25   college students.  You're talking about things you do over a

1  series of years.  So the college students sitting in your

2  class know they've done this in other years, right?

3  A.   They're not my students.  They're introductory psychology

4  classes.

5  Q.   You don't do this over summer school.  They have brothers

6  and sisters that have gone to your school.  They have other

7  friends from their high school that have gone to your school.

8  So they know this is the kind of thing that happens at times

9  in your classroom, right?

10 A.   Well, again, it's not in my class.  It's when they're

11 taking introductory psychology.  Probably some of them have

12 older peers.  I doubt psychology experiments are a real focus

13 of conversation, but some people may have some idea,

14 awareness.

15         But they are asked afterwards, and anyone who did

16 have awareness or was suspicious, they're not included in the

17 data analysis.

18 Q.   But you don't do anything ahead of time, and you don't

19 know how many college students are interested in it.  I want

20 to be part of this, so I'm going to do it anyway.  You have no

21 way of knowing?

22 A.   I have no way of knowing what the motivation is, no.

23 Q.   The truth is you, Doctor, you didn't see any of the

24 witnesses in this case testify, did you?

25 A.   That's correct.

1    Q.   All right.  And you are not here to tell this jury that

2    any of the eye witnesses who testified in this case got it

3    wrong, are you?

4    A.   No, I'm not here to do that.

5    Q.   Because there's no scientific way, not just for you, but

6    there's no scientific way for anybody else to say they got it

7    wrong, is there?

8    A.   No.  That's why the juror's job is so tough.

9    Q.   Right.  And in this case, have you even reviewed the

10   testimony of the witnesses?

11   A.   Actually I did review the testimony of the witnesses,

12   yes.

13   Q.   Of all of the witnesses?

14   A.   Four of the witnesses.

15   Q.   And you told us that you were -- you have testified I

16   think you said a total of -- give me one second, of 45 times,

17   six times in Federal courts, 37 times in state court, and two

18   times in military court martials, correct?

19   A.   Yes.

20   Q.   And that's over your 40 year career in academia, and

21   offering yourself as an expert witness to people that are

22   willing to hire you, correct?

23   A.   Yes.

24   Q.   And so roughly once a year you've been accepted on

25   average as an expert in court, right?

1    A.    On average, yes.  I've been accepted much more in recent

2    years than in past years.

3    Q.    All right.  Now, the -- you said you were hired, you were

4    consulted, in 40 years you were consulted twice by a

5    governmental agency to consult with them; is that right?

6    A.    Yes.

7    Q.    Okay.  And this would be state governments, local

8    governments, municipal governments, Federal government?  Which

9    government was it that we're --

10   A.    One was a state, and one was Federal.

11   Q.    Okay.  And after consulting with you, neither one of them

12   decided to call you, did they?

13   A.    Right.

14   Q.    Okay.  And in fact, Judge Fuste is allowing you to

15   testify here in court as an expert in front of this jury; but

16   many, many judges that you have gone in front of who have

17   listened to your credentials and listened to your theories and

18   listened to your opinions have shall we say declined to allow

19   you to testify in front of juries, correct?

20   A.    That would be true for the '80s and '90s.  And in recent

21   years as people have become aware of the issues and the issues

22   of eyewitness evidence, I've been accepted most of the time.

23   Q.    Okay.  So the answer to my question is yes, that many,

24   many times judges who have listened to your credentials, your

25   theories and your opinions have declined to let you testify in

1    front of the juries, in front of them, correct?

2    A.    Over 40 years, yes.

3    Q.    Now, let's talk about the -- you mentioned there were

4    studies that were done as stranger stranger events.  And

5    Mr. Ruhnke asked you certain hypotheticals.  Now, if an

6    individual has known the perpetrator much of his life, and

7    gets a good opportunity to view the perpetrator, and

8    recognizes him immediately, pretty good ID?

9    A.    Well, again, there's no research that I'm aware of.  It's

10   all on stranger recognition.

11   Q.    Right.

12   A.    So I would say that's the jury's decision.

13   Q.    But you have -- nothing that you've said here then has

14   any moment with regard to a person, an eyewitness who's

15   actually known the defendant, correct?

16   A.    Well, I would -- the factors at the time of the crime

17   would still be relevant.  The effect of having known him

18   beforehand, if that's the case, there's not research on that.

19   Q.    Okay.  So what I want to make sure we're really clear on

20   is even the situations that you're talking about, about

21   stress, and about perhaps they could get it wrong, and perhaps

22   it could be an honest mistake, and perhaps, perhaps, perhaps,

23   that's all based on studies on stranger-stranger, right?

24   A.    Yes.

25   Q.    So there have been no studies that you've done where it

1    is a relative, like a cousin who grew up with them, correct?

2    A.    Correct.

3    Q.    And there's been no studies that you're aware of where

4    there's a person who has known the individual from the

5    community from the time the individual was young, and would

6    see him every day, and maybe saw him once a week or so when he

7    was older, and saw him like two days before the event?

8    There's nothing like that that you are aware of, correct?

9    A.    Not that I am aware of, yes.

10   Q.    And when you were talking in terms of ear witnesses, you

11   were talking again, when you said -- when they do the -- the

12   ear witness identifications, where there are a group of people

13   in another room or over a microphone who say a particular

14   phrase, and the ear witness is not visibly able to see the

15   people but is trying to say that's the voice, I recognize that

16   voice, that's what you're talking about, those studies,

17   correct?

18   A.    Yes.

19   Q.    And those are stranger-stranger ones, too, correct?

20   A.    Yes.

21   Q.    So, if for instance there was a situation where a woman

22   knew a perpetrator very well, had known him most of her life

23   or much of her life, and who was shot and lying on the floor.

24   And then there's a pause, and then she hears the voice of the

25   person that she has known much of her life shouting, no one

1    gets out alive.  And that woman believes she's about to meet

2    her maker.  Not much of a chance she gets that one wrong, is

3    there?

4    A.    Again, I don't know.  There's not research on ear

5    witnesses in that kind of a situation.

6    Q.    Okay.  And, Doctor, let's talk for a minute about

7    corroboration, because what you're telling us here, as I

8    understand it, is with regard to stranger-stranger things,

9    this is just a person who gets a glimpse at somebody who they

10   didn't know before, perhaps cross racial, perhaps in the dark,

11   perhaps with their face partially covered up, and all those

12   things.  But let's talk for a minute about corroboration,

13   okay?

14   A.    Okay.

15   Q.    Now, if a person is identified, positively identified by

16   two, not one but two different people who know him, know his

17   name, know his name, and he's identified independently by

18   those two different people -- are you with me so far?

19   A.    (Nodding head up and down.)

20   Q.    Yes?

21   A.    Yes.

22   Q.    And then is identified in addition to that by a third

23   person that was a stranger-stranger situation, right?  Didn't

24   know him from before.  And that person independently,

25   independently picks that individual out of a photo array, are

1  you with me still?

2  A.    Yes.

3  Q.    And then two days later that same individual who has an

4  -- or will be identified by these three witnesses that I've

5  told you about, is found in constructive possession of three

6  firearms with a relative, a cousin --

7         MR. AGUAYO:  Your Honor, I'm going to object to the

8  --

9         THE COURT:  Overruled.  Overruled.

10  BY MR. HEGYI:

11  Q.    Is found in constructive possession approximately two

12  days later of three firearms with his cousin, and one of those

13  firearms is matched ballistically to that very same crime

14  scene, and are determined to have left 20 shell casings right

15  there on the scene in the location where two of the people,

16  the general location where two of the people say they saw that

17  person, and then three projectiles or partial projectiles from

18  that same firearm are found on that scene, pretty darn good

19  and positive evidence that those identifications were

20  absolutely spot on; isn't that right?

21  A.    Well, certainly there's no research that comes anywhere

22  near to matching that combination of situations that you've

23  mentioned.  What I can talk about are those factors that have

24  been generally found to be important and to effect people's

25  identifications.

```
 1              Again, I think it's a jury question how that
 2   information, along with whatever other information specific to
 3   the case is available, that's the jury's task from my
 4   perspective to put that all together and decide what to do
 5   about it.
 6              THE COURT:  But, Dr. Brigham, listen to me, sir.
 7              THE WITNESS:  Yes.
 8              THE COURT:  Yesterday when I examined you here with
 9   the lawyers, that same kind of question, you said pretty good
10   identification.  Isn't that so?
11              THE WITNESS:  As a -- as a lay person looking at it,
12   that's what I would think, yes.
13              THE COURT:  That's what you told me yesterday.
14              THE WITNESS:  Yes.  As a lay person, but -- okay.
15              MR. HEGYI:  Nothing further, Your Honor.
16              MR. RUHNKE:  I have a couple questions, Your Honor,
17   if I may.
18              THE COURT:  A couple of questions at the most.  I
19   think we have covered this.
20              MR. RUHNKE:  Sure.
21                         FURTHER EXAMINATION
22   BY MR. RUHNKE:
23   Q.   In cross-examining you, Mr. Hegyi talked about your
24   theories.  Are the theories you've described to us today your
25   theories?
```

1  A.   No.  They're theories that have been developed in

2  psychology on the basis of research by myself, but many, many

3  other people as well.  So they're not theories I have invented

4  myself.  They are theories that are widely recognized and

5  accepted within the research community.

6  Q.   And in a situation where someone is somewhat familiar

7  with a subject, witnesses this traumatic, traumatic event

8  under the circumstances we've described, and as we said

9  before, is then exposed to a slew of post-event contamination

10 in the newspapers --

11         THE COURT:  Mr. Ruhnke, I'm sorry.  You already asked

12 this question before.  That's it.

13         MR. RUHNKE:  I'm asking a different question.

14         THE COURT:  No.

15         MR. RUHNKE:  It will be a different question.

16         THE COURT:  Different question, yes.  Not the same

17 question.

18         MR. RUHNKE:  Yes.  It will be a different question.

19 BY MR. RUHNKE:

20 Q.   Would you want to know how that person is familiar with

21 the subject identified, how many times they've seen them, when

22 was the last time they saw them, when was the last time they

23 spoke with him, all questions like that?  Would that be

24 relevant?

25         MR. HEGYI:  Your Honor, I'm going to object.

```
 1            THE COURT:  Sustained.

 2            MR. HEGYI:  He said he's not an expert in that.

 3            THE COURT:  Sustained.

 4            MR. RUHNKE:  Okay.  I withdraw it.

 5            MR. AGUAYO:  I just have one, if I may.

 6            THE COURT:  One.  One.

 7            MR. AGUAYO:  Yes, sir.

 8                          REDIRECT EXAMINATION

 9   BY MR. AGUAYO:

10   Q.   Sir, the example that the prosecutor gave you and your

11   response, that's based on the information or the way he

12   phrased that request, correct?

13   A.   Correct.

14            MR. AGUAYO:  No further questions.

15            THE COURT:  Thank you very much.  You are now

16   excused, sir.

17            (At 9:59 AM, witness excused.)

18            THE COURT:  Members of the jury, I should tell you

19   that one of the areas of instruction you will get is an

20   instruction on identification from the Court.

21            Next witness, please.

22            MR. AGUAYO:  Yes, Your Honor.  Mr. Alvin Aponte, sir.

23            COURTROOM DEPUTY:  Raise your right hand.

24            Do you solemnly swear that the testimony you are

25   about to give in this case is the truth, the whole truth, and
```

```
 1    nothing but the truth, so help you God?

 2              THE WITNESS:  I do.

 3              MR. AGUAYO:  May I begin, Your Honor?

 4              THE COURT:  Please.

 5              A L V I N   A P O N T E   M A R R E R O,

 6         called as a witness by Defendant Oquendo Rivas, having

 7         been sworn, testified as follows:

 8                        DIRECT EXAMINATION

 9    BY MR. AGUAYO:

10    Q.    Sir, would you please state your name for the record?

11    A.    Alvin Aponte Marrero.

12    Q.    And are you employed, sir?

13    A.    Yes, sir.

14    Q.    And what are you employed as?

15    A.    I currently work as a private investigator.

16    Q.    Previous to your job a private investigator, what did you

17    do?

18    A.    I worked in different law enforcement agencies in Puerto

19    Rico.

20    Q.    Could you give us some examples?

21    A.    Yes.  I worked for the Puerto Rico Police.  I also worked

22    for the NIE.  It's an acronym in Spanish for (Remarks in

23    Spanish), Special Investigations Bureau.  And also for the

24    FEI, Independent Prosecution.

25    Q.    Okay.  So now you're working as a private investigator,
```

1  correct?

2  A.   That's correct.

3  Q.   Approximately last week or a week and a half before, did

4  I assign you a task?

5  A.   Yes, sir.

6  Q.   All right.  And would you tell us what that task was?

7  A.   Yes.  You gave me a diagram or a picture of a diagram so

8  that I would go to La Tombola in Toa Baja and take some

9  measurements.

10 Q.   Okay.  Sir, I'm showing you what's identified as

11 Defendant's ID Four.  Do you know what that is, sir?

12 A.   Yes.  This is a copy of the diagram that you gave me.

13 Q.   And that's the area -- what area is reflected there, sir?

14 A.   The area of La Tombola and its -- the surrounding areas,

15 the street areas.

16        MR. AGUAYO:  All right.  Your Honor, I would like to

17 have that admitted, please.

18        THE COURT:  Any objection to that?

19        MS. DOMINGUEZ:  No objection.

20        MR. HEGYI:  No objection, Your Honor.

21        THE COURT:  Very well.

22        (At 10:03 AM, Defendant Oquendo's Exhibit Four

23         admitted into evidence.)

24        MR. HEGYI:  There is Spanish written on there, so we

25 assume there will be a translation, but we have no

```
 1   objection.
 2            THE COURT:  He wants it for the measurements.  Go
 3   ahead.
 4            MR. AGUAYO:  It's for the measurements, Your Honor.
 5   BY MR. AGUAYO:
 6   Q.   Can you see that, sir?
 7   A.   Yes, sir.
 8   Q.   Now, what exactly did I ask you to do?
 9   A.   To measure the area where the frying stand was up to the
10   edge of Bravo Street.
11   Q.   Okay.  And I see here you have different numbers, one,
12   two, three, four, five and six, correct?
13   A.   That's correct.
14   Q.   All right.  Can you explain to us what those numbers
15   mean?
16   A.   Those numbers identify the different measures --
17   measurements that I took.
18   Q.   All right.  If you look at number one, sir, from the
19   fritura stand -- I'm sorry.  This area here, this would be
20   Bravos Street, correct?
21   A.   Yes, sir.
22   Q.   And this street here would be Calle Progreso, correct?
23   A.   Correct.
24   Q.   All right.  Let's go to the first one.  From the fritura
25   stand to number one, the Bravo Street, how many feet is that?
```

1    A.   I submitted you a report with the measurements, and if

2    you'd please facilitate that to me, I can answer.  I don't

3    have one.

4              MR. AGUAYO:  May I, Your Honor?

5    BY MR. AGUAYO:

6    Q.   All right.  So the number one, from the fritura stand to

7    the Bravos Street.

8    A.   Yes.  From the wall where the fritura stand was to the

9    edge of Bravo Street, that gave me a measurement of 58 feet

10   and two inches.

11   Q.   And let's go to number two.

12   A.   Yes.  From that same wall to the edge of Bravos Street,

13   that gave me a measurement of 58 feet and three inches.

14   Q.   And number three?

15   A.   Yes.  You will notice that in number three I made the

16   drawing of a little square.  That reflects an entry gate that

17   is there.  If you look at this gate with your face to it, you

18   will see that there is a pipe on the right.  From that to the

19   edge of Bravo Street, that measurement was 57 feet.

20   Q.   All right.  Number four, sir?

21   A.   That's -- number four is from the business wall up to the

22   edge of Bravo Street.  That gave me a measurement of 56 feet

23   and seven inches.

24   Q.   And number five, sir?

25   A.   That's from the edge of the business itself up to Bravo

1    Street's edge.  That lead to -- that gave me a measurement of

2    57 feet and eight inches.

3    Q.   And finally, number six, sir.

4    A.   (Remarks in Spanish.)

5    Q.   All right.

6    A.   From the corner of the wall of the business to the edge

7    of Bravo Street, that gave me a measurement of 56 feet and

8    four inches.

9    Q.   Sir, I'm giving you what has been marked for

10   identification as Defendant's Five.  Is that the measurements

11   that correspond to what's on the croquis?

12   A.   Yes, sir.

13   Q.   So those measurements would accompany, in order to

14   understand that croquis, you would use those measurements on

15   that document to reflect the measurements that are on the

16   croquis, correct?

17   A.   Correct.

18        MR. AGUAYO:  Your Honor.  I'd like to have this in

19   evidence also, Your Honor.

20        MR. HEGYI:  Your Honor, no objection, with the

21   translation.  No objection.

22        THE COURT:  Well, let's put them together.

23        MR. AGUAYO:  Yes, sir.

24        THE COURT:  Clip them together, both.  Received.

25        (At 10:09 AM, Defendant Oquendo Rivas Exhibit Five

1              admitted into evidence.)

2    BY MR. AGUAYO:

3    Q.   Now, sir, during the investigation of this case, did I

4    also ask you to prepare a video?

5    A.   Yes, sir.

6    Q.   All right.  Can you explain to the members and ladies and

7    gentlemen of the jury how that was done, sir?

8    A.   Yes.  On December 11, 2012, with Attorney Aguayo, we went

9    over to Bayamon to see Mr. Malave.

10   Q.   Who is Mr. Luis Malave, sir?

11   A.   The -- Mr. Luis Malave was the security officer that was

12   working in the Las Gaviotas subdivision.

13            MR. HEGYI:  Objection, Your Honor.  This is going to

14   be hearsay.

15            MR. AGUAYO:  No, Your Honor.

16            THE COURT:  I don't think it's being offered to prove

17   the veracity of the content.

18            MR. AGUAYO:  No.

19            THE COURT:  Actually, Mr. Malave is going to testify,

20   correct?

21            MR. AGUAYO:  Yes, Your Honor.

22            THE INTERPRETER:  I'll complete my answer in English.

23   After the events of La Tombola occurred, after Las Gaviotas.

24   BY MR. AGUAYO:

25   Q.   I'm sorry.  Did you finish?

```
 1              THE INTERPRETER:  (Nodding head up and down.)
 2  BY MR. AGUAYO:
 3  Q.   So we picked up Luis Malave.  Where did we go to?
 4  A.   We went over to Las Gaviotas subdivision to make the
 5  video.
 6  Q.   Okay.  And what did we do?
 7  A.   Well, we took three takes of Las Gaviotas.  The first
 8  take was of the route that he did that night.  The second take
 9  was the Las Gaviotas perimeter, in its -- inside of it.  The
10  third take was the outside perimeter of Las Gaviotas.
11  Q.   All right.  Do you have that tape with you, sir?
12  A.   Yes, sir.
13              MR. AGUAYO:  May I have that marked for
14  identification?
15  BY MR. AGUAYO:
16  Q.   Sir, I'm showing you what has been identified as
17  Defendant's ID Six.  Would you tell us what that is?
18  A.   This is the video that was made from the tasks that we
19  performed at Las Gaviotas.
20  Q.   And after you made that videotape, did you -- were you
21  able to look at it immediately thereafter?
22  A.   Correct.
23  Q.   So you saw the three (Remarks in Spanish)?
24              THE INTERPRETER:  Takes.
25  BY MR. AGUAYO:
```

```
1    Q.   I'm sorry.

2    A.   Correct.

3    Q.   All right.  And prior to coming here to testify here

4    today, were you able to see that video again?

5    A.   That's correct.

6    Q.   And the contents of the video that you reviewed prior to

7    coming here to testify, is it the same contents of the video

8    you took on that particular day?

9    A.   The same.

10        MR. AGUAYO:  We would move to have it entered into

11   evidence.

12        MS. DOMINGUEZ:  May we approach?

13        THE COURT:  Please.

14        (Bench conference held.)

15        THE COURT:  You've seen it?

16        MS. DOMINGUEZ:  We've never seen it.

17        MR. HEGYI:  We never knew it existed.  And he told us

18   he gave us all of the reverse Jencks.

19        MR. AGUAYO:  No, Your Honor.  This is really --

20        THE COURT:  Was there a motion for reciprocal

21   discovery?

22        MS. DOMINGUEZ:  Yes.

23        MR. HEGYI:  Yes.

24        THE COURT:  Was it agreed by the Court?

25        MR. HEGYI:  We sent e-mails back and forth, and they
```

 1   agreed.

 2         THE COURT:  Is that true?

 3         MR. AGUAYO:  That is true.  I gave the reciprocal

 4   discovery to Julia Diaz.  An agent came to the office to pick

 5   it up.

 6         THE COURT:  You're telling me Julia Diaz had the

 7   video?

 8         MR. AGUAYO:  Yes.

 9         MS. DOMINGUEZ:  I don't question Mr. Aguayo's

10   representation.

11         THE COURT:  It's okay.

12         MR. HEGYI:  But he provided us with reverse Jencks

13   for witnesses as they were going to appear on the stand.  He

14   never made -- first of all, I'm not saying he didn't do that.

15   Ms. Diaz Rex is no longer part of the case, as the Court

16   knows.  But he didn't identify for us it was something he was

17   going to use today or it had been provided.

18         MR. AGUAYO:  I gave it to Julia Diaz.  She sent an

19   agent over, picked it up.  What more do I have to do?

20         THE COURT:  Well, that's true.  Make a telephone call

21   to Julia Diaz and inquire.

22         MR. AGUAYO:  And let me make a telephone call to my

23   office, because I'm sure my secretary has a receipt.

24         THE COURT:  Okay.

25         MR. AGUAYO:  Because I told Julia Diaz to come to my

1    office, as they do from me to them, come to the office,

2    discovery's ready.  She didn't come personally, but it was an

3    agent.  We should have a receipt.

4              Now, this video's not going to be put on until Luis

5    Malave.

6              MR. HEGYI:  So we would have a chance to take a look

7    at it.

8              THE COURT:  We're not going to watch it now?

9              MR. AGUAYO:  No.

10             THE COURT:  Okay.  Perfect.  Perfect.  That's good.

11             (Bench conference concluded.)

12             MR. AGUAYO:  That would be all, Your Honor.

13             THE COURT:  That's it for the time being, Mr. Aguayo?

14             MR. AGUAYO:  Unless there's cross.

15             THE COURT:  No, but you, that's it?

16             MR. AGUAYO:  I'm finished.

17             THE COURT:  Okay.  Mr. Hegyi, anything?

18             MR. HEGYI:  Could I get Defendant's Four and Five,

19   please?

20             MR. AGUAYO:  Oh, I'm sorry, Your Honor.  Did I

21   move -- I requested the video be moved into evidence.

22             THE COURT:  We are going to defer until we hear

23   Mr. Malave.  Okay.

24             MR. AGUAYO:  No problem.

25                              CROSS-EXAMINATION

1    BY MR. HEGYI:

2    Q.   Good morning, sir.

3    A.   Good morning.

4    Q.   First of all, when you went out to the -- what used to be

5    the La Tombola building back in 2009, that is now a church,

6    correct?

7    A.   I didn't go to La Tombola in 2009.

8    Q.   No.   Today -- you went, according to your report, sir, it

9    looks like you went sometime in February of this year.

10   A.   That's correct.

11   Q.   In February of this year, it's now a church, correct?

12   A.   Nothing is there now.   It's closed.   To me it's the same

13   thing that it used to be, a business.

14   Q.   Okay.   Now, did you -- was the fritura stand, was it

15   there still when you went there in February of 2013?

16   A.   The area is there.

17   Q.   Sure.   That wasn't my question, though.   Was the fritura

18   stand still there?

19   A.   The stand, sale stand, as such, no, it's not there.

20   Q.   In this case, you're aware that the police took about 880

21   photographs of the crime scene in this case.   Did Mr. Aguayo

22   show you any of the photographs showing you where the fritura

23   stand actually was?

24   A.   I saw some.

25   Q.   Okay.   And in the ones that you saw, sir, did you notice

```
 1    that, for instance, you've done -- on defense Exhibit Number

 2    Four, which is in evidence in this case, all of your

 3    measurements go to the actual wall of the building, at what

 4    used to be La Tombola, correct?

 5    A.    Exempt number three.

 6    Q.    Okay.  And number three goes up almost to the wall; is

 7    that what you're saying?

 8    A.    That's correct.

 9    Q.    So if the fritura stand in fact covered this whole space

10    or most of this entire space here, between what is marked on

11    this as La Tombola and what is marked here to the right of it

12    as residencia, you're not able to help us because you didn't

13    take any of the measurements from what would have been the

14    right side of where the fritura stand was, correct?

15    A.    From the right side, no.

16    Q.    Now, the video that you did was done in -- which I guess

17    is Defense Exhibit Number Six for identification, that was

18    done in December, I think you said December 11 of 2012,

19    correct?

20    A.    Yes.  Yes, sir.

21    Q.    And just like the La Tombola, and you didn't know what

22    the La Tombola looked like in September of 2009, you don't

23    have any idea -- you can't help us with what the subdivision

24    there, Las Gaviotas --

25              THE COURT:  Gaviotas.
```

1   BY MR. HEGYI:

2   Q.   Gaviotas.  You can't help us with what that looked like

3   in September of 2009, can you?

4   A.   Not exactly, because I didn't go to Las Gaviotas on that

5   date.

6   Q.   Right.

7   A.   But from what Malave told me it looked --

8   Q.   I'm not asking what he told you.

9         THE INTERPRETER:  I have to enter the answer into the

10  record.

11        MR. HEGYI:  But I'm objecting to the hearsay part.

12        THE COURT:  We have to have it in the record.

13        THE WITNESS:  According to what Malave told me, that

14  was the general aspect of it.

