```
1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF PUERTO RICO

3

   UNITED STATES OF AMERICA,
4
                     Plaintiff,
5   v.                                    Docket No. 09-427

6                                         San Juan, Puerto Rico
   ALEXIS CANDELARIO SANTANA, and         February 28, 2013
7   DAVID OQUENDO RIVAS,

8                Defendants.
   _____

9

10                  JURY TRIAL - AFTERNOON SESSION

11         BEFORE THE HONORABLE JUDGE JOSÉ A. FUSTÉ,

12               UNITED STATES DISTRICT JUDGE.

13    _____

14   APPEARANCES:

15   For the Government:      Mr. Bruce Hegyi, AUSA
                             Ms. Maria Dominguez Victoriano, AUSA
16                           Ms. Marcela Mateo, AUSA

17

18
   For the Defendants:       Mr. David Arthur Ruhnke, PHV
19                           Mr. Francisco Rebollo Casalduc, Esq.
                             Mr. Jose R. Aguayo, Esq.
20

21

22

23

24

25   Proceedings recorded by stenography.  Transcript produced by
     CAT.
```

<pre>
 1                         I N D E X

 2   WITNESSES:                                        PAGE

 3        BRAULIO ORTIZ RODRIGUEZ (Continued)
          Direct examination by Ms. Dominguez            3
 4        Cross-examination by Mr. Rebollo              28
          Redirect examination by Ms. Dominguez        71
 5
          ANA ROSARIO MORALES
 6        Direct examination by Ms. Dominguez          77

 7        DR. MARIA CONTE MILLER
          Direct examination by Mr. Hegyi              86
 8
          IRMA RIVERA DIAZ
 9        Direct examination by Ms. Mateo             100

10        SPECIAL AGENT ERNST JACOBSON
          Direct examination by Mr. Hegyi             106
11
          DR. FRANCISCO CORTES
12        Direct examination by Ms. Mateo             116

13

14   EXHIBITS:

15        Government's Exhibit 172                      13
          Government's Exhibit 171                      13
16        Government's Exhibit 173                      20
          Government's Exhibit 176-A and 176-B          88
17        Government's Exhibit 177-A and 177-B          94
          Government's Exhibit 178-A and 178-B         102
18        Government's Exhibit 179 to 185              112
          Government's Exhibit 186                     117
19        Government's Exhibit 187-A and 187-B         119
          Government's Exhibit 187-C and 187-D         122
20        Government's Exhibit 188                     123
          Government's Exhibit 189                     125
21        Government's Exhibit 190                     127

22

23

24

25
</pre>

```
 1                                    San Juan, Puerto Rico
 2                                    February 28, 2013
 3                                    At or about 1:48 PM
 4                         *     *     *
 5           (At 1:48 PM, proceedings reconvened.)
 6           (At 1:49 PM, jury entered courtroom.)
 7           THE COURT:  Let's continue, please.
 8           MS. DOMINGUEZ:  Thank you.
 9           B R A U L I O   O R T I Z   R O D R I G U E Z,
10   called as a witness by the Government, having been previously
11   sworn, testified as follows:
12                    DIRECT EXAMINATION (Continued)
13   BY MS. DOMINGUEZ:
14   Q.   Mr. Ortiz, before we recessed for lunch, I had been
15   asking you questions with respect to the murder of Richard
16   Matias Negron on July 25th, 1999.  Do you recall that?
17   A.   Yes.
18   Q.   And you had testified that at that time, in the evening
19   hours, you were with Alexis, Juanvi, Bayeta, Sanco, and Willy
20   outside the disco waiting for Richard to come out?
21   A.   Yes.
22   Q.   And I had asked you what you were doing while you were
23   waiting in the car.
24   A.   We were in the car smoking marijuana.
25   Q.   And you also had testified that at some point Richard
```

1    came out accompanied by three other people.

2    A.    Yes.

3    Q.    Two men and one woman.

4    A.    Yes.

5    Q.    Please tell us what happened when Richard finally came

6    out of the disco?

7    A.    When Richard came out, I took out from the glove

8    compartment of the car two pistols.  I gave one to Alexis and

9    kept one.  And it seems that Richard's car was parked close to

10   ours, because he came walking towards us.  And then as he was

11   approaching, Alexis got out of the car and killed Richard, and

12   wounded the girl and one of the guys.

13   Q.    When you say that you had two pistols in the car, you

14   kept one and you gave the other to Alexis, do you recall what

15   kind of pistols they were?

16   A.    Nine millimeters.

17   Q.    And when you say that Alexis got out and shot Richard,

18   tell us exactly what he did.

19   A.    Well, he got out and he went towards him and started

20   shooting.

21   Q.    And what if anything did Richard do?

22   A.    He tried to run, but he fell.

23   Q.    And did you see what the two men and woman who were with

24   Richard did when the shooting began?

25   A.    Well, the woman tried to get in the middle between them,

1    and that's why he shot her.  And the other one tried to run,

2    but he shot at him and he fell.

3    Q.   When you say the woman tried to get inbetween them, do

4    you mean inbetween Alexis and Richard?

5    A.   Yes.

6    Q.   And, sir, did you fire at Richard or any of the people

7    accompanying him?

8    A.   No.

9    Q.   Why not?  You had a gun, didn't you?

10   A.   Yes.

11   Q.   Why didn't you fire?

12   A.   Well, because since I started smoking marijuana, I

13   freaked out and I didn't get out.

14   Q.   So are you saying that you didn't shoot because you were

15   experiencing a sort of high from the pot that you had smoked?

16   A.   Yes.

17   Q.   But before you began smoking the pot, you had every

18   intention of assisting Alexis in murdering Richard?

19   A.   Yes.

20   Q.   And did Richard die as a result of the shots fired at him

21   by Alexis?

22   A.   Yes.

23   Q.   And did any of the other three people that were with him

24   die?

25   A.   No.

1  Q.   Were any of those people injured?

2  A.   Yes.

3  Q.   Who?

4  A.   The woman, and one of the -- Papito.

5  Q.   Now, sir, I'd like to talk to you yet about another

6  murder.  The murder of David Nieves Cardona on August the

7  16th, 1999.  Do you recall the events surrounding that murder?

8  A.   Yes.

9  Q.   Did you participate in that murder?

10  A.   Yes.

11  Q.   Please tell us who was David Nieves Cardona.

12  A.   He was another guy who was always with our enemies from

13  Ingenio.

14  Q.   This is the drug point associated with Gardo and Yamil?

15  A.   Yes.

16  Q.   And was David Nieves Cardona known by any nickname?

17  A.   Yes.

18  Q.   What?

19  A.   Davicito.

20  Q.   And could you tell us whether you recall whether this

21  murder occurred during the day or during the evening?

22  A.   During the day.

23  Q.   And on August 16, 1999, shortly before the murder of

24  David Nieves Cardona, could you tell the members of the jury

25  where you were?

1  A.   I was with Alexis and Sanco.

2  Q.   And where were you?

3  A.   In the Ingenio ward of Toa Baja.

4  Q.   And were you simply driving around or were you driving

5  around for any particular purpose?

6  A.   No.  We were driving around and always we were checking

7  to see who we could hunt.

8  Q.   So whenever you were driving around, it was always a

9  possibility that you could hunt someone down depending on who

10  you saw?

11  A.   Yes.

12  Q.   And that day, you encountered David Nieves Cardona?

13  A.   Yes.

14  Q.   Where did you see him?

15  A.   Around Ingenio, around the school in Ingenio he was

16  parked.

17  Q.   And what car were you, Sanco and Alexis in?

18  A.   In a van like Caravans.

19  Q.   And was this a stolen car or legitimate car?

20  A.   I can't remember right now.

21  Q.   And do you recall who was driving?

22  A.   Yes, Sanco.

23  Q.   And do you recall whether Alexis was in the front

24  passenger seat or in the back?

25  A.   I can't remember right now.

1   Q.   Well, what happened when you saw David?

2   A.   Well, when he saw us, he made a signal to Sanco.

3   Q.   Were you able to see what the signal was?

4          THE COURT:   Amago (ph) is like a threat or something

5   that you want to do.   That's what it means.   If I go like

6   this, that's an amago.

7          THE INTERPRETER:   Threatened.

8          THE WITNESS:   He like made a threatening --

9   BY MS. DOMINGUEZ:

10  Q.   Gesture?

11  A.   Gesture at him.

12         THE COURT:   What would be the word?

13         THE INTERPRETER:   Faked him out.   Thanks to

14  Mr. Rebollo.

15         THE WITNESS:   He faked him out.   And Sanco went ahead

16  and put on the brakes right then and there and turned around.

17  BY MS. DOMINGUEZ:

18  Q.   And are you able to show us what that gesture was?

19  A.   Yes.

20  Q.   Show us.

21  A.   (Witness gestured.)   He did like this.   What's up?

22  Q.   Indicating for the record moving his hand up and down.

23         And Sanco stopped the car after David made the

24  gesture at him?

25  A.   Yes.

1    Q.    And then what happened?

2    A.    Well, we turned around, and when he saw us turning

3    around, he took off in his car.

4    Q.    And what did you do?

5    A.    We chased after him.

6    Q.    Okay.  And how long did the chase last?

7    A.    About two or three minutes or four at least, more or

8    less.

9    Q.    Okay.  And what happened?

10   A.    As we were chasing after him, I told Alexis to wait until

11   I shot first.

12   Q.    Why did you do that?

13   A.    Because Alexis was --

14        THE INTERPRETER:  In despair.

15        THE WITNESS:  -- in despair.

16   BY MS. DOMINGUEZ:

17   Q.    Desperate to do what?

18        THE COURT:  No, no.  I don't think it was in despair.

19   He was rushed to act.

20        THE WITNESS:  He was rushed to act.

21        THE COURT:  (Remarks in Spanish) means rushed to

22   act.

23        THE WITNESS:  Si.

24   BY MS. DOMINGUEZ:

25   Q.    He was rushed to do what?

1    A.    He was in a rush to kill him.

2    Q.    So what happened as you're chasing David?

3    A.    Well, as he took a turn, I started shooting at him. And

4    his windows broke, and he hit a post.

5    Q.    Now, how close were you to him during this chase when he

6    took the curve?

7    A.    Like from car to car.

8    Q.    And were you on the same side as David?

9    A.    Yes.  We were behind him.

10   Q.    And could you tell whether there was anyone in the car

11   with him?

12   A.    Yes.  He was alone.

13   Q.    And after that individual crashed into a column or a

14   post, what happened next?

15   A.    Well, then we stopped next to him and we started shooting

16   at him.

17   Q.    And what happens?

18   A.    Well, then he got out of the car.  I got out of the car.

19   And he kept running.  And a magazine of mine fell close to

20   where the car was.  And as Sanco went in reverse, he hit me

21   with a tire of the van.

22   Q.    As you were trying to chase David?

23   A.    Yes.

24   Q.    And what happened after you were hit in the leg?

25   A.    Well, then I got into the van, and we continued to chase

1    after him.

2    Q.   And eventually did he catch up to him?

3    A.   Yes.  He was trying to get into a house.  And I got out

4    and I killed him.

5    Q.   And did David Nieves Cardona die that day, August the

6    16th, 1999?

7    A.   (No audible response.)

8         MS. DOMINGUEZ:  May I approach, Your Honor?

9    BY MS. DOMINGUEZ:

10   Q.   Let me show you identification 170 and 171.

11        Are you aware that David Nieves Cardona died on

12   August the 16th, 1999?

13   A.   Yes.

14   Q.   Let me show you identifications 170 and 171.  Would you

15   take a look at those a moment, and let me know when you're

16   done.  Done?

17   A.   Yes.

18   Q.   Now, referring to the first one, 170, do you recognize

19   the person depicted in that photograph?

20   A.   Yes.

21   Q.   Who is that?

22   A.   Davicito.

23   Q.   Are you referring to David Nieves Cardona?

24   A.   Yes.

25        COURTROOM DEPUTY:  Counsel, I'm sorry.  That will be

1    171 and 172.

2              MS. DOMINGUEZ:  I'm sorry.  Yes.  Correction, 171 and

3    172

4    BY MS. DOMINGUEZ:

5    Q.   And does Exhibit 171 for identification accurately

6    reflect the general condition he was in after you shot him?

7    Understanding that the bandages on the face would not have

8    been there at the time?

9    A.   Yes.

10   Q.   And let me show you now, let me ask you with respect to

11   the exhibit that you've already examined, 172 for

12   identification, can you tell us whether you recognize the area

13   that is depicted in that photograph?

14   A.   Yes.

15   Q.   What area is that?

16   A.   Ingenio, the Ingenio ward.

17   Q.   And the area depicted in this photograph, what relation,

18   if any, does it have to the place where David was murdered?

19   A.   It was close to where he left the car.

20   Q.   Before he started to run away?

21   A.   Yes.

22   Q.   And can you see David's car in this photograph?

23   A.   Yes.

24             MS. DOMINGUEZ:  Your Honor, I --

25             MR. RUHNKE:  The second one, you can go ahead.

```
 1              MS. DOMINGUEZ:  I would move for the moment 172 at
 2   this time without defense objection.
 3              MR. RUHNKE:  No objection.
 4              THE COURT:  No objection.  Very well.
 5              (At 2:09 PM, Government Exhibit 172 admitted into
 6               evidence.)
 7   BY MS. DOMINGUEZ:
 8   Q.   Sir, I'd like you to refer to the monitor.  Is this the
 9   area you described as the area where David left his car before
10   the chase ensued?
11   A.   Yes.
12   Q.   And can you point to where David's car is on this photo?
13   A.   (Witness indicating.)
14   Q.   Indicating for the record a blue car in the right hand
15   portion of the picture.
16              MS. DOMINGUEZ:  And I would move 171 into evidence
17   without objection as well.
18              THE COURT:  Very well.  Received.
19              (At 2:10 PM, Government's Exhibit 171 admitted into
20               evidence.)
21   BY MS. DOMINGUEZ:
22   Q.   Sir, who was the person in this photograph?
23   A.   Davicito.
24   Q.   This is the person that you killed?
25   A.   Yes.
```

1    Q.    And, sir, I'd like to now direct your attention to

2    January 3rd, 2001, to talk about the last murder about which

3    I'm going to ask you today.  I'm going to be asking you about

4    a murder that took place on January 3rd, 2001, where three

5    people were killed, Zuly Santana Frances, Harry Santiago

6    Santiago, and Erick Morales Alvarez.  Santana Frances.  Did

7    you know any of those three people?

8    A.    No.

9    Q.    Did you participate in that murder?

10   A.    No.

11   Q.    In fact, you were in jail at the time?

12   A.    Yes.

13   Q.    And, sir, do you have any information with respect to

14   those murders?

15   A.    Yes.

16   Q.    And where did your information come from?

17   A.    Alexis.

18   Q.    Now, you were in jail.  How is it that you received

19   information from Alexis with respect to these three murders?

20   A.    I talked to him on the phone.

21   Q.    From the jail?

22   A.    Yes.

23   Q.    And were you cooperating yet with the local authorities?

24   A.    No.

25   Q.    And when you spoke with Alexis, what, if anything, did he

1  tell you with respect to the circumstances surrounding those

2  three murders?

3  A.   That they were going to go shoot at Gardo's house, and

4  that as they were around El 26, they saw a truck that looked

5  like Gardo's.  And when the guys in the truck saw him, they

6  started to cut through the cars.  And when they saw him, they

7  thought it was Gardo, and he shot at them.

8  Q.   And did he tell you what kind of car these three people

9  were driving that looked like Gardo's?

10  A.   Yes.  I think it was a CR-5.

11  Q.   Is that a Toyota?

12  A.   Yes.

13  Q.   And what else did he tell you?

14  A.   That he shot them and killed them.

15  Q.   Did he tell you with what weapon he shot at these three

16  people?

17  A.   Yes.

18  Q.   And did he tell you also that he had mistakenly shot

19  these people because it wasn't Gardo?

20  A.   Yes.

21  Q.   And did he tell you that the three people had died?

22  A.   Yes.

23  Q.   Now, sir, towards the end of 1997 and beginning of 1998,

24  when you were a leader in Alexis' drug organization and his

25  right hand man, did there come a time when Alexis moved to the

```
 1   United States?
 2   A.   Yes.
 3   Q.   Do you know where he went to?
 4   A.   Yes.
 5   Q.   Where did he go?
 6   A.   Detroit, Michigan.
 7   Q.   And did you discuss with Alexis the fact that he was
 8   moving to Detroit before he left?
 9   A.   Yes.
10   Q.   And did you discuss with him why it was that he was
11   leaving to Detroit?
12   A.   Yes.
13   Q.   And what did Alexis tell you as to the reason that he was
14   leaving to Detroit?
15   A.   To cool off, because he was in hot waters.
16   Q.   And when you say that Alexis was in hot waters, please
17   explain to the members of the jury what you mean by that.
18   A.   Well, that since we had killed a lot of people, he was
19   being -- the cops were looking for him.
20   Q.   Sir, you had killed a lot of people, too, hadn't you?
21   A.   Yes.
22   Q.   And did you leave to Detroit, too?
23   A.   Yes, I did.  After.
24   Q.   And about how long after Alexis left did you leave to
25   Detroit?
```

1    A.   I can't remember very well.

2    Q.   If you were to estimate, understanding you can't remember

3    exactly, would it be more or less than six months after Alexis

4    left?

5    A.   More or less four or five months.  More or less.

6    Q.   And when you moved to Detroit, who went with you?

7    A.   My kids' mom and my kids.

8    Q.   And when you first arrived in Detroit, where did you

9    live?

10   A.   At Alexis' house.

11   Q.   And for how long did you live at Alexis' house?

12   A.   A couple of months.

13   Q.   Now, is this a house that Alexis rented or he bought in

14   Detroit?

15   A.   A house he bought.

16   Q.   And tell us a little about that house.  Was it a nice

17   house?

