UNITED STATES DISTRICT COURT

DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

Docket No. 09-427

San Juan, Puerto Rico
March 4, 2013

ALEXIS CANDELARIO SANTANA, and
DAVID OQUENDO RIVAS,

Defendants.

---

JURY TRIAL

BEFORE THE HONORABLE JUDGE JOSÉ A. FUSTÉ,

UNITED STATES DISTRICT JUDGE.

---

APPEARANCES:

For the Government: Mr. Bruce Hegyi, AUSA
Ms. Maria Dominguez Victoriano, AUSA
Ms. Marcela Mateo, AUSA

For the Defendants: Mr. David Arthur Ruhnke, PHV
Mr. Francisco Rebollo Casalduc, Esq.
Mr. Jose R. Aguayo, Esq.

Proceedings recorded by stenography. Transcript produced by CAT.

I N D E X


| WITNESSES: | PAGE |
|---|---|
| YOCASTA BRUGAL, M.D. | |
| Direct examination by Ms. Mateo | 33 |
| EDDIE VIDAL GIL | |
| Direct examination by Ms. Dominguez | 46 |
| JESUS FIGUEROA CRUZ | |
| Direct examination by Mr. Hegyi | 54 |
| Cross-examination by Mr. Ruhnke | 65 |
| Redirect examination by Mr. Hegyi | 66 |
| NATHAN COHEN | |
| Direct examination by Mr. Hegyi | 67 |
| SPECIAL AGENT EDMOND ROSE | |
| Direct examination by Mr. Hegyi | 79 |
| JOHN MORGAN FERGUSON | |
| Direct examination by Mr. Hegyi | 93 |
| AGENT MELVIN GARCIA | |
| Direct examination by Mr. Hegyi | 106 |
| Cross-examination by Mr. Ruhnke | 121 |
| Redirect examination by Mr. Hegyi | 128 |
| SPECIAL AGENT LUIS PENN | |
| Direct examination by Mr. Hegyi | 130 |
| AGENT CARLOS BARREIRO | |
| Direct examination by Mr. Aguayo | 179 |
| Cross-examination by Ms. Dominguez | 188 |
| AGENT KHRISTOPHER PAGANO | |
| Direct examination by Mr. Aguayo | 192 |
| Cross-examination by Ms. Dominguez | 197 |
| Redirect examination by Mr. Aguayo | 200 |
| DR. JOHN C. BRIGHAM | |
| Voir dire examination by Mr. Aguayo | 203 |
| Direct examination by Mr. Aguayo | 209 |
| Examination by Mr. Ruhnke | 219 |
| Cross-examination by Mr. Hegyi | 223 |
| Further examination by Mr. Ruhnke | 236 |

INDEX PAGE (Continued)

EXHIBITS:


| | |
|---|---|
| Government Exhibit 191 | 35 |
| Government Exhibit 191-A | 35 |
| Government Exhibit 192 | 38 |
| Government Exhibit 193 | 41 |
| Government Exhibit 194 | 44 |
| Government Exhibit Brisas Two | 58 |
| Government Exhibits Brisas 3-A, 3-B, 143 | 59 |
| Government Exhibits Brisas 3-D through 3-M | 62 |
| Government Exhibits | 65 |
| Government Exhibit 162-B | 72 |
| Government Exhibits 162-C and 162-D | 77 |
| Government Exhibits Brisas 59, 62 and 63 | 78 |
| Government's Exhibits | 84 |
| Government's Exhibit DET A | 90 |
| Government's Exhibit DET 12 | 103 |
| Government's Exhibit 196 | 115 |
| Government's Exhibit 198 | 118 |
| Government's Exhibit 199 | 118 |
| Government's Exhibit 200 | 120 |
| Government's Exhibit 201 | 121 |
| Government's Exhibit 175 | 137 |

San Juan, Puerto Rico
March 4, 2013
At or about 1:35 PM

* * *

MR. RUHNKE: Mr. Aguayo's in the hallway. He should be here in a second. Yes. Here he comes. If everybody's ready?

THE COURT: Yes.

MR. RUHNKE: There were several issues I asked to speak with you briefly about this morning. I learned for the first time on Sunday morning that the Government is going to elicit statements made by my client, our client, at the time of his arrest. That was never turned over in discovery. It's not contained within the Jencks materials. And I would ask this Court to not allow them to do that, because they've never turned it over to us, not once.

THE COURT: What statements?

MR. RUHNKE: I'm not quite clear what they are. I think the way it developed, and maybe Mr. Hegyi will illuminate it in a minute, but apparently he learned about the statements when interviewing the people who made the arrest. It's not contained in the reports. So I just want to flag a series of issues.

The second issue is, and this bears on probably my overall theme here, which is going to be our schedule.

THE COURT: I'm sorry?

MR. RUHNKE: My overall theme here will be the upcoming schedule of this trial. The Government advised me again yesterday that they have a rebuttal penalty phase expert, a former official from the Bureau of -- Bureau of Prisons.

I've done some inquiries already, and I know that this official has generated substantial discovery and other materials in other cases that he's testified in.

THE COURT: What is --

MR. RUHNKE: He's going to testify, he's going to testify that he has reviewed -- actually, I don't know entirely what he's going to testify.

THE COURT: What is your understanding?

MR. RUHNKE: My understanding is he's going to testify that prisoners do not get sentenced directly to the Supermax facility. He's going to testify what day-to-day life is like at a United States penitentiary. He's going to testify that he reviewed Mr. Candelario's prison records. And I don't know whether he's going to offer an opinion as to whether Mr. Candelario is a future danger or not.

I know the Sampson case, Judge Wolfe noted that he would not have permitted that kind of opinion evidence, because future danger is so hard for anyone to predict accurately. But generally speaking, what life is like in the

BOP, what classification systems they have in place.

Now, we are calling an expert on those issues, a former warden from the Bureau of Prisons.

THE COURT: But if you call somebody -- that would be penalty phase?

MR. RUHNKE: That would be penalty phase.

THE COURT: But if you do that, you cannot expect him not to counter.

MR. RUHNKE: Oh, I agree. I agree. What I am saying is we are today -- we're seven days into the guilt phase. I had advised the Government on February 1 that I would be calling the kind of experts that I would be calling, and another four weeks have gone by. And I will need, if Your Honor allows the expert -- I agree with the general proposition. Of course I could expect a rebuttal witness. But it's a witness that's going to take a substantial amount of time to deal with and investigate, and there's a lot of material to look into.

He's testified in other cases. I know he testified, I think in 2010 or 2011, in a case in the District of New Mexico called United States against Lujan, L-u-j-a-n. And in that case, there's a large sealed record of materials related to this witness. And I don't know what's in those sealed records. There -- there may be litigation around the scope of what he can testify to.

For example, Mr. Hegyi has told me that he intends to, for example, note that in Mr. Candelario's disciplinary records, there's a finding that he possessed a cell phone at one point. How much -- there's nothing in the -- there are no reports, there are no findings by anybody, just a note in the file that he was disciplined for a cell phone. And he stated it wasn't his, it belonged to another inmate. Apparently the Bureau of Prisons has lost those underlying reports.

It sets up actually a complicated, fairly complicated Sixth Amendment argument, whether these kind of incidents must be proved with live witnesses since they're clearly testimonial in nature. And it's these Crawford issues that come up. I flag it, because it's a complicated issue, and it's coming up.

And I also want to bring the Court's attention to a problem I'm having with my eyewitness identification expert. The Court discussed holding a 104 type hearing, perhaps tomorrow, on the --

THE COURT: Whenever. I mean --

MR. RUHNKE: Right. On the admissibility of that evidence. When I engaged the expert I engaged, I had told her first, it looks like we'd need you in May or so. And then I said, well, it may even be as early as April. And I was acting on Government estimates. I was first told by Mr. Contreras that the case would last six months. That

seemed a little excessive.

THE COURT: That tells you what I said before.

MR. RUHNKE: I understand.

THE COURT: Mr. Contreras was not qualified to be in this case to begin with. Couldn't even estimate.

MR. RUHNKE: Then we told the jury on the questionnaire, it would be three months, up to June. Your Honor told them six to eight weeks. We're now on day seven of the trial, and the Government's about to rest, or is going to rest we believe at some point today.

Her problem is this, and it's a problem that I may be able to be resolved and I may be able to get her here tomorrow. She is on a writing deadline, a contractual writing deadline with LexisNexis. She's a key author of the leading treatise on eyewitness identification. The 5th edition is about to come out. She has to have her piece of it in two weeks.

She gave me the name of the contact person at LexisNexis. I tried to contact her over the weekend to see if in accommodation to a Federal death penalty case and the United States District Court Judge, they would extend that deadline by two weeks. I have not heard back.

THE COURT: I am willing to help in that sense.

MR. RUHNKE: Okay. Thank you. Right now it's only 20 to 8:00 where the person's located. LexisNexis happens to

be located in New Jersey, and that's where the person is. So they probably haven't seen the e-mail or message yet. I'll check further with that on the recess.

THE COURT: You can use my name and say that I would like to talk to the person --

MR. RUHNKE: Okay. That's perfect.

THE COURT: -- if necessary, because I don't want that kind of complication.

MR. RUHNKE: When I sit down, I'll send that person an e-mail right away right from counsel table. But overall, and I say this as a lawyer who's been practicing for 38 years, I've been in front of judges with all kind of ways of handling trials. There are judges who set a 9:30 start and they come out on the bench at, you know, 10:30 and lunch drags on for an hour and a half, and a break at 4:30. And the case drags on much longer than it reasonably should have.

And I don't particularly care for that kind of schedule myself, because I'm wasting my time, the jurors' times are being wasted, et cetera. Your Honor's schedule is somewhat different than that. We are in court at 8:30 in the morning. We have -- and we have a witness on the stand ready to go. And we generally do not break until 6:00, 6:30 in the evening. I'm fine with that. During the trial, I was fine with that.

But I'm at a point right now, and I say this with as

much sincerity as I can say it, I am not ready to put on a penalty phase case, and I cannot be ready to put on a penalty phase case unless we get a reasonable break between the trial and the -- and the start of a penalty phase.

THE COURT: What are you talking about?

MR. RUHNKE: I'm talking about seven days. And I've tried 16 capital cases to a verdict. I've never been in a case where a Judge has not allowed us at least four or five days between guilt and penalty to make the transition and do what we need to do.

In a sealed pleading I filed at 6:45 this morning -- I know, for a Subpoena, I noted that my client's father is in Miami, had back surgery two weeks ago, is in a rehabilitation facility, and is supposed to remain there for 30 days. I'm going to try to get ahold of the doctor this morning to see if and when he can travel. If he can't travel for another couple weeks, we may have to go to Miami and take a videotape deposition of the father.

THE COURT: We can do it through video conferencing.

MR. RUHNKE: Well, I would like to be there face-to-face with him. He is in a rehab facility in Miami. I mean, he is -- it's not like he's in Germany or someplace. But we're working 12 to 14 hour days. I counted up yesterday. Yesterday there were 96 e-mail exchanges between members of the defense community and members of the prosecution

community.

The first one went out I think for me at about ten minutes to 6:00, ten minutes to 7:00 yesterday morning. I got a response back ten or 15 minutes later from members of the prosecution team.

We are all working very, very hard. We are -- I have witness interviews scheduled through eight o'clock -- starting at eight o'clock tonight. And I find myself like an emergency room doctor doing triage. I'm doing what has to be done, but there are other things that I should be doing right now which I'm not doing because I don't have the time, physically don't have the time to do it. It's not for a lack of energy. I'm not running out of gas. It's just there are so many hours in a day and so many tasks you can do.

And Your Honor has stressed many, many times that we need to do this case right. And under the category of doing this case right, we need this level of breathing room.

This case has gone very quickly. I think the parties have been cooperative. We're talking about stipulations that might ease some of the penalty phase time. But we can't have those discussions and negotiations while we're simultaneously trying the case, simultaneously trying to talk to witnesses, simultaneously filing motions, simultaneously doing everything that needs to get done to make this penalty -- penalty phase. That is, the best penalty phase counsel can put on in this

very, very highly aggravated case.

I mean, this is a historic day in the District of Puerto Rico. Shortly there will be two Federal capital cases on trial in this courthouse. And as I say, we don't mind working hard, and we are working hard. And I'm telling Your Honor respectfully that I need the week, not because I really need two days. I really need a week.

I'm not negotiating. I'm not saying I'll ask for a week and I hope he gives me five days. I really need a week in order to be the best effective advocate for Mr. Candelario's life, if it comes to that. I don't know what the Government's opinion is on that.

THE COURT: Let's take this one by one. The statements, what statements are these?

MR. HEGYI: Yes, Your Honor, the first statement is when I finally got the people in to interview them that arrested Mr. Candelario --

THE COURT: What statement is this?

MR. HEGYI: At the time they interdicted the boat and they brought it to port, he had a Florida driver's license that was fraudulent, but they were asking him questions like -- and remember, he's a person, person coming to American shores, so just like going to the airport, they have a right to interdict and start asking questions.

And he couldn't tell them the name on the -- the

address on the driver's license. It's a Florida driver's license. He could tell them the name of the individual that he claimed to be, but the address -- they would say, well, what's your address in Florida? And he said, I don't know. And they said, well, what's your date of birth? I don't know. What's your Social Security number? I don't know.

So they said, well, how is it you don't know? And he goes, because I'm mentally retarded. And that's the statement that I then explained to Mr. Ruhnke.

THE COURT: No. Let me put it this way. Let me tell you this. Everybody knows that he was arrested on a boat and that he had a fraudulent driver's license issued to somebody else. We know that.

MR. HEGYI: And credit card issued to somebody else, and other things.

THE COURT: That evidence, I don't think anybody can dispute, is admissible. For whatever reason it's admissible, correct, Mr. Ruhnke?

MR. RUHNKE: Correct, Your Honor.

THE COURT: Now, the statement, I am not going to allow it. No way.

MR. HEGYI: Can we get in that he didn't know his address and date of birth?

THE COURT: Yes. That's different.

MR. HEGYI: Okay.

THE COURT: What is your name -- because it's evidence of the fact that obviously the agents had a reason to suspect at that moment that he was not the person, okay? But the other statement, no.

MR. HEGYI: Okay.

THE COURT: Why? Because it's not documented.

MR. HEGYI: That is correct, it's not documented.

THE COURT: It's not documented. And we are almost finishing the guilt phase, and I don't think that's fair.

MR. HEGYI: Okay.

THE COURT: So forget about that part. It's out the window. It's not going to happen.

MR. HEGYI: Yes, Your Honor.

THE COURT: The issue of the license, yes, that has a consequence. It's relevant for other things that the case law says it's relevant, and that's about it.

MR. HEGYI: And the credit card. And he had 200 some odd dollars in cash.

THE COURT: Sure. All those things are fine.

MR. HEGYI: And when they live scanned him. He ultimately admitted he was Alexis Candelario Santana.

THE COURT: He doesn't have to admit it. The implication is there, that he is Alexis Candelario Santana. That's it?

MR. HEGYI: That's it. The statement --

THE COURT: Forget about the statement. The statement is out. What about this BOP expert?

MR. HEGYI: Fair enough. May I explain it to Your Honor? While we were in voir dire for the first time, Mr. Ruhnke designated not one, but two future dangerousness experts.

One is a gentleman named Cunningham, and another is a gentleman named Bezy. And he sent me CVs, and he sent me a transcript and the Power Point that they had done. And I've indicated to him that we would oppose him being able to call two experts for the same thing, number one.

And number two, that Mr. Cunningham, the second of the experts, is a psychologist. He goes around the country, he's testified 200 times in Atkins hearings, and that's what he does. And now he's sort of branching off and becoming also a person who reads a lot on prisons. He's never worked for the Bureau of Prisons. He's never worked in any jail. And he now starts trying to do an analysis of it.

And so we would -- I explained to him we would intend to file a motion in limine to exclude Mr. Cunningham. But in the meantime, we're in voir dire already when he first discloses this to us. And so I've been trying to find a rebuttal expert, which I was finally able to do. And so I provided him the curriculum vitae, and also some charts that he has done before.

THE COURT: What is this business about all these sealed records and testimony?

MR. HEGYI: Sure. There is a case in New Mexico called Lujan where he testified. I checked with him last night when Mr. Ruhnke raised it, and, Your Honor, this person isn't even hired yet. We are in the process of hiring him. And he is in Florida, so he's available. But I was told that he doesn't -- I was told from him he doesn't have copies of his other transcripts.

It's not in the capital case library, the electronic library, so I've sent an e-mail to the individual from capital cases that tried that case in New Mexico saying A, could you check and see if Mr. Ruhnke's correct that there's daily transcript. That person was not sentenced to death, so there was no appeal.

And number two, if there is sealed stuff, can you get me clean copies of it, just not the stuff with the stickers on it which is under seal. But presumably they have other copies, clean copies that are not under seal, and so could he get those to me. And as soon as I get them, I will get them to Mr. Ruhnke, along with the transcript, if there is one available for his testimony.

As I'm standing here, I will check with him. I don't know of any other cases that he's testified in. I know he was going to testify in a case in New York, and when he got there,

when the cross-examination was done of the defense expert, there was no need to call him, so he didn't testify in that. But I don't know if there are other cases where he's testified or not.

THE COURT: Let me ask Mr. Ruhnke something. What do you know through the grapevine about the Lujan case?

MR. RUHNKE: I know that there was -- that this witness testified, and I can probably get a transcript from that case. I don't think I'll have any problem getting that.

THE COURT: Through the lawyers or whatever?

MR. RUHNKE: Yeah. I may even have a transcript from -- I'm thinking back, I may even have a transcript from his testimony from that case. That's not my problem.

THE COURT: So that should not be an issue?

MR. RUHNKE: Right, but I understand there was a lot of under seal litigation in that case, and I don't know what it was about.

THE COURT: Nobody knows what it's about.

MR. RUHNKE: I think it was about the scope of what he could testify to, but it's under seal, so I really, really don't know. I know there was a discovery order that was entered, I believe publicly, for the kind of information that he -- at his disposal. Believe me, I just looked at this stuff.

THE COURT: Which judge tried that case in New Mexico?

MR. RUHNKE: I don't remember the name of the judge. I can find that out very quickly. I'll find out and --

THE COURT: Let's go to another point regarding this.

MR. RUHNKE: Okay.

THE COURT: Do you people, both sides, do you really want to bring experts on this issue?

MR. RUHNKE: Yeah, I think we do. And let me just say a few things in response to what Mr. Hegyi just said. Mr. Hegyi said for the first time on February 1, that was the date set for the disclosure of penalty phase experts, and I met the date that was set.

And Dr. Cunningham -- it's Dr. Cunningham, by the way, not Mister. Dr. Cunningham is not a psychologist who somehow goes around the country testifying about stuff he's read. He and two others are the leading researchers in the United States on the issue of violence in prison; the rates of violence in prison; the rates of homicide in prison; the relationship between people who serve life sentences versus lesser terms of years.

He is published widely in peer-reviewed journals in the field. He's a very well-respected, award winning, as a matter of fact, research psychologist.

THE COURT: What is the purpose of his testimony?

MR. RUHNKE: So that the jury understands -- the Government is arguing here that if he is not killed, not executed, Mr. Candelario will pose a future danger in prison. That's their nonstatutory aggravating factor of future dangerousness.

We intended to do two things. Mark Bezy, B-e-z-y, is a former Bureau of Prisons official, retired as the warden of the Federal Correctional Complex at Terre Haute. Started off as a corrections officer at Marion, and worked his way up to be --

THE COURT: He would know what can happen in a prison.

MR. RUHNKE: That's right. He will know. And he will also review Mr. Candelario's prior record in the state prison system and at MDC Guaynabo, and be able to express an opinion as to where he is likely to be classified. And he's likely to be classified to a United States penitentiary.

He will discuss what his view is of the record, how difficult a prisoner Mr. Candelario is in the run of prisoners that go through a Federal system. So he brings the practical, and Dr. Cunningham brings the academic. And, you know, this jury really needs to know what will happen to Mr. Candelario if they do not sentence him to death.

THE COURT: Let's suppose that I allow that --

MR. RUHNKE: Yes.

THE COURT: -- in the penalty phase. What I still don't understand, what is the issue of not being able to tackle the Government's expert?

MR. RUHNKE: It's not being able to. It's needing time to be able to.

THE COURT: But if I give you the week, for example --

MR. RUHNKE: If you give me the week, it makes it much easier and doable, and I'm being as honest as I can about that.

THE COURT: Let's talk about the other issue, the eyewitness identification witness. If there is any need for me to call somebody at LexisNexis, whatever, I prefer -- I'm willing to do that, because I think we should get whomever is going to testify and get it done.

MR. RUHNKE: Yes, sir.

THE COURT: For no other reason than it has to be done.

MR. RUHNKE: While I was sitting at counsel table, I sent an urgent e-mail to the person at LexisNexis. I advised her the Judge would like to speak with the person who is in charge of this decision. I told her in yesterday's e-mail that it's very likely that the Judge would be very appreciative of this courtesy, and I have not heard back yet.

As I said, it's not even eight o'clock on the east coast yet.

THE COURT: One thing I wanted to talk to you about, which I kind of advanced in an e-mail that I shared with you regarding this hiatus, if you will --

MR. RUHNKE: Yes.

THE COURT: -- is this. Let's face it. I am reading papers not to follow the case, but to follow the public opinion. More than what the reporters say, I am looking at the comments that people make on news, you know, comments. And I look at El Nuevo Dia. I look at Primera Hora. I look at Noticias. I hear, whenever I have the opportunity, radio comment shows, things of the sort, about these issues.

And my perception, my perception is that there is a situation out there because of the violent crime that is going on. Every day, more. This weekend alone, 12 murders. Some of it totally senseless. Denny's Restaurant at 7:30 in the morning. You saw that?

MR. RUHNKE: (Nodding head up and down.)

THE COURT: And my fear of the hiatus -- I will give it to you, if you want it, but the fear is you will have a jury out, after -- assuming that there is a guilty verdict, you're going to have a jury out for a week going back to the daily routines which we cannot control.

MR. RUHNKE: I understand.

THE COURT: And you never know what influences, direct or indirect, you never know what -- how much time they may, without even telling us, devote to looking at some of these commentaries.

MR. RUHNKE: I understood.

THE COURT: Things of the sort. And I wonder, I wonder honestly whether that's the kind of thing we want here, to have a public opinion, in a sense, convince directly or indirectly a jury panel as to what is it that they should do.

MR. RUHNKE: Yes, Your Honor.

THE COURT: You see? And that's why I was kind of perhaps trying to tell you that the least time that they are idle -- the routine is now, they have to get up very early in the morning to be here at 8:30, ready to go. They leave late. They go home. There is little time, idle time to deal with this thing. And of course that brings about less time to get all these influences in, too.

And I wonder whether you really want that to happen. I mean, if you want the week, I'll give you the week. But you have to understand that there is a tremendous risk that is against the defendant -- not against the defendant --

MR. RUHNKE: No, I understand. With that understanding, I --

THE COURT: If that is the understanding, and it's

above board that I told you as a member of society that sits here, that reads, that listens, that gets the pulse of things that are going on, fine. But believe me, you are taking a major risk. I think you need some time, without a doubt. If you need the seven days, I'll give you the seven days.

MR. RUHNKE: Your Honor, with that understanding, with that advice from the Court, I will ask for the seven days. I think it's important.

THE COURT: You can have the seven days.

MR. RUHNKE: Your Honor, perhaps a suggestion. When we take that hiatus, if you could address each juror individually in the juror box and extract an individual promise that they will not look at, read or hear anything about the case?

THE COURT: I can try that.

MR. RUHNKE: I've seen that done before.

THE COURT: I can do that. I can do that. You have to understand that we all know how things work in the real world. And one thing is instructions. One thing is what we'll never find out.

MR. RUHNKE: Yes.

THE COURT: And I have a concern. That's all. I would prefer if it were me, assuming that everybody was prepared for whatever reason, I would prefer that they had the least distraction. The least distraction so that we can

hopefully avoid as much negative influences coming into the process as we can. That's all. But if you want the week, I'll give you the week.

MR. RUHNKE: Thank you, Your Honor. I do.

MR. HEGYI: Your Honor, the last question was on the eyewitness identification. And the Court has probably long since forgotten that we filed a motion in limine back on January 16.

THE COURT: I have not forgotten it. I have seen it. I have read the First Circuit cases. I'm prepared to deal with that issue.

MR. HEGYI: Okay. Thank you.

And we have not received anything from the defense. I'm not complaining about it, in light of the fact that they were put in a situation of less -- a situation because of witness security issues, so it is what it is. And --

THE COURT: It is what it is.

MR. HEGYI: Okay. And, Your Honor, just so we're real --

THE COURT: Do you really think you are going to rest today?

MS. DOMINGUEZ: Yes.

MR. HEGYI: Yes, we really do, Your Honor.

Now, I don't want to leave this record without everybody, every attorney saying in this room while we know

we're working hard, all of us, you're working very hard, so I know that and I want to make it clear on the record.

THE COURT: I even have a draft of the instructions all ready, a draft of the instructions with the information that the Government gave me by e-mail, to all of you. I have a good idea. I am going to -- the charge is going to be prepared by groups of offenses more than anything else, the concept of RICO, the concept of murder under Puerto Rico law. Those concepts. That's the way we're going to deal with this.

And I'm prepared to deal with it, and I'm going to give you a draft pretty soon so you can take a look at it.

MR. HEGYI: Thank you, Your Honor.

MR. AGUAYO: Your Honor, may I say a few words?

THE COURT: How long is going to be defense evidence so I can plan accordingly?

MR. RUHNKE: Your Honor, we intend to put on a very brief case depending on Your Honor's ruling on the eyewitness defense. But two or three agents on the issue of prior inconsistent statements, and the agents who interviewed Mr. Perez to clear up the issue of how many photographs he was actually shown during the -- during their interview. He said he was shown several or many, and he said he was shown a photo spread.

The Government's agreed we can call the agents to say no, that did not happen.

THE COURT: No problem with that.

MR. RUHNKE: And we'll be 20 minutes.

THE COURT: And you, Mr. Aguayo?

MR. AGUAYO: Yes. Yes, sir. As to defense, yes, Your Honor, we'll be calling the agents that we Subpoenaed concerning the contradictions that -- as to what they say in the 302s, as to what the Government's witness says they saw, what they did, when they did it. We'll also be putting on four -- the three alibi witnesses, Luis Malave who corroborates what they're saying in part.

THE COURT: Yes.

MR. AGUAYO: We'll also be putting on Mr. Alvin Aponte concerning we followed up --

THE COURT: Alvin Aponte about what?

MR. AGUAYO: We followed up on the Court's suggestion concerning sending someone out there to measure, out to Bravo Street. We thank you for that.

THE COURT: The measurement was from the fritter stand to --

MR. AGUAYO: Bravo Street.

THE COURT: Right. You people cannot stipulate it?

MR. HEGYI: He's never brought it to us.

THE COURT: Well, I said it, I suggested --

MR. AGUAYO: Yes.

THE COURT: -- that both of you get somebody, both

sides get somebody there and measure it.

MR. AGUAYO: Well, the thing is, Your Honor, quite frankly we've been working, as Mr. Ruhnke says, and also the Government, nonstop on this. Friday we worked until ten o'clock at night, Saturday, and even yesterday.

THE COURT: That's the nature of trial.

MR. AGUAYO: I understand that, Your Honor, but we didn't think that this would be ending so quickly, as a result of which we've had to concentrate and really just, you know, just being -- just stopping to sleep to get up to do this again.

And, like I said, my thing is, Your Honor, in the scheme of things, I understand that my request is maybe relatively less important than what we're talking about with the penalty phase. We're talking about life or death.

However, the request that I'm making, Your Honor, is given the fast pace and given all the work we've been doing, especially this weekend, once the case closes both for the Government and the defense, I'm asking the Court for at least a day or two to prepare closing argument.

Now, as I said, we've done a lot of work. This is not a case where my client might be looking at probation or a couple years in jail. He's looking at a life term in prison without possibility of parole. As you stated at the beginning, and to the jurors, we're going to move this case

quickly, but we're not going to sacrifice quality.

In order for me to prepare for that closing statement, I need a little time. And so therefore, Your Honor, I'm requesting at least give us some time, some reasonable amount of time once the case closes, both the Government and the defense, that I be permitted a reasonable amount of time to prepare this closing.

THE COURT: Let me think about that.

MR. AGUAYO: Thank you, Your Honor.

THE COURT: Anything else?