15        THE COURT:  Sustained as hearsay.

16        MR. HEGYI:  Move to strike as hearsay.

17        THE COURT:  Go ahead.

18  BY MR. HEGYI:

19  Q.   The video you took was in December 2012, more than three

20  years after La Tombola?

21  A.   That's correct.

22        MR. HEGYI:  Nothing further, Your Honor.

23        THE COURT:  Thank you very much.

24        MR. AGUAYO:  I just have one -- a couple, Your Honor,

25  if I may.  May I have the exhibits?

1    BY MR. AGUAYO:

2    Q.   Sir, let's assume for a second that the fritura stand is

3    in this area here, okay?

4    A.   Correct.

5    Q.   Given the measurements which you took to Bravos Street,

6    from here, the fritura stand, to Los Bravos, that would

7    certainly be more than five or six feet, correct?

8    A.   Many more.

9    Q.   About 50?

10   A.   Practically, yes.

11   Q.   All right.  Thank you.  I have no questions.  However, we

12   have the letter, the letter about the video?

13            THE COURT:  I understand.

14            MR. AGUAYO:  Can we approach the bench?

15            THE COURT:  Sure.  You are now excused, sir.

16            MR. AGUAYO:  Yes.  I have no more questions.

17            THE WITNESS:  Thank you.

18            (At 10:23 AM, witness excused.)

19            (Bench conference held.)

20            MR. AGUAYO:  Here.  And this.

21            MS. DOMINGUEZ:  And we verified that Ms. Diaz did

22   receive the video.

23            THE COURT:  You received it.

24            MS. DOMINGUEZ:  And we did not question at all

25   Mr. Aguayo's representation.

```
 1              THE COURT:  Okay.  That's fine.  We're done.

 2              (Bench conference concluded.)

 3              THE COURT:  Mr. Aguayo, any additional evidence?

 4              MR. AGUAYO:  Yes, Your Honor.  If I may.

 5              Yes, Your Honor.  The defense would call Johanna

 6      Marie Lopez Urquia, U-r-q-u-i-a.

 7              THE COURT:  Please stand up and raise your right

 8      hand.

 9              Do you solemnly swear that the testimony you are

10      about to give in this case is the truth, the whole truth, and

11      nothing but the truth, so help you God?

12              THE WITNESS:  I do.

13              MR. AGUAYO:  May I begin, Your Honor?

14                      JOHANNA MARIE LOPEZ URQUIA,

15          called as a witness by Defendant Oquendo Rivas, having

16          been sworn, testified as follows:

17                      DIRECT EXAMINATION

18      BY MR. AGUAYO:

19      Q.   Madam, what is your name?

20      A.   Johanna M. Lopez Urquia.

21      Q.   And what is your age, ma'am?

22      A.   28.

23      Q.   And how far did you go in school, ma'am?

24      A.   I have completed a technical degree in medical billings,

25      and I have approximately 86 credits in publicity and public
```

1   relations.

2   Q.   From what school?

3   A.   From the Sacred Heart University.

4   Q.   Madam, in October of 2009, were you employed?

5   A.   No.

6   Q.   Okay.  Madam, what is your marital state?

7   A.   I am single, but I am the consensual partner of David

8   Oquendo.

9   Q.   Do you see that person, David Oquendo, here?

10          THE COURT:  There's no need.  No need.

11          MR. AGUAYO:  All right.

12   BY MR. AGUAYO:

13   Q.   How long have you known David Oquendo Rivas?

14   A.   Approximately 15 to 16 years.

15   Q.   All right.  And how long have you had a consensual

16   marriage with David Oquendo Rivas?

17   A.   Between four and five years.

18   Q.   Do you have children with him?

19   A.   One girl.

20   Q.   And how old is she now?

21   A.   Four years old.

22   Q.   Back in October of 2009, how old was she?

23   A.   She was approximately eight months old.

24   Q.   Now, madam, where do you reside?

25   A.   At the Las Gaviotas development in Toa Baja.

1    Q.    And how long have you lived there, ma'am?

2    A.    Approximately 20 years.

3    Q.    So you lived there on October 17, 2009, correct?

4    A.    Yes.

5    Q.    And who else lived at that house at Las Gaviotas?

6    A.    For that -- on that date?

7    Q.    Yes.  October 17, 2009.

8    A.    Okay.  Living at that house were myself, our daughter,

9    and my husband, my mom, my sister, and my brother.

10   Q.    Okay.  And who does that house belong to?

11   A.    To my mom and my dad.

12   Q.    And how much time had David Oquendo lived at that

13   residence?

14   A.    Approximately about one year.

15   Q.    Now, did he always stay at that residence?  Did he sleep

16   over at that residence every night?

17   A.    No.

18   Q.    Where else would he stay at?

19   A.    At his parents' house.

20   Q.    Okay.  But in terms of did he stay more with you at that

21   residence where you lived or did he stay more with his

22   parents?

23   A.    He would spend more time, stay more time in my residence.

24   Q.    Okay.  Now, Ms. Lopez, did you know that David Oquendo

25   had a firearm?

```
1    A.    Yes.

2    Q.    How did you find out about it?

3    A.    Because on one occasion I saw it on the floor of our SUV.

4    Q.    Okay.  And that was a .45?

5    A.    I have no knowledge about firearms.  I don't know if it

6    was that type.

7    Q.    And what, if anything, did you do?  How did you react

8    when you saw that firearm?

9    A.    When I saw the firearm on the floor of the SUV, I got

10   quite upset.  I got quite upset, and I told him to please get

11   rid of that firearm.

12   Q.    Would you have allowed him to enter that firearm into

13   your home?

14   A.    Never, for my safety and for the safety of my daughter,

15   and my family.

16   Q.    You know that David Oquendo was arrested on October 20th

17   for possession of a firearm, correct?

18   A.    Yes, correct.

19   Q.    I'm sorry.  2009.  October 20, 2009, correct?

20   A.    Correct.

21   Q.    And did you know that the gun that he had in his

22   possession was a .45 caliber?

23   A.    Excuse me?

24   Q.    Did you know that the gun that he had in his possession

25   was a .45 caliber pistol?
```

1    A.    No, I did not know.

2    Q.    And what was your reaction to his arrest?

3    A.    Upset, very upset.

4    Q.    Why were you upset, ma'am?

5    A.    Because he continued having a firearm in spite of the

6    fact that I had told him to get rid of it.

7    Q.    Okay.  Now, I'm drawing your attention -- oh, is David

8    Oquendo, for that time period of October of 2009, was he

9    employed?

10   A.    Yes.

11   Q.    And what was he employed as?  What did he do?

12   A.    He worked with his dad in a gardening business.  He also

13   worked with a Sure Bond business which is engaged in the

14   business of washing roofs and floorings, cobblestones.  Sure

15   Bond.  Sure Bond.  And he also worked with a company that was

16   engaged in remodeling the inside of offices with gypsum board.

17   Q.    Ma'am, you know, I call your attention to October 17th,

18   2009.  Do you remember that day?

19   A.    Yes, I do.

20   Q.    What did you do that afternoon, madam?

21   A.    That afternoon we went to exchange the cell phones that

22   belonged to my sister and her then boyfriend.

23   Q.    When you say we, who are you referring to?

24   A.    I went with my daughter, my sister's bestfriend, and her

25   daughter, and my sister, and her then boyfriend.

1    Q.    And you went to -- said something about some cell phones?

2    A.    Okay.  On that afternoon, we went to change both of their

3    cell phones to Sprint at Plaza Del Sol.  After that we went to

4    the Vaca Brava restaurant.

5    Q.    And where is that located, ma'am?

6    A.    In Barranquitas.

7    Q.    All right.  And do you recall what time you arrived

8    there?

9    A.    To the restaurant?

10   Q.    Yes, to the restaurant, ma'am.

11   A.    We arrived at the restaurant approximately between 3:30

12   and 4:00, more or less.

13   Q.    Okay.  And what time did you leave there, approximately?

14   A.    We left -- we left at about 6:00, no, about 6:30, more or

15   less.  I don't recall the time exactly.

16   Q.    All right.  And where were you going to from the

17   restaurant?

18   A.    When we left the restaurant, we continued on to my house.

19   Q.    All right.  Did you arrive at the house, ma'am?

20   A.    Yes, we arrived at my house.

21   Q.    And once you arrived at the house, what happened?

22   A.    When we arrived at my house, my mom was waiting for us.

23   When we arrived at the house, she was very upset waiting at

24   the gate, because it was the first time that we had gone to

25   that restaurant, and we had not invited her to go with us.

1    Q.   Okay.  And what happened after that?  I'm sorry.  I'm

2    sorry.  Prior to your arriving at the house, did you call

3    David Oquendo?

4    A.   Yes.  We were in communication when we were coming down

5    from the restaurant.

6    Q.   And what, if anything, did you tell him?

7    A.   That we had already left the restaurant, and that we were

8    headed home.

9    Q.   Okay.  Do you know where he was?

10   A.   At his parents' house.

11   Q.   Okay.  Now, you arrived at the house.  You greet your

12   mom.  What happened after that?

13   A.   Everyone went to their respective room.

14   Q.   Okay.  Now -- I'm sorry.  Did David Oquendo eventually

15   come home?

16   A.   Yes, approximately between 9:00 and 9:20.

17   Q.   And how did he arrive?  On a bicycle?  On a car?  How did

18   he arrive?

19   A.   In his SUV.

20   Q.   And what kind of SUV is that?

21   A.   It was a dark gold Ford Explorer.

22   Q.   Okay.  And how did you know that he had arrived?

23   A.   Because when he arrived, he didn't have a key to the

24   house, and I had to go out to open the gate for him.

25   Q.   All right.  And when you opened the gate, did you open

1   the gate --

2              THE COURT:  I'm sorry.  I'm sorry.  Was it, I think

3   she said (Remarks in Spanish.)  That's what she said?

4              THE INTERPRETER:  I believe so, Your Honor.

5              THE COURT:  You said that he didn't have the key.

6   One thing is (Remarks in Spanish), another one is I didn't

7   have the key.

8              THE INTERPRETER:  I stand corrected, Your Honor.

9              THE COURT:  Okay.  So what is the answer?

10             THE WITNESS:  That he called me when he was about to

11  arrive at the house in order for me to open the gate for him

12  then, because he did not have a key to get in.

13             THE COURT:  Where were his keys?

14             THE WITNESS:  He never had a key to the house.

15             THE COURT:  Very well.

16  BY MR. AGUAYO:

17  Q.   And why didn't he have a key to the house?

18  A.   Because I didn't work, and I was always at the house.

19  And there wasn't the need for him to have a key.

20  Q.   Okay.  Now, so if I'm not mistaken, you stated that he

21  arrived in his vehicle, and then you went to open porton (ph),

22  the gate?

23  A.   Yes.

24  Q.   All right.  And what does David do?

25  A.   He was approaching, walking from the corner, because he

1    would always leave his vehicle parked at the corner.  And he

2    would walk along the sidewalk from the corner until he reached

3    the house.

4    Q.   All right.  And once he reaches the house, what happens?

5    A.   We went into the bedroom, because he was going to get

6    clothing in order to shower, to bathe.

7    Q.   All right.  When he comes into the house or when he gets

8    his clothing to bathe, does he see anyone or is there anyone

9    that you see?

10           THE INTERPRETER:  The interpreter needs a repetition.

11   BY MR. AGUAYO:

12   Q.   When he gets home and goes into the room to get clothes,

13   to take a shower or bath, is there anyone else in the house

14   that you see?

15   A.   Yes.  Yes.  When he was going to go bathe, he said hello

16   to my sister and to my mom.

17           THE COURT:  Why would he park in the corner and not

18   in front of the house?

19           THE WITNESS:  Because at my house I had a car, my mom

20   had a car, my sister had a car, and my brother had a car.  And

21   in order not to interrupt the neighbor's area, one would park

22   as one would arrive.  If the vehicles were such that there was

23   no longer any room for anyone else to park, the last one to

24   arrive would park at the corner.

25           MR. AGUAYO:  May I continue, Your Honor?

```
 1  BY MR. AGUAYO:
 2  Q.   Where were we?  Does he go take a shower?
 3  A.   Yes, he went and showered.
 4  Q.   And after he showered, what, if anything, happened to
 5  David?
 6  A.   After he left the bathroom, he went to the bedroom again.
 7  And then he called my sister, because my sister was going to
 8  show him some music videos.
 9  Q.   Okay.  When you say he called your sister, how did he
10  call your sister?
11  A.   Over the phone.
12  Q.   Why, if they're in the same home, are they calling by
13  phone?
14  A.   Because she was in her room, and we were in ours.
15  Q.   Okay.  So he calls her and what happens?
16  A.   My sister then comes to our room in order to show him the
17  video that they were going to see.
18  Q.   Okay.  And did they watch the video?
19  A.   He saw the video.  I was watching a TV program.
20  Q.   Okay.  And after they watched the video, what happens
21  with your sister?  What's her name, by the way?
22  A.   Clayivinet Lopez.
23  Q.   Okay.  So do you also call her Clayi?
24  A.   Clayi.
25  Q.   Clayi.  So after they watched the video, Clayi goes back
```

1  to her room?

2  A.   After seeing the video, she left our room.

3  Q.   By the way, where was the baby?

4  A.   With us in the room, sleeping in her crib.

5  Q.   All right.  Now, at approximately 11:50 PM, near

6  midnight, what, if anything, happened?

7  A.   I received a call from one of the neighbors in order for

8  her to learn whether we knew what was happening.

9  Q.   And what happened?

10 A.   We went outside, because we also did not know what was

11 happening.  When we went out, we saw that my mom, my sister,

12 and my brother also came out.  I went out with David and my

13 daughter.

14 Q.   All right.  And did you see anybody outside?

15 A.   Yes.  When we went out to the area of the sidewalk, the

16 neighbor from in front of us came out.  He came out

17 practically at the same time that we did.  And he asked us

18 whether we knew what was going on.  That he was taking care of

19 some kids, some children, and he heard a loud noise.  The

20 front neighbor.  But the one on the left was also there.

21      Next to my house, there was also a party going on

22 that -- so that there were people going in and out.

23 Q.   Okay.  Now, you're outside, and while you're outside,

24 what are you all doing?

25 A.   We were talking with the front neighbor saying that

1  something had been heard, but no one knew what had been heard.

2  My mom and my sister went in.  And my brother, myself and my

3  daughter stayed outside, as well as David.

4  Q.   All right.  Let me ask you something before we proceed.

5  This neighbor that was in front, have you tried to talk to him

6  about the events of today?  I mean, I'm sorry, the events of

7  October 17, 2009?

8  A.   On one occasion I tried to talk to him.

9  Q.   And what happened?

10         MS. DOMINGUEZ:  Objection, hearsay.

11         THE COURT:  Sustained.

12         MR. AGUAYO:  All right.  No problem.

13  BY MR. AGUAYO:

14  Q.   As a result of what he told you, he's not here to

15  testify, correct?

16  A.   Correct.

17  Q.   Let's talk about the neighbor, on the side.

18  A.   Are you talking about the neighbor in front, towards the

19  side or the one nextdoor?

20  Q.   We already talked about the neighbor in front.  Let's

21  talk about the neighbor to your side, el lado (ph)  All right?

22  A.   (Remarks in Spanish.)

23         MS. DOMINGUEZ:  Objection, hearsay, Judge.

24         THE COURT:  Sustained.

25  BY MR. AGUAYO:

```
 1   Q.   No problem.

 2            THE INTERPRETER:  The interpreter didn't get that for

 3   the record, Your Honor.

 4            THE COURT:  Put it in the record, please.

 5            THE WITNESS:  The neighbor nextdoor doesn't remember,

 6   because he had been drinking.

 7            THE COURT:  Well, okay.  I already sustained the

 8   objection.  That's hearsay, not admissible.

 9   BY MR. AGUAYO:

10   Q.   All right.  Let's continue.  So you're outside, with

11   David.

12            THE COURT:  Let's take a short five minute recess so

13   we can deal with something here.

14            MR. AGUAYO:  Thank you, Your Honor.

15            (At 10:52 AM, jurors left the courtroom.)

16            MR. AGUAYO:  Your Honor, if you could tell her not to

17   talk to anybody.

18            THE COURT:  She knows that.  You'll tell her.

19            (At 10:52 AM, recess taken.)

20            (At 11:10 AM, proceedings reconvened.)

21            THE COURT:  Let's begin, Mr. Aguayo.

22            MR. AGUAYO:  May I continue, Your Honor?

23            THE COURT:  Yes.

24   BY MR. AGUAYO:

25   Q.   Ms. Lopez, we had talked about the neighbor to the front
```

1    and the neighbor to the side.  You had also talked about a

2    fiesta, party going on nextdoor, correct?

3    A.    Correct.  There was a party where there were a lot of

4    people coming in and going out.

5    Q.    Did we ever try to contact them, to your knowledge?

6    A.    Yes.

7    Q.    All right.  And were we successful in finding them?

8    A.    We located them, but (Remarks in Spanish.)

9              MS. DOMINGUEZ:  Objection, based on hearsay, Judge.

10             THE COURT:  Sustained.

11             THE WITNESS:  They didn't agree to.

12             MR. AGUAYO:  All right.

13             THE COURT:  Sustained.

14   BY MR. AGUAYO:

15   Q.    Ms. Lopez, we're outside.  Let's go back.  October 17,

16   2009, you're outside with -- well, October 17th going into

17   October 18th, in the early morning hours, you're outside with

18   David, correct?

19   A.    I was outside with David, our daughter, and my brother.

20   A little while after we were outside, that we were talking,

21   the security officer goes by.  Security guard goes by.

22   Q.    Do you know approximately how much time transpired from

23   the time that you were outside to when the security officer

24   comes by, more or less?

25   A.    A while went by.  I can't pinpoint.

1    Q.   Now, what were you doing inbetween that time that you

2    went outside, and the security guard came by?

3    A.   Well, we were talking about -- I was telling them about

4    when we went to the restaurant, the type of food that they

5    had.

6    Q.   All right.  Now, you mentioned that the security guard

7    came by.  What's the name of the security guard?

8    A.   Officer Malave.

9    Q.   All right.  And when he comes by, where are you?

10   A.   We were outside of the house.

11   Q.   All right.  I'm sorry.  All right.  So Mr. Malave comes

12   by and in what vehicle is he in?

13   A.   He was in the urbanization's official vehicle, which is a

14   white pick-up.

15   Q.   And what, if anything, happened?

16   A.   We were talking outside there, and when he went by that,

17   he stopped.  He started talking to us.

18   Q.   All right.  And without telling us what he said, what was

19   the conversation about?

20   A.   About what he had heard when he was at the security check

21   point.

22   Q.   Okay.  And approximately how long did you converse?

23   A.   It was several minutes, because I was able to go in to

24   give my daughter to my sister.  And when I came out, the

25   officer was still there, the guard was still there.

1   Q.   Okay.  And what happened afterwards with the guard?

2   A.   He continued his rounds.

3   Q.   Okay.  Ms. Lopez, how was David dressed when he went

4   outside?

5   A.   He was not wearing a shirt, and he had shorts on that

6   like go to the knee or halfway to the knee for like playing

7   basketball.

8   Q.   All right.  Now, after Mr. Malave leaves, what does David

9   do and you do?

10  A.   David was smoking a cigarette, and he was calling his

11  brother on the phone.

12  Q.   What's the name of his brother?

13  A.   Ronnie Oquendo.

14  Q.   And do you know why he was calling him?

15  A.   Because he knew that he was going to go hang out that

16  night, and since no one knew what was going on, he wanted to

17  make sure that his brother was fine.

18          MS. DOMINGUEZ:  Objection.  Same objection, Your

19  Honor.

20          THE COURT:  Well, but that's not hearsay really.

21          MS. DOMINGUEZ:  Lack of foundation for her

22  knowledge.

23          THE COURT:  Well, that's okay.

24  BY MR. AGUAYO:

25  Q.   Was he able to reach him at any time?

```
 1    A.    Into the night.

 2    Q.    Okay.  But he did reach him?

 3    A.    Yes, he did reach him.

 4    Q.    And was Ronnie okay?

 5    A.    Yes.  (Remarks in Spanish.)

 6              MS. DOMINGUEZ:  Objection.

 7              THE COURT:  Sustained.  Whatever Ronnie said was not

 8    admissible.

 9              MR. AGUAYO:  All right, Your Honor.

10              THE INTERPRETER:  Your Honor, may the interpreter

11    answer?

12              THE COURT:  Yes.

13              THE WITNESS:  He said that he was at Jungle, but that

14    he was fine, that he didn't know what was going on.

15    BY MR. AGUAYO:

16    Q.    All right.  Fine.  Now once you finish talking to Malave,

17    the phone call, what do you and David do?

18    A.    We went into the house.  I got -- he went into the room.

19    I got our daughter.  When I picked up my daughter, we went

20    into the room again.  We started watching TV for a while.

21    David continued calling his brother, and then we went to bed.

22    Q.    Now, Ms. Lopez, just a couple more questions.  Ms. Lopez,

23    David is your consensual husband?

24    A.    Yes.

25    Q.    And he is the father of your daughter, who is now four
```

1   years old?

2   A.    Yes.

3   Q.    You love David?

4   A.    Yes, I love him.

5   Q.    Would you lie to this jury concerning what happened that

6   night in order to protect or save David?

7   A.    I would never lie before the jury, before the Judge,

8   before anyone, because that was horrible.

9   Q.    When you say horrible, you're talking about the events of

10  La Tombola?

11  A.    Yes.

12  Q.    Would you protect a person that supposedly was involved

13  in the events of La Tombola?

14  A.    No one.  I wouldn't be sitting here if I wasn't certain

15  that he was in my house with me.

16          MR. AGUAYO:  I have no further questions, Your

17  Honor.

18          THE COURT:  Any cross?

19          MS. DOMINGUEZ:  Yes, sir.

20                          CROSS-EXAMINATION

21  BY MS. DOMINGUEZ:

22  Q.    Ma'am, you and I have never met and have never spoken

23  before; is that correct?

24  A.    Correct.

25  Q.    Now, you've told the members of this jury that David

```
 1    Oquendo Rivas lived with you and your parents for
 2    approximately the last four or five years before he was
 3    arrested; is that accurate?
 4    A.    No.  No.
 5    Q.    How long had you lived with him prior to his being
 6    arrested?
 7    A.    One year approximately.
 8    Q.    And even for that year, he didn't live full-time with
 9    you; is that correct?
10    A.    He did not live all of the time with me.
11    Q.    You've told us that part of the time he lived with his
12    parents?
13    A.    Yes, part of the time he was with his parents.
14    Q.    And do you know where his parents lived?
15    A.    Yes, at Sector 26 in Toa Baja.
16    Q.    And how close is that to where you live?
17    A.    About five to ten minutes away.
18    Q.    And you're familiar with a business that has been
19    referred to throughout your testimony as La Tombola?
20    A.    Familiar?
21    Q.    Well, you know where it is?
22    A.    I don't understand the question.
23    Q.    Do you know where it is?  You've seen it before?
24    A.    I have seen it once.
25    Q.    Well, isn't that business about one or two minutes by car
```

1   from your home, by car?

2   A.   It is several minutes away from the house by car.

3   Q.   So you've only seen it once?  Is that your testimony?

4   A.   Correct.

5   Q.   Now, during the year 2009, did I hear you correctly that

6   you were not employed but David was employed?

7   A.   Correct.

8   Q.   And I think you mentioned three separate jobs that he

9   had.  One of which was gardening with his father, and then

10  remodeling offices, and cleaning floors?

11  A.   Yes.

12  Q.   And the remodeling offices job, who was that with?

13  A.   The man's name, if I am not mistaken, is Yamil.  Excuse

14  me.  Hiram.  Hiram.

15  Q.   Okay.  And do you know his last name?

16  A.   No.

17  Q.   Have you ever met him before?

18  A.   Yes.

19  Q.   And what about the cleaning floor business or job?  Who

20  was that with?

21  A.   I don't recall his boss' name, but it was in Levittown.

22  The offices were in Levittown.

23  Q.   And how did David juggle those three jobs?  Do you know

24  what hours he worked at each?

25  A.   At Sure Bond, almost always if it wasn't during the day,

```
1    it could be during the very early morning hours.  And the
2    gardening with his dad would be whenever there wasn't work for
3    him at Sure Bond or with the gypsum board.
4            And with Sure Bond, that was according to the
5    budget, according to the project.  If it was a job that lasted
6    only one day, that was it, and that would be done.  Not Sure
7    Bond.  The interpreter's corrected.  The gypsum board.
8    Q.   So would it be fair to say that he had a flexible
9    schedule?
10   A.   He was always working.
11   Q.   He was always -- well, you said gardening with his father
12   was when he didn't have any other work?
13   A.   Yes, but Sure Bond was an eight hour job, and if it was
14   that they didn't have work in the morning because the project
15   wasn't being done in the morning, they would do it in the
16   afternoon.  And if they were short on personnel, he would do
17   the morning schedule and the afternoon as well.
18   Q.   Well, because he was such a busy person, you would expect
19   on a week day between noon and 3:00 he'd be working, correct?
20   A.   Do you mean 12:00 noon to 3:00 in the afternoon?
21   Q.   Yes.
22   A.   Yes.
23   Q.   Now, did you know a cousin of David's by the name of
24   Christian Ortiz?
25   A.   Yes.
```

1    Q.    How well do you know him?

2    A.    He was his relative.

3    Q.    And you knew him because of the relationship that David

4    and Christian had?

5    A.    Yes.

6    Q.    And they were close?

7    A.    They were cousins.

8    Q.    But in addition to being cousins, were they close?

9    A.    Yes.

10   Q.    Now, you are aware, ma'am, that on October the 20th,

11   which is a Tuesday, a week day, David and Christian were

12   arrested?  You are aware of that; is that correct?

13   A.    Yes.

14   Q.    And you know what time they were arrested?

15   A.    It was during -- it was afternoon, day.  I don't recall

16   the time exactly.