18   A.   Yes.  This was a house that was in good condition, and a

19   nice house.

20   Q.   And, sir, when you moved to Detroit, did you continue to

21   be involved in the drug business?

22   A.   Yes.

23   Q.   And how about Alexis?

24   A.   Yes.

25   Q.   Were you involved in the drug business together or each

1   one separately?

2   A.   Together.

3   Q.   Please tell us what you and Alexis were doing in Detroit.

4   A.   Well, Omi would send him Fed Ex packages with heroin and

5   coke inside.

6   Q.   Heroin and cocaine?

7   A.   Yes.

8   Q.   And what did you and Alexis do with those drugs in

9   Detroit?

10  A.   He had a black guy that he would give the drugs to, and

11  the black guy would sell them for him.

12  Q.   Well, if someone else was selling the drugs, what did you

13  and Alexis do with respect to the drugs?

14  A.   We'd receive them and we'd give them to El Moreno.

15  Q.   And when you received the drugs, had they already been

16  processed?

17  A.   No.

18  Q.   And do you know who would process the drugs?

19  A.   Omi, who would send them to us.  And we would receive it,

20  and Alexis would check it and we would give it to Moreno.

21  Q.   So you and Alexis would not package it for individual

22  sale?

23  A.   No.

24  Q.   Now, after you moved out of Alexis' house, where did you

25  go?

```
 1   A.    He bought us a house.

 2   Q.    He bought who a house?

 3   A.    Me and the mother of my children.

 4   Q.    And in whose name was that house?

 5   A.    It was in the name of my children's mom.

 6   Q.    And what is her name?

 7   A.    Mineli Rivera Matias.

 8   Q.    And did you live in that house with your wife and your

 9   children?

10   A.    Yes.

11   Q.    And do you remember the address of the house where you

12   lived in Detroit?

13   A.    I cannot remember very well the address of the house that

14   he bought for us, but I have an identification with the house

15   where we lived with him.

16   Q.    Okay.  What identification is that?

17   A.    An identification from Detroit, Michigan.

18   Q.    Is it a driver's license or what type of identification

19   is it?

20   A.    I think it's an identification, because it doesn't say

21   driver's license.

22   Q.    And did you bring that with you today?

23   A.    Yes.

24   Q.    Would you mind providing it to us?

25   A.    Si.
```

1    Q.   Now, sir, do you know the address of where you lived at

2    Alexis' house by heart?

3    A.   One -- after I saw it, yes.

4    Q.   If you could refresh your recollection of the address

5    where you lived with Alexis in Detroit and --

6              MR. RUHNKE:  Can I see it?

7              MS. DOMINGUEZ:  One moment, please.

8              Your Honor, the defense has admitted they have no

9    objection to this exhibit coming in, although neither one of

10   us had it.  I'm going to mark it as composite Exhibit 173.

11             THE COURT:  Very well.

12             (At 2:24 PM, Government Exhibit 173 admitted into

13             evidence.)

14   BY MS. DOMINGUEZ:

15   Q.   Sir, I'm going to have you read the address before I

16   publish it in the event you can't see it clearly on the

17   monitor.  Can you tell us what the address was of the house

18   you were living at with Alexis?

19   A.   12742 Flanders Street, Detroit, Michigan.

20   Q.   I projected these identifications onto the screen.  Could

21   you just confirm to me that these are the two IDs you have

22   handed to me and have been marked into evidence?

23   A.   Yes.

24   Q.   And, sir, why is it that you have two that expire on the

25   same date?

```
1    A.    I can't remember.

2    Q.    Is that you in both of these photos, the way you looked

3    when you were in Detroit?

4    A.    Yes.

5    Q.    One with long hair and one with short hair?

6    A.    Yes.

7    Q.    And, sir, how long were you in Detroit?

8    A.    About one year, more or less.

9    Q.    And did there come a time in 1999 that you returned to

10   Puerto Rico?

11   A.    Yes.

12   Q.    And when you returned, did you continue to have

13   involvement with the drug point at palo de goma?

14   A.    Yes.

15   Q.    And what were you doing there?

16   A.    I was a lookout at the drug point, and I also watched

17   over Omi.

18   Q.    Now, when you and Alexis had gone to Detroit, who was

19   left in charge of the drug point at palo de goma?

20   A.    Omi, Rufo, and Jannette.

21   Q.    And who was Jannette?

22   A.    Jannette was the widow of Julio Feto.

23   Q.    This is Julio Feto, the person that was killed when the

24   attempt was made on Alexis life?

25   A.    Yes.
```

1   Q.   And when you returned to Puerto Rico, was Omi still in

2   charge of the drug point?

3   A.   Yes.

4   Q.   And were Rufo and Jannette still assisting him?

5   A.   Yes.

6   Q.   And did there come a time, sir, that you again left

7   Puerto Rico?

8   A.   Yes.

9   Q.   And was that approximately in the year 2000?

10  A.   Yes.

11  Q.   Where did you go?

12  A.   Boston, Massachusetts.

13  Q.   Why is it that you left to Boston in the year 2000?

14  A.   Because I had cases pending in court.

15  Q.   And your attorney alerted you that you would probably be

16  arrested?

17  A.   Yes.

18  Q.   And while you were working in Boston, did you there also

19  continue to be involved in the drug business?

20  A.   Yes.

21  Q.   What were you doing?

22  A.   Dealing with cocaine.

23  Q.   And when you say (Remarks in Spanish,) or dealing, do you

24  mean you were selling cocaine?

25  A.   Yes.

1   Q.   Now, the drugs that you were selling in Boston, were you

2   getting them from the palo de goma drug point or from

3   somewhere else?

4   A.   Palo de goma.

5   Q.   Who was sending them to you?

6   A.   Omi.

7   Q.   And while you were in Boston, sir, where was Alexis?

8   A.   I think he was in Florida.

9   Q.   But he was not in Puerto Rico?

10  A.   No.

11  Q.   Now, sir, I'd like to direct your attention to the 23rd

12  of October of the year 2000.  Almost one year after the murder

13  of David Nieves Cardona.  Tell us what happened on that date

14  when you were in Boston.

15  A.   I worked at Goya, and I was arrested.

16  Q.   And why were you arrested?

17  A.   Because I had cases pending in court.

18  Q.   In Boston or in Puerto Rico?

19  A.   In Puerto Rico.

20  Q.   And, sir, what happened after you were arrested in

21  Boston?

22  A.   I was extradited in November.

23  Q.   And you were brought to Puerto Rico?

24  A.   Yes.

25  Q.   And you had to face the firearm charges and drug charges

1   that you've previously testified about?

2   A.   Yes.

3   Q.   And were you also charged with a series of murders of

4   which you testified here about today?

5   A.   Yes.

6   Q.   And, sir, did you reach an agreement with the local

7   Department of Justice with respect to these charges?

8   A.   Yes.

9   Q.   And as a result of that agreement, did you eventually

10  plead guilty to 11 murder charges?

11  A.   Yes.

12  Q.   And did you receive a 20 year sentence?

13  A.   Yes.

14  Q.   As part of your Cooperation Agreement, did you cooperate

15  against others who had been involved in the murders?

16  A.   Yes.

17  Q.   And did that include Alexis Candelario Santana?

18  A.   Yes.

19  Q.   Now, you've told us for the better part of the day how

20  you admired Alexis, you respected him and you wanted to be

21  just like him.

22  A.   Yes.

23  Q.   You were willing to kill for him?

24  A.   Yes.

25  Q.   You were willing to give your life to protect him?

```
 1   A.   Yes.

 2   Q.   Yet you ended up cooperating against him.

 3   A.   Yes.

 4   Q.   Explain to us why that was.

 5   A.   Because when I got locked up, I asked him for help, and

 6   he told me no, he wasn't going to help me.

 7   Q.   Did you ask him specifically for something?

 8   A.   Yes, to get me an attorney.

 9   Q.   And what did he tell you?

10   A.   That if I wanted an attorney, I had to come back to the

11   people with the Neta.

12           THE INTERPRETER:   To the town.  I'm not sure.

13   BY MS. DOMINGUEZ:

14   Q.   Who are the Netas?

15   A.   Los Neta are an organization in prison.

16   Q.   And so he wanted you to do what with the Neta?

17   A.   That I go live with them.

18   Q.   Do they live in a separate section of the jail?

19   A.   Yes, they live separately.

20   Q.   And why were you reluctant to do that?

21   A.   Because I was told that if I went to Los Neta, I was

22   going to get hung.

23   Q.   So you were upset at Alexis?

24   A.   Yes.

25   Q.   You felt betrayed by him?
```

```
 1   A.    Yes.

 2   Q.    And you were angry?

 3   A.    Yes.

 4   Q.    And you decided to cooperate against him?

 5   A.    Yes.

 6   Q.    And others?

 7   A.    Yes.

 8   Q.    And as a result of being angry and upset at Alexis, did

 9   you make up things and lie about Alexis' involvement in these

10   murders?

11           MR. REBOLLO:  Objection, vouching, Your Honor.

12           THE COURT:  Well, why don't you rephrase.

13   BY MS. DOMINGUEZ:

14   Q.    Now, sir, as a result of having been angry or upset at

15   Alexis, how, if at all, did that effect your testimony in the

16   cases in which you testified against him?

17           MR. REBOLLO:  Same objection.

18           THE COURT:  I will allow it.

19           THE WITNESS:  Repeat the question.

20   BY MS. DOMINGUEZ:

21   Q.    As a result of being upset with Alexis, did that effect

22   in any way the testimony that you gave to the local

23   authorities about his involvement in the murders?

24   A.    No.

25   Q.    But you've testified that you were angry?
```

```
 1    A.    Yes.
 2    Q.    In fact, you wrote to a woman named Jenny in 2001 about
 3    Alexis?
 4    A.    Yes.
 5    Q.    Who was Jenny?
 6    A.    Alexis' lover.
 7    Q.    And what did you tell Jenny while you were in jail?
 8    A.    That when I got out, I was going to rip off Omi's head,
 9    kill Alexis, and flee to Argentina.
10    Q.    And did you mean that?  That's how you felt?
11    A.    At the time I felt anger, and that's what I said.
12    Q.    And, sir, as you sit here today, are you still angry at
13    Alexis Candelario?
14    A.    No.
15    Q.    Why not?  What's changed?
16    A.    Because thanks to the fact that he dropped me, he let me
17    go, he abandoned me, today I've changed my life and I'm alive,
18    thanks to God.
19    Q.    You've told us throughout your testimony, sir, of all of
20    your criminal activities since the time you were a teenager.
21    A.    Yes.
22    Q.    You sold drugs, you delivered drugs, you were a leader in
23    a drug trafficking organization, and you've killed many
24    people.
25    A.    Yes.
```

1   Q.    Is that the person you are today?

2   A.    No.

3   Q.    Why not?

4   A.    Because I realized I was living a life that was going to

5   lead me to the tomb or to prison for the rest of my life, and

6   I decided to change my life.

7   Q.    Sir, and as you sit here today testifying before this

8   jury about all the people that you've killed and all the

9   criminal acts that you have performed, how do you feel?

10  A.    I'm embarrassed about the things that I did, and I regret

11  all the harm that I caused.  And I've asked God for

12  forgiveness.  And I truly, well, have asked God to forgive me

13  for everything that I did.  And I regret all the bad things I

14  did and all the harm I caused.

15  Q.    I have no further questions.

16          THE COURT:  Very well.  Cross.

17          MR. REBOLLO:  May it please the Court.

18          THE COURT:  Please.

19                    CROSS-EXAMINATION

20  BY MR. REBOLLO:

21  Q.    So, Mr. Ortiz, after killing all those people, selling

22  all those drugs, it is possible to snap your fingers one day

23  and become a law abiding, truth telling citizen?  Is that what

24  you're telling us?

25  A.    I'm here telling the truth.

```
 1   Q.   Well, you are a killer, aren't you?
 2   A.   I was a killer.
 3   Q.   In fact, a serial killer, right?
 4   A.   Yes, I was a killer, yes.
 5   Q.   Not only a serial killer, but a confessed convicted
 6   killer of many people?
 7   A.   Yes, I was.
 8   Q.   And yet you're not in prison today?
 9   A.   No.
10   Q.   You're living somewhere with your wife enjoying your kids
11   in the free community, right?
12   A.   Yes.
13   Q.   And you're not pending any sentence?
14   A.   No, because I served.
15   Q.   Did you?  You're not waiting to face any Judge to decide
16   whether you should do additional time for your crimes, are
17   you?
18   A.   No, no -- I don't know.
19   Q.   You have no pending state charges or state sentences?
20   Let's put the state part aside, all right?
21        THE INTERPRETER:  State -- the interpreter needs a
22   repetition.
23   BY MR. REBOLLO:
24   Q.   You have no pending state charges or state sentencing?
25   Let's put the state side aside.
```

```
 1   A.   No.

 2   Q.   And you're not even facing any Federal charges?

 3   A.   No.

 4   Q.   You know that for the facts that you have confessed to us

 5   today, you could be facing the same Federal charges that have

 6   this man -- has this man here today?

 7            MS. DOMINGUEZ:  Objection.

 8            THE COURT:  I will allow that.  Go ahead.

 9            MS. DOMINGUEZ:  Because there is additional charges

10   related to conduct that's not attributable.

11            THE COURT:  Well, some of the charges.  Some of the

12   charges.

13   BY MR. REBOLLO:

14   Q.   Right?

15   A.   Could you repeat the question again?

16   Q.   That you know that for all of those murders you have told

17   us today, you could be facing the same murder charges that

18   have us here in this court for the last month?

19   A.   Yes, yes, but I'm telling the truth.

20   Q.   In fact, at the Federal level, the conduct you have told

21   us about could potentially expose you to the death penalty.

22            MS. DOMINGUEZ:  Same objection, lack of foundation.

23            THE COURT:  Overruled.  I will allow that.

24            THE WITNESS:  Yes.

25   BY MR. REBOLLO:
```

 1    Q.   You know that you could and perhaps should be exposed to

 2    charges that could potentially carry the death penalty?

 3    A.   I came to tell the truth and to assume responsibility.

 4    And I'm here.

 5    Q.   Let's try answering the question now.  You know that for

 6    the murders you have admitted today, you could and perhaps

 7    should be facing Federal charges that could expose you to the

 8    death penalty?

 9    A.   No, I didn't know.

10    Q.   Well, you know that charges based on murders never

11    expire, so they're still alive today?

12    A.   I was judged and sentenced, and I served my time for

13    that.

14    Q.   And so did Alexis, right?

15    A.   Yes.

16    Q.   But he's sitting here today, right?

17              MS. DOMINGUEZ:  Objection.

18              THE COURT:  Sustained.

19    BY MR. REBOLLO:

20    Q.   And you could be sitting here today if those Federal

21    charges based on those murders had been filed by the United

22    States government, right?

23    A.   I don't know.

24    Q.   You know that not one Federal charge has been filed

25    against you to this day?

1  A.    No, because I don't -- I don't know.  I came to tell the

2  truth, and I'm here.  And I don't know.

3  Q.    You know -- let's try the question again.  You know that

4  no Federal charges, zero, have been filed against you by the

5  Federal Prosecutor's Office?

6  A.    Yes, I know.

7  Q.    For murder or for anything else?

8  A.    Yes, I -- yes.

9  Q.    And you don't even have a written Plea Agreement?  This

10 is a type of verbal understanding you have with the Federal

11 government?

12 A.    I came here to tell the truth.

13 Q.    You know that drug charges could have been filed against

14 you and weren't?

15 A.    Yes.

16 Q.    Or murder charges that even if they did not carry the

17 death penalty, carried life in prison, mandatory life, and

18 they weren't?

19 A.    Yes.

20 Q.    All in exchange for your agreement to testify against

21 Alexis in this case; isn't that correct?

22        MS. DOMINGUEZ:  Objection to the characterization of

23 the agreement.  There's been no testimony of any agreement of

24 any nature.

25        THE COURT:  Well, there is no agreement that we know

1    of.

2              MR. REBOLLO:  That's the point.

3              THE COURT:  Well, the point is there is no

4    agreement.

5              MR. REBOLLO:  No written agreement.  There is some

6    type of understanding here.

7              THE COURT:  If you have proof of an agreement, let's

8    have the proof of it.

9              MR. REBOLLO:  Very well, sir.  Yes, sir.

10   BY MR. REBOLLO:

11   Q.   Now, let's talk about the events that brought you to sit

12   in this chair today.  You were arrested sometime in the year

13   2000, correct?

14   A.   Yes.

15   Q.   And I'm not talking about the arrest in Boston.  I'm

16   talking about the arrest that was made here in Bayamon by the

17   local police.

18   A.   Yes.  I was arrested here.

19   Q.   And you were arrested in possession of a weapon?

20   A.   Yes.

21   Q.   And that weapon presented a problem for you, didn't it?

22   A.   Yes, because I got a case out of that.  I got in trouble.

23   Q.   Well, you got some lesser firearm charges against you

24   filed, right?

25   A.   Yes.

1  Q.   But you knew that that particular weapon presented a

2  problem for you?

3  A.   No.

4  Q.   You knew that that weapon you had used to kill a

5  particular person; isn't that correct?

6  A.   I don't remember.

7  Q.   You knew that that was the weapon that you had used to

8  kill Richard Matias Negron in that disco murder you told us

9  about a while ago, right?

10 A.   I didn't kill Richard.

11 Q.   The weapon that you had with you when you were arrested,

12 that's the one used to kill Richard Matias Negron; isn't that

13 correct?

14 A.   I don't remember.

15 Q.   And they got it on you, right?

16 A.   Yes, I was arrested and several weapons were seized.

17 Q.   You knew that weapon, once the police investigated a

18 little bit more, they were going to find out it was the one

19 used to kill Richard Matias and you were caught red handed

20 with it?