MR. AGUAYO: Well, the only thing is I just want to emphasize that in trying to effectuate a Sixth Amendment right of effective assistance of counsel, Your Honor, I inform the Court, I am not ready to do a closing immediately.

THE COURT: Let me say this: You cannot complain one thing.

MR. AGUAYO: Yes, sir.

THE COURT: I have approved every single petition for money that you have asked.

MR. AGUAYO: Yes, sir.

THE COURT: I have gone over budget in this case.

MR. AGUAYO: Yes, sir.

THE COURT: I have gone over guidelines in this case for money.

MR. AGUAYO: Yes, sir.

THE COURT: If you ask me for ten experts, I have given you ten experts. If you ask me for an expert on stars, I have given you an expert on stars. Everything you have asked, I have given you. And don't think for a minute it has been easy for me to deal with the money issue with the Court of Appeals, okay? So you cannot complain about one thing, that I've given you every single opportunity to be prepared.

MR. AGUAYO: In those terms, Your Honor, in terms of the experts and all that, investigators, that's correct.

THE COURT: Investigators, hours and hours and hours and hours. When I add up what it's going to cost the Government, the defense side alone on this case, not counting the Court side or the Government side, you're going to be astonished at the numbers. I'm going to let you know what it was.

MR. AGUAYO: Your Honor, I understand that.

THE COURT: Many judges would never, ever have approved what I approved.

MR. AGUAYO: Your Honor, I appreciate that.

THE COURT: And that translates into additional help for you, because you are not trying this alone. You are trying it with a bunch of other people who are helping you on Government's budget.

MR. AGUAYO: Your Honor, I understand and appreciate that. But what I'm referring to here is the time needed to

prepare for closing argument.

THE COURT: Yes, but don't make an issue of Sixth Amendment, because I think it's a total exaggeration when you make that argument.

MR. AGUAYO: Well, Your Honor, I sincerely believe the guilt or not guilty of David Oquendo is going to rest a large part on Mr. Oquendo's --

THE COURT: David Oquendo's case is not a death penalty case.

MR. AGUAYO: I understand, Your Honor.

THE COURT: And he has gotten the benefits directly or indirectly as if it was a death penalty case. So what I'm saying is ask me for the time.

MR. AGUAYO: Yes, sir.

THE COURT: Ask me for the day that you need.

MR. AGUAYO: Yes, sir.

THE COURT: But don't make an issue that is insulting to my intelligence. That's all I'm saying. You see the point?

MR. AGUAYO: Well, I understand, Your Honor, your point, sir, but I --

THE COURT: Because let me tell you, it hasn't been for lack of cooperation on the part of the Court budget wise, and you have gotten everything you needed to be prepared to handle this case.

MR. AGUAYO: Your Honor, I understand that. And I don't want to go over this again with Your Honor, because I do respect what Your Honor's saying, but what I'm talking about here is not budget, but the time I need to prepare for this closing.

THE COURT: Then say, Judge, we may need a day to prepare for closing arguments, but don't extend it to make a Sixth Amendment issue and all this, because I think it's going overboard. That's all I'm saying. Keep the perspective of things, that's all, because no Court of Appeals is going to say if I denied you one day to prepare closing arguments, there was a Sixth Amendment issue. No court. Okay? That's all I'm saying.

MR. AGUAYO: Okay, Your Honor. Thank you.

THE COURT: Well, are we ready? Keep me posted on that issue with the LexisNexis thing.

MR. RUHNKE: Yes, Your Honor. I have not heard back from them as of yet.

MR. AGUAYO: Excuse me. Your Honor, one more thing. As you know, my expert, my eyewitness expert had written an e-mail saying he could not be here for today as the Court had instructed to bring him.

THE COURT: Tomorrow's fine, or whenever. When is he coming?

MR. AGUAYO: Well, what I was going to tell Your

Honor is based on that, I did find somebody else.

THE COURT: Yes.

MR. AGUAYO: And he will be available today as instructed by the Court.

THE COURT: Right, but if we finish the evidence early enough --

MR. AGUAYO: Yes, sir.

THE COURT: -- we'll take on that proffer, to begin with.

MR. AGUAYO: All right.

THE COURT: If not, we'll do it tomorrow, okay?

MR. AGUAYO: Yes, sir.

THE COURT: So let's bring the jury in.

(At 9:12 AM, jury entered courtroom.)

THE COURT: Members of the jury, you know that I like to start on time, and it's now 9:15. Don't think for a minute that we were just wasting our time. I was discussing with the lawyers a bunch of issues that may make what remains of the case a lot easier, if you will, kind of scheduling, things of the sort. So that's what we were doing.

And I think that in a sense, I think that we accomplished a lot that may eventually save time for you, also. So let's now proceed with the next witness.

MS. MATEO: Yes, Your Honor. The Government calls Yocasta Brugal.

COURTROOM DEPUTY: Raise your right hand.

Do you solemnly swear that the testimony you are about to give in this case is the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

Y O C A S T A B R U G A L,

called as a witness by the Government, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MATEO:

Q. Please state your name for the record.
A. Yocasta Brugal.
Q. And where are you currently working?
A. San Juan Bautista School of Medicine.
Q. And what is your title?
A. Resident dean.
Q. Can you briefly describe your educational background?
A. Yes. I am a doctor, medicine doctor, and after I made my specialty in pathology, and after I make a specialty in forensic pathology.
Q. And you perform autopsies?
A. Yes, a lot.
Q. Did you work at Ciencias Forenses at some point?
A. Until 2003.
Q. And how long did you work there?

A. 25 years.
Q. And in that time you worked there, how many autopsies do you think you performed?
A. More than 15,000.
Q. And have you been qualified as an expert in forensic pathology?
A. Yes.
Q. In state court?
A. Yes.
Q. And how many times?
A. I can't remember. More than ten or 15 times.
Q. In Federal Court?
A. In Federal Court, ten or 15. In the other, more than a hundred.
MS. MATEO: The Government offers Yocasta Brugal as an expert in forensic pathology at this time.
MR. RUHNKE: No objection.
THE COURT: Very well.
BY MS. MATEO:
Q. Dr. Brugal, I'm going to hand you what's been marked as Government's ID 191 and 191-A. Do you recognize what I just handed to you?
A. Let me look. Yes. I performed this autopsy, Javier Francisco Ramos, with the number 3840-95.
Q. And is that a certified copy from Ciencias Forenses of

your autopsy report?

A. Yes.

MS. MATEO: The Government moves 191, which is the autopsy report at this time.

THE COURT: Any objection?

MR. RUHNKE: No objection.

MR. AGUAYO: None, sir.

THE COURT: Received.

(At 9:16 AM, Government's Exhibit 191 admitted into evidence.)

BY MS. MATEO:

Q. 191, can you explain what that is? The other exhibit, the other ID I handed to you?

A. This ID is a drawing of the man with a lot of gun shots.

Q. And you are the one that created that diagram or --

A. Yes.

Q. -- did the markings?

A. This is a copy, really this is a copy, photocopy.

MS. MATEO: The Government moves 191-A into evidence at this time.

MR. RUHNKE: No objection.

MR. AGUAYO: No objection.

THE COURT: Very well.

(At 9:17 AM, Government's Exhibit 191-A admitted into evidence.)

BY MS. MATEO:

Q. I'm now putting on the screen 191-A. One moment to -- I've got it. There we go.

First of all, Dr. Brugal, can you please tell us the autopsy number on the report?

A. The number is 3840 from the year '95.

Q. And that's what's here on the bottom of Exhibit 191-A?

A. Yes.

Q. And the name?

A. Francisco -- no, Javier Francisco Martinez Ramos.

Q. And what was the date of the autopsy?

A. October 3rd, 19 -- of 1999 -- '95.

THE COURT: '95.

BY MS. MATEO:

Q. And you stated here this drawing showed multiple gunshot wounds that you drew in. How many gunshots were there on this individual?

A. 63.

Q. And were you able to determine the age of this individual?

A. Yes. Well, they told me the age is 27.

Q. And within a reasonable degree of medical certainty, were you able to determine the cause of death for this individual?

A. Yes.

Q. And what was that?

A. The cause of death is severe -- I have to look, because it's many years and I don't have, like other pathologists, the accessibility to the records.

Q. That's fine.

A. It's laceration, perforation of internal organs due to gunshot wounds.

Q. And multiple gunshot wounds or were you able to determine which shots were fatal?

A. Many of them, especially the ones in the face and cranium that they destroyed all the face and the brain.

Q. And these are the ones depicted here?

A. (Nodding head up and down.)

Q. Were you able to determine how many gunshot wounds there were to the face?

A. Seven.

Q. Seven. And also were you able to determine the entry and exit wounds?

A. Yes.

Q. And where, if it was in the front of the body or in the back?

A. Well, he have in the majority of the -- one in the face, he have in the front, but the one in the thorax and abdomen, he have in the back.

Q. And what kind of damage did he receive from the shots in the face?

A. Well, they destroy all the teeth, the bones, the face, the ocular globe of the eye, many fractures of the cranium, and they destroyed the encephala -- I mean the brain of this individual.

Q. And were you able to determine the manner of death within a reasonable degree of medical certainty?

A. Yes. The -- yes.

Q. And what was the manner of death?

A. Laceration -- ah, the manner of death was the homicide.

Q. I'm going to hand you now what's been marked for ID as Government's ID 192. Looking at the Government's ID, what did I hand you? What's been marked as Government's ID 192?

A. Yes. This is a copy of the autopsy that I performed on Julio Angel Martinez Santana, number 4114 of '96.

Q. And Government's ID 192, is that a diagram you prepared?

A. A diagram, yes.

Q. And you prepared that with the markings?

A. Yes.

MS. MATEO: The Government moves 192 into evidence at this time.

MR. RUHNKE: No objection.

THE COURT: Received.

(At 9:21 AM, Government's Exhibit 192 admitted into evidence.)

BY MS. MATEO:

Q. Dr. Brugal, you stated already the autopsy number, so just let me know what the date of the autopsy was for this individual.

A. November 4 of 1997.

Q. And how old was Julio --

A. Excuse me. '96.

MR. RUHNKE: I think the answer was '96.

THE WITNESS: '96, yes.

BY MS. MATEO:

Q. And how old was this individual, Julio Martinez Santana?

A. Excuse me?

Q. How old was this individual?

A. Oh, he was 28 years.

Q. And you indicated here, what I've put on the screen as Government's Exhibit 192, are drawings. How many gunshot wounds did this individual have?

A. Three.

Q. And where were they located?

A. They were located -- the gunshot A that is in my autopsy is the one that is in the thigh, in the back, 30 inches from the heel.

Q. If you want to turn around and just point to A right there on the screen. And for the record, it's the back side in the middle of the thigh.

A. That wound exit, that bullet exit very close to the

entrance at 30 inches from the heel. And only injured the soft tissue -- I mean skin, subcutaneous tissue and muscle.

Q. You said there was three gunshots. Which one was the fatal gunshot in this case?

A. He have another one, the one that's in the anterior part of the thigh, 27 from the heel. 27 inches from the heel. And this one entered through the extremity, and lacerated the vein and the femoral artery. And a consequence, the person died because he have severe bleeding.

Q. And so within a reasonable degree of medical certainty, were you able to determine the cause of death?

A. Yes. The cause of death is hypovolemic shock. That means he lost a lot of blood.

Q. And the manner of death?

A. Homicide.

THE COURT: And how many shots all together? How many gunshot wounds all together you said?

THE WITNESS: No -- I said three. This one that exit here; this other one that goes to the -- again, to the other extremity, thigh, and lacerates the vein on the artery in the inguinal area.

BY MS. MATEO:

Q. And what were you able to observe to determine the blood loss?

A. Yes. Because, one, that you bleed very rapidly when an

artery is involved like the femoral artery. The vein is a little slowly. And all the organs were very pale. Okay. Pale.

Q. And this is what you observed with Julio Martinez Santana?

A. Yes.

Q. I'm now going to hand you what's been premarked as Government's Exhibit 193. And looking at Government's ID 193, what did I hand you?

A. Yes. This is the diagram of the body of Saul Padin Orozco.

Q. And did you prepare that with your markings based on the autopsy report that you created?

A. Yes.

MS. MATEO: Government moves 193 into evidence at this time.

MR. RUHNKE: No objection.

MR. AGUAYO: No objection, Your Honor.

THE COURT: Received.

(At this time, Government's Exhibit 193 admitted into evidence.)

BY MS. MATEO:

Q. Dr. Brugal, can you please tell us the autopsy number?

A. The number is 1990 from the year 1997.

Q. And the name?

A. The name, Saul Padin Orozco.
Q. And the date of the autopsy?
A. May 27, 1997.
Q. And the age?
A. 21 years old.
Q. And did you observe any evidence of trauma?
A. Yes. He have a few abrasions, I mean, you know, is the only symbol -- the epidermis, the injury don't go to the subcutaneous issue. He have an abrasion in the left ear. He have another one compatible with a projectile in the left shoulder. He have in both elbows. He have in the posterior thigh, the left posterior thigh. And he have a contusion in the anterior part of the leg, the right leg. And he have eight gunshot wounds.
Q. How many gunshot wounds?
A. Eight.
Q. And were you able to determine if the trauma was before or after death?
A. Before.
Q. And were you able to determine if there was a fatal shot in this?
A. Yes. Yes.
Q. Which one was it, if you want to point to it, to the diagram behind you?
A. Yes. It's this one. The one that is in the gluteal

area, 32 inches from the heel.

Q. And what were the injuries that were caused?

A. This bullet penetrated to the body, and produced in the abdominal cavity multiple bowel perforation, liver perforation. And I recover the bullet in the muscle of the abdomen, in the right side.

Q. And was there substantial blood loss in --

A. 2,030 cc.

Q. Can you explain how much a human being usually has, how many cc's?

A. We have 500 cc -- 5,000 cc. Okay. He lost more than half. But if you lost that in a very short time, you die. If you lost -- you know, you can have a chronic anemia, something like that, you can loss and your body try to keep alive. But when you lost more than half in such a little time, you die.

Q. And so within a reasonable degree of medical certainty, were you able to determine the cause of death?

A. The cause of death is the laceration and perforation of the internal organs due to gunshot wounds.

Q. And the matter of death?

A. Homicide.

Q. And lastly I'm going to hand you what's been premarked as Government's Exhibit 194. Dr. Brugal, what did I just hand you, Government's ID 194?

A. I have the diagram in the autopsy of David Nieves

Carmona.

Q. And you drew those markings based on your autopsy report?

A. Yes. The ones that have the letter E is the entrance, and the ones that have exit is the exit.

MS. MATEO: The Government moves 194 into evidence at this time.

MR. RUHNKE: No objection.

MR. AGUAYO: No objection.

THE COURT: Received.

(At 9:31 AM, Government's Exhibit 194 admitted into evidence.)

BY MS. MATEO:

Q. You said this was for David Nieves Carmona. What's the autopsy number?

A. 3132-99.

Q. And the date?

A. August 17 of 1999.

Q. And the age?

A. The age is 22.

Q. And, Dr. Brugal, did you observe gunshot wounds with this individual?

A. Yes. He had three gunshot wounds.

Q. And is this what you marked as Government's 194, which is now on the screen?

A. Yes.

Q. Were you able to determine a fatal shot?

A. Yes. Give me a moment. Well, the one A, that is the one is 75 inches from the heel, entrance to the body, and produce fracture of the first, second, and third ribs, left ribs; produced the laceration of the subclavian artery; and produced perforation of the left lung; and fracture of the ninth rib in the left side; perforated the diaphragm; and have bleeding that was measured of 1090 cc. That's A.

The B only produced laceration of the soft tissue. The other one is in the wrist, in the left side, in the left hand.

Q. Dr. Brugal, were you able to determine -- I see here you marked them with E. Were all the entries of these gunshots in the back?

A. Yes.

Q. And were you able to determine within a reasonable degree of medical certainty the cause of death?

A. The cause of death is perforation and laceration of internal organs due to gunshot wound.

Q. And the manner of death?

A. Homicide.

MS. MATEO: I have no more questions for this witness, Your Honor.

THE COURT: Any cross?

MR. RUHNKE: No, thank you.

MR. AGUAYO: No, sir.

THE COURT: Thank you very much. You are now excused.

(At 9:34 AM, witness excused.)

MS. MATEO: Your Honor, the Government calls Eddie Vidal.

COURTROOM DEPUTY: Raise your right hand.

Do you solemnly swear that the testimony you are about to give in this case is the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do so swear.

E D D I E V I D A L G I L,

called as a witness by the Government, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MS. DOMINGUEZ:

Q. Please tell us your full name.

A. Good morning to everyone. My name is Eddie Vidal Gil.

Q. And, sir, where do you work?

A. I've been working for 25 years for the Puerto Rico Police as a drug trafficking investigating agent in Puerto Rico.

Q. And are you currently designated as a Task Force Agent with the Drug Enforcement Administration?

A. Yes, ma'am. I spent a little bit over ten years. I've

been assigned to the DEA Task Force in Ponce investigating drug trafficking.

Q. And during the 25 years you've been a police officer and the last ten years that you've been a Task Force Agent, have you been investigating drug trafficking organizations?

A. That is correct. For the total amount of time of 25 years I've been in Puerto Rico Police, as well as for the ten years I've been assigned to the DEA Task Force, I've been investigating drug trafficking in Puerto Rico.

Q. Are you able to estimate, sir, approximately how many such investigations you've been involved in?

A. Well, I don't have a specific number in mind, but I investigated hundreds of investigations.

Q. And, sir, during your 25 years as a police officer and your ten years as a Task Force Agent investigating drug trafficking organizations, can you tell us whether you also received any special training in that regard?

A. That is correct. I received endless trainings related to drug trafficking. Almost all the trainings I've taken are related to drug trafficking.

Q. And has this been training offered to you by the Drug Enforcement Administration or by the Police of Puerto Rico or both?

A. I have received training from the Puerto Rico Police, as well as from the DEA. From both agencies.

Q. Now, sir, in connection with the investigations that you have been involved in of drug trafficking organizations, have you also worked as an undercover agent?

A. Correct. I have received training, and I've been involved in hundreds of investigations being an undercover agent.

Q. And, sir, have you previously been qualified as an expert in various areas associated with drug trafficking?

A. Correct. I've been qualified at least in ten drug trafficking cases as an expert in drugs.

Q. And also in the operation of drug trafficking organizations?

A. Yes, ma'am.

Q. And when was the last time that you were so qualified, sir?

A. I'd say one, two years ago.

MS. DOMINGUEZ: Your Honor, at this time we'd proffer Agent Vidal as an expert in the operation of drug trafficking organizations.

MR. RUHNKE: Could we come to side bar, Your Honor?

THE COURT: Sure.

(Bench conference held.)

MS. DOMINGUEZ: Was he on the list?

MS. MATEO: He's on the original list.

MR. RUHNKE: I was asking whether -- we were given a

list of the witnesses that remained in the Government's case, and he was not on that list. And if there was a subsequent list, I don't think I ever saw it.

MS. MATEO: He was named on the list of witnesses.

MR. RUHNKE: Originally, right?

MS. MATEO: Yes.

MR. RUHNKE: What I'm saying is last week the Government gave us a list of the witnesses they were going to call. His name is not on that list. I haven't had a chance to -- I don't even know what he is going to say, because I wasn't prepared to have him come in today. I haven't looked at his report. Maybe a proffer of what he has to say --

MS. DOMINGUEZ: Judge, I apologize. I thought he had been put on the list.

THE COURT: Is he on the list or not on the list?

MS. DOMINGUEZ: He is on the list, but apparently there was another list of witnesses, an accommodation --

MR. RUHNKE: Just so you know, there was an original list with hundreds of witnesses on it, but last week the Government gave us a list of the remaining --

MS. DOMINGUEZ: It's going to be very, very brief. He's going to talk about drug trafficking organizations, the hierarchy, the runners, sellers, the use of cell phones, the way cash was handled, the use of ledgers.

He is -- I'm going to show him Exhibit 143, which

he's not going to be able to identify the code on that exhibit, but he will be able to identify as a drug ledger. But we have other witnesses able, if you would like to pass him. We can call him after lunch if you wish.

MR. RUHNKE: Well, it's not written in stone that witnesses who are experts in drug trafficking organizations are -- it's not a slam dunk that you call an expert in drug trafficking organizations and he qualifies to describe drug trafficking organizations. If I had known he was coming, I would have done some research on it.

MS. DOMINGUEZ: Well, he was designated as an expert.

MR. RUHNKE: Absolutely. I'm not quarreling with that. There are lots of witnesses that were on the list, and the Government's cut down its case a lot. And that's why we're here where we are. We were given the list of the remaining witnesses, and this is -- he's not on it, so we weren't expecting him to be here.

Could we reschedule this witness until after lunch to give us a chance to look at what he has to say?

MS. DOMINGUEZ: We have other witnesses we can call out of turn.

THE COURT: Is there a report or something?

MS. DOMINGUEZ: No report.

MR. RUHNKE: So we have an expert without a report,

which makes life difficult, too.

THE COURT: Well, the Rules require a report.

MR. RUHNKE: Or something.

MS. DOMINGUEZ: We gave a verbal, we gave a written disclosure of the substance of his testimony, Judge.

THE COURT: Let me get something here.

MS. DOMINGUEZ: Judge, this is the disclosure that was given on Mr. Vidal.

THE COURT: This is it?

MS. DOMINGUEZ: Yes, sir. The --

THE COURT: Rule 16 was complied with.

MR. RUHNKE: I understand. We didn't have notice he was coming in.

MS. DOMINGUEZ: We've been trying to give counsel advance notice of witnesses coming for the following day. Apparently it was an oversight, because he was on an earlier list and then was subsequently, on a following list --

MR. RUHNKE: I think we can --

THE COURT: I don't have a --

MR. RUHNKE: We can do this after lunch.

THE COURT: I don't have a problem asking him to come back after, but there's no rule defense or Government needs to know in advance who's going to testify in a particular morning or day.

MS. DOMINGUEZ: We've been doing it in good faith,

Judge.

THE COURT: If it's a matter of accommodating, that's one thing, but the Rules don't require that kind of accommodation.

MR. RUHNKE: I agree.

MS. DOMINGUEZ: Since we have other witnesses, I have no problem recalling him this afternoon. In any event, if he wants to speak to him over the lunch recess, we can make them available.

MR. RUHNKE: That's fine, Judge.

THE COURT: So what should I tell the jury, because it's kind of embarrassing getting somebody off the stand? That you have asked to interview --

MR. RUHNKE: (Nodding head up and down.)

THE COURT: -- and the Government acceded, and that we'll recall him after lunch?

MR. RUHNKE: Yes. That's good.

THE COURT: Okay.

MR. AGUAYO: Your Honor, excuse me. One last thing. In regard to his testimony, David Oquendo, doing the Rule 105 in regard to his testimony about drug trafficking organizations, enterprises, whatever this would be would have nothing to do with David Oquendo. And therefore, I will request a Rule 105.

THE COURT: Does it have anything to do with David

Oquendo?

MS. DOMINGUEZ: No.

THE COURT: Okay. Then we'll give a Rule 105 later.

MR. AGUAYO: Thank you, Your Honor.

(Bench conference concluded.)

THE COURT: Members of the jury, this is what we're going to do. The parties have agreed that before the agent testifies, Mr. Ruhnke will have an opportunity to interview him on some aspects that he has an interest in talking to him about. I don't have an issue with that. So what we're going to do is take him off the stand now, and bring him back after lunch so Mr. Ruhnke has an opportunity to talk to him over lunch recess, okay?

And we're going to call another witness. Fair enough? Very well.

Mr. Vidal, we are going to let Mr. Ruhnke interview you during the lunch recess or during a break that you have, and then we will recall you after lunch. Okay?

MR. RUHNKE: Yes, Your Honor.

THE COURT: Thank you very much.

(At 9:47 AM, witness left the stand.)

MR. HEGYI: The Government calls Jesus Figueroa Cruz.

(At 9:49 AM, witness took the stand.)

COURTROOM DEPUTY: Raise your right hand.

Do you solemnly swear the testimony you are about to give in this case will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

MR. HEGYI: May I proceed, Your Honor?

THE COURT: Please, Mr. Hegyi.

J E S U S F I G U E R O A C R U Z,

called as a witness by the Government, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HEGYI:

Q. Good morning, Lieutenant.

A. Good morning.

Q. Could you give us your complete name, please?

A. Jesus, L., as in Luis, Figueroa Cruz.

Q. And how old are you, please?

A. 41.

Q. How far have you gone in school?

A. Second year of college.

Q. And are you a sworn officer with a law enforcement agency?

A. Yes, sir.

Q. How long have you been a sworn officer with a law enforcement agency?

A. 20 years.

Q. What is your -- what agency are you currently employed by, please?

A. Puerto Rico Police Department.

Q. And do you hold a rank, sir, and if so, what?

A. I'm lieutenant.

Q. Do you have a current duty assignment today?

A. Yes.

Q. What is that?

A. I'm the coordinator of all DEA Task Force in Puerto Rico.

Q. How long have you been involved in investigating narcotics here in Puerto Rico?

A. Ten years.

Q. Did you have occasion -- were you involved in drug investigations here in Puerto Rico in 2006?

A. Yes.

Q. Were you involved in a -- in 2006, were you involved in a drug investigation that involved a wire tap with DEA?

A. Yes.

Q. Who were the two lead DEA agents that were working with you in that investigation?

A. Nathan Cohen and Jake Jacobsen.

THE COURT: Ernst.

THE WITNESS: Ernst Jacobsen.

THE COURT: Jacobsen?

MR. HEGYI: Yes.

THE COURT: Jacobsen.

MR. HEGYI: He testified last week, Your Honor.

THE COURT: Yes.

BY MR. HEGYI:

Q. Now I'm going to direct your attention, if I could, sir, to September 26, 2006. On that day, did you participate in the execution of a search warrant at a residence in Arecibo in Barrio Brisas, Las Brisas, excuse me, Calle B 61?

A. Yes.

Q. Who was the main target of that investigation?

A. Carmelo Rondon Feliciano.

Q. And on the wire tap, was he referred to by the pseudonym Panzon?

A. Yes.

Q. And he's also someone we now know by the name Omi?

A. Yes.

Q. Was there another individual arrested with regard to that investigation as well?

A. Yes, sir.

Q. And what was that individual's name?

A. Christian Lopez Lebron.

Q. Okay. I'm going to take you back now, sir, to the execution of the search warrant on September 26, 2006, in Las Brisas. What was your role in the execution of the search

warrant?

A. Well, I along with the other agents, Nathan Cohen and Jake --

Q. Is Jake the nickname for Jacobsen?

A. That's Jacobsen, yes. We were seizing all the evidence found.

Q. Were you one of the first individuals to enter the home after the residence was cleared and secured when the SWAT people went in?

A. Yes, sir.

Q. Did you see -- we're going to focus on drugs with you, sir. We're going to focus with guns elsewhere. But with regard to the drugs, did you see where the various drugs were before they were selected?

A. Yes.

Q. And were you involved in the actual collecting of the drugs going into the chain of custody of the drugs?

A. Yes, sir.

Q. And were you involved with and participated in the laying out of the various drugs that were seized on September 26, 2006, from Las Brisas at the office and DEA where they were all photographed that same day?

A. Yes.

MR. HEGYI: Your Honor, we've been using the composite exhibit number for Las Brisas, Composite Exhibit

162. Each one of these are individually marked with the name Brisas and then a number after it.

THE COURT: Very well.

BY MR. HEGYI:

Q. Lieutenant, I'm going to hand you what's been marked as Brisas Two, and then ask you if you can recognize what's in that picture?

A. Yes.

Q. Who is it, sir?

A. Christian Lopez Lebron.

MR. HEGYI: The Government offers Brisas Two.

THE COURT: No objection?

MR. AGUAYO: None, Your Honor.

THE COURT: Received.

(At 9:57 AM, Government's Exhibit Brisas Two admitted into evidence.)

BY MR. HEGYI:

Q. Well, it's a fairly dark photograph, but when the jury has it in front of them, that will be a picture of Christian Lopez Lebron; is that correct, Lieutenant?

A. Yes, sir.

Q. Is that how he looked at the time of his arrest on September 26, 2006?

A. Yes, sir.

Q. Now, in the course of going through the residence there,

did you come upon a book that was in a sink? And I'm going to show you what are marked as Brisas Exhibits 3-A, 3-B, and then I'm going to show you what is actually in evidence through a different witness as Government's Exhibit 143. Do you recognize what's in those photographs, Lieutenant?