17   Q.    Okay.  And you were aware that David and Christian were

18   arrested in constructive possession of three weapons?

19            MR. AGUAYO:  Objection, Your Honor.  That's a legal

20   term, constructive possession.  It would be unfair for her to

21   answer that.

22            MS. DOMINGUEZ:  I'll rephrase that.

23            THE COURT:  Why don't we call it possession.  Plain

24   possession.

25   BY MS. DOMINGUEZ:

1   Q.   And you are aware that David and Christian were arrested

2   in possession of three firearms?

3   A.   That David was arrested with one weapon, and Christian

4   was arrested with two weapons.

5   Q.   But they were together at the time?  When they were each

6   possessing firearms, you are aware that they were together?

7   A.   I wasn't there, but yes, that is what came out in the

8   media.

9   Q.   Well, are you suggesting to us that you haven't discussed

10  this with David?

11  A.   About?

12  Q.   About his arrest with an illegal firearm.

13  A.   Yes.  When I went to the visit, we talked about that

14  subject.  And I was very upset because, like I mentioned a

15  little while ago, I had told him to get rid of that weapon.

16  Q.   So you know from your discussions with David that he and

17  Christian were together with three firearms when they were

18  arrested; is that correct?  Is that correct?

19  A.   No.

20  Q.   You don't know that?

21  A.   We only spoke about the fact that I was upset, because we

22  had said that he was going to get rid of those firearms.  We

23  did not talk about whether it was one, two, or three firearms.

24  Q.   So let me see if I understand your testimony, ma'am.

25  What was upsetting to you was that he hadn't listened to you

1    when you told him to get rid of the firearm, but not the fact

2    that he was arrested with an illegal firearm?

3    A.   Yes, I was upset by the fact that he hadn't -- that he

4    hadn't gotten rid of the weapon due to my safety and our

5    daughter's safety.  And that this had wound up in his arrest.

6    Q.   And did it also upset you, the fact that this man that

7    you lived with, the father of your daughter was in possession

8    of an illegal firearm, was violating the law?

9    A.   Yes.

10   Q.   Were you bothered, not only that he didn't listen to you,

11   but that he was breaking the law?  Did that bother you?

12   A.   Of course.

13   Q.   And of course you were also aware that between 12:00 and

14   3:00 on October the 20th, or October the 19th, that David

15   Oquendo Rivas was not doing gardening, or remodeling offices

16   or cleaning floors when he was in possession of that firearm?

17   A.   No, because I knew where he was.

18   Q.   Well, the fact is, ma'am, that you didn't know where

19   David was when he wasn't with you?

20   A.   He told me that he was going to his relative's house.

21   Q.   Of course all you knew was what David told you.  But you

22   didn't know whether that was true?  Isn't that true?

23   A.   Yes, correct.

24   Q.   And of course David had lied to you, he'd been less than

25   honest to you in the past?  Isn't that true?

```
1    A.    I don't understand your question.
2    Q.    He hadn't been less than honest with you in the past?  He
3    hadn't lied to you before?
4    A.    With regard to the fact that he was with another girl.
5    That's all.
6    Q.    Okay.  Well, I'm not referring to that.  Didn't he tell
7    you he would get rid of the gun?
8    A.    Ah, okay.
9    Q.    And he didn't?
10   A.    He didn't do it.
11   Q.    In fact, since you know that he was arrested on October
12   the 20th with a gun, you know that rather than getting rid of
13   the gun what he did was conceal it from you?
14   A.    I never saw it again.
15   Q.    So would it be a reasonable conclusion that then he was
16   concealing it from you?
17   A.    No.  Because I didn't get back into his vehicle.  And
18   that was weeks before, the argument.
19   Q.    Okay.  So two scenarios are possible.  Either he
20   concealed it from you, or he didn't conceal it from you and
21   you just simply didn't bother to follow up on whether he had
22   the gun still.  But in any event, he was less than honest
23   with you about getting rid of it?  You would agree with me
24   there?
25   A.    It was my understanding that he had gotten rid of the
```

1    weapon.

2    Q.   I understand that, and thank you for sharing that with

3    us, but I'd like you to answer my question.   Whether he got

4    rid of the gun, didn't get rid of the gun, concealed it from

5    you or didn't, he was less than honest with you when he told

6    you that he would get rid of the gun?

7    A.   Correct.

8    Q.   Because you know that he didn't; is that correct?

9    A.   I know of that after his arrest.

10   Q.   All right.   And so would your answer be yes, that he was

11   less than honest with you?

12   A.   Yes.

13   Q.   And based on the fact that he lied to you about getting

14   rid of the weapon, you know from that experience that you

15   can't always trust what David told you?

16   A.   Could you repeat that question for me?

17   Q.   You know that David had lied to you in the past, so you

18   couldn't really trust everything he told you?

19   A.   I can trust.

20   Q.   I'm sorry?

21   A.   I can trust.

22   Q.   You can trust him?

23   A.   Yes.

24   Q.   So even if he lied to you, you would still trust him,

25   correct?

```
 1   A.    Yes, correct.

 2   Q.    Of course.  This is the father of your daughter?  Yes?

 3   A.    He is my daughter's father, but not necessarily because

 4   of that do I need to trust in him.

 5   Q.    And he's also the man that you love?

 6   A.    Yes.

 7   Q.    Now, understanding that you don't know much about

 8   firearms, let me show you what's in evidence as Government

 9   Exhibit 158 C.  I'm going to show it to you, and then let me

10   know when you're done looking at it.

11   A.    May I touch it?

12   Q.    Absolutely.  Okay.  Are you done looking at it?

13   A.    (Nodding head up and down.)

14   Q.    I'm going to put it on the monitor.

15   A.    Oh, sorry.  Yes, I looked at it.

16   Q.    If you could refer to the monitor, please.  Could you

17   tell us whether that looks like the firearm that you saw in

18   David's car?

19   A.    I only saw it once.

20   Q.    I understand.  Does that look like the weapon?

21   A.    It was a weapon.  I don't know whether it was small,

22   whether it was big.  I didn't stop and look at it.

23   Q.    Now, I'm going to represent to you that that's the weapon

24   that David was arrested with on October the 20th.  And so is

25   it your testimony that you don't know whether that's the
```

```
 1    weapon you saw or whether it was an additional weapon that

 2    David had?

 3    A.   No, that I can't pinpoint, whether that was the weapon

 4    that I saw in the SUV, because I did not stop to look at it.

 5    Q.   Now, when you saw the weapon in David's car, where was

 6    it?

 7    A.   On the floor of the seat.

 8    Q.   What seat?  The driver's seat?  The passenger's seat?

 9    A.   Passenger.

10    Q.   In the front or in the back?

11    A.   In the front.

12    Q.   Was it underneath the seat?

13    A.   By where you -- the foot rest.  By where when you sit

14    down, where you place your feet.

15    Q.   Okay.  Now, did you know whether David had a permit to

16    carry that gun?

17    A.   No.

18    Q.   You didn't know or he didn't?

19    A.   He did not have one.

20    Q.   Did you ask him if he had a permit?

21    A.   No, I didn't ask him.

22    Q.   But you know that he didn't?

23    A.   Yes, I know that he did not have one.

24    Q.   And do you know that in Puerto Rico it is a crime to

25    carry or possess a weapon without a permit?
```

1    A.   Yes, I know that.  That is why I asked him to get rid of

2    the weapon.

3    Q.   And when you say get rid of the weapon, what did you

4    expect him to do?  To just dump it in a garbage can or how did

5    you expect him to get rid of that weapon?  Or didn't you care

6    how he would get rid of it?

7    A.   No.  I only wanted, for my family's safety as well as

8    mine, for him to get rid of the weapon.

9    Q.   And were you concerned about the safety of anyone David

10   should encounter while he was armed or just the safety of you

11   and your daughter?

12   A.   I didn't think that he was going to encounter anyone

13   armed.

14   Q.   Not that he should encounter anybody that was armed, but

15   that he, an armed person, should encounter someone.

16   A.   That did not enter my mind.  I was only thinking about me

17   and my family.

18   Q.   Now, on October the 17th, 2009, you said that David

19   Oquendo got home at about 9:00 or 9:30 PM.

20   A.   Approximately.

21   Q.   Now, you've told us all about the -- what you did with

22   your day.  So it's safe to assume you weren't with David

23   before you saw him at 9:00, 9:30 that evening?

24   A.   I spoke with him over the telephone, but I did not see

25   him until I arrived at the house.

1   Q.   And again, you spoke to him over the phone, and he told

2   you he was at his parents' house, but you have no personal

3   knowledge whether that in fact was true?  Is that correct?

4   A.   When I spoke to him, he told me that he was at the

5   hospital visiting his godfather with his father.  And yes, I

6   did speak to his father, and I do know that he was at the

7   hospital visiting his godfather with his father.

8   Q.   He was at the hospital all day?

9   A.   During the afternoon.

10  Q.   Well you didn't tell us about that during your testimony

11  when Mr. Aguayo was asking you questions.

12  A.   I was not asked.  Mr. Aguayo, Attorney Aguayo did not ask

13  me what David did.  He asked me what I did.

14  Q.   He didn't ask you whether you spoke to David and whether

15  you knew where he was?  You don't remember that?

16  A.   When I -- when I was coming down from Vaca Brava, and

17  that was already as night was falling.

18  Q.   Okay.  And then David told you that he was at his

19  parents' house; is that correct?

20  A.   During the night.

21  Q.   And did you talk to his father or his mother at that time

22  as well?

23  A.   I don't recall.

24  Q.   So you have no personal knowledge of where David was, and

25  all you know is what he told you?

1    A.   I know that in the afternoon he was with his dad, because

2    I spoke to him.  And at night I spoke to him, and he told me

3    that he was with his dad.  In the afternoon I spoke to the

4    dad.

5    Q.   Let's try this again.  I'm talking to you about the

6    evening, ma'am.  Do you understand that?  Not when he was in

7    the hospital, but when he told you he was at his parents'

8    house.  Do you understand that?

9    A.   I understand your question now, but you were mixing the

10   questions up.

11   Q.   Okay.

12   A.   For me.

13   Q.   Let's see if I can manage to ask you this clear question

14   in a way that you can understand.

15   A.   Yes.

16   Q.   When you spoke to David in the evening when you were on

17   your way home, he told you that he was at his parents' house?

18   A.   Correct.

19   Q.   My question is very simple.  You had no personal

20   knowledge of where he was?  All you knew was what he told you?

21   A.   Only what he told me.

22   Q.   Now, later you told us that your sister went into the

23   bedroom, and that she and David were watching a video?

24   A.   A music video.

25   Q.   And what time did you and David go to sleep?

1  A.   During early morning hours, after 1:00, 2:00 in the

2  morning.

3  Q.   So it's your testimony that around 11:50, when the

4  neighbor calls you, you and David had been awake all night?

5  A.   We were awake, because we -- he arrived at about 9:00,

6  9:20, 9:30.  While he bathed -- we went to the room.  He

7  called my sister.  My sister came to the room.  She showed him

8  the video.  He was on the internet, and I was watching a

9  television program.

10         The following day we didn't have to work, so, yes,

11  we did go to bed late.

12  Q.   So, again, let me ask you the question.  It's your

13  testimony that at 11:50, when the neighbor called, you and

14  David had been up all night?

15  A.   When the call came in from the female neighbor, yes, we

16  were awake.

17  Q.   Okay.  And what time did your sister leave the room?

18  A.   I can't pinpoint that.

19  Q.   Well, if you use 11:50 as a marker, how long before you

20  got that call?

21  A.   The call?

22  Q.   How long before you received the call had your sister

23  left the room?  Half an hour, an hour?

24  A.   It could be 40 minutes, 60 minutes.

25  Q.   Okay.  So you don't recall?

1    A.    No, I can't recall.  I can't say precisely.

2    Q.    But whether it's 40 minutes or 45 minutes or more, you do

3    know that at some point your sister leaves the room and you

4    and David are left alone in the bedroom with your daughter?

5    A.    Yes.

6    Q.    And your daughter was sleeping or was she up, too?

7    A.    Yes.  At that time she was asleep.

8    Q.    Okay.  And how long did you and David remain in the room

9    alone before you got the call at 11:50?

10   A.    I can't say precisely.

11   Q.    Now, you remember the time of 11:50 very precisely, but

12   you can't remember for how long you and David had been alone

13   in the room before you got that call?

14          MR. AGUAYO:  Objection, Your Honor.  She's always

15   stated approximately.

16          THE COURT:  Well, approximately 11:50 sharp.

17          MR. AGUAYO:  No, but she's saying it's precisely

18   11:50.  That's incorrect.

19          THE COURT:  Okay.  Go ahead.  You can ask the

20   question.

21   BY MS. DOMINGUEZ:

22   Q.    But you would agree with me that for at least 40 minutes

23   you and David, according to your testimony, you and David were

24   alone in the room with your sleeping daughter?

25   A.    We were awake.  Our daughter was asleep.

1   Q.   But you were alone, other than your sleeping daughter?

2   A.   Yes.  Yes.

3   Q.   And it's your testimony that during that time, from the

4   time your sister leaves until the time you get this call at

5   around 11:50, that David was with you?

6   A.   David was with me.

7   Q.   And of course we would have to accept your testimony

8   about that, because -- and of course we would have to accept

9   your testimony with respect to the fact that David was with

10  you?

11  A.   I am saying the truth.  He was with me.

12  Q.   That's not my question, ma'am.  My question is that we

13  would have to accept your testimony for that?

14  A.   Because it is the truth.

15  Q.   According to you?  Right?

16  A.   Not according to me.  That is the reality.

17  Q.   Now, are there any windows in your bedroom?

18  A.   A small one in the bathroom.

19  Q.   So in the actual bedroom, there are no windows?

20  A.   No.

21  Q.   Now, it's your testimony that after you received this

22  phone call, you and your family members and David went

23  outside?

24  A.   Yes.

25  Q.   Okay.  Do you remember what time that was?

```
 1  A.    After 12:00.
 2  Q.    Well, could you tell us how long after 12:00?  Five
 3  minutes, ten minutes?
 4  A.    No.
 5  Q.    And you have testified that at the time that you went out
 6  and stood in front of the house, that there were neighbors
 7  there?
 8  A.    Yes.
 9  Q.    In front, directly in front, and to the side as well?
10  A.    Directly in front, to the front left, and the neighbors
11  that were at the party that were at the house nextdoor on the
12  left.
13  Q.    And these are neighbors who would have had an opportunity
14  to have seen David who was standing according to your
15  testimony immediately in front of your house?   Is that
16  correct?
17  A.    The neighbor in front saw him.
18  Q.    Well, unfortunately you can't testify for anyone else.
19  A.    Okay.
20  Q.    So if you could just concentrate on answering my
21  question.  My question is whether there were neighbors there
22  that were in a position to see David, who was standing,
23  according to your testimony, immediately in front of your
24  house?
25  A.    Yes.
```

1    Q.    Okay.  And you said that he had no shirt on and he was

2    wearing some sports shorts?

3    A.    Yes.

4    Q.    And what color were those shorts?

5    A.    It was dark-colored pants.  Shorts.  I don't remember.

6    Q.    Now, were you also aware that one of the guns which was

7    recovered when David and his cousin Christian were arrested on

8    October the 20th, has been ballistically proven to have fired

9    at least 20 shots at the La Tombola massacre?

10   A.    I did not know that.

11   Q.    And were you also aware that the firearm that David had

12   in his possession the day of the arrest had an obliterated

13   serial number?

14   A.    Could you repeat that question for me?

15   Q.    Were you aware that the firearm that David had in his

16   possession the day of his arrest had an obliterated serial

17   number?

18            MR. AGUAYO:  Objection, Your Honor.

19            THE COURT:  Were you aware.  That's all.

20            MR. AGUAYO:  Well, the obliterated serial number is

21   with Christian, not with David.

22            THE COURT:  I see.

23            MR. AGUAYO:  So I just want that to be clear.  She's

24   putting that obliterated gun in David's hand when it's in

25   Christian's.

```
 1              THE COURT:  I understand.
 2   BY MS. DOMINGUEZ:
 3   Q.   Do you know that one of the firearms recovered had an
 4   obliterated serial number?
 5   A.   Yes.
 6   Q.   Now, let me direct your -- you to the monitor in front of
 7   you.  Even though you've testified you don't know much about
 8   firearms, can you tell that this firearm is cocked?
 9   A.   No.
10   Q.   You can't tell that that firearm is ready to be fired?
11   A.   No, I don't know.  No, I don't know.
12   Q.   Now, David was arrested on October 20th on the gun
13   charge; is that correct?
14   A.   Yes.
15   Q.   And you also know, ma'am, that on February 23rd, 2011,
16   David was charged in an Indictment?
17   A.   I don't know the date, but I do know about that
18   Indictment.
19   Q.   But you know it was a couple of years ago?  Even though
20   you don't know the exact date?
21   A.   Yes.
22   Q.   And you were also aware that that Indictment contained a
23   series of charges against David based on the La Tombola
24   incident?
25   A.   Yes.
```

1    Q.    The incident that occurred on October the 17th, 2009?

2    When you claim David was with you?

3    A.    With me, correct.

4    Q.    And you know that on February the 24th, the day after the

5    date of the Indictment, there was an additional appearance?

6    Did you know that?  That he had an initial appearance on that

7    Indictment?

8              MR. AGUAYO:  Your Honor, perhaps if we don't use

9    legal terms and explain to her.

10             THE COURT:  Well, were you aware that on the 20th,

11   was it?

12             MS. DOMINGUEZ:  24th.

13             THE COURT:  24th, he had to come to court, they

14   brought him to court before a judge?

15             THE WITNESS:  I know that he had to come before a

16   Judge, but I don't recall the date, because of the time that

17   has gone by.

18   BY MS. DOMINGUEZ:

19   Q.    And did you attend that hearing?

20   A.    What happens is that there were several hearings, and I

21   don't know if I was present at that one.

22   Q.    Well, fair enough.  Let me ask you then, generally, you

23   were aware that in connection with that Indictment, there were

24   a series of hearings where David had to appear before a Judge

25   in connection with that Indictment that charged him with

1   incidents regarding La Tombola?

2   A.   Yes.

3   Q.   And you attended some of those hearings; is that correct?

4   A.   I don't recall whether it was those hearings or whether

5   it was the hearings regarding the possession of the firearm,

6   because I don't have someone to care for my daughter, and I

7   had to stay taking care of my daughter.

8   Q.   But you would agree with me, ma'am, that since February

9   the 23rd, 2011, or approximately for two years, you have known

10  that David Oquendo Rivas has been under Indictment for charges

11  emanating from the La Tombola incident?  Is that correct?

12  A.   That he has been appearing at them, yes.

13  Q.   And that he's been under Indictment for two years for

14  charges related to La Tombola?

15  A.   Yes.

16  Q.   And is it not correct, ma'am, that today is the first

17  time that you have ever claimed before any law enforcement

18  officer that David Oquendo Rivas was with you the evening of

19  October the 17th, 2009?  Yes or no?

20  A.   (Remarks in Spanish.)

21  Q.   Yes or no?

22        MR. AGUAYO:  Objection, Your Honor.

23        THE WITNESS:  I was never asked.

24        THE COURT:  Never asked.  That was the answer.

25  BY MS. DOMINGUEZ:

1   Q.   You were never asked.  Are you suggesting to the members

2   of this jury that you were going to wait to be asked whether

3   David was with you on October the 17th, 2009, before you spoke

4   up?

5   A.   No.

6   Q.   Is that your testimony?

7   A.   Since the time of -- since the time of his arrest, I have

8   always told his attorneys that he was innocent.  I have never,

9   no member of the prosecution team, no officer, no judge, no

10  one has given me the opportunity for me to say that he was not

11  there.

12          MR. AGUAYO:  Excuse me.

13          THE WITNESS:  That he was with me.

14          MR. AGUAYO:  May we approach the bench on something

15  here?

16          THE COURT:  Sure.

17          (Bench conference held.)

18          MR. AGUAYO:  Your Honor, those questions have been

19  ingenuous, because in the bail hearing which David had on

20  October 20th, Malave was there.  And they did not allow him to

21  testify that David -- that he saw David -- what Malave is

22  going to testify now, that he saw David that night.  And he

23  was in front of the house, and she was there.  They didn't get

24  into that.  But it's in the transcript which I read concerning

25  the October 20th incident.

1            MS. DOMINGUEZ:  Judge, I'm going to her intent, her

2      state of mind.  It's her credibility at issue.  I'll take care

3      of Malave when he testifies.

4            MR. AGUAYO:  That's the point.  You're making it

5      sound like she didn't come forward.

6            MS. DOMINGUEZ:  She didn't.

7            MR. AGUAYO:  She was at the hearing.

8            THE COURT:  It's matter that goes to credibility,

9      whether she understood at some point in time as a citizen that

10     she had an obligation to come forward and tell them what she

11     knows.  Tell the Government or police officer.

12            MR. AGUAYO:  But I would also add, Your Honor, if

13     she's speaking with lawyers and lawyers are giving her

14     instructions, then she's following the lawyer's

15     instructions.

16            THE COURT:  Absolutely.

17            MR. HEGYI:  A lawyer instructing her not to tell the

18     truth and not to come forward?

19            MR. AGUAYO:  No.  That we're going to use her at this

20     trial.

21            THE COURT:  I think this can be explored if it's

22     explored correctly, and I will allow the exploration of

23     this.

24            MR. AGUAYO:  All right.

25            (Bench conference concluded.)

1   BY MS. DOMINGUEZ:

2   Q.   Now when you testified that no one gave you the

3   opportunity, not a Judge, not the the U.S. Attorney's Office

4   gave you the opportunity to tell them that David was with you,

5   did you try?  Did you ever call?  Did you pick up the phone?

6   Did you send a letter?  Did you do any of that?  Did you do

7   any of that?

8   A.   No.  I simply told the investigator and the attorneys.

9   Q.   And what was the name of the investigator that you told?

10  A.   Mr. Alvin Aponte.

11  Q.   So just to recap here, it is true then, ma'am, that for

12  two years while David Oquendo Rivas has been in jail, you did

13  not ever come forward to tell any law enforcement officer that

14  David was allegedly with you on the evening of October the

15  17th, 2009?  Is that true?  Yes or no?

16  A.   That I never went?

17  Q.   Did you not understand the question?

18  A.   No, I didn't understand it.

19  Q.   Okay.  Let me try it again.

20  A.   Please.

21  Q.   During the last two years that David Oquendo Rivas has

22  been in jail, isn't it correct, ma'am, that you have never

23  contacted any law enforcement officer to tell them that on the

24  evening of October the 17th, 2009, the night of La Tombola,

25  David Oquendo Rivas could not have been at La Tombola because

```
 1   he was allegedly with you?

 2   A.    Correct.

 3   Q.    And you didn't do that; is that correct?  Before today?

 4   Before any law enforcement officer?

 5   A.    No.

 6   Q.    But today you're here testifying in the trial of David

 7   Oquendo, correct?

 8   A.    Correct.

 9   Q.    The father of your daughter?

10   A.    Uh-huh.  Correct.

11   Q.    And your commonlaw husband?

12   A.    Correct.

13   Q.    And even though he has been in jail for the past two

14   years, you have maintained contact with him?

15   A.    Yes.

16   Q.    Both by telephone?

17   A.    By phone.

18   Q.    And also in person?  Through visits that you make to him

19   in the jail?

20   A.    Yes.

21   Q.    And it is your hope, as you testify here today, that soon

22   you will be together again?  Is that correct?

23   A.    I am simply saying the truth.

24   Q.    Let me repeat the question.  Is it or is it not your

25   hope, as you're testifying here today, that he will again soon
```

```
 1   be with you and your daughter?

 2   A.   Yes.

 3   Q.   I have no further questions.

 4          MR. AGUAYO:  Yes, I have some questions, Your Honor.

 5          THE COURT:  You have much?

 6          MR. AGUAYO:  Well --

 7          THE COURT:  I just need to know, because there is a

 8   strategic decision to make here regarding lunch.

 9          MR. AGUAYO:  Well, Your Honor, I'm going to ask the

10   Court, Attorney Chico is looking for it, the Notice of Alibi

11   which we gave months ago, that we gave it to the Government,

12   and that the Government could have gone to interview them

13   but -- we have the date?

14          MS. DOMINGUEZ:  Judge, is there a question that's

15   being posed to this witness?

16          MR. AGUAYO:  I'm asking for judicial notice.

17          THE COURT:  There is -- yes, there is a notice of an

18   alibi.  What is the date?

19          MR. AGUAYO:  Your Honor, if we can break for lunch,

20   and Chico can find it for me but we'll be asking for judicial

21   notice.

22          THE COURT:  How many questions do you have for her?

23   That's the question.

24          MR. AGUAYO:  Well, I have basically two.

25          THE COURT:  Okay.  Why don't you do that first.
```

```
1                          REDIRECT EXAMINATION

2    BY MR. AGUAYO:

3    Q.   Ms. Lopez, when you were interviewed by the investigator,

4    the Government states that the Indictment was on February

5    23rd, 2011, correct?  Do you recall that?

6    A.   (Shaking head from side to side.)  No.

7    Q.   All right.  Let's assume that the Indictment was on

8    February 23rd as the prosecutor told you.

9    A.   Okay.

10   Q.   Now, Alvin Aponte, the investigator went to see you,

11   correct?

12   A.   Correct.

13   Q.   And he took notes of what you told him?

14   A.   Yes, he made notes of everything I told him.

15   Q.   And you signed that, did you not?

16   A.   Correct.

17   Q.   And do you know what date you signed that?

18   A.   No.

19   Q.   If I showed you the document which you signed, would that

20   refresh your memory?

21   A.   Yes.

22           MR. AGUAYO:  May I, Your Honor?

23           THE WITNESS:  Yes, that is my signature.  And that is

24   the date.

25   BY MR. AGUAYO:
```

1    Q.   All right.  And what date is that?

2    A.   March 24, 2011.

3    Q.   And that's one month after the Indictment?

4    A.   Correct.

5    Q.   So from one month after the Indictment, you've already

6    said that David was with you?