21 A.   I didn't know that exactly had been the weapon used to

22 kill him.  I didn't know.

23 Q.   Are you telling this jury under oath that you do not know

24 that that pistol you were arrested with in Bayamon was the one

25 that was used to kill Richard Matias Negron?  Yes or no?

```
 1   A.   No.

 2   Q.   You remember giving a sworn statement on August 27, 2002,

 3   regarding the Richard Matias Negron murder?

 4   A.   Yes.

 5           MR. REBOLLO:  Your Honor, may I have some guidance on

 6   how the Court --

 7           THE COURT:  Well --

 8           MR. REBOLLO:  Yes.

 9           (Bench conference held.)

10           MR. REBOLLO:  Judge, the reason I'm asking for

11   guidance, I've tried some other cases with some other judges,

12   and there was a little rule, and I got into not trouble but I

13   got the judges upset, so I want to know exactly how you want

14   me to do this.  I can either put it on the monitor --

15           THE COURT:  Let me see what it is.  Let me read it

16   first.

17           MR. REBOLLO:  It's the last paragraph.

18           THE COURT:  I don't understand, because it doesn't

19   say -- explain to me what is the --

20           MR. REBOLLO:  Judge, he says here that the gun -- the

21   gun that was used to kill Matias --

22           THE COURT:  No.  The gun that he gave Alexis that

23   night.

24           MR. REBOLLO:  Well, he didn't explain that here.

25           THE COURT:  Well, he did.
```

1          MR. REBOLLO:  He didn't explain it.

2          THE COURT:  He said he pulled out two guns from the

3    glove compartment and gave one to Alexis.  He kept one.

4          MR. REBOLLO:  He says here that when he was coming

5    out of the Bayamon court, he was shot, hurt, and the Bayamon

6    cops occupied that gun.

7          THE COURT:  It's not inconsistent at all with what

8    he's telling you.

9          MR. REBOLLO:  He's not agreeing that he was caught

10   with the weapon that was used with the murder.

11         THE COURT:  That's not what it says there,

12   Mr. Rebollo.  It doesn't say that.  He's agreeing -- I don't

13   understand what you're trying to do.  I frankly don't.

14         MR. REBOLLO:  He says here that the gun that was

15   seized from him in Bayamon is the one used to kill Richard

16   Matias Negron.

17         MS. MATEO:  Which he gave to Alexis, which is

18   consistent with what he said.

19         THE COURT:  All he's saying is that that's one of the

20   guns he used, the one he gave to Alexis that night.

21         MR. REBOLLO:  The point is the gun that was seized

22   from him, I'll show him the --

23         THE COURT:  Maybe, do you understand it?  Because I

24   don't see the inconsistency.

25         MS. DOMINGUEZ:  I think counsel is trying to get him

1    to admit, which that's not his testimony and this is not

2    inconsistent with his testimony --

3             THE COURT:  I don't see the inconsistency at all.

4    I'm sorry.

5             MR. REBOLLO:  Judge, can I give him the sworn

6    statement to see if it refreshes his recollection?  And I'll

7    ask him again.

8             MR. RUHNKE:  If I could jump in, too, I think I

9    understand what my brother counsel is trying to do.  When he

10   was arrested, he was carrying the gun that was used to kill

11   Richard Matias.

12            THE COURT:  No.  Wait a minute.  It doesn't say that

13   here.  It says the pistol that I --

14            MR. RUHNKE:  No, no.

15            THE COURT:  The pistol that that night I gave to

16   Alexis, referring to this incident, is the same that I always

17   used; and one day when I was leaving the Court, I was shot.

18   And the people from homicide in Bayamon occupied the pistol.

19            MR. REBOLLO:  Exactly.

20            MS. DOMINGUEZ:  But he's not saying he used it.

21            MR. REBOLLO:  He's in possession.

22            MS. DOMINGUEZ:  But he's not saying he used it.  And

23   that's been the premise to your question.

24            THE COURT:  I'm sorry.  (Shaking head from side to

25   side.)

1          MR. RUHNKE:  Let me just stop here.  He's not saying

2     he used it.  The witness has said clearly that he gave the

3     pistol to Alexis, he was too high on marijuana to carry out

4     that particular murder.  However, on the day he was arrested

5     and shot by the police, he had that pistol with him.

6          Therefore, he knows -- therefore, he knows that if

7     they check out that pistol, they're going to connect him or at

8     least the pistol and him to the Richard Matias murder.  I

9     mean, that's the --

10          THE COURT:  Right, right.  But the implication that

11     the question brings about is different.

12          MS. DOMINGUEZ:  Right.

13          THE COURT:  He had two pistols to begin with in the

14     car that night at the disco.

15          MR. RUHNKE:  We can revisit it.

16          THE COURT:  One used by Alexis.  One used by him.

17     Okay.

18          MR. RUHNKE:  Yeah.

19          THE COURT:  He claims he never shot, but Alexis shot.

20     But the pistols are still his.  When he's arrested in Bayamon,

21     one of these pistols is occupied.

22          The implication that has been made by Mr. Rebollo is

23     he's denied having killed this guy at the disco, because of

24     the fact this gun was occupied with him.  And I'm sorry,

25     that's not what he said.  I'm sorry.

1          MR. REBOLLO:  That's not what I'm driving at.

2          THE COURT:  Yes.  That's exactly what you said.

3          MR. RUHNKE:  We can redo it.

4          THE COURT:  I will not allow that.  That's totally

5   consistent in the context of what I've heard here.

6          MR. REBOLLO:  Can I give him the Sworn Statement, so

7   he can --

8          THE COURT:  No.  You ask him whatever you want about

9   it, but not that.

10          (Bench conference concluded.)

11          MR. REBOLLO:  May it please the Court.

12          THE COURT:  Please.

13   BY MR. REBOLLO:

14   Q.   Mr. Ortiz, according to your testimony, it was Alexis who

15   used a particular gun to kill Richard Matias at the disco

16   murder, correct?

17   A.   Yes.

18   Q.   But that when you were arrested in Bayamon in the arrest

19   you just told us about, that was the gun that was seized from

20   you; isn't that correct?

21   A.   A pistol was seized from me.

22   Q.   And it was the gun that had been used to kill Richard

23   Matias Negron, correct?

24   A.   It's just that I don't -- I can't say if that was that

25   particular pistol.

1          THE COURT:  Let me try something.  The night of the

2     incident at the discotheque you had two guns in the glove

3     compartment, correct?

4          THE WITNESS:  Yes.

5          THE COURT:  Who owned these guns?

6          THE WITNESS:  Those pistols were given to us by

7     Alexis.

8          THE COURT:  Okay.  So you gave one to Alexis, you

9     kept one that night?

10          THE WITNESS:  Yes.

11          THE COURT:  And you're telling us, you told us

12     before, that for whatever reason that you have explained, you

13     did not shoot and Alexis did shoot, that's what you're telling

14     us, correct?

15          THE WITNESS:  Yes.

16          THE COURT:  What happened to the pistols after that

17     incident, after you left the scene?  What happened to those

18     two pistols?

19          THE WITNESS:  It's just that I can't remember -- I

20     can't remember exactly what happened to those pistols.  But

21     the way it worked was that I could have a pistol one day, and

22     then the next day another person had the same pistol, and the

23     next day another, and so forth.

24          THE COURT:  Let me ask, you kept the pistols?  The

25     pistols were not thrown away, disappeared?  You guys kept the

1    pistols, both pistols?

2               THE WITNESS:  Yes.

3               THE COURT:  Okay.  At the time that you were arrested

4    in Bayamon, you had a pistol?

5               THE WITNESS:  Yes.

6               THE COURT:  The pistol that you had in Bayamon was

7    one of the many pistols that the organization had?

8               THE WITNESS:  Yes.

9               THE COURT:  Is it possible that the one that you were

10   arrested with happened to be the one that Alexis used that

11   night to kill this gentleman at the discotheque?  I'm asking.

12   I'm asking.

13              THE WITNESS:  Yes, it's possible.

14   BY MR. REBOLLO:

15   Q.   That's what you told the state prosecutors when you gave

16   the Sworn Statement; isn't that correct?

17   A.   Yes.

18   Q.   That the pistol that was used to kill Richard Matias

19   Negron was the one you were arrested with in Bayamon?

20   A.   Yes, it may be.

21   Q.   And you knew right then and there that if the police

22   investigated a little bit more, they were going to tie that

23   pistol to that murder?

24   A.   Yes.

25   Q.   And since the pistol was seized in your possession,

1    therefore they were going to tie you to that murder?

2    A.    Yes, because I was there, too.

3    Q.    But you were found in possession of the gun that killed

4    the person, right?

5    A.    Yes, I think so.

6    Q.    And the attorney you had told you that given his

7    conversations with the state prosecutors, they were

8    investigating you not only for that murder but for several

9    other murders?

10   A.    He told me I was being investigated for some murders,

11   yes.

12   Q.    And you knew you had committed those murders, so

13   eventually you were going to be caught, right?

14   A.    Yes.

15   Q.    And if caught and convicted of any one of those murders,

16   you would have to do 99 years in state prison, a state

17   sentence of 99 years.

18   A.    I didn't know what the sentence would be, but I did know,

19   yes, I was going to get in trouble.

20   Q.    And you knew you were in serious trouble then?

21   A.    Yes.

22   Q.    And you didn't want to do all that time in prison, did

23   you?

24   A.    It's just that I didn't know how much time I was going to

25   get in jail.

1   Q.   But you knew you had to come up with an answer quickly to

2   avoid serving all those years in jail, correct?

3   A.   I knew I had to decide between telling the truth or

4   remaining silent, and I chose to tell the truth.

5   Q.   Speaking of telling the truth, did you tell this jury

6   about every murder that you have been involved in?

7   A.   Yes.

8   Q.   All of them, right?

9   A.   Yes.

10  Q.   Did you forget to tell them about a murder you committed

11  on February 8, 1991 -- 99?

12  A.   No, I think I've said everything I've done.

13  Q.   Well, have we spoken about a person named Carlos Ayala

14  Bruno?  We haven't, have we?

15  A.   No.

16  Q.   You know who he is, right, or was?

17  A.   I think so.

18  Q.   Nicknamed Perlita, right?

19  A.   Yes.

20  Q.   And you killed him on February 8, 1999, and yet did not

21  say a word about that one to this jury today?

22        MS. DOMINGUEZ:  Judge, I object to the form of the

23  question that's being asked.

24        THE COURT:  Well, let's see what the answer is.  What

25  is the answer, sir?

```
1              THE WITNESS:  I've talked practically about
2    everything I've done, and I'm here.
3              THE COURT:  The question is whether you killed this
4    guy, Perlita?
5              THE WITNESS:  Yes.
6              THE COURT:  Go ahead.
7    BY MR. REBOLLO:
8    Q.   And you hadn't told us about that this morning, right?
9              MS. DOMINGUEZ:  Again, Judge, I object.  He's been
10   responding to my questions.
11             THE COURT:  He responded to your questions, yes.  But
12   he has a right to elicit any other murder if there are any
13   others.
14             MS. DOMINGUEZ:  I understand, Judge.  I just object
15   to the manner in which there is a suggestion --
16             THE COURT:  The manner is a different story.  But he
17   has a right to ask.  Go ahead.
18             So you admit that one also, Perlita?
19             THE WITNESS:  Yes.
20   BY MR. REBOLLO:
21   Q.   About a minute ago you told this jury you had already
22   told them about every murder you had ever committed, right?
23   A.   Yes.
24   Q.   And that was a lie, right?
25   A.   No.
```

1   Q.   Because you hadn't told them about your murder of a man

2   named Carlos Ayala Bruno, also known as Perlita, right?

3   A.   No, I haven't lied, because I'm not denying that I killed

4   him.

5   Q.   And you killed him with a couple friends of yours named

6   Juan Andino Gonzalez and Jonathan Cruz Burgos, right?

7   A.   Yes.

8   Q.   And any other murders that you haven't told this jury

9   about?

10  A.   No, no.  I don't remember.  I don't have a number like

11  that to remember so many things.

12  Q.   You killed so many people you just can't remember the

13  body count, right?

14          MS. DOMINGUEZ:  Objection, argumentative.

15          THE COURT:  Sustained.  Argumentative.

16  BY MR. REBOLLO:

17  Q.   Did you tell the Government, the Federal Government that

18  you had killed Carlos Ayala Bruno, or did you keep that from

19  them, also?

20          MS. DOMINGUEZ:  I object to the characterization of

21  concealment.

22          THE COURT:  Well, there is -- that's not the

23  question.  The question is were you ever asked about this

24  Perlita guy by the Government?

25          THE WITNESS:  Not that I can remember.

```
 1  BY MR. REBOLLO:
 2  Q.   Well, did --
 3            MR. REBOLLO:  I'm sorry, Your Honor.
 4            THE COURT:  Excuse me.  Were you asked about any
 5  other murders?
 6            THE WITNESS:  About the ones that I was asked, I
 7  answered and I told them.  But obviously it's so many cases
 8  and so many things that I may forget something.  But the local
 9  police asked me, and it's all in the agreement that I signed.
10            THE COURT:  Is there any other murder that you may
11  have forgotten that now you remember you committed?
12            THE WITNESS:  No, I can't remember.
13            THE COURT:  Go ahead.
14  BY MR. REBOLLO:
15  Q.   Well, did the Federal Government ask you to tell them the
16  truth about everything you had done and any illegal activities
17  you knew about?  Did they ask you something like that?
18  A.   Yes.
19  Q.   And because they didn't ask you specifically whether you
20  had killed this person, you didn't tell them?
21  A.   I just didn't remember.
22  Q.   You don't remember any others right now you're telling
23  us?
24  A.   No.
25  Q.   How about a human being by the name of Jose Ramon Rentas
```

1    Aponte?  Do you remember who he was?

2    A.    Yes.

3    Q.    Another human being whose life you took, right?

4    A.    Yes.

5    Q.    And that was on April 7, 1999, right?

6    A.    I think so.

7    Q.    And you didn't tell this jury about it today until I

8    asked you now at three o'clock, right?

9          MS. DOMINGUEZ:  Judge, I object.

10         THE COURT:  Sustained.  Ms. Dominguez asked very

11   specific questions of specific murders, and he was never asked

12   to volunteer names of other people he had murdered.  That's a

13   fact.

14         You can ask him -- you can ask him for all the

15   murders he has committed --

16         MR. REBOLLO:  Yes.

17         THE COURT:  -- that were not covered before.  Of

18   course you can ask that.  But don't implicated that it was

19   being hidden by Ms. Dominguez.  That's not true.

20         MR. REBOLLO:  No, I'm not suggesting --

21         THE COURT:  That's the implication.

22         MR. REBOLLO:  I apologize.  I'm not suggesting

23   that.

24         THE COURT:  Please.

25   BY MR. REBOLLO:

1   Q.   The fact is, Mr. Ortiz, that you did not tell the Federal

2   Government, these agents and prosecutors about that other

3   human being you had murdered, right?

4   A.   There are documents, an agreement I signed in which I

5   state everything I did.

6           THE COURT:  That's with the local court?

7           THE WITNESS:  Yes.

8           THE COURT:  Okay.

9   BY MR. REBOLLO:

10  Q.   The question was, the fact remains that you did not tell

11  the FBI or the Federal prosecutors about that other human

12  being whose life you had taken; isn't that correct?

13  A.   It's just that this document says everything I did, and I

14  answered everything I was asked.

15  Q.   And because they didn't ask you specifically whether you

16  had murdered that person, you didn't think it was important to

17  tell them?

18  A.   It's just that there's a document that says everything I

19  did.  And it says everything I did, and all the cases that I

20  served for.  And they have that document.  And everything they

21  asked me about, I answered.

22  Q.   And these two men that you killed, that had nothing to do

23  with Alexis Candelario, right?  These are people you killed on

24  your own, because you're a killer?

25          MS. DOMINGUEZ:  Objection, argumentative.

1          THE COURT:  It's an argumentative question.  But the

2     question can be asked, would it be fair to say that those two

3     murders that Mr. Rebollo asked you about, the last two ones

4     had nothing to do with palo de goma or the organization in

5     Sabana Seca?

6          MR. REBOLLO:  The question is with Alexis

7     Candelario's permission.

8          THE COURT:  Or with Alexis Candelario?

9          THE WITNESS:  Everything that I did, I did because I

10    was ordered to do it by Alexis.  All the people I killed, I

11    killed because Alexis ordered me to.  And that's the truth.

12         THE COURT:  Including Perlita?

13         THE WITNESS:  Yes.

14         THE COURT:  Including the last gentleman that

15    Mr. Rebollo asked you about?

16         THE WITNESS:  Everybody.

17    BY MR. REBOLLO:

18    Q.   Alexis was never charged by the state authorities for the

19    murder of Perlita or of Jose Rentas Aponte, was he?

20    A.   No.

21    Q.   Because this is the first time you have ever said that

22    Alexis Candelario had anything to do with that; isn't that

23    correct, sir?

24    A.   No.

25    Q.   When your -- you feel you're caught in the corner, you

1    point your finger to Alexis, don't you?

2    A.    No.

3    Q.    How about -- by the way, are there any other murders you

4    committed that you haven't told us about?

5    A.    Again, I repeat to you that they have all these

6    documents, and they know.

7    Q.    You lost count?  You can't tell us?

8              MS. DOMINGUEZ:  Objection, argumentative.

9              THE COURT:  Sustained.

10   BY MR. REBOLLO:

11   Q.    How about a human being by the name of Miguel Medina,

12   also known as Micky?  Remember who he was?

13   A.    Yes.

14   Q.    You killed him on November 15, 1997, right?

15   A.    Yes.

16   Q.    You hadn't told us about that man this morning or to my

17   questions a few minutes ago, right?