A. Yes, sir.

Q. Did those come from a sink in a bathroom in Las Brisas at the time of the search warrant?

A. Yes, sir.

MR. HEGYI: Government offers those three exhibits, Your Honor.

MR. RUHNKE: No objection.

THE COURT: Received.

(At 9:59 AM, Government's Exhibits Brisas 3-A, 3-B, and 143 admitted into evidence.)

BY MR. HEGYI:

Q. I'm going to put on the monitor for the jury to see, this is Las Brisas 3-A. Sir, would you point out for us where this drug book is, please?

A. Here. (Witness indicating.)

Q. You've made an X on a book that's almost dead center in the middle of Brisas 3-A, blue in color, and has dogs on the back of it, sitting in the sink; is that correct?

A. Yes, sir.

Q. And Las Brisas Exhibit 3-B, is that a photograph of the

front of that same drug ledger?

A. Yes, sir.

Q. Now I'm going to put what's in evidence with a different witness as Government's Exhibit 143. Is this a picture of that same drug book now opened up to display two different pages that were inside that drug ledger?

A. Yes, sir.

Q. Now, would you just generally describe, and I mean briefly because we're going to show a few photographs and show the evidence that's sitting out on this table in front of this jury. Would you describe for us just briefly what you found in terms of drugs and drug paraphernalia when you executed this search warrant on September 26, 2005, at Las Brisas?

A. Well, heroin was found. Cocaine. Paraphernalia, equipment to process drugs. And it was like a press to compress drugs.

Q. Scales? If you remember.

A. No, I don't recall that.

Q. Okay. The -- do you remember, sir, approximately how much total heroin was taken from that residence on September 26, 2006?

A. Approximately one fourth a kilo of cocaine.

Q. Is that approximately a half a pound?

A. Could be.

Q. And you mentioned that cocaine was found there, too,

sir?

THE COURT: Wait, wait, wait. You asked for heroin?

MR. HEGYI: That was heroin that he was speaking of a minute ago.

THE COURT: He answered cocaine.

BY MR. HEGYI:

Q. I'm sorry. Let's back up again. Do you remember how much heroin was recovered from Las Brisas approximately?

A. I'm talking about heroin. (Remarks in Spanish.)

THE COURT: Do you need any pages to refresh your recollection? Because we're talking about two different things. Mr. Hegyi is asking you about heroin, and you're answering about cocaine.

THE WITNESS: I'm not quite sure. I think it was more amount of heroin -- or cocaine, or more cocaine than heroin.

BY MR. HEGYI:

Q. That's fine. We have another witness we can do this with.

I'm going to put a series of photographs, and ask you if you recognize -- actually, I'm going to hand them to you first and ask you if you recognize these photographs as being true and correct copies of the items that were taken, the drug-related or some of the drug-related items that were taken from Las Brisas at the time the search warrant was

executed?

MR. HEGYI: They will be Las Brisas 3-D, 3-E, 3-F, 3-G, 3-H, 3-I, 3-J, 3-K, 3-L and 3-M.

THE WITNESS: Yes.

BY MR. HEGYI:

Q. And are they indeed true and correct copies of drugs that were recovered on that day at Las Brisas?

A. Yes, sir.

MR. HEGYI: The Government offers each of those exhibits.

MR. RUHNKE: No objection.

MR. AGUAYO: No objection, Your Honor.

THE COURT: Received.

(At 10:06 am, Government's Exhibits Brisas 3-D, 3-E, 3-F, 3-G, 3-H, 3-I, 3-J, 3-K, 3-L and 3-M admitted into evidence.)

BY MR. HEGYI:

Q. I'm going to go through very, very quickly. Government's Exhibit Las Brisas 3-D, is this a photograph of the drugs as they're laid out after they've been brought back from the search warrant?

A. Yes, sir.

Q. And 3-E, is that another view, just a different angle of the drugs that were recovered at Las Brisas?

A. Yes, sir.

Q. 3-F, one of those items, what type of drug does that appear to be to you?
A. Heroin.
Q. 3-G, what does that appear to be to you?
A. Cocaine.
Q. 3-H, sir, what are in those individual bags that seem to have some red in them? What is that, as it appears to you?
A. Well, it doesn't -- it's not quite clear, but it seems to be cocaine.
Q. Okay. And each one of the individual things, whether they're heroin or cocaine, whatever they are, do those appear to be packaged for sale?
A. Yes, sir.
Q. Now I'm going to put in front of you Brisas 3-I, that is a large ziplock bag with smaller ziplock bags which seem to be purplish colored things. Can you tell us what that looks like to you? And I'll also show you 3-J, which seems to be another picture of similar items.
A. Heroin.
Q. And now we had looked earlier at Government's Exhibit 3-H, and I'm going to show you Government Exhibit 3-K, which may be a clearer picture of what was in 3-H. What does that appear to be to you, sir?
A. Cocaine.
Q. And does that look like it was packaged for sale?

A. Yes, sir.
Q. Now, 3-L, do you recognize what that appears to be?
A. Yes, sir.
Q. What does that appear to be?
A. Heroin.
Q. And is it packaged for sale to the street?
A. Yes, sir.
Q. And now, Brisas Exhibit 3-M, what does that appear to be to you, sir?
A. Heroin.
Q. And does that appear to be packaged for sale to the street?
A. Yes, sir.
Q. If you would take just one minute, Lieutenant, and step down and look at the drugs that are arrayed in front of the jury on this table, and confirm for us that those drugs are the drugs that were seized from Las Brisas in the search warrant on September 26, 2005?

MR. HEGYI: And while he's looking at this, for the record these will be Brisas numbers 5, 6, 7, 8, -- they'll be out of order, but 5, 9, 7, 8, 12, 23, 14, 13, 16, 18, 28, 29, 20, 21, 15, 22, 24, 25, 26, and two of them are marked 27.

We have an agreement that the Government can introduce this exhibit. I'm going to mark it 162-A, which is a cross reference chart between the DEA exhibit numbers and

the numbers that are marked here on the evidence.

MR. RUHNKE: We agree, Your Honor.

MR. HEGYI: So the Court will understand, the DEA analysis will use the DEA exhibit numbers of the drugs.

BY MR. HEGYI:

Q. Have you had an opportunity to look at it, sir?

A. (Nodding head up and down.)

Q. Please retake the stand. Sir, are these the drugs that were seized from Las Brisas?

A. Yes, sir.

Q. And once you seized them, you turned them over to Agent Nathan Cohen for shipment to the DEA laboratory; is that correct?

A. Yes, sir.

MR. HEGYI: Your Honor, we offer all of the drugs on the table, and I pass the witness.

THE COURT: Any objection?

MR. RUHNKE: Without objection.

THE COURT: Received.

(Government Exhibits admitted into evidence.)

THE COURT: Cross-examination, if any.

CROSS-EXAMINATION

BY MR. RUHNKE:

Q. Sir, just to refresh your recollection, what was the date of this seizure?

A. September 26, 2006.

Q. Are you aware that at that point Alexis Candelario had been in jail for three years?

A. Yes, sir.

MR. RUHNKE: Thank you. Nothing further.

REDIRECT EXAMINATION

BY MR. HEGYI:

Q. Lieutenant, I don't know the answer to this, but are you aware that Alexis Candelario Santana was still making phone calls out of the jail to Omi --

MR. RUHNKE: Objection, Your Honor.

BY MR. HEGYI:

Q. -- in this case?

THE COURT: Whether he was aware, that's all.

BY MR. HEGYI:

Q. That he was aware the defendant in this case was going over a drug book with him and giving him orders and guidance? Were you aware of that?

A. Yes, sir.

MR. HEGYI: Thank you, Your Honor. May the witness be excused?

MR. AGUAYO: Your Honor, may we have the 105, Your Honor?

THE COURT: Yes. These drugs are only attributable to the defendant, Alexis Candelario, and not to the other

gentleman, who is the gentleman here, Mr. Oquendo.

MR. HEGYI: Your Honor, may I get the next witness?

(At 10:14 AM, witness left the stand.)

MR. HEGYI: Your Honor, the Government calls Special Agent Nathan Cohen.

COURTROOM DEPUTY: Raise your right hand.

Do you solemnly swear that the testimony you are about to give in this case is the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

N A T H A N C O H E N,

called as a witness by the Government, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HEGYI:

Q. Good morning, sir.

A. Good morning.

Q. Could you give us your name, please?

A. My name is Nathan Cohen.

Q. How old are you?

A. I'm 36 years old.

Q. Do you have a college degree?

A. Yes, I do.

Q. A Bachelor's in business administration, if I'm correct?

A. Yes, I do.

Q. Did there come a point in time in your career, sir, when you decided to go into law enforcement?
A. Yes, I did.
Q. When did you first go into law enforcement and in what agency?
A. In February of 2002 I was hired by the United States Border Patrol.
Q. And did there come a point in time when you left -- were you a sworn officer there?
A. Yes, I was.
Q. And did there come a point in time when you left the Border Patrol and went with a different law enforcement agency, law enforcement?
A. Yes.
Q. Which agency?
A. In September of 2004 I was hired by the Drug Enforcement Administration.
Q. And are you currently a sworn Special Agent with the Drug Enforcement Administration?
A. Yes, I am.
Q. Have you continuously been since in or about December of 2004?
A. Yes, I am.
Q. Did there come a point in time then when you were stationed, Agent Cohen, here in Puerto Rico?

A. Yes, from July of 2005 to July of 2008.

Q. And during that time frame or much of that time frame, did you have a partner that you worked with?

A. Yes. I was working with Special Agent Jake Jacobsen.

Q. What's his real name?

A. Ernst Jacobsen. He goes by Jake.

Q. Okay. Everybody calls him Jake?

A. Right.

Q. Did you and Agent Jacobsen in or about 2006 embark on an investigation that worked its way into a Court ordered wire tap?

A. Yes, we did.

Q. Who was the target of that investigation initially?

A. Of the initial investigation or the Title III wire?

Q. The Title III wire tap.

A. The Title III wire tap was Carmelo Rondon Feliciano.

Q. Also known as Panzon and Omi?

A. Correct.

Q. Now, very, very briefly, and I mean briefly, what do you as a Federal agent have to do in order to get a Court ordered wire tap? Can you just start tapping because you feel like it?

A. No, we cannot. We put together what we believe to be probable cause in the form of an Affidavit. That Affidavit is submitted to a Federal judge. The Federal judge reviews it.

If he believes that we have the circumstances set forth in the Affidavit for probable cause, the Judge will sign it, along with an Order that authorizes us to intercept a certain particular phone number.

Then that Order is given to the cellular telephone company, and they basically -- nothing more than flipping a switch for us to start listening.

Q. Now, you said start listening. How -- in this case, how many hours -- first of all, did you pursue a Court ordered authority to do a wire tap in this case?

A. Yes, we did.

Q. And were you involved and were you one of the people that were supervising this Court ordered wire tap?

A. Yes, I was. I was the affiant.

Q. You were the person that swore to the truth of matters?

A. Yes, I was.

Q. Now, when a Court ordered wire tap is authorized, can you just sit back for months or years at a time and not say anything to the Court, or are you required to make periodic reports to the Court to let them know what's going on and whether it is still probable cause to frankly invade somebody's -- otherwise invade their privacy?

A. When the wire tap Affidavit and Order are signed by the Judge, it's authorized for 30 days, but every ten days we have to make a report to the Court showing the calls and how the

case is progressing to see that we are obtaining the things that we expected to obtain.

Q. And did you yourself do that in this case?

A. Yes, I did.

Q. How long was this wire, this wire tap? Approximately how long was it actually in place?

A. This case lasted about 30 days, about the month of September in 2006.

Q. And as a result, did you yourself provide the Court then with three, what are ten-day reports providing the Court with what's going on so that the Court can know that you're doing the right things and not doing the wrong things?

A. Yes, I did.

Q. And how many hours a day was the Court ordered, Court approved wire tap being monitored in this case?

A. We monitored or listened to phone calls for 16 hours a day. We were closed down from -- it was approximately eight hours, through the middle of the night, and opened up the next morning.

Q. And did you keep, you and the people working under you, did you keep listening, post to a sign-in log so that you could always be sure that you knew exactly when you were listening and who was there and so on and so forth?

A. Yes, we did.

Q. I'm going to hand you what I've now marked as Government

Exhibit 162-B, and I'll ask you if this is indeed the original of that sign-in log for the Court approved wire tap in this case?

MR. HEGYI: Excuse me, Your Honor. Thank you for your indulgence.

BY MR. HEGYI:

Q. Is that indeed the original of the listening post log?

A. Yes, it is.

MR. HEGYI: The Government offers Exhibit 162-B.

MR. RUHNKE: No objection.

THE COURT: Received.

(At 10:22 AM, Government's Exhibit 162-B admitted into evidence.)

BY MR. HEGYI:

Q. Sir, did -- when -- what was your role initially on September 26, 2006?

A. Initially, my team, we were split in two teams: One for an arrest team of Mr. Rondon Feliciano, and the other team was for a search warrant at a different location. I was the person running the team for the arrest.

Q. Okay. And did you indeed on that day locate and arrest a person known to you by the nickname Panzon, also known now as Omi?

A. Yes, we did.

Q. When you arrested him, sir, did he have any -- did you

search a vehicle that he was in?

A. Yes. We seized a white Nissan Frontier, if I remember the car, and during inventory search found a backpack that contained a firearm and the driver's license of Carmelo Rondon Feliciano, along with some personal effects.

Q. All right. Now, the firearm, do you remember the make and model?

A. It was a Fabrique Nationale pistol. It was caliber 5.7.

Q. Okay. Did it have a serial number that was visible?

A. No. It was obliterated.

Q. What do you mean by obliterated?

A. It had been scratched off with a file or a dremel tool or something.

Q. Was there any ammunition or any clips that were associated with that Fabrique Nationale 5.7 caliber semi-automatic magazine?

A. There was one magazine with one round in the chamber and another fully loaded mag in with the gun.

Q. When you say in the chamber, it was loaded and ready to fire?

A. Yes. As soon as the safety was flipped off, it was ready to fire.

Q. Now, once you had arrested Panzon, Omi, Mr. Carmelo Rondon Feliciano, did you then have occasion to go to Las Brisas where they were engaged in the search warrant of the

premises?

A. Yes, I did.

Q. And did -- did you participate then in bringing the various drugs or looking at the various drugs that were arrayed out when they were brought back to the office?

A. Yes, I did.

Q. And did you participate with displaying and laying out all of the firearms and ammunition that another witness has told us about, actually Jacobsen, Agent Jacobsen? Did you participate in that as well?

A. Yes. After they seized the weapons, they brought them to me, and I laid them out on the table.

Q. And did you then turn over the Fabrique Nationale 5.7 semi-automatic pistol to the ATF for them to retain in custody?

A. Yes, to Special Agent Art Gonzalez.

Q. Now, are you aware, sir, having reviewed documents as to the approximate weight of the cocaine that was seized from Las Brisas on that day?

A. Yes. There was about a pound of cocaine and about a half a pound of heroin, if I remember right.

Q. And I am going to --

MR. HEGYI: One moment, Your Honor.

BY MR. HEGYI:

Q. Did you, sir, then, you and Agent Jacobsen, did you then

submit all of the drugs to the DEA lab for analysis?

A. Yes, we did.

Q. And were they in the same condition they were in at the time of the seizure at Las Brisas?

A. Absolutely.

Q. And then were they, after being analyzed, returned to you and are those them, as they sit in front of you on the table?

A. Yeah. They're stored down at the Miami lab, and then upon request during a trial, they send them over to us to present for trial.

MR. HEGYI: Your Honor, we have a stipulation that is signed by the defendants, and it relates to the analysis by the DEA with copies of the DEA reports. With the Court's permission, may I read the stipulation now?

THE COURT: Sure. Sure.

Members of the jury, a stipulation is an agreement about a fact or facts over which there is no dispute. And it's the equivalent of having had the evidence through a witness here. Go ahead.

MR. HEGYI: Thank you, Your Honor.

The United States, by and through its attorney, the United States Attorney for the District of Puerto Rico, and defendant Alexis Candelario Santana, do hereby agree and stipulate that the following facts are true: One, various items that had previously been submitted to the Drug

Enforcement Administration, DEA laboratory, were analyzed in October of 2006 by expert chemists employed at the DEA laboratory.

Two, among other items submitted were DEA seizure exhibit numbers 19, 20, 21, 22, 23, 24, 25, 27, 28, 30, 31, 33, 34, 35, 36, 37, 39, 40, 41, 42 and 43.

Number three, each of these items was properly analyzed and found to contain illegal controlled substances as set forth more fully in the attached DEA laboratory reports which we have marked as Government's Exhibit 162-D respectfully for each such DEA seizure exhibit number.

Number four, in such attached DEA laboratory reports -- and, Your Honor, with permission I'm going to show the headings, because it explains it, and we don't want the jury to be unnecessarily confused by it. I am just looking at the second page of Government's Exhibit 162-C -- excuse me, D.

The headings, under paragraph four of the stipulation in the attached DEA laboratory reports, the heading and term gross weight refers to the overall weight of a particular item submitted, which includes the weight of the packaging, if any, as well as the weight of the suspected drugs.

The heading and term net weight refers to the weight of the contents of the packaging, if any. Excuse me, that should be the weight without -- that would be referring to the weight without the weight of the contents of the packaging, if

any.

The heading and term amount of actual drug refers to the net weight of the suspected drug multiplied by whatever the concentration or purity of the drug mixture was determined to be.

The heading and term reserve weight refers to the amount of the net weight that remains in existence after the analysis process has been completed and a portion of the drug mixture was necessarily consumed in the process of analyzing the substances.

So stipulated the 4th day of March, 2003 by the Government. And also by Mr. Candelario and Mr. -- there is no objection to this by counsel for Mr. Oquendo.

The Government offers 162-C and 162-D.

MR. RUHNKE: No objection.

THE COURT: Received.

(At 10:30 AM, Government's Exhibits 162-C and 162-D admitted into evidence.)

MR. HEGYI: Your Honor, I pass the witness.

THE COURT: Any cross?

MR. AGUAYO: None from us, Your Honor.

THE COURT: Thank you very much. You are excused.

THE WITNESS: Thank you.

(At 10:30 AM, witness excused.)

THE COURT: Next witness.

MR. HEGYI: Your Honor, just one minute, if I may. Agent -- Your Honor, they didn't have the weapon here at that moment. May I ask the agent to take the stand again just to identify which numbers it is?

THE COURT: Sure. Sure.

(Witness retook the stand.)

BY MR. HEGYI:

Q. Agent, I'm going to hand you what has been marked as Brisas Exhibit 62, and I'll ask you, sir, if this is indeed the Fabrique Nationale pistol that you recovered at the time of the arrest of Omi, also Las Brisas 59, the two clips, and Las Brisas 63, the rounds of ammunition?

A. Yes, they are.

MR. HEGYI: The Government offers each of those exhibits, Your Honor.

MR. RUHNKE: No objection.

MR. AGUAYO: No objection, Your Honor.

THE COURT: Received.

(At 10:31 AM, Government's Exhibits Brisas 59, 62 and 63 admitted into evidence.)

THE COURT: Can I see the ammunition? I need to see the ammunition. That's all I want to see.

MS. DOMINGUEZ: Your Honor, thank you for your indulgence. Now may this witness be excused?

THE COURT: Thank you very much. Next witness.

(At 10:32 AM, witness excused.)

MR. HEGYI: Your Honor, we just need a moment to bring the rest of the firearms in. This will be a short witness.

THE COURT: Why don't we take a short, five-minute recess.

(At 10:32 AM, recess taken.)

(At 1:35 PM, proceedings reconvened.)

THE COURT: Mr. Hegyi.

MR. HEGYI: Yes, Your Honor. The Government calls Special Agent Edmond Rose.

THE COURT: His first name is Edmond?

MR. HEGYI: Edmond.

COURTROOM DEPUTY: Raise your right hand.

Do you solemnly swear that the testimony you are about to give in this case is the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Please.

S P E C I A L A G E N T E D M O N D R O S E,

called as a witness by the Government, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HEGYI:

Q. Good afternoon, sir.

A. Good afternoon.
Q. Could you give us your full name, please?
A. Edmond Rose.
Q. How old are you, sir?
A. 34 years old.
Q. How far have you gone in school?
A. Completed a Bachelor's Degree.
Q. At some point in your life did you become interested in law enforcement?
A. Yes, sir.
Q. Could you tell us when that was and what agency you began your law enforcement career with?
A. In 2005, I became a U.S. Customs and Border Protection Officer.
Q. And where were you stationed in?
A. In Detroit, Michigan.
Q. And subsequent to that, did you become employed with another Federal law enforcement agency?
A. I did.
Q. And when was that and what agency?
A. 2006, I was employed by the United States Postal Inspection Service.
Q. For those of us that were unfamiliar that the Postal Service even has an inspection service, tell us what it is you do?

A. We're the Federal law enforcement of the Postal Service. We conduct criminal investigations that involve criminal matters that utilize the U.S. Mail.

Q. Okay. Might that involve child pornography, drugs, things of -- fraud, things of that nature?

A. Yes.

Q. In 2007, where were you stationed?

A. In Detroit, Michigan.

Q. And have you spent your entire career with the Postal Inspection Service in or about Detroit, Michigan?

A. Yes.

Q. I'm going to direct your attention to the date June 28, 2007. Were you on duty on that day?

A. Yes.

Q. Do you have a partner that you normally work with?

A. I did, yes.

Q. At the time?

A. Yes.

Q. And who is that?

A. Postal Inspector Chris Ray.

Q. R-a-y?

A. R-a-y. Correct.

Q. On June 28, 2007, did you have occasion to have your interest peeked by some mail matter that came to your attention?

A. Yes.

Q. Could you tell the ladies and gentlemen of the jury what was it about the mail matter that peaked your interest?

A. This particular piece of mail was an Express Mail, an overnight parcel that had originated in Sabana Seca, Puerto Rico, and was destined for an address in Detroit, Michigan. After conducting some investigative inquiries of the parcel, we determined that the return address on the parcel was fictitious, which is something that's consistent with packages we've found in the past that contained drugs.

Q. In your history, drugs come from Puerto Rico to Detroit?

A. Via the mail, yes.

Q. And as a result, did you have an occasion to have a drug dog take a sniff at the package?

A. Yes.

Q. And did the drug dog alert?

A. It did.

Q. As a result of your investigation, did you seek from a judicial officer authorization to open that package?

A. A Federal search warrant was obtained.

Q. On oath and probable cause?

A. Yes.

Q. And when you opened that package, what, sir, did you find?

A. One brick, approximately one kilo of a white powdery substance that had field tested positive for cocaine.

Q. I'm going to hand you what have been marked as -- this will be composite Exhibit 195, and these will be photographs that are marked 1-A, 1-B, 1-C. And it will be DET, for Detroit, 1-A, 1-B, 1-C, and then DET Two, Seven, Eight, Nine, Ten, 11. And I'll ask you if you recognize these?

A. Yes, I do recognize these.

Q. Are those photographs of the package and the contents of the package?

A. Yes.

Q. Do they fairly and accurately depict that which they purport to show?

A. Yes.

MR. HEGYI: The Government offers each of those exhibits.

MR. RUHNKE: Without objection.

THE COURT: Received.

(At 1:39 PM, Government Exhibits admitted into evidence.)

BY MR. HEGYI:

Q. Would you look for us, Agent, at the monitor that's going to be just to your right? We're going to go through these relatively quickly, but to allow the jury to see what we have here. In evidence now is -- let's start with Government's

Exhibit One. Why don't we start in order with 1-A. Is this a photograph of the outside of the package that you were telling us about?

A. Yes.

Q. And 1-B, sir, is that a close up of the mailing label showing both to whom it is being sent and allegedly to whom it was being sent by?

A. Yes.

Q. And you indicated that that would be Sonia Benitez, in Sabana Seca, Puerto Rico?

A. Yes.

Q. And the person that it was allegedly being sent to was Oscar Benitez in Detroit, Michigan?

A. Yes.

Q. Is that true?

A. Yes.

Q. Now, and then 1-C shows the postage being canceled, correct?

A. Yes.

Q. And it shows the date June 27, 2007?

A. Yes.

Q. Now, let's look at the Exhibit DET Seven. Is that a -- as you are opening, we're now going to sort of peel the onion as we're going inside; is that fair? This is the outermost container inside of the mailing envelope, or the box; is that

correct?

A. Yes.

Q. Okay. Then as you were working your way down, DET Eight you arrived at this item that seems to be with sort of kaki colored tape around it; is that right?

A. Yes.

Q. And what was ultimately inside that kaki colored tape that's there?

A. Approximately one thousand grams of cocaine.

Q. You mentioned a kilo. What is that in terms of pounds?

A. A kilo is approximately 2.2 pounds.

Q. So that was approximately 2.2 pounds of cocaine?

A. Yes.

Q. And then what are we seeing here in DET Nine?

A. This is the brick again. It has the initials of my partner, Chris Ray, CDR.

Q. And the date?

A. And the date.

Q. Now, I'm going to show you what is DET Ten. Do you see that?

A. Yes.

Q. What is all that appears to be the letters LA, and then 23?

A. It was affixed to the brick.

Q. Okay. When you opened it up, it was already on it?

A. Yes.

Q. Some kind of label or brand?

A. Come kind of branding, yes.

Q. Actually, I overlooked putting it up. This was the other packing that was in there before you got to the brick?

A. Yes. This was the original -- that's the first thing we saw when we opened the package.

Q. And then the last of the photographs, DET 11, what is this plastic item, rectangular in shape, that is in the bottom half and towards the left-hand side? What is that?

A. That is a field test. A field test used to test the powder to see if it contains some of the properties of cocaine.

Q. Did it test positive?

A. It did.

Q. Is this what we would think of as a field test?

A. Yes.

Q. And then ultimately the item has to go to the U.S. Postal Service lab in Dulles, Virginia, in order to be formally tested to find out what it is; is that fair?

A. Correct.

Q. Now that you and your partner have located two point -- roughly 2.2 pounds of a brick of cocaine, what you believe to be cocaine, and there's an address on it, what did you do?

A. We coordinated with other law enforcement agents to

conduct a controlled delivery of the parcel to its intended destination address.

Q. Okay. Would that be the address I'm showing you, DET 1-B? Would that be the 1965 Clark Street in Detroit?

A. Yes.

Q. Okay. Now, tell us what you did, if anything? Did you just let that 2.2 pounds of cocaine go to that address? What if you lost it?

A. No. We did not.

Q. Okay. Well, what did you do?

A. We replaced the -- we placed approximately one gram of cocaine inside of the box, and then we placed an item inside of the box to replicate the rest of the weight. And then we resealed the box, and conducted the delivery that way.

Q. Okay. Now, when you resealed the box, did you put any device or devices inside it that would allow you remotely to be able to know when the box was being opened?

A. Yes.

Q. And who actually did that?

A. Myself.

Q. Then briefly tell us what you did, you and your group, that you had organized, what you did to do this controlled delivery, as you said, taking the now -- now it only contained one gram of illegal substance, correct?

A. Yes.

Q. But it weighed, it felt like it contained the whole 2.2 pounds?

A. Yes.

Q. And tell us what you all did in your controlled delivery at 1965 Clark Street in Detroit, Michigan?

A. Well, we -- there were several agents and officers. We had a Postal Inspector act in an undercover capacity as a mailman and actually deliver the package to the address.

The package was accepted at the address. Myself and other agents were around the address monitoring activity in and out of the house, and also monitoring the beeper inside of the package.

Q. Okay. Now, were you personally there eyes on for the formal delivery, the initial one?

A. Yes.

Q. Okay.

A. Yes.

Q. Were you also monitoring to see if the person it was delivered to had actually opened the item?

A. Yes.

Q. And had it been opened when it was delivered to that apartment?

A. No.

Q. Okay. What happened next?

A. Approximately 30 minutes later, an individual drove up in

a 1994 Mazda.

Q. Pick-up truck or do you know?

A. No. I believe it was a passenger vehicle.

Q. Okay.

A. Drove -- I'm sorry. They walked into the address.

Q. That individual?

A. Yes.

Q. By himself?

A. Yes.

Q. Okay.

A. And then a short time afterwards left the residence with the package in hand.

Q. Was the package the same package that had been delivered?

A. Yes.

Q. And were you still monitoring to see if that package had yet been opened?

A. Yes.

Q. And had it yet been opened?

A. It had not been opened, no.

Q. And then what happened?

A. As the individual was leaving the residence, a bus was called to basically -- the call went in to arrest this person as they were leaving. And he was apprehended.