7    A.   Correct.

8    Q.   And you knew that you eventually when we had this trial

9    would be a defense witness, you would testify at this trial?

10             MS. DOMINGUEZ:  Judge, these are all leading

11   questions.

12             THE COURT:  I will allow that.

13             THE WITNESS:  Correct.

14             MR. AGUAYO:  Your Honor, I would -- I have the copy

15   of the Notice of Alibi, so I can request judicial notice.

16             THE COURT:  What is the date?

17             MR. AGUAYO:  Judicial notice for on September 28 --

18   I'm sorry, November -- September 12, 2012 was the Notice of

19   Alibi.  It's docket number 505.

20             THE COURT:  Very well.

21   BY MR. AGUAYO:

22   Q.   Now, since -- and in this document, this Notice of Alibi,

23   is your name and your address?

24             MS. DOMINGUEZ:  Judge, lack of foundation that this

25   witness has even seen this document.

```
 1              THE COURT:  She did not prepare that.
 2              MR. AGUAYO:  All right.
 3              THE COURT:  The document is in evidence --
 4              MR. AGUAYO:  All right.  Then I have just one more
 5   question.
 6   BY MR. AGUAYO:
 7   Q.   Since September 12, 2012, has the Government or any
 8   government agent bothered to go see you and ask you about the
 9   alibi defense?
10   A.   No one ever asked me, nor did anyone go to see me.
11              MR. AGUAYO:  No further questions, Your Honor.
12              THE COURT:  Thank you.  Anything else?
13              MS. DOMINGUEZ:  No, Judge.
14              THE COURT:  Thank you very much.  You are now
15   excused.
16              (At 12:18 PM, witness excused.)
17              THE COURT:  Lunch recess.  We will be back hopefully
18   at 1:30.
19              THE WITNESS:  Thank you.
20              COURT SECURITY OFFICER:  All rise.
21              (At 12:18 PM, jury left the courtroom.)
22              (At 12:18 PM, recess taken.)
23              (At 1:46 PM, proceedings reconvened.)
24              MR. AGUAYO:  Your Honor, may we approach?
25              THE COURT:  Of course.
```

1          (Bench conference held.)

2          MR. AGUAYO:  A couple things, Your Honor.

3          THE COURT:  Can I see the Notice of Alibi?

4          MR. AGUAYO:  Yes.  Your Honor, I would like to put

5   this in as an exhibit, as judicial notice under 201.

6          MS. DOMINGUEZ:  We would object, Judge.  We would

7   object, because the cross-examination was directed at the

8   witness's actions, not the attorney's actions.

9          THE COURT:  What I can do is I can give an

10  instruction about the fact that the Rules require notice of

11  alibi, and notice of alibi was given.  I don't know how many

12  of these are going to testify.

13         MR. AGUAYO:  They're all going to testify.

14         THE COURT:  Well, if all testify, I will say you gave

15  notice to them on such and such a date.  That's all.

16         MR. HEGYI:  Your Honor, I would ask that you include

17  the precise language, the exact language that was provided,

18  which is that the person was in the home until the following

19  morning.  Was in the home.  We'd ask that that language be

20  included.

21         THE COURT:  Can I see this copy?

22         MR. AGUAYO:  Of course.

23         THE COURT:  Okay.  Let's cross that bridge when we

24  get there.  If I think that you are entitled to, how do you

25  call it -- you gave notice of alibi without a doubt, and that

1   is something that has to be put in context somehow.  Okay.

2   MR. AGUAYO:  Your Honor, the other thing is, as you

3   know, the -- well you don't know.  We subpoenaed the

4   newspapers, because Jannette Maysonet said, and it came out

5   with the agent's testimony, that she said that she recognized

6   Oquendo in the newspapers, a picture of him in the newspaper

7   after his arrest.

8   Now, we Subpoenaed El Nuevo Dia, and I asked her,

9   those days, the newspapers that were out was El Nuevo Dia,

10  Primera Hora, and El Vocero.  She said yes.  We Subpoenaed El

11  Nuevo Dia, and Primera Hora.  And David's picture is not

12  there.  And that's fine.  We can stipulate to that if they

13  want.  However, the El Vocero which we asked them to give us,

14  the thing is they filed a motion with the Court.

15  THE COURT:  Yes.  I saw the motion, and I understood

16  from the motion that there was going to be agreement.

17  MR. AGUAYO:  Yes, there was.  There was.

18  THE COURT:  Okay.

19  MR. AGUAYO:  So what happened was last night when we

20  arrived at the office, I'll tell you what happened here.  The

21  file with the newspapers, every page is on a separate PDF

22  file.  Someone has been through and through them, but we're

23  missing January 2011.  I spoke to the attorney for Vocero.  He

24  says they have problems with that month.  He just texted me

25  that they don't have it.

```
 1              MR. AGUAYO:  Because I was going to ask the Court to
 2   call Vocero.
 3              THE COURT:  I cannot call Vocero.
 4              MR. AGUAYO:  I just found out.
 5              Maria, please, I don't --
 6              THE COURT:  (Remarks in Spanish.)  What -- the CD
 7   doesn't have it.  El Vocero doesn't have it.  They lost tons
 8   of documents they say.
 9              MR. AGUAYO:  So what I'm going to do --
10              THE COURT:  You have copies of the articles?
11              MR. AGUAYO:  Yes, we have copies of the articles on
12   the disc.
13              THE COURT:  You collected them?
14              MR. HEGYI:  Not the ones that are lost.
15              MR. CHICO:  The ones that are lost, we have to go to
16   the library for them.
17              THE COURT:  That's the only thing you can do.
18              MR. AGUAYO:  My question is, I was hoping to finish
19   today, with that person saying I reviewed all these articles
20   and that picture's not there.  If they have to go to the
21   library, to the archives to look for January, then I can't
22   finish today.  That's the problem I have.
23              We didn't realize that they wouldn't have January --
24   they've been looking at them all night and this morning.
25              THE COURT:  Why don't we cross that bridge when we
```

1  get there, because if all that remains at the end of the day

2  from both sides is that little thing, we can take care of it

3  later.

4          MR. AGUAYO:  Okay.  All right.

5          THE COURT:  Because I have to work on the charge.  We

6  have to meet on the charge.  We can always, you know, ask you

7  not to rest until you get that this week, figure it out.

8          MR. AGUAYO:  Okay.  Fine.

9          THE COURT:  Let's wait to see where we can reach.

10          MR. AGUAYO:  And now what we're going to do, Your

11  Honor, is Mr. Ruhnke's going to interrupt mine in order to put

12  on his.

13          MR. RUHNKE:  It will take ten minutes.

14          MR. AGUAYO:  And then we'll come back and do mine.

15          THE COURT:  No problem.  I told you this morning you

16  can do that.

17          MR. AGUAYO:  Oh, I didn't hear Your Honor.

18          (Bench conference concluded.)

19          COURT SECURITY OFFICER:  All rise.

20          (At 1:51 PM, jury entered courtroom.)

21          THE COURT:  So, Mr. Ruhnke, you're going to call

22  somebody now.

23          MR. RUHNKE:  Yes, Your Honor.

24          THE COURT:  Yes.

25          MR. RUHNKE:  I call Task Force Agent Cristobal

1    Rodriguez.

2              COURTROOM DEPUTY:  Raise your right hand.

3              Do you solemnly swear that the testimony you are

4    about to give in this case is the truth, the whole truth, and

5    nothing but the truth, so help you God?

6              THE WITNESS:  I do.

7              THE COURT:  Very well.

8              MR. RUHNKE:  Thank you.

9                 TASK FORCE AGENT CRISTOBAL RODRIGUEZ,

10          called as a witness by Defendant Candelario Santana,

11          having been sworn, testified as follows:

12                          DIRECT EXAMINATION

13   BY MR. RUHNKE:

14   Q.   Good afternoon, sir.

15   A.   Good afternoon.

16   Q.   Sir, you are an agent of law enforcement?

17   A.   Yes.

18   Q.   What agency are you employed by?

19   A.   Correctional department.

20   Q.   And are you assigned to a task force, Federal task force?

21   A.   Yes, sir.

22   Q.   And in that capacity, did you work on the investigation

23   of La Tombola?

24   A.   I was there.

25   Q.   Okay.  And did you interview witnesses in regard to the

1    La Tombola investigation?

2    A.   Yes.

3    Q.   In particular, did you interview a witness named Amarilys

4    Fonseca Matias?

5    A.   Yes.

6    Q.   And after that interview, were you responsible for

7    preparing an FBI 302 report?

8    A.   Yes.

9    Q.   I'm handing you a document marked Defendant's Exhibit 12.

10   Is that the 302 report that you prepared?

11   A.   A copy, yes.

12   Q.   And feel free to refer to it if you have to refresh your

13   recollection, sir.

14          Okay.  All right.  That interview took place on

15   November 9, 2009; is that correct?

16   A.   Yes.

17   Q.   And during the interview, Ms. Fonseca Matias described to

18   you and another agent what occurred inside La Tombola on

19   October 17, 2009, correct?

20   A.   Yes.

21   Q.   All right.  And one of the things she told you was that

22   at some point during a lull in the shooting, she heard a voice

23   that said in sum and substance, nobody gets out of here alive;

24   is that correct?

25   A.   Yes.

1    Q.   And she also testified -- also told you that she had seen

2    some of the articles of clothing of the shooter; is that

3    correct?

4    A.   Yes.

5    Q.   And did she tell you that she could not identify the

6    people who were doing the shooting, nor could she identify the

7    voice of the man she heard?

8    A.   Yes.

9    Q.   No further questions.

10             THE COURT:  Any cross?

11             MS. DOMINGUEZ:  None.

12             THE COURT:  Thank you.  You are now excused.

13             THE WITNESS:  Thank you.

14             (At 1:56 PM, witness excused.)

15             THE COURT:  Mr. Ruhnke, any additional evidence?

16   Mr. Ruhnke, anything else?

17             MR. RUHNKE:  Yes.  I call Task Force Agent Antonio

18   Nunez.

19             COURTROOM DEPUTY:  Raise your right hand.

20             Do you solemnly swear that the testimony you are

21   about to give in the case now before the Court is the truth,

22   the whole truth, and nothing but the truth, so help you God?

23             THE WITNESS:  I do.

24                 TASK FORCE AGENT ANTONIO NUNEZ,

25        called as a witness by Defendant Candelario Santana,

1          having been sworn, testified as follows:

2                     DIRECT EXAMINATION

3   BY MR. RUHNKE:

4   Q.   Sir, good afternoon.

5   A.   Good afternoon.

6   Q.   Are you a law enforcement agent?

7   A.   Yes, sir.

8   Q.   And what agency do you work for?

9   A.   I work for the Police of Puerto Rico, but I'm assigned to

10  the FBI task force.

11  Q.   And did you work on the investigation of the murders and

12  injuries at La Tombola?

13  A.   That's correct.

14  Q.   And did you on two occasions participate in interviews of

15  a witness named Jose Perez?

16  A.   Correct.

17  Q.   I'm handing you documents marked Defendant's Exhibit 15

18  and 14.  Are those the reports of those two interviews?

19  A.   That's correct.

20  Q.   And am I correct that Mr. Perez was interviewed for the

21  first time on February 2, 2011, and the second time February

22  15, 2011?  If you look at your 302s?

23  A.   The first one was on February 2nd of 2011.

24  Q.   And the second one was on?

25  A.   And the second one, February 15, 2011.

1   Q.   Okay.  All right.  And during those two interviews, was

2   Mr. Perez shown photographs?

3   A.   Correct.

4   Q.   During the first interview, he was only shown one

5   photograph; is that correct?

6   A.   That's right.

7   Q.   And is that the photograph that I'm putting on the screen

8   in evidence as Government's Exhibit 165?  Let me see if I can

9   get this going.  Thank you.

10  A.   Correct.

11  Q.   That's the photograph he was shown; is that correct?

12  A.   Yes, sir.

13  Q.   And during the second interview, was he shown that

14  photograph again as well as an older photograph of

15  Mr. Candelario Santana?

16  A.   Correct.  The one that was first shown to him was the one

17  of him with short hair.  And then this one was shown.

18  Q.   Over these two interviews, am I correct that the witness

19  only saw two photographs?

20          THE INTERPRETER:  In the two interviews?  I'm

21  sorry.

22  BY MR. RUHNKE:

23  Q.   Two photographs -- I'll withdraw it and restate the

24  question.

25          Am I correct that in the course of these two

1   interviews, the witness was shown a total of two photographs?

2   Correct?

3   A.   In the first interview, one photograph was shown.  And in

4   the second interview, two photographs were shown.

5   Q.   And the two photographs at the second interview included

6   the one photograph that had been shown at the first interview,

7   correct?

8   A.   That's right.  That's correct.

9   Q.   Am I correct that he was never shown a photo spread?

10  A.   That's correct.  A photo array was never shown.  He knew

11  the person.

12  Q.   So there was no photo spread shown to him, correct?

13  A.   No.

14  Q.   Is it correct that no photo spread was shown to him?

15  A.   That is correct, it was not.

16  Q.   Thank you.  I have no further questions.

17          THE COURT:  Any question?

18          MS. DOMINGUEZ:  Very, very, very brief.

19          THE COURT:  Very well.

20                      CROSS-EXAMINATION

21  BY MS. DOMINGUEZ:

22  Q.   Sir, why is it that you didn't show Mr. Perez Otero a

23  photo lineup?

24  A.   Because during the interview, he always stated that he

25  knew the person that he had seen that night.  And he called

1  the person by his name.

2  Q.   And who did he identify?

3  A.   Alexis Candelario.  (Witness indicating.)

4  Q.   And when the person that is making the identification

5  indicates to you as an agent that he knows the person and can

6  identify the person by name, is it customary that that person

7  does not need to be shown a lineup?

8  A.   Correct.  A lineup of pictures is not shown to this

9  person, because the person already knows the person.

10  Q.   As opposed to someone who is making an identification

11  when he sees the suspect for the first time during the

12  incident?

13  A.   That's right.  When a person encounters a suspect for the

14  first time, then a lineup of photos is shown to this person.

15  If the suspect is in that lineup, then the person will

16  identify him.

17  Q.   And before you showed him the photograph that Mr. Ruhnke

18  displayed to you, where Alexis Candelario is depicted with the

19  braids, did Mr. Perez Otero tell you that it was Alexis

20  Candelario that he had seen that night at La Tombola?

21  A.   Correct.  He said it -- he said that, and he also said

22  that he was wearing braids, and that he had a beard, and hat.

23  That's why the photo was shown to him, to see if the person

24  was in the same condition as in the picture when the person

25  saw him.

1    Q.   And when you showed him the picture, was he again able to

2    positively identify Alexis Candelario?

3    A.    He identifies him, and he also says that that night he

4    saw him in that same condition.   That is the night of La

5    Tombola.

6    Q.    I have nothing further.

7              MR. RUHNKE:   Nothing further.

8              THE COURT:   Thank you.   Anybody else?

9              MR. RUHNKE:   I have a stipulation to read, Your

10   Honor.

11             THE COURT:   Yes.   Please.

12             MR. RUHNKE:   It's marked --

13             THE COURT:   It's another stipulation.   We don't mark

14   it --

15             MR. RUHNKE:   It is marked.

16             THE COURT:   It is marked.   Okay.   Exhibit --

17             MR. RUHNKE:   It is marked Defendant's Exhibit 16, and

18   I'll read it to the jury if I may, Your Honor.

19             THE COURT:   Sure.

20             MR. RUHNKE:   Okay.   It reads, and I'll zoom in just a

21   bit, the following is hereby stipulated and agreed to by and

22   among the parties to this matter.

23             One, testimony of Noelia Fermin Rijos.   If called to

24   testify as a witness, Noelia Fermin Rijos would provide the

25   following evidence.   She was interviewed by representatives of

1   the FBI on February 11, 2011, and provided the following

2   information.

3          On the evening of October 17, 2009, she arrived at La

4   Tombola at approximately 10:45 PM.  Shortly before the

5   shooting started, she was in the area of the fritters stand

6   when she observed two of the shooters.  She only described

7   one, since once the shooting started, she went to the ground

8   and hid under a cabinet.

9          That individual was described as wearing red and

10  black Air Jordan type sneakers, and a red short-sleeved shirt.

11  He was skinny, had tan colored skin, and wore a bandana around

12  the area of his eyes.

13         The subject looked at the witness and shook his head

14  as if to say no.  He was wearing a black baseball cap with a

15  New York Yankees logo on it.  He was carrying a long, black

16  rifle.

17         The person was someone she had seen in Sector 26

18  driving a Toyota Corola.  The witness was shown photo spreads,

19  each of which contained six photographs.  One photo spread

20  contained a photograph of David Oquendo Rivas.  The other

21  photo spread contained a photograph of Christian Ortiz Rivera.

22  She was unable to identify anyone in either photo spread.

23         And now actually it should read two, testimony of

24  Felix Rivera Rivera.  If called to testify as a witness, Felix

25  Rivera Rivera would provide the following evidence:   He was

interviewed by represents of the Bayamon District Attorney on October 19, 2009.

He was in and out of La Tombola on the evening of October 17, 2009, and at one point had gone home to bathe.  At around 11:30 he observed three men get out of a black car. The driver was carrying a rifle that looked like an AH 15. The front seat passenger was carrying a short weapon with an extended clip.  The rear passenger had a rifle.

The driver was dark skinned, five feet ten inches tall, with a bandana wrapped around his nose and eye area like the motorcyclists wear, with the point of the triangle pointing down.  He was wearing a black cap, a black shirt, and had on long, dark-colored jeans that were old.

The front seat passenger was white, short, wearing a dark hat and a light-colored shirt.  The rear seat passenger was possibly wearing a red shirt and an old hat.

And it's signed and executed by all the parties.  And I offer this into evidence, Your Honor.

MR. HEGYI:  No objection.

MR. RUHNKE:  And that completes my presentation, Your Honor.

THE COURT:  No more evidence?  You're resting.

MR. RUHNKE:  We believe we rest.  I can't imagine what else we'd be doing.

THE COURT:  Okay.  Very well.

1          MR. RUHNKE:  Thank you.

2          THE COURT:  Mr. Aguayo.

3          MR. AGUAYO:  Yes, Your Honor.  The defense calls

4    Angela Urquia Ortiz.

5          COURTROOM DEPUTY:  Raise your right hand.

6          Do you solemnly swear that the testimony you are

7    about to give in this case is the truth, the whole truth, and

8    nothing but the truth, so help you God?

9          THE WITNESS:  Yes, I do.

10          MR. AGUAYO:  May I begin, Your Honor?

11          A N G E L A   V I V I A N A   U R Q U I A,

12       called as a witness by Defendant Oquendo Rivas, having

13       been sworn, testified as follows:

14                        DIRECT EXAMINATION

15   BY MR. AGUAYO:

16   Q.   Madam, what is your name?

17   A.   Angela Viviana Urquia Feliz, with a z on the end.

18   Q.   Pardon the question, but what's your age?

19   A.   47 years old.

20   Q.   Madam, how far did you go in school?

21   A.   I have an Associate Degree in secretarial sciences.

22   Q.   Madam, are you employed?

23   A.   Yes.

24   Q.   Where are you employed?

25   A.   In the Consuega Jewelry Store in Old San Juan.

1    Q.    And how long have you worked there, ma'am?

2    A.    Seven to eight years approximately.

3    Q.    And what do you do there, ma'am?

4    A.    I'm a saleswoman.

5    Q.    Were you working on October 17, 2009?

6    A.    Yes.

7    Q.    Madam, what is your marital status?

8    A.    Divorced.

9    Q.    For how long, madam?

10   A.    Approximately 14 years.

11   Q.    All right.  Do you have any children, madam?

12   A.    Yes.

13   Q.    Would you please name them?

14   A.    Johanna Marie Lopez Urquia, Clayivinet Lopez Urquia, and

15   Jose Luis Lopez Urquia.

16   Q.    Madam, where do you reside?

17   A.    I live in the Las Gaviotas subdivision, Paloma Street

18   E-13, Toa Baja, Puerto Rico.

19   Q.    How long have you resided there, ma'am?

20   A.    From 20 to 21 years.

21   Q.    And who owns that residence?

22   A.    Jose Luis Lopez Guadarama (ph) and Angela Viviana Lopez

23   Urquia.

24   Q.    Would Jose Lopez Guadarama, would that be your

25   ex-husband?

1    A.    Yes.

2    Q.    All right.   Now, before October 17, 2009, who lived in

3    that residence?

4    A.    Angela, me, Johanna Marie Lopez Urquia, Clayivinet Lopez

5    Urquia, Jose Luis Lopez Urquia, David Oquendo, and Jovianette

6    Oquendo.

7    Q.    What is the name?

8    A.    Joviannette.

9    Q.    And who is she?

10   A.    My granddaughter.

11   Q.    And that is the daughter of Johanna and David?

12   A.    Yes.

13   Q.    Okay.   Now, aside from Mr. Oquendo living in your house,

14   did he live somewhere else, also?   Did he spend the nights in

15   some other place?

16   A.    Yes.

17   Q.    Where?

18   A.    At his parents' home.

19   Q.    In terms of staying at your house in relation to staying

20   at his parents' house, where would he stay more?

21   A.    At my home.

22   Q.    And for how long had he been living there approximately?

23   A.    Since Johanna got pregnant.

24   Q.    So that would be what, eight months, a year?   More or

25   less how long?

1   A.   About a year approximately.

2   Q.   All right.   Now, drawing your attention to October 17,

3   2009, do you remember that day?

4   A.   Yes.

5   Q.   And were you working that day?

6   A.   Yes.

7   Q.   What time did you leave for work?

8   A.   8:00, 8:30 in the morning.

9   Q.   And where did you go to work?

10  A.   I went to the Consuega Jewelry Store in Old San Juan.

11  Q.   And what time did you finish work?

12  A.   5:20, 5:30.

13  Q.   And after you left your work, where did you go?

14  A.   I went to buy food.

15  Q.   All right.   And after that what happened?

16  A.   I returned to my home.

17  Q.   When you arrived to your home, who, if anyone, was there?

18  A.   Jose Lopez Urquia, my son.   He was sleeping.

19  Q.   Where was Johanna, Clayivinet, and the baby?

20  A.   They had gone to eat at Vaca Brava.

21  Q.   All right.   Did you ever see Johanna, Clayivinet, and the

22  baby arrive at the house?

23  A.   Yes.

24  Q.   Approximately what time did they arrive at the house?

25  A.   8:00, 8:30, more or less.

1  Q.   All right.  And who, if anyone else, arrived at your

2  house that night?

3  A.   David Oquendo.

4  Q.   By the way, do you see David Oquendo here in the

5  courtroom?

6  A.   Yes.

7  Q.   Can you identify him, please, for the record?

8          THE COURT:  No need.

9          MR. AGUAYO:  All right.  No problem.

10          THE WITNESS:  Okay.

11  BY MR. AGUAYO:

12  Q.   Approximately what time did you see David arrive at your

13  house?

14  A.   9:00, 9:30.

15  Q.   All right.  Do you know how -- if you know, do you know

16  how David arrived at your house?

17  A.   In the SUV that he had at that time.

18  Q.   All right.  And, all right, so David arrives.  What do

19  you recall happened once he arrived?

20  A.   He said hello to those of us that were in the house.  And

21  then he went inside his bedroom and Johanna's bedroom.

22  Q.   Okay.  And when, if ever, did you see him again that

23  night?

24  A.   He went from the bedroom, to the bathroom, to shower.

25  Q.   And after he showered, what did he do, if you recall?

1   A.    He returned to his room again.

2   Q.    All right.  And where did you go, madam?

3   A.    My bedroom.

4   Q.    Okay.  Approximately 11:50 PM, close to midnight, what if

5   anything occurred that you remember?

6         MS. DOMINGUEZ:  I'm sorry, Judge.  Would it be 11:15

7   or 11:50?

8         MR. AGUAYO:  11:50.

9         MS. DOMINGUEZ:  I think the translation was 11:15.

10        THE INTERPRETER:  Interpreter stands corrected.

11  (Remarks in Spanish.)

12  BY MR. AGUAYO:

13  Q.    Do you recall any -- did you hear anything?

14  A.    Yes.

15  Q.    What did you hear, ma'am?

16  A.    A lot of shots.

17  Q.    Did you hear them close or did you hear them at a

18  distance?

19  A.    Close.

20  Q.    Okay.  And what did you do once you heard those shots?

21  A.    Well, when everything became calm, I went out into the

22  hallway and then to the carport.  But in the hallway I

23  encountered Johanna and David.  And Johanna gave the baby to

24  Clayita, and then we went out to the carport.

25  Q.    How much time, ma'am, expired from the time you heard the

1    shots to the time you came out to the hallway?

2    A.    Seconds.

3    Q.    Okay.  So you come out to the hallway, and you see them,

4    and what happens?

5    A.    We went over to the carport.

6    Q.    Okay.  And what did you do there?

7    A.    We were -- we were commenting on what had happened.  We

8    didn't know what it was.

9    Q.    And you're outside the house when -- you said the

10   carport?

11   A.    Still in the carport, not outside yet.

12   Q.    Okay.  And what happened?

13   A.    Nothing.  We just -- we were talking there until

14   everything passed.  And there was a party in the house next to

15   us.

16   Q.    Okay.  So you're talking, talking.  What happens after

17   that?

18   A.    A while passed, and then the man that does the rounds,

19   the security guard of the subdivision came by.