18   A.    No.

19   Q.    Any other people you haven't told us about that you

20   killed?

21   A.    All that information is in the Plea Agreement that I

22   signed with the local police.

23   Q.    Can you answer the question now, sir?

24   A.    Repeat the question.

25             THE COURT:  Any other murder that comes to mind that

1   you have not talked about here today?  That's the question.

2          THE WITNESS:  It's just that again, I repeat, it's so

3   many cases that I have answered what I have been asked about.

4   BY MR. REBOLLO:

5   Q.   How about a human being by the name of Jorge Santos

6   Salas?  Do you remember who he was?

7   A.   I can't remember right now.

8   Q.   Another man you killed on November 7, 1997, right?

9   A.   I just can't remember right now.

10  Q.   Same day -- same week you killed the one I just asked you

11  about, Miguel Medina, also known as Micky.  Both the same

12  week, right?

13  A.   Again, I repeat, I don't remember.

14  Q.   And when you were arrested by the Bayamon police with the

15  gun that has been used to kill Richard Matias Negron, you knew

16  you had killed these other individuals I just asked you about,

17  right?

18  A.   Yes.

19  Q.   And you knew that now that the police were on to you, it

20  was a matter of time before they investigated and got to you

21  with those murder charges, right?

22  A.   Yes.

23  Q.   And your attorney told you as much, right?

24  A.   Yes.

25  Q.   And you were told if you don't want to spend the rest of

1   your life in prison, you have to point the finger at somebody

2   else, right?

3   A.   I have to tell the truth.

4   Q.   You had to give up some names, right?  You had to talk

5   about somebody else, right?

6   A.   I had to tell the truth and say who had -- I had

7   participated with in the things that I did.

8   Q.   And you were -- then the police, the State Police

9   officers went to see you, right?

10  A.   Yes.

11  Q.   And asked you about all these murder that had been

12  committed in Sabana Seca and which had not been resolved,

13  which were still pending?

14  A.   Yes.

15  Q.   And you decided to cooperate, quote, unquote, with them

16  by telling them who had committed them, right?

17  A.   I cooperated and told the truth.

18  Q.   And in each and every one of the ones they asked you, you

19  pointed your finger at Alexis, right?

20  A.   For each of the cases, I told them who I had done it with

21  and the truth.

22  Q.   Now, you didn't do it for free out of the goodness of

23  your heart, right?

24  A.   Yes, I said it because it was the truth.

25  Q.   You did it in exchange for a lenient sentence, right?

1   A.   Well, I have no control over the prosecutors.   The

2   prosecutors in exchange for my testimony gave me 20 years in

3   prison.

4          THE COURT:   Let me ask you something.   This was in

5   Bayamon Superior Court?

6          THE WITNESS:   Yes.

7          THE COURT:   When did you go in?

8          THE WITNESS:   I was caught on October 23rd, 2000.

9          THE COURT:   You were detained immediately?

10         THE WITNESS:   Yes.   I was arrested in Boston, and I

11  was extradited in 30 days.

12         THE COURT:   When were you released by the

13  Commonwealth Department of Corrections, by the locals, for

14  serving your sentence?

15         THE WITNESS:   I think it was July 7 or 8, 2011.

16         THE COURT:   So you basically served about ten years

17  of your 20 year sentence?

18         THE WITNESS:   Ten years and nine months

19  approximately.

20         THE COURT:   Go ahead.

21  BY MR. REBOLLO:

22  Q.   Pretty good deal wouldn't you say for all the murders you

23  had committed?

24  A.   Well, I had the opportunity to get out one day.

25  Q.   How long do you think that a person that's committed as

1    many murders as you should serve in prison?

2    A.   I don't know.

3    Q.   Now, when you say you had no control over the sentence,

4    are you telling us you had been lucky to reach a deal where

5    you only got ten years of prison time?

6    A.   I have to thank God.

7    Q.   How about for the fact that the Federal Government has

8    decided never to accuse you of anything for these murders?

9           MS. DOMINGUEZ:   Objection.

10          THE COURT:   Sustained.   Sustained.

11   BY MR. REBOLLO:

12   Q.   Now, remember who the agents were, state agents were that

13   you sat with when you started your cooperation?

14   A.   Yes.

15   Q.   Who were they?

16   A.   Officer Ana Rosario, Officer Rafael Albino, Officer

17   Huerta, Officer Bonilla, Sergeant Montalvo, Sergeant Mulich,

18   and several more whose names I can't remember.

19   Q.   And the murders that I asked you about a few minutes ago,

20   and I'll repeat them, the murder of Jorge Santos Salas, Jorge

21   Santos Salas; Miguel Medina, a/k/a Micky; Jose Rentas Aponte;

22   and Carlos Ayala Bruno, those four Alexis Candelario was never

23   charged with, right?

24   A.   I don't think so.

25   Q.   Now, when you sat with these agents that you have

```
 1   described for us, remember when that was?
 2   A.   No, I don't remember.
 3   Q.   Do you remember that you sat down with them and they
 4   asked you about pending murders in the Sabana Seca area, and
 5   in about a week they had them all resolved?  Do you remember
 6   that?
 7   A.   They asked me -- they told me I had to tell them
 8   everything I had done and the people I had done it with.
 9   Q.   That was not the question.  The question was if you
10   remember that in about a week, two weeks time, these agents
11   with your help had all these murder resolved?
12   A.   No, I don't remember if it was a week or two after.
13   Q.   And there were murders that had been committed years
14   earlier and nobody had been arrested, they hadn't been
15   resolved, right?
16   A.   Yes.  I told them everything I knew.
17   Q.   All right.  I take it you don't remember the specific
18   dates of the interviews that you had with the agents?
19   A.   No.
20   Q.   All right.  Let me see if I can help you out by giving
21   you copies of your Sworn Statements and see if that refreshes
22   your recollection.  Fair?
23   A.   Okay.
24   Q.   And I'll be -- with the Court's permission, I'll be
25   making a list of those dates.  Let me hand you --
```

1          MR. REBOLLO:  Do I need to mark this, Judge, so I

2    can just -- it's to refresh recollection.

3          THE COURT:  Just use it, and if we have to mark it

4    for whatever reason -- tell us the date.

5          MR. REBOLLO:  Let me hand you -- it will be faster if

6    I use the monitor, Judge, if that's okay with you.

7          THE COURT:  Identify them, please, so we can deal

8    with Identification Number.

9    BY MR. REBOLLO:

10   Q.   Sir, let me direct your attention to the monitor.

11         MS. DOMINGUEZ:  Judge, I object to this being

12   projected.

13         THE COURT:  The reason is that we don't know whether

14   there's any inconsistencies, whatever.

15         MS. DOMINGUEZ:  Right.  It's hearsay to the extent

16   there's not an inconsistency, and it hasn't been

17   established.

18         MR. REBOLLO:  All I'm interested in is the date.

19         THE COURT:  Tell him the date, and he'll take the

20   date for granted, I'm sure.

21   BY MR. REBOLLO:

22   Q.   Sir, I hand you Defendant's Identification Four.  I ask

23   you, is this not the Affidavit you provided in the case of

24   Silvestre Gonzalez Santos, and if the date that appears on the

25   last page is not April 18 of 2001?

```
 1   A.    Yes.

 2   Q.    All right.  So April 18, '01, right?

 3   A.    Yes.

 4   Q.    Let me hand you Defendant's ID Five, and ask you if this

 5   is not the Sworn Statement that you gave regarding the death

 6   of Javier Martinez Ramos, also known as Tokio, and if this is

 7   not April 18, 2001 as well?

 8           MR. REBOLLO:  Can I show the date?  It would be

 9   quicker.

10           MS. DOMINGUEZ:  That's fine.  We have no objection

11   to the date.

12   BY MR. REBOLLO:

13   Q.    You see there?

14   A.    I can't see what it says.

15   Q.    Okay.  The date is not clear, but it's clearly April

16   2001, right?

17   A.    Yes.

18   Q.    Can you see the 18 here?

19   A.    Yes.

20   Q.    You saw it, right?

21   A.    Yes.

22   Q.    Right there, the eight?  Okay.  Same day, right?

23   A.    Yes.

24   Q.    Let me show you the Sworn Statement you gave.  That's

25   your name, right?
```

```
 1   A.   Yes.

 2   Q.   You see again this is April 11, 2001?

 3   A.   Yes.

 4   Q.   And this involved the death of Jimmy Nelson Velez Matos,

 5   fair?

 6   A.   Yes.

 7   Q.   All right.  So Jimmy Nelson Velez Matos.  April 11, 2001.

 8   I show you next Defense ID Seven.  ID Seven, this is your

 9   Sworn Statement.  See it?

10   A.   Yes.

11   Q.   April 17, I can't see the year, but I'll get to the last

12   page in a second.  This involves the death of Melvin Medina

13   Arce.  See it?

14   A.   Yes.

15   Q.   And that one was done, last page, April 17, 2001.  See

16   it?

17   A.   Yes.

18   Q.   Let me show you Defendant's ID Eight.  This is a Sworn

19   Statement provided by you.  See it?

20   A.   Yes.

21   Q.   April 2001?  Do you see the 18 again like the other one?

22   A.   Yes.

23   Q.   And that involves Orlando Cardona Ortiz, Orli.  Do you

24   see it there?

25   A.   Yes.
```

1    Q.   Now, the one involving the -- the one involving the disco

2    murder, that's the one where you were arrested with the gun

3    that was used in that particular killing, right?

4    A.   Yes, it may be.

5    Q.   All right.  And this one took a little longer, right,

6    because you were arrested with a weapon?  You weren't

7    cooperating on this one right away, right?  It was a little

8    different case?

9    A.   No, sir.  When I signed the Plea Agreement with the local

10   police, I gave everything.

11   Q.   Well, this is your Sworn Statement.  See it?

12   A.   Yes.

13   Q.   And this involved the Disco Freeworld murder.  Do you see

14   it?

15   A.   Yes.

16   Q.   And the date is a little later, right?  August 22,

17   2002 -- August 27, I'm sorry, 2002?

18   A.   Yes.

19            MR. REBOLLO:  Judge, I hear thirst.  Can we take a

20   break?

21            THE COURT:  You hear what?

22            MR. REBOLLO:  Thirst, people drinking.

23            THE COURT:  I have allowed jurors to bring water if

24   they want to.

25            MR. REBOLLO:  I'm sorry.  If there's a need for a

```
 1   break --
 2              THE COURT:  The jury knows if they need a break, all
 3   they have to do is ask.
 4              MR. REBOLLO:  Okay.  Yes, sir.
 5   BY MR. REBOLLO:
 6   Q.   All right.  Now, the triple murder, which is the last
 7   murder you were asked about?
 8              COURTROOM DEPUTY:  Mr. Rebollo, I'm sorry.  There's
 9   another one.
10              MR. REBOLLO:  Okay.  Sorry.
11   BY MR. REBOLLO:
12   Q.   Let me ask you about two more.  One involving -- you see
13   the date?  This is ID Five, Defendant's ID Five.  You see the
14   date of that one?  April, 2001 as well?
15   A.   Yes.
16   Q.   I think there may be a typo elsewhere, but it's clear
17   there, right?
18   A.   Yes.
19   Q.   You can see the 18 under the E there?
20   A.   Yes.
21   Q.   And this involves the murder of Javier Martinez Ramos,
22   Tokio?
23   A.   Yes.
24   Q.   Oh, this is a copy.  That's why.
25              COURTROOM DEPUTY:  It's Number Ten.  The other one.
```

```
 1              MR. REBOLLO:  I'm sorry.  All right.  Let me go to
 2   Number Ten.
 3   BY MR. REBOLLO:
 4   Q.   This one, your Sworn Statement, April 17, 2001, involving
 5   the murder of Saul Padin Orozco?
 6   A.   Yes.
 7   Q.   April 17, 2001.  All right.
 8              Now, the triple murder that you testified last
 9   about, that's the one you say you spoke on the phone with
10   Alexis, and Alexis supposedly according to you admitted his
11   participation there.  You were in prison when that happened,
12   right?
13   A.   Yes.
14   Q.   And you didn't give a Sworn Statement pertaining to that
15   murder, right?
16   A.   No.
17   Q.   Because you didn't testify in that case, right?
18   A.   No, no.  I didn't testify.
19   Q.   Because this testimony about you getting a phone call
20   where Alexis admitted this, this is something new, right?
21   A.   No.
22   Q.   You never told that to the state authorities, right?
23   A.   No.
24   Q.   You were never a witness in that case at the state level,
25   right?
```

```
 1   A.    No.

 2   Q.    No, you were not a witness, right?

 3   A.    No.

 4   Q.    Correct?

 5   A.    Yes.  No.

 6   Q.    Correct that you were not a witness?

 7   A.    Yes, correct, I was not a witness.

 8   Q.    All right.  Thank you.  So that testimony did not exist

 9   back then when the state authorities filed the case, right?

10           MS. DOMINGUEZ:  I object to the form of the question.

11           THE COURT:  Well, go ahead.  I will allow it.

12   BY MR. REBOLLO:

13   Q.    Sir?

14   A.    Repeat the question.

15   Q.    That testimony did not exist back then when the state

16   authorities filed those charges, right?

17           THE INTERPRETER:  Filed the charges?  Sorry.

18           MR. REBOLLO:  Yes.

19           THE WITNESS:  I can't remember if I commented

20   something to the local police.

21   BY MR. REBOLLO:

22   Q.    That's something that you disclosed for the first time

23   when you were talking to the Federal authorities, right?

24   A.    I can't remember if I told the local police about it.

25   Q.    Well, if you did, they never asked you to submit a Sworn
```

1    Statement, right?

2    A.    Yes.

3    Q.    All right.  Now, you were imprisoned from October 23,

4    2000, to July 7, 2011, right?

5    A.    Yes.

6    Q.    And so starting 2011, you were about to complete your

7    prison sentence, right?

8    A.    Yes.

9    Q.    You were about to be done, to put these murders behind

10   you, right?  Serve out your state sentence?

11   A.    Yes.

12   Q.    And then you got a visit from the Federal authorities,

13   right?

14   A.    I received several visits, yes.

15   Q.    Right close to the time that your sentence was about to

16   be done?

17   A.    I can't remember the exact date.

18   Q.    Well, it was sometime in 2010, beginning of 2011, right?

19   A.    I just don't remember when it was exactly.

20          THE COURT:  Well, let me see if I can help.  Were you

21   still in jail when they visited you?

22          THE WITNESS:  Yes.

23          THE COURT:  Go ahead.

24   BY MR. REBOLLO:

25   Q.    And they told you they were still interested in your

1   testimony regarding -- that you had given in state court

2   regarding Alexis Candelario, right?

3   A.   They asked me if I had testified against Alexis at the

4   state level.

5   Q.   And they asked you because they were interested in your

6   testimony again, right?

7   A.   They wanted to know if I could -- if I was willing to

8   tell the truth about what I knew.

9   Q.   Did they come to tell you that they needed your testimony

10  to file Federal charges against Alexis?

11  A.   No.

12  Q.   Well, do you remember when was it -- did you go to the

13  Grand Jury, the Federal Grand Jury that participated in this

14  case?

15  A.   Yes.

16  Q.   Do you remember when that was?

17  A.   I can't remember the date, but yes.

18          MR. REBOLLO:   Your Honor, may I put the Grand Jury

19  front page on here?

20          THE COURT:   Sure.

21  BY MR. REBOLLO:

22  Q.   Do you see that's a transcript of your Grand Jury

23  testimony?

24  A.   Yes.

25  Q.   Do you see the date was February 15 of 2011?

1    A.    Yes.

2    Q.    So you told us that you had been released from state

3    prison on July 7 of 2011, right?

4    A.    Yes.

5    Q.    So about roughly five months before you were to be a free

6    man again, law enforcement agents came knocking at your door

7    again, right?

8    A.    Yes, on that date.

9    Q.    And these are the authorities that you know have the

10   power at any time to file murder charges against you which

11   could expose you to the death penalty or a life sentence,

12   right?

13          MS. DOMINGUEZ:  Judge, I object, because that's

14   incorrect.  It's the Grand Jury that files charges.

15          THE COURT:  Well, go ahead.  It's the Grand Jury that

16   files charges.

17          MR. REBOLLO:  I said Federal authorities.

18   BY MR. REBOLLO:

19   Q.    You know the Federal Government, the ones for whom the

20   agents that went to visit you work, have the power at any time

21   to file charges against you for those murders that could

22   potentially expose you to the death penalty or a life

23   sentence?

24          MS. DOMINGUEZ:  Again, I object.

25          THE COURT:  To serious penalties.  Could be.  Yes.  I

1   will allow that.

2              THE WITNESS:  The agreement that I signed stated that

3   if any state or Federal agency needed me to testify again in

4   another investigation, I had to tell the truth and what I had

5   stated once already.

6              MR. REBOLLO:  May I have a second, Your Honor?

7   BY MR. REBOLLO:

8   Q.   You're telling this jury that the agreement you signed

9   included the Federal authorities, is that what you're telling

10  this jury?

11  A.   I am saying the document specified that if any state or

12  Federal agency needed me to say what had happened in relation

13  to any other investigation, I had to tell the truth.

14  Q.   You're telling us that it included the Federal

15  authorities?  Is that your testimony under oath?

16             THE COURT:  I need to clarify that.  I'm sorry.  I

17  need to know whether it's the Federal Government signed the

18  agreement or is it that he was told as part of the local

19  agreement that he had to say the truth in any forum that he

20  would be asked to testify.

21             It's two different things.  So you have to clarify

22  that.

23             MR. REBOLLO:  May we have a side bar then, Judge, to

24  clarify?