Q. Okay. Now, let me stop you. When we get to the he's apprehended part, did you actually see that or do we need to

talk to a different person?

A. Agent Ferguson can speak to that better.

Q. Okay. Once he's arrested, however, did you learn the name of the person who was arrested?

A. Yes.

Q. And do you know what the person's name was?

A. Yes.

Q. What was it?

A. Wilfredo Candelario Santana.

Q. Also known as Coper?

A. Coper, yes.

Q. I'm going to show you -- I'm going to hand you --

A. Thank you.

Q. Let me get back to my microphone first before I get scolded. I'm going to hand you DET Exhibit A. Do you recognize who is in that photograph?

A. Yes.

Q. Who is that?

A. That's Wilfredo Candelario Santana.

Q. And that is how he appeared on the day he was arrested?

A. Yes.

MR. HEGYI: The Government offers DET A.

MR. RUHNKE: No objection.

THE COURT: Received.

(Government's Exhibit DET A admitted into evidence.)

BY MR. HEGYI:

Q. Okay. So the jury can see this, this is Wilfredo Candelario Santana, also known as Coper or Coper?

A. Yes.

Q. And were you involved in then, sir, the packaging and mailing of the drugs -- first of all, did you become involved in the chain of custody for any items taken out of Mr. Candelario Santana's right, front pocket?

A. Yes.

Q. And what did you do with the items that came from his front, right pocket and the brick of cocaine?

A. They were transported back to my office, and then from there they were mailed out to our forensic laboratory in Dulles, Virginia, for forensic examination.

Q. All right. Now, when you mailed them to Dulles, Virginia, were they in the same condition that they were in when the items were taken from Mr. Candelario Santana's right pocket and also the brick of cocaine that was initially seized?

A. Yes.

Q. Did you participate in a consensual search at the residence in Detroit, Michigan, that was provided by Mr. Wilfredo Candelario Santana?

A. I did.

Q. And what sorts of things did you find there?

A. There was at least one additional express mailing, just the box. That looked similar in nature to the box that we did the controlled delivery on. And also an AK-47 style weapon was taken out of the house.

Q. Now, the box that looked similar to the one that we have in evidence here, photos here, was that -- did that go through the U.S. Mail or Federal Express or some other carrier?

A. It would have gone through the U.S. Mail.

Q. And what day was that container postmarked?

A. June -- it was post marked June -- well, I can't speak to its postmark.

Q. Okay.

A. I believe the delivery date was June 27.

Q. You believe it was the day before this delivery?

A. Yes.

Q. Did you actually yourself look at the AK-47 type weapon?

A. Yes. I saw it when I was at the --

Q. And Agent Ferguson is the individual to talk to about the disposal of that weapon?

A. Yes.

MR. HEGYI: Pass the witness, Your Honor. If I haven't I offer DET A --

THE COURT: Cross.

MR. RUHNKE: We don't have any questions.

MR. AGUAYO: No cross, Your Honor.

THE COURT: Thank you very much. You're excused.

(At 1:51 PM, witness excused.)

MR. AGUAYO: Your Honor, would you give the 105, or should I just put on record it's subject to 105?

THE COURT: We'll deal with it when we are finished.

MR. AGUAYO: Thank you, Your Honor.

MR. HEGYI: Your Honor, the Government calls Ferguson --

THE COURT: First name?

MR. HEGYI: John. John Ferguson.

COURTROOM DEPUTY: Raise your right hand.

Do you solemnly swear that the testimony you are about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Please.

(At 1:51 PM witness took the stand.)

J O H N M O R G A N F E R G U S O N,

called as a witness by the Government, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HEGYI:

Q. Good afternoon, sir. Could you give us your name,

please?

A. John Morgan Ferguson.

Q. And how old are you, please?

A. I am 49 years old.

Q. How far have you gone in school?

A. I have attended approximately two years of college.

Q. Okay. After college did you go into the military?

A. I did. I was in the military for 11 and a half years.

Q. Were you a member of the special forces?

A. I was.

Q. The Green Berets?

A. The Green Berets, correct.

Q. When you got out of the military, sir, did you go into law enforcement?

A. I did.

Q. Did you go in with a local department in Michigan?

A. I did. I went with the Ecorse Police Department for a year and a half.

Q. And then?

A. Over to the Grosse Ile Police Department.

Q. Can you spell that for the court reporter?

MR. HEGYI: Oh, she's from Michigan. Fantastic.

BY MR. HEGYI:

Q. So in the course of your duties as a law enforcement -- you're a sworn law enforcement officer?

A. I am a sworn law enforcement officer, yes.

Q. Did there come a time when you were a member of the DEA Task Force in the Greater Detroit Michigan Task Force?

A. I was.

Q. How long have you been a member of the task force?

A. I've been a member nearly six years come June.

Q. So the jury understands, do you actually go to work every day at the local police department, or for the past six years do you go to work at DEA?

A. DEA.

Q. Okay. Did you have occasion, sir, to become involved in an investigation in 2007 with Agent Ed Rose?

A. I did.

Q. And as a part of that investigation, did you proceed to the area of Clark Street in Michigan for a controlled delivery?

A. I did. 1965 Clark Street.

Q. Okay. And tell us what you did that you observed while you were there, please?

A. I observed upon arriving, I observed a postal delivery truck driving to the area. They made delivery. That was radioed over the radio. Subsequent to that delivery, a gray or silver Toyota pulled into the parking structure adjacent to --

Q. Toyota or Mazda?

A. Mazda. Pulled into the parking lot adjacent to the 1965 Clark Street address. From that point, I couldn't see obviously. The radio was reporting that an individual had gotten out and went up the back stairwell. I did see, after a few minutes, that individual with the box in his hand containing the kilo of cocaine come back down the steps at which point we notified everybody, I notified everybody via radio that we were going to bust, bust, bust, three times, and started to converge on the area.

Q. Did you see what that individual did -- first of all, had you seen the package once it had been resealed?

A. Yes. That's common.

Q. Did that individual appear to have exactly that same package?

A. Exactly that same package.

Q. What did you see that individual do with that package if anything, sir?

A. Either because he was alerted of our presence or --

Q. Don't speculate why he may have done it. Just what did you see him do?

A. He placed it into his vehicle that had driven to the scene, and then began to flee on foot.

Q. And were you one of the people that pursued him?

A. I was.

Q. Were you one of the three people that apprehended him?

A. I was within the proximity, within a few, 15 yards from where he was apprehended.

Q. Did you actually go when he was apprehended to where he was apprehended?

A. I did.

Q. Did you see items removed from his front, right pocket?

A. I did.

Q. Did those items that were removed from his front, right pocket, were they taken back to DEA or the Postal Service?

A. They were given to the Postal Service as evidence.

Q. Okay. And did you participate in the -- well, before I do that, do you recognize what is here, DET A? Do you recognize who that is?

A. I do.

Q. Who is that?

A. That is Wilfredo Candelario Santana.

Q. Is that the person that had the package that just then got chased and the stuff taken out of his righthand pocket?

A. That is he, yes.

Q. Okay. Now, did you, sir, participate in a consensual search of the residence of Wilfredo Candelario Santana?

A. I did.

Q. And do you remember the address there?

A. 6357 Gladys.

Q. That's G-l-a-d-y-s Street?

A. Correct.

Q. In Detroit?

A. That is correct.

Q. And while there, sir, could you describe for the ladies and gentlemen of the jury what did you see?

A. We were allowed entrance. We began to search. We recovered evidence. I recovered evidence of a toolbox, plastic toolbox, that contained two electronic scales, some cutting agents, which I believe would be a powder -- I believe in this case it was anestatal, which is vitamin B-12.

We found other packaging material, another Express parcel with the identical address of the sender, but the recipient's address was 6357 Gladys.

Q. Let me stop you for a second. We have in evidence here now the Government's Exhibit DET 1-B showing us the address of the sender for the package that you all took down in your controlled delivery, that being from Sonia Benitez at 1630 Parcelas Nuevas in Sabana Seca?

A. Correct.

Q. Is what you're trying to tell us that allegedly that same person at that same address had mailed the date before another package but it mailed it to 6357 Gladys?

A. That is correct.

Q. Okay. And were there any other packages that were similar to that that you noted in there?

A. That one that I spoke of was delivered on the 27th of June, one day prior to the incident in question. There were similar parcels, one from New York. However, that one did obviously -- almost identical resemblance to the package that we got on the 28th containing a kilo of cocaine.

Q. Okay. Now, did you notice whether or not there were any identifications for --

A. I did.

Q. Tell us about that.

A. I did. In one of the dresser drawers in 6357, there were ten Texas identification cards and/or driver's licenses. Each of the -- each of the ten bore Wilfredo Candelario Santana's photograph, but each had a different name and address. We found that obviously highly suspicious.

Q. Okay. Now, did you find one of those Texas identification, photo identification documents had a name on it very similar to the name on the package for the controlled delivery?

A. That was found over at 1965 Clark Street.

Q. Okay.

A. Underneath, it was in a wallet containing a Massachusetts medical card with Wilfredo Candelario Santana's medical card from Massachusetts, an ID card with Wilfredo Candelario Santana's name on it, and then a Texas driver's license in that same wallet with Oscar Benite, leaving out the z of

Benitez. It was Oscar Benite.
Q. But other than subtracting the z from what we're seeing here in DET 1-B, was it exactly the same name?
A. Yes, it was.
Q. And did that have his photograph on it?
A. That did.
Q. Okay. Meaning Wilfredo Candelario Santana?
A. Yes.
Q. Now, you were talking about the types of things you found on the consensual search of the dwelling of Wilfredo Candelario Santana. Was there a point in time during the search when his girlfriend or whoever was living there, was allowing you to search said, you know what, I'd like you to stop? Did that occur?
A. There was. After we had found the assault weapon in the basement, Ms. Suarez didn't -- didn't want us to be there anymore.
Q. Okay. And once Ms. Suarez, his girlfriend, said stop, did you immediately stop?
A. We immediately stopped.
Q. Did you then give her a receipt for all of the items that you had taken and leave?
A. We did. And we exited to the front porch, at which point we all departed in our vehicles.
Q. Now, did you in fact find mail matter and identifications

of Wilfredo Candelario Santana in that dwelling?

A. We did. At 6357 as well.

Q. Now, you mentioned something about having found an AK-47 in the basement.

A. Yes.

Q. Did you -- were there any clips there with that AK-47?

A. There were seven total. One was found in the weapon, and six were found in a soft, black vinyl case in the pockets.

Q. All right. Approximately, of those seven clips, were they all -- did they all have the same capacity or did some of them have a different capacity?

A. Six had -- they were 30 round magazines, and one was a 40 round magazine.

Q. Now, when this AK-47 type weapon was located, was there a clip in it?

A. There was.

Q. Was there a round in the chamber?

A. There was a round in the chamber.

Q. All someone would have to do is flip the safety off and ready to go, bang?

A. That is correct.

Q. Was Mr. Wilfredo Candelario Santana charged in Michigan?

A. He was.

Q. Was he convicted in Michigan?

A. He was.

Q. After his conviction, was the AK-47 destroyed?

A. It was.

Q. Are you the person that authorized the destruction of the AK-47?

A. I was.

Q. Do you have in your mind a good image of what that AK-47 looked like?

A. I do.

Q. Okay. Now, I've shown you what's been marked as DET 12. That is not a photograph of the actual weapon; is that correct?

A. That is not.

Q. Is that a true statement?

A. That is a true statement, correct.

Q. How does what I showed you there, DET 12, compare to the weapon that you assisted in recovering from Wilfredo Candelario Santana's apartment on June 28, 2007?

A. The barrel in the picture, this picture here, the barrel is actually a little shorter than the barrel that we recovered, as well as the stock portion that goes into your shoulder actually he folded to the side. But it was partially made of wood.

Q. Okay. So that one, the one in his apartment could be made a lot smaller, because you could fold it over on

itself?

A. That's correct.

Q. With those two changes, is what is in that picture a fair and accurate representation, similar to the one that you seized?

A. Very much so.

MR. HEGYI: The Government offers DET 12 as simply a representative photograph.

THE COURT: Received.

MR. RUHNKE: Yes, with the understanding it's not the rifle.

MR. HEGYI: Correct.

THE COURT: It's not the one. It illustrates what the agent testified about.

MR. RUHNKE: Yes.

(At 2:04 PM, Government Exhibit DET-12 admitted into evidence.)

BY MR. HEGYI:

Q. All right. And so we're clear now, so the jury can see DET 12, the barrel to the one you seized in Michigan was longer than what's here, and the stock that's shown in this picture here, actually the one you saw, it folded over on itself so it could fold and make itself smaller than what we see here?

A. Correct. And it wasn't entirely wood. There was some

metal to it, and a wood butt end.

Q. Okay. Now, what is our next -- let me make this DET -- hold on one second.

MR. HEGYI: Your Honor, we have a stipulation which I've marked as DET 12, and this relates to the analysis of the drugs that were sent. And DET 12-A will be the actual analyses themselves.

THE COURT: And the results were?

MR. HEGYI: The results were, Your Honor, that the brick of cocaine was indeed cocaine. It was 86 percent pure. And that the other items taken from Wilfredo Candelario Santana's right front packet were five paper folded items that were heroin, heroin mitro chloride, 54 percent pure.

And we offer this stipulation. Essentially, ladies and gentlemen, what it says is that we agree that the materials were properly handled and were properly analyzed. And that they were in fact cocaine, approximately 2.2 pounds, a kilo, and then in addition, five items of heroin that --

THE COURT: The stipulation is evidence in the case.

MR. HEGYI: Yes, it is.

THE COURT: Received.

MR. HEGYI: Thank you.

BY MR. HEGYI:

Q. Agent, in your years with the DEA Task Force and your

experience in law enforcement, have you ever come upon a -- even to this day, have you ever come upon cocaine that is 86 percent pure?
A. I have not.
Q. What is the ordinary, if there is an ordinary, purity of cocaine when you come across it, even in brick form? What's the ordinary purity or the range of purity?
A. From personal experience of doing undercover purchases and having it analyzed, the -- I have seen ranging anywhere from 24 percent, not any higher than 35 percent. I've never seen 86 percent in all my years of law enforcement work.
Q. Now, what would a brick like that -- do you have an idea, given your experience, as to what a brick like that would have been worth coming into Detroit as a brick to the first stop before it's been cut by anybody?
A. As coming into Detroit?
Q. Yes, sir.
A. Back then, I recall a brick of cocaine being 21,500 to 23, 24,500.
Q. But that would be at the reduced level?
A. At the reduced level.
Q. This is really two to three times that?
A. I couldn't even -- I don't know in all honesty what that markup would be.
Q. But it would be significant?

A. It would be significant.

MR. HEGYI: I pass the witness, Your Honor.

THE COURT: Any cross?

MR. RUHNKE: We have no questions, Your Honor.

MR. AGUAYO: (Shaking head from side to side.)

THE COURT: Thank you very much. You are now excused.

(At 2:08 PM, witness excused.)

THE COURT: Next witness.

MR. HEGYI: Agent Melvin Garcia.

THE COURT: I'm sorry?

MR. HEGYI: I'm sorry, Your Honor. I'm flying too fast. Agent Melvin Garcia.

COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear that the testimony you are about to give in this case is the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

A G E N T M E L V I N G A R C I A,

called as a witness by the Government, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HEGYI:

Q. Good afternoon.

A. Good afternoon, sir.

Q. Could you give us your name, please?
A. Melvin Garcia.
Q. How old are you?
A. 38 years old.
Q. How far did you go in school?
A. I completed a Bachelor's Degree in criminal justice.
Q. Okay. And at some point did you serve in the military?
A. I served four years -- six years in the military active duty, and I am still currently serving in the U.S. Army Reserve.
Q. Did you serve your country in Iraq?
A. I did serve the country in Iraq from 2006 to 2008.
Q. Now, were you from 2004 through 2009 a criminal investigator first with DOD and then the Department of the Army?
A. Yes, sir.
Q. Beginning in 2009, did you leave the military law enforcement and move to civilian law enforcement?
A. Yes, I did, sir. I moved March, 2009. I became a U.S. Customs and Border Protection Marine Interdiction Agent.
Q. Okay. Let's go slow on this. Well, first of all, you're from Puerto Rico?
A. I am from Puerto Rico.
Q. Born here, raised here?
A. Born and raised in Puerto Rico.

Q. Now, tell us, we probably all heard of the Customs and Border Protection, and the Department of Homeland Security, but you mentioned a different agency that's underneath all of that. What agency is it?

A. I work for a component of U.S. Customs and Border Protection called the Office of Air and Marine.

Q. Okay. And inside of that is there something called the Marine Interdiction Agency?

A. It's a title. It's Marine Interdiction Agent.

Q. Okay. Is that your title?

A. That's my title.

Q. And are you a sworn officer, a sworn agent --

A. Yes, sir.

Q. -- of the Federal government? And I'm sorry to ask you to do this, because I wrote it down wrong, what is the actual name of the agency that you work for?

A. The Office of Air and Marine.

Q. Okay. Got it. Now, tell the ladies and gentlemen of the jury, on a -- I'm going to ask you to focus, if you would, please, back onto the time frame December 15, 2009. Are you with me?

A. Yes, sir.

Q. Back then would you go to work on the land or would you go to work on the water ordinarily?

A. Work on the land most of the time.

Q. Okay.
A. On the water most of the time. Sorry.
Q. Okay. And when you say you're working on the water, what kind of things do you do? What was your vision?
A. Our mission daily is to conduct maritime border security, patrol in the waters of the United States to prevent, detect and deter smuggling activities, call it the smuggling of narcotics, illegal aliens, and firearms, and also to combat terrorism.
Q. Okay. And are you also worried about human smuggling?
A. Yes, sir.
Q. Okay. Back in December of 2009? Were you stationed in Puerto Rico or were you stationed somewhere else?
A. I was stationed in St. Thomas, Virgin Islands.
Q. And I know virtually everybody in this courtroom knows the answer, but somebody reading this transcript won't. About how far is the U.S. Virgin Islands from Puerto Rico by boat?
A. By boat, it's 38 nautical miles. From 38 to 40 nautical miles to the east coast of Puerto Rico.
Q. Okay. So for a regular weekender boat, about how long does it take to get there on calm waters?
A. On calm waters and depending on the speed the boat, the vessel was traveling, I'd say from two and a half hours to an hour and a half depending on the boat.
Q. Okay. Now, were you working -- were you working on

December 15, 2009?

A. I was on duty on December 15, 2009.

Q. Now, were you on the water or were you on land?

A. I was on the water.

Q. Now, were you working by yourself or with others?

A. I was working with others.

Q. Okay. And did you have occasion at roughly 4:57 PM, five o'clock PM, to see something that caused you to want to check further?

A. Yes.

Q. Something unusual?

A. Yes. We were sitting, floating, in the boat. Interceptor 9795 was the boat we were using that day. We were in the West Gregory Channel in St. Thomas, Virgin Islands, and we saw a boat approaching from the west.

Q. And was the fact that it was approaching from the west, was there some reason that that would cause you to have at least a mild interest in it?

A. The reason why the boat caught our attention is because we had some information of recent smuggling activities coming from Tortola into around the north coast of St. Thomas to get to Charlotte in St. Thomas, Virgin Islands.

Q. So because of that, your interest was peeked seeing this particular vessel coming from that particular direction?

A. Yes, sir. And it was because of the size of the boat,

the amount of people that were in the boat, and the outfits that they were wearing that day.

Q. Stay with me on this one. What was it about the outfits of people on the boat? What difference does that make?

A. In the boat there were six persons.

Q. Okay.

A. Three males, three females. The females were wearing long jeans, and it's something unusual and something very characteristic with illegal aliens being smuggled into the United States, especially from Tortola and St Maarten. And that kind of caught our attention.

Q. Did the ladies have long sleeve shirts on, short sleeve shirts on?

A. They had shirts that were not compatible with being on a boat trip.

Q. Is what you're saying ordinarily you'd see people with cut off jeans or swimsuits or things like?

A. (Nodding head up and down.)

Q. Cover-ups?

A. Yes.

Q. And these people had long jeans, and that's unusual?

A. Yes.

Q. And is that unusual because in part, being on the water and getting sprayed, they'd get wet?

A. Exactly.

Q. So what if anything did you then do seeing this vessel coming in from that angle under somewhat suspicious circumstances? What did you do?
A. We haled and stopped the vessel. We did what we call the initial assessment, which is basically come close with our boat close to their boat, and prepping our boats to try return next to them. And as we were doing that, we were close to talk to the captain. The captain told us right away --
Q. Don't tell us what the captain said at this point.
A. All right.
Q. But did you ask all of the people in the boat for identification? Was that one of the things you did?
A. We asked the captain to collect everybody's identification. That's what I was getting to.
Q. Okay. Perfect. And was the captain able to collect identification from all six of the people on the boat?
A. Negative.
Q. Okay.
A. He only collected from two persons on the boat.
Q. And as a result of the fact you had six people under somewhat suspicious circumstances coming in from a suspicious angle, and only two of them had identifications, what if anything did you decide to do with that vessel and its occupants?
A. We decided to escort the boat vessel to Crown Bay Marina

out of St. Thomas, which was the closest marina at the time, to further investigate.

Q. Before we get to actually Crown Bay Marina, was there anybody on that boat that caused you to have even additional suspicions?

A. Yes, sir. There was a male in the boat. One of the males, as we did the initial approach towards the boat, the five of the persons on board, the three females and two males were turned around and faced us, which is something common.

Q. Common?

A. Common. And we saw, we observed that one of the males would not look at us. He refused to look at us. And it was as our boat turned, he was turning his face away from us.

Q. And was that also one of the reasons you decided, we need to take this boat and check further?

A. Yes.

Q. So once you got them to the Crown Bay Marina, did you leave them on the boat they came on or did you ask them to get out?

A. I asked them to get out.

Q. When they got out, did all of them stand together and communicate with each other or did someone do something that was also unusual at that point?

A. The person who was not showing his face kind of stood to the side. The other five were together, but that person was

to the side. The other ones did not want to get close to him, and he didn't want to get close to the others.

Q. Okay. And did that person do anything with regard to his face or moving away or looking away or keeping his head down?

A. He was pretty much keeping his head down all the time, avoiding to have eye contact with me.

Q. Okay. Just one moment. Now, did you go to each one of the individuals and ask them who they were, for identification, their addresses, whether they were U.S. citizens, things of that nature?

A. Yes, we did. That's normal procedures.

Q. Did you also attempt to do that with this individual who was acting in a suspicious or evasive manner?

A. Yes, I did.

Q. And did you ask that individual for identification?

A. Yes, I did. I asked him for a government issued identification card.

Q. And did that individual provide identification?

A. He provided a driver's license from Florida, Florida state driver's license.

MR. HEGYI: What's our next number?

COURTROOM DEPUTY: 196.

MR. HEGYI: Thank you.

BY MR. HEGYI:

Q. I'm handing you, Agent Garcia, what's marked as

Government Exhibit 196 for identification. What is that?

A. This is the driver's license that was presented by Neville Hernandez, which was later determined to be Alexis Candelario.

Q. You jumped a little ahead of me. The person that was acting suspiciously, did that individual present you with that identification?

A. Yes, he did.

MR. HEGYI: Okay. The Government offers 196 in evidence.

MR. RUHNKE: No objection.

THE COURT: Received.

(At 2:21 PM, Government Exhibit 196 admitted into evidence.)

MR. HEGYI: May I publish this, Your Honor?

THE COURT: You can take it out of there if you want. It's easier.

BY MR. HEGYI:

Q. I'm now putting up on the ELMO here the -- what was in the package that is marked Government's Exhibit 196 that's in evidence. Is this in fact the Florida driver's license that the individual presented to you that was acting particularly in a suspicious manner?

A. Yes, sir.

Q. Now, did you contact the Florida authorities to determine

whether or not that driver's license number was a valid or a fraudulent driver's license number?

A. Yes. I contacted sector --

MR. RUHNKE: Your Honor, hearsay. We object on hearsay.

THE COURT: Well, I will allow it.

BY MR. HEGYI:

Q. All right.

A. I contacted sector Orlando Communications Center. Basically it's something that is normal procedure for us to do, especially when dealing with a driver's license that is not from Puerto Rico or the Virgin Islands. And to check the database. And the response was the license was fraudulent.

Q. Okay. As a result of that, did you ask questions of this individual who was presenting himself at Neville Hernandez?

A. Yes, I did.

Q. For instance, did you ask him while you were holding the driver's license and he was not holding the driver's license, did you ask him what his address was in Miami?

A. I asked him.

Q. And was he able to provide you with that address?

A. He was not.

Q. Did you ask him for instance what his date of birth was?

A. I asked him what his date of birth was, and what his Social Security number was.

Q. Was he able to provide you or did he provide you with either of those?

A. No.

Q. And did you by chance take note of his bag that he had with him?

A. He had a bag. We -- I asked the captain of the vessel and the passengers for consent to search their property. The captain agreed, so the other passengers as well. Conducted a search, and found only one bag.

And in the bag, there was a packet of underwear, brand new, still, you know, sealed; t-shirts in packets as well, sealed; socks; and clothing. He was -- that bag belonged to the person who provided the identification, the Florida state driver's license.

Q. The person who was sailing, his name --

A. Neville Hernandez.

Q. And let me see if I understand what you're saying. All of the underwear and everything in there was brand new, still in the merchandise container?

A. Yes, sir.

Q. Okay. Did that person that claimed to be Neville Hernandez also have a credit card on him with the name Neville Hernandez?

A. Yes, sir.

Q. I'm showing you what's been marked Government's Exhibit

198, and I'll ask you if this is that credit card?

A. Yes, it is.

Q. And is it indeed in the name of Neville Hernandez?

A. Yes, it is.

MR. HEGYI: Government offers 198.

MR. RUHNKE: No objection.

THE COURT: Received.

(At 2:25 PM, Government Exhibit 198 admitted into evidence.)

BY MR. HEGYI:

Q. Did that individual who's name he reported to be Neville Hernandez have a cell phone on him?

A. Yes, sir.

Q. Did he have more than one cell phone on him?

A. Yes, sir.

Q. How many cell phones did he have on him?

A. Three.

Q. I'm showing you what's been marked Government's Exhibit 199 for identification. Are those the three cell phones that the individual claiming to be Neville Hernandez had on him?

A. Yes, sir.

MR. HEGYI: The Government offers 199.

MR. RUHNKE: Without objection.

THE COURT: No objection. Received.

(At 2:26 PM, Government Exhibit 199 admitted into

evidence.)

BY MR. HEGYI:

Q. Did this individual claiming to be Neville Hernandez have any monies on him?

A. Yes, sir.

Q. How much? If you know.

A. I don't recall the exact amount, but I know it was sufficient -- it was over 2,000 dollars in cash.

Q. Okay.

MR. HEGYI: We're at 200.

BY MR. HEGYI:

Q. I've put in front of you what's been marked as Government Exhibit for identification 200. Do you have that in front of you?

A. Yes, sir.

Q. What is that?

A. This is the 23 footer Wall Craft vessel that we stopped on December 15, 2009. This is where the six persons were on board.

Q. And the one claiming to be Neville Hernandez?

A. Yes, sir.

Q. Do you think you would remember after these years, do you think you'd be able to identify the person who claimed to be Neville Hernandez if you saw him again?

A. I think so, yes. I'm pretty sure.

Q. Do you see that person today?
A. It's that person sitting, the gentleman wearing the white shirt and eyeglasses. (Witness indicating.)

MR. HEGYI: May the record reflect in court identification of defendant, Your Honor?

THE COURT: Correct.

BY MR. HEGYI:
Q. I'm going to show you Government's Exhibit 201 for identification.

MR. HEGYI: And in the interim, Your Honor, we offer Government's Exhibit 200.

THE COURT: Received.

(At 2:29 PM, Government Exhibit 200 admitted into evidence.)

BY MR. HEGYI:
Q. Do you have 201 in front of you?
A. Yes, I do.
Q. And what is 201 a picture of?
A. This is a picture of Neville Hernandez the night of December 15, 2009.
Q. And is that a fair and accurate depiction of how he looked to you when you first saw him on the water, when you first got him off of the boat at the port?
A. Yes, sir.

MR. HEGYI: The Government offers 201.

THE COURT: Received.

(At 2:29 PM, Government Exhibit 201 admitted into evidence.)