20   Q.    I'm sorry.  Do you know his name?

21   A.    Malave.

22   Q.    Is it Luis Malave, ma'am?

23   A.    Yes.

24   Q.    And you stated -- what was his job?

25   A.    He's the subdivision security guard.

1    Q.    And how long have you known Luis Malave as a security

2    guard?

3    A.    A year or two.

4    Q.    Is he related in any way to you?

5    A.    No.

6    Q.    Do you know if he's related in any way to David?

7    A.    No.

8    Q.    You don't know or he is not?

9    A.    No, I don't know, but I don't think he is related.

10   Q.    All right.  Now, when Malave arrived, how did he arrive?

11   Was he walking or was he driving?

12   A.    He was driving.

13   Q.    All right.  And did he pass your house?

14   A.    Yes.

15   Q.    When he passed by your house, where were you located?

16   A.    In the entrance of the carport.  In the carport.

17   Q.    And where was David and Johanna?

18   A.    Next to me also in the carport.

19   Q.    All right.  And when Mr. Malave passed by your house,

20   what did he do, if anything?

21   A.    He stood still.

22   Q.    And what happened?  What did you see?

23   A.    David and Jose came out to talk to him.

24   Q.    Okay.  And do you know what they talked about?

25   A.    All I heard was that Malave told them that the entrance

1    and exit gate had been closed so that no one in the

2    subdivision would come in or go out.

3            MS. DOMINGUEZ:  Objection, hearsay.

4            THE COURT:  Sustained.  Sustained.

5    BY MR. AGUAYO:

6    Q.   To your knowledge, how long was Malave talking with

7    David?  More or less?  I'm sorry.

8    A.   A while.

9    Q.   Okay.  And what happened, if you saw?  What did Malave do

10   after speaking with David?

11   A.   No, because I went in.  When I saw that everything was

12   calm, I went back into my bedroom.

13   Q.   Okay.  Now, and forgive me, what did you do in the

14   bedroom?  Did you see David again or what did you do?

15   A.   I went in and I went to bed.  Everyone was in the house.

16   Q.   Okay.  Now, Dona Angela, Johanna is your child, correct?

17   A.   Yes.

18   Q.   And she's married to David Oquendo Rivas, correct?

19   A.   Yes.

20   Q.   And the small child, Jovianette Oquendo Lopez is your

21   grandchild?

22   A.   Yes.

23   Q.   And you love all of them?

24   A.   Yes.

25   Q.   My question is, that even though you love them, would you

1    lie for David Oquendo concerning these events?

2    A.   No.  Not for David and not for anyone else.

3    Q.   All right.

4          MR. AGUAYO:  No further questions, Your Honor.

5          THE COURT:  Cross.

6                 CROSS-EXAMINATION

7    BY MR. HEGYI:

8    Q.   Good afternoon, ma'am.

9    A.   Good afternoon.

10    Q.   Do you know David's cousin Christian Ortiz Rivera?

11    A.   I saw him once.

12    Q.   Have you heard David talking about him?

13    A.   Yes, occasionally.

14    Q.   They're close?

15    A.   I didn't see him frequently.  I don't know.  I only saw

16    him once.

17    Q.   You don't know one way or another from your conversations

18    with David?

19    A.   No.

20    Q.   Okay.  Your daughter, are you close with her?

21    A.   Yes.

22    Q.   Do you talk about virtually everything or do you keep

23    secrets from one another, you and your daughter?

24    A.   Well, I understand that she has her privacy, that she's

25    not going to tell me.

1   Q.   Okay.  Did your daughter share with you that about two

2   weeks or so before the La Tombola massacre, she had seen David

3   Oquendo Rivas with a semi-automatic firearm in his SUV?

4                MR. AGUAYO:  Objection, Your Honor.  She never

5   testified to a semi-automatic.  As a matter of fact, she said

6   --

7                THE COURT:  Well let's change the question to

8   pistol.

9                MR. HEGYI:  Okay.

10  BY MR. HEGYI:

11  Q.   Did she ever share with you that approximately two to

12  three weeks before the La Tombola massacre, she had seen David

13  Oquendo Rivas with a pistol inside of his SUV?

14  A.   No.

15  Q.   Did you learn the day that David and his cousin Christian

16  were arrested with the three pistols on October 20th, 2009,

17  two to three days after La Tombola massacre?  Did you learn

18  about it that day or was it sometime after that?

19  A.   I learned about it the day of the arrest.

20  Q.   Okay.  And did you learn that David had taken ownership

21  for the three guns that he and Christian together admitted

22  ownership of those three guns that they were arrested with?

23                MR. AGUAYO:  Objection, Your Honor, as to ownership.

24  They didn't say they owned them.

25                THE COURT:  Well, I will allow the question.  Go

1  ahead.

2          THE WITNESS:  I learned about it through the news.

3  BY MR. HEGYI:

4  Q.   Okay.  Did you have any conversations with David?

5  A.   When?

6  Q.   After he was arrested?

7  A.   No.  Well, when I visited him in jail.

8  Q.   Okay.  Did you ever talk to him about those guns?

9  A.   No.

10 Q.   Did you ever talk to him about the La Tombola massacre?

11 A.   No.

12 Q.   Now, did you ever talk to your daughter about those three

13 guns?

14 A.   No.

15 Q.   Ma'am, when you got home from work, and then going to do

16 shopping, grocery shopping, you say that you got home I think

17 you said at about 8:00 or 8:30 that night; is that right?

18 A.   No.

19 Q.   What time did you get home?

20 A.   7:00, 7:30.

21 Q.   Okay.  I'm sorry.  Then did you see -- you're right.  I

22 beg your pardon.  I wrote it down wrong.

23          You saw your daughter and your -- well, I guess your

24 two daughters and the baby get back at about 8:00, 8:30 that

25 night?

1    A.    That's correct.

2    Q.    Any were you looking at your watch or are you just trying

3    to think back about the approximate time you recall them

4    getting back?

5    A.    I checked the clock more or less.

6    Q.    Okay.  And was there any reason why on a given day, when

7    you were going to work and coming home, that all these years

8    later you would remember what time people came home?  I mean

9    was there a particular reason you were looking at the clock

10   and trying to remember?

11   A.    Yes.  Because I was attentive to the fact that they were

12   not home.  And I am always calling them up.

13   Q.    Okay.  And did you in fact call them up that night?

14   A.    Yes, sir.

15   Q.    And then you mentioned that David -- you know, that --

16   now your family is home, right?  8:00 or 8:30 your family is

17   home, correct?

18   A.    Yes.

19   Q.    Then you felt better because your family's home, right?

20   A.    Yes.

21   Q.    But then you ended up telling us that about nine o'clock

22   or 9:30 that David came to your house?

23   A.    That's correct.

24   Q.    Had you called David between the time you got home and

25   the time David came home?

1    A.    No.

2    Q.    Did you have any specific reason back then on October 17

3    to be trying to remember the exact time that David came home?

4    Was there any reason at all for you to try to remember the

5    exact time?

6              MR. AGUAYO:   Objection, Your Honor.   She has not

7    given an exact time.   She gave an approximation.

8              THE COURT:   Objection overruled.

9              THE WITNESS:   Can you repeat the question, please?

10   BY MR. HEGYI:

11   Q.    Sure.   Did you, back on October 17 of 2009, did you have

12   any reason to try to remember the exact time that David

13   Oquendo Rivas got to your house that night?

14   A.    It's because a short time had passed after the girls had

15   arrived from dinner.

16   Q.    Okay.   So this is just an estimate?   It's that he arrived

17   sometime shortly after, and this is your guess; is that right?

18   A.    Yes, more or less.

19   Q.    Okay.   So this is the best guess that you can come up

20   with these years later, right?

21   A.    Yes.

22   Q.    Now, did I understand you to say that once David got

23   there, that he ended up at one point going into the bathroom

24   to take a shower or a bath?

25   A.    Correct.

131

1   Q.   And then you went to your bedroom; is that right?

2   A.   That's correct.

3   Q.   And I take it that you went to sleep?

4   A.   No.

5   Q.   Were you wide awake the entire night before you heard the

6   gunshots?  Were you awake the entire time?

7   A.   Yes.

8   Q.   Okay.  What were you doing?

9   A.   In bed.

10  Q.   Okay.  What were you doing?

11  A.   Waiting for my other daughter, because her boyfriend was

12  there.  And I was waiting for her to go to the bedroom so that

13  I could go to sleep.

14  Q.   Okay.  Which other daughter is that?

15  A.   Clayita.

16  Q.   So let me -- hang on a second.

17  A.   Clayivinet.

18  Q.   Okay.  So Clayivinet was not home?

19  A.   Yes.

20  Q.   And what time did -- as best you remember, I know we're

21  going just rough guess these years later, but about what time

22  did Clayivinet -- is it Clayivinet Lopez Urquia?  Is that

23  correct?

24          THE INTERPRETER:  U.

25          MR. HEGYI:  U-r-q-u-i-a.

1              THE WITNESS:  That's correct.

2              MR. AGUAYO:  If I may, Your Honor, I think he asked

3     her, so Clayivinet was not home, and she answered yes.  Yes,

4     she was home.

5              THE COURT:  I think you should let him do his

6     cross-examination.

7              MR. AGUAYO:  I'm sorry, Your Honor.  Thank you.

8     BY MR. HEGYI:

9     Q.   All right.  Let me clear that up, though.  I thought you

10    told us that you were staying up because you were waiting for

11    her to get home.  Did I misunderstand that?

12    A.   No.  She was in the house.

13    Q.   Okay.  So with everybody in the house now, why were you

14    saying you were staying up?  I must have misunderstood what

15    you were saying.

16    A.   Because she was in the bedroom with her boyfriend, and I

17    didn't want to go to bed until she came to bed with me.

18    Q.   I see.  And did she ever come to bed with you?

19    A.   Yes, after everything passed.

20    Q.   Okay.  So was that then later in the morning of October

21    18 after you went outside and came back in?

22    A.   Can you please repeat the question?

23    Q.   Okay.  When you say that she did come to bed with you but

24    it wasn't until everything was over, is what you're saying

25    that she was there and she didn't come to bed with you until

1    the next morning sometime?

2    A.    Correct.

3    Q.    And what is her boyfriend's name, please?

4    A.    Concepcion Guzman Perez.

5    Q.    And was he there in your home then at the time when you

6    say you heard the shots being fired?

7    A.    Yes.

8    Q.    And your daughter Johanna would have known that, right?

9    A.    Yes.

10   Q.    Now, when was it that, and I'd like you to be as specific

11   as you can, you heard a series of gunshots, correct?

12   A.    Correct.

13   Q.    And from where you were, did it appear to you that they

14   were coming from the general direction of where Sabana Seca,

15   the La Tombola would be?

16   A.    I didn't know until a short while ago where La Tombola

17   was.   I've never been there.

18   Q.    Okay.  Did the shots seem to you to be close or far away?

19   A.    Close.

20   Q.    Were there few or many shots that you heard?

21   A.    Many.

22   Q.    Now, once that happened, you say you got up and you went

23   into the hallway.   And I'd like for you to -- is that correct?

24   You got up and went into the hallway?

25   A.    That's correct.

1   Q.   And then you said you and your daughter Johanna and David

2   ended up going into I think you said your carport or your

3   garage?

4   A.   And Jose.

5   Q.   Okay.  And then you ended up going from the garage out to

6   the outside of your home?  Do you recall that?

7   A.   I didn't.

8   Q.   Okay.  You never went outside your home?

9   A.   Up to the gate only.

10  Q.   Okay.  Now, when you say the gate, do you mean a gate

11  inside the front door or do you mean the gate out near the

12  street?

13  A.   The carport gate.  It leads to the street.

14  Q.   Okay.  What I want to understand is did you step outside

15  of your -- the front door or the side door of your home and go

16  outside where the gate was and where there might be grass?

17  A.   No.

18  Q.   Okay.  So you always stayed inside of the gated area,

19  which would be what, inside the carport area?

20  A.   Yes.

21  Q.   And did your daughter, Johanna, stay in there with you?

22  A.   Yes.

23  Q.   And did David stay in there with you?

24  A.   At that moment, yes.

25  Q.   Okay.  Did you see David leave from inside the gated

1    carport area where you and Johanna were?

2    A.   He didn't go out until he saw Malave, and then he went

3    out with Jose to see Malave.

4    Q.   Okay.  I'd like for you to give me your -- take a minute

5    and think about it, but I'd like for you to give me your very

6    best estimate as to how long it was from the time you heard

7    the gunshots until you saw Malave.  Until you very first saw

8    Malave.  Was it five minutes?  Was it ten minutes?  Was it 15

9    minutes?

10   A.   More than 15 minutes.

11   Q.   Okay.  How many more?  What's your best guess?

12   A.   25 minutes more or less.  I don't know.

13   Q.   And that's not one of the times that you tried to keep in

14   your mind?

15   A.   No.

16   Q.   Now, could you describe your house for us, please, ma'am?

17   Is it a one-story house, a two-story house?

18   A.   One story.

19   Q.   Okay.  And I think I know the answer to this, but just to

20   be clear, there's no basement in your house, is there?

21   A.   No.

22   Q.   How many bedrooms are there?

23   A.   Four.

24   Q.   How many bathrooms?

25   A.   Two.

```
 1    Q.    And how close is your bedroom to your daughter Johanna's

 2    bedroom?

 3    A.    A minute or less.

 4    Q.    No, I'm sorry.  Are they adjoining?  Are they down the

 5    hall?  Are they the other end of the house?  Where is your

 6    bedroom in relation to Johanna's bedroom?

 7    A.    The distance?  20 feet?

 8    Q.    Okay.  They're not right next to each other, right?

 9    A.    No.

10    Q.    Now, you and your daughter Johanna have talked about this

11    case a lot, haven't you?

12    A.    No.

13    Q.    You've never talked about it at all?

14    A.    We have talked, but we don't go into detail.

15    Q.    Okay.  Let me see if I understand what you're saying.

16    This is the -- this is a very important event for your

17    daughter, isn't it?  This trial?

18    A.    Yes.

19    Q.    She really doesn't want to see David Oquendo Rivas get

20    convicted, does she?

21    A.    No.

22    Q.    And yet you and your daughter don't talk about details

23    about this case as close as the two of you are and living in

24    the same home?

25    A.    Well, we have talked, but not in detail or anything.  We
```

1  don't touch upon the subject, because she has one way of

2  thinking and I have my own way of thinking.

3  Q.   Okay.  Has she tried to talk to you and you've said,

4  honey, I don't want to talk to you?  Or have you tried to talk

5  to her and she said, mom, don't talk to me?

6  A.   No.

7  Q.   You just both independently decided we're not really

8  going to talk about the facts of this case, all on your own?

9  A.   Yes.

10  Q.   The neighbors that you -- I understand you never went

11  outside the gate, but give me the neighbors that you saw.

12  Tell me the names of the neighbors.  You've lived there 20

13  years, right, or more?

14  A.   Yes.

15  Q.   What are the names of the neighbors that you saw that

16  night outside?

17  A.   Okay.  Okay.  I saw the one on the left.  That's

18  Augustin.

19  Q.   What's Augustin's full name?

20  A.   Augustin Diaz.  Can I clear something up?

21  Q.   Sure.

22  A.   The thing is I know Augustin because he's lived there for

23  as long as I have lived there, but many of the neighbors have

24  come and gone.  And I come in and out, and I don't have time

25  for that.

1  Q.   Fair enough.  Understood.  Who else did you see out

2  there?

3  A.   I saw the nephew of the neighbors in front.  I know that

4  his name is Chris, but I don't have any more information.

5  Q.   Does he live there, Chris?

6  A.   No.

7  Q.   Okay.  What is the name of the neighbor that lives in

8  front?

9  A.   I don't know.

10  Q.   Okay.  Who else did you see outside?

11  A.   Chris.

12  Q.   Augustin, Chris, who else?

13  A.   And Jose.

14  Q.   You've already told us about Jose, right?

15  A.   Not my son.  The neighbor in front.

16  Q.   Okay.  So what's the neighbor in front?  Jose, what's his

17  full name?

18  A.   I don't know.

19  Q.   Okay.  Who else?

20  A.   Aside from Malave?

21  Q.   Yes.

22  A.   No one else.

23  Q.   There was no one else aside from Augustin Diaz, Chris,

24  the nephew of your neighbors, and Jose.  And until -- and then

25  ultimately Malave showed up.  So the whole time there was just

1    the four people outside?

2    A.   There were some guests of Augustin's party, but I didn't

3    know those guests.

4    Q.   Okay.  And what's the name of the people who were having

5    the party?

6    A.   Augustin Diaz.

7    Q.   Okay.  So it's that neighbor, Augustin Diaz?

8    A.   Yes.

9    Q.   And were people, were a lot of people coming and going or

10   just a couple of people coming and going to Augustin Diaz'

11   house?

12   A.   I don't know.

13   Q.   Didn't notice?

14   A.   No, I didn't.

15   Q.   Did -- have you ever seen David Oquendo Rivas with any

16   kind of a firearm?

17   A.   No.

18   Q.   Have you ever attended any of the hearings, the Court

19   hearings involving your commonlaw son-in-law David Oquendo

20   Rivas, other than coming today?

21   A.   Yes.

22   Q.   And you were -- did you attend all of them or just some

23   of them?

24   A.   Some.

25   Q.   Okay.  Am I right, ma'am, that up until today, you have

```
 1   never spoken to any prosecutor, any Judge, any law enforcement
 2   officer?  You've never taken it upon yourself to go to them
 3   and tell them what you're telling this jury today; is that
 4   true?
 5   A.   No.
 6   Q.   Is that a true statement?
 7   A.   Yes.
 8           MR. HEGYI:  Thank you, Your Honor.
 9           MR. AGUAYO:  Just as regards that last question, Your
10   Honor.
11                        REDIRECT EXAMINATION
12   BY MR. AGUAYO:
13   Q.   Dona Angela, you were interviewed by a private
14   investigator in this case by the name of Alvin Aponte?
15   A.   Yes.
16   Q.   Okay.  And you gave a statement which you signed,
17   correct?
18   A.   Yes.
19   Q.   All right.  Do you recall that date?
20   A.   No.
21   Q.   If I were to show you this --
22           MR. AGUAYO:  May I, Your Honor?
23           THE WITNESS:  Can I put my glasses on?
24   BY MR. AGUAYO:
25   Q.   Of course, ma'am.  Ma'am, would you look at that and look
```

1   at the date and see if that's your signature on that document?

2   A.   Yes.

3   Q.   And what date is that?

4   A.   March 24th, 2011.

5   Q.   That's one month after the Indictment in this case?

6   A.   Yes.

7            MR. AGUAYO:  Finally, Your Honor, I would request

8   that the Court take judicial notice that in the notice of

9   alibi defense her name was listed, and this was on September

10  12 of 2012.

11           THE COURT:  You're asking me to take notice of what?

12           MR. AGUAYO:  Judicial notice that a notice of alibi

13  was presented to the Court, government.

14           THE COURT:  I said I was going to instruct the jury

15  as to that.

16           MR. AGUAYO:  I understand.  But at that time it was

17  only as to Johanna.  Now it's as to Angela.

18           THE COURT:  As to all of them.  All that will

19  testify.

20           MR. AGUAYO:  Yes, Your Honor.

21           MR. HEGYI:  Your Honor, may I ask one question of

22  this witness?

23           THE COURT:  Sure.

24                        RECROSS-EXAMINATION

25  BY MR. HEGYI:

1   Q.   Ma'am, you understood that your son-in-law was being

2   detained in prison for very serious charges, didn't you?

3   A.   Yes.

4   Q.   You understood that the person that you went to in order

5   to give that statement was a defense investigator in this?

6   A.   Yes.

7   Q.   You didn't come to law enforcement or a Judge or a

8   prosecutor or an Assistant U.S. Attorney or an FBI Agent and

9   tell them?  You went to his defense investigator and told him,

10  right?

11  A.   I didn't go.

12  Q.   When he came to you, you talked to him, right?

13  A.   Yes.

14  Q.   But you never came to a Judge or a prosecutor or an

15  Assistant U.S. Attorney or an FBI Agent or anybody in law

16  enforcement and -- voluntarily went to them and told them, did

17  you?

18  A.   I didn't understand why I should.

19         MR. HEGYI:   No further questions, Your Honor.

20         MR. AGUAYO:   I have just one question, Your Honor.

21                    FURTHER EXAMINATION

22  BY MR. AGUAYO:

23  Q.   Dona Angela, since September 12, 2012, has any

24  prosecutor, any agent come to your house to ask you about

25  these events?

```
 1   A.    No, no one.

 2   Q.    Have they ever bothered to go there to talk to you?

 3   A.    No.

 4   Q.    Thank you.  No further questions.

 5         THE COURT:  Thank you very much.  You are now

 6   excused.

 7         (At 2:57 PM, witness excused.)

 8         THE WITNESS:  Thank you.

 9         MR. AGUAYO:  Your Honor?  May I, Your Honor, the next

10   one?

11         THE COURT:  Yes.

12         MR. AGUAYO:  It would be Clayivinet Lopez Matias.

13         COURTROOM DEPUTY:  Raise your right hand.

14         Do you solemnly swear that the testimony you are

15   about to give in this case is the truth, the whole truth,

16   and nothing but the truth, so help you God?

17         THE WITNESS:  I do.

18         MR. AGUAYO:  May I begin, Your Honor?

19              C L A Y I V I N E T   L O P E Z,

20         called as a witness by Defendant Oquendo Rivas, having

21         been sworn, testified as follows:

22                        DIRECT EXAMINATION

23   BY MR. AGUAYO:

24   Q.    Ms. Lopez, what is your name?

25   A.    Clayivinet Lopez.
```

1  Q.   What is your age?

2  A.   26 years old.

3  Q.   And what is your civil status?  Your marital status?

4  A.   Married.

5  Q.   How long have you been married?

6  A.   Two years.

7  Q.   Do you have any children?

8  A.   No.

9  Q.   How far did you go to school?

10 A.   I am completing my Master's.

11 Q.   All right.  Could you tell us where you went to college?

12 A.   I did my Bachelor's Degree at the University of Puerto

13 Rico, the Carolina campus.

14 Q.   And what did you get your Bachelor's Degree in?

15 A.   In finance.

16 Q.   And subsequent to finishing that, what did you study?

17 A.   I started my Master's Degree at the Interamerican

18 University, the metropolitan campus.  And I am completing it

19 at the University of Southern Florida.

20 Q.   And where do you live, ma'am?

21 A.   In Tampa.

22 Q.   Florida?

23 A.   Yes.

24 Q.   And who do you live with?

25 A.   With my husband and my brother.

1    Q.   All right.  And where do you work, if you work, madam?

2    A.   I work in the company with my husband.  It is a

3    consulting company.

4    Q.   Is that your husband's company?  You're both -- is that

5    the company that belongs to both of you?

6    A.   Yes.

7    Q.   What type of consulting, ma'am?

8    A.   We give consultancy to hospitals when they change from

9    paperwork to computer.  We go to the hospitals and we do

10   training for the doctors and the employees.

11   Q.   Madam, where were you living on October 17, 2009?

12   A.   At E 13 Paloma Street, Las Gaviotas development in Toa

13   Baja.

14   Q.   And with whom did you live there?

15   A.   With my mother, my sister, my brother, my niece, and my

16   brother-in-law.

17   Q.   All right.  And the name of your brother-in-law is?

18   A.   David Oquendo.

19   Q.   Do you see him in this courtroom today?

20   A.   Yes.

21        MR. AGUAYO:  There's no need to identify?  All right.

22   BY MR. AGUAYO:

23   Q.   Now, how long was David Oquendo Rivas -- Johanna is your

24   sister, correct?

25   A.   Yes.

1  Q.   Do you know how long David was Johanna's boyfriend?  Not

2  how long they knew each other.  How long they were as

3  boyfriend --

4  A.   It's been several years.

5  Q.   All right.  Do you know how long David has been Johanna's

6  husband?

7  A.   About five -- about four to five years.

8  Q.   Aside from living in your house, do you have any

9  knowledge as to where David also sometimes spent the night?

10  A.   At his house with his parents.

11  Q.   Okay.  Now, I draw your attention to October 16 --

12  October 17th, 2009.  Do you remember that day?

13  A.   Yes.

14  Q.   And during the day, what, if anything, did you do?

15  A.   During that day we went to Sprint, at Plaza del Sol, to

16  exchange some cell phones.  And after that we moved on to Vaca

17  Brava at Barranquitas.

18  Q.   Was Johanna with you?

19  A.   Yes.

20  Q.   The baby?

21  A.   Yes.

22  Q.   I'm sorry.  And other people?

23  A.   Yes.  My best friend was also with us, as well as her

24  daughter.  And my husband, who at that time was my boyfriend.

25  Q.   All right.  So you go to Vaca Brava.  That's in

1  Barranquitas, correct?

2  A.    Yes.

3  Q.    Approximately what time did you arrive?

4  A.    At about between 3:00 and 4:00 in the afternoon.

5  Q.    And approximately what time did you leave?

6  A.    We have -- it was already becoming evening.  Night was

7  already falling.  I don't remember the time.

8  Q.    All right.  And where did you -- did his -- where did you

9  go, from the restaurant to where?

10  A.    To my house.

11  Q.    Okay.  And approximately what time did you arrive there?

12  A.    It was already night time.  It was already at night.

13  Q.    And when you arrived there, what did you do?

14  A.    When we got there, my best friend took her daughter out

15  of the vehicle, the SUV, and she changed the car seat and put

16  it in her vehicle.

17  Q.    Okay.

18  A.    And we went into the house.  My mom was waiting for us at

19  the entrance door.  At the front door.

20  Q.    And what happened?

21  A.    She scolded us.

22  Q.    And why is that?

23  A.    Because we had gone to Vaca Brava, and we hadn't taken

24  her with us.