25             THE COURT:  Sure.

```
 1              (Bench conference held.)
 2              THE COURT:  That is exactly what it says.
 3              MR. REBOLLO:  It doesn't say Federal --
 4              THE COURT:  I'm sorry.  You have to be careful,
 5    Mr. Rebollo.  I'm not going to let you do implications that
 6    are not correct.  I'm going to intervene.  You know that.
 7              MR. REBOLLO:  That's why I'm asking to proffer.  I
 8    don't want to violate the Court's ruling.
 9              THE COURT:  You do whatever you want.  If you go out
10    of the line, I'm going to stop you.
11              MR. REBOLLO:  I know, sir.
12              THE COURT:  So this is not signed by the Federal
13    Government.
14              MR. REBOLLO:  Right.
15              THE COURT:  So all it says, like any Plea Agreement,
16    if you're asked to testify even before God, you have to say
17    the truth.  That's all it says.
18              MR. REBOLLO:  But it doesn't say Federal Government
19    in any way.  In fact, it's limited to the Commonwealth of
20    Puerto Rico.
21              THE COURT:  Why are you including the Federal
22    Government --
23              MR. REBOLLO:  I'm not including it.  He is.
24              MS. DOMINGUEZ:  It says any other judicial forum.
25              THE COURT:  Any other judicial forum.  That includes
```

1    anything.

2         MR. REBOLLO:  Look at number two.  The reach of this

3    agreement is limited to all penal actions that can filed

4    against Mr.  --

5         THE COURT:  That is a boiler plate Plea Agreement

6    clause that is included in every Plea Agreement everywhere you

7    go that says that you have to tell the truth, the truth, and

8    even if you go before -- even exaggerating, before God --

9         MR. REBOLLO:  But, Judge, what the witness is saying

10   is it included the Federal authorities.  I'm asking him

11   specifically.  I'm not getting a straight answer.

12        THE COURT:  He's telling you exactly what the Plea

13   Agreement says.  That if he's called by Federal authorities to

14   testify, he has to tell the truth.  If he's called by an

15   administrative agency, he has to tell the truth.  If he's

16   called by a court in Mayaguez, he has to tell the truth.

17        MR. REBOLLO:  That's an interpretation.

18        THE COURT:  I'm sorry?

19        MR. REBOLLO:  If that's the Court's interpretation --

20        THE COURT:  That is my interpretation.

21        Let me tell you, if you don't finish him today, we're

22   continuing tomorrow.

23        MR. REBOLLO:  No, no.  I'll finish him today.  Can we

24   take a recess?

25        THE COURT:  Okay.

```
 1              (Bench conference concluded.)

 2              (At 3:58 PM, recess taken.)

 3              (At 4:17 PM, proceedings reconvened.)

 4         MR. REBOLLO:  Your Honor, thanks for the break.  I

 5    just have three more points to make.

 6         THE COURT:  Whatever time you need.

 7    BY MR. REBOLLO:

 8    Q.   Mr. Ortiz, let me go back for a minute to earlier today

 9    when I asked you if you remembered having killed a person

10    named Jorge Santos Salas on November 7, 1997.  And you told me

11    you didn't remember.

12              MR. REBOLLO:  Let me say it again.

13    BY MR. REBOLLO:

14    Q.   Let me go back, Mr. Ortiz, to earlier today when I asked

15    you if you remembered having killed a man named Jorge Santos

16    Salas on November 7, 1997.  And you told me you did not

17    remember.

18    A.   Yes.

19    Q.   Do you still not remember?

20    A.   No, I don't remember.  I don't remember by name, no.

21    Q.   Would looking at a copy of the agreement you had with the

22    state authorities help you refresh your recollection as to

23    whether this was one of the men that you killed and to whose

24    murder you plead guilty to?

25    A.   I could try.
```

```
 1              THE COURT:  Would you point him -- show it to him and
 2   point out the page and the particular place?
 3              MR. REBOLLO:  Yes, sir.
 4              THE COURT:  It's easier that way.
 5   BY MR. REBOLLO:
 6   Q.   Do you remember now, sir?
 7   A.   By the name, I don't remember.
 8   Q.   All right.  But do you see that it was in fact part of
 9   your plea agreement with the state authorities pursuant to
10   which you plead guilty to that murder?
11   A.   Yes.
12   Q.   All right.  Let me have that.
13              Two more questions, sir.  When you met with the FBI
14   and the Federal prosecutors, did they say to you in sum and in
15   substance, please tell us about your entire criminal history?
16   A.   Yes.
17   Q.   And finally, are there any other crimes that you have
18   committed that you have not told us about today?
19   A.   Not that I can remember, no.
20              MR. REBOLLO:  Judge, that's all I have.  If I could
21   mark this as a demonstrative exhibit?
22              THE COURT:  Sure.  Sure.
23              MR. REBOLLO:  And that would be it.
24              THE COURT:  Demonstrative exhibit.
25              MR. REBOLLO:  No more questions, sir.
```

```
 1              THE COURT:  Any more questions?
 2              MS. DOMINGUEZ:  I have some redirect.  I don't know
 3   if --
 4              THE COURT:  Do you have any?
 5              MR. AGUAYO:  No.
 6              MS. DOMINGUEZ:  Very briefly, Judge.
 7              THE COURT:  Very briefly.
 8              MS. DOMINGUEZ:  May I approach the witness?
 9              THE COURT:  Please.
10                         REDIRECT EXAMINATION
11   BY MS. DOMINGUEZ:
12   Q.   Sir, let me show you what's marked as Government
13   Identification 174.  What is that document?  What is that
14   document?
15   A.   That's the document I signed with the local authorities.
16   Q.   And is that the document to which you repeatedly made
17   reference throughout the cross-examination of Mr. Rebollo?
18   A.   Yes.
19   Q.   And does that document contain all the murders to which
20   you have plead guilty?
21   A.   Yes.
22   Q.   And I direct your attention to the first and second pages
23   of that document.  Please tell us whether all the murders that
24   Mr. Rebollo questioned you about claiming that you had not
25   shared those with this jury are contained in that document.
```

```
 1   A.   Yes.

 2   Q.   And do you also recall his questions which suggested that

 3   you had also kept those from the Federal government?

 4   A.   Yes.

 5   Q.   Let me ask you, sir, did you keep that document from the

 6   Federal government?

 7   A.   No.

 8   Q.   Have you discussed the content of that agreement on

 9   repeated occasions with Federal prosecutors and agents?

10   A.   Yes.

11   Q.   Is the fact that you plead guilty to all the murders

12   included in that agreement, including the ones about which

13   Mr. Rebollo asked you, a matter of public record?

14   A.   I believe so.

15   Q.   Now, sir, Mr. Rebollo also asked you a series of

16   questions with respect to the manner in which the Federal

17   government approached you nearing the end of your prison

18   sentence.   Do you remember those questions?

19   A.   Yes.

20   Q.   And he suggested that you needed to cooperate with the

21   Federal authorities by pointing the finger at someone because

22   you didn't want to stay in prison or go back to jail.   Do you

23   remember those questions?

24   A.   Yes.

25   Q.   Now, sir, you testified that you elected to cooperate
```

1    with the Federal authorities.

2    A.    Yes.

3    Q.    And that you believed that that was required pursuant to

4    the terms of your Plea Agreement with the local government?

5    A.    Yes.

6    Q.    You testified you went to the Grand Jury in February of

7    2011, while you were still in jail.

8    A.    Yes.

9    Q.    And that you've also been interviewed and debriefed on

10   many occasions by Federal agents and prosecutors.

11   A.    Yes.

12   Q.    Mr. Ortiz, I'd like you to tell the members of this jury

13   when throughout that entire process you were ever told that

14   you would never be charged with a Federal crime.

15   A.    Never.

16   Q.    And tell the members of the jury when throughout that

17   entire process you have demanded any kind of immunity so that

18   you could not be charged.

19   A.    Never.

20   Q.    Have you made statements in the Grand Jury and to Federal

21   agents and prosecutors that incriminates you?

22   A.    I believe so.

23   Q.    And why have you done that, sir, if you have not received

24   immunity, nor told you will not be charged?

25   A.    Because I'm here to tell the truth.

1    Q.   Now, Mr. Rebollo also asked you some questions suggesting

2    that the Federal government wanted you to cooperate so that

3    they could bring charges against Alexis Candelario Santana.

4    Do you remember that?

5    A.   Yes.

6    Q.   Did anybody ever tell you, sir, that if you decided not

7    to cooperate with the Federal authorities, the Federal

8    Government would be unable to bring charges against Mr. Alexis

9    Candelario Santana?

10   A.   No.

11   Q.   Have you been the only witness to testify in this trial?

12          MR. REBOLLO:   Objection.

13          THE COURT:   Well, sustained.   We know that.

14   BY MS. DOMINGUEZ:

15   Q.   Now, Mr. Rebollo also suggested to you that you got a

16   pretty good deal at the local level in exchange for your

17   cooperation against Alexis Candelario Santana and others.   Do

18   you remember those questions?

19   A.   Yes.

20   Q.   Now, you plead guilty to how many murders at the local

21   level?

22   A.   About 11, more or less.

23   Q.   And you were sentenced to how many years?

24   A.   20 years in prison.

25   Q.   Of which you served almost 11 years?

1    A.    Yes.

2    Q.    Now, sir, in the cases in which you either testified or

3    cooperated against Alexis Candelario Santana, are you aware of

4    whether he plead guilty to 12 of those second degree murders?

5              MR. REBOLLO:  Objection, Your Honor.

6              THE COURT:  Excuse me?

7              MR. REBOLLO:  Argument.  It is improper.

8              THE COURT:  I don't understand the question.  What

9    kind of murders?

10             MS. DOMINGUEZ:  Second degree murders.

11             THE COURT:  Okay.  12.

12             MS. DOMINGUEZ:  12.

13             THE COURT:  I will allow that, if he knows.

14             THE WITNESS:  Yes.

15   BY MS. DOMINGUEZ:

16   Q.    And do you know, if you know, the sentence that he

17   received in the local court?

18   A.    Yes.

19   Q.    What was that sentence for the 12 second degree murders?

20   A.    12 years.

21   Q.    And do you know of those 12 years, how many years he

22   served for those 12 second degree murders?

23   A.    About six years.

24   Q.    So out of you and Alexis, who got the better deal?

25             MR. REBOLLO:  Argumentative, Judge.

```
 1                    MS. DOMINGUEZ:  I withdraw the question.  I have
 2        nothing further.
 3                    THE COURT:  Thank you very much.  You are now
 4        excused, sir.
 5                    (At 4:31 PM, witness excused.)
 6                    THE COURT:  Next witness.
 7                    MS. DOMINGUEZ:  Ana Rosario, Your Honor.
 8                    THE COURT:  These are the --
 9                    MS. DOMINGUEZ:  Local murders, the prior murders.
10        The police officer.
11                    THE COURT:  Police officer.
12                    MS. DOMINGUEZ:  Yes, sir.
13                    THE COURT:  Okay.
14                    MS. DOMINGUEZ:  Very brief.
15                    THE COURT:  I would really like to finish -- you have
16        how many people from Forensic Sciences here today?
17                    MS. DOMINGUEZ:  Three.
18                    THE COURT:  I'd like to finish before 6:30 if
19        possible, okay?
20                    MS. DOMINGUEZ:  Would you like me to call the
21        pathologists first, Judge?
22                    THE COURT:  No.  I want to finish early.  We had a
23        long day yesterday.
24                    MS. DOMINGUEZ:  Yes, sir.
25                    THE COURT:  And I am pretty tired.  Let's go straight
```

1    to the point.

2            MS. DOMINGUEZ:  Yes, sir.

3            THE COURT:  No preambles.  Go ahead.

4            COURTROOM DEPUTY:  Raise your right hand.

5        Do you solemnly swear that the testimony you are

6    about to give in this case is the truth, the whole truth, and

7    nothing but the truth, so help you God?

8            THE WITNESS:  Yes, I swear.

9     L I E U T E N A N T   A N A   R O S A R I O   M O R A L E S,

10        called as a witness by the Government, having been sworn,

11        testified as follows:

12                       DIRECT EXAMINATION

13   BY MS. DOMINGUEZ:

14   Q.   Good afternoon.  Please state your full name and

15   position.

16   A.   Ana Rosario Morales, Lieutenant of the Puerto Rico

17   Police.

18   Q.   Now, Ms. Rosario, tell us please whether on October 2nd,

19   1995, you received a call to respond to a scene at Calle

20   Progreso in Sabana Seca.

21   A.   Correct.

22   Q.   And, Ms. Rosario, was that the crime scene where a person

23   named Javier Martinez Ramos had been killed?

24   A.   That is correct.

25   Q.   All right.  And what did you observe when you arrived?

A.    When I arrived there, I observed a dead person.  It was a

man.  He was on the road, Progreso Street, facing down.  Face

down.  And he had multiple bullet wounds throughout his whole

body.

Q.    And was any ballistics evidence recovered from the scene?

A.    Correct.

Q.    Could you tell us about that?

A.    Yes.  I collected from the scene 121 spent shell casings.

These were long rifle casings, caliber .223 and 7.62.

Q.    Now, from your training are you able to tell us whether

these are automatic weapons or not?

A.    They can be converted into automatic weapons.  They're

rifles.

Q.    And how many shots, if you were able to tell, had the

victim sustained?

A.    He had multiple bullet wounds on his entire body.  I

cannot give you an exact number.  But his face, he had some on

his face, his head.  He was completely disfigured.  His arm,

his right arm had multiple bullet wounds and was open,

destroyed.  And so he had multiple bullet wounds all over his

body.

        MS. DOMINGUEZ:  Your Honor, I understand there's an

objection to the photos.  May we approach?

            THE COURT:  May I see them?

            (Bench conference held.)

1          MS. DOMINGUEZ:  These are very gory, Judge.

2          THE COURT:  Forget it.

3          (Bench conference concluded.)

4          THE COURT:  Maybe --

5          MS. DOMINGUEZ:  Yes.

6          THE COURT:  Maybe -- well, we'll discuss it later.

7   Go ahead.

8          MS. DOMINGUEZ:  Judge, should I have her identify it

9   just in case and not publish?

10          THE COURT:  Sure, just in case.

11          MS. DOMINGUEZ:  May I approach?

12          THE COURT:  Please.

13   BY MS. DOMINGUEZ:

14   Q.   Let me show you what's been marked for identification as

15   Government's Exhibits 175 A and B.  Would you please examine

16   those photos and tell us whether you recognize what is

17   depicted in them?

18   A.   That's correct.  This is the man that died, that was dead

19   that night that I investigated the scene, and that I was just

20   talking about.

21   Q.   Is that Javier Martinez Ramos?

22   A.   Correct.

23   Q.   And is the condition in which he appears in those two

24   photos that I have shown you consistent with your recollection

25   of how he appeared when you responded to the scene of that

1  homicide and also consistent with the description that you

2  have given to the jury of his body?

3  A.   That's correct, it's consistent.

4         MS. DOMINGUEZ:  For the moment, Your Honor, I will

5  not offer them.

6  BY MS. DOMINGUEZ:

7  Q.   Now, Ms. Rosario, in addition to having investigated the

8  crime scene for Javier Martinez Ramos, can you tell the

9  members of the jury whether you also had occasion to meet a

10 person by the name of Braulio Ortiz Rodriguez, also known as

11 Menor?

12 A.   Correct, I met him.

13 Q.   And were you one of his handling agents?

14 A.   Correct.

15 Q.   And was Braulio Ortiz Rodriguez a cooperator for the

16 local government?

17 A.   Correct.

18 Q.   And did he provide information with respect to various

19 murders in which Alexis Candelario Santana and others were

20 involved in?

21        THE COURT:  Were allegedly involved in.

22 BY MS. DOMINGUEZ:

23 Q.   Were allegedly involved in.

24 A.   Yes, correct.

25 Q.   Did that include the murder of Javier Martinez Ramos

1   about which you have testified?

2   A.   That is correct.

3   Q.   Andres Torres Oquendo?

4   A.   Correct.

5   Q.   Melvin Medina Arce?

6   A.   Correct.

7   Q.   Orlando Cardona Ortiz?

8   A.   Correct.

9   Q.   Jimmy Velez Matos?

10  A.   Correct.

11  Q.   Saul Padin Orozco?

12  A.   Correct.

13  Q.   Silvestre Gonzalez Santos, also known as Paoli?

14  A.   Correct.

15  Q.   Richard Matias Negron?

16  A.   Correct.

17  Q.   David Nieves Carmona?

18  A.   Correct.

19  Q.   Zuly Santana Frances?

20  A.   Correct.

21  Q.   Harry Santiago Santiago?

22  A.   Correct.

23  Q.   And Erick Morales Alvarez?

24  A.   Correct.

25  Q.   Now, the last three names I read to you, Zuly Santana

1  Frances and Harry Santiago Santiago and Erick Morales Alvarez

2  resulted from one event; is that correct?  A triple murder.

3  A.    Correct.

4  Q.    Now, with respect to each of those cases -- one moment,

5  please.  With respect to each of those victims that I have

6  read out to you, have you had occasion to review certified

7  copies of sentences issued by the local court of Puerto Rico,

8  the Tribunal Primer Instancio --

9        THE INTERPRETER:  Court of First Instance.

10       THE COURT:  Court of First Instance.  Superior Court

11  Bayamon.

12  BY MS. DOMINGUEZ:

13  Q.    -- reflecting convictions for Alexis Candelario Santana

14  for each of those murders?

15  A.    Correct, yes.

16  Q.    I have nothing further.

17       THE COURT:  Thank you.  Any cross?  No cross?

18       MR. REBOLLO:  No.

19       THE COURT:  No cross?

20       MR. AGUAYO:  (Shaking head from side to side.)

21       THE COURT:  Thank you, Lieutenant.  You are now

22  excused.  Thank you.