BY MR. HEGYI:

Q. Sir, in light of your suspicions and concerns and the lack of date of birth, Social Security, the general demeanor of this individual, what, if anything, did you determine as a law enforcement agent you would do next?

A. I called the HSI ICE St. Thomas duty agent for further identification of Neville Hernandez.

Q. And did ICE send an individual to where you were with this individual who claimed to be Neville Hernandez?

A. Yes.

Q. And do you know the name of that ICE agent?

A. Special Agent Luis Penn responded that night.

Q. And did you then turn the individual who is claiming to be Neville Hernandez over to Special Agent Luis Penn?

A. Yes, I did.

Q. Thank you.

MR. HEGYI: Your Honor, we pass the witness.

THE COURT: Any cross? Please, Mr. Rebollo.

MR. REBOLLO: May it please the Court.

CROSS-EXAMINATION

BY MR. REBOLLO:

Q. Officer Garcia, good afternoon, sir.

A. Good afternoon, sir.
Q. Officer, did I hear you correctly that when you first saw the boat that you have been testifying about, it was coming from the west?
A. From the west, sir.
Q. Coming from the west in an eastward direction?
A. Towards -- from the west end. When we saw the boat, it was by Fortuna Bay in St. Thomas, which is basically almost the west end of St. Thomas. And the boat was traveling towards Brewer's Bay off the University Beach. So it's traveling in an easterly direction towards --
Q. All right.
A. Towards the West Gregory Channel.
Q. So coming from west to east?
A. Yes.
Q. Sort of coming towards Puerto Rico?
A. No. It was going towards St. Thomas.
Q. Towards St. Thomas?
A. Towards St. Thomas.
Q. St. Thomas is to the southwest --
A. The reference we're using is the west of St. Thomas. Approaching from the west of St. Thomas into the southwest.
Q. But getting close to us rather than --
A. No. It was getting closer to St. Thomas rather than Puerto Rico, yes, sir.

Q. St. Thomas, which is real close to Puerto Rico?

A. It's about 38, 40 nautical miles. It's not pretty close.

Q. All right. Now, just to be clear, you mentioned that one of the things you were suspicious about was the possibility of any human smuggling going on. You determined there was no human smuggling going on on this date, right?

A. There was no way to determine that, because we couldn't further identify Neville Hernandez. Until the point that it had to be referred to the ICE Special Agent for further processing, we did not know at the time -- we knew that the other ones were cleared based on the information they provided and the database check.

Q. Let me ask it to you this way. The other five persons that were there, none of them were illegal aliens being smuggled into the United States, right?

A. None of them.

Q. Okay. So there was no human smuggling going on?

A. I did not know at the point, because Neville Hernandez, we didn't have sufficient information to be able to determine if he was a legal or illegal alien at the time.

Q. I see.

A. So he was referred to --

Q. If there was any illegal alien smuggling going on, it would have to be limited to Neville Hernandez; is that

correct?

A. At that point he was the only person who was not fully identified.

Q. Fair enough. Now, when you ordered the boat to stop, they stopped, right?

A. They stopped.

Q. They complied?

A. They complied.

Q. And they followed your instructions throughout the intervention?

A. Yes, they did.

Q. Okay. There was no obstruction of justice, there was no disobedience by the occupants or anybody involved that day?

A. No.

Q. Okay. Now, one of the things that you did was you searched, you got consent from the captain and the occupants to search the vessel, right?

A. Yes.

Q. And they gave you consent?

A. Yes.

Q. No objection there?

A. No objection.

Q. And you found one bag, right?

A. Yes.

Q. And this is the bag that you determined belonged to this

gentleman here?

A. He said it was his bag.

Q. Okay. Did you have any reason to doubt it was his bag?

A. No.

Q. Okay. Now, in that bag, were there any weapons in that bag?

A. No.

Q. Any ammunition in that bag?

A. No.

Q. Any clips, extended clips, anything related to a firearm?

A. No.

Q. Were there any drugs in the bag?

A. There was no drugs in the bag, although during the search of the boat we brought a canine unit which alerted positive for the presence of drugs. It gave a positive alert. Further questioning of the captain and Neville Hernandez, they stated that they had smoked marijuana while being moored in Culebrita, and after that no illegal drug was found.

Q. All right. So the answer to my question is there was no drugs in the bag?

A. No.

Q. No heroin, no cocaine, no crack?

A. No.

Q. Okay. Now, you mentioned you did recover three cell phones, correct?

A. Yes.

Q. All right. Now, the boat, whose picture we saw, you determined who the owner of the boat was, right?

A. Yes.

Q. Who it was registered to?

A. Yes.

Q. You did that whole investigation, right?

A. Yes.

Q. It wasn't registered to this gentleman here?

A. No, it was not.

Q. He was not the owner of the registration of the boat, right?

A. Yes.

Q. Now, the photograph we saw, the last exhibit we saw, that is the photograph that was taken of Alexis Candelario on that date, on December 15 of 2009, right?

MR. HEGYI: 16.

BY MR. REBOLLO:

Q. 16, right?

A. That photo was taken a day after.

Q. Okay. So that's how he looked on December 16, 2009?

A. That's how he looked on December 15, 2009, and December 16, 2009.

Q. On both days, right?

A. Yes.

Q. And probably some days before that, right?
A. Yes.
Q. Okay. Now, you also interviewed everybody in the boat, right?
A. Yes.
Q. And you were able to conclude that they were all people on a boating trip, right? On a leisure boating trip, right? Is that what you remember being said?
A. That's what they claimed, they were on a boat trip.
Q. That's what you wrote down in your report, right?
A. That's what, yes, we wrote down in the report.
Q. Okay. So essentially this is the day that Alexis Candelario was arrested and brought --
A. December --
Q. -- to respond for the case we're here for today, right?
A. December 15, 2009.
Q. That's essentially what your testimony is, that you were the officer that arrested Alexis Candelario on the arrest warrant that emanated from this case?
A. I was not the officer that arrested Alexis Candelario that day.
Q. You arrested him and turned him over to the officer that served the warrant?
A. I detained Alexis Candelario for further investigation and referred him to ICE, HSI, St. Thomas Duty Agent Luis Penn.

Q. And those agents determined there was an outstanding arrest warrant as of that date, December 15, 2009, which was executed on that day?

A. After we --

MR. HEGYI: Your Honor, I object to lack of foundation. I'll have the agent that did all that. He's the very next witness.

THE COURT: Go ahead. Ask.

BY MR. REBOLLO:

Q. Essentially, Officer, you were the first officer who came in contact with Mr. Candelario, turned him over to another agent who executed the warrant which brings us here?

A. Yes.

MR. REBOLLO: That's all I have, Your Honor. Thank you very much, sir.

THE COURT: Anything else?

MR. HEGYI: Just briefly.

REDIRECT EXAMINATION

BY MR. HEGYI:

Q. The individuals that were on the boat with the person we now know to be Alexis Candelario Santana, did they have names that indicated they were related to one another, some of them?

A. Yes.

Q. And did they indicate that they were from the Sabana Seca area?

A. They claimed to be from Sabana Seca, Toa Baja area.

Q. And did they indicate they didn't know who this was?

A. This --

Q. This being Alexis Candelario Santana.

MR. REBOLLO: Hearsay, Your Honor.

THE COURT: Hearsay.

MR. REBOLLO: What they said.

THE COURT: Would you rephrase the question?

BY MR. HEGYI:

Q. Sure. The question is did those other individuals who were on the boat from Sabana Seca, when you were asking them if they knew this gentleman who is claiming to be Mr. Hernandez, did they indicate whether they knew him or did not know him?

MR. REBOLLO: Same objection.

THE COURT: Overruled.

BY MR. HEGYI:

Q. Go ahead.

A. They claimed not to know him.

MR. HEGYI: Thank you very much, Your Honor. No further questions.

THE COURT: Thank you very much. You are now excused.

(At 2:38 PM, witness excused.)

THE COURT: Next witness.

MR. HEGYI: Your Honor, the Government calls what I believe is going to be its last witness in the case in chief, Special Agent Luis Penn.

COURTROOM DEPUTY: Raise your right hand.

Do you solemnly swear that the testimony you are about to give in this case is the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

(At 2:39 PM, witness took the stand.)

S P E C I A L A G E N T L U I S P E N N,

called as a witness by the Government, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HEGYI:

Q. Good afternoon, sir.
A. Good afternoon.
Q. Could you give us your full name, please?
A. Luis Penn.
Q. How old are you, sir?
A. I'm 43 years old.
Q. And where are you from?
A. St. Thomas, Virgin Islands.
Q. Do you have a Bachelor's Degree in political science?
A. Yes, I do, from Hampton University in Virginia.
Q. Now, in or about 1994 -- that was in 1991 you got your

Bachelor's Degree from Hampton, correct?
A. That's correct.
Q. And in or about 1994, did you begin your career in law enforcement?
A. Yes, I did.
Q. And where did you start your career beginning in approximately 1994?
A. At the Virgin Islands Department of Justice as a criminal investigator.
Q. And then beginning about 2002, did you leave that position as a criminal investigator with the Department of Justice and take a position with another Federal agency?
A. That is correct.
Q. And what agency was that?
A. It was then United States Customs Service. Now the Department of Homeland Security.
Q. Okay. So that we all remember, at one time there was Customs, there was Immigration, and everything got merged under the Department of Homeland Security. And you all became known as ICE, correct?
A. That is correct.
Q. Okay. Now, ordinarily where are you stationed? In the Virgin Islands? In Puerto Rico? In Miami? Where are you stationed?
A. St. Thomas, Virgin Islands.

Q. And were you stationed in St. Thomas, Virgin Islands, on or about December 15 of 2009?
A. Yes, I was.
Q. Were you the duty agent?
A. Yes, I was.
Q. Did you perchance get a call for assistance to the -- that had you respond to the Crown Bay Marina area?
A. Yes.
Q. And do you know now who it was that -- what agent called for your assistance there?
A. Yes, Melvin Garcia.
Q. Had you known Melvin Garcia before, at least by sight before that occurred?
A. Yes. We worked together.
Q. Now, when you got to the area of the Crown Bay Marina, did you speak to Agent Melvin Garcia? Don't tell us what was said, but did you speak to him?
A. Yes, I did.
Q. Did you familiarize yourself with background at least from his perspective of what had occurred?
A. Yes, I did.
Q. And as a result of that, what if anything did you do with the individual that was with Agent Melvin Garcia who was claiming to be Neville Hernandez? What did you do with that person?

A. At that time, to further identify the individual, I took him back to the office for further identification.

Q. Okay. And did that individual continue to maintain to you, when you first took him to the ICE office there, did he continue to maintain that his name was Neville Hernandez?

A. Yes, he did.

Q. Okay. Now, when you got him back to the ICE office, did you ask him various questions that you would ask of anyone if you're trying to determine whether they're lawfully in the United States of America?

A. Yes.

Q. Did you ask him his name?

A. Asked him his name, date of birth, place of birth, where does he live.

Q. And was he able to answer those questions to your satisfaction?

A. Yes.

Q. Okay. Did he provide you, for instance, with an address that seemed to be a good address to you?

A. No. The address was no good.

Q. Okay. Did he indicate to you at some point whether or not he was actually from Puerto Rico?

A. Yes. He said he was from Puerto Rico.

Q. And was he able to describe where he was from in Puerto Rico?

A. No.
Q. As a result, at some point did you do a scan of that individual's fingerprints or palm print?
A. Yes, I did. I took his fingerprints on what we call an AFIS machine.
Q. And so the ladies and gentlemen of the jury understands, is that like a piece of glass and it has a computer that reads the print as you roll it?
A. Yes. It's like a scanner.
Q. And that's attached to a -- the FBI computer, some other computer, and it reads the fingerprint?
A. Yes. It does a check of several databases.
Q. All right. When that happened, did the fingerprint turn out to be that of Neville Hernandez or somebody else?
A. Once I ran the fingerprint check and it came back to me, it came back to an individual by the name of Alexis Candelario.
Q. Okay. And did you indicate to the individual who was sitting in front of you, who is claiming to be somebody named Hernandez, did you indicate to him what name was showing up in the computer?
A. Yes, I did.
Q. And what was his reaction when you told him, hey, this says you're Alexis Candelario Santana? What did he say?
A. He looked at me, and he eventually shook his head and

said yes, I'm Alexis Candelario.

Q. Okay. And when you rolled the fingerprints into the national database and it came back and said that it was Alexis Candelario Santana, did it indicate whether or not he was wanted?

A. Yes, it did.

Q. And as a result of that, did you place him under arrest?

A. That is correct.

Q. Now, do you think after these years you would recognize Alexis Candelario Santana if you saw him?

A. Yes, if he looked the same.

Q. Okay. Well, would you mind looking around the courtroom and see if you see somebody you recognize?

A. Yes, I do.

Q. Okay. Could you point him out by where he's seated and an article of clothing that he's wearing?

A. (Witness indicating.) Yes. He's sitting in a white long-sleeved shirt with headphones in his ears and glasses.

MR. HEGYI: May the record reflect in court identification, Your Honor?

THE COURT: Yes.

BY MR. HEGYI:

Q. I'm going to put up on the monitor what is in evidence as Government's Exhibit 201, and I'll ask you if you recognize the person depicted in that photograph?

A. Yes, I do.

Q. Who is that?

A. That's Alexis Candelario's booking picture.

Q. And is that the way he appeared as appears in Government's Exhibit 201 when you first detained him on December 15, 2009, and again when this booking photograph was taken the next day?

A. Yes.

Q. Now, we've already spoken about most of the items that this gentleman had on him at the time that he was -- that he was initially detained and then turned over to you, but do you remember how much cash Alexis Candelario Santana had on his person at the time that he was placed under arrest?

A. It was approximately 2,000 dollars, a little over 2,000 dollars cash.

MR. HEGYI: Thank you, Your Honor. Pass the witness.

THE COURT: Nothing? Thank you very much, sir.

THE WITNESS: Thank you.

(At 2:46 PM, witness left the stand.)

THE COURT: Any additional witnesses?

MS. DOMINGUEZ: No, Your Honor. We do have some stipulations to move into evidence and to publish. And there are some pending matters that we'd like to address with the Court, including the admissibility of two photos that the Court has not yet ruled on.

THE COURT: Very well. Let me excuse the jury a minute so that we can take a look at that.

COURT SECURITY OFFICER: All rise.

(At 2:47 PM, jury left the courtroom.)

THE MARSHAL: You may be seated.

THE COURT: Ms. Dominguez.

MS. DOMINGUEZ: Yes, sir.

THE COURT: What are we talking about?

MS. DOMINGUEZ: Your Honor, the Court will recall there were two photographs for Mr. Martinez on the prior murders that I had the witness identify but were not moved into evidence.

THE COURT: May I see them?

MS. DOMINGUEZ: The second one is particularly gory. We would propose the one marked 175 perhaps be admitted. This is the testimony of the pathologist that was received this morning, when he talked about the disfiguration of the face. That is the victim to whom he referred.

MS. MATEO: She.

MS. DOMINGUEZ: She referred, Brugal.

MR. RUHNKE: Your Honor, we do object to those photographs, and objected at the time.

THE COURT: I will receive only one of them, 175. The other one is just too much. 175.

(At 2:49 PM, Government's Exhibit 175 admitted into

evidence.)

THE COURT: What else?

MS. DOMINGUEZ: I'd ask Ms. Mateo to publish when the jury returns a stipulation that's been signed by all parties with respect to the testimony of a police officer who responded to three of these prior murder scenes, and also with respect to the fact that Mr. Alexis Candelario Santana was married to a woman by the name of Sonia Benitez. And he continues to be married to her today, although they've been separated since 2003.

THE COURT: Can I see the papers?

MS. MATEO: The photographs are clipped to it.

MR. RUHNKE: Yes, Your Honor. There was another issue that we're just meeting on right now, and that is that we agreed on a stipulation as to the guilty pleas and judgments to the murder charges that Mr. Candelario entered in Bayamon and San Juan I think.

MS. DOMINGUEZ: Right.

MR. RUHNKE: We've agreed to stipulate to the accuracy of the transcripts of those pleas. These were taken from the official record of the Court of Bayamon. These are not recordings that were made by attorneys. These are the official recordings.

I'm told, and I've not listened to it, that the audio is somewhat difficult and actually hard to locate on the CD.

So to avoid that problem, we have stipulated that the transcripts and the translation of the transcripts are true and accurate transcriptions of what occurred in the courtroom, and the translation itself is an accurate translation.

THE COURT: What is it that the Government is offering?

MS. DOMINGUEZ: Your Honor, this is Composite Exhibit 206. This is by stipulation of the parties. It is a demonstrative chart that relates the case number, the Complaint number, the date of conviction, the date of the murder, the name of the victim, with each of these sentences on which Alexis Candelario Santana was sentenced.

Also, it includes certified translations, and transcripts of the change of plea hearings, which are being admitted into evidence at the request of counsel. He is going to be stipulating to the transcript. We do have the audio of that, but because of the format, it has been difficult to bifurcate it from the larger proceedings, including the trial. So counsel has agreed that the transcript be received in evidence in lieu of the recordings.

What counsel is referring to is that in addition to this, there were also a series of firearm convictions that accompanied each of these second degree murder pleas or convictions. If Your Honor recalls, during the opening statement Mr. Rebollo indicated that Alexis Candelario had

never been convicted of any firearm offense, nor caught with a firearm. And in response to that, we prepared a package of all his prior firearm convictions in the same manner as I've described to the Court with the exhibit consisting of his second degree murder convictions, and have shared it with counsel.

Those have been provided also in discovery. Because it is our estimation that Mr. Rebollo opened the door with respect to that, because there are a significant number of firearm convictions to which he also plead guilty in connection with each of these second degree murders.

MR. RUHNKE: It's our view, if I recall what Mr. Rebollo stated was that he's never been arrested in possession of a firearm. And to set the -- what's at issue here, we do not disagree that these are accurate judgments, and that the -- I haven't doublechecked the chart as yet, but I assume the chart, subject to maybe some fact checking, is probably accurate.

What we're saying is the fact that he was convicted of these murders is obviously relevant to the jury's consideration. And that's something we don't -- we don't argue about. But I think to allow the weapons convictions also, solely in response to a remark and opening that he'd never been arrested in possession of a gun, which is true and remains true and the evidence remains true to that point,

renders these judgments irrelevant. And we object to them.

THE COURT: Let's take them one by one.

MR. RUHNKE: Okay.

THE COURT: Let's talk about the convictions first, the convictions for murder and the package that you have prepared which includes things that are not necessarily relevant but you stipulate them, so fine. Okay.

MS. DOMINGUEZ: (Nodding head up and down.)

MR. RUHNKE: (Nodding head up and down.)

THE COURT: So that's going to be received in evidence.

MS. DOMINGUEZ: Yes, Your Honor.

MR. RUHNKE: Okay.

THE COURT: By stipulation. That's number one. Give it to the Clerk so she can mark it.

Now, it is impossible for me to remember what Mr. Rebollo said during the opening statement about the firearm or the convictions. I just could not tell. I would have to read the transcript.

MR. RUHNKE: We'll take a look.

THE COURT: But let's assume for the sake of argument that he indeed said that he has never been found in possession of firearms. Assume the worst. Okay. My ruling would be that that alone would not allow the admission of the convictions for firearms. Under what basis in the law of

evidence would you do that?

I cannot recall a single case that says that those convictions would come in on account of a statement in opening statement. How could you justify that? There may be other ways perhaps.

MS. DOMINGUEZ: Judge.

THE COURT: Had he taken the stand, had he -- you know, perhaps in the penalty phase.

MS. DOMINGUEZ: Right.

THE COURT: If there's such penalty phase.

MS. DOMINGUEZ: Right.

THE COURT: But I think unless you convince me that they're admissible, I can't think of any single case that would allow me to legally admit that evidence.

MS. DOMINGUEZ: We wanted to bring this up to the Court, because we felt that statement was not a statement that was made consistent with the history of criminal proclivity that Mr. Alexis Candelario has had.

THE COURT: I understand that perfectly.

MS. DOMINGUEZ: And certainly these are firearm convictions that have a certain probative value, because they are -- they accompany the homicide convictions for which he plead guilty or was convicted.

THE COURT: Let me ask you something. Are these convictions for firearms part of the same filings that gave

rise to the homicides?

MS. DOMINGUEZ: Yes, sir, they are.

THE COURT: They have the same numbers? They are in the same accusations, if you want to call it that way?

MS. DOMINGUEZ: They are in separate sentences, because that is the way the local courts do them.

THE COURT: Listen to me. When he was charged in homicide in local court, was he charged with homicide of victim Mr. A and along with it came the firearm?

MS. DOMINGUEZ: Yes, sir.

THE COURT: And he pled to both?

MS. DOMINGUEZ: Yes. Some of them have eight firearm offenses, because some of them were for carrying, some of them were firing.

THE COURT: Then that has nothing do with what Mr. Rebollo said in the opening statement --

MS. DOMINGUEZ: In an abundance of caution, we have not offered them in evidence, because what is technically charged in the RICO conspiracy is the prior murders. And we are happy to abide by the Court's ruling.

THE COURT: But you are basically telling me you would love to have them in evidence, but you are not giving me a basis to admit them.

MS. DOMINGUEZ: Well, Judge, I would say in terms of the legal basis, they're inextricably intertwined with the

second degree murder convictions. Mr. Rebollo's comment -- I understand opening statements are not evidence. We compiled them because we felt they might be useful for the sentencing phase, or perhaps for some cross-examination in the unlikely event that there was some sort of character witness or something like that presented.

THE COURT: Right. That's a different story. That's a different story.

MS. DOMINGUEZ: Yes, sir.

THE COURT: I think that the course of action that I should follow is this. I should not admit it at this stage, because I don't have a good basis in evidence law to admit those firearms convictions. They are not charged in the Indictment as such.

Therefore, I don't think I should touch it with a ten foot pole. However, I am not closing the door for the admission of those convictions if the circumstances -- if the circumstances arise in the context of what remains of this case.

MS. DOMINGUEZ: Yes, sir.

THE COURT: Let me put it that way.

MS. DOMINGUEZ: Understood.

THE COURT: Okay. Fair enough?

MS. DOMINGUEZ: Yes, sir. A couple of other matters.

THE COURT: Let me take a look at this stipulation first.

MS. DOMINGUEZ: Yes, sir.

THE COURT: What are the photos? The photos are the murders? The photos in the stipulation are the murders?

MS. DOMINGUEZ: Yes, Your Honor. The prior murders.

THE COURT: Okay.

MS. DOMINGUEZ: And the reference is in the stipulation.

THE COURT: Well, the stipulation's going to be read to the jury. I'll do it.

MS. DOMINGUEZ: Yes.

THE COURT: What else?

MS. DOMINGUEZ: And also we wanted to raise with the Court, I know that the Court has marked the transcripts as court exhibits. And the Court is actually correct.

THE COURT: Which transcripts?

MS. DOMINGUEZ: The transcripts of the recordings.

THE COURT: Right.

MS. DOMINGUEZ: Title III, et cetera. Has marked them as court exhibits.

THE COURT: Right.

MS. DOMINGUEZ: The 911, et cetera. I think there may be a special concern, because we're not talking about just an English translation, but the fact that, for example, the

Title III tape is in Spanish. And I believe, Your Honor, under the case of the U.S. versus Gabriel Morales Rivera, because the tape was in Spanish, the transcript needs to substantively be admitted, the transcript of the translation.

THE COURT: I think it should, but I don't think it has to go to the jury. That's a different story.

MS. DOMINGUEZ: Okay. That's fine, Judge.

THE COURT: But the law in the First Circuit is the evidence is the recording, not the transcript.

MS. DOMINGUEZ: All right.

THE COURT: They will be in evidence, but they don't go to the jury for the time being. What else?

MR. HEGYI: Your Honor, through error of mine in these Detroit exhibits, I'll put on the record I'm going to take the representative firearm and make it Detroit letter B.

THE COURT: Fine.

MR. HEGYI: So Detroit 12 is the stipulation, and 12 A is the analysis.

THE COURT: No problem with that.

MR. HEGYI: Okay.

THE COURT: Now, what about the Rule 29? Are you resting?

MS. DOMINGUEZ: Yes, Your Honor, we are.

THE COURT: What about the Rule 29? I need to hear that.

MR. RUHNKE: When do you want to hear it, Your Honor?

THE COURT: Now.

MR. RUHNKE: Okay. Let me just -- can we take a five minute break?

THE COURT: Sure.

MR. RUHNKE: And let me get some notes together? Your Honor, before we start the Rule 29, I know the Government has moved to dismiss ten of the counts.

THE COURT: Yes.

MR. RUHNKE: Has that been done?

THE COURT: If it hasn't been done, it will be done. Those counts are not before me anymore.

MR. RUHNKE: Okay. Thank you.

THE COURT: On the word of the Government. What else?

MR. RUHNKE: If we could take five minutes?

THE COURT: Sure.

(At 3:00 PM, recess taken.)

(At 3:15 PM, proceedings reconvened.)

THE COURT: Well, let's hear the Rule 29.

MR. RUHNKE: Your Honor, we're making this argument technically before the Government has actually rested in front of the jury, but I assume --

THE COURT: They did. I think they did.

MR. HEGYI: I said this was going to be our last witness. We didn't actually say it, but --

THE COURT: Do you mind if we do it now?

MR. RUHNKE: If they rest in front of the jury? No.

THE COURT: Bring them in and say that and bring them out again, you know --

MR. RUHNKE: I don't mind that they do it as long as it's clear what I will do is as soon as they rest, I will just adopt these arguments.

THE COURT: Yes.

MR. RUHNKE: By reference.

THE COURT: Yes.

MR. RUHNKE: All right. So I'll start by saying generally speaking to each and every count in the Indictment that remains, that the Government has failed to present evidence that a reasonable juror could find establishes proof beyond a reasonable doubt of each and every element of the offense, giving the Government all inferences of credibility. So in essence I've preserved a Rule 29 motion as to every remaining count in the Indictment. And then I want to go count by count or groups of counts.

THE COURT: Go by groups of counts.

MR. RUHNKE: By groups. So that covers all counts.

It covers Count I of the Indictment. But let me start by discussing the VICAR counts and how the VICAR counts relate to the 924(j) counts, which are the remaining counts in the Indictment that carry a potential penalty of death.

The narcotics conspiracy counts have been dismissed, and we're left with VICAR, and we're left with 924(j), as far as a sentence of death is concerned. I've done some research. I didn't take it out of the First Circuit simply because I didn't have time to take it out of the First Circuit, but within the First Circuit, there are some cases that discuss the elements of a VICAR, Violent Crime in Aid of Racketeering offense under Section 1959(a).

I found the case of United States versus Brandao, 539 F3d 44, First Circuit, 2008. And actually some of these cases are related, because they seem to deal with a street war between two groups of residents of various sections of Boston or the Boston area. What was called the Stonehurst group, and one was called the Wendover group. Two rival gangs. And apparently all they had going for each other is they lived in different sections of Boston, and that was enough to go to war over.

The elements of VICAR, as discussed in the Brandao case --

THE COURT: That's 539 44?

MR. RUHNKE: 539 44. And the discussion begins,

let's see, where am I, in the -- it can't be right that I'm reading the right page cite, because it says page three. So 44 is the beginning page cite, but as the case proceeds, it says, in order to prove a VICAR offense, it requires proof that the crime was committed in furtherance of a defendant's membership in the enterprise or because it was expected of him by reason of his membership in the enterprise.

Both cases discuss membership as a critical element of a VICAR offense. To similar effect is United States versus Nascimento, 491 F3d 25, First Circuit, 2007. This is a related prosecution to the Brandao prosecution. And it again states that VICAR requires that a defendant commit a crime of violence in order to advance or maintain his position within an enterprise that's effecting interstate commerce, that is engaging -- that is also engaging in a pattern of racketeering activity. And that there has to be a nexus between the crime of violence and membership within the enterprise. And that's at page 46 of that opinion.

And at page 47 of the opinion, the First Circuit writes that, VICAR is satisfied as long as the Act of violence -- I'm sorry. VICAR is satisfied, quote, as long as the criminal act can be said to have been expected by reason of his membership in the enterprise. Also citing United States versus Tse, T-s-e, a Chinese name, 135 F3d 200, First Circuit, 1998.

All right. So it is my view and my argument to the Court today as a matter of law that by the year 2006, Mr. Candelario is no longer in membership, a member of the enterprise. That he has been essentially expelled from the enterprise. That his -- he is not being listened to. He is not being paid. And that he has no role any longer in the enterprise.