25  Q.    All right.  What happened after that?

```
 1   A.    I went into my room.

 2   Q.    To your knowledge, did anyone else arrive at your house

 3   afterwards?

 4   A.    After that, I know that David arrived at home.

 5   Q.    How did you know that David arrived at home?

 6   A.    Because when I was already in my room, I received a phone

 7   call for me to go by their room in order to see a music video.

 8   Q.    Why would David call you on your cell phone if you're in

 9   the same residence?

10   A.    Because in my house, we do not yell out to each other

11   from room to room, nor do we look for each other.  We make our

12   life easier and call on the cell phone.

13   Q.    Okay.  And so David calls you on your cell phone.  What

14   do you do?

15   A.    I went to their room.

16   Q.    And who was in the room?

17   A.    Johanna, Joviannette and David.

18   Q.    Joviannette being the baby?

19   A.    Yes.

20   Q.    And once you go into the room, what happens?

21   A.    David showed me the video.

22   Q.    What type of video?

23   A.    It was a regaton video.

24   Q.    Okay.  And after you saw the video, what did you do?

25   A.    I went back to my room.
```

1    Q.   All right.  Approximately 11:50 PM, going toward

2    midnight, what if anything did you hear?

3    A.   I heard several noises that could be shots, but it could

4    also have been fire crackers.  There were many.

5    Q.   And as a result of hearing that, what, if anything, did

6    you do?

7    A.   I remained in my room.  And Johanna came in to bring me

8    the baby girl.

9    Q.   And after that?

10   A.   I went out in order to verify, to see what was going on.

11   Q.   And who of the family did you see out there?

12   A.   I saw Jose, Johanna, and David.

13   Q.   And your mom, did you see your mom?

14   A.   I don't recall having seen her.

15   Q.   Okay.  But you did see David, correct?

16   A.   Yes.  Yes, I did see him.

17   Q.   And what did you observe?  What did you see?  What

18   happened when you went out?

19   A.   Nothing.  They were outside talking.  I went out and I

20   checked, and I went back in.  I didn't stay outside very long.

21   Q.   Okay.  You were not there -- I ask you, did you see Luis

22   Malave come by?

23   A.   No.  I went in quickly, and I did not go outside of the

24   house.  I stayed at the front door.

25   Q.   How long did you stay at the front door seeing David in

1    front of you?

2    A.    About two to three minutes.

3    Q.    Are you sure it was David?

4    A.    Yes.  I know him well.

5    Q.    All right.  Clayivinet, Johanna is your sister, yes?

6    A.    Yes.

7    Q.    And Jovianette is your niece?

8    A.    Yes.

9    Q.    And David is married to Johanna and is the father of

10   Jovianette, correct?

11   A.    Yes.

12   Q.    All right.  And you care very much and you love your

13   sister and your niece, correct?

14   A.    Yes.

15   Q.    Okay.  Given that the situation of David obviously

16   effects them, would you lie because of that?  Would you lie in

17   this court before these ladies and gentlemen of the jury?

18   A.    I could not lie, because if I were to lie and say that

19   David was at my house and he really wasn't, I would be

20   endangering my niece, because I would be leaving her in the

21   hands of an assassin, a murderer.  And I couldn't do that.

22   Q.    And David was at your house that night?

23   A.    Yes.

24            MR. AGUAYO:  No further questions, Your Honor.

25            THE COURT:  Cross.

CROSS-EXAMINATION

BY MR. HEGYI:

Q.   Good afternoon, ma'am.

A.   Good afternoon.

Q.   You and your sister are close?

A.   Yes.

Q.   Always been close?

A.   Yes.

Q.   Do you tell each other everything or do you keep secrets

from one another?

A.   Well, we are sisters.  We tell each other about -- we

talk about our matters with each other.  There may be some

things that she keeps to herself, as well as there may be some

that I keep to myself.

Q.   Generally speaking, you share everything?  Like most

sisters do?

A.   Yes.

Q.   How about your mom?  Are you close with your mom?

A.   Yes.

Q.   Do you talk about virtually everything with your mom?

A.   Yes.

Q.   Now, did your sister tell you about having seen David

Oquendo Rivas with a pistol in his SUV two to three weeks

before the La Tombola massacre took place?

A.   No.

1    Q.    To this very day, you've never heard that before?   My

2    telling it to you is the first you've ever heard it?

3    A.    Yes.

4    Q.    Now, do you remember when David Oquendo Rivas was --

5    first of all, how well did you know David?

6    A.    We have known each other for several years, but we had

7    never had a close relationship.

8    Q.    Okay.  Did you ever see, meet, or speak to his cousin,

9    Christian Ortiz Rivera?

10   A.    I know several friends of his that are called Christian.

11   I know about -- I know one of them that's Christian, but I

12   don't know if that's his friend.

13   Q.    Okay.  Do you remember that two to three days after the

14   La Tombola massacre, that David Oquendo Rivas was caught with

15   a cousin named Christian?  Maybe you knew him as a friend

16   named Christian.  And that they had together the three of

17   them -- excuse me, the two of them had possession of three

18   pistols?

19   A.    I know that they caught David several days after the

20   matter about La Tombola, and that they also caught Christian,

21   but I do not know the detail about the pistols.

22   Q.    Okay.  The Christian that they caught David with, is that

23   one of the Christian's that you knew was either his friend or

24   his relative?

25   A.    Yes.

1   Q.    And you were aware that David was charged with very

2   serious crimes in this case, right?

3   A.    The charges now related to La Tombola?

4   Q.    Correct.

5   A.    Yes.

6   Q.    And you've known about that, that he's been charged with

7   very serious crimes related to La Tombola for several years,

8   right?

9   A.    When they were filed, yes.

10  Q.    And you've known that those charges have been pending now

11  for several years?

12  A.    Yes.

13  Q.    Now, let me go back for a minute to the night of October

14  17th, of 2009.  Have you and your sister spoken about what

15  happened on October 17, 2009?

16  A.    We have discussed what has come out in the news, but to

17  talk directly like that to each other about what happened,

18  what each one of our experiences lived that night was, no, we

19  haven't touched upon that subject.

20  Q.    Okay.  Have you and your mother spoken about the events

21  of October 17, 2009?

22  A.    The same as with Johanna, we have discussed what has come

23  out about it, but what each of our experiences that evening

24  was, no, we haven't touched upon that.

25  Q.    Okay.  So you and your sister and your mother have never

1    sat down and talked about what your specific recollections

2    were about what happened on September 17, 2009, is that what

3    you're saying?

4    A.   Well, what happens is that what we didn't want was for it

5    to be that the experience that was lived by Johanna, by me and

6    by my mommy, for it to be effected by something that I may say

7    or, that is, to have my recollection be effected by Johanna's.

8    Q.   Okay.  And did you three sit down and have a conversation

9    with each other and say we need to not talk about this,

10   because someday we may be in court and we may be asked about

11   this?  So we, the three of us, need to not talk about what our

12   recollections were?

13          Did you have that kind of a conversation with your

14   sister, or your mother?

15   A.   At no time did we sit down to talk like that.

16   Q.   Okay.  You just each independently came up with this

17   thought on your own?

18   A.   No, but when the subject would be brought up, we would

19   stop it.

20   Q.   Okay.  So if you started to try to talk about it and you

21   started to try to tell what you remembered, your sister or

22   your mother would say stop, stop, don't say anything, we

23   shouldn't talk about this?

24   A.   Yes.

25   Q.   And that happened with some regularity that you would try

1    to talk to them about it and they would say, stop, stop, don't

2    say anything?

3    A.   Not with regularity, because the subject was not

4    discussed much.

5    Q.   Okay.  But it did happen several times?

6    A.   Two or three times.

7    Q.   Okay.  And sometimes it would be you starting to talk

8    about it, and them telling you to be quiet, don't say

9    anything; and sometimes they would start talking about it, and

10   you would be the one that would say stop, don't say anything?

11   A.   Yes.

12   Q.   Now, you know that your sister goes to see David at the

13   jail, at the prison, right?

14   A.   Correct.

15   Q.   She goes there regularly and they talk?

16   A.   Yes.

17   Q.   You know that they talk regularly on the phone as well?

18   A.   Yes.

19   Q.   And does your sister share with you what they talk about?

20   A.   When he says for her to tell me hello.

21   Q.   But nothing other than that?

22   A.   Or something that may be related to my niece.

23   Q.   Okay.  But nothing about this case?  She will not discuss

24   with you anything that David tells her about this case?

25   A.   No.

```
1              MR. AGUAYO:  Objection, Your Honor.  That's presuming
2    that he is talking to her about this case.
3              THE COURT:  Overruled.
4    BY MR. HEGYI:
5    Q.   I didn't hear the answer.
6    A.   No.
7    Q.   Okay.  Now, let's go back to again the night of October
8    17 of 2009.  You said that you heard a series of gunshots, and
9    that you thought for a while or a minute or whatever that it
10   might be fire crackers; is that right?
11   A.   Yes.
12   Q.   And at the time when you heard those gunshots, you were
13   in your own bedroom, correct?
14   A.   Yes.
15   Q.   And you were in your bedroom, with you was your
16   boyfriend?
17   A.   Yes.
18   Q.   Now, without getting into things that we don't need to
19   know about, were you awake or asleep in your bedroom at the
20   time?
21   A.   I was awake watching television.
22   Q.   Okay.  Now, you told us about the -- when you had been in
23   your bedroom earlier in the evening, that you got a phone call
24   from David asking you to come down to your sister's, Johanna's
25   bedroom to watch a movie video; is that right?
```

```
 1   A.   Correct.

 2   Q.   About what time was that that you first got the phone

 3   call from David to go to Joanna's bedroom to watch the movie?

 4   A.   I don't recall the time.

 5   Q.   Okay.  Is your house a big house, a middle size house, a

 6   small house?  It's got four bedrooms, right?

 7   A.   Correct.

 8   Q.   It's got two bathrooms, right?

 9   A.   It has three.

10   Q.   Okay.  Three bathrooms.

11   A.   Yes.

12   Q.   And it's a one story house?

13   A.   Yes.

14   Q.   Is -- where is Johanna's bedroom in relation to the

15   bedroom that you were in that night?

16   A.   My room is inside of the house.  And Johanna and David's

17   room is located in the carport of the house.  They closed off

18   half of the carport, and that was their bedroom.

19   Q.   Okay.  So Johanna's bedroom where Johanna and David were

20   was actually in what used to be the carport?

21   A.   Yes.

22   Q.   And you can get in and out of the carport from outside

23   the house, right?

24   A.   Yes.

25   Q.   Now, when you -- when you got the call to go to Johanna's
```

```
 1    bedroom and you went down there, about how long did you stay
 2    there watching this video?
 3    A.    About two to three minutes.
 4    Q.    That's all?  You didn't stay and watch the video?  You
 5    just came and looked at it for a minute and then left?
 6    A.    I watched the video, and I went back to my room.
 7    Q.    Okay.  So it was a very short video?
 8    A.    Yes.
 9    Q.    And then you went back to the room -- your bedroom where
10    your boyfriend was?
11    A.    Correct.
12    Q.    About how long after that did you hear the gunshots that
13    you thought at first might be fireworks?
14    A.    I don't remember how much time elapsed between the videos
15    and the noise, the sounds.
16    Q.    You don't know whether it was a short time, a long time?
17    A.    No.
18    Q.    Now, once you did hear the gunshots, you said that you
19    got up and eventually you made it to the area of the carport,
20    right where David and your sister's bedroom was, right?
21    A.    No.
22    Q.    You didn't?  What did you do?
23    A.    I went out to the entrance of the house, not the carport.
24    Q.    Okay.  And when you went to the entrance of the house,
25    not the carport, but the entrance of the house, was your
```

1    mother there?

2    A.    I don't recall having seen her.

3    Q.    At all, after the gunshots you don't recall seeing your

4    mom at all?

5    A.    I don't recall having seen her.

6    Q.    Fair enough.  After the -- you heard the gunshots, and

7    you went to the front of the house, not the carport but the

8    front of the house.  Is that where you saw your sister and

9    David Oquendo Rivas?

10   A.    Yes.

11   Q.    And from that point on, the entire time you saw your

12   sister and David Oquendo Rivas, it was in the front of the

13   house, not in the area of the carport where their bedroom was,

14   right?

15   A.    Correct.

16   Q.    And when you were there at the front of the house, did

17   you have occasion to look outside and see if there was anyone

18   outside at all?

19   A.    From where I was standing, you could not see anyone

20   outside.

21   Q.    So is it also fair to say that where Johanna was

22   standing, she couldn't see anybody outside at that time

23   either?

24   A.    Johanna -- Johanna and I were not standing in the same

25   place so as to have me know what she could see or could not

1    see.

2    Q.   But when she was there in the front of the house where

3    you saw her, are you saying she might have had a slightly

4    different view out the door than what the view was you were

5    able to see?

6    A.   Yes, because she was outside, and I was inside.

7    Q.   Okay.  And was David outside the front of the house or

8    inside the front of the house?

9    A.   In front of the house.

10   Q.   Okay.  So he was outside the house?

11   A.   In the front of the house, yes.

12   Q.   Am I correct that at no time, on that evening, did you

13   yourself see the security officer by the name of Malave?

14   A.   I did not see him.

15   Q.   Okay.  Do you remember what time it was that you first

16   saw David on the evening of October 17 of 2009?

17   A.   I don't recall the exact time, but it was about half an

18   hour to one hour after we arrived.

19   Q.   Okay.  And what was he wearing?

20   A.   I don't recall his clothing.

21   Q.   Okay.  If he was bear chested, would you remember that?

22   A.   No.

23   Q.   You wouldn't remember one way or the other?

24   A.   No.

25   Q.   Now, you know that the outcome of this case is very

1    important to your sister, don't you?

2    A.    Correct.

3    Q.    And in fact, it's actually very important to your whole

4    family, isn't it?

5    A.    Correct.

6    Q.    Do you know about how long it was after you heard the

7    fire crackers or the shots that you first saw David Oquendo

8    Rivas?

9    A.    It was quick, because as soon as the noises happened, my

10   sister took me, my niece and went off quickly.

11   Q.    Okay.  Knowing that this case is very important to your

12   sister and knowing this case is very important to your family

13   and to you, too, right?

14   A.    It is important for my family.  It is.

15   Q.    And you knew various hearings were taking place over the

16   last several years in court?

17   A.    Correct.

18   Q.    And did you come to any of those hearings or statuses in

19   court?

20   A.    No.

21   Q.    Despite not coming, you knew that there were hearings

22   that were taking place?

23   A.    Yes.

24   Q.    And at some point you were interviewed by an investigator

25   for David Oquendo Rivas, correct?

```
 1   A.    Correct.
 2   Q.    And he even had you write out a statement and sign it,
 3   didn't he?
 4   A.    Correct.
 5   Q.    But at no time up until today did you ever contact any
 6   Judge, any prosecutor, any Assistant U.S. Attorney, any police
 7   officer, any FBI Agent, nobody in law enforcement, no judicial
 8   officer to tell them what it is that you're coming in here
 9   today and saying, did you?
10   A.    I did not communicate with any of the foregoing.
11   Q.    Okay.
12           MR. HEGYI:   I pass the witness, Your Honor.
13                        REDIRECT EXAMINATION
14   BY MR. AGUAYO:
15   Q.    Madam, when the investigator went to see you, a
16   declaration as such was prepared, a written piece of paper as
17   to what you told the investigator, correct?
18   A.    Correct.
19   Q.    As to what you had seen that night?
20   A.    Correct.
21   Q.    And you signed it, correct?
22   A.    Correct.
23   Q.    Do you recall the date?  If you don't --
24   A.    If I'm not mistaken it was in about 2011.
25           MR. AGUAYO:   Your Honor, may I?
```

1    BY MR. AGUAYO:

2    Q.   Would you look at this document and tell me whether this

3    is the declaration and whether you signed it?

4    A.   Yes, it is.  It has my signature.

5    Q.   And what date is that?

6    A.   I don't know whether it is March 24th or May 24th, 2011.

7    March 24th.

8    Q.   And since September 12, 2012, has any prosecutor or

9    government agent or judicial officer -- well, forget about the

10   judicial officer.  Any prosecutor, any government agent, have

11   they ever bothered to go see you as of September 12, 2012?

12   Has anybody even bothered to go talk to you?

13   A.   No one called me.  No one visited me.  No one contacted

14   me.

15            MR. AGUAYO:  I have no further questions, Your Honor.

16            THE COURT:  Thank you very much.

17            THE WITNESS:  May I withdraw?

18            THE COURT:  Yes.

19            (At 3:43 PM, witness left the stand.)

20            MR. AGUAYO:  I have another short witness, but can we

21   take a short break?

22            THE COURT:  We can take a short break, yes.

23            MR. AGUAYO:  Five minutes?

24            COURT SECURITY OFFICER:  All rise.

25            (At 3:43 PM, jury left the courtroom.)

```
 1              (At 3:43 PM, recess taken.)

 2              (At 4:11 PM, proceedings reconvened.)

 3              THE COURT:  Mr. Aguayo.

 4              MR. AGUAYO:  Yes, sir.  The defense of Mr. Oquendo

 5    calls Luis Malave.

 6              COURTROOM DEPUTY:  Raise your right hand.

 7              Do you solemnly swear that the testimony you are

 8    about to give in this case is the truth, the whole truth, and

 9    nothing but the truth, so help you God?

10              THE WITNESS:  Yes.

11              MR. AGUAYO:  May I begin, Your Honor?

12              THE COURT:  Please.

13                        L U I S   M A L A V E,

14         called as a witness by Defendant Oquendo Rivas, having

15         been sworn, testified as follows:

16                        DIRECT EXAMINATION

17    BY MR. AGUAYO:

18    Q.   Sir, what is your name?

19    A.   Luis Malave.

20    Q.   Sir, what is your age?

21    A.   50.

22    Q.   And what is your civil status, your marital status?

23    A.   Married.

24    Q.   And how long have you been married, sir?

25    A.   18 years.
```

```
1    Q.    Sir, do you have any children?

2    A.    Yes.

3    Q.    How many?

4    A.    One.

5    Q.    Okay.  Sir, were you working for anyone on October 17,

6    2009?

7    A.    Yes.

8    Q.    Who were you working for?

9    A.    For the Martinez Enterprises.

10   Q.    And what is the Empresas Martinez?

11   A.    A security company.

12   Q.    And when did you start, sir?

13   A.    I don't exactly remember.  I worked with them for about

14   ten years.

15   Q.    All right.  And while -- through October 17, 2009, where

16   were you giving service for Empresas Martinez?

17   A.    In Las Gaviotas development or subdivision.

18   Q.    And what was your shift, sir?

19   A.    The night shift.  It was from 9:00 in the night till 5:00

20   in the morning.

21   Q.    And what were your duties, sir?

22   A.    I had to do preventive rounds throughout the community of

23   Las Gaviotas.

24   Q.    And, sir, is Las Gaviotas a closed gated community?

25   A.    Yes.
```

1    Q.    And how big is Las Gaviotas?  How many streets?  How many

2    blocks?

3    A.    It has four streets in the center, in the middle, one in

4    the rear part, and there is one in the front where the

5    security post is.

6    Q.    Now, sir, when you say that you give security -- I'm

7    sorry, security rounds, rondas (ph), do you do security

8    rounds?

9    A.    Yes.

10   Q.    All right.  And how often would you give those rounds?

11   A.    Well, it would depend.  Usually 30 to 35 minutes,

12   depending on whether I would have to, for example, hand out

13   documents to the residents or carry out some job for the

14   administration of Las Gaviotas.

15   Q.    I'm sorry.  Sir, do you know David Oquendo Rivas?

16   A.    I know him, yes, as a resident of Las Gaviotas.

17   Q.    Do you see him here today?

18           THE COURT:  No need.  No need to do that.

19           MR. AGUAYO:  Okay.

20   BY MR. AGUAYO:

21   Q.    How long have you known David Oquendo Rivas?

22   A.    The time that I saw them there at Las Gaviotas

23   development.

24   Q.    Approximately how much time?

25   A.    About a year and a half approximately.

1   Q.   Do you know where David Oquendo lived in Las Gaviotas?

2   A.   Yes.

3   Q.   Where?

4   A.   At Angela's house.

5   Q.   Would that be Angela Urquia?

6   A.   Yes.

7   Q.   Okay.  Do you know who else lived with David in that

8   house?

9   A.   The wife, David's wife, the baby and Jose.

10  Q.   All right.  Do you know, that would be Johanna, the wife?

11  A.   Yes.

12  Q.   And how about her other sister, Clayivinet?

13  A.   No.  I met her now.  I had not met her before.

14  Q.   Okay.  Now, sir, on October 17, 2009, when, if ever, did

15  you see David Oquendo?

16  A.   Between 9:00 and 9:15 in the evening when I started my

17  shift.

18  Q.   Did you have a chance to talk with -- where did you see

19  him?  I'm sorry.  Where did you first see him?

20  A.   He came into the subdivision in his personal vehicle, a

21  Ford Explorer.  He greeted me in -- he greeted me, and he

22  asked me if everything was okay.  And I greeted him, and I

23  said that my shift had started a few minutes before.

24  Q.   Did he look nervous?  Did he look upset?  Did he look

25  calm?  How did he look?

1  A.   (Remarks in Spanish.)

2           MS. DOMINGUEZ:  Objection, hearsay.

3  BY MR. AGUAYO:

4  Q.   All right.  Without telling us what he said, what you

5  saw, did he look normal?  Did he look upset?  Did he look

6  nervous?  Just what you saw.

7  A.   No.  He looked tired.  He looked exhausted, as if he had

8  worked.

9  Q.   Now, how long did you talk to him when you saw him coming

10  in through the gate?

11  A.   Just some minutes.

12  Q.   Okay.  And after he spoke with you, where did you see him

13  going, if you saw him at all going anywhere?

14  A.   I saw that his vehicle went towards the street where he

15  lives.

16  Q.   Okay.  Now, at any time subsequent to that, did you do

17  ronda?

18           THE INTERPRETER:  A round.

19  BY MR. AGUAYO:

20  Q.   Thank you.

21  A.   Yes.

22  Q.   All right.  And did you have the occasion to pass by

23  where David Oquendo lived?

24  A.   Yes.

25  Q.   All right.  Did you see David Oquendo during that round?

```
1   A.    No.

2   Q.    Did you see his vehicle?

3   A.    Yes.

4   Q.    Did you notice where it was parked?

5   A.    Yes.  Near his residence.

6   Q.    Were there other cars in front of the house?

7   A.    Yes, there were more vehicles in front of the house.

8   Q.    Okay.  Now, late that night, close to midnight, 11:50, 12

9   o'clock midnight, what, if anything, happened?  What, if

10  anything, did you hear or see?

11  A.    I heard shots.

12  Q.    A few shots or a lot of shots?

13  A.    Pretty many.  Quite many.

14  Q.    How did you know they were shots?

15  A.    In the beginning, the sound was similar to fireworks.

16  Q.    And then how did you determine that it was gunshots?

17  A.    It started, it was heard as if it was a spray of fire,

18  that was what was heard.

19  Q.    Go on, sir.

20  A.    And it lasted for a lapse of time, and in the end I came

21  to realize that there were shots from firearms, because the

22  last shots that were heard were like those of automatic

23  weapons.

24  Q.    Okay.  And what if anything occurred?  What if anything

25  occurred after you heard those shots?
```

1    A.    I communicated with the area State Police.  And Agent

2    Melisiano was at that time the duty officer in the police

3    station.  (Remarks in Spanish.)

4              THE COURT:  Without telling us what she said to you

5    after the phone call --

6              THE INTERPRETER:  Your Honor, do I interpret the

7    answer?

8              THE COURT:  Up to there, yes.

9              THE WITNESS:  And I communicated with her and she

10   told me --

11   BY MR. AGUAYO:

12   Q.    Okay.  Without going into what she told you, after you

13   spoke with her, what happened, what if anything did you do

14   concerning the gates?  You said it was a closed community.  It

15   had gates, correct?  It was a closed community?

16   A.    Uh-huh.

17   Q.    Okay.  There's one gate for entry and one gate for exit,

18   correct?

19   A.    Yes.

20   Q.    And what, if anything, did you do concerning those gates?

21   A.    I stayed behind the post in the corner where I always

22   stood after I completed a round.

23   Q.    Were the exit gates deactivated?

24   A.    No.

25   Q.    Okay.  And what happened?  What did you do?

1   A.   I stayed there to pay attention to the entry gates.

2   Q.   And approximately how long were you there?  More or less.

3   A.   I'd say approximately 45 minutes.

4   Q.   All right.  And what did you do after that?

5   A.   After that, I commenced to do my rounds again.

6   Q.   And during those rounds, did you see David Oquendo?

7   A.   Yes.  He stopped me.  And his wife was there, too, with

8   the baby.  And he was wearing a short -- shorts, like jean

9   type shorts, without a shirt.

10          MS. DOMINGUEZ:  Objection as to what they said.

11          THE COURT:  Yes.  Sustained.

12          MR. AGUAYO:  Okay.

13          THE COURT:  No hearsay, please.

14          MR. AGUAYO:  No problem, Your Honor.

15   BY MR. AGUAYO:

16   Q.   Without telling us what David or Johanna or anybody else

17   told you, what if anything did you tell them?

18   A.   That I didn't know with certainty what it is that had

19   happened out there.  That there had been some shooting, but

20   that it was not known yet what had really happened.