23       (At 4:43 PM, witness excused.)

24       MR. RUHNKE:  Your Honor, could we briefly come to

25  side bar while the next witness is coming in?

```
 1                    THE COURT:  Sure.

 2                    (Bench conference held.)

 3                    THE COURT:  We can excuse her?

 4                    MR. RUHNKE:  Yes, yes, yes.  I said while the next

 5    witness is coming in.  Sorry.

 6                    THE COURT:  I see.  I thought it had to do with this

 7    witness.

 8                    MR. RUHNKE:  No, no, no.

 9            Your Honor, now that the convictions have been

10    entered into the record, I think it would be appropriate for

11    the jury to be instructed as you said you would at some

12    point.

13                    THE COURT:  About what?

14                    MR. RUHNKE:  That the convictions alone don't

15    establish that he's guilty of the murder.

16                    THE COURT:  This is not the moment.  I don't think

17    this is the moment.  This is something that I have to think

18    about the language, that there has to be a connection of

19    course between the murders and the Federal charges that are

20    here, but I don't want to spit out an instruction like that.

21            We can do it later.  This is not the moment.

22                    MR. REBOLLO:  You issued a ruling on this that had

23    some language.

24                    THE COURT:  But I am not prepared to instruct the

25    jury --
```

1           MR. REBOLLO:  Just so you know there's some language.

2     You worked on it already.

3           THE COURT:  The ruling was basically that the mere

4     fact that there is a state conviction for murder standing

5     alone doesn't make it, because you have to have always the

6     connection, the link to the enterprise, et cetera, et cetera,

7     et cetera.  That's basically what it is.  But I have to --

8     when I prepare the charge, I will take care of that.

9           MR. REBOLLO:  Okay.

10          THE COURT:  Not at this moment.

11          MR. RUHNKE:  I think it was more than without the

12    connection to the enterprise.  I think what Your Honor said

13    and what the Government had submitted -- what the Government

14    had submitted to Your Honor was the fact the conviction does

15    not establish that he committed the murder.  And that's what

16    we're concerned about.

17          THE COURT:  No, no.  Don't misread my Orders.  What I

18    meant to say and what the law says is that the conviction

19    alone, standing alone, is a paper from Bayamon, doesn't make

20    it.

21          MR. RUHNKE:  Right.

22          THE COURT:  You have to prove that he did the murders

23    of course, and there's testimony, other things.  There has to

24    be a link not only that he did the murder, but there has to be

25    a link with the enterprise.

1            MR. RUHNKE:  Sure.

2            THE COURT:  With the Federal charge, because even if

3    Menor were to be believed fully, that alone is not enough.

4    The jury has to make a finding that that murder that is

5    contained in the judgment, plus the testimony of the people

6    who allegedly said they participated and they had the

7    knowledge, the personal knowledge, plus all of the other

8    evidence, make a package that makes it.

9            MR. RUHNKE:  Has to make the VICAR.

10            THE COURT:  Exactly.  I'm not going to touch it with

11    a ten foot pole now.  I think it's too early.

12            MR. RUHNKE:  Okay.

13            MR. AGUAYO:  Your Honor, while we're here, the 105

14    ruling you did this morning, how far are we going to extend

15    this?

16            THE COURT:  We already did it this morning.  We

17    already told them that the murders --

18            MR. AGUAYO:  Everything.

19            THE COURT:  No, we already said to the jury that the

20    murders that were going to be discussed during this testimony

21    had nothing to do with your client.  We already said that.

22            MR. AGUAYO:  Okay.

23            (Bench conference concluded.)

24            THE COURT:  Next witness, please.

25            MR. HEGYI:  Your Honor, the Government recalls Dr.

1   Conte.

2          THE COURT:  Dr. Conte.

3          (Witness took the stand.)

4          COURTROOM DEPUTY:  Please stand up and raise your

5   right hand.

6          Do you solemnly swear that the testimony you are

7   about to give in this case is the truth, the whole truth, and

8   nothing but the truth, so help you God?

9          THE WITNESS:  I do.

10          D R.  M A R I A  C O N T E  M I L L E R,

11      called as a witness by the Government, having been sworn,

12      testified as follows:

13                     DIRECT EXAMINATION

14   BY MR. HEGYI:

15   Q.   Good afternoon, Doctor.

16   A.   Good afternoon.

17   Q.   We understand that you have --

18          THE COURT:  She was previously qualified.

19          MR. HEGYI:  Right.

20          THE COURT:  The jury heard the qualifications.  There

21   was no objection to the qualifications, so we don't have to go

22   through that.

23          MR. HEGYI:  We're not going to do that.

24          THE COURT:  I would like you to ask her questions

25   about the remaining autopsies that she participated in.

1          MR. HEGYI:  That's what we're going to do, Your

2    Honor.

3          THE COURT:  Okay.

4    BY MR. HEGYI:

5    Q.   Thank you for waiting, Doctor.  If we could turn to the

6    autopsy you did on March 1st, 1997, of Melvin Medina Arce.  It

7    should be your autopsy number 816-97.

8    A.   Yes.

9    Q.   If you would let me know when you have it?

10   A.   Yes, I have it here.

11   Q.   Doctor, are you in fact the person that did the autopsy

12   on Melvin Medina Arce?

13   A.   Yes, I did the autopsy.

14   Q.   And were you kind enough earlier today to do a diagram

15   for us?

16   A.   Yes.

17   Q.   And let me have you look at what are marked as

18   Government's Exhibits 176 A and B.  Do you have those there?

19   A.   Yes.

20   Q.   Is Government's Exhibit 176 A the diagram you did showing

21   the wounds and injuries that you observed on autopsy for

22   Mr. Arce?

23   A.   Yes, that is the diagram.

24   Q.   And is Government's Exhibit 176 B the facial

25   identification shot then done on autopsy of Mr. Arce?

1   A.    Yes.   That is the ID photo, yes.

2             MR. HEGYI:   The Government offers both 176 A and B.

3             THE COURT:   Any objection to those?

4             MR. RUHNKE:   No objection.

5             THE COURT:   None.   Thank you very much.   It's

6   received.

7             (At 4:48 PM, Government Exhibits 176-A and 176-B

8              admitted into evidence.)

9   BY MR. HEGYI:

10  Q.    For the benefit of all of us, I'm going to go ahead and

11  put 176-A on the monitor, Doctor.   And if you will please

12  describe for us your findings on autopsy for Mr. Arce and if

13  you would point them to us on the diagram that's now in

14  evidence?

15  A.    Yes.   Please, I don't know if it would be better to begin

16  with the head diagram, because that is the one that has the

17  gunshot wound A.

18  Q.    That's great.   I'm now turning to the second page,

19  Doctor, of Government's Exhibit 176-A that's in evidence?

20  A.    Okay.   Thank you.   Please, can I have the pointer?   Thank

21  you.

22             Gunshot wound A is here in the forehead on the left

23  side.   And that bullet went through the head and fractured the

24  frontal bone, and a projectile was recovered close to the

25  entrance wound.

1   Q.   Okay.   And gunshot wound B, please, Doctor?

2   A.   Gunshot wound B is here located in the face, on the right

3   side of the face.   And that projectile went through the face

4   and through, fractured the jaw, and continued entering the

5   neck and lacerating the trachea.   And also entered the pleural

6   cavity.

7   Q.   Is that the lung?

8   A.   Yes.   The lung, yes.   And lacerated the left lung.   And

9   the projectile was recovered, a fragment, in two pieces.   One

10   of the pieces was located in the left lung, and another piece

11   was located in the trachea.

12   Q.   And would that be the jacket, the copper jacket in the

13   trachea, and the lead bullet in the left lung?

14   A.   Yes, that's correct.

15   Q.   Now, Doctor, this particular wound, gunshot wound B, did

16   it have any other characteristics around it?

17   A.   Yes.   This gunshot wound has a black area associated with

18   the superior border of the hole, of the entrance wound.

19   Probably that is soot.

20   Q.   Okay.   Now, you told us yesterday about stippling.   Soot

21   we're hearing about for the first time here.   What is soot?

22   A.   Soot is black powder that is expelled from the gun at the

23   time the discharge -- the gun fires the bullet and is -- when

24   this happens, it's because there is a close relationship

25   between the aggressor and the victim.

1    Q.    You told us yesterday about how with stippling, a rough

2    rule of thumb is the barrel of the firearm must be within

3    about 12 inches of the skin upon which stippling would be

4    left.  How close does the end of the firearm need to be as a

5    general rule of thumb to leave soot as in gunshot wound B on

6    Mr. Melvin Medina Arce?

7    A.    A few inches or maybe in contact with the skin.  In

8    actual contact with the skin.

9    Q.    Okay.  And you found soot in the area of gunshot wound B?

10   A.    Yes, there was soot there, uh-huh.

11   Q.    Was there a gunshot wound C?

12   A.    Yes, gunshot wound C.  Now we need the other --

13   Q.    Okay.  I'm turning to page one.

14   A.    Uh-huh.  Gunshot wound C is located in the right

15   shoulder, and the fragmented projectile was recovered in the

16   hole, in the entrance wound.  It didn't go further into the

17   body cavity.

18   Q.    Okay.  Was there a gunshot wound D?

19   A.    Yes.  Gunshot wound D is located in the -- also in the

20   right shoulder.  The trajectory was due to the -- through

21   the skeletal tissue of the shoulder.  It went to the -- into

22   the chest cavity, fractured the rib number three, and then

23   lacerated the right lung, lacerated the heart, and the

24   projectile was recovered from the pericardial sac.

25   Q.    The pericardial sac?

1  A.   Yes.

2  Q.   The sac that goes around the heart?

3  A.   Yes.

4  Q.   And the trajectory back to front and right to left?

5  A.   Yes.

6  Q.   Okay.  We skip E using your method, and we go to -- is

7  there a gunshot wound F?

8  A.   Yes.  That is a gunshot wound located here in the right

9  elbow.  This is the entrance wound.  And the trajectory was

10 from right to left.  And the bullet exited the arm through

11 this lesion that is the exit wound that was located medially

12 in the same area of the elbow.

13 Q.   Near the ulnar nerve?

14 A.   Yes.

15 Q.   In the general area of the ulnar nerve?

16 A.   Yes.

17 Q.   And is there a gunshot wound G that you observed on the

18 body of Melvin Medina Arce?

19 A.   Yes.  Gunshot wound G is located in the rear aspect of

20 the thigh, in the right side, and the fragmented projectile

21 was recovered here, at this level of the thigh, below the

22 right gluteus.

23 Q.   Okay.  And the trajectory of that was upward?

24 A.   Upward.

25 Q.   And was there yet a gunshot wound H with regard to --

```
1    A.    Yes.

2    Q.    -- Melvin Medina Arce?

3    A.    Yes.  This is located in the -- now I will need the other

4    diagram, please.

5    Q.    I'm putting up the second page, the one that shows the

6    cranium again.

7    A.    Yes.  This is one located on the forehead on the right

8    side.  And that was very superficial.  And a fragment of a

9    projectile was recovered in that area, close to the entrance

10   wound.

11   Q.    Dr. Conte, were you able to determine to a reasonable

12   degree of pathological -- forensic pathological certainty

13   which, if any, of these gunshot wounds were fatal?

14   A.    Yes.  Gunshot wound A is definitely fatal.  Gunshot wound

15   B also.  Please can I have the -- that one, yes.

16   Q.    Okay.  And gunshot wound D?

17   A.    D is this one, is also fatal, because it lacerated the

18   heart, among other organs.

19   Q.    Allow me to put up 176-B.  Is that a photograph taken on

20   autopsy of the face of Melvin Medina Arce?

21   A.    Yes.

22   Q.    Now, had you determined to a reasonable degree of

23   patholog -- forensic pathological certainty as to the cause of

24   death?

25   A.    Yes.
```

1   Q.   What would that be?

2   A.   Multiple gunshot wounds of the body.

3   Q.   And manner of death?

4   A.   Homicide.

5   Q.   Thank you.  Could we turn lastly, Doctor, to the autopsy

6   performed by you on Erick Morales Alvarez on January 4th,

7   2011?

8   A.   Yes.

9   Q.   And did you prepare kindly for us an anatomical diagram

10  before you came to the stand today?

11  A.   (Nodding head up and down.)

12  Q.   And did you also find a photograph again, the autopsy

13  photograph for identification of Mr. Alvarez?

14         MR. RUHNKE:  Your Honor, I think Mr. Hegyi misspoke

15  and said 2011.

16         MR. HEGYI:  I'm sorry.  Thank you for correcting it.

17  BY MR. HEGYI:

18  Q.   2001?

19  A.   2001.

20         THE COURT:  2001.  Okay.

21  BY MR. HEGYI:

22  Q.   I've put in front of you what are marked as Government

23  Exhibit 177-A and B.  Are those the two items that we just

24  spoke of?

25  A.   Yes.

1   Q.   And on 177-A, does that fairly and accurately show the

2   location of the various wounds and injuries that you found on

3   his body?

4   A.   (Nodding head up and down.)

5   Q.   Could you say yes or no?

6   A.   Yes.

7   Q.   Okay.  And Government's Exhibit 177-B, is that a

8   photograph indeed of Mr. Erick Morales Alvarez on autopsy?

9   A.   Yes.

10          MR. HEGYI:  Government offers 177-A and B.

11          MR. RUHNKE:  No objection.

12          THE COURT:  No objection.  Received.  04:57 PM.

13          (At 4:57 PM, Government Exhibits 177-A and 177-B

14           admitted into evidence.)

15   BY MR. HEGYI:

16   Q.   First, ma'am, I'm going to put 177-B up for the jury to

17   see.  Is this indeed a photograph of Erick Morales Alvarez at

18   the time of autopsy?

19   A.   Yes.

20   Q.   Now, if we can turn to 177-A, this one is just a one-page

21   document having the general anatomical figure, not the cranial

22   figure.  Would you please describe for us, Doctor, the

23   injuries that you found to the body of Erick Morales Alvarez

24   when you conducted the autopsy on him, that being pathology

25   number 0056-01?

1   A.    Yes.   Gunshot wound A is located here, close to the

2   posterior midline of the body in the back of the body.   And

3   that went through the -- excuse me, through the chest wall,

4   and fractured T-5, lacerated the right lung.

5   Q.    T-5 meaning the thoracic spine?

6   A.    Yes.

7   Q.    Okay.

8   A.    Lacerated the right lung, and the projectile was

9   recovered from the chest wall in the right side.

10  Q.    And the trajectory for wound A, Doctor?

11  A.    That would be from back to front and from left to right.

12  Q.    And then upward?

13  A.    And upward.

14  Q.    Okay.   And gunshot wound B, please, Doctor.

15  A.    Okay.   Gunshot wound B is this one that is located here

16  in the back of the body, but very laterally, almost close to

17  the armpit.   And that one went subcutaneously.

18  Q.    Just under the skin?

19  A.    Under the skin.   And the projectile was recovered very

20  close to the entrance wound at this level, more or less, of

21  the chest -- of the back of the body.

22  Q.    Okay.   Gunshot wound C, please, Doctor.

23  A.    Gunshot wound C.   These are four associated gunshot

24  wounds of the back of the right shoulder.

25  Q.    By associated do you mean they're grouped closely

1   together?

2   A.   Closely together, yes.

3   Q.   Okay.

4   A.   The pathway could not be differentiated from one to the

5   other.  Yes.  And then fragmented projectiles were recovered

6   from this trajectory.  The trajectory is associated also with

7   fracture of the right clavicle.

8   Q.   Is that the collar bone?

9   A.   Yes, this one.

10  Q.   Okay.  And the trajectory on gunshot wound C, Doctor?

11  A.   From back to front.

12  Q.   Now, did you notice, you told us yesterday about

13  stippling.  You told us today about some soot?

14  A.   Yes.

15  Q.   Was there anything in that area, in the area of gunshot

16  wound C?

17  A.   In this area, and also in the back of the head, there was

18  stippling all around.

19  Q.   So that would be within -- rule of thumb, within 12

20  inches of the barrel?

21  A.   Yes.

22  Q.   Was there gunshot wound D, Doctor?

23  A.   Yes.  Gunshot wound D is located in the abdomen, left

24  side of the abdomen.  The projectile went downward and was

25  recovered from the left thigh, under the skin.

 1  Q.   Under the skin.  And then skipping E, we go to gunshot

 2  wound F, please.

 3  A.   Yes.  That is located in the chest anteriorly, in the --

 4  to the left.

 5  Q.   Okay.

 6  A.   That went through the -- the projectile didn't travel any

 7  further, was located -- recovered from the entrance wound.

 8  Q.   Okay.  And there's a gunshot wound G, Doctor?

 9  A.   And G is located in the left shoulder here, approximately

10  at the level of the shoulder, and in the proximity also of the

11  arm posteriorly.  And the projectile fragmented in multiple

12  tiny pieces that couldn't be recovered.

13  Q.   That's because they were just so tiny?

14  A.   They were very tiny, yes.

15  Q.   And the trajectory for the gunshot wound?

16  A.   That would be from back to front, and downward.

17  Q.   Okay.  Gunshot wound F, please, Doctor.

18  A.   Gunshot wound H.

19  Q.   I'm sorry.  H.

20  A.   H.  These are these two perforations that are located

21  here in the chest anteriorly in the left side.  And the

22  projectiles apparently when they impacted the body of the

23  decedent were fragmented, and they didn't go through the chest

24  wall.  Just these are very superficial wounds.

25  Q.   Is there a gunshot -- oh, I'm sorry.

1   A.    No evidence was recovered from this entrance wound.

2   Q.    Okay.  Is there a gunshot wound I, Doctor?

3   A.    Yes.  This is located here in the head, in the posterior

4   aspect of the head, and has also stippling.  The same

5   stippling that was associated -- we previously mentioned that

6   was associated with gunshot wound C, extended to the head.