This is very different from withdrawing from a conspiracy. This is an enterprise saying to the person, you're out. You're no longer part of this organization.

And I take factual support from the testimony. Wilfredo Semprit Santana, Rufo, testified that his brother, Pedro, who was killed at La Tombola, was the one in charge of the drug point from 2006 until 2009.

And I'll just quote the testimony. Rufo is explaining a quote. This is at -- I'm trying to find the page cites, and I don't -- okay. This is page 29 of the transcript of February 25, 2013.

And he says, "I received a salary from my brother.

Question, your brother Pedro?

Answer, yes.

Question, so was Pedro then who was in charge of the drug point?

Answer, yes.

Question, and were you paying or Pedro paying Alexis

for use of the drug point at that point?

Answer, no.

That was in 2006; is that correct?

Answer, yes.

And you continued with that arrangement until 2009?

Yes.

What happened in 2009, specifically February of 2009?"

The answer is, "the massacre at La Tombola," which is clearly a misanswer. I think it's corrected, that Alexis was released from jail.

So that is the testimony of Rufo that as of 2006, Alexis Candelario Santana has no role in the enterprise.

Rufo's wife, Amaryllis, was questioned that in 2000 -- I'm sorry, after Omi got caught, and I'm looking at the transcript of again February 25, 2013. And this is at page eight of that transcript.

The question is, "after Omi got caught?"

And then the answer is, "after Omi got caught.

Question, Omi was at the time your husband's boss in the drug business in Sabana Seca, right?

Answer, they were partners.

Question, they were equal partners at the drug point, right?

Answer, that's right."

So according to that segment of Amaryllis' testimony, as of 2006 when Omi was arrested -- we've had a lot of testimony about the search and seizures that accompanied that arrest, Wilfredo -- I'm sorry, Alexis Candelario Santana is no longer associated with the enterprise.

And Amaryllis says at page eight of her testimony, continuing, "question, but once Omi was gone for whatever reason, your husband took over as the complete boss, and you were helping him?

Answer, the boss, yes.

And then the question is, and this is less than five years ago, right?

And the answer is, yes."

A Statute of Limitations question I suppose.

"And no one saw or was associated in any way with Alexis Candelario Santana after he was released in February of 2009?" That's from Wilfredo Semprit Santana, Rufo, at page 29 of the transcript of February 25, 2013.

The question was, "and after Alexis was released in February 2009, did you have any contact with him?

Answer, no.

Question, did you see him around Sabana Seca?

Answer, no."

And then -- okay. So the point being that the evidence is contraindicated. There's no evidence that runs

the other way, that -- as of 2006, Alexis Candelario Santana is no longer a member of this enterprise, is no longer participating in the enterprise. And indeed if you look at this whole case and step back from it, it represents an attack on the enterprise, not somebody who is committing a crime of violence to advance or maintain his position within the enterprise, because in fact he has no position at all within the enterprise.

So as a matter of law, and as a matter of the uncontested credibility -- uncontested testimony on this issue, if he is no longer a part of the enterprise, then his actions in committing a crime of violence do not further the aims of the enterprise and are not in order to advance or maintain his position within an enterprise, and certainly are not for the payment of pecuniary value from the enterprise.

He's not receiving anything of pecuniary value from the enterprise. And the implications of it are very important, because, all right, so if those eight capital counts fail for lack of proof, then it would --

THE COURT: We're talking now about La Tombola?

MR. RUHNKE: The VICAR counts.

THE COURT: Okay.

MR. RUHNKE: If those fail for the lack of proof, then the 924(j) counts also fail, because the 924(j) counts are that he committed an act of violence with a gun or illegal

possession or use of an firearm in a crime of violence in which another person died in a crime of violence over which the United States would otherwise have jurisdiction.

And the jurisdictional crimes under 924(j) are the 1959 VICAR counts. So if my analysis is legally correct and factually correct, the VICAR counts should go. The 924(j) counts therefore fail as a matter of law.

The murder in aid of narcotics conspiracy have been dismissed, and there remain no additional capital counts in this Indictment. This is obviously not a boilerplate kind of Rule 29 motion, but that is my argument, Your Honor.

THE COURT: What about you, Mr. Aguayo?

MR. AGUAYO: Yes, sir. Your Honor, again, since we don't know which counts are actually going to be dismissed, the argument I have here goes to --

THE COURT: That's why I want you to address it as groups of counts.

MR. AGUAYO: All right. Yes, Your Honor.

THE COURT: Because we're talking about basically the same facts --

MR. AGUAYO: Exactly.

THE COURT: -- under different labels.

MR. AGUAYO: That's correct.

THE COURT: So why don't we just concentrate on the groups. Let's forget about -- okay.

MR. AGUAYO: First of all, Your Honor, I join Mr. Ruhnke's argument specifically concerning the VICAR counts and the 924(j)(2) counts. However, in addition, the elements of the offense concerning these VICAR counts is that, one, a criminal organization exists. The organization is a racketeering enterprise.

Defendant committed a violent crime, and the defendant acted for the purpose of pecuniary gain or to gain entrance to or maintain or increase his position in the enterprise.

As to aiding and abetting, the aider and abetter must know the principal was acting either for pecuniary gain or to maintain or increase his position.

THE COURT: So in that sense you are in agreement with Mr. Ruhnke.

MR. AGUAYO: Yes. What I am saying is there is absolutely no evidence, if we cut to the chase, Your Honor, if we cut two or three pages of my allocution here, basically what I'm saying is there is absolutely no evidence in this trial that David Oquendo Rivas, assuming in the light most favorable to the government, that these facts in -- that this event in fact occurred as the Government is alleging.

The Government has presented absolutely no evidence that David Oquendo had any knowledge that assuming again that this is correct, that the principal, Alexis, was committing

these acts at La Tombola, allegedly along with him, for pecuniary gain or to gain entrance or maintain or increase his position in the enterprise.

Indeed, Your Honor, and there certainly has been no evidence that Oquendo participated by himself or for whatever purpose by himself in the events of La Tombola for events of pecuniary gain or to maintain or increase his, David Oquendo's, position in this or any other enterprise.

As a matter of fact, all the proof that has come in was David Oquendo was not related in any way, shape or form to any of the drug activities of this enterprise, beginning I think in 1993 and depending on what we understand, continuing until 2009 or whenever. He is not involved in this.

Oquendo comes in according to the Indictment, the Government's evidence, on October 17, 2009. Prior to that, there is no evidence that he's in any enterprise at all.

So our position is that, one, David Oquendo, there is no evidence that David Oquendo knew that the reason why Alexis Candelario was doing this was for pecuniary gain or to gain entrance or maintain or increase his position in the enterprise. And two, there is certainly no evidence that he was doing this for pecuniary gain.

Nobody has said here Oquendo was at La Tombola because Alexis or anyone else was going to give him money or anything of value, even a favor. So just the -- let's say

even just the mere knowledge, I mean there's nothing here to prove the fourth element of the essential elements of this offense.

I also bring the Court's attention to the case of U.S. v. Frampton, 382 F3d 213, 2004 case, Second Circuit. And in that case, similar to our case --

THE COURT: This is 382 213.

MR. AGUAYO: 382 F3d 213, of 2004, Second Circuit.

Similar to this case, there were two persons, Frampton and an individual named Cooley, who -- the drug business was going bad, and they go to a person by the name of Henry and ask him if they can sell at his drug point. Henry believes it's only for a short time, and these people, Frampton and Cooley, believe that they're part of the organization now.

When Henry comes to Frampton and Cooley and says, listen, guys, about time, you have to leave, they're not in agreement. So Frampton and Cooley hire a person by the name of Johnson to go kill Henry. And the reason why they want to kill Henry is because they want to take over that drug point.

Henry goes and he kills -- I'm sorry, Johnson goes and kills Henry. The Court there stated that the intent necessary to support a conviction for aiding and abetting goes beyond the mere knowledge that the defendant's action would

tend to advance some nefarious purpose or principle. The defendant must act with specific intent of facilitating or advancing the commission, principles of the underlying crime. And then they cite cases.

Then they go on to say, indeed, that the oral argument at the Government conceded that it points to no direct evidence demonstrating that Johnson knew of Frampton's criminal intent. In other words, that Frampton was doing this in order to take over that drug point. And based on that, they reverse Johnson's conviction.

I would also cite, Your Honor, a case from this district, which is United States versus Rosario Diaz, 202 F3d 54, at 62, First Circuit.

THE COURT: 202.

MR. AGUAYO: 202 F3d 54, at page 62, First Circuit, 2000. That was the case, Your Honor, of -- that was known here as the Edna (ph) case. And indeed I was the one that represented Rosario Diaz. But another attorney did the appeal.

And there they were charging him or he was convicted for carjacking. That involved getting some money from a woman that they kidnapped.

THE COURT: I remember the case.

MR. AGUAYO: Okay. That case -- anyway, that was reversed on an appeal. And it stated, to support a conviction

for aiding and abetting, the Government must prove in addition to the commission of the offense of the principals that the defendant consciously shared the principal's knowledge of the underlying criminal act and intended to help the principals.

In other words, Your Honor, and as related to the 959 charges, again, there is absolutely not one iota of proof to show that Oquendo knew that Alexis Candelario was doing this for pecuniary gain or to gain entrance, maintain or increase his position in the enterprise. And certainly there is no evidence that Oquendo was doing this for pecuniary gain or to gain entrance or maintain his position or increase his position in that enterprise, which nobody has testified to here throughout this trial that he was in.

THE COURT: So your position is that the evidence may only sustain in the light most favorable to the Government, that if David Oquendo was there and participated and shot some people --

MR. AGUAYO: Yes.

THE COURT: -- that was it, but we don't know the motivations, we don't know anything else?

MR. AGUAYO: Exactly. It's -- the fourth element of that charge has to be proven, and it hasn't, based on the evidence presented here. I understand the Government has closed its case, so based on the evidence the Government has presented here, and has closed its case.

THE COURT: The only thing that has not been done is reading this stipulation. Otherwise they have closed the case.

MR. AGUAYO: Yes. That would be my argument. And I join Mr. Ruhnke concerning the 924(j) one, too.

THE COURT: Very well.

MR. AGUAYO: Thank you, Your Honor.

THE COURT: Let me hear the Government on these issues. Very interesting issues.

MS. DOMINGUEZ: Your Honor, throughout this trial --

THE COURT: Why don't we start with -- well, do it any way you want.

MS. DOMINGUEZ: Yes. Throughout this trial this Court has heard evidence that since 2003, and in fact even before 2003, a drug trafficking point existed at palo de goma in Sabana Seca. And it almost became tradition. That drug point went through various owners. In 2000 -- in 1993 Alexis Candelario Santana, a young man of barely 18 years of age, seized an opportunity when the prior owner, Roman, had been jailed, and seized control of that drug point.

And the testimony, I think the overwhelming evidence in this trial has been that since 1993, even through the time that Alexis Candelario Santana left Puerto Rico and went to Detroit in 1998, even through the time when Alexis Candelario Santana went to jail in 2003, that he has been the undisputed

owner of that drug point, exercising exclusive control over the activities at that drug point and disposing of the money that was generated, the substantial monies that were generated from that drug point.

I do concede that counsel is correct factually, Mr. Ruhnke and Mr. Aguayo, when they make reference to the fact that there came a point in time after Alexis had been in jail for several years, around 2006, 2007, when disputes arise between Omi, Carmelo, the person that Alexis had left in charge of the drug point when he went to jail, and Alexis over money.

And that's a resounding theme, because if there was one thing that was imperative to Alexis Candelario Santana was that his money be respected. He has never, I suggest to this Court, viewed himself as having been divested of ownership rights of that drug point. His attitude, his behavior, his conduct has always been consistent with the fact that he is the rightful owner of that drug point.

Now, Your Honor, there has been also evidence throughout this case coming from the testimony of Rufo, Wilfredo Semprit Santana, that during the period of time that conflicts over money arose with Omi, that Alexis began to threaten that, you're going to see what's going to happen. When I come out, I'm going to kill you. You're not paying me my money.

And Rufo testified that although these were credible threats, because of who Alexis was, his fears were relaxed because Alexis was in jail. Alexis had been sentenced to 12 years, and no one expected that he would be out in six years.

And when Omi is finally jailed, around 2007, Rufo seizes the opportunity to take absolute control of this drug point with his brother, Pedro. At this point Carmelo is in jail. At this point Alexis is in jail. And many other members and soldiers of this organization are also either jailed or dead. But I suggest to this Court that there is no evidence that Alexis Candelario Santana ever withdrew from this RICO enterprise or drug conspiracy.

He continued to level threats, and he did that for one reason, Judge, because he still considered that he was the owner of this drug point and rightfully entitled if he could not run it himself to at least receive profits from the drug point that he considered to be his.

And these threats never stopped. They continued to be leveled, even through his son Alexito. And the Court heard some Title III call about that, which taken in conjunction with Rufo's testimony, clearly again reflects just another level of threat, another level of fear and intimidation that became very customary with Alexis Candelario Santana.

Now, with respect to David Oquendo Rivas, Judge, I think clearly the evidence has been -- and the Court has given

105 instructions. There has been no evidence to suggest that that individual, Oquendo Rivas, was at any time involved with the drug point at palo de goma.

The evidence has been he lived in Sector 26 in Toa Baja, that he knew Rufo and Alexis, but yes, I concede not that he was involved in the operation of the drug point in any way. But it is clear, Judge, that on October 17, 2009, David Oquendo Rivas armed himself, together with other soldiers of Alexis, and they took concerted action to assail an innocent public for the most part, unarmed civilians, who were injured and killed.

And to suggest, Judge, that that was done in -- with no particular intent, motivation other than to hurt people that David had no prior conflict with, I think defies common sense. It is clear that Alexis Candelario Santana, now newly released from prison, needs to gather a new army. His soldiers are dead. They're in jail or they have betrayed him, as was the case with Rufo and Pedro.

So Alexis Candelario Santana has to gather new people, because he cannot instill the fear, the violence and the intimidation that were his weapons alone. And so I suggest to this Court that a reasonable inference of these facts are that David Oquendo Rivas, whom the evidence is knew Alexis Candelario Santana, knew who Rufo was -- and the testimony again has been, Judge, this drug point has been

there forever. People knew who Alexis was. Alexis was feared and respected in Sabana Seca. And he allied himself with Alexis Candelario Santana on the evening of October the 17th.

There is no evidence that Alexis -- that David Oquendo Rivas had any conflict with William Ramos, whom he knew, with Jose Amesquita Semprit, who he knew. And yet this man arms himself that night, and together with Alexis Candelario Santana, because the evidence is that Alexis went in the right door and David went in the left door, they were acting in concert. They were acting in tandem. And --

THE COURT: I guess along with others, because there is evidence also of other people.

MS. DOMINGUEZ: Correct.

THE COURT: With masks.

MS. DOMINGUEZ: There were various shooters there, and the ballistics evidence suggests that. But Alexis Candelario Santana made a very powerful statement on the evening of October 17th, because, Judge, if it had been just vengeance he wanted to exact on Rufo or he simply wanted to eliminate Rufo as the competition, there were many easier ways of hitting Rufo, of killing him and of eliminating him.

Alexis Candelario Santana, the evening of October the 17th, made a powerful statement to all of Sabana Seca, and that statement was, I am back. I am back to reclaim what is mine, and no one better get in my way. He was back to instill

the respect that perhaps people had lost, because perhaps the fear had been relaxed from the six years that Alexis had been in jail, and before that his absence in Detroit.

But I believe, Judge, that the fact that Alexis Candelario Santana and David Oquendo Rivas joined forces that evening to commit unspeakable acts of violence, lends credence to the government's theory that David Oquendo Rivas was a soldier in Alexis' army that night to help him claim what he believed was always rightfully his, his drug point.

MR. RUHNKE: Just one quick factual point just to be sure we're all on the same page. It's clear, there seems to be almost a suggestion that there was a whole new enterprise he put together after he came out of prison. The Indictment charges as the underlying enterprise, the same enterprise that's charged in Count I of the Indictment. So there's no --

THE COURT: It's one enterprise --

MR. RUHNKE: Yes. So with that comment, Your Honor, that's all I have to say on this issue.

MR. AGUAYO: Your Honor, if I may quickly add, again, going back to this Frampton case, it clearly states, the Court states, the appellate court applied to the facts of the Frampton case the burden was on the Government to prove at the time Johnson assaulted Henry, in other words killed him, he knew that Frampton was seeking to increase his position in the 41 Ingalls enterprise, and acted towards that end.

Then again in oral argument the Government concedes that there's no evidence of Johnson's knowledge of that. But the Court goes on to say, moreover, the circumstantial evidence proffered by the Government to support such an inference that Johnson and Cooley were friends and therefore Johnson must have realized the real purpose behind his role in the plot to murder Henry, is far too attenuated. In other words, Your Honor --

THE COURT: Well, but that's a matter of final -- you have to make credibility assessments. You have to make inferences. If you talk about that, then you are putting it under the circumstantial evidence and will have --

MR. AGUAYO: Well, what I'm saying, Your Honor, if I may, is the Government has not put in one iota of evidence during its case in chief that David Oquendo knew the intent of Alexis, whether it was for pecuniary gain, to enter, maintain or increase position in the enterprise. There's not one iota of evidence of that. And therefore --

THE COURT: What about circumstantial evidence?

MR. AGUAYO: Even the circumstantial evidence. Where is it in the circumstantial evidence, Your Honor, that Oquendo knew about this, that this was for pecuniary gain?

THE COURT: Well, if you take the extraordinary step in joining somebody else in that kind of killing spree, don't you think the jury could easily conclude that he had some

grounds to make a decision as to participate and that that could easily be precisely what you are saying.

MR. AGUAYO: Well, in the Frampton case, the guy was hired in order to shoot Henry. Frampton went with him, and --

THE COURT: Here we don't even have the evidence of somebody hiring Oquendo.

MR. AGUAYO: I understand that. There is none.

THE COURT: Well --

MR. AGUAYO: There is none.

THE COURT: -- in that case, the case you're citing is --

MR. AGUAYO: The point is not that they hired him. The point is what evidence is there that Oquendo knew that Alexis was doing this in order for pecuniary gain, to gain entrance -- what evidence is there to show that this man had in his mind that he knew why Alexis was doing this?

THE COURT: That is something you will have to argue before the jury and convince the jury that there is no evidence.

MR. AGUAYO: Thank you, Your Honor.

THE COURT: There is no way I'm going to dismiss this case. Motions are going to be denied. I agree that you have a very strong point. I'm not saying you don't have it, but it's a matter the jury has to decide.

Let's bring the jury in so we can read the

stipulation. There will be official resting.

MR. RUHNKE: Your Honor, is my motion denied, also?

THE COURT: Yes.

MR. RUHNKE: Okay. Thank you.

Your Honor, could we come to side bar while the jury's coming in?

THE COURT: Sure.

(Bench conference held.)

THE COURT: Yes.

MR. RUHNKE: While this was going on, I heard back from LexisNexis, and they are willing to extend the deadline.

THE COURT: That's fantastic.

MR. RUHNKE: So now I have to figure out how to get my expert down here as soon as I can get her down here, but I had this thought as well. I don't know when Your Honor wants to do this 104 hearing. If you wanted to do it this afternoon --

THE COURT: How long will it take?

MR. RUHNKE: You'd have to ask Mr. Aguayo first.

MR. AGUAYO: Quite frankly, Your Honor, I've never done one of these, so I don't know how long it's going to take.

MR. RUHNKE: It would be like a direct examination before the jury.

THE COURT: Do you have any idea how long it would take, the direct examination?

MR. AGUAYO: Fifteen, 20 minutes.

THE COURT: How about yours?

MR. RUHNKE: Probably a little longer than that.

THE COURT: A couple of hours.

MR. RUHNKE: At worst.

THE COURT: I cannot do it tonight, that's for sure.

MR. RUHNKE: Okay. Let me talk to my expert. She can probably get on an early morning flight tomorrow. We can do it Wednesday. We could do it tomorrow.

THE COURT: You start with the evidence. You have other evidence to present.

MR. RUHNKE: About a half hour.

THE COURT: That's something. Get the expert here as soon as you can.

MR. RUHNKE: Okay. Fine. And then we'll do the other one this afternoon.

THE COURT: Sure.

MR. RUHNKE: So you can't do it this afternoon.

THE COURT: I can -- up till 6:00 I can, or 5:45.

MR. RUHNKE: Because it could happen like this. I could listen to Mr. Aguayo's expert and say there's nothing substantially different than my expert would add to it.

THE COURT: Okay. Yes.

MR. RUHNKE: And obviate the need for her coming down at all.

THE COURT: I understand that.

MR. RUHNKE: Okay.

THE COURT: Let's bring the jury in. I understand that.

MR. RUHNKE: Okay.

THE COURT: Remember I'm going to give you the week off.

MR. RUHNKE: I know you are.

THE COURT: But I'm not going to start giving you days and days and days.

MR. RUHNKE: How about two days?

THE COURT: No, I cannot do that.

(Bench conference concluded.)

(At 3:52 PM, jury entered courtroom.)

COURT SECURITY OFFICER: Please be seated.

THE COURT: Members of the jury, there is -- the last piece of evidence here is a stipulation that I will read to you. It pertains to the testimony of a police officer, Francisco Ramos Gonzalez. He's a retired police officer.

If he were called to testify, he would testify as follows: That he responded to the following crime scenes while he was a Puerto Rico Police officer, and recovered the

ballistics and evidence noted below. First, crime scene of murder of Julio Martinez Santana on November 4, 1996, at Calle Los Magos in Sabana Seca, Toa Baja, Puerto Rico. There he recovered three nine millimeter casings from the crime scene.

Number two, or B, crime scene of murder of Melvin Medina Arce on February 28, 1997, where an individual by the name of Omar Matias Negron was injured. On the scene he observed a Mitsubishi 3000 VR-4 with multiple bullet impacts on the hood and the windshield.

He recovered 40 rifle casings of various calibers, starting from the front of condominium Atlantico in Levittown and Calle Mariano Abril Casatano, also in Levittown. He would identify Government's Exhibits 203 A and 203 B as true and accurate photographs depicting the crime scene on February 28, 1997.

Third, or C, crime scene of the murder of Orlando Cardona Ortiz on March 7, 1997, on Calle Progreso in Sabana Seca, Toa Baja. He recovered 14 nine millimeter casings and six projectile fragments. He would have identified government exhibits 204 A, 204 B, and 204 C as true and accurate photographs depicting the crime scene that allegedly occurred on March 7, 1997.

Lastly, crime scene where the lower torso of a human body belonging to Jimmy Velez Matos was recovered in a plastic bag on March 7, 1997. He would have identified Government's

Exhibits 205 A, 205 B and 205 C as true and accurate photographs depicting the condition of the torso when it was recovered.

There is another stipulation regarding the spouse of Alexis Candelario Santana. It is stipulated that Alexis Candelario Santana was married to Sonia Benitez in 1987. Although he remained married to her, they have been separated since approximately 2003.

And that is the stipulation, with the added photos that pertain to it. This is as if the police officer had testified.

And the Government is resting, correct?

MS. DOMINGUEZ: Yes, Your Honor. We would move into evidence the binder containing the prior murder convictions.

THE COURT: Yes. Let me show -- where is the binder?

MS. DOMINGUEZ: 206, and the chart of prior convictions, 206 A.

THE COURT: Yes. We also received in evidence this binder, which is Exhibit 206 composite, which contains prior murder convictions with a chart and some transcripts of proceedings pertaining to Alexis Candelario Silva in local court.

COURTROOM DEPUTY: Candelario Santana.

THE COURT: Candelario Santana. I'm sorry. Okay. So you're resting?

MS. DOMINGUEZ: Yes, sir.

THE COURT: And I would say that the rule 29s would be the same thing as before?

MR. RUHNKE: Yes, Your Honor.

MR. AGUAYO: Correct, Your Honor.

THE COURT: Correct, Mr. Aguayo?

MR. AGUAYO: Correct, Your Honor.

THE COURT: Same oppositions, and same ruling.

Very well. So are we ready for some defendant's evidence?

MR. RUHNKE: Not today we're not, Your Honor.

THE COURT: You're not?

MR. RUHNKE: No, we're not.

THE COURT: What about you, Mr. Aguayo?

MR. AGUAYO: Yes, Your Honor.

THE COURT: Hmm?

MR. AGUAYO: I am, Your Honor.

THE COURT: Please.

MR. AGUAYO: Your Honor, I would like to call first Agent Carlos Barreiro.

THE COURT: Who?

MR. AGUAYO: The case agent, Carlos Barreiro.

MS. DOMINGUEZ: Your Honor, there are some matters that the Government would like to raise with respect to these witnesses. May we approach?

THE COURT: Sure.

(Bench conference held.)

MR. AGUAYO: I don't understand. She knows I was going to call him.

THE COURT: Well, let's see what it is.

MR. AGUAYO: Why is this in front of the jury?

MS. DOMINGUEZ: Well, we've discussed this before. Judge, it's my understanding that Mr. Aguayo, based on his 2-A compliance letter, that Mr. Aguayo wants to call agents to impeach certain witnesses on certain statements.

I understand that clearly where the impeachment is directed to the identification of the defendant, it is clearly a matter relevant to the issue of guilt or innocence. However, there are matters that I believe are collateral to those issues, and I wanted to bring that to the attention of the Court.

I don't know if Mr. Aguayo would like to explain to the Court for each of the three agents what the nature of the alleged inconsistency is.

MR. AGUAYO: Yes, Your Honor.

MS. DOMINGUEZ: I have transcripts of the witnesses' testimony in court, and the 302.

MR. AGUAYO: Your Honor, is there someplace I can put this down?

Your Honor, what the Government is talking about here

is trying to say that it's the collateral issue rule, and there's U.S. versus Mona Nelini Seves (ph), which of course Your Honor and Ms. Dominguez was there. That case clearly states if an issue is collateral, and I spoke -- if a matter is collateral, the matter is not relevant to the litigation to establish the facts of consequence, i.e. not relevant for the purpose of the mere contradiction of the in court testimony.

And there's a two prong test. That the testimony is offered, must not only contradict the witness's testimony, but also be material to defendant's guilt or innocence.

In this case, as to Jannette Maysonet, we're talking about two things. One, she testified concerning her identification, that he was five or six feet behind her running. Where in fact in the 302 of the FBI Agent she says that she sees him coming out of Bravos Street, which will be brought out, which is about 58 to 60 feet away. And of course that goes to his identification, and this misidentification, which is my defense.

She also said that she recognized his photo in the newspapers after his arrest in October of 2009. She said she did not say that to the agent at that time. I have the 302, which states that she said it to him at that time. So that's also very important, because it goes to identification.

MS. DOMINGUEZ: She did admit that. This is her trial testimony.

MR. AGUAYO: All right. We go further, if I might get my notes, Your Honor.

THE COURT: Sure.

MR. AGUAYO: If I might get my notes, because there is another part in here. Hold on a second. Yes, but let's go on. This is one part. If I may get my notes, please?

THE COURT: Sure.

MR. AGUAYO: If I may, Your Honor, I was doing a summary of this last night.

MS. DOMINGUEZ: There's another portion here on page 161 where I marked it.

MR. AGUAYO: Yes, there is another portion where she said, after the interview she saw it and then she called the agent. And if I can get it, I can go directly to it. Well, maybe that's it. Is that it? Let me see. What page is that?

MS. DOMINGUEZ: 161.

MR. AGUAYO: 161.

MS. DOMINGUEZ: And then again on page 162 she admits it again.

MR. AGUAYO: He said says she said it -- I kept hammering at it, and she said, I saw it afterwards, and then I called him --

THE COURT: What would be the harm? If you think about it, the agent can explain it. Okay?

MR. AGUAYO: Your Honor, that's as to that one. And

then comes as to William Ramos Vazquez. William Ramos Vazquez, again it goes to the issue of identification. He says in his testimony that he saw the shooter, purportedly David Oquendo, I'm sorry, wearing I think it was black clothes.

MS. DOMINGUEZ: He says it in his trial testimony.

MR. AGUAYO: If I may. I'm sorry. You go first.

MS. DOMINGUEZ: He said black clothes and a cap. And in his testimony, he said black clothes.

MR. AGUAYO: Exactly. People are saying caps, no caps. Your Honor, I have to work with what I have.

MS. DOMINGUEZ: Judge, whether he has a cap or he doesn't --

THE COURT: I think we should allow him to explore it. What else?