21   Q.   While -- okay.  Let's go back just a second.  While you

22   were waiting -- while you were waiting at the outside of the

23   guardhouse, as you said, you were standing in the corner, did

24   you see any cars enter or exit?  After the shooting that you

25   heard.

```
 1   A.    Yes.  A black vehicle approached, but it did not come in
 2   at any time.
 3   Q.    What did it do?
 4   A.    (Remarks in Spanish.)
 5   Q.    Okay.
 6   A.    It went in reverse, the vehicle.  And then it went up to
 7   the light.
 8   Q.    Okay.  So let's go back to Mr. Oquendo.  So you see David
 9   Oquendo with Johanna, yes?
10   A.    Yes.
11   Q.    Okay.  And you stop and you speak with -- and you stop
12   and you speak with David, correct?
13   A.    Yes.
14   Q.    And how did David look?  I mean, did he look nervous?
15   Did he look agitated?  Did he look normal?  How did he look?
16   A.    He looked serene.
17   Q.    Okay.  And you mentioned something about his clothes.
18   What did he have on in this part of the body?  In the lower
19   part of his body.
20   A.    Yes, some jean shorts that go a little bit below the
21   knees.
22   Q.    Okay.  And did he have a shirt on or no shirt on?
23   A.    He was without a shirt on.
24   Q.    Okay.  And how long did you speak with him, sir?
25   A.    Just some minutes.
```

1    Q.   And then where did you go?

2    A.   I continued with the round.

3    Q.   Okay.  Now, sir, do you remember accompanying me to make

4    a video of Las Gaviotas and our private investigator Alvin

5    Aponte?

6    A.   Yes.

7    Q.   Okay.  And what were we filming?

8    A.   At first what we were filming in the video was the way I

9    did the rounds in the inside perimeter.  The second take was

10   to do the whole inside perimeter.  And the third round was to

11   cover the outside perimeter.

12   Q.   Okay.  Now, did you have the opportunity to view that

13   video before you came to testify here?

14   A.   Yes.

15   Q.   And was that video, what's depicted in that video the

16   same thing that you saw that we were filming?

17   A.   Yes.

18   Q.   All right.

19          MR. AGUAYO:  Your Honor, at this time I'd like to

20   put on the video if I can?

21          THE COURT:  Very well.

22   BY MR. AGUAYO:

23   Q.   Sir, I want you --

24          COURTROOM DEPUTY:  No, no.  I will do it.

25          THE COURT:  She'll do it.

```
1              COURTROOM DEPUTY:  There you are.

2    BY MR. AGUAYO:

3    Q.   All right.  The date -- sir, the day that we made this

4    video, do you recall, was December 11, 2012?

5    A.   Yes.

6    Q.   All right.  Sir, the events of La Tombola were on October

7    17th, 2009.  We did the video on December 11 of 2012.  Were

8    the structures that we're going to see in the video, were they

9    all there in October of 2009?

10   A.   Except for this entry and exit, tele-entry, it was not

11   there at that time.

12   Q.   Aside from that, of the structures, were they there?

13   A.   Yes.  And the rest of the homes, they look more or less

14   the same as when I was working there.

15   Q.   All right.

16              MR. AGUAYO:  Excuse me.  Could you put this so I can

17   see it, also?

18              COURTROOM DEPUTY:  Touch the screen.

19              MR. AGUAYO:  Okay.  Thank you.

20   BY MR. AGUAYO:

21   Q.   The first one is how you did your rondas, correct?

22              THE INTERPRETER:  Rounds.

23              THE WITNESS:  I would start here in this middle or

24   center street in front of the guard post.

25   BY MR. AGUAYO:
```

1  Q.   All right.  Stop there.  What is that vehicle there?

2  A.   That is the vehicle that was used to do the rounds in the

3  subdivision.

4  Q.   Continue, please.  Stop there.  And what is this that

5  we're seeing where the cars are coming in?

6  A.   That is the security guard post.

7  Q.   Continue, please.  All right.  Please explain to us as

8  the film is on, what is this?

9  A.   This is the center street.  And the guard post is in the

10  middle, and that's where I usually start my round in this

11  middle street.  This one in the center is Reyal Street if I'm

12  not mistaken.

13  Q.   And why are those garbage cans out in the street?

14  A.   It must have been that the garbage truck came at dawn to

15  pick up the trash.

16  Q.   Okay.  Now where are we turning?

17  A.   I don't recall the name of this street, but in the end of

18  it there are tennis courts.

19  Q.   Okay.

20  A.   Facing tennis courts.

21  Q.   Stop it for a second, please.  Now, there's a fence

22  there, correct, in front?

23  A.   Yes.

24  Q.   And behind there that is the tennis court fence?

25  A.   Yes.

1    Q.   Okay.  And approximately how tall is the first fence that

2    you see?

3    A.   Above six feet.

4    Q.   And what about the cancha -- the tennis court fence?

5    A.   It's much higher really.

6    Q.   All right.  Let's continue.  And what's behind that

7    fence?  Is that another Urbanization?  Stop it.

8    A.   Yes.

9    Q.   Okay.  And what is this that we're seeing here?

10   A.   Okay.  I would get down and I would go in this gate.  And

11   I would check all around the tennis courts.

12   Q.   Okay.  Continue, please.  All right.  Where are we going

13   now?

14   A.   We're going here to the left.  We are going toward the

15   basketball court, and the administration offices.

16   Q.   Okay.

17   A.   Which is this that the camera's taking now.  I would get

18   down here and go through this gate and check the whole

19   basketball court and the administrative offices.  And I would

20   also check the locks of differential smaller houses that

21   contained tables and chairs for activities.

22        Here we turn a left.  You get to this small part of

23   the street.  It has no exit.  And you turn here.  And all of

24   that part of that perimeter is checked.

25        After that, you return to the Main Street where we

1    started the round.  This is a security pick up, and this is

2    where we start the round, in that middle street.  And then we

3    go on to the next street, and we take a right.

4    Q.   And what street is this?

5    A.   If I'm not mistaken, that's Paloma Street.  The previous

6    street from where we came out, if I'm not mistaken, that's

7    Phoenix.

8    Q.   Okay.  Keep going.  This is Paloma Street where David

9    lived with Johanna and the baby?

10   A.   Yes.

11   Q.   Keep going, please.  Okay.  Stop it.  Do you see where

12   David used to live?

13   A.   Yes.

14   Q.   Could you stand up and point it out so the ladies and

15   gentlemen of the jury could see, please?  There's a screen

16   behind you.

17   A.   Yes.  Here.

18   Q.   Okay.  And is that where you saw David that night?

19   A.   Yes.

20   Q.   All right.  Continue.  Continue.

21        All right.  So this would be the house, that one

22   that's -- stop.  Show me again where David and Johanna lived,

23   please?

24   A.   (Witness indicating.)

25   Q.   Okay.  And where did you see David and Johanna that

1    night?  If you could just turn around and point it out?

2    A.   Here in front of the residence.

3    Q.   Okay.  Keep going.  Okay.  Now, David's vehicle, when you

4    went around, did you find it in the same place?  Stop.  Where

5    did you see David's vehicle parked?

6    A.   In general, that SUV was parked here.

7    Q.   Okay.  And that night when you did your round, did you

8    see that vehicle parked there?

9    A.   Yes.

10   Q.   And when you spoke with David and Johanna, did you see

11   his vehicle still parked in the same place?

12   A.   Yes.

13   Q.   Okay.  Let's continue, please.  Where are we going now,

14   sir?

15   A.   We take a left, and we're going to go to the last street.

16   Q.   Excuse me.  I lost my --

17            COURTROOM DEPUTY:  Touch the screen.

18            MR. AGUAYO:  Okay.  Thank you.

19   BY MR. AGUAYO:

20   Q.   Now where are we going, sir?

21   A.   Well, one would stop here in this small part of the

22   street.  There's hardly any space there to turn.  One would

23   verify the perimeter there, and then one would continue on

24   with the round.  From there, we would go on to where the round

25   was started.

1    Q.   And that would be the casita on the right-hand side?

2    A.   Yes.  Can you stop it there?  A little before.  Stop

3    there.  That's the tele-entry that I mentioned before.  It has

4    some buttons, and you press the code and it allows you to exit

5    the subdivision.  But at that time that tele-entry wasn't

6    there.

7    Q.   Okay.  Let's talk a little bit about this.  If a visitor

8    wanted to come in, into the Urbanization, how would he gain

9    access to that -- to the urbanization?

10   A.   That same tele-entry you see there, there's one on the

11   outside.

12   Q.   Is that in October of 2009?

13   A.   Yes.

14   Q.   Okay.  Go on, please.

15   A.   Well, the visitor would use the tele-communicator, and

16   would communicate with the resident.  And the resident would

17   then press a code in the phone at the home, and would allow

18   the visitor to enter that way.

19   Q.   Okay.  And what would happen if this would be a landline

20   phone?

21   A.   Not necessarily.  It could be a cellular phone, too.

22   Q.   Okay.  Now, that's if it's a visitor.  What happens if

23   it's a resident?  How do the residents have access to come in?

24   A.   With the beeper.

25   Q.   Okay.  Now, let's talk about the salida, the exit, all

1   right?  How would the resident -- well, how would a visitor be

2   able to exit?

3   A.   If it's before 12 midnight, the vehicles get close to the

4   gate and there's a sensor there.  And then the gate will open.

5   Q.   And what would happen after midnight?

6   A.   After 12 midnight, I would disconnect current, electrical

7   current to that gate.

8   Q.   And how would a person be able to leave?

9   A.   Before, if -- if I wasn't there at that corner where the

10  pick-up was, the person would have to -- if I was doing the

11  round in that pick-up, the person there at the exit gate would

12  have to wait until I arrived.

13          You'd first take down their information, which house

14  the person had been at, information would be taken down,

15  vehicle registration, the model, the color.  Then the person

16  would be allowed to leave.

17  Q.   What about if it were a resident?  If it was a resident

18  before 12:00 AM, how would they be able to get out?

19  A.   Information was taken down, too.  It was the order of the

20  administration.

21  Q.   All right.  Let's go through that.  If I'm a resident and

22  it's before 12:00 in the morning, before you take off the

23  electricity, do I go out just as any visitor would, that would

24  go by you with your vehicle and the gate would open?

25  A.   Yes.

```
1    Q.   And if I'm a resident and I want to leave after 12:00 AM,
2    after midnight, you stated that you cut the electricity.  How
3    would a resident get out?
4    A.   Well, if I wasn't at the corner, the person would have to
5    wait until I got back.
6    Q.   And what about the data, what would you take concerning
7    the resident, if any?
8    A.   Name, license plate number, model and the color.
9    Q.   Okay.  Now, the next part of the video you stated was
10   about what?  The perimeter of the Urbanization, correct?
11   A.   Yes.  The first part.
12   Q.   Can you play it?
13             MR. CHICO:  This is the end of the first part.
14             MR. AGUAYO:  Okay.  Let's go to the second part then.
15   BY MR. AGUAYO:
16   Q.   Now, sir, is it correct here what we're showing is the
17   perimeter of the Urbanization to show the ladies and gentlemen
18   of the jury how this Urbanization is enclosed?
19   A.   Yes.  We were traveling the whole perimeter.
20   Q.   Behind those houses, what is there, other houses, a wall,
21   or it's open?  What's behind there?
22   A.   They have fences or walls.
23   Q.   Are the walls made of cement?
24   A.   Yes.
25   Q.   And how high are they, sir?
```

1    A.    Above six feet.

2    Q.    All right.  And what is behind these houses, sir?

3    A.    Over here a wall, on this side.  There's also an

4    apartment complex also known as Las Gaviotas.  And it also has

5    a fence, a pretty high one in that area.

6              Can you stop it?  These houses in front, they are of

7    another complex, not apartments, homes.  Behind the -- behind

8    this house that I see in the front are other houses, and they

9    have a pretty high wall.

10   Q.    All right.  Continue, please.

11   A.    That's a tennis court area.

12   Q.    You've already told us it has a pretty high fence,

13   correct?

14   A.    Yes.

15   Q.    And these houses to the right, what's behind them?

16   A.    A wall and homes.  And they have nothing to do with Las

17   Gaviotas subdivision.

18   Q.    And those walls at the perimeter, are they high also,

19   those houses?

20   A.    I'm sorry?  The question again?

21   Q.    Are the walls behind those houses, are they high?

22   A.    Pretty high.  We go to the end of the street.  These

23   houses on the right, there's a wall behind them, and it

24   divides the homes from a housing project back there.

25   Q.    And are the walls behind those houses, are they also

1    high?

2    A.    Yes, quite high.   Behind those houses it's above six

3    feet.

4    Q.    Okay.

5    A.    Stop there a moment.   That house that there is in front,

6    there's a wall behind them, and then behind that is the Main

7    Street to enter into the subdivision.

8    Q.    Sir, could you stand up and look to your right-hand side?

9    Are there houses down that little road?

10   A.    These homes that I'm facing, they have walls or fences.

11   Q.    Okay.   And that little road that you see going off to

12   your right?

13   A.    This?

14   Q.    Yes.   Are there houses back there?

15   A.    This part over here is part of the housing project.   And

16   on this corner house, that's where the wall starts and it goes

17   down.

18   Q.    The separation between that house and the residencial, is

19   there also a wall there?

20   A.    There's also a fence there.

21   Q.    Is it high?

22   A.    Above six feet.

23   Q.    All right.   Let's continue.   And behind these houses that

24   you see here on the right-hand, what's behind that?

25   A.    Those houses have fences.

1    Q.    Are those cement walls or chain link walls?

2    A.    Cement.

3    Q.    Okay.  Now, we get back to the guardhouse, and we'll go

4    to the third one.  The third and final video.  Now, you stated

5    that the third one was the perimeter outside Las Gaviotas,

6    correct?

7    A.    Yes.

8    Q.    Okay.  Again, please.

9    A.    Stop there.  That bar that you see on the right, in this

10   wall that we see in the front here, that's the entry, the

11   tele-entry for the entrance for the visitors when they come.

12   The visitor will communicate with the resident, and the

13   resident will authorize and open from the residence.

14   Q.    All right.  Can we continue, sir?

15   A.    Yes.

16   Q.    Okay.  And what do you see on the top of these -- go back

17   a second, Chico, please.  Chico.  Well, go.  Go.  Continue.

18   Continue.  I'm sorry.  Okay.  What do you see on top of these

19   walls?

20   A.    The white part?

21   Q.    They're like spikes, are they not?

22   A.    Those are Christmas lights.

23   Q.    On top of that.

24   A.    Oh, yes, those are spikes.

25   Q.    All right.  Can we continue, please?  Now, those spikes

1    are on some parts of the walls and in others there's not,

2    correct?

3    A.   Yes.

4    Q.   Okay.  So now what are we seeing here to the left hand

5    side?

6    A.   That's the wall, and then a part of it is Las Gaviotas,

7    and then part of it is the apartments that are adjacent to Las

8    Gaviotas.  It ends here in front of this Ford pick-up.  It has

9    a serpentine, and it comes together, the apartments and the

10   houses.  It goes all over.

11        MR. AGUAYO:  Your Honor, I have to apologize.  I had

12   a little problem backing up here, so it might take a little

13   while.

14   BY MR. AGUAYO:

15   Q.   Is that the serpentine wire?

16   A.   This is the wall for the Las Gaviotas apartments.  It's

17   quite high.  It will have eight to ten feet in that area.  Ten

18   feet high.

19        Stop.  There.  From that corner on, that ends where

20   the trash bins are.  Employees are doing repairs.  And that

21   has an entrance to the apartment complex.  And the wall is

22   quite high in that area.

23        MR. AGUAYO:  Chico, can you just give a little bit,

24   fast forward, because I just kept going back and forth with

25   the car.

1  BY MR. AGUAYO:

2  Q.   Okay.  So here we have the same scene, but I'm just

3  backing out, correct?

4  A.   Yes.  That which we see on the left is a wall.  It's

5  painted in peach color.  That wall belongs to Las Gaviotas,

6  and it's quite high.

7  Q.   And the houses that you see there are the houses that

8  come up immediately after the wall?

9  A.   Yes.

10  Q.   So you would have a wall, and immediately thereafter you

11  would have the house, the structure?

12  A.   Yes.

13  Q.   Okay.  Where are we now?

14  A.   We're going towards the light.

15  Q.   All right.  So we've already passed the walls of Las

16  Gaviotas, correct?

17  A.   Yes.

18  Q.   And what we're going to do is go around Las Gaviotas to

19  see the perimeter, right?

20  A.   Yes.

21  Q.   What do we have here on the right?

22  A.   This is the housing project.

23  Q.   Okay.  And that housing project is adjacent to Las

24  Gaviotas, correct?

25  A.   It is adjacent to Las Gaviotas.

1   Q.   So the wall from this housing project to Las Gaviotas, is

2   there a wall inbetween?

3   A.   What you see, this group of apartments, well behind them

4   there is a wall.  That wall goes through all the way until

5   that post that you see painted in green, painted after in

6   green.

7   Q.   And behind these houses to the right, there's also

8   another wall that divides this housing project with Las

9   Gaviotas, yes?

10  A.   Yes.  These are the homes of Las Gaviotas over there, and

11  the fence is there.

12  Q.   How many fences do we have here dividing Las Gaviotas

13  from the residential area?  From the other residential area.

14  A.   There are two fences, and they're above six feet high.

15  Q.   Please continue.

16  A.   We are going here towards the exit.

17  Q.   This is where we exit?

18  A.   Yes.

19  Q.   And where do we go from there?

20  A.   Towards the right.  What you see here, we're going to

21  pass the white wall, and then it turns peach.  That peach wall

22  belongs to the homes.  It has nothing to do with Las Gaviotas

23  subdivision.  It belongs to another group of homes that has

24  another name.

25  Q.   But here we're trying to show what's all around Las

```
 1  Gaviotas, correct?

 2  A.   Yes.  That's the National Guard in Sabana Seca.

 3  Q.   And now?

 4  A.   You take a right.  We are still by the grounds of the

 5  National Guard.  All those immediately -- and we are passing

 6  it now.  That's the Municipal Police station.  And we begin to

 7  see the Las Gaviotas apartments here.

 8  Q.   And those apartments are adjacent to the Urbanization,

 9  correct?

10  A.   Yes.

11  Q.   With the tennis court we saw previously?

12  A.   And also the basketball court and the administration

13  offices.

14  Q.   And of course all this has walls, correct?

15  A.   Stop there.  (Remarks in Spanish.)

16  Q.   Yes.

17  A.   This is -- this where this wall ends, that's the Las

18  Gaviotas apartments perimeter, the one that we traveled when

19  we got to that end where we could barely turn.

20  Q.   Okay.  Continue, please.

21  A.   We continue on.  Now we are going to approach the

22  intersection where the medical emergency offices of Toa Baja

23  are.  You see the ambulances here.

24       And we turn to the right.  We take another right

25  here at the corner.  And then we go toward the front and the
```

1  end.  And we get to the Las Gaviotas subdivision again.  We

2  are approaching once again the front of the Las Gaviotas

3  subdivision.

4  Q.   All right.  That's it.  Sir, I just have two more

5  questions for you.  You stated that you're not related to

6  David Oquendo, correct?

7  A.   No.

8  Q.   Do you have any reason to lie on his behalf?

9  A.   No.

10          MR. AGUAYO:  No further questions, Your Honor.

11          THE COURT:  Cross.

12          MS. DOMINGUEZ:  Briefly, Your Honor.

13          THE COURT:  Please.

14                      CROSS-EXAMINATION

15  BY MS. DOMINGUEZ:

16  Q.   Good afternoon, sir.

17  A.   Good afternoon.

18  Q.   I'd like to ask you just a few questions about the

19  security system you had at the development.

20  A.   Yes.

21  Q.   As I understand your testimony, after 12:00 AM, in order

22  to exit, anyone, visitor or resident, needs to be let out by

23  the security guard on duty?

24  A.   Yes.

25  Q.   Is that correct?

1  A.   Yes.

2  Q.   But the same is not true to come into the development?

3  Is that correct?

4  A.   Yes.

5  Q.   It is correct?

6  A.   Yes.

7  Q.   So a resident with either a beeper or with the code, the

8  access code, could come in at any hour without having to check

9  in with the security guard on duty?

10  A.   Yes.

11  Q.   In fact, there may not even be a security guard on duty

12  there because the security guard could be doing the rounds?

13  A.   Yes.

14  Q.   Now, let me ask you, sir, have you had, during the time

15  that you're a security guard at this development, which I

16  think you said was about a year and a half, did you have any

17  burglaries in that development?

18  A.   Situations with residents, persons that would hear noises

19  in the back part, the patios of their houses.  You would go

20  and investigate in order to verify that everything was fine.

21  But major things during my shift, generally speaking no.  Many

22  things like that didn't happen.

23  Q.   Now, could you explain to us, sir, under what

24  circumstances you would have to register someone who was

25  coming into the development?

1    A.    If the resident was not at home, for example, I would

2    approach the person.  The person would say to me, I am calling

3    through the tele-entry.  No one is answering for me.  I would

4    approach the person and I would say, I am going to the

5    resident's house.  But if that person doesn't answer, doesn't

6    respond, I cannot let you in, because if they don't answer me

7    when I call the house, it means that there is no one there.

8    And I cannot allow that person entry pursuant to instructions

9    from the administration.

10   Q.    Sir, I appreciate that, but that's not exactly my

11   question.  My question is, under what circumstances would you

12   have to register a resident or a visitor entering the

13   development?

14          Now I'm talking about, I'm referring to somebody

15   that you allow access to, not that you keep out.

16   A.    Okay.  The resident is called.  I call from a listing

17   that there is.  For example, is Pedro Rosa here.  Correction

18   on the translation, I have Pedro Rosa here at the entrance.

19   Are you authorizing me to allow him entry?  The information is

20   taken down for this.  The model did have the car, the license

21   plate number, and since the resident approved it, they are

22   allowed to go through.

23   Q.    And in 2009, would you know whether that tele-entry

24   system had already been installed?

25   A.    The one for entering, yes, was functioning, was working.

1   Q.   And, sir, you told us you were on duty on October the

2   17th, 2009 beginning I believe your testimony was nine

3   o'clock.  Is that accurate?

4   A.   Yes.

5   Q.   And let me show you.  May I approach?  Let me show you

6   the entry log that's marked for identification Exhibit 209 A.

7           MR. AGUAYO:  Excuse me, Maria.  Which one?  What

8   date?

9           MS. DOMINGUEZ:  October 17.

10          MR. AGUAYO:  October 17.  All right.  Thank you.

11   BY MS. DOMINGUEZ:

12   Q.   Do you recognize that as a sign-in sheet for Las

13   Gaviotas?

14   A.   This sheet is the exit record.

15   Q.   Okay.

16   A.   The exit log.

17   Q.   And where would be the entrance record?

18   A.   No, that is -- how do you say it.  This is the sheet for

19   the exit log.

20          THE COURT:  Microphone.  Microphone.

21          THE WITNESS:  No, this is the exit log, not the

22   entrance log.  It will state it on the sheet, entry or exit

23   log.

24   BY. MS. DOMINGUEZ:

25   Q.   Okay.  And there should be a sheet that says entry log?

1    A.   There is supposed to be, because there were several

2    sheets.

3    Q.   Do you know of any reason why those entry logs would be

4    missing?

5         MR. AGUAYO:  Objection, Your Honor.  He didn't give

6    those to her.  She subpoenaed them from the compound.

7         THE COURT:  What is the question again?

8    BY MS. DOMINGUEZ:

9    Q.   Does he know of any reason why the entry logs would be

10   missing?

11        THE COURT:  Does he know of any reason.  That's all.

12   It's a valid question.

13        THE WITNESS:  I wouldn't know.  I don't know if there

14   weren't any during that time, what happened, whether the

15   administration hadn't provided any.

16   BY MS. DOMINGUEZ:

17   Q.   Well, let me ask you, sir, do you remember on October the

18   17th, 2009, a date on which you've testified about during your

19   testimony today, do you remember whether you prepared an entry

20   log?

21   A.   No.

22   Q.   Okay.  Now, I'd like to direct your attention to October

23   the 17th, 2009.  That evening, when you were on shift --

24   A.   Would you allow me to interrupt you?

25   Q.   Yes.

1    A.   There was a conflict with the president, with the

2    administration.   This person for personal reasons of hers --

3    you keep on doing what you have to do, and whoever is

4    attempting to enter, let them enter however they can.   Those

5    were her instructions.

6    Q.   Okay.   Now do you have anything, do you want to

7    supplement my answer to your prior question, as to whether you

8    know whether you prepared an entry log on October the 17th,

9    2009?   Or is your answer the same?

10   A.   No, no.

11   Q.   That you don't know?

12   A.   No, I did not prepare a sheet.   As a matter of fact,

13   sometimes they would prepare it and sometimes they wouldn't.

14   The administration.

15   Q.   So you would agree with me, sir, that then we cannot rely

16   on the entry logs in order to make a determination as to who

17   entered that evening, Las Gaviotas?

18   A.   During the entry hours.

19   Q.   And the entry hours were 24 hours a day, weren't they?

20   A.   Si.

21   Q.   There was no restrictions to enter, was there?

22   A.   Yes, yes.

23   Q.   All right.   Now, taking your attention back to October

24   the 17th, 2009, sir, you testified that you recall seeing

25   David Oquendo that day, that evening, between approximately

1   9:00 or 9:15 in the evening.  Would that be accurate?

2   A.   Yes.

3   Q.   And of course because you do not have an entry log from

4   which to verify the information, you would be exclusively

5   based on your memory back to October 17, 2009; is that

6   correct?

7   A.   Yes.

8   Q.   Now, sir, there came a time late that evening when you

9   heard some shots being fired that you originally testified you

10  thought were fire crackers; is that correct?

11  A.   Yes.

12  Q.   And to the best of your recollection, approximately what

13  time was that?

14  A.   At about 11:45, more or less.

15  Q.   Now, you indicated also during your testimony, sir, that

16  sometime after you heard these shots being fired, that you saw

17  a Ford F-150 pick-up truck attempting to enter the

18  development; is that correct?  Observed.