7   And gunshot wound I is -- was superficial, and there was no

8   evidence recovered from that trajectory.

9   Q.    Okay.  And gunshot wound J, Doctor?

10  A.    That is located in the lateral aspect of the left

11  elbow, and there was a very close -- short trajectory.  The

12  bullet exited the body through the lateral aspect of the

13  left shoulder in a pathway that was from -- it was downward.

14  Q.    Okay.  Doctor, did you notice any what we call pseudo

15  stippling?

16  A.    Yes.  There was pseudo stippling in this area in the left

17  arm laterally and anteriorly.

18  Q.    Okay.  And did you also find an unusual marking at the

19  base of the neck on the right rear of the neck?

20  A.    Yes.  This mark is probably due to the superficial

21  trajectory of a projectile through this area, but didn't --

22  the projectile didn't penetrate the skin.

23  Q.    It just sliced along it?

24  A.    Just sliced.

25  Q.    Doctor, were you able to determine which of these wounds

1   was fatal?

2   A.   Yes.  The only one in this case that is fatal is A.

3   Q.   That's the one that went through the T-5, the vertebra

4   T-5, and into the right lung?

5   A.   Yes.

6   Q.   And was recovered in the right chest wall?

7   A.   Yes, that is the one.

8   Q.   Doctor, were you able to determine to a reasonable degree

9   of forensic pathological certainty the cause of death of

10  Mr. Erick Morales Alvarez?

11  A.   Yes.  Multiple gunshot wounds of the body.

12  Q.   And the manner of death, please?

13  A.   Homicide.

14          MR. HEGYI:  Thank you, Your Honor.  Pass the

15  witness.

16          THE COURT:  Any cross?

17          MR. RUHNKE:  No thank you, Your Honor.

18          THE COURT:  Thank you.

19          MR. HEGYI:  May the witness be excused, Your Honor?

20          THE COURT:  Thank you very much.  You are now

21  excused.

22          (At 5:05 PM, witness excused.)

23          THE COURT:  Next witness, please.

24          MS. MATEO:  The Government calls Irma Rivera Diaz.

25          COURTROOM DEPUTY:  Please stand up and raise your

1   right hand.

2           Do you solemnly swear that the testimony you are

3   about to give in this case is the truth, the whole truth, and

4   nothing but the truth, so help you God?

5           THE WITNESS:  I swear.

6                   I R M A   R I V E R A   D I A Z,

7       called as a witness by the Government, having been sworn,

8       testified as follows:

9                       DIRECT EXAMINATION

10  BY MS. MATEO:

11  Q.   Please state your full name.

12  A.   Irma Rivera Diaz.

13  Q.   And where do you currently work?

14  A.   At the Puerto Rico Institute of Forensic Sciences.

15  Q.   And what's your title?

16  A.   I am a forensic pathologist two, and I direct the

17  forensic pathology residency program.

18  Q.   And are you a medical doctor?

19  A.   That is correct.

20  Q.   And can you please briefly describe your educational

21  background?

22          THE COURT:  Is there any issue with the fact that

23  she's a licensed --

24          MR. RUHNKE:  We have no objection to her

25  qualifications.

1               THE COURT:  No objection.  Very well.

2               MS. MATEO:  We offer her as an expert in forensic

3   pathology.

4               THE COURT:  Very well.  She's qualified.

5               MS. MATEO:  Thank you.

6   BY MS. MATEO:

7   Q.   Then let's go and talk about the autopsy performed on

8   Harry Santiago Santiago.  I'm going to show you what's been

9   marked as Government's ID 178-A and B.  Do you recognize

10  these?

11  A.   Yes.

12  Q.   And starting with 178-A, is that a diagram that you

13  completed?

14  A.   That is correct.

15  Q.   And 178-B, what is that?

16  A.   This is the corpse identification photograph.

17  Q.   And that has the autopsy number that is related to Harry

18  Santiago Santiago?

19  A.   That is correct.

20              MR. HEGYI:  The Government offers these two into

21  evidence.

22              THE COURT:  Any objection?

23              MR. REBOLLO:  No.

24              THE COURT:  None.  Received.

25              (At 5:08 PM, Government Exhibits 178-A and 178-B

1           admitted into evidence.)

2    BY MS. MATEO:

3    Q.   Dr. Rivera, let's talk about the observations you made on

4    Harry Santiago Santiago.  Were there any gunshot wounds?

5    A.   That is correct.

6    Q.   How many?

7    A.   Nine.

8    Q.   And did you label these with numbers or letters?

9    A.   Letters.

10   Q.   I'm going to put on the screen what's been moved into

11   evidence as 178-A.  And this is the second page for the

12   record.  And can you please describe the gunshot wounds,

13   starting with A?

14   A.   Over here or over here.

15   Q.   If you can, point behind you but still try to use the

16   microphone.

17   A.   These wounds are labeled with letters, but this by no

18   means implies that this was the sequence in which the shots

19   took place.  This is only for identification purposes.

20           We have bullet wound A, which is located in the left

21   posterior aspect of the neck.  This is a wound that presents a

22   pattern of pseudo stippling associated, which means that this

23   projectile went through an intermittent object producing

24   fragmentation.  And these fragments hit the skin, and produce

25   gross abrasions, which is known as pseudo stippling.

1            This trajectory is subcutaneous tissues going

2    through -- goes through subcutaneous tissues, and the muscle

3    plan -- and the muscle.   And two lead fragments were recovered

4    in the angle of the left side of the jaw, mandible.   The

5    trajectory in this wound is from back to front, and from left

6    to right, and slightly upward.

7    Q.    I'll move it to page one so we can look at B.

8    A.    This wound is comprised of two projectile wounds located

9    in the posterior aspect of the left thorax, which is located

10   on the left side of the back.   And these wounds present gun

11   powder stippling, finds -- associated finds (sic), gun powder

12   stippling that measured six by five inches.   And there was no

13   soot or firearms impression.

14           And these wounds penetrated the abdominal cavity

15   through fractures of the seventh, eighth and ninth rib of the

16   left hemithorax of the posterior aspect.   They lacerated the

17   spleen.   It produced a perforation on the left side of the

18   diaphragm, which produced herniation of the abdominal organs

19   to the thoracic cavity, the left thoracic cavity, which

20   included the spleen, the stomach, part of the gross bowel --

21   the large bowel, sorry.

22           THE INTERPRETER:   Intestine.

23           THE WITNESS:   It produced a laceration of the lung.

24   It perforated the pericardial sac, which is a membrane that

25   protects the heart and keeps it in place.   And it produced a

1    laceration of the heart and of the lung valve.

2            THE COURT:  No.  Pulmonary valve.

3            THE WITNESS:  Pulmonary valve.  Recovering a lead

4    fragment in the first intercostal space of the left

5    hemithorax in the anterior aspect, a jacket in the left

6    thoracic cavity also associated with this trajectory,

7    recovered a fragment of lead and a fragment of a jacket.  This

8    trajectory came from back to front, from upward -- from

9    downward up, from back to front, and from bottom to top or

10   upward, and left to right.

11   BY MS. MATEO:

12   Q.   And turning the page again to page two of Government's

13   178-A, is this C right here where I'm pointing to?  Sorry.

14   A.   This wound is a laceration due to the passing of a

15   projectile.

16   Q.   And D?

17   A.   This is also a -- this is also another laceration by the

18   passing of a projectile.  Laceration is when there's a loss of

19   the integrity of the skin due to the passing of or impact with

20   an object.  An object we use to demonstrate this is when

21   children fall and open their skin here, that's a laceration.

22   It's something superficial on the skin.

23   Q.   And now pointing to E.

24   A.   This is also a laceration on the left ear due to the --

25   or by the passing of a projectile.

1    Q.    Turning to page one and focusing on F.

2    A.    This is a laceration by the passing of a projectile on

3    the posterior aspect of the left shoulder, and this wound

4    presents an associated stippling.

5    Q.    And is that the same -- we have G as well here; is that

6    correct?

7    A.    This is also a laceration by the passing of a projectile.

8    And it presents also associated stippling.

9    Q.    And H is a laceration as well?

10   A.    That is correct.  And it also presents an associated

11   stippling pattern.

12   Q.    And I is a laceration as well?

13   A.    That is correct.  A laceration caused by the passing of a

14   projectile.

15   Q.    Dr. Rivera, did you determine within a degree of medical

16   certainty the cause of death?

17   A.    Yes.  That is correct.

18   Q.    And what was it?

19   A.    Projectile wound.

20   Q.    And the manner of death?

21   A.    Homicide, in it's forensic meaning, not legal meaning.

22   Q.    And putting on the screen what's been marked as 178-B.

23   And what is this a photograph of?

24   A.    This is the identification photograph of case 8571

25   pertaining to Harry Santiago Santiago.

```
 1              MS. MATEO:  No more questions.

 2              THE COURT:  Any cross?

 3              MR. RUHNKE:  No, sir.

 4              THE COURT:  No cross.  Thank you.  You are now

 5    excused.

 6              (At 5:21 PM, witness excused.)

 7              THE COURT:  Next witness, Mr. Hegyi.

 8              MR. HEGYI:  Your Honor, thank you.  We have to take a

 9    witness out of order, because he's flown in from California

10    and he has to fly back.

11              THE COURT:  Okay.

12              MR. HEGYI:  And this is Special Agent Ernst Jacobson,

13    Your Honor.

14              COURTROOM DEPUTY:  Raise your right hand.

15         Do you solemnly swear that the testimony you are

16    about to give in this case is the truth, the whole truth, and

17    nothing but the truth, so help you God?

18              THE WITNESS:  Yes.

19                   E R N S T   J A C O B S O N,

20         called as a witness by the Government, having been sworn,

21         testified as follows:

22                        DIRECT EXAMINATION

23    BY MR. HEGYI:

24    Q.   Good afternoon, sir.

25    A.   Good afternoon.
```

1    Q.    Could you give us your full name, please?

2    A.    Jake Jacobson.

3    Q.    Ernst Jacobson?

4    A.    Yes.  I go by Jake, but my real name is Ernst Jacobson.

5    Q.    How old are you, please?

6    A.    43 years old.

7    Q.    You have a Bachelor's Degree in criminal justice,

8    correct?

9    A.    Yes.

10   Q.    And you began your career in law enforcement when, sir?

11   A.    In 1994.

12   Q.    With what law enforcement agency?

13   A.    U.S. Border Patrol.

14   Q.    How long were you with the U.S. Border Patrol?

15   A.    Approximately three years.

16   Q.    And following that, who did you then become employed by

17   and with?

18   A.    Became employed as a special agent with the Drug

19   Enforcement Administration.

20   Q.    And are you currently a special agent with the Drug

21   Enforcement Administration?

22   A.    Yes.

23   Q.    For a period of time, Agent Jacobson, were you stationed

24   here in Puerto Rico?

25   A.    Yes.

1    Q.    For what period of time, sir?

2    A.    2003 to 2007.

3    Q.    And during that time, were you working out of a specific

4    resident office?

5    A.    Yes, I was.

6    Q.    And what resident office was that?

7    A.    It was the Ponce resident office.

8    Q.    Now, did that mean you could only work in Ponce or you

9    could work all over Puerto Rico?  In fact, could you work all

10   over the United States?

11   A.    Specifically in the venue of Puerto Rico.

12   Q.    Okay.  Did you have a partner during the time frame of

13   2006?

14   A.    Yes.

15   Q.    And who was your partner?

16   A.    Special Agent Nathan Cohen.

17   Q.    Was he also with the DEA?

18   A.    Yes.

19   Q.    We're taking you out of order, so I'll just jump into

20   some portions we'll flesh out for the jury later on.  On or

21   about September 26, 2006, did you have occasion following a

22   Court ordered wire tap that had gone on for a while, which

23   we'll explain later, did you have occasion to be involved in

24   the execution of a Search Warrant at Calle Four, Barrio Las

25   Brisas, in Arecibo, Puerto Rico?

1    A.    Yes.

2    Q.    And were -- when you got to that address, sir, first of

3    all, as a result of that Court ordered wire tap, did you at

4    that point, the time when they were going in for the search

5    warrant, did you actually already have an arrest warrant for a

6    particular individual?

7    A.    We did have one arrest warrant.

8    Q.    Would that be Carmelo Rondon Feliciano?

9    A.    Yes.

10   Q.    Now, when you went to do that particular search warrant,

11   were you there when the Puerto Rico Police Department, swat

12   team, first entered the building?

13   A.    Yes, I was.

14   Q.    Once they cleared the residence -- was it a residence?

15   A.    Yes.

16   Q.    Once they cleared the residence, were you then among the

17   very first people that were with the DEA to actually go and

18   begin looking for evidence?

19   A.    Yes.

20   Q.    Just generally speaking, tell the ladies and gentlemen of

21   the jury what sorts of things you observed on September 26,

22   2006, when you were in the process of executing the search

23   warrant?

24   A.    We found a room, one room in the residence that was

25   specifically dedicated to processing drugs, specifically

1    cocaine and heroin.  It contained cocaine and heroin,

2    cutting agents, and also packaging material and actually a

3    drug press.

4    Q.   Okay.  Now we're going to go into drugs with a different

5    person, but did you then focus -- if we could focus on the

6    firearms, were firearms located in that residence?

7    A.   Yes.

8    Q.   What number and type of firearms?

9    A.   Throughout the residence, we found six handguns and three

10   assault type rifles.

11   Q.   AK-47 type rifles?

12   A.   There were two AK-47s and one Marlin that had been a .45

13   caliber, that had been modified.

14   Q.   To make it an assault type rifle?

15   A.   Yes.

16   Q.   And did you find magazines and clips and even a drum that

17   would allow for an extended fire fight to take place?

18   A.   Yes.  There were several magazines also for the handguns.

19   There were extended magazines for the handguns.  And there

20   were also two extended magazines in particular.  One was a

21   magazine -- normally they're a 30 round magazine, but they had

22   been welded together to extend the capacity.  Then there was

23   another one that had a capacity which was called a drum, and

24   it has a magazine on each side for about 50 rounds each.

25   Q.   So one could fire a hundred rounds without having to

1   reload?

2   A.    Correct.

3   Q.    Now, did you, sir, find a fairly large amount of

4   ammunition as well?

5   A.    Yes.

6   Q.    And more than 1100 rounds of ammunition?

7   A.    Yes.

8   Q.    I'm going to hand you what have been marked as Government

9   Exhibits 179, 180, 181, 182, 183, 184, and 185  And ask you if

10  you recognize them?

11  A.    Yes, I do recognize them.

12  Q.    And what are they, sir?

13  A.    These are photographs taken of the weapons out of that

14  residence that we had for the search warrant that were found

15  throughout the residence.  And after they were photographed

16  where they were found, they were taken to a table right

17  outside the residence and set up on this table.

18  Q.    And did you participate in A, recovering the items; B,

19  laying them out; and were you present when those photographs

20  were taken?

21  A.    Yes.

22  Q.    And do they fairly and accurately depict that which they

23  purport to show?

24  A.    Yes.

25          MR. HEGYI:  The Government offers I think it's 179

1    through 185.

2              THE COURT:  Any objection?

3              MR. RUHNKE:  No objection.

4              MR. AGUAYO:  (Shaking head from side to side.)

5              THE COURT:  Very well.  Received.

6              (At 5:29 PM, Government Exhibits 179 through 185

7               admitted into evidence.)

8              THE COURT:  Publish.

9              MR. HEGYI:  I'll publish just a couple of them, Your

10   Honor.

11   BY MR. HEGYI:

12   Q.   Now, these items, these firearms for instance, I'm going

13   to put 185 up on the screen.  I don't know if we can dim the

14   lights at all?

15             THE COURT:  That's okay.  But he can see it

16   perfectly, and the jury can see it perfectly on the small

17   monitors.

18   BY MR. HEGYI:

19   Q.   Okay.  Do you see these weapons here?

20   A.   Yes.

21   Q.   Are those some of the automatic weapons you were talking

22   about?

23   A.   Yes.

24   Q.   Now I'm going to go to 182, Government Exhibit 182.  You

25   mentioned something about drums.  Is this what you're talking

1    about, this item here, the two circular things?  Look like

2    large life saver rings or like weights right here?

3    A.    Yes.

4    Q.    Okay.  And then boxes of ammunition?

5    A.    Yes.

6    Q.    Okay.  And 183, again showing the drums and different

7    boxes of ammunition on the left side?

8    A.    Yes.

9    Q.    Now, you mentioned there was a banana clip that had

10   been welded, two of them welded together.  Is that this item

11   right here that comes around almost making it a complete U?

12   A.    Yes.

13   Q.    Okay.  And I don't know if this is going to be light

14   enough for everybody to see it, but some of these clips appear

15   to be fairly long.  This is what you're referring to as

16   extended clips?

17   A.    Yes.

18   Q.    That was at Government's Exhibit 179.  I was just asking

19   about the clips.  Now I'm looking at Government's Exhibit 180.

20   On the left side, another view of that double welded banana

21   clip?

22   A.    (Nodding head up and down.)

23   Q.    And some of the automatic weapons; is that correct?

24   A.    Yes.

25   Q.    Now, Agent, did you in fact write down the serial numbers

1    for all of the firearms for which serial numbers were visible?

2    A.   Yes.

3    Q.   And you included that in your report?

4    A.   Yes.

5    Q.   Now, were some of the serial numbers to the firearms

6    obliterated, meaning filed off or burned off chemically?

7    A.   Yes.

8    Q.   Do you remember how many?

9    A.   Two.

10   Q.   Okay.  And the two, were they assault weapons or pistols

11   or what?

12   A.   They were the AK-47s.

13   Q.   Now, your partner that you mentioned to us, Nathan Cohen,

14   did he -- what was his role at least initially on the day that

15   this take down took place?