MR. AGUAYO: The next one is Jose Amesquita Semprit. Amesquita Semprit said, if you recall, Judge, during his trial testimony that during a pause is when he turned around. Then he spotted Oquendo.

In the 302 it says after the pause, during the second shooting, during the shooting was when he turned. After the pause. So that's also important for misidentification, because I want to bring out how in the world, people are shooting like crazy, you're going to be turning around.

MS. DOMINGUEZ: This is the portion he's referring

to, Judge.

MR. AGUAYO: Yeah, but it's the rough notes. That's fine, but I'm talking about the rough notes, which I showed you.

THE COURT: It seems to me no matter how you look at this, it can be explained in your closings. I don't think there is any big issue here. Let's do it.

MR. AGUAYO: Okay. Thank you, Your Honor.

(Bench conference concluded.)

MR. AGUAYO: Your Honor, we call the case agent, Carlos Barreiro.

COURTROOM DEPUTY: Raise your right hand.

Do you solemnly swear that the testimony you are about to give in this case is the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

MR. AGUAYO: Excuse me, Your Honor.

A G E N T C A R L O S B A R R E I R O,

called as a witness by Defendant Oquendo Rivas, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. AGUAYO:

Q. Sir, what is your name?

A. My name is Carlos Barreiro.

Q. You're an FBI agent?

A. That is correct.
Q. How long have you worked with the FBI?
A. For over four years.
Q. And you've been trained by the FBI?
A. Yes, sir.
Q. And as part of the training, you've received training in conducting interviews?
A. That's correct.
Q. And to record what the person being interviewed says, to take notes?
A. Yes.
Q. To take notes, yes? You also prepare a report? You prepare a report?
A. That's correct.
Q. And that report is called an FBI 302?
A. That's correct.
Q. And those 302 reports are not necessarily word for word transcriptions of what the person being interviewed said?
A. Yes.
Q. Okay. But the 302s are summaries of the interviews, correct?
A. Excuse me?
Q. They are summaries of the interviews?
A. Of the more important facts, relevant details.
Q. Okay. A summary of the important facts that the person

being interviewed, that your interviewing tells you? A summary of the important facts, correct?
A. Yes.
Q. And you take your job seriously, correct?
A. That's correct.
Q. You're not a sloppy agent, correct?
A. Of course not.
Q. Okay. So the 302s, you prepare an accurate summary of the important facts that the witness tells you during these interviews, correct?
A. Yes.
Q. And you've worked on investigation of this case, La Tombola, correct?
A. I inherited the case in 2011.
Q. You're the case agent, are you not?
A. From that point.
Q. Okay. And you've conducted interviews and prepared 302s for this case, correct?
A. Yes.
Q. Okay. Now, let's talk about February 4th, 2011, when you interviewed Jannette Maysonet Negron on that day. Do you recall who she is?
A. Yes.
Q. And you prepared a 302 of that interview, did you not?
A. Yes.

Q. An accurate 302 of what she said, correct?

A. Of what she said, yes.

Q. Okay. Now, isn't it correct, sir, that in that 302, and if you need it I have it here to refresh your memory. Isn't it correct, sir, that --

THE COURT: I think he should have a copy of that.

MR. AGUAYO: All right, Your Honor.

THE WITNESS: I would really like that.

BY MR. AGUAYO:

Q. Yes, sir. Here you go, sir. In paragraph five, all right? Do you see it, sir?

A. Yes.

Q. Isn't it correct that paragraph five states that when she arrived, referring to Ms. Maysonet, she saw an individual with a long weapon, and the individual was coming from Los Bravos Street, correct?

A. Well, I used Los Bravos Street as a reference --

Q. I'm asking you, is that what you wrote?

A. Yes.

Q. Okay. She did not say that the shooter was five to six feet behind her running toward her, correct?

A. If I may explain? I mean --

Q. I'm just asking you the question. You can explain. Please answer my question first.

THE COURT: No, no, no. I think you have to let him

explain it.

MR. AGUAYO: Okay.

THE COURT: Because it's a document he wrote. It's a summary.

THE WITNESS: Yes. Every time we were interviewing a witness, I needed a reference to know where the shooters were coming from. And when I use that the shooter was coming from Los Bravos, that means it was coming from that direction, okay?

That doesn't mean that the shooter was standing on Los Bravos Street. That means at some point -- I didn't want to use that as a measure of distance, but as a reference where the shooter was coming from.

BY MR. AGUAYO:

Q. Okay. I've got you.

A. Okay. It could have been close or far from her. The interview wasn't that detailed regarding that point. And with only -- she mentioned that the shooter was coming from there, and then she describes the shooter.

Q. All right. Are you finished?

A. Yes, sir.

Q. Okay. In your report, if a witness such as Jannette Maysonet tells you, I heard someone running behind me, I turned around, and that person was five to six feet from me, you would agree with me that's something important; isn't that

correct?

A. Yes.

Q. Yet that's not in that report, correct?

A. It's not in that report.

Q. What it says is she saw him coming from Bravos Street, correct?

A. Maybe with -- not with those words.

Q. Well, why don't we read what she says.

A. No, it's just that the report is an interpretation of what she said. It's not verbatim. I mean, it's not a transcript of what she said. I wasn't recording or writing word for word.

Q. All right. I want to be clear that there's nothing there about her turning around and seeing somebody running towards her five or six feet away?

A. It is not. It is not.

Q. And the only thing that is there concerning where she's seeing the person is, coming from Bravos Street? That's the only thing that's there, correct?

A. Which is what I put.

Q. Okay. Now, sir, Government's Exhibit --

MR. AGUAYO: May I, Your Honor?

BY MR. AGUAYO:

Q. Government's Exhibit 16. If you could turn around, sir?

THE COURT: Use the microphones, please.

MR. AGUAYO: I'm sorry?

THE COURT: Stay close to the microphones, both of you.

BY MR. AGUAYO:

Q. Now, this is the fritura stand, correct?

A. That's correct.

Q. And the street that's in front of la fritura stand, correct?

A. That's correct.

Q. And Bravos Street is all the way over here, correct?

A. Yes.

Q. Thank you. Now, sir, you know, in that interview of February 4th, 2011, approximately a year and three months after the events, she stated to you that the shooter had long blue jeans, correct?

A. Yes.

Q. And a black shirt?

A. Could you refer me to the paragraph where I described it?

Q. If I may, here.

A. I just want to make sure I have the --

Q. Here.

A. Okay.

Q. Okay. Had long blue jeans, yes?

A. Yes.

Q. Had a black shirt, yes?

A. That's correct.

Q. And a baseball cap, correct?

A. Yes.

Q. Now, let's go to paragraph seven. Isn't it correct that Ms. Maysonet stated to you during the interview that she had recognized the shooter, and she had recognized him because she saw his picture in the newspaper, she saw his picture after he was arrested in October of 2009? Correct?

A. She indicated that she recognized the shooter.

Q. Uh-huh.

A. And then saw the shooter, and then recognize -- she recognized the shooter at the incident, on October 17, 2009. And that then she recognized the shooter again when she saw the shooter in the newspaper. But it's not written there. No, no. It's okay. It's not written there, but I remember she was very, very specific.

Q. All right. Are you finished, sir?

A. Yes, sir.

Q. But here it does not say what you just said?

A. No.

Q. The only thing it says here is Maysonet indicated that she recognized the shooter?

MS. DOMINGUEZ: Judge, objection to his reading from the report.

THE COURT: Well, why don't you ask him.

BY MR. AGUAYO:

Q. I'll ask him. Isn't it correct that what you just finished saying is that she indicated that she had seen him at the events, and then she told you that? That's not there. What is there is that she said I recognized this pic -- I recognized him because I saw a picture of him in the newspaper after his arrest in October of 2009. Isn't that what's there?

A. It's what's there.

Q. Okay. Now, let's go to the second page of the 302. You showed Ms. Maysonet Negron a photo lineup, correct?

A. Yes.

Q. And she couldn't recognize David Oquendo Rivas on the first one, correct?

A. We showed to her two lineups, one containing the photo of another individual, Christian Lopez Lebron, and another lineup containing -- that contained the photo of David Oquendo Rivas.

Q. All right. So you showed her two photo arrays, sir?

A. Two photo lineups, and then a group of photos.

Q. You didn't show her 16 or 18 photos as she's testified?

A. No.

Q. So she was wrong? Excuse me, sir.

MS. DOMINGUEZ: Judge.

THE COURT: Sustained.

BY MR. AGUAYO:

Q. All right. So you showed her two?
A. Two photo lineups, and a group of photos.
Q. And she did not recognize David Oquendo in the first one?
A. In the first photo lineup that contained Christian Lebron, it was not there. And then based on the description, we presented to her the photo lineup of where -- that contained the photo of David Oquendo Rivas. And she said, I think I recognize someone, but it's the photo lineup. The photos are too small. I would like to see big photos, of bigger size.
Q. And that's when you showed her the bigger one?
A. Then we showed the photos that we had.
Q. And that's when she identified them?
A. Then she was very clear that that was the person.
Q. Thank you very much, sir.

THE COURT: Any cross?

MS. DOMINGUEZ: Yes, Judge.

CROSS-EXAMINATION

BY MS. DOMINGUEZ:

Q. Sir, do you take shorthand?
A. Excuse me?
Q. Do you know shorthand?

THE COURT: (Remarks in Spanish.)

THE WITNESS: No, sorry.

BY MS. DOMINGUEZ:

Q. So I take it that when you're interviewing these witnesses, you're not writing down verbatim everything they say, are you?

A. That's correct.

Q. You decide what you think is important and then in your own words you jot down some notes?

A. That's correct.

Q. And then sometime later, maybe days later you take a look at those notes and you try to recollect why it is that you wrote down what you wrote down and what you were meaning to say when you wrote those down, and you create a report?

A. That's correct.

Q. And that's what's known as an FBI 302?

A. That's correct.

Q. And the notes and the FBI 302, does it contain the witness' words or your words?

A. My words.

Q. And if we refer back to the FBI 302 that you wrote in this case, do you still have a copy of it?

A. Yes.

Q. The fact is, sir, that you never wrote down that the individual that Ms. Maysonet identified was on Los Bravos Street; isn't that true?

A. No. Yeah, that's true.

Q. Okay. You wrote down that the individual was coming from Los Bravos?

A. That's correct.

Q. And you explained to us that you did that because you wanted to use a reference point to show the direction from which he was traveling?

A. That's correct.

Q. So just to be clear, did Ms. Maysonet ever tell you that when she saw David Oquendo Rivas he was on Los Bravos Street?

A. She didn't.

Q. Now, do you know whether Ms. Maysonet was shown a series of photo lineups by the local authorities in this case, which she described about two inches thick? Do you know that?

A. I don't know that.

Q. Okay. So the fact is that you have shown her the lineups that you've testified about, correct?

A. Yes.

Q. But you don't know what other lineups she may have been shown when she was interviewed by the local authorities?

A. That's correct.

Q. And the local authorities were also conducting an investigation concerning this case?

A. That's correct.

Q. In fact before the FBI?

A. That's correct.

Q. And would you agree with me, sir, that Ms. Maysonet was always consistent not only in her description, physical description of David Oquendo Rivas, but also in identifying him as the person that she saw shoot at La Tombola the evening of October the 17th, 2009?

A. Yes.

Q. And with respect to the other matters that you've been asked about by counsel, would you agree with me she is in a better position to know what she heard that night and saw that night than you are?

A. Definitely.

Q. I have no other questions.

MR. AGUAYO: I have just a few.

THE COURT: I think that we're done. I'm sorry.

MR. AGUAYO: Your Honor.

THE COURT: That's it. That's it.

MR. AGUAYO: Your Honor, could I just ask if the date he wrote the rough notes is the same date that he wrote the --

THE COURT: It's done. Next witness.

MR. AGUAYO: All right. Khristopher Pagano, Your Honor.

THE COURT: Who?

MR. AGUAYO: Khristopher Pagano. Agent Khristopher Pagano.

Is he here?

MS. MATEO: He was outside.

COURTROOM DEPUTY: Raise your right hand.

Do you solemnly swear that the testimony you are about to give in this case is the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, I swear.

(At 4:21 PM, witness took the stand.)

THE COURT: Please be seated. Adjust your microphone.

THE WITNESS: Okay.

THE COURT: Mr. Aguayo, you can go ahead.

MR. AGUAYO: Thank you, sir.

SPECIAL AGENT KHRISTOPHER PAGANO,

called as a witness by Defendant Oquendo Rivas, having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. AGUAYO:

Q. Sir, what is your name?

A. Khristopher Pagano, Special Agent.

Q. Are you a special agent, sir?

A. Special Agent with the FBI.

Q. How long have you worked for the FBI, sir?

A. I've been working with the FBI since 2009.

Q. And you've been trained by the FBI, correct?

A. That is correct.

Q. And as part of that training, you received training on conducting interviews?

A. Yes.

Q. And to record what the person being interviewed says, you take notes?

A. That is correct.

Q. Those notes are a summary of your interview?

A. Yes, that is correct.

Q. And you summarize the important facts that that person is telling you in the interview?

A. Yes.

Q. You don't invent facts and put them into your 30 -- into your report or your rough notes, correct?

A. No. Correct.

Q. Never invent facts?

A. Correct, never.

Q. All right. Now, you prepare -- as you're interviewing somebody, you're preparing, you're interviewing them, you're hearing them, and you're preparing a rough draft, correct? You're doing a draft of your notes, correct?

A. That is correct.

Q. Which subsequently you put into your report?

A. That is correct.

Q. All right. Now, and of course you take your job

seriously?

A. Yes.

Q. You're not a sloppy agent, are you? Correct?

A. Correct.

Q. So the notes that you prepare are an accurate summary of the important facts of the interview, correct?

A. Yes.

Q. Okay. And you've conducted I imagine countless interviews and prepared both notes and 302s?

A. Yes.

Q. Okay. And you prepared notes and 302s for this particular case, correct?

A. Yes.

Q. Let's talk about January 20th, 2011.

A. Okay.

Q. Let me give you --

MR. AGUAYO: May I, Your Honor?

BY MR. AGUAYO:

Q. I'm showing you, do you recognize these as your rough notes of January 20th, 2011?

A. Yes, that is correct. I recognize my handwriting.

Q. Okay. And this was the interview that you had with a gentleman by the name of Jose Amesquita Semprit on that day?

A. That is correct.

Q. And you took those rough notes of the interview, correct?

A. Yes.

Q. And they are accurate as to what he had told you, correct?

A. Correct.

Q. Because you're not going to invent anything, correct?

A. That is correct.

Q. All right. On the fifth page, sir, of those notes, do you see it? This one here.

A. Okay.

Q. On the fifth page of those notes, Mr. Amesquita Semprit talks about El Gordo, correct?

A. Yes.

Q. And he identified Gordo as David Oquendo Rivas, correct?

A. Correct.

Q. And Mr. Amesquita says that the shooting started, and there was a pause, correct?

A. That is correct.

Q. And then you write, and after the pause, a shooting -- a second shooting started, correct?

A. That is correct.

Q. And during the second shooting, you write there that during the second shooting is when he saw Gordo, correct?

A. That is correct.

Q. Not during the pause, but during the second shooting, correct?

A. That is what I wrote, correct.

Q. Okay. Now, and he saw Gordo near the speakers, correct?

A. That is what I have written here in the notes.

Q. All right. So as a matter of fact, you have a croquis there, correct?

A. Yes.

Q. Okay. And where he's putting Gordo, if you're looking from La Tombola, inside looking out, he would be against the righthand wall, correct?

A. That is correct.

Q. Okay. Let's put that aside now. Let's go now to William Ramos Vazquez. You interviewed him -- you interviewed him on February 4th, 2011, correct?

A. That is correct.

Q. And you prepared a 302 of that interview, correct?

A. Yes.

Q. An accurate 302 of what he said?

A. Say that question again.

Q. An accurate --

A. Yes, that is correct.

Q. All right. And on paragraph four of that 302, Mr. Ramos according to your 302 talks about two individuals, correct?

A. Yes.

Q. And he describes those two individuals as dressed in black, correct?

A. Yes.

Q. And of course when a witness describes something important, you're going to write it down, correct?

A. Correct.

Q. That's an accurate description of what he said, correct?

A. Of his recollection, yes.

Q. All right. And he didn't say there at any time that he saw the individuals with a black cap, correct?

A. That is correct. I don't see in this 302 anything about a black cap.

Q. All right. Thank you very much, sir.

THE COURT: Wait, wait, wait.

THE WITNESS: Okay.

THE COURT: Any cross?

MS. DOMINGUEZ: Very, very brief, Judge.

CROSS-EXAMINATION

BY MS. DOMINGUEZ:

Q. Agent Pagano, when Mr. Aguayo was asking you some questions about the interview of Jose Amesquita Semprit, and he asked you about the accuracy of a particular description, you said, well, that's what it says there?

A. Yes, that is correct.

Q. So let me ask you, do you actually recall what Mr. -- what Cheito told you during that interview, Jose Amesquita, or are you simply reading from your notes and the 302?

A. I am reading from the notes and the 302.

Q. So you have no independent recollection of what Jose Amesquita Semprit told you during the interview?

A. No.

Q. So as far as you know, he could have told you that it was during the pause?

A. Correct.

Q. As a matter of fact, if you look at your 302 --

MS. DOMINGUEZ: May I approach, Judge?

BY MS. DOMINGUEZ:

Q. You don't write in your 302 that in fact the identification was made during a pause during the first shooting?

A. Correct.

Q. And that would be entirely consistent with his testimony; is that correct?

A. That is correct.

Q. Now, with respect to William Ramos Vazquez, Mr. Aguayo asked you a series of questions with respect to whether he told you that not only were the individuals dressed in dark clothing but also were wearing a baseball cap.

A. Yes.

Q. And again I take it that you have no independent recollection of what Mr. Ramos told you at the time?

A. No.

Q. And as you sit here today, you can't tell this jury whether he told you he had a cap or not?
A. Correct.
Q. Now, in your experience as an FBI Agent and writing 302 reports, would you agree with me, sir, that witnesses often don't give you all the facts of a particular event that they witnessed within one interview; is that correct?
A. That is correct.
Q. And that's because there is a lot of facts that can be elicited during an interview?
A. Yes.
Q. And would you agree with me that there are some facts that are more important than others?
A. That is correct.
Q. For example, one of the more important facts that you focus on as an investigator is a witness identification of a person's face; is that correct?
A. That is correct.
Q. And did you focus on that during William Ramos' interview?
A. Yes.
Q. And was he consistent in his identification of David Oquendo Rivas as one of the shooters?
A. That is correct.
Q. Now, sir, the fact that a witness may not give you a

particular fact, does that mean that it didn't happen?

A. No. It could have well happened.

Q. And again, as you sit here today, you don't remember whether William Ramos told you that the person also had a cap?

A. I don't remember.

Q. I have nothing further.

THE COURT: One question.

MR. AGUAYO: Yes, sir.

THE COURT: As long as it's not along the same lines as you asked before.

MR. AGUAYO: No, sir. It's a different question.

REDIRECT EXAMINATION

BY MR. AGUAYO:

Q. Sir, isn't it correct that the same day that you wrote these rough notes, January 20th, 2011, is the same day you wrote your report?

A. No. No. That -- we have five working days to start our 302s. And during that time, as you well imagine, we are interviewing other people and following other leads.

Q. Sir, I'm looking at the -- giving you -- this is the wrong one.

MR. AGUAYO: Excuse me, Your Honor. It seems to have disappeared, Your Honor. Excuse me.

Thank you Mr. Hegyi.

BY MR. AGUAYO:

Q. Sir, your rough notes, what date do they have?
A. In the rough notes?
Q. Yes.
A. Date received 1-20-11.
Q. Okay. And here?
A. 1-22-11.
Q. Okay. And your report?
A. This is William Ramos, and this is Jose.
Q. I'm sorry. I'm sorry. I'm sorry. It's the wrong one.

MS. DOMINGUEZ: Which one do you want?

MR. AGUAYO: It doesn't matter.

MR. RUHNKE: Are you talking about Cheito?

MR. AGUAYO: Yes. No, this isn't it either. No further questions.

THE COURT: Thank you very much. You are now excused.

THE WITNESS: Okay. I'm excused? Thank you.

(At 4:33 PM, witness excused.)

THE COURT: Do you have any additional witnesses now, Mr. Aguayo? Mr. Aguayo, anything else for today?

MR. AGUAYO: I have other witnesses, Your Honor, if Your Honor wants me to continue.

THE COURT: The other person is here?

MR. AGUAYO: Yes, Your Honor.

THE COURT: Okay. We should then perhaps adjourn

at -- let the jury go so I can deal with that other situation.

MR. AGUAYO: Yes, sir.

THE COURT: Okay. Members of the jury, we're going to finish for today. I still have to hear some other persons that I have to make an assessment as to whether they're going to testify or not. Remember that you are not to discuss this case with anyone or allow anyone to discuss this case with you. Until you retire to the jury room at the end of the case, you simply are not going to talk about this case.

Do not read or listen to anything touching upon this case in any way. No research or investigation on your own. Keep an open mind. We are not finished by any means. We have to receive a lot of evidence, too, because the parties have told me they have evidence to offer.

So with that in mind, I will let you go, and we will see you tomorrow morning at the usual hour. Thank you.

COURT SECURITY OFFICER: All rise.

(At 4:34 PM, jurors left courtroom.)

THE COURT: Please be seated. Mr. Aguayo, you can call your proffer. Do you have the person here?

COURTROOM DEPUTY: Raise your right hand.

Do you solemnly swear that the testimony you are about to give in this case is the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Mr. Aguayo.

MR. AGUAYO: Yes, sir.

D R. J O H N C. B R I G H A M,

called as a witness by Mr. Aguayo, having been sworn, testified as follows:

VOIR DIRE EXAMINATION

BY MR. AGUAYO:

Q. Sir, would you please state your name for the record?

A. Dr. John C. Brigham.

Q. And could you tell us your employment history, sir?

A. Yes. I have Master's and Doctorate Degrees from Duke University and University of Colorado in social psychology. From 1969 until 2004, I was on the faculty of Florida State University as a professor, then -- associate professor, then professor. Since 2004 I've been an emeritus professor at Florida State.

Q. And what courses did you teach while you were at Florida State University?

A. The main two courses I taught were psychology in law and social psychology.

Q. And your educational background, sir?

A. Yes. A Bachelor's Degree from Duke University in 1964. A Master's Degree and Ph.D. Degree from University of Colorado. The Ph.D. was in 1969.

Q. Sir, what are your primary areas of research?
A. I am a social psychologist. My primary area of research since about 1975 has been studying the factors that effect the factors of eyewitness memory.
Q. You have publications relating to eyewitness reliability?
A. Yes, I do.
Q. Approximately how many, sir?
A. Approximately 55 publications in journals on eyewitness memory.
Q. Are these publications in peer reviewed journals?
A. Yes, they are.
Q. What exactly does that mean?
A. That's a means of quality control in sciences when you do a piece of research, and analyze the data, and write it up. Then you submit that manuscript to the appropriate scientific journal. The editor then reads it and sends it out, usually to two or three experts in the area.

They all read it and prepare careful reviews pointing out the strengths and weaknesses of the article and the research. The article editor then evaluates all of these things, and then decides whether the article should be published as is, which almost never happens, or is publishable with revisions, as suggested by the reviewers, or that it should be revised and resubmitted where it goes through the review process again, or that it be rejected.

The idea is it's a quality control kind of mechanism, and in social psychology, about 80 percent of the articles that are submitted for publication are rejected eventually. So it's only the best 20 percent that actually get published.

Q. And you have been published?

A. Yes.

Q. And have you received any research grants, sir?

A. Yes. I've received several research grants from the National Science Foundation and National Institute of Justice for studying eyewitness memory.

Q. All right. And you stated the purpose of those research grants were for?

A. Studying various aspects of eyewitness memory.

Q. How did you obtain those research grants, sir?

A. You submit a grant proposal to the granting agency, and then it goes through a peer review process where it is sent out to several reviewers as experts in the area. And then generally they have a committee that meets two or three times a year that evaluates all the proposals that have been given, along with the reviews that have been made of it, and decides which proposals are worthy of receiving grant money.

Q. Are you a member of any professional organization, sir?

A. Yes, I am.

Q. Which one, sir?

A. The major ones in the American Psychology Association, I'm sorry, American Psychological Association and the American Psychology Law Society.

Q. Have you held any offices?

A. Yes. I'm former treasurer and president of the American Psychology Law Society. I've been on the Board of Directors of the American Psychological Association.

Q. Have you attended and/or presented papers at professional meetings?

A. Yes, I have.

Q. How many?

A. Well over a hundred meetings in the U.S., and Canada, and Great Britain, Whales, Scotland, Italy, and Australia.

Q. Have you attended professional presentations by other researchers on eyewitness memory?

A. Yes, I have.

Q. How many, sir?

A. Well over -- many hundred in the various conferences that I've gone to.

Q. Have you been a member of a general editorial board?

A. Yes, I have.

Q. Which one, sir?

A. The editorial board in social psychology and the law, in human behavior, and the -- basically that applies to social psychology.

Q. What were your responsibilities?

A. On the editorial board, you serve as one of the chief reviewers, so that you get sent a lot of the manuscripts that are submitted to the editor. He farms them out to the editorial board as well as to other reviewers.

So you review perhaps several dozen manuscripts each year in that role.

Q. Sir, how much research is there on factors effecting eyewitness reliability?

A. Since about 1970, there have been several thousand studies done on this issue. It's been the hottest area in the area that's going to be called psychology and law. There's been more studies on this issue than any other.

Q. And the nature of that research?

A. It's experimental research, or correlational research, or survey research, or archival research, sir.

Q. What is archival research?

A. Archival research has to do with getting the records of actual crimes, and trying to find consistencies. And the value of it is that you deal with real crimes, real issues. The problems are that every crime is different, and you can't easily combine crimes into one big analysis.

So archival analysis in my view is best used for identifying problems, issues that come up in real cases that you can maybe analyze psychologically, scientifically, and

then doing correlational and experimental research to actually examine those problems scientifically.

Q. And how much experimental research is there?

A. There is, as I said, several thousand experimental studies that have been done.

Q. And exactly what do you mean by experimental research?

A. Studies that have generally -- well, all of them use the scientific method. They manipulate variables. They measure behaviors. They do the appropriate statistical analysis, and they draw legitimate conclusions about what the research shows in terms of the hypothesis of the study.

Q. Are you familiar with this type of research, sir?

A. Yes.

Q. And how do you stay familiar?

A. I stay familiar by reading the psychological journals, also searching as a reviewer for other people's work, and attending psychological conferences.

Q. Sir, how -- have you been qualified as an expert on eyewitness issues?

A. Yes, I have.

Q. How often, sir?

A. I've been qualified as an expert, probably perhaps a hundred times, but I've actually testified at trial before a jury 37 times.

Q. In which jurisdictions, sir?

A. Excuse me, that's in 11 states and the District of Columbia. Also, six times in Federal Court.

Q. Okay.

MR. AGUAYO: Your Honor, I would tender Mr. Brigham as an eyewitness identification expert.

THE COURT: Any voir dire?

MR. HEGYI: No voir dire at this point.

Your Honor, if Counsel has his CV -- this is the first I've heard this gentleman's name. We've never been provided with his name, CV.

MR. AGUAYO: Your Honor, I apologize. I was going to bring Mr. Penrod, and then I had to make the quick arrangements.

MR. HEGYI: We'll deal with it. It's just I had heard of Penrod, and I was ready to talk about Penrod.

THE COURT: Right, but we knew Penrod was not coming, that's for sure.

MR. AGUAYO: I'm sorry.

THE COURT: I understand.

DIRECT EXAMINATION

BY MR. AGUAYO:

Q. Dr. Brigham, has there been much research over eyewitness testimony in the last several decades?

A. Yes, there has.

Q. Why?

A. Two main reasons. One is the study of memory is a very basic aspect of all psychology in studying human behavior. The second, an increasing awareness that eyewitness mistakes have lead to more convictions of innocent people than has any other factor.

Q. And, sir, what do you see as your role in testifying at this trial?

A. When I testify at a trial, I see my role as providing the jury with information, what has been found by psychological research about the various factors that have been studied, some of which will be relevant to any particular trial, so that the jurors may use this information if they wish in coming to decisions about the various issues in the trial.

It is not my role to comment on specific witnesses or try to impugn the veracity of any witness. The idea is people are going to have to make, jurors have to make very tough decisions. And it's been shown in the area of eyewitness memories through surveys that a lot of people have incorrect beliefs about eyewitness memory, how accurate it is, and the factors that effect it.