19  A.   Yes.

20  Q.   Okay.  And you described this vehicle as dark colored?

21  A.   Yes.

22  Q.   But it was dark outside.  Were you able to tell the exact

23  color or can you just simply tell us that it was dark?

24  A.   Yes, black.  A black vehicle.

25  Q.   And when you say that, did you not allow the vehicle to

1  enter, can you be more specific?  Did the vehicle actually ask

2  to be admitted into the development or did you personally make

3  the decision that you would not entertain a request for

4  admission?

5  A.   No, not only did I not allow it to enter, but rather that

6  the persons that were inside of the vehicle at no time put

7  down the window in order to identify themselves so as to say

8  listen, I am John Doe, I'd like for you -- I'd like for you to

9  allow me to enter into the complex.  They didn't at any time

10  put down the windows so as to have me allow them entry into

11  the complex.

12  Q.   So the vehicle just stood at the entryway waiting to see

13  if you would open the gate?

14  A.   That is correct.

15  Q.   And of course you did not?

16  A.   I did not open the gate.  Since the person did not

17  identify him or herself, generally speaking, if you approach a

18  complex where there is a security service, you lower the

19  window and you identify yourself.  At no time was there any

20  contact of that sort.

21  Q.   And of course you were in a state of heightened alert

22  because you had, a few minutes earlier, you had heard these

23  gunshots being fired nearby?

24  A.   That is correct.

25  Q.   And how much time would you say expired between the time

1  you heard the shots to the time the pick-up drove up to the

2  entry to Las Gaviotas?

3  A.   About some minutes.   About two to three minutes

4  approximately.

5  Q.   Okay.   And would it be accurate to say that you described

6  that amount of time as five minutes in your written statement

7  to the defense?

8  A.   Yes.

9  Q.   And by the time that pick-up truck attempts to gain entry

10  into the development, the shooting had stopped; is that

11  correct?

12  A.   Yes.   After this happened, the vehicle approached.   I

13  called.   I contacted Agent Feliciano, who was being -- who was

14  the duty officer.   The agent asked me whether I had been able

15  to write down the license plate number for the vehicle, and I

16  told him no.   Due to the position that the vehicle was in and

17  because it was dark in that area, because that is a dark area.

18  And it immediately left.   So that step was not able to be

19  taken.

20  Q.   All right.   And then sometime thereafter is when you

21  begin your round, your security around the development?   Is

22  that correct?

23  A.   Yes.   Between 12:30 and 1:00 AM approximately.

24  Q.   All right.   And it's during that lapse of time between

25  12:30 and 1:00 that you again see David Oquendo?

198

```
 1   A.    That is correct.

 2   Q.    And as you've described it, he was standing in the front

 3   of the house where he lived with Johanna?

 4   A.    And the baby.

 5   Q.    And who else was outside?  I'm sorry.  Did you see

 6   Johanna's sister?

 7   A.    No.  No.  Because I met Joannas' sister right here in the

 8   courtroom, because I had not known, did not know that she had

 9   a sister.

10   Q.    So if she lived with Johanna and her mother in 2009, she

11   entered and exited that development a number of times and you

12   never knew that she lived there?  Is that correct?

13   A.    Yes, I didn't get to meet her during that time.

14   Q.    Did you see Johanna's mother outside?

15   A.    No.  No.

16   Q.    So you only saw Johanna and David?

17   A.    And the baby.

18   Q.    Okay.  So the baby was still outside between 12:30 and

19   one o'clock?

20   A.    Yes.  In front of the house.  Yes, they were in front of

21   the house talking.  They were with the baby.  I recall that

22   they were walking with her, holding her by her hands, because

23   she was still quite a baby during that time.

24   Q.    Now, if you can estimate, understanding your testimony

25   that that security round took place between 12:30 and 1:00,
```

1    are you able to estimate for us whether it was closer to 12:30

2    or closer to 1:00 that you saw David Oquendo?

3    A.    About that.  I couldn't give you the exact time.

4    Q.    Okay.  But whether it be 12:30 or whether it be one

5    o'clock in the morning, it's your testimony that the baby was

6    still outside?  Is that correct?

7    A.    Yes, she was with them.

8              THE COURT:  The baby was walking with them.

9              THE WITNESS:  They were walking with her, holding her

10   hands.

11   BY MS. DOMINGUEZ:

12   Q.    Now, sir, let me show you -- Court's indulgence just one

13   moment.  I want to mark for identification Exhibit 208.

14             MR. AGUAYO:  Which one?

15             MS. DOMINGUEZ:  October 16.  Let me ask you to take a

16   moment, sir, to review this sheet.  May I remain here a

17   moment, Judge?

18             THE COURT:  Yes.

19   BY MS. DOMINGUEZ:

20   Q.    Could you tell us, first of all, was this document

21   written by you?

22   A.    No.  This is from Officer Luis Moyet.  That is what is

23   written here.

24   Q.    And who was he?

25   A.    He was the supervisor of the post.

```
 1   Q.    Okay.
 2   A.    The post supervisor.
 3   Q.    And, sir, can you see that there is an entry for -- there
 4   is I should say a registered exit for David Oquendo in that
 5   registry sheet that I just showed you?
 6   A.    I didn't take notice of David Oquendo's exit.  Yes.
 7   Q.    Now, could you tell us, you've already testified on
 8   direct examination, but could you remind us what car David
 9   Oquendo drove usually?
10   A.    Yes.  A Ford Explorer SUV, a light gold in color.  This
11   vehicle, as made by the manufacturer, the paint is one that
12   has colors that change, tornasol (ph).  In the evening, that
13   color seems to look as if it were green.
14              THE COURT:  It's called pearlite.
15              THE WITNESS:  Pearlite.
16              THE COURT:  Pearlite in color.
17              THE WITNESS:  Pearlite in color.  Thank you, Your
18   Honor.
19   BY MS. DOMINGUEZ:
20   Q.    And, sir, did you ever see David Oquendo driving an F-150
21   Ford?
22   A.    A Ford, yes.
23   Q.    An F-150?
24   A.    No, no.  A Ford Explorer.
25   Q.    You never saw him driving a Ford F-150?
```

```
 1   A.   No.
 2   Q.   And, sir, if I place this document 203 A in front of you,
 3   would that refresh your recollection whether David Oquendo
 4   also drove other vehicles into the Las Gaviotas development?
 5            MR. AGUAYO:  Your Honor, she said at the entry.  This
 6   is salida.
 7            THE COURT:  It doesn't really matter.  Could be
 8   entry, exit.  Whether he was driving other vehicles in or
 9   out.
10            MR. AGUAYO:  I just want to be clear.
11            THE COURT:  Objection overruled.
12            THE WITNESS:  I never got to see him driving this
13   type of vehicle.
14   BY MS. DOMINGUEZ:
15   Q.   Now, let me ask you, sir, going back to the time when you
16   observe David Oquendo in the front of Johanna's house with
17   Johanna and the baby.
18   A.   Yes.
19   Q.   Were there neighbors outside or around the house?
20   A.    In the beginning of the street, when I started the round
21   on that street, on the house to the left, on the houses to the
22   left there were residents that were talking.  And midway down
23   the street on the left side.
24   Q.   What is the name of the street you're referring to?
25   A.    If I'm not mistaken, that street is Paloma Street.
```

1    Q.   The houses you are referring to, sir, how far are they

2    from David and Joanna's house, the one where you saw them?

3             THE COURT:  The number of houses.

4    BY MS. DOMINGUEZ:

5    Q.   The number of houses.

6    A.   That -- from where those resident houses were, the house

7    would be in the front to the right, about some ten houses away

8    or a bit more.

9    Q.   Now, during this preventive round that you were --

10   security sweep that you were conducting, on Paloma Street did

11   you notice a house where they were having a party?

12   A.   No, no.  I didn't notice that at that time.

13   Q.   And to be very clear, sir --

14            THE COURT:  Right in front of David's house?

15            THE WITNESS:  No.

16   BY MS. DOMINGUEZ:

17   Q.   And to be very clear, sir, you did not see any neighbors

18   across the street, directly across the street from Johanna's

19   house?

20   A.   No.

21   Q.   Or the house immediately to the right of the house

22   directly in front of the house?

23   A.   No.

24   Q.   Or the one on the left of the house directly in front?

25   A.   No.

1   Q.   And what you are able to tell us, sir, about the

2   whereabouts of David Oquendo on the evening of October the

3   17th, 2009, is that you saw him at approximately 9:00 or 9:15

4   that evening.  Correct?

5   A.   When he entered.

6   Q.   And then you saw him again between 12:30 in the morning

7   and 1:00 in the morning when you were conducting your security

8   sweep?

9   A.   Yes.

10          MS. DOMINGUEZ:  May I approach, Your Honor?

11   BY MS. DOMINGUEZ:

12   Q.   Let me show you what is marked as exhibit for

13   identification 209.  Let me place this document in front of

14   you, sir, and please take a moment to examine it.

15          Let me know when you're done, sir.

16   A.   Yes.

17   Q.   Do you recognize what is depicted in that identification

18   209?

19   A.   It looks like the fence of Las Gaviotas.

20   Q.   All right.  And if you look at it, are you able to tell

21   us where that fence is located in relation to the entrance?

22   A.   It looks like the street that comes down from the light,

23   the traffic light.

24   Q.   And how close is that to the entrance?

25   A.   I'd have to see this photograph from a different angle in

1    order for me to be able to give you a better description of

2    that area.

3    Q.   But you do recognize that as a portion of the gate that

4    surrounds the Las Gaviotas development?

5    A.   Yes.

6         MS. DOMINGUEZ:  We move 209 into evidence.

7         MR. AGUAYO:  Your Honor, I would object for the

8    simple reason --

9         THE COURT:  Can I see it?

10        MS. DOMINGUEZ:  Yes, sir.

11        MR. AGUAYO:  Can we approach, Your Honor?

12        THE COURT:  Sure.

13        (Bench conference held.)

14        MR. AGUAYO:  Although it looks like it, I don't know

15   if it is.  That's the problem I have.

16        THE COURT:  What is the point you're trying to make?

17        MS. DOMINGUEZ:  The height, and that there's no

18   spokes.

19        THE COURT:  Admitted.

20        (At 5:51 PM, Government's Exhibit 209 admitted into

21         evidence.)

22        (Bench conference concluded.)

23        THE COURT:  Received in evidence.

24        Let's take a five minute recess, and we'll be back.

25   We have to finish this witness.  Five minutes.

```
 1              (At 5:51 PM, recess taken.)

 2              (At 6:12 PM, proceedings reconvened.)

 3              MS. DOMINGUEZ:   Thank you, Your Honor.

 4    BY MS. DOMINGUEZ:

 5    Q.   Mr. Malave, all right, I'd like to direct your attention

 6    to the monitor in front of you.

 7    A.   Yes.

 8    Q.   Do you recognize that as the photo that I showed you

 9    shortly before the recess?

10    A.   Yes.

11    Q.   And while you're not able to tell us at the moment where

12    that portion of the gate is located in relation to the

13    front -- the entrance of the development, you do recognize

14    this as a portion of the gate that surrounds Las Gaviotas?

15    A.   It is quite similar.

16    Q.   Okay.  And would you agree with me, sir, that it appears

17    to be shorter than the wall that is immediately adjacent to

18    it?

19    A.   Yes.

20    Q.   And as it is depicted in the photograph, it does not have

21    any spokes in the upper portion of the wall?

22    A.   Yes.

23    Q.   Now, sir, let me ask you also, referring again to the

24    entrance of the development, whether in addition to the entry

25    and exit gate for vehicles, there was also a pedestrian gate?
```

1    A.   Yes.

2    Q.   And how did that gate operate?  Was it open or closed?

3    A.   That gate was always closed.  Any resident that would

4    want to use the pedestrian gate had to have his key.

5    Q.   Of course then any resident that entered or exited that

6    gate with his or her own key would not have to rely on you to

7    allow them entry or exit; is that correct?

8    A.   Yes.

9    Q.   And in 2009, were there any security cameras covering the

10   area of the entrance, exit and pedestrian gate?

11   A.   No.  No.

12   Q.   Now, sir, I'm sorry, I'm going to ask you this question

13   out of turn.  I neglected to ask you when you observed David

14   Oquendo late that evening between 12:30 and 1:00 AM and the

15   early morning hours of October the 18th, you described him as

16   not wearing any shirt; is that correct?

17   A.   Yes.

18   Q.   And he was wearing some shorts below the knee; is that

19   accurate?

20   A.   Yes.  Yes.

21   Q.   Do you remember what color they were?

22   A.   Yes.  They were blue jean color.

23   Q.   Okay.  And lastly, sir, do you recall whether he was

24   wearing any shoes?

25   A.   I didn't notice that.

1   Q.   So you wouldn't know one way or the other?

2   A.   I wouldn't know whether he was wearing sandals or some

3   sort of moccasins, but I did notice that he was wearing the

4   blue shorts to right below the knee.

5   Q.   Now, sir, just to recap here, you've explained to us that

6   unless it's after midnight, a resident or visitor did not need

7   to request that you allow them to exit, because there was a

8   sensor on the gate; is that correct?

9   A.   In order to exit after midnight?

10  Q.   No, before midnight.

11  A.   Before?  Yes, they could leave freely without any

12  problem.

13  Q.   So you wouldn't necessarily know everyone that exited the

14  development before midnight on a particular day?

15  A.   Yes.

16  Q.   In fact, you might not even be there if the exit occurs

17  during a period of time when you're conducting your security

18  sweep; is that correct?

19  A.   Yes.

20  Q.   Thank you, sir.

21          MS. DOMINGUEZ:  I have no further questions, Judge.

22          THE COURT:  Mr. Aguayo.

23          MR. AGUAYO:  Yes, sir.

24                      REDIRECT EXAMINATION

25  BY MR. AGUAYO:

1    Q.   Sir, all right, concerning the entry log to Las Gaviotas,
2    if some resident, if a resident has a beeper, do you have to
3    enter him in the entry log?
4    A.   No.
5    Q.   Okay.  And, sir, the Ford F-150 truck that you saw after
6    the shots were fired, what color was it?
7    A.   Black.
8    Q.   Are you sure about that, black?
9    A.   Yes.
10   Q.   Okay.  Now, sir, when you were asked if when you went by
11   David Oquendo and Johanna's residence, did you see people in
12   front, did you see people to the side, and did you see people
13   having a party to the left, do you recall that?
14   A.   Yes.
15   Q.   And you stated that you did not see that?
16   A.   In the beginning, halfway down the street, on the left
17   side, yes.  But in front of their residence, the ones that I
18   saw was them.
19   Q.   So the only thing that you can say, what you saw as to
20   other people, either in front, to the side, or nextdoor, is
21   what you saw at the moment that you arrived, correct?
22   A.   Yes.
23   Q.   So if there was a person in the front, if there was a
24   person on the side, or if there were people outside from la
25   fiesta, from the party, and they went back inside when you

```
 1   passed, you wouldn't see them, correct?
 2               MS. DOMINGUEZ:  Objection, Your Honor.  Calls for
 3   speculation, assumes facts not in evidence, and leading.
 4               THE COURT:  Well, I think that the answer is obvious.
 5   If it wasn't there, he could not see a bit, nothing.
 6               MR. AGUAYO:  Thank you, Your Honor.
 7               Could I have 209, please?
 8   BY MR. AGUAYO:
 9   Q.   Now, sir, when we were showing the video of Las Gaviotas,
10   remember there were portions that had spikes on the walls?
11   A.   Yes.
12   Q.   And did we also see and it did we also mention that some
13   parts of the wall don't have puas (ph)?
14   A.   Yes.
15   Q.   As in this picture, correct?
16   A.   Yes.
17   Q.   I want to ask you, sir, behind that wall, immediately
18   behind the wall, over here, do you see that, sir?
19   A.   Yes.
20   Q.   There are houses, correct?
21   A.   Yes.
22   Q.   All right.  And that wall is adjacent or in front of all
23   the houses as we saw in the video along the perimeter,
24   correct?
25   A.   Yes.
```

1    Q.   Okay.  Now, my last question, sir.  Ms. Dominguez, the

2    prosecutor, asked you about the pedestrian gate.  Do you

3    remember that?

4    A.   Yes.

5    Q.   All right.  And you had stated in your testimony that

6    after the shots were fired, that you stayed there until

7    approximately 12:30, 12:45.  Correct?

8    A.   Yes.

9    Q.   Do you remember, the time that you were there from 12:30

10   to approximately 12:45, did you see David Oquendo come in

11   through that gate?

12   A.   No.

13            MR. AGUAYO:  No further questions, Your Honor.

14            MS. DOMINGUEZ:  Judge, I have no further questions.

15   May in inquire from counsel if he has an objection to the

16   admission of this document written by Mr. Malave?

17            MR. AGUAYO:  Well, let me see.

18            MS. DOMINGUEZ:  Although it's out of turn, Judge.

19            MR. AGUAYO:  I don't know what it is.  If I may be

20   given a moment, Your Honor?

21            Your Honor, at this time we would like to put in --

22            THE COURT:  The video.

23            MR. AGUAYO:  -- the video, yes, Your Honor.

24            THE COURT:  Very well.  Received.

25            MS. DOMINGUEZ:  I have no objection.

1           (At 6:26 PM, Defendant Oquendo Exhibit admitted into

2            evidence.)

3           MS. DOMINGUEZ:  We'd like to move in this Exhibit,

4    too, then.

5           THE COURT:  No objection?

6           MR. AGUAYO:  Yes, Your Honor.  It hasn't been

7    authenticated.

8           MS. DOMINGUEZ:  I asked him questions about this, but

9    I'll be happy to do it briefly with two or three questions,

10   Judge.

11          THE COURT:  Sure.

12          MS. DOMINGUEZ:  It's a log that he prepared.  I asked

13   him some questions about it.

14          THE COURT:  Let me take a look at it.

15          MS. DOMINGUEZ:  May I briefly just inquire?

16          THE COURT:  Yes.

17                          RECROSS-EXAMINATION

18   BY MS. DOMINGUEZ:

19   Q.   Sir, let me just ask you a last couple of questions.

20   I'll try to be brief here.  Let me ask you about Government

21   Exhibit 210 for identification, sir.  Do you recognize that?

22   A.   Yes.

23   Q.   What is that document?

24   A.   An exit record register.

25   Q.   And who prepared that exit record?

```
 1    A.    I did.

 2    Q.    And for what date was that prepared?

 3    A.    It states here October 18th.

 4    Q.    So that would be for October the 18th from 12:00 AM on,

 5    until 5:00 AM?

 6    A.    Yes.

 7    Q.    And you recognize your handwriting?

 8    A.    Yes.

 9    Q.    And is that the form that was used to prepare those exit

10    registries?

11    A.    Yes.

12    Q.    And is it prepared in the same manner as you prepared the

13    other registries in the regular course of business?

14    A.    Yes.

15    Q.    And that was prepared at the request of the Association,

16    to whom you provided protection at the development; is that

17    correct?

18    A.    Yes.

19    Q.    And the information that was entered as the person was

20    attempting to exit --

21              THE COURT:  I don't need to hear anything further.

22    Received.

23              MR. AGUAYO:  No objection, Your Honor.

24              THE COURT:  Very well.

25              (At 6:29 PM, Government Exhibit admitted into
```

```
 1              evidence.)

 2              THE COURT:  Mr. Aguayo, do you have any additional

 3   evidence?

 4              MR. AGUAYO:  Yes, Your Honor, we have.

 5              THE COURT:  Just to know.  I have to make some plans

 6   here.

 7              MR. AGUAYO:  It would be for stipulations, Your

 8   Honor, that we have to write out.

 9              THE COURT:  Aside from the stipulations, you don't

10   have anything else?  Why don't you approach the side bar a

11   minute.

12              MR. AGUAYO:  Yes.

13              (Bench conference held.)

14              THE COURT:  What is the stipulation about?

15              MS. DOMINGUEZ:  Mr. Aguayo approached us with a

16   stipulation with respect to the newspaper articles, and we

17   agreed.  He's going to write it up.  And we have no problem

18   with that.

19              THE COURT:  Okay.

20              MR. AGUAYO:  Also a stipulation that they found

21   Christian's DNA, and they didn't find David's.

22              MS. DOMINGUEZ:  As a major contributor.

23              MR. HEGYI:  And I've already drafted it up, and it's

24   been signed by everybody.

25              THE COURT:  And that would be it, your case?
```

```
 1              MR. AGUAYO:  Yes, sir.

 2              THE COURT:  Mr. Ruhnke, you don't have anything

 3    further?

 4              MR. RUHNKE:  No, sir.

 5              THE COURT:  And rebuttal?

 6              MS. DOMINGUEZ:  We have a very brief rebuttal case.

 7              THE COURT:  Okay.  So that's the morning.

 8              MS. DOMINGUEZ:  Yes, sir.

 9              THE COURT:  Okay.  Thank you very much.

10              (Bench conference concluded.)

11              THE COURT:  You are now excused, sir.  You can leave.

12    Thank you.

13              (At 6:30 PM, witness excused.)

14              THE COURT:  Members of the jury, the only evidence

15    that remains according to what I discussed with counsel is a

16    couple of stipulations that they are going to write tonight.

17    There is an agreement, but they have to put them in black and

18    white.  And the Government says that they're going to call

19    very brief rebuttal evidence.

20              Rebuttal evidence is evidence the Government may

21    present as a result of the evidence presented by defendants.

22    Other than that, we're going to be finished with the

23    presentation of evidence in this part of the case.

24              So with that in mind, I will ask you to be here

25    tomorrow at the usually hour to receive this evidence.  And I
```

1    am sure that after that we're going to have a shorter day.  I

2    may dismiss you earlier so I can work on the jury instructions

3    and other things, okay?  See you tomorrow morning.

4              COURT SECURITY OFFICER:  All rise.

5              (At 6:31 PM, jury left the courtroom.)

6              THE COURT:  Let me ask counsel a couple of things

7    here.  If we finish tomorrow, let's say before eleven o'clock

8    in the morning --

9              MS. DOMINGUEZ:  Yes, sir.

10             THE COURT:  --are we ready for closings Thursday

11   morning?

12             MR. AGUAYO:  No.

13             THE COURT:  You're not?

14             MR. AGUAYO:  No, sir.

15             THE COURT:  So you want to do closings and

16   instructions on Friday?

17             MR. AGUAYO:  Yes, sir.

18             MR. RUHNKE:  (Nodding head up and down.)

19             MR. REBOLLO:  I'm ready when you say, Judge.

20             MS. DOMINGUEZ:  We are ready when you say as well.

21             THE COURT:  You are not ready, really?

22             MR. AGUAYO:  I am not ready, Your Honor, really.

23             THE COURT:  What about Thursday afternoon?

24             MR. AGUAYO:  Your Honor, if you'll give me to Friday,

25   I'd really appreciate it.

1          THE COURT:  You are, Ms. Dominguez?

2          MS. DOMINGUEZ:  Yes, sir.

3          THE COURT:  Mr. Ruhnke, you rested?

4          MR. RUHNKE:  Mr. Rebollo?

5          THE COURT:  Mr. Rebollo, you are ready?

6          MR. REBOLLO:  Judge, I don't want to cause -- we can

7    do it Friday.

8          THE COURT:  Assume we should be ready for closings

9    after lunch on Thursday.

10         MR. AGUAYO:  Yes, sir.

11         THE COURT:  That's the most I can do.

12         MR. REBOLLO:  Judge, we won't have time to finish by

13   the afternoon.

14         THE COURT:  You'll be surprised.  How long do you

15   think your closings will be.

16         MR. REBOLLO:  At least a couple hours, three.

17         THE COURT:  I don't think I have ever had a closing

18   go for three hours.

19         MR. REBOLLO:  I've given them here, Your Honor.

20         THE COURT:  Not with me.

21         MR. AGUAYO:  Your Honor, I haven't started it, but

22   I'm thinking about an hour, hour and 15 minutes.

23         THE COURT:  That sounds reasonable.

24         MR. AGUAYO:  I'm sorry.

25         THE COURT:  That sounds reasonable to me.  Three

1    hours, no way.

2              MR. RUHNKE:  How about the Government?

3              THE COURT:  Government, how much do you have?

4              MR. HEGYI:  An hour, hour and a half, Your Honor.

5              THE COURT:  Sound reasonable.

6              MR. REBOLLO:  I can do two, Your Honor.

7              THE COURT:  I'll give you two.  We're going to do it,

8    and if we have to work later, we will so we can have -- the

9    idea is I don't want to rush deliberation on a guilt phase on

10   a Friday late in the afternoon.  That's not good for anybody.

11   That's why I want to start Thursday at lunch time to pace

12   ourselves and do it right.

13             MR. REBOLLO:  We're going to request that they

14   deliberate on Monday.

15             THE COURT:  No.  We will start deliberations as soon

16   as they get the case.  I'm sorry.  That's the way it's going

17   to be.

18             MR. REBOLLO:  I understand that, but we were under

19   the impression because it will be on Friday, the deliberations

20   would be Monday.

21             THE COURT:  No.

22             MR. REBOLLO:  We don't want them to start Friday

23   either.

24             THE COURT:  No.  We are going to do it this way.  We

25   will start the closings at one o'clock on Thursday with the

1    idea they will deliberate until a reasonable hour on Friday.

2    If they are not finished, I will dismiss them and they will

3    continue Monday.  Okay.  Thank you.

4              MR. RUHNKE:  Yes, sir.

5              COURT SECURITY OFFICER:  All rise.

6              (At 6:34 PM, proceedings concluded.)

7                            *     *     *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   U.S. DISTRICT COURT      )

 2   DISTRICT OF PUERTO RICO)

 3

 4        I certify that this transcript consisting of 219 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable Judge José

 7   Antonio Fusté on March 5, 2013.

 8

 9

10

11

12   S/ Amy Walker

13   Amy Walker, CSR 3799

14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```