16   A.   He was in charge of the team that was going to conduct

17   the arrest of Carmelo Rondon Feliciano at another residence.

18   Q.   Okay.  And to your knowledge now, did he indeed arrest

19   that gentleman?

20   A.   Yes.

21   Q.   And following the arrest, did he recover a firearm from

22   the general person on or about the person of Carmelo Rondon

23   Feliciano?

24   A.   They recovered.

25        MR. RUHNKE:  Your Honor, it's going to be hearsay.

| 1 | MR. HEGYI:  Well, okay.  I'm going to tie it up, Your |

         MR. HEGYI:  Well, okay.  I'm going to tie it up, Your

Honor.

         THE COURT:  Do you have a -- how do you have

knowledge of that?

         THE WITNESS:  Once the weapon was seized, it was

brought over to this location, and it was in fact on that same

table when those photographs were taken.

         THE COURT:  Somebody else is going to testify as to

that.

         MR. HEGYI:  Yes, Your Honor.

         THE COURT:  I will allow it.

BY MR. HEGYI:

Q.    The only thing I wanted to ask is, was another firearm

brought to the residence where you were at?

A.    Yes.

Q.    And was it a pistol?

A.    Yes.

Q.    Do you remember the make of the pistol?

A.    It was a Febrique Nationale.

Q.    Did that pistol have an obliterated serial number as

well?

A.    Yes.

Q.    Did you then, sir, turn all of those firearms over to an

ATF Agent by the name of Arthur Arturo Gonzalez?

A.    Yes.

1  Q.   Okay.

2          MR. HEGYI:  I pass the witness, Your Honor.

3          THE COURT:  Any cross?

4          MR. RUHNKE:  No, thank you.

5          THE COURT:  Any cross?

6          MR. AGUAYO:  (Shaking head from side to side.)

7          THE COURT:  Thank you.  You are now excused.

8          (At 05:33 PM, witness excused.)

9          THE COURT:  Anything else?

10         MS. MATEO:  We have one more witness, if that's

11  okay.  Dr. Francisco Cortes.

12         COURTROOM DEPUTY:  Raise your right hand.

13         Do you solemnly swear that the testimony you are

14  about to give will be the truth, the whole truth, and nothing

15  but the truth, so help you God?

16         THE WITNESS:  I do.

17         THE COURT:  Okay.  Ms. Mateo, please.

18           D R.   F R A N C I S C O   C O R T E S,

19       called as a witness by the Government, having been sworn,

20       testified as follows:

21                      DIRECT EXAMINATION

22  BY MS. MATEO:

23  Q.   Yes.  Please state your full name.

24  A.   Francisco Cortes.

25  Q.   And where are you currently working?

1    A.    I work for the Institute of Forensic Sciences of Puerto

2    Rico.

3    Q.    And what is your title?

4    A.    I'm forensic pathologist.

5            MS. MATEO:  Your Honor, at this time I'd like to

6    offer him as an expert if there's no objection.

7            MR. RUHNKE:  No objection.

8            THE COURT:  All right.  Go ahead.

9    BY MS. MATEO:

10   Q.    I'm going to show you what's been premarked as

11   Government's Exhibit 186.  Do you recognize it?

12   A.    Yes, ma'am.

13   Q.    How?

14   A.    This is my autopsy report on case 763-97.

15   Q.    And is it a certified copy?

16   A.    Yes.

17   Q.    And what's the autopsy number?

18   A.    763-97.

19           MS. MATEO:  The Government offers it into evidence at

20   this time.

21           THE COURT:  Very well.  Received.

22           (At 5:35 PM, Government Exhibit 186 admitted into

23             evidence.)

24   BY MS. MATEO:

25   Q.    And, Dr. Cortes, I ask you, did you observe gunshots on

```
 1   this individual?

 2   A.    Yes, ma'am, I did.

 3   Q.    How many?

 4   A.    Eleven.  There are 11 marked on the autopsy report.

 5   Q.    And were you able to determine which ones were fatal?

 6   A.    The ones that effected the trunk or the torso of the

 7   body.

 8   Q.    And which ones were those, if you can give us the letter

 9   number?

10   A.    B, C, D, E.

11   Q.    I'm sorry, Doctor.  Before we continue, who was this

12   autopsy performed on, so we can get the name?

13   A.    Andres Torres Oquendo.

14   Q.    Thank you.  Please continue.  Were there any other fatal

15   gunshots?

16   A.    Yes.  F, and G, H, I, J.  K effected the extremities.

17   Q.    And what damage did the fatal gunshot wounds you

18   mentioned, B through G, cause briefly?

19   A.    It perforated the heart on more than one occasion, as

20   well as the liver, intestines, and the mesentery.

21   Q.    And, Doctor, were you able to determine the cause of

22   death within a reasonable degree of medical certainty?

23   A.    Cause of death was laceration, perforation of internal

24   organs due to gunshot wounds.

25   Q.    And the manner of death?
```

```
1    A.    Homicide.

2    Q.    Now, Doctor, I would like to move on to an autopsy

3    performed on Jimmy Nelson Velez Matos.   I handed you what was

4    marked as Government's ID 187-A and B?

5    A.    Yes, ma'am.

6    Q.    And do you recognize those?

7    A.    Yes, ma'am.   They're my autopsy reports.

8              MS. MATEO:   The Government moves them into evidence

9    at this time, 187-A and B.

10             THE COURT:   Received.

11             (At 5:38 PM, Government Exhibits 187-A and 187-B

12               admitted into evidence.)

13   BY MS. MATEO:

14   Q.    And, Doctor, can you explain, please, why there are two

15   autopsy reports for this individual?

16   A.    The body was in parts.   The autopsy report 923-97

17   consists of a lower torso and thighs of a male.   The thighs

18   were cut above the knees.   The autopsy report 939-97 refers to

19   a head and two legs.

20             MS. MATEO:   And just for the record, the one he first

21   described, 923-97 is marked 187-A, and 937-97 is marked as

22   B.

23             THE COURT:   Very well.

24             THE WITNESS:   Yes, ma'am.

25   BY MS. MATEO:
```

1   Q.   And can you please describe the injuries that you

2   observed or what you observed?

3   A.   In 923-97, it was decomposing tissue from the body.   The

4   thighs were cut just above the -- as I said, the knees.   And

5   there was no evidence of penetrating trauma to this area.   In

6   937-97, we had a head and two legs.

7   Q.   Are the two legs that are referenced in there referenced

8   to the previous autopsy?

9   A.   Yes, they are.   There is a -- in the external exam, there

10  is a head and two legs.   The legs encased in 937-97 have

11  direct relation with the proximal segments of the femur or

12  femora presented in case 923.

13  Q.   And in regard to the head, were you able to determine

14  what if anything was used to cut the bone?

15  A.   The bones were cut apparently with a hacksaw, that kind

16  of instrument.

17  Q.   Did the head have any gunshots?

18  A.   The head presented a gunshot wound with an entrance and

19  exit wound.

20  Q.   And how old was this individual based on your medical

21  opinion?

22  A.   The segments of the body were that of a white man,

23  probably less than 25 years of age.

24          MS. MATEO:   May we approach?

25          THE COURT:   Sure.

```
 1                    (Bench conference held.)

 2              MS. DOMINGUEZ:  This is the one with the machete.

 3              THE COURT:  Can I see it?

 4              MS. DOMINGUEZ:  This is corroborative of Menor --

 5              THE COURT:  Well, yes.

 6              MS. DOMINGUEZ:  And perhaps maybe the torso and not

 7    the head?

 8              THE COURT:  Well, it's corroborative of Menor.  In

 9    any event, these photos, I'm not allowing them in the guilt

10    phase obviously, but you never know what can happen in the

11    other phase.  You can use those two.

12              MS. DOMINGUEZ:  We can?

13              THE COURT:  They are kind of blurry.  You can use

14    them.

15                    (Bench conference concluded.)

16              THE COURT:  Mark them please.

17              MS. MATEO:  Yes.  187-C and D.  I'm going to hand

18    them --

19              MR. REBOLLO:  Your Honor, just to verify, what's the

20    exhibit number for the autopsy report?

21              MS. MATEO:  It's 187-A and B.

22              MR. REBOLLO:  They're in evidence.

23              THE COURT:  Yes.  186 or 187?

24              MS. MATEO:  187-A and B.

25              THE COURT:  Because of the fact that, you know --
```

1           MR. REBOLLO:  Sure.

2    BY MS. MATEO:

3    Q.   Dr. Cortes, what did I just hand you?

4    A.   They are photocopies of color photographs from this case.

5    Q.   And they have the autopsy number on it?

6    A.   That's correct.

7    Q.   And they accurately depict what you observed when

8    performing the autopsy?

9    A.   Yes, ma'am.

10          MS. MATEO:  At this time the Government moves 187-C

11   and D into evidence.

12          THE COURT:  Received.

13          (At 5:44 PM, Government Exhibits 187-C and 187-D

14           admitted into evidence.)

15   BY MS. MATEO:

16   Q.   Putting on the screen 187-C.  Is this what you described

17   as the two legs of a male torso?

18   A.   This is the male torso with the proximal portions of the

19   thighs.

20   Q.   And now publishing 187-D.

21   A.   This is the head.

22   Q.   And, Doctor, were you able to determine the cause of

23   death within a reasonable degree of medical certainty?

24   A.   There was a gunshot wound to the head.

25   Q.   And the manner of death?

1    A.    Homicide.

2    Q.    I'm now going to hand you what's been premarked as

3    Government's Exhibit 188.  Government -- what was premarked as

4    Government Exhibit 188, what is it?

5    A.    188 is a diagram of a human male body, and it presents

6    the bullet wounds that presented in the body of Orlando

7    Cardona Torres.

8    Q.    And did you create that diagram?

9    A.    I placed the bullet wounds.

10          MS. MATEO:  At this time the Government moves Exhibit

11   188 into evidence.

12          MR. RUHNKE:  No objection.

13          THE COURT:  Received.

14          (At this time, Government Exhibit 188 admitted into

15           evidence.)

16   BY MS. MATEO:

17   Q.    Putting on the screen 188 of Orlando Cardona Torres.

18   What was the autopsy number?

19   A.    925-97.

20   Q.    And the date of autopsy?

21   A.    The autopsy date was March 8th, 1997.

22   Q.    And you said that you marked the gunshot wounds.  How

23   many gunshots were there in this case?

24   A.    I believe there were 34.

25   Q.    Could you determine the fatal shot?

1    A.    Well, the multiplicity of gunshot wounds that you can see

2    here, not taken individually but as a whole, are fatal.  He

3    has one gunshot wound in the cervical cranial area on the

4    right side that exits on the right side that wouldn't

5    necessarily of itself be fatal.  However, you have over 30

6    other gunshot -- gunshot wounds in the back.  The majority of

7    which are in the superior half.  Some of them are exiting in

8    the anterior aspect of the body.

9          This is a description of the body in anatomical

10   position.  That means the body is placed upright with the

11   palms of the hand sticking forward.  That's a given in all

12   autopsy reports.  This is what we have here, and it shows that

13   the majority of the entrance wounds, the great majority are in

14   the posterior aspect of the body.  And the exit wounds on the

15   anterior aspect of the body.

16   Q.    So they were coming from back to front?

17   A.    In the great majority, yes.

18   Q.    And were you able to determine the cause of death within

19   a reasonable degree of medical certainty?

20   A.    Yes.  Laceration, perforation of internal organs.

21   Q.    And the manner of death?

22   A.    Because of gunshot wound.  It's a homicide.

23   Q.    I'm now going to hand you what's been premarked as

24   Government's Exhibit 189.  And looking at, excuse me,

25   Government's ID 189, do you recognize it?

```
 1   A.    Yes, ma'am.

 2   Q.    And what is it?

 3   A.    It's the anatomical drawing of the human male figure with

 4   the gunshot wounds.

 5   Q.    And you yourself drew the gunshot wound on that diagram?

 6   A.    Yes, ma'am.

 7   Q.    The Government offers 189 into evidence at this time.

 8             MR. RUHNKE:  Without objection.

 9             THE COURT:  Very well.  Received.

10             (At 5:48 PM, Government Exhibit 189 admitted into

11              evidence.)

12   BY MS. MATEO:

13   Q.    And what was the autopsy number?

14   A.    1997-97.

15   Q.    And the name?

16   A.    Silvestre Gonzalez Santos.

17   Q.    And what was the date of the autopsy?

18   A.    The autopsy was performed on the 28th of May, 1997.

19   Q.    And, Dr. Cortés, you had indicated gunshot wounds.  How

20   many gunshot wounds were there?

21   A.    24 gunshot wound.

22   Q.    And, as I asked before, were you able to determine a

23   fatal shot?

24   A.    As I said before, the -- there are various fatal shots.

25   The ones that occurred in the thoracic response, there are
```

```
 1    also shots that are or wounds that are also in conjunction
 2    with the other shots proved to be fatal.  I mean, you're
 3    losing blood all the time here.
 4    Q.    And so were you able to determine the cause of death
 5    within a reasonable degree of medical certainty?
 6    A.    Yes, ma'am.
 7    Q.    And what was it?
 8    A.    Laceration, perforation of internal organs due to gunshot
 9    wound.
10    Q.    And the manner of death?
11    A.    Homicide.
12    Q.    And are you able to determine which ones were entrance
13    wounds, if they were in front or the back?
14    A.    There were entrance wounds on the front and on the back.
15    Q.    Lastly, I'm going to hand you what's been premarked as
16    Government's ID 190.  Looking at Government's ID 190, what did
17    I hand you?
18    A.    It's a drawing of a human anatomical body, male body, and
19    with a gunshot wound.
20    Q.    And, Dr. Cortés, did you prepare the gunshot wound or did
21    you prepare the drawing?
22    A.    I drew the gunshot wound on the body.
23          MS. MATEO:  Government moves 190 into evidence at
24    this time.
25          THE COURT:  I gather no objection?
```

```
 1              MR. REBOLLO:  (Nodding head up and down.)

 2              THE COURT:  Very well.  Received.  05:51 PM.

 3              (At 5:51 PM, Government Exhibit 190 admitted into

 4               evidence.)

 5   BY MS. MATEO:

 6   Q.   And what was the autopsy number in this case?

 7   A.   2793-99.

 8   Q.   And the name?

 9   A.   Richard Matias Negron.

10   Q.   And what was the date of the autopsy?

11   A.   The autopsy was performed the 25th of July, 1999.

12              MR. RUHNKE:  2009 it says on the -- I'm sorry.  I'm

13   reading a translation.  I apologize.

14              MS. MATEO:  That's all right.

15   BY MS. MATEO:

16   Q.   And I'm placing Government's Exhibit 190.  You had

17   mentioned that you had drew gunshot wounds.  How many gunshot

18   wounds were there in this case?

19   A.   Eight.

20   Q.   And did you mark some as entrance wounds in this diagram?

21   A.   My entrance wounds are the open circles, and the filled

22   in circles are the exit wounds.

23   Q.   So there's entrance wounds on the front and back of this

24   individual?

25   A.   That's correct.
```

1    Q.   And in this case were you able to determine a fatal shot?

2    A.   The shots that are in the torso, in the trunk area, are

3    fatal.  They effect major organs.

4    Q.   And were you able to determine the cause of death within

5    a reasonable degree of medical certainty?

6    A.   Yes.  It was laceration and perforation of internal

7    organs due to gunshot wound.

8    Q.   And the manner of death?

9    A.   Homicide.

10   Q.   Now, I want to ask you, and this is my mistake for not

11   asking you before, on the first two that we discussed, Andres

12   Torres Oquendo, can you please give me the date of the

13   autopsy?

14   A.   This is case 763-97.  The autopsy was performed on the

15   24th of February 1997.

16   Q.   And the two for Jimmy Nelson Velez, which are

17   Government's Exhibit 187-A and B, what were the dates of the

18   autopsies in that case?

19   A.   The date of the autopsy for the 923-97 --

20   Q.   Which is 187-A?

21   A.   Is 187-A.  Is I believe it was the 8th of March.  I don't

22   have it exactly here, but it should be in that area.

23   Q.   And 187-B?

24   A.   187 -- this is referring to case 939-97.  And this was

25   performed on the 10th of May, 1997.

1          MS. MATEO:  Government has no more questions at this

2     time.

3          THE COURT:  Any cross?

4          MR. RUHNKE:  No, thank you.

5          THE COURT:  Thank you very much.  You are now

6     excused.

7          (At 5:54 PM, witness excused.)

8          THE COURT:  Are we finished for the day?

9          MS. MATEO:  (Nodding head up and down.)

10         THE COURT:  Members of the jury, thank you very much

11    once again for the long day.  Remember, no reading.  First of

12    all, you are not to discuss this case with anyone or allow

13    anybody to discuss this case with you.  You cannot read or

14    listen to anything touching upon this case.  No research or

15    investigation on your own.

16         You have to keep an open mind until the very end of

17    the case.  You are not ready for deliberation of any kind.

18    Reject any approach of anybody to try to talk to you about the

19    case.  If that happens, you have to tell me immediately in the

20    first opportunity.

21         As you already know, we are not going to work on this

22    case tomorrow, because we have advanced the case more than

23    what we expected.  The lawyers need time to do a couple of

24    things that are important for next week, so we're going to not

25    work tomorrow.  We are going to regroup Monday morning first

1    thing, okay?  Thanks very much.

2              THE COURT:  All rise.

3              (At 5:55 PM, proceedings concluded.)

4                              *     *     *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  U.S. DISTRICT COURT     )

2  DISTRICT OF PUERTO RICO)

3

4       I certify that this transcript consisting of 131 pages is

5  a true and accurate transcription to the best of my ability of

6  the proceedings in this case before the Honorable United

7  States District Court Judge José Antonio Fusté on February 28,

8  2013.

9

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25