So the idea is to supply them with more accurate beliefs, as shown by the research as to what the important factors are, and the type of impacts they are likely to have on the average individual's memory.

Q. Would those be factors like stress?

A. Yes.
Q. Weapons focus?
A. Yes.
Q. The short duration of time where one views a person that you subsequently identify?
A. Yes.
Q. Retention intervals?
A. Yes.
Q. In other words, you see them today, and then a year and a few months later you identify them?
A. That would be an issue, yes.
Q. Post event information?
A. Yes.
Q. Lineup instructions by the officers?
A. Yes.
Q. Unconscious transfers?
A. Yes.
Q. All right. Let's just talk a little bit about this. In terms of stress, what could you help the jury with?
A. Well, what research surveys have shown is that many people believe that stress burns something on your memory. You see something and it's so stressful you'll never forget it. And people often feel that way.

What research shows is that's not the way human memory works. In fact, high stress interferes with the

encoding of memory.

Q. Say that again, sir?

A. High stress interferes with the encoding of memory, so memory doesn't get into the brain as fully or accurately when somebody's under high stress as it does when they're just moderately aroused. So that -- I'm sorry. So that witness to a highly stressful crime is in a very difficult situation in many ways, but what the research has shown is that their memory is more likely to be in error than if they were witness to a less stressful incident.

Q. Okay. What about weapons focus?

A. What the research has shown here, when a weapon is involved in crime or an incident, that has two effects. One is it raises the level of stress even higher, but second, the people tend to focus their attention on the weapon rather than on the face of the person holding it.

So they spend less time looking at the person's face. Therefore, they encode a less strong memory and are more likely to make an error later on when trying to identify that person.

Q. And what about the duration, how much time they have to view the person?

A. What the research shows, as people would probably expect, is that the longer you have to see somebody, the more likely you are to be able to encode an accurate memory of them. It's

a little more complicated though because other research shows when people are asked how long a stressful event had taken, they generally exaggerate by a factor of two or three the length of time.

Q. What does that mean?

A. That means if they say it took a minute, it probably took more like 20 or 30 seconds. If they say it took 30 seconds, it probably took ten or 15 seconds. People exaggerate the length of time that a stressful event took.

Q. And what about retention interval?

A. Yes. That's the interval between witnessing an event and trying to identify somebody at the event. And the longer the retension interval, the poorer the memory is for two different reasons. One is people forgetting. The longer the time period, the more you're going to forget, the so-called forgetting curve.

But secondly, the longer the time period, the more time there is for post event information. That is, other information about the crime or the criminal that the person hears about, sees, even just thinks of. And that can interfere with their memory.

Memory doesn't sit there like a computer file or photograph. Our memories are constantly changing in our brains without our awareness. And when somebody is exposed to post event information, that's like changing their memory and

makes it less accurate without them being aware of that. And the longer the time period, the more chance there is for that to happen.

Q. All right. And you stated lineup instructions. Are you referring to what agents, when they're showing photo arrays or lineups, the instructions that should be given?

A. Yes.

Q. Could you explain a little bit more on that?

A. Yes. There's been a good deal of research to that, too, and what it shows is that so-called biased instructions tend to produce biased results, tend to increase the likelihood that someone will make a mistake. And the research has shown, so there have been, excuse me, guidelines put forth by the Department of Justice to try in consultation with law enforcement and attorneys and psychological researchers to develop instructions that will minimize this bias and get the most accurate information from the persons looking at the lineup.

Q. This is the Federal Department of Justice?

A. Yes, Federal Department.

Q. And these would be instructions to be given to, for example, FBI agents, DEA agents, anyone who's going to --

A. Yes, police, anyone who's going to administer the lineup to a witness.

Q. What kind of instructions are those, sir?

A. What they say is you should emphasize that the person may or may not be in the lineup. You should emphasize that -- tell people you'll be giving them a bunch of pictures, that you will ask for -- if they make a decision, you'll ask them how certain they are at the end. Also, to emphasize that the investigation will continue whether or not you make an identification.

It's been found that some people worry, if I don't identify somebody, they'll stop the investigation. So they go ahead and identify somebody on a hunch or a guess, a couple others that I'm currently blanking on.

Q. And how about unconscious transfer?

A. Unconscious transfer is a fancy name. It's also been called memory blending. It's been found that when -- it's -- the hardest part of a memory to remember is its source. And most people experience this in their own lives in very trivial ways. You remember somebody said that, or you heard it somewhere, and you can't remember what the source of a particular belief or fact is, or you get it wrong. You found out it wasn't that person you thought, which is trivial in every day life, but if it's in part of a court situation in the criminal justice system, then it's no longer trivial.

And what's been shown both experimentally and in actual cases is people often confuse a memory from one source, they think it came from a different source. So, for example,

somebody who was a customer in a convenience store several days before a robbery, after the robbery, particularly if the person looks a little like the robber, they may be misidentified as the robber.

The person correctly remembers they've seen the person before. They incorrectly remember where they've seen them, that it's actually from being in the store before.

There are hundreds and hundreds of reports of that type of incident. So any time you have a person who has been seen under one condition, they may be misidentified as having been encountered under a different situation.

Q. How about the issue of filler selection, the fillers?

A. Yes. A good lineup, photograph lineup generally consists of six photos, the suspect and five others. The five others should be similar in general appearance to the suspect, so that the suspect is not distinctive in any way, either in terms of his own characteristics or in terms of the photograph or the background in the photograph.

Research has shown any time one lineup member is distinctive, people whose memories are not very good, they're most likely to pick that person. Their eyes are drawn to the one picture that stands out from the others, and they're more likely to guess that person. If the person is distinctive, because he fits the description of the criminal more than the other five, then that's particularly problematic, because

witnesses may recognize that he fits the description that they gave and may pick him out for that reason even if he's not the guy.

Q. Finally, sir, what about blind administration?

A. What's been suggested and urged actually as a policy and adopted by many states and cities in the U.S. is the person administering the photo lineup not be aware of who the suspect is. And that's traditionally, it's the same detective whose case it is who puts together the lineup and shows it to the eyewitness. And the problem or the potential problem there is either intentionally or unintentionally, that person may communicate to the witness who he thinks the suspect is, or the criminal is number one, two, three, four, five or six.

And again, research has shown in experimental sessions people will do that even when they're not trying to. They're not trying to mislead anybody. They're not trying to mislead the witness. But they know who it is they think, and through expressions, smiling, head nods and so forth they sometimes communicate to the witness who they would like them to pick. And witnesses do that.

If on the other hand -- and that's one of the things, the instructions are trying to minimize that, but to minimize that more, if the person is someone else who administers the lineup who doesn't know who is the suspect, then you don't have that problem. Then you cannot

intentionally or unintentionally bias the responses of the witness.

Q. What about divided attention?

A. Any time there is more than one object in a situation, people can't look at everything at once. So I mentioned already when there's a weapon, when there's more than one person, when there's more than one object, be it guns, cars, other people, people have to divide their attention between these various parts of their official environment, so they spend less time looking at any one aspect. And that makes it harder for them to encode an accurate memory of say a person's face.

Q. And how about alcohol? Does that take away from the encoding?

A. Yes. Research has shown that alcohol is one of those other drugs that interferes with the encoding process, so less gets in, and what gets in is less accurate than without the alcohol or drugs.

MR. AGUAYO: Your Honor, I will -- that would be all for me.

BY MR. AGUAYO:

Q. Oh, just one last question. That would be your role in the trial, to give an overview to the jurors as to these different areas?

A. Yes.

MR. RUHNKE: May I ask some before the cross starts?

THE COURT: Do you have any?

MR. RUHNKE: Just a couple questions.

EXAMINATION

BY MR. RUHNKE:

Q. Dr. Brigham, good afternoon.

A. Good afternoon.

Q. Just a couple of questions about identification. Have there been studies done with regard to people wearing baseball caps and the role that the hairline and the overall shape of the face plays in ability to recognize?

A. Yes, there have. And what is found is that a cap or a hat reduces accurate identification, because it takes away one cue, namely the hair and the hairline, and sometimes hair color.

Q. And this may be obvious, too, but what about masks?

A. Yes. Masks, well, anything that interferes with getting a good look at the full face and ears and hair and so forth reduces the quality of the memory and makes it more likely someone's going to make a mistake in trying to identify someone.

Q. And I don't know if I heard you testify to this or not. Is there a difference between showing photographs in a single photo spread and showing them sequentially?

A. Yes. And what the so-called sequential lineup is is

something that's been recommended in recent years, including in a Department of Justice report. A sequential lineup would be rather than seeing six photographs all at the same time, you're shown one photograph at a time. And after each photograph, you're asked, is this the person.

So it's a harder task, but what research shows is then you would not want to have the suspect be the first picture you show. What happens when you do that, as compared to a regular lineup, is you cut down a little bit on the number of hits, but you cut down a great deal on the number of mistakes. So overall you get more accurate responses with a so-called sequential lineup than you do with a simultaneous lineup.

Q. And is it the research that when you give a single photo spread, people tend to go to the person who most resembles the person they saw?

A. Yes.

Q. And again, I don't know if you testified to this or not, is there such a thing called a double blind lineup, photo lineup?

A. Yes.

Q. Did you testify about that?

A. Well, I didn't use that term.

Q. Could you explain what that is?

A. Yeah. What that means is basically what I described in

other terms. The person who's administering the lineup doesn't know who the suspect is, so he's blind, he or she is blind to who it is, as well as the witness himself, herself is blind to who it is unless they can identify them.

Q. Is that to avoid the effect of unconsciously indicating a correct choice or steering somebody unconsciously toward a correct choice?

A. Exactly, yes.

Q. And in terms of instructions, is it the better practice to tell a witness the person may or may not be in this lineup, and we just want you to look?

A. Yes. Research has shown if you don't tell them that, people are more likely to guess, and they're more likely to guess wrong.

Q. Because they think they wouldn't be showing him or her a photo spread unless the person was in it?

A. Exactly. They tend to look at it as a multiple choice test. Here it is. Who is he? And you'll hear witnesses, I've narrowed it down to these two or three, and they're trying to figure out who it was. With a memory regarding that perspective, if you've narrowed it down to two or three, you shouldn't be identifying anybody.

Q. And in a situation where a subject claims to have know someone previously, would it be important to know when was the last time they've seen him, what were the circumstances of the

knowledge of the person?

A. Yes.

Q. And those could all factor into accurate identification?

A. Yes.

Q. Have there been studies that show they can make a mistake even in identifying a person they know?

A. Yeah. The better they know them, the less likely they are to make such a mistake, but particularly when they know them to only a partial degree, then they're more likely to make the mistake.

Q. So where it's a person they don't know very well, they're more likely to make a mistake than if it's their brother?

A. Right. And there could be more likely unconscious transfer, because the person looks familiar, but they don't know where from.

Q. You said post observation contamination, so if someone sees an event, sees something and then is repeatedly exposed to publicity, that features a photograph of that person, is that what you're talking about?

A. Yeah, that would be one instance that would taint their memory terribly if they saw a photograph of someone or if they saw them at a hearing or even heard things about them or even thought about the situation. All of this changes what's in memory.

Q. Thank you, Doctor. I have nothing further.

THE COURT: Please.

MR. HEGYI: Thank you.

CROSS-EXAMINATION

BY MR. HEGYI:

Q. Hi, Doctor.

A. Hi.

Q. You have told us you've actually been accepted as an expert witness I think you said 37 times?

A. In state court, and six times in Federal Court, yes.

Q. And have there been times you've come in and prepared to testify in Dauber hearings and the courts have said thanks but no thanks?

A. Yes.

Q. Many times?

A. Many times in state court, not very often in Federal Court.

Q. But your practice is mostly state court, right?

A. Yes.

Q. Okay. Now, I've been in law enforcement for a lot of years. It sounds like since you were there. I'd ask you to agree that years ago in the '70s, when I was a cop, we were taught to go away from the sequential ones, where you're putting a photograph down and then another photograph down and another photograph down, because we were being accused of

subconsciously sending off vibrations to the victim or the witness to pick the one that we wanted. And that's why we were criticized by psychologists such as yourself, and that's why we went to the single photo array, correct?

A. Well, it's true that it's easier to bias a sequential lineup, the way you put it down, how long you show it.

Q. If you nod your head?

A. Right.

Q. Or cough, whatever you do?

A. Right.

Q. You clear your throat? You leave it there longer than the next one? And that because of the criticism from persons like yourself, that's why law enforcement went to doing a photo array where all the photographs are placed in front of the witness at the same time, and the witness can view them all at the same time, as much as he or she wants, and decide for him or herself whether they recognize the person or not, right?

A. Well, lineups were being used far, far before the '70s when this research got going. So lineups didn't arise from this research. They were already being used. They were very often live lineups in the past, and more often photographic lineups more recently.

Q. Now, Doctor, it seems to me that there are different areas or pivot points or fracture points with regard to

eyewitness identifications. And I think you sort of touched on some of them, but I'd like to visit you with some others. Much of the research focuses on things like cross-racial identifications, doesn't it?

A. Correct. Yes.

Q. So if, for instance, an eyewitness is of the same race as the perpetrator, there is much less concern that they're going to get it wrong. Fair enough?

A. There's less concern, right.

Q. Right. And if, for instance, the person was a stranger, had never seen the person before, versus knows them, even knows their name, has seen them scores of times, there's much less concern about a known individual, somebody who is well acquainted with the perpetrator, than there is of a stranger on stranger thing, correct?

A. Yes.

Q. And if the perpetrator has distinctive characteristics, for instance prominent moles that are in certain spots, and they can be described by the victim or the witness, and then they're able to select a photograph, and low and behold there it is right where they said, that's something that gives you confidence, more confidence in terms of being able to stand behind that identification?

A. Actually, no. That would be a biased lineup. In other words, if one of the lineup members had those moles and the

other five didn't --

Q. No, no. You mistake me.

A. Okay.

Q. If what's done is they actually cover them up, so what happens is for instance if say the person has a tattoo of a dollar sign below their right eye here, and so what you do is you end up blacking out or whiting out by everyone's right eye --

A. Right.

Q. -- that spot, and the victim ends up going, that's him right there, and in fact that person does have a dollar sign tattooed below their right eye, that's one you'd have good confidence in, correct?

A. More confidence, yes.

Q. All right. Now, if for instance individuals had grown up, since they were little kids, had known somebody essentially their entire life, seen them every day for most of their life, and know their voice, know them by sight, and that person indicates they recognized his voice, locked eyes with him, know him anywhere, it was him, can say the name, does say the name, and in fact you're able to say that there is indeed this long standing relationship between them, good confidence in that ID?

A. Yes, relatively so, yes.

Q. And even if someone, for instance, had been -- had known

somebody forever, their whole life, happens to get shot in the neck, falls to the ground but can hear, there's a pause, and can hear the person shouting as he's coming through the door, no one gets out alive, and the person actually thinks this is the last words that I'm going to hear, and knows that's who it is, gets shot eight more times on the ground by the individual, but because of having been shot in the neck isn't able to actually see anymore, and says that's the person, I would never forget him, I know that voice anywhere, pretty good confidence in that?

A. Pretty good, although so-called -- sometimes those ear witnesses and ear witness memory turns out to be even worse than eyewitness memory. It doesn't mean it's wrong, but it's not as easy as it might seem.

Q. That's what I want to get clear on. We're not saying people are wrong. We're just talking about potential shades of gray?

A. Mistakes, yes. Honest mistakes.

Q. Potential mistakes?

A. Yes.

Q. Because in truth of fact, most of the time when people say, that's him, and I'm positive it's him, it turns out it's right, isn't it?

A. Yes. It's been estimated about two-thirds of the time they're right. That is a Supreme Court case last year. And

about one-third of the time they're not, on average.

Q. Okay. And if for instance two people who know a perpetrator very well, know his name, seen him lots of times, and those two individuals, independent of one another, independent, don't know the other one's gone to the police, don't know the other one's talked to the police, they independently provide the police with the name and the description of that individual, are you with me?

A. Yes.

Q. Before any photo arrays are shown, I know him, this is who it is, pretty good IDs, pretty good confidence, two separate people, two different locations watching the same thing?

A. Yes.

Q. Okay. And then if a third individual who doesn't know the perpetrator ends up selecting the same photograph, independently, doesn't know the other two people have gone to the police, doesn't know -- doesn't know even that the other two people have said anything, but independently selects from a photo array that individual, the same one, pretty good confidence in that, too?

A. Yeah. The issue might be even if all three of these pick the same guy, if the same biasing factors effected all three of them, it could -- it could still not be the guy, although chances would be that it would be.

Q. We're getting into sort of the microscopic areas?

A. Small I'd say.

Q. But -- (attorney indicating.)

A. About -- (witness indicating.)

Q. Now, there's also concerns with identifications that may not have other corroboration, correct?

A. Correct.

Q. So, for instance, if somebody is selected by one or more individuals, perhaps some that know him and some that don't, and say two days later he's in a -- being caught with a cousin and several guns, and one of those guns comes right back to that crime scene, that's pretty good corroboration when the people end up picking him out or calling him by name saying I know him and here's what his name is?

A. That would be certainly important to the jury. It wouldn't effect what I would say, because I'm talking only about the identification situation.

Q. Right, but when we're looking for corroboration, isn't that something people are concerned about, whether we have the right guy or the wrong guy?

A. Sure.

Q. Okay. And the fact he might have the gun that was from the scene two days later in his constructive possession, that's pretty powerful evidence you picked the right person, isn't it?

A. If I were a juror, I'd probably think that, yes.

Q. Now, a lot of the studies, it seems like maybe even most of the studies that are done actually on how well people remember things are done really with students in college environments, correct?

A. Correct.

Q. And those studies themselves get criticized and have been criticized for a number of reasons. What kind of reasons are you aware of that those studies generally get criticized?

A. Well, one of the issues is for obvious ethical issues, you cannot terrorize or mistreat college students like victims of violent crimes are often terrorized or mistreated.

Q. And to go along with that, it means that when -- college students that are getting their Coca Cola, or 20 bucks for sitting in there and doing it, and God knows what they've been up to before they do it and after they do it, but they know they're involved in some experiment and it's fun, it's a game, you know, it's not real, when they look at something and say oh, yeah, that's him or it's not him, they don't have the come to Jesus moment where they're sitting here realizing if I pick this person out, they may well get locked up. And they may go away for a long time, and I need to be really serious about this.

As opposed to that, what we've got is a bunch of 18-year-old kids that are involved in a game, right?

A. Well, it's true the consequences are clearly different. We do know also that college students, contrary to stereotype, do take research experiments seriously.

Q. Some of them do?

A. Most of them do actually.

Q. I guess one wonders how one really studies that, whether they really take it seriously or take it partly seriously?

A. You watch them, compare them with adults of different ages to see if they perform similarly. College students typically perform better.

Q. Okay. But we're talking about adults that are also playing games. They're also brought in in panels, and it's also not real, right?

A. Some are not. Some are situations they thought are real. For example, we did studies using convenience store subjects and bank tellers as subjects when they had no idea at the time that this wasn't a real situation. So there are some studies that are so-called staged event studies that participants do think are real. And you get the same kind of results as you do when it's more obviously an experiment.

Q. Doctor, when you've been in this field for quite a while, you understand that individuals, anybody on the street knows that eyewitnesses can get it right or they can get it wrong, right?

A. Yes.

Q. And jurors that come in and sit in a box in a court, any court in the United States, any court in Puerto Rico, they already know, eyewitnesses can get it right, eyewitnesses can get it wrong?

A. What surveys show is the average juror doesn't know how bad -- they know at an abstract level that, yeah, eyewitnesses can be wrong, but what research shows is they tend to very much over believe eyewitnesses in terms of the likely error rate of their identification.

Q. But when you say they over believe in the eyewitness identification, you're doing it based on the studies that you've done which are, and that other people have done which are pretend situations?

A. Well, again, they're not all pretend situations.

Q. Well, a lot of them are?

A. A lot of them are, yes.

Q. And you're factoring all of them in together?

A. (Nodding head up and down.)

Q. For instance, there have been studies that have been done that show that, you know, people who are victims of fraud, those people tend to react more like the mock victims or the mock eyewitnesses than people who are actually victims of violent crimes, correct?

A. I'm not sure about that.

Q. But you know of a study done by John Yule?

A. Yule, yes.
Q. You know about him?
A. I know some of his work. I don't think I know that study.
Q. And you know of Elizabeth Loftus? You know about her?
A. Yes.
Q. And she also is not a particular fan of the kind of work that you're doing, correct?
A. Actually, she's done much of that work.
Q. Right, but she doesn't -- but she doesn't testify for defendants in these cases like yourself?
A. She has done that for 30 years.
Q. Are you aware of her -- let me see. I see, yes, but what she's done is question the studies that are going forward?
A. She's questioning the archival studies --
Q. Right.
A. -- which are Yule's work. Yule does archival research.
Q. Now, you know the work of Howard -- is it Egeth?
A. Egeth, yes.
Q. And his concerns with regard to the mock eyewitnesses and how they don't perceive events in the same manner as true eyewitnesses do?
A. The last article of his I saw was about 1985. They had a conference at Johns Hopkins on eyewitness memory, and he presented a paper there that was later published. So he's an

early critic. I don't know of anything that he's published on that in the last 25 years.

Q. How about the Expert Psychological Testimony about Eyewitnesses in Updates in Psychology, Science and Human Affairs? He says, in honor of William Bevan, published in 1995 by him --

A. I've never heard of that book or the article.

Q. Doctor, in a case where five of the six eyewitnesses or ear witnesses to the case know the individual or individuals, and have identified them by name, do you really have much to add here?

A. I think so. And again, it's up to the jurors to decide what they want to do with it, but any time there's been an eyewitness identification made under extremely stressful situations, particularly with a weapon involved, I think it is important that jurors be made aware of the factors that may play a role in that. And if it turns out that the other evidence they consider very strong, they may not pay a lot of attention to the research, but I think it's important that they know about it so they can realize what factors might be important and decide whether to use that research or not.

What research on jurors also shows is that when expert testimony about eyewitness memory is given, jurors tend to spend more time deliberating. And not deliberating just on the eyewitness evidence, but on all the evidence. They pay

closer attention to all the evidence when they've got this expert testimony about eyewitness memory.

Q. Doctor, do you think it would be helpful to the jury simply, or perhaps in lieu, to have a jury instruction that focuses the jury on things such as what you're saying?

A. I think that would be more useful than not having anything. What we know from research on jury instructions themselves, however, is that often jurors either misunderstand or don't pay much attention to jury instructions.

Now, that's gotten better in recent years I think, but in the past, anyway, jury instructions according to the -- research has shown to not be a very good way of communicating information to jurors.

Q. But it is a way?

A. It is a way, yes.

Q. And, Doctor, you'll agree, won't you, that you can't say with any degree of scientific certainty whether any of the witness IDs in this case are faulty, can you?

A. No.

Q. Okay. And there is simply no scientific way to determine that, is there?

A. Right.

MR. HEGYI: Can I have a moment, Your Honor? Pass the witness.

MR. RUHNKE: Just one follow-up question, if I can.

One follow-up area, a couple questions.

THE COURT: Very briefly.

MR. RUHNKE: Okay. Very briefly.

FURTHER EXAMINATION

BY MR. RUHNKE:

Q. You said that jurors and lay people tend to overvalue eyewitness identification. What do you mean by that?

A. Well, there have been studies, for example one thing, one study we did years ago was present subjects with descriptions of three situations involving robberies and ask them for each of those, if a hundred witnesses who were -- who saw that situation, if they are presented a fair lineup that did have the perpetrator in it, how many -- what percentage, how many of those hundred would be able to pick him out.

And those three cases had actually been used in research, so we knew how many people actually picked them out. And when we asked people how many would pick them out, 82 of our suspects overestimated the number of people that would pick them out.

Q. In other words, they overestimated the number of people who were actually able to make an identification from a lineup?

A. Yes.

Q. And the studies also show that lay people tend to think of memory as you described it, as a computer file, a videotape

that merely needs to be rewound and replayed?

A. Yeah, a lot of people do. And that belief is slowly being eroded, but still a surprising number of people do believe that it's -- that, I'll never forget a face, or people never forget a face, which again, is simply not true. But a lot of people believe that.

Q. And there's been enumerable cases throughout history of people who said, I would never forget a face, who turn out to be dead wrong, correct?

A. Yes, sir. Yes.

MR. RUHNKE: Your Honor, I have nothing further on that.

THE COURT: Thank you very much.

You can sit in the back a minute, sir.

(At 5:22 PM, witness left the stand.)

THE COURT: Would counsel please approach the side bar a minute?

(Bench conference held.)

THE COURT: Will this be basically what he's going to testify to?

MR. AGUAYO: On the overview, yes, Your Honor.

THE COURT: What do you mean, on the overview?

MR. AGUAYO: Not, for example, Jannette Maysonet, what do you think of her --

THE COURT: He's not going to comment on any

particular evidence?

MR. AGUAYO: No. He's going to just give an overview.

THE COURT: Okay. This is what I think. This could be either way. This could be either way. The truth of the matter is that the case is a serious case. Depriving one of the defendants of this evidence versus the other would be so -- something that maybe the Court of Appeals won't like. Let me put it that way.

It seems to me that both sides can easily deal with this issue in the context of the evidence and in the context of direct and cross-examination. I'm not going to take a risk. I'm going to allow it, and you people deal with it.

MR. HEGYI: May I ask Your Honor a question? Do they each need a person?

THE COURT: Are you both going to bring them?

MR. RUHNKE: Your Honor, I've got practical difficulties. I've listened to Dr. Brigham this afternoon. I do want to talk to my expert, but my inclination right now is to say he's providing the same information she would provide.

THE COURT: Okay. Because I don't think we need two, but anyway, that would be perhaps too much. Anyway, let's do that. So tomorrow we'll take his testimony if you want to offer it, okay?

MR. AGUAYO: Okay.

MR. RUHNKE: And then we'll go ahead.

THE COURT: Frankly, I think it favors more the Government than you, but anyway.

MR. AGUAYO: Well, Judge, in all fairness, I'm going to be thinking about everything that was brought out here, and I'll decide whether to go forward or not. That's it.

MR. RUHNKE: Well, if he doesn't go forward, then I'll take him through direct.

THE COURT: Well, sure.

MR. AGUAYO: If he's still here.

MR. HEGYI: Could we get a copy of his CV, please?

MR. AGUAYO: Yeah, yeah.

THE COURT: This is a gamble. Let me put it that way. Anyway, that's it. Tomorrow morning.

MR. RUHNKE: Your Honor, what about scheduling?

THE COURT: What do you mean by scheduling?

MR. RUHNKE: Assuming we wrap all the evidence up tomorrow.

THE COURT: You think you're going to wrap all the evidence tomorrow?

MR. RUHNKE: I think so.

MS. MATEO: How come you're looking to me?

MR. RUHNKE: I'm looking towards the rebuttal department.

MS. DOMINGUEZ: At this time, at this point, we don't anticipate any rebuttal.

THE COURT: You honestly think you're going to finish all your evidence tomorrow?

MR. AGUAYO: I have -- if I bring him, I have --

THE COURT: We have to have the charge, we have to talk about it.

MR. AGUAYO: I have five witnesses.

THE COURT: I don't think we're going to finish tomorrow.

MR. RUHNKE: Okay. I believe we are, but that's just my opinion.

THE COURT: I will -- I will give you some time to prepare for your closings.

MR. AGUAYO: Thank you, Your Honor. I really appreciate it.

THE COURT: Somehow. That gives me time to fine tune the instructions, too, and discuss them with you.

MR. RUHNKE: Yes. When do you want to have a charging conference?

THE COURT: As soon as I have a draft of the thing for you to take a look at.

MR. RUHNKE: Sure.

MR. HEGYI: Your Honor, do you charge the jury before we close?

THE COURT: No, no. After. After. Because if something goes really wrong, I'll clean it up in my instructions.

MR. HEGYI: Okay. And you're going to get -- okay. Thank you, Your Honor.

MS. MATEO: Thank you, Judge.

(Bench conference concluded.)

(At 5:27 PM, proceedings concluded.)

* * *

U.S. DISTRICT COURT )
DISTRICT OF PUERTO RICO)

I certify that this transcript consisting of 242 pages is a true and accurate transcription to the best of my ability of the proceedings in this case before the Honorable United States District Court Judge José Antonio Fusté on March 4, 2013.

S/ Amy Walker
Amy Walker, CSR 3799
Official Court Reporter