```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF PUERTO RICO

 3

    UNITED STATES OF AMERICA,
 4
                    Plaintiff,
 5    v.                              Docket No. 09-427

 6                                    San Juan, Puerto Rico
    ALEXIS CANDELARIO SANTANA, and    March 6, 2013
 7  DAVID OQUENDO RIVAS,

 8              Defendants.
    _____

 9

10                      JURY TRIAL

11      BEFORE THE HONORABLE JUDGE JOSÉ A. FUSTÉ,

12             UNITED STATES DISTRICT JUDGE.

13    _____

14  APPEARANCES:

15  For the Government:      Mr. Bruce Hegyi, AUSA
                             Ms. Maria Dominguez Victoriano, AUSA
16                           Ms. Marcela Mateo, AUSA

17

18
    For the Defendants:      Mr. David Arthur Ruhnke, PHV
19                           Mr. Francisco Rebollo Casalduc, Esq.
                             Mr. Jose R. Aguayo, Esq.
20

21

22

23

24

25  Proceedings recorded by stenography.  Transcript produced by
    CAT.
```

```
1                         I N D E X

2   WITNESSES:                                    PAGE

3       SPECIAL AGENT CARLOS BARREIRO
        Direct examination by Mr. Hegyi            26
4
        GUILLERMO GONZALEZ
5       Direct examination by Ms. Mateo           30
        Cross-examination by Mr. Aguayo           35
6
        MILDRED PEREZ
7       Direct examination by Ms. Dominguez       38
        Cross-examination by Mr. Aguayo           40
8       Redirect examination by Ms. Dominguez     41

9       DAISY COLLAZO TORRES
        Direct examination by Ms. Mateo           45
10      Cross-examination by Mr. Aguayo           50

11      VALENTIN PEARSON CEPEDA
        Direct examination by Ms. Dominguez       55
12      Cross-examination by Mr. Aguayo           57

13      MOISES FRANCO MIRANDA
        Direct examination by Ms. Dominguez       59
14      Cross-examination by Mr. Aguayo           61

15      JOSE GONZALEZ SERRANO
        Direct examination by Ms. Dominguez       62
16      Cross-examination by Mr. Aguayo           64
        Redirect examination by Ms. Dominguez     65
17      Recross-examination by Mr. Aguayo         66

18      LUIS ANGEL MOYET RIVERA
        Direct examination by Ms. Mateo           67
19      Cross-examination by Mr. Aguayo           70

20      ANTONIO NUNEZ FOX
        Direction examination by Mr. Hegyi        71
21

22

23

24

25
```

1                        INDEX (Continued)

2                                                      Page

3    WITNESSES (Continued):

4        IRIS DONES
         Direct examination by Mr. Aguayo              86
5        Cross-examination by Ms. Dominguez            87

6

     EXHIBITS:
7
         Government Exhibit Seven                       29
8        Government Exhibits                            31
         Government Exhibits 211-212                    47
9        Government Exhibit 207                         70
         Defendant Oquendo Rivas Exhibits 7-9          36
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              San Juan, Puerto Rico

 2                              March 6, 2013

 3                              At or about 8:50 AM

 4                      *      *      *

 5          THE COURT:  Let me say first, by 11:00 I should have

 6   a pretty comprehensive draft of the charge which I can share

 7   with you.  The point is, later in the day we can meet and

 8   discuss it.

 9          I noted on the record this morning that as of now,

10   there has been no submissions by either side of a proposed

11   charge for the guilt phase.  That's okay.  I really usually do

12   my own instructions.  If there is something filed, I look at

13   it of course.

14          This proposed charge -- this is a complicated

15   Indictment, so what I have done is that I have -- I have

16   segregated the principals by topics basically, the enterprise,

17   things of the sort, like that, you know.  Of course I will

18   explain to the jury that the Indictment is an index, is not

19   evidence of anything of course, but it's a good index that

20   they have to follow with an appropriate verdict form that I

21   haven't prepared, but I will today, to be able to then analyze

22   count by count and circumstance by circumstance.

23          For example, you have some complicated counts, like

24   for example Count I that includes the enterprise, the RICO

25   thing, and everything else, and includes also a special
```

1   allegation on drug dealing, see.  So in that sense, even

2   though it's a RICO count, it's also in a sense a conspiracy to

3   possess with intent to distribute.  Things -- you have to --

4   you have to somehow explain this in a coherent form to a

5   non-lawyer, and I've tried to do that.

6           I have included alibi instructions.  I have included

7   identity instructions.  I have included everything I can think

8   of.  If we left something out, of course we're going to deal

9   with it.  And if I committed some mistake, of course we're

10  going to correct it, too.

11          One thing that popped up in my mind in the middle of

12  the night when I was looking at this was the binder, I have

13  not looked at that, that contains the transcript from state

14  court.  Why were some transcripts added to that?  What did

15  they say?  That's the question.

16          MR. RUHNKE:  The transcripts contain Mr. Candelario's

17  actual entry of guilty pleas, his admission, and what he says

18  on the record to accept responsibility for these crimes.

19          THE COURT:  Is there any material that you people

20  continued to use to somehow mitigate or collaterally attack

21  the sentences?

22          MR. RUHNKE:  We do not intend to collaterally attack

23  the sentences, Your Honor.  The judgments will always be in

24  place.  What is in there is a very minimal plea colloquy.  He

25  plead guilty.  What is in there is a statement from the Judge,

1    you understand if you were found guilty of any of these

2    charges on first degree murder, you would go to prison for 99

3    years.  And under this, you'll be sentenced to a maximum of 12

4    years.

5             There's no discussion in there of what you did that

6    makes you guilty of these crimes.

7             THE COURT:  Right.  But of course, of course these

8    convictions were never attacked, never appealed.  He served

9    time for them.

10            MR. RUHNKE:  Yes.

11            THE COURT:  There are no state proceedings

12   collaterally attacking them at any point in time.

13            MR. RUHNKE:  And there could not be.

14            THE COURT:  Could not be.  But the thing is this,

15   what is the purpose of having that material in there?

16            MR. RUHNKE:  The purpose is to put it in connection

17   --

18            THE COURT:  Well --

19            MR. RUHNKE:  It would be one thing if these contained

20   detailed admissions of, I chopped up the body of Jimmy Velez

21   Nelson for example.  They do not.  And I think the jury's

22   entitled to know what he did when he entered his guilty

23   plea.

24            THE COURT:  Let me say this.  I have to look at this

25   binder.  I know you stipulated the binder basically.

```
 1              MR. RUHNKE:  Yes, sir.

 2              THE COURT:  But I am convinced after doing research

 3   for more than three weeks already that these convictions

 4   cannot be even remotely explained, minimized or attacked in

 5   the context of this case.  There is no case law that says

 6   that.  On the contrary, all the case law is to the effect that

 7   convictions of this nature, other than for -- other than for

 8   issues that pertain to basically a failure, a total failure on

 9   the part of assistance of counsel, you know --

10              MR. RUHNKE:  Your Honor, the --

11              THE COURT:  -- cannot be explained or mitigated.  I

12   want to look at that, because if your intention is to do that,

13   once I have looked at the transcript, I haven't, so I don't

14   know what they say, I may then exclude those transcripts.

15   Mark them as Court exhibits, and give an instruction, if you

16   dare to say in your closings that -- try to do that, I'm going

17   to give an instruction on collateral attack.  I'm not going to

18   allow that.

19              MR. RUHNKE:  There's a difference between

20   collaterally attacking a conviction, which is time barred, and

21   way beyond the doable at this point.  We actually discussed

22   that with people who practice regularly in the state courts of

23   Puerto Rico, and we're told that it's impossible to -- it

24   would have been impossible to collaterally attack these

25   convictions.  But, for example, there is -- the jury may well
```

1    think that by entering guilty pleas to these charges,

2    Mr. Candelario accepted a detailed responsibility; he admitted

3    that he shot this person; he admitted that he dismembered the

4    body.

5            THE COURT:  Wait a minute.  But isn't that -- I mean,

6    he admitted to the murder.

7            MR. RUHNKE:  Your Honor, you should look at these

8    transcripts.

9            THE COURT:  I have to look at them.

10           MR. RUHNKE:  You should look at them.

11           THE COURT:  I have to look at them.

12           MR. RUHNKE:  Because it was done in a way that would

13   never have been acceptable in Federal Court.

14           THE COURT:  It doesn't really matter.

15           MR. RUHNKE:  I know.

16           THE COURT:  It doesn't really matter.  All I'm going

17   to tell you is I have to look at it, but if I find that the

18   purpose is to somehow in a gentle way create some sort of

19   doubt about the conviction or how serious it was in that

20   sense, let's call it some sort of attack against the

21   conviction or minimizing the conviction, I will not allow

22   it.

23           MR. RUHNKE:  Not minimizing the conviction, but it's

24   important to us to put it into context, because the jury may

25   well think, as I said earlier, that he was asked, did you

1   shoot this person, did you shoot that person.

2          THE COURT:  The jury doesn't have an idea of how you

3   plead guilty to anything.  The jury doesn't have the ability,

4   nor I will give them instructions on change of plea colloquys

5   or anything of the sort.  All I have is a conviction.  I want

6   to look at the folder.

7          MR. RUHNKE:  Okay.

8          THE COURT:  The thing is, last night it just bugged

9   me, because I remember in the opening statement Mr. Rebollo

10  tried to do that and I cut him off.

11         MR. RUHNKE:  Yes, sir.

12         THE COURT:  And nothing else happened regarding that

13  during the trial, see?  And then the binder was admitted in

14  evidence, and was kind of stipulated, some transcripts.  And

15  last night, when I was finishing the charge, probably two

16  o'clock in the morning, I just said, I wish I had the binder

17  to take a look at it, because it bugged me thinking that

18  perhaps the purpose of this was precisely what I think it

19  is.

20         MR. RUHNKE:  It's context, Your Honor.  I mean, the

21  Government will argue and -- I expect the Government to argue

22  that he pled guilty to each and every one of these murders,

23  and therefore, there's no doubt that he's guilty of these

24  murders.  There's a conviction.  There's a judgment.

25         Your Honor is going to instruct the jury at some

| | |
|---|---|
| 1 | point that the judgment is not enough standing alone -- |
| 2 | THE COURT:  Of course not. |
| 3 | MR. RUHNKE:  -- to establish the verdict. |
| 4 | THE COURT:  You have to connect the judgment with the |
| 5 | accusation in this case.  I mean, if he murdered somebody in |
| 6 | 1997, or whatever it was, let's take the chopping of the body, |
| 7 | that's a state murder. |
| 8 | MR. RUHNKE:  Yes. |
| 9 | THE COURT:  But for it to be something that pertains |
| 10 | to us here, it has to be connected to the enterprise of |
| 11 | course.  Of course.  I will instruct the jury about that. |
| 12 | MR. RUHNKE:  I think Your Honor's point was slightly |
| 13 | different, but I don't have the opinion sitting in front of |
| 14 | me. |
| 15 | THE COURT:  Well, show it to me, because I really |
| 16 | want to see what it said.  I could not find it last night.  I |
| 17 | was so tired at some point I didn't look anymore. |
| 18 | MR. RUHNKE:  I actually have it in court. |
| 19 | THE COURT:  Sure.  We can do it later in the day. |
| 20 | I'm just alerting you so we can discuss it. |
| 21 | MR. RUHNKE:  Your Honor, there's two other issues to |
| 22 | raise with you.  One is Mr. Hegyi has discussed the expert |
| 23 | witness from the Bureau of Prisons and the sealed record. |
| 24 | THE COURT:  I have not received anything from the |
| 25 | Judge.  Nothing. |

1          MR. RUHNKE:  Okay.

2          MR. HEGYI:  If I may get the microphone?

3          THE COURT:  Strange.  Usually judges respond to

4    judges, but he hasn't.

5          MR. HEGYI:  I have this to report, Your Honor.  The

6    Capital Case Unit trial lawyer that tried that case is on

7    paternity leave.  It wasn't there when I was having kids or

8    you, but --

9          THE COURT:  I never had paternity leave.

10         MR. HEGYI:  Right.  I've gotten ahold of him.  He has

11   e-mailed me a whole group of items.  It isn't an encyclopedia,

12   but he e-mailed them.  The issue is he said I think these are

13   under a protective order.  I think these may not be under a

14   protective order.

15         What we would I think jointly ask you to do is if you

16   would not mind indicating, whatever I will turn over to him

17   would just be used for the purposes of this case.

18         THE COURT:  Absolutely.

19         MR. HEGYI:  Then I feel comfortable, and I think

20   Mr. Ruhnke does, that we don't get in trouble with the Judge

21   over there.

22         THE COURT:  The Judge over there was -- I wrote to

23   him.  I asked him for his help.  He hasn't responded.  So

24   whatever happens in Las Vegas stays in Las Vegas.

25         MR. HEGYI:  Fair enough, Your Honor.  I'll get those

 1 | to Mr. Ruhnke.

 2 |         THE COURT:  Very well.  I'll protect you.

 3 |         MR. RUHNKE:  It's docket 767 filed on January 17,

 4 | 2013.

 5 |         THE COURT:  Can I see it?

 6 |         MR. RUHNKE:  Yes.

 7 |         THE COURT:  767.  This is precisely what I'm telling

 8 | you.  I don't see anything inconsistent in 767 to what I'm

 9 | telling you.

10 |         MR. RUHNKE:  Your Honor, there is a statement by the

11 | Government you quote there.

12 |         THE COURT:  Where?  19?  Look at it and see whether

13 | it's paragraph 19.

14 |         MR. RUHNKE:  Yes, it's that paragraph.  And you said

15 | you would instruct the jury consistent with the Government's

16 | statement.  Well, it says what it says.

17 |         THE COURT:  Yes.  I have to instruct the jury, my

18 | understanding is, and believe me, this is my first RICO case.

19 | I don't pretend to be a RICO expert.  My understanding is that

20 | these state court murders that were disposed of by a local

21 | Judge, for which he served time and which are alleged in this

22 | Indictment, have to be connected.  There must be a nexus

23 | between those and the pattern of racketeering activity that is

24 | also charged in this case.  And I have to let the jury know

25 | that.

1          They have to -- if they don't have that evidence, if

2     they cannot make that finding beyond a reasonable doubt, of

3     course those judgments mean nothing.  That's prior conduct

4     that he served time for.  Is that so?

5               MR. RUHNKE:  Sure, to -- but what I thought the Court

6     was going to instruct them, what the Government said is the

7     fact that he plead guilty standing alone does not establish

8     that he committed those murders.  And that's what --

9               THE COURT:  That's not what I say here.

10              MR. RUHNKE:  That's what the Government's statement

11    is.

12              THE COURT:  I'm sorry.  That is not the law.

13              MR. RUHNKE:  I'm just quoting what the Government

14    said and what Your Honor stated.

15              THE COURT:  I'm sorry.  That is not the law.  The law

16    is what I said there in that memo.  It's very clear.  Very

17    clear.

18              So let me have that binder, because I really want to

19    look at it as soon as I can, because I have no idea what this

20    is, and --

21              MR. RUHNKE:  Your Honor, there was one more brief

22    matter.

23              THE COURT:  Sure.

24              MR. RUHNKE:  With the Court's permission, Mr. Rebollo

25    and I would like to divide the closing argument.

```
1              THE COURT:  I don't care.  Of course.

2              MR. RUHNKE:  Thank you.  It won't take any more

3   time.

4              THE COURT:  No problem with that at all.  Of course

5   not.

6              MR. AGUAYO:  Good morning, Your Honor.

7              THE COURT:  Yes.

8              MR. AGUAYO:  It's my understanding that this morning

9   the Government will be putting on some rebuttal witnesses.

10             THE COURT:  You're going to put what, some rebuttal

11  evidence?

12             MR. AGUAYO:  Yes.  It's my understanding, sir, that

13  they'll be putting on some rebuttal witnesses.  I have asked

14  Mr. Hegyi for a proffer.

15             The first witness, which is the case agent, Carlos

16  Barreiro, they want to put in as I understand it a photo array

17  which includes Christian Ortiz Rivera.  Quite frankly, I don't

18  see how that goes to rebuttal of an alibi.

19             THE COURT:  I don't understand.  He will have to

20  explain that to me.

21             MR. AGUAYO:  That's what I -- before they put me on

22  the stand --

23             THE COURT:  Yes.  Let's see what it is.

24             MR. HEGYI:  Would you like me to proffer to the

25  Court?
```

1          THE COURT:  Sure.

2          MR. HEGYI:  Sure.  The defense in this case we

3  suspect is going to argue in the last stipulation for instance

4  that we expect them to introduce in this case that the DNA on

5  the nine millimeter that left the shell casings at the scene,

6  while a mixture, the primary person who deposited it, the

7  primary contributor is in fact Christian Ortiz Rivera.  Who's

8  his cousin.

9          The DNA cannot say who the others are or are not.  So

10 we expected that what they're going to do is argue to the jury

11 that the eye witnesses got it wrong, that the real shooter

12 that was there was Christian Ortiz Rivera, and it's a

13 misidentification.  It's his cousin.  They probably look just

14 alike.  And so they could have easily gotten it confused.  And

15 as a result, we would like to -- it's already in evidence and

16 I would like to have the case agent look at the photo array

17 that's in evidence and put a box on it and say, this is

18 Christian Ortiz Rivera.  And also in evidence is a photo array

19 of David.

20          And so the jury can look at them and say, wow, those

21 two people look completely different.  So that's why we want

22 to do that with the case agent.

23          MR. AGUAYO:  The question there, Judge, is how does

24 that rebut the alibi defense?

25          THE COURT:  Well, he's not referring to the alibi

```
 1   defense.  He's referring to the stipulation.
 2            MR. HEGYI:  The stipulation that you have that you're
 3   going to be putting into this case that's going to say the DNA
 4   primary contributor is Christian Ortiz Rivera.
 5            THE COURT:  I think it's totally relevant.  I mean,
 6   if the stipulation is in, that's in.
 7            MR. AGUAYO:  Well, it hasn't gone in yet, but it will
 8   go in, Your Honor.
 9            THE COURT:  Sure.
10            MR. HEGYI:  Then the next person we expect to call,
11   and -- that agent last night driving the speed limit went from
12   the front of La Tombola to the Las Gaviotas development, to
13   the gate, and will be here to testify how long it took to
14   drive from one to the other.  He also went and measured the
15   wall, and we'll explain where the wall is in front of the
16   building.  And we'll indicate the height of the wall from the
17   ground to the top of that wall, and the location of where that
18   wall is.
19            In addition, we expect to call the president of the
20   Association there.  And she will, we expect, indicate that
21   there are -- that that house that is immediately behind where
22   that wall is, that doesn't have the spikes in it, has been
23   abandoned for eight years.  So that the logical inference is,
24   first of all, it's not that tall.  Second of all, there's no
25   spikes on top of it.  Third, that people were jumping over
```

1    that wall all the time, and going in and out.  And they're

2    unobserved.

3           And that, Your Honor, will be the direction.

4    Remember, the security officer Malave said the dark-colored --

5    he called it black, the dark-colored pick-up truck pulled up,

6    wouldn't open the windows, and left and went in that

7    direction.  That that's precisely the direction where that

8    wall is low and where there are no spikes and the abandoned

9    house is.

10          THE COURT:  Circumstantial evidence of probability.

11          MR. HEGYI:  Correct.  Correct.

12          THE COURT:  That's what it is.

13          MR. HEGYI:  And she will also be able to talk about

14   the relative distance between that house, the abandoned house,

15   and where David was living.  We're interviewing some of the

16   neighbors that we expect are going to be able to talk about

17   that night and whether there was or wasn't a party going on

18   out there; whether or not they saw David out there.

19          There is the officer that's going to move in the

20   register, which indicates that I think the day before, shortly

21   before he'd seen David driving an F -- Ford 150 pick-up

22   truck.

23          THE COURT:  What color?

24          MR. HEGYI:  It's the entry that's there.  That's

25   actually in evidence, but he's going to --

| | |
|---|---|
| 1 | MS. MATEO:  It's an ID. |
| 2 | MR. HEGYI:  I'm sorry.  It hasn't been moved into |
| 3 | evidence.  It's been identified.  But he's going to indicate |
| 4 | that's his handwriting, and David was driving a Ford F-150 |
| 5 | pick-up truck. |
| 6 | MR. AGUAYO:  That pick-up truck? |
| 7 | THE COURT:  I don't know.  I wasn't there.  It's just |
| 8 | circumstantial evidence. |
| 9 | What else? |
| 10 | MR. HEGYI:  And then, Your Honor, we're trying to run |
| 11 | this down now, but I believe it's Special Agent Pagano is the |
| 12 | person who had interviewed Mr. -- Security Officer Malave. |
| 13 | And the 302, which I believe it's going to be Christopher |
| 14 | Pagano is the one that wrote it, that Security Officer Malave |
| 15 | didn't say it was a black pick-up as he did here, just a dark |
| 16 | pick-up.  And that may have some relevance. |
| 17 | MS. MATEO:  And just for correction, it's going to be |
| 18 | Agent Nunez, not Pagano. |
| 19 | MR. HEGYI:  Sorry. |
| 20 | THE COURT:  Well, let's proceed.  Let's bring the |
| 21 | jury in and proceed. |
| 22 | MR. AGUAYO:  Your Honor, excuse me.  If they bring in |
| 23 | the neighbors or even Daisy, the president, if there are rough |
| 24 | notes or Jencks -- |
| 25 | THE COURT:  Of course.  Of course. |

1           MR. AGUAYO:  -- before they put them on --

2           THE COURT:  Of course.  They have to give them to

3    you.

4           MR. HEGYI:  Your Honor, there aren't -- these are

5    people we just spoke to last night, and today.  We're talking

6    to them now.

7           THE COURT:  Which is in a sense kind of an

8    embarrassment that you had to do this last night.  Not you.

9           MR. HEGYI:  We are where we are.

10          THE COURT:  Your predecessors in the case --

11          MR. HEGYI:  We are where we are, Your Honor.

12          MR. AGUAYO:  Does that include Ms. Daisy?  They're

13   saying they interviewed those people last night, but what

14   about -- I'm sorry.  I don't know her last name.  Ms. Daisy,

15   the president.

16          THE COURT:  I understand that it was last night, too.

17   They talked to her last night.

18          MR. AGUAYO:  Well, Your Honor, that might not be

19   correct, because if you recall, when Luis Malave testified

20   here on a Saturday, Maria Dominguez was asking him about

21   whether he loaned a car to David Oquendo.  And it's my

22   impression they had interviewed her by the time that Malave

23   testified.

24          THE COURT:  Why don't we just wait until it

25   happens.

1          MR. AGUAYO:  All right.

2          THE COURT:  And we'll give you the flexibility to

3  figure this out.  And if there is any objection to be made,

4  you'll make it.

5          MR. AGUAYO:  Thank you.

6          THE COURT:  Because it's very difficult to put a

7  finger on the basis of what a guy says and what the other guy

8  says.

9          MR. AGUAYO:  Yes, sir.

10          THE COURT:  That's why you have to try the case.

11          Let's bring the jury in.

12          I haven't seen the transcripts of course, but it

13  depresses me simply listening to the description you made of

14  the transcripts.

15          MR. RUHNKE:  Your Honor, the Government had taken the

16  position that the pleas alone were not enough to establish the

17  racketeering act.  That was the position taken by the

18  Government, and that's the position we took.

19          THE COURT:  The judgment is the one -- the judgment

20  plus the explanation, the connection.  It has to be.

21          MR. RUHNKE:  But the explanation from the defendant

22  at the time I think is especially given what the Government's

23  likely to argue about it --

24          THE COURT:  We'll see what it is.

25          MR. RUHNKE:  Okay.

1           THE COURT:  Let me just figure this out.  All I'm

2   saying is I have to figure it out.

3           MR. RUHNKE:  Thank you.

4           COURT SECURITY OFFICER:  All rise.

5           (At 9:14 AM, jury entered courtroom.)

6           THE COURT:  Well, let's proceed.

7           Any rebuttal evidence?

8           MR. HEGYI:  Your Honor, I believe there's two

9   stipulations.

10           THE COURT:  Yes.  Very well.  Let's deal with the

11   stipulations.  These were pending to close your case.

12           MR. AGUAYO:  Plus the judicial notice, Your Honor.

13           THE COURT:  Yes.  Can I see them?  Perhaps I --

14           MR. AGUAYO:  Yes, sir.

15           THE COURT:  Perhaps I can read them or --

16           MR. AGUAYO:  Yes, sir.

17           THE COURT:  They are signed?

18           MR. AGUAYO:  Yes, sir.

19           THE COURT:  Well, let's mark them as exhibits,

20   because they are stipulations.

21           You want to put in the notice of alibi defense or you

22   want to instruct the jury about it?

23           MR. AGUAYO:  I want to put it in.

24           THE COURT:  Any objection about that?

25           MS. DOMINGUEZ:  No, Your Honor.

1          THE COURT:  Very well.  Put in the alibi defense.  I

2     already incorporated it into the instructions, by the way.

3          COURTROOM DEPUTY:  Defendant's Seven.

4          (At 9:16 AM, Defendant's Exhibit Seven admitted into

5     evidence.)

6          THE COURT:  Very well.  I understand.  Let me explain

7     this to you, okay?

8          MR. AGUAYO:  Sure.

9          THE COURT:  Members of the jury, there are two

10    additional stipulations that I should read.  They will be

11    marked as exhibits.  They will be exhibits what?

12         COURTROOM DEPUTY:  Eight and Nine.

13         THE COURT:  Eight and Nine.  Eight is a stipulation

14    of facts as to DNA evidence, and that's between David Oquendo

15    Rivas and the Government, with no objection on the part of

16    Mr. Candelario and his lawyers.  But it's basically a

17    stipulation between Oquendo and the Government.

18         It reads as follows, and remember that stipulation is

19    evidence in the case:

20         "That two nine millimeter semi-automatic pistols that

21    were recovered on October 20, 2009, at the time of the arrest

22    of Christian Ortiz Rivera and David Oquendo Rivas were

23    submitted to the Institute of Forensic Sciences, the

24    Institute, in 2009 for DNA testing.  In 2009, 2010, the

25    protocols at the Institute did not permit for the analysis of

DNA samples that contained DNA mixtures from more than one

person.   In 2009 and 2010, it was determined that the two nine

millimeter semi-automatic pistols recovered on October 20,

2009, contained DNA mixtures from more than one person.

Recently, the Institute's protocols progressed and

did allow the Institute to do a more sophisticated DNA

analysis on DNA samples that contain mixtures of the DNA

samples of more than one individual.

On February 27, 2013, Institute serologist Mariel

Candelario Gorbea, who is not related to Alexis Candelario

Santana, completed her report in which she provided her

opinions concerning the further analysis of the DNA mixtures

previously obtained from the two nine millimeter

semi-automatic pistols.

In her report, DNA expert Candelario Gorbea found and

determined the following facts that the United States and

David Oquendo agreed and stipulate to be true and correct:

Both the nine millimeter semi-automatic pistols contain DNA

from at least three separate individuals.  Each person whose

DNA is located on an item, whether or not that person's

identity is known or unknown, is referred in the DNA field of

science as the contributor of the DNA to the particular item.

One of the three or more contributors on each of the

two nine millimeter semi-automatic pistols was found to be the

major contributor, and the other contributors were minor

1    contributors.  Meaning that one person's DNA was more dominant

2    and/or plentiful and/or pure on the nine millimeter

3    semi-automatic pistols than was the DNA of the other two or

4    more minor contributors.

5            As part of the DNA analysis, a sample of David

6    Oquendo Rivas' DNA was submitted to the Institute for

7    analysis.  DNA expert Candelario Gorbea determined that the

8    major contributor of DNA on both nine millimeter

9    semi-automatic pistols was Christian Ortiz Rivera.  And the

10   DNA expert Candelario Gorbea was not able to determine one way

11   or another -- or other the identities of any of the two other

12   minor contributors of DNA that were on either of the two nine

13   millimeter semi-automatic pistols."

14           And this is signed by all the parties concerned.

15   That's the stipulation.  This would be Exhibit Eight.

16           Exhibit Nine pertains to El Nuevo Dia, Primera Hora,

17   and Vocero newspapers.  The stipulation is to the following

18   effect, and is between the Government and David Oquendo.

19           "That a photograph of David Oquendo Rivas was never

20   published in El Nuevo Dia between the days of October 17,

21   2009, and February the 4th, 2011.

22           Number two, that a photograph of David Oquendo Rivas

23   was never published in Primera Hora newspaper between the

24   dates October 17, 2009, and February 4, 2011.

25           Three, that a photograph of David Oquendo Rivas was

1   never published in El Vocero newspaper between the dates of

2   October 17, 2009, and February 4, 2011."

3        This is the stipulation.  It's signed by those

4   involved, including no objection on the part of the other

5   defendant.  This would be Exhibit Nine.

6        This formally rests your case, correct?  Fully,

7   fully, correct?

8        MR. AGUAYO:  Yes, Your Honor.

9        THE COURT:  Very well.  Thank you.

10       Any rebuttal?

11       MR. AGUAYO:  I'm sorry.  You did have judicial notice

12   of the alibi, correct, sir?

13       THE COURT:  I'm sorry?

14       MR. AGUAYO:  We are getting judicial notice on the

15   notice of alibi of September 2012?

16       THE COURT:  It's marked as evidence.

17       MR. AGUAYO:  Thank you, Your Honor.

18       THE COURT:  Yes.

19       So there is some rebuttal evidence we would like to

20   hear that --

21       MR. HEGYI:  Yes, Your Honor.  With both defendants

22   having rested, the Government in its rebuttal case would call

23   Special Agent Carlos Barreiro.

24       COURTROOM DEPUTY:  Raise your right hand.

25       Do you solemnly swear that the testimony you are

1    about to give in this case is the truth, the whole truth, and

2    nothing but the truth, so help you God?

3              THE WITNESS:  I do.

4      S P E C I A L   A G E N T   C A R L O S   B A R R E I R O,

5         called as a witness by the Government, having been sworn,

6         testified as follows:

7                        DIRECT EXAMINATION

8    BY MR. HEGYI:

9    Q.   Good morning, Agent.  You've already testified in front

10   of this jury.  Would you just remind the jury what your name

11   is, sir?

12   A.   My name is Carlos Barreiro.

13   Q.   And for approximately what -- approximately what point in

14   time did you take over as being lead agent for the FBI in this

15   investigation and case?

16   A.   January of 2011.

17   Q.   In the course of this investigation, Agent Barreiro, more

18   than one, were various photo arrays created that contained the

19   photograph of defendant David Oquendo Rivas?

20   A.   Yes.

21   Q.   And were various photo arrays, meaning more than one,

22   created that contained the photograph of Christian Ortiz

23   Rivera, his cousin?

24   A.   That's correct.

25   Q.   I'm going to indicate -- let me go ahead and hand you

```
1    what are in evidence as Government's Exhibits Seven and Eight.

2    Do you recognize what are Government's Exhibits Seven and

3    Eight?

4    A.    Yeah.  Exhibit Seven contained a photo lineup.  That

5    photo lineup contained a photo of Christian Ortiz Rivera.

6    Q.    Okay.  And is that one of the lineups that was used at

7    some point in this case?

8    A.    Yes.

9    Q.    And there are six photographs, and you're indicating one

10   of those six is Christian Ortiz Rivera; is that correct?

11   A.    Yes.

12   Q.    And then what is in evidence as Government's Exhibit

13   Eight?  What is contained in that, sir?

14   A.    It's a photo lineup that contains the photo of David

15   Oquendo Rivas.

16   Q.    And is that one of the lineups that was used with certain

17   witnesses in this case?

18   A.    Yes, it was available.

19   Q.    Would you use -- do you have a pen with you?

20   A.    I don't, sir.

21   Q.    Here.  Use this.  It's a different color.  Using that red

22   pen, sir, would you look at Government's Exhibit Number Seven

23   that's in evidence, and would you put a square box around the

24   person there that is Christian Ortiz Rivera?

25   A.    (Witness indicating.)
```

```
 1   Q.    And would you put the name Christian Ortiz Rivera next to
 2   that?  And then put your name and today's date, March 6, 2013
 3   so we won't get confused as to who it was that was putting
 4   that box there or the date?
 5   A.    (Witness indicating.)
 6   Q.    Have you now done so?  Today is the 6th, March 6th.  Have
 7   you now done so?
 8   A.    Yes.
 9            THE COURT:  Let me have my pencil back.
10            MR. HEGYI:  I'm going to ask him to do it on the
11   back.
12            THE COURT:  It's not easy to get that kind of red
13   pencil anymore.
14            MR. HEGYI:  The Government reoffers Government
15   Exhibit Seven now as modified by this --
16            THE COURT:  Very well.
17            MR. HEGYI:  -- agent and requests to publish it to
18   the jury.
19            (Government Exhibit Seven admitted into evidence.)
20   BY MR. HEGYI:
21   Q.    And with Government's Exhibit Eight, would you do the
22   same thing?  Put the red box around the individual that is
23   David Oquendo Rivas, and please write his name there and your
24   name and the date.
25            THE COURT:  So this Christian Ortiz Figueroa --
```

```
 1              COURTROOM DEPUTY:  Rivera.
 2              THE COURT:  -- Agent, is the alleged cousin of David?
 3              THE WITNESS:  Yes.  Christian Ortiz Rivera, sir.
 4              THE COURT:  And he has nothing to do with Christian
 5    Lopez Lebron?
 6              THE WITNESS:  No.
 7              THE COURT:  Okay.
 8    BY MR. HEGYI:
 9    Q.   Have you now done so, sir?
10    A.   Yes.
11              MR. HEGYI:  May the record reflect I'm returning the
12    red pen to the Court.
13              THE COURT:  Red pencil.
14              MR. HEGYI:  And may I now publish this to the jury?
15              THE COURT:  Sure.
16              THE WITNESS:  I'm sorry.  I made a mistake.  I put
17    Rivera instead of Rivas.  I'm sorry.  I was --
18              THE COURT:  Here's the red pencil.
19              MR. HEGYI:  And I am again returning the red
20    pencil.
21              THE COURT:  Thank you.
22              MR. HEGYI:  Thank you, Your Honor.
23              I pass the witness.
24              THE COURT:  Any cross?
25              MR. AGUAYO:  No cross.
```

```
 1                    THE COURT:  Thank you very much.  You are now
 2   excused, sir.
 3                    (At 9:28 AM, witness excused.)
 4                    THE COURT:  Next witness, please.
 5                    MS. MATEO:  The Government calls Guillermo
 6   Gonzalez.
 7                    MR. HEGYI:  Your Honor, just so I'm being proper, I
 8   think I forgot to reoffer Government Exhibit Eight.
 9                    THE COURT:  I think you did.
10                    MR. HEGYI:  Okay.
11                    THE COURT:  In any event, they are both in evidence.
12                    (At 9:29 AM, Government Exhibits admitted into
13   evidence.)
14                    THE COURT:  Guillermo Gonzalez.
15                    COURTROOM DEPUTY:  Raise your right hand.
16              Do you solemnly swear that the testimony you are
17   about to give in this case is the truth, the whole truth, and
18   nothing but the truth, so help you God?
19                    THE WITNESS:  Yes, I do.
20                    G U I L L E R M O   G O N Z A L E Z,
21          called as a witness by the Government, having been sworn,
22          testified as follows:
23                              DIRECT EXAMINATION
24   BY MS. MATEO:
25   Q.   Please state your full name for the record.
```

1    A.    Guillermo Gonzalez.

2    Q.    And are you currently employed?

3    A.    Yes.

4    Q.    Where?

5    A.    At the Federal Bureau of Investigation.

6    Q.    And what's your title?

7    A.    Special Agent.

8    Q.    And how long have you been with the FBI?

9    A.    Four years.

10   Q.    At our request yesterday evening, did you time how long

11   it took to travel by car from La Tombola to Las Gaviotas?

12   A.    Yes, I did.

13   Q.    And around what time did you go last night?

14   A.    We arrived at the area from around 8:30 to nine o'clock

15   at night.

16   Q.    And I'm going to show you what's been marked into

17   evidence as Government's 14 and ask you -- I'm going to put it

18   on -- what route you took.

19   A.    Yes, ma'am.  Can you point out where La Tombola is?

20         THE COURT:  You have to keep your voice up.  Okay?

21         THE WITNESS:  Yes.  La Tombola is right here.

22   (Witness indicating.)  At this location here.

23   BY MS. MATEO:

24   Q.    Okay.

25   A.    Yeah.  It's right here.

1    Q.   And which route did you take?

2    A.   We started from La Tombola.  We headed down Progreso

3    Street.  We made a right at Calle Luna, and then a right on

4    Main Street, all the way to the light.  At the light we made

5    another right, and then we arrived to Las Gaviotas.

6    Q.   And taking that route, did you pass Calle Los Bravos?

7    A.   Yes.

8    Q.   And did you measure the distance?

9    A.   Yes.  We used the odometer of the vehicle.  It came

10   approximately to .06 miles.

11             MR. AGUAYO:  I'm sorry?

12             THE WITNESS:  .06.

13             THE COURT:  .06, less than one mile.

14             THE WITNESS:  Yes.

15   BY MS. MATEO:

16   Q.   And did you stay reasonably within the limit?

17             MR. RUHNKE:  Your Honor, is that .06 or 0.6?

18             THE WITNESS:  .06.

19             THE COURT:  .06.

20             THE WITNESS:  Yes.

21             MR. RUHNKE:  Six 100ths of a mile.

22             THE COURT:  Yes.  I am assuming it's a bit more than

23   half a mile, correct?  Or I'm incorrect?

24             MR. RUHNKE:  It's six 100ths.  If it's .06, it's six

25   100ths.  I think he means 0.6.

```
 1            THE WITNESS:  Yes.  0.6.

 2            THE COURT:  Okay.  .5 would be half a mile.  .6 is

 3    just a bit more than half a mile.

 4            MS. MATEO:  Yes.

 5    BY MS. MATEO:

 6    Q.   When traveling, did you stay reasonably within the speed

 7    limit?

 8    A.   Yes, ma'am.

 9    Q.   What speed did you go?

10    A.   30 miles an hour.

11    Q.   So, Agent, I ask you how long did it take you to travel

12    from La Tombola to Las Gaviotas?

13    A.   It took us one minute and 50 seconds.

14    Q.   50, five zero?

15    A.   Yes.

16    Q.   Agent, also at our request did you measure the height of

17    -- I'm going to put on the screen what's been already put in

18    as Government's Exhibit 209.  Did you measure the height of

19    this wall as depicted in evidence as Government's 209?

20    A.   Yes, ma'am.

21    Q.   And where is this wall located?

22    A.   This wall's located -- it's the wall that divides Las

23    Gaviotas from the main street, Rial Street.

24    Q.   And what street -- excuse me.  Strike that.

25            What direction is the traffic light?
```

```
 1   A.   The traffic light is -- I don't know is that south, but

 2   it's heading towards the same direction the person is walking

 3   to.

 4   Q.   And in relation to the guard of Las Gaviotas, where is

 5   the wall?

 6   A.   If you stand in front of the security guard, it's going

 7   to be located to your left side.

 8   Q.   And yesterday when you measured it, did it have any

 9   spikes?

10   A.   No, it did not.

11   Q.   And did you see this house, which is depicted as a blue

12   house in Government's Exhibit 209?

13   A.   Yes, I did.

14   Q.   Did you also figure out what the address was of that

15   house?

16   A.   Yes.   The house is located on Rena Street I believe it

17   is, and it's house number B-7, Bravo Seven.

18   Q.   And did this, the height of the wall, did it vary in

19   height or was it uniform as --

20   A.   It varied a little bit.

21   Q.   And you measured it from ground to top?

22   A.   That's correct.

23   Q.   And what was the height of the wall at its highest point?

24   A.   Five eight.

25   Q.   And what was it at its lowest?
```

1    A.    Five six.

2    Q.    I pass the witness at this time.

3          THE COURT:  Any cross?

4          MR. AGUAYO:  Yes, sir.

5                     CROSS-EXAMINATION

6    BY MR. AGUAYO:

7    Q.    Sir, you stated that you went I believe it was last night

8    to the area?

9    A.    Yes.

10   Q.    And it was approximately 8:30, 9:00 PM?

11   A.    Yeah, from 8:30 to 9:00 PM.

12   Q.    Okay.  Now, that's -- yesterday was I believe Tuesday if

13   I'm not mistaken?

14   A.    That's correct.

15   Q.    Okay.  It's a weekday?

16   A.    Yes.

17   Q.    Okay.  And October 17th, 2009, was a Saturday, correct?

18   A.    I believe so.

19   Q.    Okay.  Now, when you were traveling that point -- 0.6

20   miles, how many cars did you see?

21   A.    I wasn't counting cars on the street.

22   Q.    Okay.  It was flowing, yes?

23   A.    Yes.

24   Q.    Okay.  At the night of La Tombola -- so it wasn't like

25   the night of La Tombola, where you had complete chaos, people

1    running around, people trying to dash out, cars in the

2    streets, horses in the streets, it was not the same condition,

3    correct?

4    A.    I wouldn't know.  I wasn't there at that time.

5    Q.    Okay.  But you would agree with me, sir, that you are

6    traveling from La Tombola to Las Gaviotas in one minute and 50

7    seconds, under those conditions that you've talked about

8    today, okay, does not compare with the conditions of the

9    streets, the chaos, the horses, the cars, everybody running

10   around from La Tombola to Las Gaviotas, correct?

11   A.    Again, I wouldn't know how was the condition on the

12   street of the La Tombola, so I couldn't answer that question.

13   Q.    Now, you stated, sir, that this wall, if I may, all

14   right, it doesn't have spikes, correct?

15   A.    That's correct.

16   Q.    Did you go around the perimeter to see if other parts of

17   the walls had spikes?

18   A.    Yes.  There were other walls, other sections of that wall

19   that had spikes.

20   Q.    And some of the walls had the wire, the coiled wire on

21   it?

22   A.    No.  Just spikes.

23   Q.    You didn't see coiled wire on?

24   A.    No.

25   Q.    Okay.  And you went through the whole perimeter, correct?

1    A.    I went to that section of the wall.

2    Q.    Just to this section?

3    A.    Yes.

4    Q.    No other section?

5    A.    No.

6    Q.    Now, do you know, sir, whether there were spikes here on

7    this particular wall in October of 2009?

8    A.    No, I do not.

9    Q.    So you have no idea if they were and they were taken off

10   or there wasn't any at that time?

11   A.    No, I did not.

12   Q.    That would be all, Your Honor.

13         THE COURT:  Thank you.  You are now excused.

14         THE WITNESS:  Thank you.

15         THE COURT:  Next witness.

16         MS. DOMINGUEZ:  The Government calls Mildred Perez.

17         MR. AGUAYO:  Your Honor, may we, before she

18   testifies, come to the --

19         (Bench conference held.)

20         MR. AGUAYO:  All I heard was what was proffered to

21   me, was the two agents and Daisy.  I'd like to know what this

22   woman's going to say.

23         MS. DOMINGUEZ:  These are neighbors.

24         MR. AGUAYO:  What are they going to say?

25         MS. DOMINGUEZ:  They never saw Johanna with anybody

```
 1    in front of her house.

 2              MR. AGUAYO:  That night at that time?

 3              MS. DOMINGUEZ:  Yes.

 4              MR. AGUAYO:  Okay.

 5              (Bench conference concluded.)

 6              COURTROOM DEPUTY:  Raise your right hand.

 7              Do you solemnly swear that the testimony you are

 8    about to give in this case is the truth, the whole truth, and

 9    nothing but the truth, so help you God?

10              THE WITNESS:  Yes.

11                      M I L D R E D   P E R E Z,

12         called as a witness by the Government, having been sworn,

13         testified as follows:

14                          DIRECT EXAMINATION

15    BY MS. DOMINGUEZ:

16    Q.   Good morning.

17    A.   Hello.

18    Q.   Please tell us your name.

19    A.   My name's Mildred Perez.

20    Q.   Okay.  Ms. Perez, if you are able to testify in English,

21    please do so.  If you need the services of the interpreter,

22    there is one sitting next to you.

23    A.   Okay.  Is more easy for me.

24    Q.   Okay.  Now, do you live at Las Gaviotas?

25    A.   Yeah.
```

1  Q.   Do you know a person by the name of Johanna Lopez Urquia?

2  A.   Yeah, I know who it is.

3  Q.   Okay.  And is she a neighbor?

4  A.   Yeah.

5  Q.   Okay.  Now, can you explain to us where your house is

6  situated in relation to Johanna's house?

7  A.   Nextdoor.

8  Q.   On the same side of the street?

9  A.   Yeah.

10 Q.   If you were facing Johanna's house, would your house be

11 on the right or on the left of hers?

12 A.   Right.

13 Q.   Okay.  Now, I'd like to take you back to the evening of

14 October the 17th, 2009, the evening of the La Tombola

15 massacre, close to midnight.

16 A.   Yeah.

17 Q.   Okay.  Can you tell us whether that night you were home?

18 A.   Yes, I believe I was.

19 Q.   And between 11:45 and midnight, did you hear any shots?

20 A.   No.

21 Q.   And around that night, did you happen to go outside your

22 house and observe Johanna and other people in front of her

23 house?

24 A.   No, no, no.

25 Q.   Now, how long have you been living in Las Gaviotas?

```
 1   A.   19 years.
 2   Q.   Now, in those 19 years, and specifically referring to the
 3   year 2009 when these events occurred, was it unusual to hear
 4   shots around the vicinity of your neighborhood?
 5   A.   Well, back during those years, you could hear more, yes.
 6   Q.   Okay.  So you were accustomed to hearing shots
 7   occasionally around your neighborhood?
 8   A.   Yeah.
 9   Q.   And when you heard these shots, would you usually come
10   out?
11   A.   No.  I have two children.
12   Q.   Okay.  Why wouldn't you come out when you heard shots?
13   A.   Because I take care of my family.  I don't want to expose
14   it.
15            MS. DOMINGUEZ:  I have nothing further.
16            THE COURT:  Any cross?
17            MR. AGUAYO:  Yes.  Yes.
18                          CROSS-EXAMINATION
19   BY MR. AGUAYO:
20   Q.   Ms. Perez, you were asked if on October 17th, 2009, close
21   to midnight, if you were at home.  You stated, I believe I
22   was.  You stated, I believe I was.
23   A.   (Remarks in Spanish.)
24   Q.   But you did say --
25   A.   I believe so, yes, because I'm not in the habit of being
```

```
1   out in the evening.  I have two children and a husband, and

2   we're always home at that time.  There has to be some kind of

3   a family eventuality.

4   Q.   And you don't know whether that family eventuality

5   occurred on October 17, because you said, I believe I was at

6   home?

7   A.   Yes, I believe so.

8   Q.   Okay.  And you stated that you did not hear shots,

9   correct?

10  A.   (Shaking head from side to side.)

11  Q.   And you stated that you didn't go outside of the house,

12  correct?

13  A.   (Shaking head from side to side.)

14  Q.   Thank you.  No further questions.

15            MS. DOMINGUEZ:  Just one question, Judge.

16            THE COURT:  Yes.

17                     REDIRECT EXAMINATION

18  BY MS. DOMINGUEZ:

19  Q.   Ms. Perez, understanding that it's your best recollection

20  that you were home, even in the event you weren't home, let's

21  assume for the moment that you weren't --

22  A.   Uh-huh.

23  Q.   -- you are sure that you did not see Johanna standing in

24  front of her house with anyone else near to the day of the La

25  Tombola massacre?
```

1    A.    (Remarks in Spanish.)

2    Q.    All right.

3    A.    It's just that I can't specify if that particular date --

4    I don't know the date in October, whether she was outside or

5    not, because I just cannot remember.  I cannot remember if on

6    that specific date she was outside or not.  I just can't.

7    Q.    Well, fair enough.  In the years that you have been

8    living at Las Gaviotas, have you ever stood in front of your

9    house at midnight and seen Johanna in front of her house with

10   people at other times?

11        MR. AGUAYO:  Objection, Your Honor.  Relevancy.

12        THE COURT:  I will allow that.

13   BY MS. DOMINGUEZ:

14   Q.    Have you ever stepped out of your house at midnight?

15   A.    Yes, I've seen it here.

16   Q.    You've stepped out of --

17   A.    I've seen her, but as far as me going outside because I

18   see Johanna outside, no.  But I have seen her.

19   Q.    And you don't usually go out of your house at midnight

20   and stand in front of your house, do you?

21   A.    No, I -- no.  I mean no, I don't step out of my house at

22   that time.

23   Q.    And you particularly don't do that when you hear shots?

24   A.    No.  No.

25   Q.    I have nothing further.

1        THE COURT:  Let me ask you something, because I have

2   a doubt here.  When did you become aware of La Tombola

3   incident during those days?

4        THE WITNESS:  On TV, the news that were broadcast.

5        THE COURT:  Do you know whether that place is close

6   to where you live?

7        THE WITNESS:  Well, I've heard comments that it's in

8   Sabana Seca, but I don't know where it is.

9        THE COURT:  Now, in retrospect, once you saw or heard

10  the news reported about what happened, did you, were you able

11  to examine your mind to see whether you heard anything or saw

12  anything that night?

13        THE WITNESS:  No.  No.

14        THE COURT:  Anything unusual that comes to mind that

15  night?

16        THE WITNESS:  No.  No.

17        THE COURT:  Do you remember a party in your

18  neighborhood?

19        THE WITNESS:  No.  No.

20        THE COURT:  Comments by your neighbors as to what

21  happened may have refreshed your recollection as to something

22  that you may have heard or seen that night?

23        THE WITNESS:  Specifically that night, during those

24  days --

25        THE COURT:  Yes.

```
1              THE WITNESS:  It's just that -- no, no.  I just
2    happened to find out that guy is Johanna's husband.  I didn't
3    know.
4              THE COURT:  Had you seen that guy around the
5    neighborhood before?
6              THE WITNESS:  Yes.  Si, because he understands
7    Spanish.
8              THE COURT:  Si.
9              THE WITNESS:  The thing is that since she lives
10   nextdoor, I would see him walking on the sidewalk in front of
11   my house.  And he would greet, and he would greet courteously.
12   And I would greet him courteously, and so would my husband.
13   And that's it.  That is basically the exchange of conversation
14   we would have.
15             THE COURT:  Very well.  Anything?
16             MR. AGUAYO:  No, sir.
17             THE COURT:  Thank you very much.
18             (At 9:50 AM, witness left the stand.)
19             MS. MATEO:  The Government calls Daisy Collazo.
20             COURTROOM DEPUTY:  Raise your right hand.
21             Do you solemnly swear that the testimony you are
22   about to give in this case is the truth, the whole truth, and
23   nothing but the truth, so help you God?
24             THE WITNESS:  Yes, I swear.
25             THE COURT:  Please.
```

```
1              D A I S Y   C O L L A Z O   T O R R E S,

2          called as a witness by the government, having been sworn,

3          testified as follows:

4                              DIRECT EXAMINATION

5   BY MS. MATEO:

6   Q.    Please state your full name.

7   A.    Daisy Collazo Torres.

8   Q.    And where do you live?

9   A.    I live in Urbanization Las Gaviotas, Toa Baja, Puerto

10  Rico.

11  Q.    And how long have you lived there?

12  A.    20 years.

13  Q.    Ms. Collazo, does Las Gaviotas have a home owners'

14  association?

15  A.    Yes, ma'am.

16  Q.    Do you participate in that association?

17  A.    Yes.  I'm the president.

18              THE COURT:  How long have you been the president?

19              THE WITNESS:  Excuse me?

20              THE COURT:  How long have you been the president?

21              THE WITNESS:  Nine years.

22              THE COURT:  Nine years.  Okay.

23  BY MS. MATEO:

24  Q.    I'm going to ask you a few questions.  First I want to

25  put on the screen what's been already marked as Exhibit 209.
```

1    A.    Yes.

2    Q.    And I want to ask you if you recognize this area as being

3    part of Las Gaviotas?

4    A.    Yes.

5    Q.    And this wall, is it a permanent wall, part of Las

6    Gaviotas?

7    A.    Yes.  It's a permanent wall that belongs to the

8    neighborhood.

9    Q.    And this house, is it part of the neighborhood?

10   A.    Yes, it's part of the neighborhood.

11   Q.    I'm going to hand you what's been marked for

12   identification as Government's 211 and 212.  What did I just

13   hand you?

14   A.    The residence B-7, and the wall, and residence B-6.

15   Q.    And these are photographs of an area in Las Gaviotas?

16   A.    Yes, ma'am.

17   Q.    And the photos accurately depict that house and the area

18   in Las Gaviotas?

19   A.    Yes.

20          MS. MATEO:  The Government moves 211 and 212 into

21   evidence at this time.

22          THE COURT:  Received.

23          (At 9:53 AM, Government Exhibits 211 and 212 admitted

24   into evidence.)

25          THE COURT:  Ma'am, the house that is shown on the

1   screen is B-7?

2            THE WITNESS:  Yes, it's B-7.

3            THE COURT:  Okay.

4   BY MS. MATEO:

5   Q.   I'm putting 211 on the screen, and I'll ask you the same

6   question.  This house, for the record, can you see what color

7   it is?

8   A.    Blue.

9   Q.   And is this a different view of 209 showing the wall and

10  the house?

11  A.    It's the same.

12  Q.    It's the same house?

13  A.    Yes.

14  Q.    And this is -- what's the address of this house?

15  A.    B-7.

16  Q.    On what street?

17  A.    Calle Rena.

18  Q.    And this is an access area, a walkway?

19  A.    Yes.  Well, it's between the two houses.  It's not a

20  walkway.  It's just between the two houses.  They don't have a

21  wall dividing the two houses.

22  Q.    And there's no gate?

23  A.    There's no gate.

24  Q.    I'm going to put on what's been introduced in evidence as

25  Government's Exhibit 212.  And is this also the residence B-7?

```
 1    A.    Yes.  It's the same residence from a different side.
 2              THE COURT:  Ma'am, would you come closer to the
 3    microphone a little bit?  Thank you.
 4    BY MS. MATEO:
 5    Q.    And is this a front view of the --
 6    A.    Yes.  A front view.
 7    Q.    And is this the -- I guess between the houses, that
 8    walkway?
 9    A.    Yes, between the houses.  Usually they have a wall.  That
10    doesn't have any wall.
11    Q.    And does this give access to the wall that was depicted
12    in a previous picture?
13    A.    Yes.
14    Q.    And what's behind the wall?
15    A.    A road, Los Magos.
16    Q.    And I wanted to ask you, this -- well, leave it on the
17    screen, 212.
18              This house, is it occupied or vacant?
19    A.    It's vacant.
20    Q.    And is it vacant or abandoned?
21    A.    No.  It's vacant.
22    Q.    And how long has it been in that state?
23    A.    Approximately seven years.
24    Q.    So in 2009 it was vacant?
25    A.    Yes, it was.
```

1    Q.    And I'm going to put back what's Government's Exhibit

2    209.  Are there spikes on that wall?

3    A.    No.   There's no spikes.

4    Q.    Had there been spikes on that wall?

5    A.    No.

6    Q.    Why not?

7    A.    Because that's something that the owners, they do it for

8    their own protection.  It's not the Association having done

9    that yet.

10   Q.    So since --

11   A.    Each owner put their own spikes.

12   Q.    So since this house has been vacant, no spikes have been

13   put on this wall?

14   A.    No spikes, yes.

15   Q.    And lastly, as president and also a resident of Las

16   Gaviotas, can you tell us if there's been a problem with

17   burglaries starting in 2009?

18   A.    Yes.  We have several situations that we figured out that

19   they maybe jumped by that wall, because it's the only house

20   that nobody live there.  So if you see, it's not that high,

21   the wall.

22   Q.    And this one that's depicted in 209, in back of B-7 in

23   this house, is this the wall you're talking about with the

24   burglaries?

25   A.    Yes.

1              MS. MATEO:  I pass the witness at this time.

2              THE COURT:  Let me ask you something, ma'am.  Was a

3    guard by the name of Malave working when you were president?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  You ever give him any instruction not to

6    take information as to the people who were coming into the

7    Urbanization for whatever reason?

8              THE WITNESS:  No.  All the instructions are every

9    visitor that get to the gate, they need to give the details,

10   name, where they're going to visit, and they take the plate

11   number.  And then they call the owner to authorize the visit.

12             THE COURT:  You never set aside those instructions.

13             THE WITNESS:  No.  I don't give that type of

14   instructions.  My instructions are very strong that they have

15   to -- since they are on the gate, because we don't have

16   security 24 hours in the gate -- we have security 24 hours,

17   but not in the gate, because they go and do their rounds.  And

18   usually that's what I tell -- you have -- everybody that

19   passes through the gate, you have to take all the information.

20   Visitors or residents that -- by visitors, if they've got

21   their beepers, so that's different.

22             THE COURT:  Any cross?

23             MR. AGUAYO:  Yes, sir.

24                           CROSS-EXAMINATION

25   BY MR. AGUAYO:

1    Q.    Good morning, Ms. Collazo.

2    A.    Good morning.

3    Q.    Let's talk about the last question that the Judge, this

4    Honorable Court asked you about the registration of entries

5    into the Urbanization.  If you're a resident and have a

6    beeper, would your -- the security guard have to register you?

7    A.    No, because you open with your beeper.

8    Q.    Okay.  So there would be no indication there, and there

9    would be no need --

10   A.    No.

11   Q.    -- to register you if you were a resident?  You just --

12   A.    Just use it.

13   Q.    Now, you stated that this house, which is exhibit --

14   Government's Exhibit 21 --

15          COURTROOM DEPUTY:  211.

16          MR. AGUAYO:  I'm sorry.

17   BY MR. AGUAYO:

18   Q.    211.  You said that the blue house had been abandoned,

19   correct?

20   A.    Vacant.

21   Q.    I'm sorry?

22   A.    Vacant.

23          THE COURT:  Vacant.

24   BY MR. AGUAYO:

25   Q.    I'm sorry.  What about the right one?  Did somebody live

1   there?

2   A.   Yes.

3   Q.   Okay.  And they were living there in 2009, correct?

4   A.   Yes.

5   Q.   Okay.  Now, you stated, ma'am, that you had problems with

6   burglaries in 2009.  Were those burglaries during the day or

7   during the night?

8   A.   Well, some during the night, and some probably during the

9   day.

10  Q.   Okay.  But were people inside?

11  A.   People --

12  Q.   Inside the houses that were burglarized?

13  A.   In this particular one or the other --

14  Q.   You said this one has been vacant, correct?

15  A.   Yes, vacant.

16  Q.   How about this one?

17  A.   People live there.

18  Q.   Okay.  And these burglaries, were they during the day or

19  during the night, madam?

20  A.   Probably in the night, probably in the day.

21  Q.   Okay.  That's fine.  Let me ask you, madam, when these

22  things occur, and residents hear something in their backyard

23  or they feel the presence of someone, they call, do they not,

24  the security guard to tell them, listen, I heard this or I

25  heard that or somebody's committing a burglary, please come?

1  Yes?

2  A.    If they hear, they call.  If they don't hear --

3  Q.    All right.  Now, on that particular night, October 17th,

4  did anybody complain about having somebody in their backyard?

5         MS. MATEO:  Objection, Your Honor.  Lack of

6  foundation.

7         THE COURT:  I will allow that.  Did you have anybody

8  complain to you --

9  BY MR. AGUAYO:

10 Q.    Anybody complain to you --

11        THE COURT:  -- on October 17 that they had somebody

12 in their backyard?

13        THE WITNESS:  Not that I remember.

14 BY MR. AGUAYO:

15 Q.    Okay.  Now, you as the president of the Home Owners'

16 Association, the security guards would report to you if there

17 was a burglary or if there was something strange that occurred

18 that particular night, would they not, if in fact it did?

19 A.    Probably.  You never know.

20 Q.    But you're the president of the Association?

21 A.    Yes, I'm the president, but you never know.

22 Q.    And part of the responsibilities or duties of the

23 security guard, if something happens in that urbanization,

24 such as a burglary, such as somebody being there that should

25 not be there, such as somebody jumping a wall, if he has that

1  information, he has to pass that on to you, does he not?

2  A.   I suppose, but sometime they don't do it.

3  Q.   And madam, last question, your house is situated in Las

4  Gaviotas, correct?

5  A.   Yes.

6  Q.   But it's not a straight line, and you cannot see Angela

7  Urquia's house, correct?

8  A.   No.

9  Q.   Okay.  Thank you.

10          MR. AGUAYO:  That would be all, Your Honor.

11          THE COURT:  Anything else?  Thank you very much.

12          THE WITNESS:  That's it?

13          THE COURT:  You can leave, yes.  Thank you.

14          (At 10:03 AM, witness left the stand.)

15          MS. DOMINGUEZ:  The Government calls Valentin

16  Pearson.

17          THE COURT:  Pearson?

18          MS. DOMINGUEZ:  Pearson.

19          MR. AGUAYO:  Your Honor, may we approach the bench?

20          THE COURT:  Sure.

21          (Bench conference held.)

22          MR. AGUAYO:  I just want to inform the Court that --

23          THE COURT:  Are you afraid or something --

24          MR. AGUAYO:  No.  He drinks with me in La Vina.

25          MS. DOMINGUEZ:  You can cross him on that.

1              MR. AGUAYO:  I just wanted you --

2              THE COURT:  Maybe he's drank with me in La Vina, too.

3    Let's forget about it.

4              (Bench conference concluded.)

5              COURTROOM DEPUTY:  Stand up and raise your right

6    hand.

7              Do you solemnly swear that the testimony you are

8    about to give in this case is the truth, the whole truth, and

9    nothing but the truth, so help you God?

10             THE WITNESS:  Yes.

11             V A L E N T I N   P E A R S O N   C E P E D A,

12             called as a witness by the government, having been sworn,

13             testified as follows:

14                           DIRECT EXAMINATION

15   BY MS. DOMINGUEZ:

16   Q.   Good morning, sir.  Please tell us your name.

17   A.   Valentin Pearson Cepeda.

18   Q.   Sir, do you live in the development Las Gaviotas in Toa

19   Baja?

20   A.   Yes.

21   Q.   And do you know a person by the name of Johanna Lopez

22   Urquia?

23   A.   Yes.

24   Q.   And could you tell us, sir, where your house is located

25   in relation to hers?

1   A.   In front.

2   Q.   Across the street?

3   A.   Yeah.

4   Q.   Now, I'd like to direct your attention to the evening,

5   late evening of October the 17th, 2009, the evening when the

6   events of La Tombola occurred.  Do you remember, sir, where

7   you were that evening?

8   A.   I arrived home around 11:30, 11:00.

9   Q.   And when you arrived home, did you stay outside or did

10  you go inside?

11  A.   I go inside.

12  Q.   And after you went inside, did you go to bed or were you

13  still awake?

14  A.   I go inside and wash my body and go to the bed.

15  Q.   If it's easier for you to respond in Spanish --

16  A.   I got home.  I bathed, and I went to bed.  I turned the

17  air conditioner and stayed inside.

18  Q.   Now, sir, I'd like to direct your attention specifically

19  to the time of 11:45 PM, approximately 15 minutes after you

20  arrived home.

21  A.   I don't know.  I didn't hear anything.

22  Q.   I'd ask the translator if she can please translate the

23  question.

24       Okay.  Did you hear any shots coming from outside?

25  A.   No, I didn't hear anything.  No.

```
 1   Q.   And that evening, did there come a time when you actually
 2   came outside your house again?
 3   A.   No.  No.
 4   Q.   And you never saw Johanna in front of her house that
 5   evening?
 6   A.   I didn't go out.
 7   Q.   And you didn't observe any other neighbors in the
 8   street?
 9   A.   No.
10        MS. DOMINGUEZ:  I have nothing further.
11        THE COURT:  Was there a party going on when you got
12   home in the neighborhood?
13        THE WITNESS:  No, I didn't see anything.
14        MR. AGUAYO:  Just one question.
15        THE COURT:  Please.
16                    CROSS-EXAMINATION
17   BY MR. AGUAYO:
18   Q.   Sir, if there was a party going on, and it's inside the
19   house, would you see it as you came to your residence?
20   A.   Well, I may see it, but since at that point I just got
21   home and I didn't notice anything --
22   Q.   Thank you, sir.
23        MR. AGUAYO:  No further questions.
24        THE COURT:  Any unusual cars in your neighborhood in
25   front of your house that day?
```

1          THE WITNESS:  Well, since there are quite a few

2  vehicles of residents around in where I live, it's normal for

3  there to be a lot of cars on the street, but that day I got

4  home and I went inside and --

5          THE COURT:  Business as usual?

6          THE WITNESS:  For me it was.

7          THE COURT:  Very well.  Anything else?

8          MS. DOMINGUEZ:  Nothing, sir.

9          THE COURT:  Thank you.

10          THE WITNESS:  Okay.  Good day.

11          (At 10:08 AM, witness left the stand.)

12          MR. AGUAYO:  Your Honor, may we approach the bench,

13  please?

14          THE COURT:  Sure.

15          (Bench conference held.)

16          MR. AGUAYO:  Your Honor, I of course am not going to

17  object when you ask these questions at that moment.  I don't

18  mean to be disrespectful.  But it's getting to the point that

19  these questions -- and I understand the Court has the

20  discretion to ask questions.

21          THE COURT:  Not only the discretion.  The

22  obligation.

23          MR. AGUAYO:  I just want to put my objection on --

24          THE COURT:  Noted.

25          MR. AGUAYO:  -- which includes also perhaps

1  relatedly, but we can discuss it more when we're talking about

2  the jury instructions, when Mr. Jack Brigham was testifying

3  and you said to him, but this is what you told me yesterday,

4  that -- I think that goes beyond clarifying, if not

5  advocating, and I say this with all respect Your Honor,

6  advocating the prosecution's standpoint.

7       THE COURT:  Well, I have an obligation to do what I

8  have to do as a presiding judge.

9       MR. AGUAYO:  Okay.

10      THE COURT:  This is not a circus here; is that clear?

11      MR. AGUAYO:  I understand.  I have my obligation to

12  make the objection.

13      THE COURT:  Very well.

14      (Bench conference concluded.)

15      MS. DOMINGUEZ:  The Government calls Moises Franco.

16      COURTROOM DEPUTY:  Raise your right hand.

17      Do you solemnly swear that the testimony you are

18  about to give in this case is the truth, the whole truth, and

19  nothing but the truth, so help you God?

20      THE WITNESS:  Yes.

21      M O I S E S   F R A N C O   M I R A N D A,

22      called as a witness by the government, having been sworn,

23      testified as follows:

24                      DIRECT EXAMINATION

25  BY MS. DOMINGUEZ:

1  Q.   Good morning, sir.

2  A.   Good morning.

3  Q.   Please tell us your name.

4  A.   Moises Franco Miranda.

5  Q.   Sir, do you live in the development Las Gaviotas in Toa

6  Baja?

7  A.   That is correct.

8  Q.   And do you know a person by the name of Johanna Lopez

9  Urquia?

10 A.   Yes.

11 Q.   Okay.  Now, could you tell us, sir, in relation to your

12 house, where you live, where Johanna's house is located?

13 A.   The house is in front -- not in front, to the side,

14 because they're not -- the houses are not --

15 Q.   So if we're facing your house, our back would be to

16 Johanna's house; is that correct?

17 A.   No.  Johanna's house is on the other side to the right.

18 Q.   Let me rephrase the question.  If we're facing your

19 house, Johanna's house would be on the opposite side of the

20 street?

21 A.   Oh, yes.  Yes.

22 Q.   Okay.  And if we're standing in front of Johanna's house

23 facing the street on which your house is, would your house be

24 to the right or to the left of her house?

25 A.    If I'm in front of Johanna's house --

1           THE COURT:  Why don't we change the question, sir.

2   You are standing in front of your house looking at Johanna's

3   house.

4           THE WITNESS:  Okay.

5           THE COURT:  Which side is Johanna's house?

6           THE WITNESS:  In front, to the right.

7           MS. DOMINGUEZ:  Okay.  Thank you, Judge.

8   BY MS. DOMINGUEZ:

9   Q.   Now I'd like to direct your attention, sir, to the

10  evening of October 17, 2009, the late evening between

11  approximately 11:45 and midnight.  Were you home that evening?

12  A.   Yes.

13  Q.   And between that -- those hours, between 11:45 and

14  midnight, do you recall, sir, whether you heard any shots?

15  A.   No.

16  Q.   Okay.  And do you recall whether at around midnight that

17  night you came out of your house and stood in the front yard

18  of your house and were able to see other neighbors?

19  A.   No.

20  Q.   Did you see Johanna that night, around midnight?

21  A.   No.

22  Q.   I have no further questions.

23                       CROSS EXAMINATION

24  BY MR. AGUAYO:

25  Q.   I just want to make sure, sir, I heard you correctly.

1    You did not come outside of your house, correct?

2    A.    No.

3    Q.    So if you didn't come out of your house, you don't know

4    who was outside, correct?

5    A.    Of course not.

6    Q.    No further questions.

7              THE COURT:  Anything else?

8              MS. DOMINGUEZ:  Jose Gonzalez.

9              THE COURT:  Thank you, sir.

10             (At 10:15 AM, witness left the stand.)

11             COURTROOM DEPUTY:  Raise your right hand.

12             Do you solemnly swear that the testimony you are

13   about to give in this case is the truth, the whole truth, and

14   nothing but the truth, so help you God?

15             THE WITNESS:  May God help me.  Correct.

16             J O S E   G O N Z A L E Z   S E R R A N O,

17         called as a witness by the government, having been sworn,

18         testified as follows:

19                        DIRECT EXAMINATION

20   BY MS. DOMINGUEZ:

21   Q.   Good morning, sir.  Please tell us your name.

22   A.   My name is Jose A. Gonzalez Serrano.

23   Q.   And, sir, do you live at the Las Gaviotas development in

24   Toa Baja?

25   A.   That is correct.

1  Q.   Since when have you lived there?

2  A.   It's been seven to eight years.

3  Q.   And, sir, do you know a person by the name of Johanna

4  Lopez Urquia?

5  A.   Well, actually I don't know her, because -- may I

6  explain?

7       THE COURT:  Sure.

8       THE WITNESS:  Because I do know that she's a neighbor

9  who relatively lives on my street.

10  BY MS. DOMINGUEZ:

11  Q.   That would be Las Palomas Street?

12  A.   That is correct.

13  Q.   And in relation to your house, where is Johanna's house

14  located?

15  A.   It is not right in front of my house, but from my house

16  you can see her house.

17  Q.   And if you were standing in front of your house looking

18  at Johanna's house, in what direction are you looking?  Right

19  or left?

20  A.   I believe toward my left.

21  Q.   Now, sir, I'd like to direct your attention to the

22  evening of October the 17th, 2009, the evening of the La

23  Tombola massacre.  Now, late that evening, between

24  approximately 11:45 and midnight, were you home?

25  A.   I believe so.

1  Q.   And that night, did you happen to hear any shots being

2  fired at approximately the time that I've described?

3  A.   I don't believe I did.  And the reason is that I usually

4  keep my house hermetically closed, because I arrive late after

5  work, even Saturdays.  And so I'm always at the back of the

6  house, very much inside the house.

7  Q.   And do you recall, sir, whether that night at

8  approximately midnight you exited your house and stood in the

9  front yard of your house?

10  A.   No.  No.

11  Q.   And did you discuss with any neighbors at approximately

12  midnight the events, the shots that had been heard?

13  A.   No.

14  Q.   And did you see Johanna at approximately midnight?

15  A.   No.

16  Q.   I have nothing further.

17       THE COURT:  Any cross?

18       MR. AGUAYO:  Yes, sir.

19                    CROSS-EXAMINATION

20  BY MR. AGUAYO:

21  Q.   Sir, on October 17, when the prosecutor asked you, drew

22  your attention to October 17, 2009, and asked you if you were

23  home, you said I believe so.

24  A.   (Nodding head up and down.)

25  Q.   Okay.  So you're not sure?

1    A.   I believe that yes, I was home.

2    Q.   Okay.  And why do you know that you were home on that

3    particular day?

4    A.   Well, I can't say exactly, but I believe that, yes, I was

5    inside the house.

6    Q.   Okay.  And do you smoke, sir?

7    A.   Yes, I smoke occasionally.

8    Q.   And back in 2009, did you smoke?

9    A.   No.  Relatively it's been about two years since I've been

10   smoking.

11   Q.   Okay.  So you -- when you say that you don't know, you

12   stated she asked, the prosecutor asked you if you exited your

13   house, and you said, I don't know -- no, I did not.  Is it

14   that you did not or you don't recall?

15   A.   I don't remember.

16   Q.   No further questions, Your Honor.

17            MS. DOMINGUEZ:  Just a couple of questions.

18            THE COURT:  Please.

19                      REDIRECT EXAMINATION

20   BY MS. DOMINGUEZ:

21   Q.   Would it be normal for you, sir, to come out of your

22   house at approximately midnight and stand in your front yard?

23   A.   No.

24   Q.   Do you ever remember doing that?

25   A.   No.

```
 1   Q.   I have nothing further.
 2            THE COURT:  Thank you.  Anything else?
 3            MR. AGUAYO:  Just one question if I may, Your
 4   Honor.
 5            THE COURT:  One question.
 6                          RECROSS-EXAMINATION
 7   BY MR. AGUAYO:
 8   Q.   Sir, you stated that you lived in Las Gaviotas for how
 9   long?
10   A.   It's been seven to eight years.
11   Q.   And you're saying that you never come out at night to
12   stand in front of your house in those seven to eight years?
13   A.   No.  No.
14   Q.   No further questions.
15            THE COURT:  Thank you.
16            (At 10:23 AM, witness left the stand.)
17            THE COURT:  Anything else?
18            MS. MATEO:  The Government calls Luis Moyet.
19            THE COURT:  Luis what?
20            MS. MATEO:  M-o-y-e-t.
21            COURTROOM DEPUTY:  Moyet.
22            Please stand up and raise your right hand.
23            Do you solemnly swear that the testimony you are
24   about to give in this case is the truth, the whole truth, and
25   nothing but the truth, so help you God?
```

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  Please.
 3          L U I S    A N G E L    M O Y E T    R I V E R A,
 4      called as a witness by the government, having been sworn,
 5      testified as follows:
 6                          DIRECT EXAMINATION
 7  BY MS. MATEO:
 8  Q.   Please state your full name for the record.
 9  A.   Luis Angel Moyet Rivera.
10  Q.   And are you employed?
11  A.   Security, a security guard.
12  Q.   And where are you a security guard?
13  A.   At present in Cupey, Las Paseo.
14  Q.   And in 2009 where were you a security guard?
15  A.   Las Gaviotas Urbanization.
16              THE COURT:  Come closer to the microphone, please,
17  sir.
18  BY MS. MATEO:
19  Q.   I'm going to hand you what's been premarked as
20  Government's ID 207.  Do you recognize what I just handed
21  you?
22  A.   Yes, I recognize this.
23  Q.   How do you recognize it?
24  A.   Well, this is an exit log, registration log that I used
25  when I worked over there at Las Gaviotas.
```

1   Q.   And you prepared this log?

2   A.   Yes, I did.

3   Q.   Is your signature on it?

4   A.   Yes, it has my signature.

5   Q.   And what's the date on that log?

6   A.   Friday, October 16, 2009.

7   Q.   And the information you entered on that log, was it near

8   the time the vehicles exited Las Gaviotas?

9         THE INTERPRETER:  The interpreter needs a repetition

10  of the question.

11  BY MS. MATEO:

12  Q.   The information that you entered on that log, is that

13  near or around the time the vehicles were exiting Las

14  Gaviotas?

15  A.   Yes.

16  Q.   And is this based on the procedures established by Las

17  Gaviotas?

18  A.   That's correct.  Yes.

19  Q.   And it's regularly done by all security?

20  A.   Yes.

21  Q.   And is that an accurate copy of the log from October

22  16th, 2009?

23  A.   Yes.

24  Q.   At this time the Government moves 207 into evidence.

25        MR. AGUAYO:  No objection, Your Honor.

```
 1                    THE COURT:  Received.
 2                    (At 10:27 AM, Government Exhibit 207 admitted into
 3       evidence.)
 4       BY MS. MATEO:
 5       Q.   I'm going to put it on the screen.  It's going to appear
 6       on the monitor in front of you.  And this is your name here
 7       and the date?
 8       A.   Yes.
 9       Q.   And I'm going to ask you, at approximately 1:23, did you
10       register David Oquendo leaving Las Gaviotas?
11       A.   Yes.
12       Q.   Is this the name that you wrote down here at 1:23?
13       A.   Yes.
14       Q.   And what vehicle?
15       A.   A burgundy F-150.
16                    MR. RUHNKE:  Your Honor, is that time 11:23 or 1:23?
17                    MS. DOMINGUEZ:  1:23.
18                    THE WITNESS:  1:23.
19       BY MS. MATEO:
20       Q.   This log begins at twelve midnight, and goes to 5:00 AM;
21       is that correct?
22       A.   Right.
23       Q.   So the first entry is at 12:01?
24       A.   Right.
25       Q.   And this is 1:23?
```

1    A.   Yes.

2              THE COURT:  What is the color of the vehicle you

3    said?  I don't see it.

4              THE WITNESS:  Vino.  Vino.

5              THE COURT:  Vino.

6              THE INTERPRETER:  Burgundy.

7              THE WITNESS:  Burgundy.

8              THE COURT:  Very well.

9              MS. MATEO:  I pass the witness at this time.

10                        CROSS-EXAMINATION

11   BY MR. AGUAYO:

12   Q.   Mr. Moyet, just to be clear, the vehicle that David

13   Oquendo's driving is a wine-colored F-150, correct?  Wine

14   colored?

15   A.   Yes.

16   Q.   Now, that registry to go out is because at 12 o'clock

17   midnight, all vehicles have to be registered, correct?

18   A.   Yes.

19   Q.   But in terms of entry, if you have your beeper, your

20   clicker, you can come in without being registered even if it's

21   after 12 o'clock, correct?

22   A.   That is correct.

23             MR. AGUAYO:  No further questions, Your Honor.  Thank

24   you.

25             MS. MATEO:  Nothing further, Your Honor.

1          THE COURT:  Thank you.

2          (At 10:30 AM, witness left the stand.)

3          MR. HEGYI:  Your Honor, the Government calls Task

4    Force Officer Antonio Nunez Fox.

5          COURTROOM DEPUTY:  Raise your right hand.

6          Do you solemnly swear that the testimony you are

7    about to give in this case is the truth, the whole truth, and

8    nothing but the truth, so help you God?

9          THE WITNESS:  I swear.

10               A N T O N I O   N U N E Z   F O X,

11       called as a witness by the government, having been sworn,

12       testified as follows:

13                        DIRECT EXAMINATION

14   BY MR. HEGYI:

15   Q.   Good morning.

16   A.   Good morning, sir.

17   Q.   You've previously testified in front of this jury, but

18   for our record would you please give us your name once more?

19   A.   Yes, Antonio Nunez Fox, F-o-x.

20   Q.   Okay.  And you are a task force officer with the Police

21   Department of Puerto Rico, and you are assigned to working

22   with the FBI; is that correct?

23   A.   Yes, that is correct.

24   Q.   And you were involved in the investigation into the La

25   Tombola massacre?

```
1    A.    Correct.

2    Q.    As part of that investigation, did there come a point in

3    time when you and Special Agent Pagano interviewed a security

4    guard at Las Gaviotas by the name of Luis Malave?

5    A.    That is correct.

6    Q.    At the time that you interviewed Luis Malave, did you

7    discuss with him the color of the pick-up truck that he

8    indicated he had seen within five minutes or so after he heard

9    the shots that were coming from the area of Sabana Seca and

10   the La Tombola?

11   A.    He indicated that the F-150 that tried to enter was a

12   dark color.

13   Q.    Okay.  Now, here's what I want to focus on.  Did he say

14   that it was black, or did he only -- was he only able to say

15   it was dark in color?

16   A.    He only indicated it was a dark color.

17   Q.    In your experience, for all of your years with the police

18   department and as a task force officer with the FBI, a

19   burgundy colored pick-up truck in the dark --

20              MR. AGUAYO:  Objection, Your Honor.

21              THE COURT:  That's for the jury to decide.

22              MR. AGUAYO:  Exactly.

23              THE COURT:  That's for the jury to decide whether

24   burgundy color is dark or not.

25              MR. HEGYI:  At night time.  Okay.  Thank you, Your
```

1   Honor.  No further questions.

2          THE COURT:  Okay.  Thank you.

3          (At 10:34 AM, witness left the stand.)

4          THE COURT:  Any additional evidence?

5          MS. DOMINGUEZ:  Your Honor, that concludes the

6   Government's rebuttal case.

7          MR. AGUAYO:  Your Honor, may we approach the bench?

8          THE COURT:  Sure.

9          (Bench conference held.)

10          MR. AGUAYO:  Your Honor, Ms. Dominguez, as she is

11   fair about things, has advised me that there is a person out

12   there, a neighbor who says that there was a party going on at

13   the house nextdoor if I wanted to talk to her.  Now she

14   informs me that it's information that she got -- I don't know.

15   I haven't interviewed her.  But if in fact she can say there

16   was a party nextdoor, I'd like to interview her.

17          THE COURT:  Let's take a five-minute recess and you

18   can talk to her.

19          MS. DOMINGUEZ:  She's there.  I'll give you some more

20   information.

21          THE COURT:  Let's take a five-minute recess and deal

22   with it.

23          (Bench conference concluded.)

24          THE COURT:  Let's take a short, five-minute recess.

25          COURT SECURITY OFFICER:  All rise.

```
 1              (At 10:35 AM, jury left the courtroom.)

 2              THE COURT:  Ms. Dominguez, Mr. Ruhnke, could you

 3    approach?  Everybody.  You, too.  I don't care.  I just

 4    thought of the principal actors.

 5              (Bench conference held.)

 6              THE COURT:  Why is it that you stipulated these

 7    transcripts?  There must be a reason.

 8              MR. AGUAYO:  Judge, if I may, while you're doing this

 9    if I may --

10              THE COURT:  Sure.  Go ahead.  That's why I said you

11    probably don't have to be here.

12              MR. AGUAYO:  Okay.

13              THE COURT:  Why you stipulated these transcripts?

14    There must be a reason.

15              MS. DOMINGUEZ:  Why, we were going to publish the

16    tapes and ran into technical difficulties, because it is mixed

17    into the trial.  Our technical experts told us there is no way

18    to rewrite the discs so it can be extracted.

19              THE COURT:  Why do you need change of plea colloquy

20    if you have the judgments?

21              MS. DOMINGUEZ:  It was requested by Mr. Ruhnke.  He

22    would not stipulate to these unless we stipulated to the --

23              THE COURT:  That's the reason?

24              MS. DOMINGUEZ:  Yes.

25              MR. RUHNKE:  And they do contain the admissions of
```

1   the defendants and the contents.

2          THE COURT:  I'm going to read them.  I just have

3   one.

4          MR. RUHNKE:  I don't have copies with me in court.

5   I'm wondering if I can get a set of those to look at.

6          MS. DOMINGUEZ:  We'll get you another set.

7          MR. RUHNKE:  I didn't realize it would be an issue.

8   I've been doing some research on it while I was sitting there

9   listening, and there were a couple of cases on a doctrine

10  called offensive collateral estoppel in using the stipulation

11  to establish an underlying conduct as opposed to conviction.

12  I'll put it on the record when I get back --

13         THE COURT:  Give me the citations so I can read

14  them.

15         MR. RUHNKE:  I will.  Of course.  I just started the

16  research.  I didn't understand this would be a situation.  And

17  it has an impact how we're going to do our summation, so we

18  have to get it resolved.

19         THE COURT:  You should assume unless you convince me

20  otherwise, there is an issue.  I understand this is a watered

21  down version of a collateral attack.  That's what it is.

22         MR. RUHNKE:  The implications of it, Your Honor, is

23  you are basically -- if you're telling the jury that these

24  convictions establish the truth of the underlying conduct --

25         THE COURT:  I'm not going to say that.  I'm not going

1    to say that.  I'm going to say that he plead guilty to these

2    things.

3              MS. DOMINGUEZ:  Certainly he pled guilty.  He didn't

4    plead guilty to saying the murder occurred in this fashion --

5              MR. RUHNKE:  And that fashion --

6              MS. DOMINGUEZ:  -- but certainly he plead guilty to

7    having participated in the murder of the individual.

8              MR. RUHNKE:  There's no doubt that he plead guilty to

9    the charges, but the effect of it would be the Court saying,

10   Braulio Ortiz -- Braulio is telling you the truth, because he

11   pled guilty to these charges.

12             MS. DOMINGUEZ:  Right.  And we would not argue that,

13   because there is no specific version of how the events

14   transpired that is linked to the guilty plea.

15             MR. RUHNKE:  That's correct.

16             THE COURT:  You know what I find offensive in the one

17   that I read, I mean the wheeling and dealing that goes on in

18   state court, it's unbelievable.  This is a disgrace.

19             MS. DOMINGUEZ:  Judge, the cooperator got more time

20   than --

21             THE COURT:  This is a disgrace.  This Judge and these

22   prosecutors on a first degree murder charge in two seconds

23   switch it to second degree murder, okay?  No recidivism

24   charge, nothing of the sort.  Just, hell with it.  It's just

25   -- just irresponsible in every sense of the word from my point

1    of view from administration of justice.  This is ridiculous.

2         MS. DOMINGUEZ:  That Judge was later (Remarks in

3    Spanish.)

4         THE COURT:  This happens every day in state court.

5         MS. DOMINGUEZ:  It does.

6         THE COURT:  Happens every day in state court.

7         MR. RUHNKE:  That's why we want the context.

8         THE COURT:  That's why we have the impunity we have

9    in this society.

10         MR. RUHNKE:  I know the background of this from

11   having read the transcript.  There was a trial.  He was found

12   guilty by a judge only.  He was sentenced to 18 years.  The

13   Judge made disparaging remarks about Braulio's credibility.

14   He was the only witness that testified.

15         THE COURT:  That's an attack, collateral attack, if

16   you're going to go into that.

17         MR. RUHNKE:  No, I'm not.  But what I would like to

18   do is say here is the context of the plea.

19         THE COURT:  And you see the actors, the lawyers

20   involved here, you know, and the recommendation and everything

21   else.  This is ridiculous.  This is sick.  It has nothing to

22   do with you.

23         MR. RUHNKE:  I know.

24         THE COURT:  And nothing to do with you.  But I don't

25   want a part -- as a lawyer, as a judge, I don't want any part

 1    of this.  This is offensive.

 2              MR. RUHNKE:  But we have to be careful here that the

 3    jury -- that we don't run into a situation where essentially

 4    an instruction tells a jury he must have done these things

 5    because he plead guilty to them.

 6              MS. DOMINGUEZ:  Well, I think there's no question

 7    that --

 8              THE COURT:  What other thing can you say?  If I plead

 9    guilty to first degree murder or second degree murder, isn't

10    it implied that I did it?

11              MR. RUHNKE:  Yes, it's im --

12              MR. HEGYI:  And it's another thing.  We still are

13    required to proffer why, and that it was part of the

14    enterprise, so we have to add that, too.

15              THE COURT:  How do the transcripts help you to prove

16    that?

17              MR. HEGYI:  We don't think they do.

18              THE COURT:  So why o--

19              MS. DOMINGUEZ:  That was at the request of counsel.

20              MR. HEGYI:  It was at the request of defense

21    counsel.

22              THE COURT:  Okay.  I would like to see those cases.

23    Honestly, I want to read them and make certain.  I want to do

24    the right thing.

25              MR. RUHNKE:  I'll give you some cases today.

1              MR. REBOLLO:  Just for the record, to people like

2    yourself and us, yes, I agree it would be unconscionable.  If

3    you plead guilty, you must be guilty.  But we are not him.  He

4    has a different background, different life experiences.  There

5    are other things that go into decisions made with people with

6    these backgrounds.

7              THE COURT:  I understand that, Mr. Rebollo, but do

8    you honestly think the Court of Appeals is going to ever

9    decide, let's suppose this goes on appeal, that when he plead

10   guilty in this particular case to second degree murder, which

11   actually is first reduced without any justification, reduced

12   to second degree murder, no recidivism, nothing of the sort,

13   that there is an explanation why he really wasn't guilty?

14             Do you think the Court of Appeals, the First Circuit

15   is ever going to say that?

16             MR. RUHNKE:  The First Circuit may say a jury in a

17   case like this is entitled to see the context of the plea,

18   entitled to see what he actually admitted doing and why.  And

19   the answer is nothing.  The answer is nothing.  He admitted to

20   no conduct in this.

21             And the Government's going to want to argue from this

22   --

23             THE COURT:  There is plenty of case law in the First

24   Circuit that deals with this issue of collateral attacks, not

25   only in the context of a 922, 924, all kind of things.

1           MR. RUHNKE:  Yes.  One of the cases that you

2    mentioned in the Order, the Acosta case, is a career criminal

3    offender.

4           THE COURT:  Can you imagine if every time that there

5    is a prosecution for a case that requires as a predicate

6    condition precedent the commission of a felony, you're going

7    to start watering down the felony in front of the jury.

8           MR. RUHNKE:  I will tell you that we relied on what

9    the Government told us in its pleading, that the jury would

10   not be instructed, that this establishes the Racketeering Act.

11          MS. DOMINGUEZ:  And the record should reflect that

12   these arguments, trying to water down these pleas are being

13   made in the absence of the defendant taking the stand where he

14   is not even going to explain what his mental process, what his

15   state of the mind was in pleading.

16          THE COURT:  Take a look at this.  This is Exhibit PM

17   Sentence Eight.

18          MS. DOMINGUEZ:  This is the one, Judge.  If you look

19   at the chart here, it will tell you the case number.  The case

20   number, 0131 --

21          THE COURT:  0131.

22          MS. DOMINGUEZ:  If you look here, it will tell us

23   which it is.

24          THE COURT:  206.  For David Nieves Carmona.

25          MS. DOMINGUEZ:  David Nieves Carmona.

1          THE COURT:  But look at the judgment.  It doesn't

2    even say who he killed.

3          MS. DOMINGUEZ:  It doesn't.  That's why we had to

4    prepare this chart, because it makes no reference to a victim.

5          THE COURT:  But it doesn't even say who he killed.

6          MR. RUHNKE:  I know.

7          THE COURT:  He pleads to second degree murder of

8    whom?

9          MR. RUHNKE:  I know.  And if you read the plea

10   transcript, there is a colloquy that goes back and forth.

11   He's warned what the consequences are of being found guilty of

12   any of the first degree charges.  He recognizes that he will

13   be able to return to his family in a few years if he takes

14   this plea.  And that's all context.

15         THE COURT:  Right, it's context also from another

16   point of view.  This is what I have to -- another context is

17   the slap on the wrist that he gets for all these things.

18   Reductions of all kinds.

19         MR. RUHNKE:  Yes.

20         THE COURT:  It's unbelievable.

21         MR. RUHNKE:  But that's what happened.

22         THE COURT:  Do you really want to go into all this?

23         MR. RUHNKE:  What we want to argue is you ought to

24   take a look at his plea to decide what he actually admitted to

25   when he plead guilty, and how much detail he gave before you

1    decide whether Braulio's telling the truth.  And that's --

2    because the opposite is to say, well, Braulio is a truthful

3    witness, because he plead guilty, end of story.

4         MS. DOMINGUEZ:  Well, there's no question that

5    Alexis' guilty plea to these murders lends credence to Menor's

6    testimony.

7         THE COURT:  If I were to allow you to use this, it's

8    more than anything else because of the fact that the

9    convictions do not even mention the name of the victim, the

10   sentences, the judgments.

11        Look at this.  These are forms.  I mean, we don't

12   have here the accusation, or we do have the accusation here?

13        MS. DOMINGUEZ:  No.  It's not included.

14        MR. HEGYI:  Your Honor, there's no question he knew

15   who he was pleading to having killed, and he never appeared.

16        THE COURT:  Where are the charges?

17        MR. RUHNKE:  There is no colloquy that even shows he

18   knew who he was pleading guilty to -- he's standing up there

19   and admitting on three different occasions this charge, this

20   charge, this charge.

21        MS. DOMINGUEZ:  But he had a lawyer.

22        MR. RUHNKE:  He did have a lawyer.

23        MS. DOMINGUEZ:  I mean, we can presume there was a

24   discussion with his lawyer.

25        MR. RUHNKE:  We just want to be able to have the jury

1   look at these and say, look, this is what his guilty plea was,

2   and to put it in context.

3           MR. HEGYI:  But that is a collateral attack.

4           MR. RUHNKE:  We're not attacking anything.  The

5   judgment is there.

6           THE COURT:  It all depends how you do it of course,

7   like everything else in the world.  You can have the

8   transcript, depending to what extent, to what extent you try

9   to --

10          MR. RUHNKE:  Argue from it.

11          THE COURT:  To minimize or to collaterally attack in

12  a tropical way, because this is all tropical, the convictions,

13  see?  This is tropical proceedings basically.

14          MR. RUHNKE:  Your Honor, I can represent that we will

15  do it --

16          THE COURT:  But of course I think I have to instruct

17  the jury that these are real judgments.

18          MR. RUHNKE:  Yes.  We never disputed that.

19          THE COURT:  That they cannot be attacked

20  collaterally.

21          MR. RUHNKE:  I think we can do it responsibly.

22          THE COURT:  I think you have to do it responsibly.

23          MR. HEGYI:  Your Honor, I think what they're trying

24  to do is exactly what Mr. Rebollo's trying to do in

25  openings.

1          THE COURT:  On the other hand, you people stipulated

2   the things.  You stipulated the exhibit on the other hand.

3   Nobody forced you to do this.  You could have put all these

4   documents along with the accusation in evidence.  They were

5   certified documents.  Isn't it a fact?

6          MR. HEGYI:  Yes, Your Honor.

7          MS. DOMINGUEZ:  They are.  They are.

8          THE COURT:  So you dug a hole.  I'm so fed up with

9   this case and the way it's been handled.  Believe me, you have

10  no idea.

11         MR. AGUAYO:  Your Honor, before you leave, I spoke

12  with the lady, and she says she just heard about the party.

13  However, I understand that Ms. Dominguez did speak with

14  Mr. Augustin, and he did say the party was there.

15         THE COURT:  Do you want to call her?  That's the

16  question.

17         MR. AGUAYO:  Or a stipulation as to what he told

18  her.

19         THE COURT:  You call her.  Let's bring the jury back

20  and call her and get it over with.

21         MR. AGUAYO:  Sir, if I can have -- I don't have his

22  number.

23         THE COURT:  What?

24         MR. AGUAYO:  I don't have his phone number.

25         MS. DOMINGUEZ:  Call her.

| | |
|---|---|
| 1 | MR. AGUAYO:  Call who? |
| 2 | THE COURT:  Call the witness. |
| 3 | MR. AGUAYO:  That would be Augustin. |
| 4 | THE COURT:  No, the -- |
| 5 | MR. AGUAYO:  What witness? |
| 6 | THE COURT:  The lady that is here. |
| 7 | MR. AGUAYO:  You're going to allow me to bring in |
| 8 | hearsay? |
| 9 | MS. DOMINGUEZ:  Let's just get it over with. |
| 10 | THE COURT:  Bring the jury in.  One more witness. |
| 11 | MR. RUHNKE:  Your Honor, can we have five minutes to |
| 12 | just -- two minutes? |
| 13 | THE COURT:  Two minutes.  I'll wait for you here. |
| 14 | COURT SECURITY OFFICER:  All rise. |
| 15 | THE COURT:  Any additional witness, Mr. Aguayo? |
| 16 | MR. AGUAYO:  Yes, sir, Your Honor.  The defense calls |
| 17 | Ms. Iris Dones. |
| 18 | THE COURT:  Close the door, Marshal. |
| 19 | COURTROOM DEPUTY:  Raise your right hand. |
| 20 | Do you solemnly swear that the testimony you are |
| 21 | about to give in this case is the truth, the whole truth, and |
| 22 | nothing but the truth, so help you God? |
| 23 | THE WITNESS:  Yes. |
| 24 | THE COURT:  Please. |
| 25 | I R I S   D O N E S, |

1    called as a witness by the defense, having been sworn,

2    testified as follows:

3                        DIRECT EXAMINATION

4    BY MR. AGUAYO:

5    Q.   Good morning, ma'am.  Would you please state your name

6    for the record?

7    A.   Iris Dones.

8    Q.   Ms. Dones, where do you reside?

9    A.   In Las Gaviotas subdivision.

10   Q.   Okay.  Yesterday various FBI agents and law enforcement

11   went to Gaviotas, correct?

12   A.   Correct.

13   Q.   And they were interviewing a lot of people there,

14   correct?

15   A.   Correct.

16   Q.   About how many agents went, ma'am?

17   A.   Around five.

18   Q.   Okay.  And --

19   A.   Six.

20   Q.   -- they interviewed the neighbors around the area where

21   Johanna Lopez lives, correct?

22   A.   That's my understanding, yes.

23   Q.   At any time, did you meet also with the neighbors?

24   A.   After the agents' visit.  We commented.

25   Q.   All right.  Was there any comments concerning a party

1   that was being held at Mr. Augustin's house the night of

2   October 17?

3   A.   It was mentioned.

4   Q.   How many people mentioned that?

5   A.   There were about five of us neighbors there, and perhaps

6   three or two.

7   Q.   So two or three people mentioned to you that there was in

8   fact a fiesta at Don Augustin's house, correct?

9   A.   Correct.

10   Q.   The night of the events of La Tombola, correct?

11   A.   That's what they said, yes.

12   Q.   No further questions.

13          THE COURT:  Any further cross?

14                      CROSS-EXAMINATION

15   BY MS. DOMINGUEZ:

16   Q.   On the evening of October the 17th, 2009, were you at

17   your home in Las Gaviotas?

18   A.   I don't remember.

19   Q.   Do you recall at any time that evening, at around

20   midnight, having seen Johanna in front of her house?

21   A.   The thing is, since I don't remember if I was there or

22   not, I can't say if she was or not.

23   Q.   Do you usually come out and stand in front of your house

24   at midnight?

25          MR. AGUAYO:  Objection, Your Honor, relevancy.

```
 1            THE COURT:  I'm sorry?  What?

 2            MR. AGUAYO:  I said relevancy.

 3            THE COURT:  Well, I will allow that.

 4            THE WITNESS:  No, I don't usually go out.

 5   BY MS. DOMINGUEZ:

 6   Q.   Okay.  Do you ever recall having done that in all of the

 7   year 2009, standing in front of your house at midnight?

 8   A.   Well, perhaps if it was New Years Eve or a special

 9   occasion, otherwise I would not.

10   Q.   So if you had been home on October the 17th, 2009, it's

11   likely that you would not have stood outside your house at

12   midnight?

13   A.   Correct.

14   Q.   Nothing further.

15            THE COURT:  Let me ask you something, because I need

16   to ask.  When did you become -- did you hear any shots that

17   night, any night during those days?

18            THE WITNESS:  I didn't hear -- I don't remember

19   hearing shots that night, but it is common to hear shots

20   often.

21            THE COURT:  Okay.  When did you get to know about La

22   Tombola --

23            THE WITNESS:  Nearby.  Correction.

24            THE COURT:  -- massacre?  When did you get to know

25   that indeed something had happened in La Tombola?
```

1          THE WITNESS:  The following day, because of the

2  paper.

3          THE COURT:  So the next day you have the paper in

4  front of you, you read what's going on?

5          THE WITNESS:  I generally read the papers on Sunday,

6  so I believe it was that way, but it was something so

7  impactful that I must have read it in the Sunday paper.

8          THE COURT:  That did not help you to remember where

9  were you the night before?

10          THE WITNESS:  Honestly, not.

11          THE COURT:  You did not reflect that morning as to

12  whether you had heard something, whether you had seen

13  something, nothing of the sort?

14          THE WITNESS:  Not really.

15          THE COURT:  That morning, did the neighbors get

16  together, as you did last night, to comment what had happened

17  in La Tombola?

18          THE WITNESS:  It is not customary for me to leave the

19  house and comment on what's in the news.  I don't --

20          THE COURT:  Very well.  Thank you.  Anything else?

21          MR. AGUAYO:  No, sir.

22          THE COURT:  Thank you.

23          Thank you, ma'am.  Thank you for coming.

24          (At 11:00 AM, witness left the stand.)

25          THE COURT:  Any additional evidence?

1              MS. DOMINGUEZ:  None from the Government.

2              THE COURT:  Nothing else?

3              MR. AGUAYO:  No, sir.

4              THE COURT:  Very well.  This concludes the

5    presentation of evidence, members of the jury.  What is going

6    to happen now is the following.  I am going to let you go for

7    the day.  I'm going to let you go for the day after you have

8    your lunch that has been ordered.  Okay?  Diana just reminded

9    me of that.

10             Then the plan of action is this:  I am going to

11   devote the rest of the day and tomorrow, which is Wednesday,

12   correct?

13             COURTROOM DEPUTY:  Thursday.

14             THE COURT:  Thursday.  Okay.  Today and the morning

15   of tomorrow, I'm sorry, to deal with issues of jury

16   instructions, meeting with lawyers about jury instructions,

17   things of the sort.  And unless something really major happens

18   that makes it impossible, we should reconvene tomorrow at one

19   o'clock to start the closing arguments.  Then I will instruct

20   you on the applicable law.

21             When we finish, whether that's Thursday or Friday

22   morning, I don't know, that's the idea.  So you're excused

23   until tomorrow at 1:00.  If for some reason, if for some

24   reason the plan changes, we will let you know.  Okay?

25   Otherwise tomorrow at 1:00 PM.

1          Remember, do not discuss this case with anyone or

2     allow anybody to discuss this case with you.  You are not to

3     read or listen to anything touching upon this case in any way.

4     There are people from the press here sitting.  They publish

5     every day.  But your obligation is to only receive the input

6     of the witnesses and the exhibits.  Nothing else.

7          So you're not going to read or listen to anything

8     touching upon this case.  Okay?  You are not going to do any

9     research or investigation on your own.  And most importantly,

10    you are not going to engage in mini deliberations,

11    deliberations of any kind, because you still have to hear the

12    lawyers close their case before you for whatever convincing

13    force those arguments have.  And you have to hear my

14    instructions on the applicable law.  You will not be ready for

15    deliberations until that is all done.

16         So with that in mind, I will let you go.  Thank you

17    very much.

18              COURT SECURITY OFFICER:  All rise.

19              (At 11:02 AM, jury left the courtroom)

20              (At 11:02 AM, recess taken.)

21              (At 5:05 PM, proceedings reconvened.)

22              THE COURT:  You saw that I'm not going to touch the

23    exhibit.  I'm going to leave it the way it is.

24              MR. RUHNKE:  Okay.  Okay.  Yes, I saw it.

25              THE COURT:  And if you're going to make reference to

```
 1   the transcripts, both sides, you have to do it in the context
 2   of -- I don't know what to tell you.  You have to do it in the
 3   context of whatever you think will pass muster, okay?
 4           MR. RUHNKE:  Yes.
 5           Your Honor, before we start the charge conference, on
 6   behalf of Alexis Candelario Santana I want to renew my Rule 29
 7   motion.
 8           THE COURT:  Yes.  You have to.  I'm sorry.
 9           MR. RUHNKE:  For the same reasons previously
10   advanced.
11           THE COURT:  Yes.  It will have to be the same ruling,
12   but it's preserved.
13           MR. AGUAYO:  And me, also.
14           THE COURT:  Yes.  Absolutely.
15           MR. AGUAYO:  On behalf of David Oquendo Rivas, we
16   renew our motion for the same reasons we spoke about.
17           THE COURT:  Yes.  Duly preserved.
18           Well, what do you think of the charge?  Looks that
19   bad or what?
20           MR. RUHNKE:  It's taking a complicated case and
21   summarizing it pretty well.
22           MS. DOMINGUEZ:  Yes, absolutely.
23           MR. RUHNKE:  I've been reading the RICO charge, and I
24   just glaze over them when I read them actually.  Is it from a
25   standard charge book?
```

```
1              THE COURT:  No, I just -- this is a charge that I
2    prepared a long with another judge for another case.  We
3    prepared it together in part.  In part it's a work product of
4    two judges who worked together a couple of months ago.  A
5    Judge from Rhode Island and myself.
6              MR. RUHNKE:  I would start just by observing on page
7    eight of the draft --
8              THE COURT:  Page?
9              MR. RUHNKE:  Page eight.
10             THE COURT:  Let me go through it.  Yes.
11             MR. RUHNKE:  It's just a heading, but it's really --
12   it's conspiracy to commit RICO, not a RICO substantive
13   violation.
14             THE COURT:  Where is that?
15             MR. RUHNKE:  You have a heading that says RICO,
16   Racketeering Influence and Corrupt --
17             THE COURT:  What should be the title?
18             MR. RUHNKE:  Probably conspiracy to commit RICO,
19   because that's what Count I charges.
20             THE COURT:  The only reason I put it this way was
21   because of -- because of the special finding that is contained
22   in Count I that includes a conspiracy with intent to
23   distribute narcotics.  I tried to follow kind of the titles of
24   the different portions of the count.
25             I'll -- I don't care about titles.  I mean, the
```

1    important thing is that we -- you would propose what?

2         MR. RUHNKE:  I would just say conspiracy to commit

3    RICO.

4         THE COURT:  That's it?

5         MR. RUHNKE:  Yes.

6         MS. DOMINGUEZ:  That's fine with us.

7         THE COURT:  Hmm?

8         MS. DOMINGUEZ:  That's fine with us.

9         MR. RUHNKE:  And because I'm not from this district,

10   is it the Court's practice to send the instructions back to

11   the jury room?

12        THE COURT:  I'll give each one of them a set.

13        MR. RUHNKE:  Fine.  I prefer that as well.

14        THE COURT:  It's the only way.  If you read this to

15   third year law students and give them a test, they will fail

16   it.

17        MR. RUHNKE:  You give this to 38-year lawyers --

18        MR. AGUAYO:  Your Honor -- I'm sorry.  David, are you

19   finished?

20        THE COURT:  Let me think about this title.  Let me

21   just make a note here, revisit title.

22        MS. DOMINGUEZ:  But of course RICO would still be

23   spelled out.

24        MR. RUHNKE:  Yes.

25        THE COURT:  That's what you want to call it?

1          MR. RUHNKE:  I would just say conspiracy to commit

2    RICO.

3          MS. DOMINGUEZ:  Racketeering Influence --

4          MR. RUHNKE:  Right.  The rest would just stay the

5    same.

6          THE COURT:  Okay.  Let me think about that part.

7    What else?

8          MR. AGUAYO:  Your Honor, as to David Oquendo, maybe I

9    missed it, Your Honor, but I don't believe I saw anything

10   there concerning stipulations or judicial notice.

11         THE COURT:  Maybe there's nothing --

12         MS. DOMINGUEZ:  No, there wasn't.

13         MR. RUHNKE:  That's true.

14         THE COURT:  Let me make a note about that.  I told

15   them so many times, but let me make a note, stipulations and

16   effect.

17         MR. AGUAYO:  And judicial notice?

18         THE COURT:  Judicial notice of what?

19         MR. AGUAYO:  Judicial notice of the notice of

20   alibi.

21         THE COURT:  I marked it in evidence.  What do you

22   mean?

23         MR. AGUAYO:  I know, but --

24         THE COURT:  I marked it in evidence.  Not only that,

25   I included it in the alibi charge.

```
 1              MS. DOMINGUEZ:  Correct.

 2              MR. AGUAYO:  Okay.  Then I --

 3              THE COURT:  Why repeat it?

 4              The stipulations, yes, we have to include that.

 5    You're right.

 6              MS. DOMINGUEZ:  And, Judge, I mentioned to Mr. Ruhnke

 7    briefly before coming in that I don't know if they're going to

 8    raise the defense of withdrawal from the conspiracy.

 9              THE COURT:  I don't think there is any evidence of

10    withdrawal here.

11              MS. DOMINGUEZ:  No, but I'd like to know.  I'd like

12    not to be blindsided with that during the clothing arguments,

13    because there's no instruction on that.

14              MR. RUHNKE:  We will not be arguing withdrawal from

15    the conspiracy.

16              THE COURT:  I didn't put it in because of the fact

17    that I thought that there was no evidence of withdrawal.

18              MS. DOMINGUEZ:  Correct.

19              THE COURT:  First Circuit case law withdrawal is

20    brutal.

21              MR. RUHNKE:  I've read it.

22              THE COURT:  You have to almost, you know, send some

23    sort of deed or something saying that you're out.

24              MR. AGUAYO:  Put it in the paper.

25              THE COURT:  No, honestly, it's extremely stiff.
```

```
 1            MR. AGUAYO:  You have to go either to them or you
 2   have to tell everybody.
 3            THE COURT:  It's really difficult to prove withdrawal
 4   of a conspiracy in the First Circuit.
 5            MR. AGUAYO:  Can you imagine co-defendants saying
 6   yes, we're in, and he told us he was out?
 7            THE COURT:  So there's no withdrawal.  What else?
 8            MR. AGUAYO:  Oh, yeah.  Your Honor, when Dr. Brigham
 9   testified -- you know, his role there was to testify
10   concerning an overview of eyewitness identification.  I want
11   to be sure that the Government is not going to come in and
12   say, well, he told us that when there's a witness, that -- I'm
13   trying to think about what he said.  Either there were three
14   witnesses that identified Oquendo or that if it was someone
15   who knew Oquendo from time passed and then identified him --
16   in other words, he was trying to seek, not is there a study
17   concerning this, which he did when he talked about strangers
18   upon strangers and people that knew each other as opposed to
19   stranger upon stranger.  But what I want to be sure is he's
20   not going to say, as Mr. Brigham said as to specific facts,
21   this is --
22            THE COURT:  I don't think he covered any specific
23   facts.  There were some questions of a hypothetical nature
24   asked of him.
25            MS. DOMINGUEZ:  There were.  He said a couple of
```

1   things.  He said, first of all, that there had been no studies

2   to the extent I can recall on people who knew each other.  All

3   the studies were stranger upon stranger.

4         MR. AGUAYO:  That's okay.

5         MS. DOMINGUEZ:  And he also answered some

6   hypothetical questions posed by Mr. Hegyi whether that would

7   lessen the possibility of a misidentification.  The fact they

8   knew each other, that they knew him by name.

9         So clearly the identification didn't come to say this

10   identification was correct or not.

11         MR. AGUAYO:  I just want to make sure Mr. Hegyi or

12   whoever doesn't say Dr. Brigham said this identification is

13   okay.

14         MS. DOMINGUEZ:  Absolutely not.

15         THE COURT:  You have to keep it in the context of

16   what he said, general principles.

17         MS. DOMINGUEZ:  Judge, Section 42, the section that

18   deals with cooperating witnesses and accomplices --

19         THE COURT:  I included there even Menor.

20         MS. DOMINGUEZ:  Right, who is not a cooperator, but

21   is an accomplice to the prior murders.  And I don't know if

22   the Court also wants to put Rufo, who plead guilty to the same

23   RICO conspiracy even though he's not included in this

24   Indictment.  Throughout his testimony he did make reference to

25   the fact he had plead guilty.

1          MR. RUHNKE:  Yes.  I think we should.

2          THE COURT:  Rufo.

3          MS. DOMINGUEZ:  Wilfredo Semprit Santana.

4          THE COURT:  That would be in the paragraph, you may

5    have also heard and figured out, Wilfredo Semprit Santana

6    there, okay?

7          MS. DOMINGUEZ:  Right.

8          THE COURT:  Yes.  I left that out.

9          Okay.  I added that.  Let me put here page 42.  What

10   else?

11         MR. RUHNKE:  Your Honor, page 44, there is a flight

12   charge.

13         THE COURT:  Yes.

14         MR. RUHNKE:  I don't think there's any evidence that

15   Mr. Candelario's trip to the Virgin Islands was flight.

16         THE COURT:  Well --

17         MR. RUHNKE:  I assume that's what you're arguing.

18         MS. DOMINGUEZ:  Well, he was a fugitive.

19         MR. RUHNKE:  Was he a fugitive --

20         MS. DOMINGUEZ:  He had fake ID, credit card, fake

21   driver's license, didn't identify himself, claimed to be

22   someone else.

23         THE COURT:  Yes.

24         MR. RUHNKE:  Let's back up to the initial statement.

25   I don't think he was a fugitive, because I don't think there

1   was any -- he had any knowledge at all that there was a

2   warrant out for his arrest.  I believe there was a sealed

3   warrant, but --

4           THE COURT:  That's precisely the reason why I put it

5   in the different alternatives that the First Circuit has.  You

6   read my mind.

7           MR. RUHNKE:  Yes.

8           THE COURT:  That's exactly why I put it in the

9   different alternatives the First Circuit has contemplated,

10  which is after he's accused of the crime or intentional flight

11  from the scene of the crime or the jurisdiction where the

12  crime is committed, all -- the First Circuit has used all

13  these different scenarios.  But I do think that -- I do think

14  that it's pretty obvious that he was not on a fishing trip.

15          MR. RUHNKE:  Well, let start up with the first line

16  of this.  Intentional flight by Alexis Candelario Santana

17  after he is accused of the crime for which he's now on trial.

18  He was not accused.  There was no Indictment.  There was no

19  Complaint that had been served on him.

20          THE COURT:  Why don't we say then -- he was not

21  accused then?  No Indictment yet?

22          MS. DOMINGUEZ:  I believe that there had yet not been

23  a charging document.

24          THE COURT:  Okay.  The warrant for arrest was from

25  state courts or what?

1            MR. RUHNKE:  There was a sealed felon in possession

2    complaint.

3            MS. DOMINGUEZ:  There was.

4            MR. RUHNKE:  Right.  Based on, you know, Rufo's

5    testimony of La Tombola, and another incident that never got

6    proved at trial.

7            MS. DOMINGUEZ:  How about attempts to conceal his

8    identity, Judge?

9            THE COURT:  I have a better idea.  Let's eliminate

10   that and say -- let's not mention him by name.  Let's

11   eliminate -- let's start the instruction with intentional

12   flight by a defendant from the scene of a crime, from the

13   jurisdiction where the crime was committed, may be considered.

14   That tempers it a little bit, don't you think?  Okay?

15           MR. RUHNKE:  It certainly tempers it a bit, but the

16   essence of a flight charge is somebody has been accused of a

17   crime and leaves the jurisdiction.

18           THE COURT:  Not necessarily.  That's the thing.  It

19   includes, it includes the First Circuit case, fleeing the

20   jurisdiction -- you know that you're involved in a hassle,

21   let's put it that way, a crime situation, and you just want to

22   hit the road, want to disappear for whatever reason.  Even if

23   no charge has been filed, see?

24           You just disguise yourself, or you get yourself a

25   fake driver's license, or you just get on a boat, or you just

```
 1    move to Michigan or something, whatever, disappear, try to
 2    distance yourself.
 3              MR. RUHNKE:  Yes.
 4              THE COURT:  That's the thing.
 5              MR. RUHNKE:  Even now though we're talking about a
 6    month after La Tombola.  It sounds like the next day he's
 7    taking off to the Virgin Islands.
 8              MS. DOMINGUEZ:  Right, but he had been the subject of
 9    many news reports.
10              THE COURT:  Yes.  I think it was pretty obvious.
11              MS. DOMINGUEZ:  He was hot.  He was trying to get out
12    of the jurisdiction.  And that's evident I think inferentially
13    from the fact he was trying to conceal his identity.  If there
14    were no pending charges or he had no fear to be charged, why
15    would he do that?
16              THE COURT:  Had he, for example, been stopped in the
17    boat even with Miami, Florida driver's license and said no,
18    listen, I am so and so, I use this for other reasons,
19    whatever, but he really pushed the limit trying to -- I think
20    I'm willing to do that.  Eliminate the phrase intentional
21    flight by Alexis Candelario for which he's accused of the
22    crime now on trial, comma, and start with intentional flight
23    by a defendant, without mentioning his name.
24              MR. RUHNKE:  It's an improvement, but I'll just
25    maintain my objection --
```

1    THE COURT:  You have to.  I mean, I understand that

2 part.

3    MR. RUHNKE:  -- to flight.

4    THE COURT:  But I think that this is exactly what it

5 is.  Okay.

6    MR. RUHNKE:  On the collateral attack charge --

7    THE COURT:  Excuse me.  Let me mark this here.  Page

8 44.

9    MR. AGUAYO:  What page, David?  The next one?

10    THE COURT:  Collateral attack is which one?

11    MR. RUHNKE:  Page 45 at the bottom.

12    I objected to this at side bar as something called

13 defensive collateral estoppel.  I maintain my objection to

14 it.

15    THE COURT:  But I need to see those cases.

16    MR. RUHNKE:  Okay.  There's only one case that I

17 have.

18    THE COURT:  I haven't read the case.  I don't know

19 what it is about.

20    MS. DOMINGUEZ:  Which case?

21    MR. RUHNKE:  Pelullo, Third Circuit case.

22    THE COURT:  Let me read it.  You have a copy there of

23 the case?

24    MR. RUHNKE:  I don't.  I don't.  I have it on my

25 laptop.

1          MS. DOMINGUEZ:  I have some other cases that we've

2    relied on if the Court would like.  Does the Court wish copies

3    of these that we believe support your position?  If you

4    like --

5          THE COURT:  Do you want to see these?  Give me the

6    citation of yours.

7          MR. RUHNKE:  Pelullo.  There, in that group.

8          MS. DOMINGUEZ:  No --

9          THE COURT:  If you have the citation.

10         MR. RUHNKE:  I was doing the research while I was

11   listening to the alibi rebuttal evidence, so it is United

12   States against Pelullo.  P-e --

13         THE COURT:  P-e --

14         MR. RUHNKE:  -- l-u-l-l-o.

15         THE COURT:  -- l-u-l-l-o.  Pelullo.

16         MR. RUHNKE:  Pelullo.  There may be two L's or one

17   L.

18         MS. DOMINGUEZ:  14 F3d 881.

19         MR. RUHNKE:  Third Circuit, 1984.

20         THE COURT:  14 F3d what?

21         MR. RUHNKE:  14 F3d 881, Third Circuit, 1994.

22         And the case the Government cited in its papers,

23   United States against Tocco --

24         THE COURT:  I remember the Tocco case.

25         MR. RUHNKE:  That's a Sixth Circuit case, 2000, 200

1  F3d 401.

2  THE COURT:  Let me make a call here a minute.  Let me

3  bring that case a minute and see if I can get a copy.

4  Okay.  Let's go to any other subject.

5  MR. RUHNKE:  There is just a typo in that section as

6  well.

7  THE COURT:  In page 45?

8  MR. RUHNKE:  Yes.  Page 46 actually.

9  THE COURT:  46.

10  MR. RUHNKE:  I think --

11  THE COURT:  Where?

12  MR. RUHNKE:  Let me just find it.  I've written it

13  in.  I think in the next to the last sentence, I think you

14  meant to say the conviction can only be attacked by litigation

15  in the court in which or from which they originated.

16  THE COURT:  No.  It's not a typo.  It's a mistake.

17  The conviction can only be attacked by litigation --

18  MR. RUHNKE:  In the court from which they

19  originated.

20  THE COURT:  In the courts.

21  MR. RUHNKE:  From which or in which?

22  THE COURT:  From which they originated, and not

23  collaterally here -- from the court system.  It's actually --

24  because it could be appeals court, could be the Supreme

25  Court.

1          MR. RUHNKE:  Right.  That's true.

2          THE COURT:  From the court system.  Puerto Rico

3    courts, and not in the Federal court.  That's page 46.

4          MS. DOMINGUEZ:  Right.  And, Judge, it should be

5    pleural convictions, right?

6          THE COURT:  Yes, it should be.  Page 46.  Okay.  I

7    understand.

8          MR. RUHNKE:  The other issue, which I've been trying

9    to figure out a way to state, is, and I'll just describe the

10   concept, I don't want the jury to think, oh, he plead guilty

11   to all these charges in the '90s and early 2000, therefore

12   he's more likely to be guilty of the murders in La Tombola.

13         THE COURT:  Okay.

14         MR. RUHNKE:  That it is, you know, a carry over

15   404(B) character kind of evidence.  And what I -- what I'd

16   started to draft was something along the lines of saying it

17   would be improper to infer from the guilty pleas and the

18   judgments entered as to the earlier murders that he was

19   therefore more likely to have committed the murders at La

20   Tombola.  Each crime alleged in this Indictment must be proven

21   up or down on its own merits, and without regard to other

22   crimes for which you may find or might have found

23   Mr. Candelario guilty.

24         And I go right to it.  For example, you could

25   conceivably find Mr. Candelario responsible for the murders

1    alleged in the period of, whatever that period is, and nothing

2    of the murders at La Tombola or visa versa.  Each charge must

3    stand or fall on its own merits.

4            THE COURT:  Let me -- I see your point.  I'm looking

5    at page five and six now.  Let me take a look at page six.

6            MS. DOMINGUEZ:  My only concern is that they can

7    consider the convictions for other legitimate reasons.  You

8    don't have to exclude them from their analysis.  It just

9    should not be used exclusively to prove propensity based on

10   the prior convictions.

11           THE COURT:  Exactly.  That's true.

12           MR. RUHNKE:  Yes, that's right.

13           THE COURT:  Let me do something.  I see the

14   concept.

15           MR. RUHNKE:  Okay.

16           THE COURT:  What I will do is -- take a look at page

17   six.  In the context of these three instructions that are

18   here, multiple counts --

19           MR. RUHNKE:  Yes.

20           THE COURT:  -- one defendant, separate consideration,

21   I should insert some language to distance the Bayamon

22   convictions.  All of them were in Bayamon; am I right?

23           MS. DOMINGUEZ:  Bayamon, and one in San Juan, also.

24           MR. RUHNKE:  And one in San Juan.  The disco murder

25   was in San Juan.

1       THE COURT:  The Supreme Court convictions from a

2   404(B) effect, that's what you want?

3       MR. RUHNKE:  Yes.

4       THE COURT:  What you want is something, something

5   that establishes that we don't have a -- the fact that they

6   are alleged and the fact that they are there and that they

7   have been -- there has been an attempt to prove them as part

8   of this Federal thing, you don't want them to have the double

9   effect of them being like a 404(B) propensity kind of thing.

10      MR. RUHNKE:  Exactly.

11      THE COURT:  I understand.  I'll think of something.

12      MR. RUHNKE:  Okay.

13      THE COURT:  And I'll tell you tomorrow morning what

14   it is.

15      MR. RUHNKE:  Okay.

16      THE COURT:  I have to think about it.  I think it's a

17   valid point, and the place to do it is here in these three

18   instructions.

19      MR. RUHNKE:  Yes.  I agree.

20      THE COURT:  Yes.  It's a valid point.

21      MR. RUHNKE:  I'm trying to find these cases while

22   we're talking.

23      THE COURT:  What else?

24      MR. AGUAYO:  Your Honor, I hate to rehash all this

25   again, but could we do the openings first thing Friday

1    morning?

2          THE COURT:  No, I can't.  It's not that I want to be

3    difficult.  I just can't.  I have -- you have no idea.  Friday

4    morning I have a school of 40 students visiting the courtroom.

5    I have so many things going on at the same time I just cannot

6    change the whole calendar.  It's just impossible.  You know,

7    we can't do that.  I'm sorry.  The most I can do is start at

8    one o'clock tomorrow.  I'm very sorry.  I just wish -- I

9    can't.  I wish I had all the time in the world.

10          I have after this case, and while you have this week

11   off, I'm going to try the Supermax case.  Otherwise where am I

12   going to -- you know, and after that I'm trying the other

13   case.  It's just one after the other, Jose.  I just can't.

14   This is --

15          MR. AGUAYO:  Your Honor.

16          THE COURT:  This is out of control, this docket, you

17   know.

18          MR. AGUAYO:  Your Honor, but, you know, I even hate

19   to say this, I'm not asking, I'm begging until Friday.

20          THE COURT:  Let me tell you something.  I'm going to

21   tell you a war story.  I remember a time -- there's that judge

22   in the hallway here, Judge Grant, made me try four cases in a

23   row.  When I say four cases in a row, it means jury was out

24   deliberating, we were making a new jury to start a new case,

25   okay?  That jury was deliberating.  There were sometimes two

1    juries out deliberating, and we were picking a third jury out

2    for another case.  That's the way it was.

3            I've been through this as a lawyer.  I know what

4    you're taking about.  But this case from your standpoint is

5    not that complicated.  Your case is not that complicated.

6            MR. AGUAYO:  Your Honor, if I may, it's not --

7            THE COURT:  There's a lot at stake.

8            MR. AGUAYO:  Exactly.

9            THE COURT:  But why do you need so much time to -- my

10   God, you have been thinking about this since 2009.  I'm sorry.

11   I wish I could.  I don't have the time.  I just can't do it.

12   I extended it to one o'clock because I thought that's the best

13   I can do.  Honestly, I don't want to be difficult.  It's

14   simply that I can't.

15           Any other thing about the charge that we should

16   consider here?  You saw that the alibi defense I include,

17   also.

18           MR. AGUAYO:  Yes.

19           THE COURT:  The appropriate language from the

20   document, and even the document is in evidence.

21           MR. AGUAYO:  Yes, sir.

22           THE COURT:  So there is no issue with that.

23           And I allowed your identification expert.  Swear to

24   God I will never allow an identification expert again I think,

25   because he didn't convince me.  But I allowed it, because of

```
 1    the seriousness of the case.  I said to myself, I should in
 2    the balance of things -- these guys are in this predicament.
 3    The least I can do is allow it.
 4              Any other thing that --
 5              MR. RUHNKE:  No.  Are we waiting for your clerk on
 6    that case?
 7              THE COURT:  He should be bringing it.  Yes.  I told
 8    him to bring it.
 9              MR. AGUAYO:  If there's no other issue pertaining to
10    Oquendo, may I leave so I can --
11              THE COURT:  If you want to leave, you can leave.
12              MR. AGUAYO:  No.  I mean is there any other --
13              MS. DOMINGUEZ:  Judge, we also in the e-mail we sent
14    --
15              THE COURT:  I saw it.
16              MS. DOMINGUEZ:  -- we indicated we'd be dismissing --
17    in going over all the victims, there was one victim we were
18    unable to locate --
19              THE COURT:  I saw it.
20              MR. RUHNKE:  I'm just sitting here thinking, there
21    was an attempted murder charge, and the whole defense -- we
22    didn't notice that person never appeared.
23              MS. DOMINGUEZ:  That was in the list we turned
24    over.
25              THE COURT:  There were so many things.  You think I
```

1    can remember -- I can remember a couple.

2              MS. DOMINGUEZ:  I'm sure you would have thought of it

3    once the list was inserted into the instructions.

4              MR. REBOLLO:  Your Honor, is there a verdict form

5    ready?

6              MR. RUHNKE:  I appreciate Your Honor's confidence.

7              THE COURT:  I'm preparing one.  I'm preparing one.

8    Mari Rosa is typing it out.  I'll show you first.

9              I took Count I first, whether guilty or not guilty,

10   whatever; and then I do a separate thing about the drugs.

11             MR. RUHNKE:  Quantity.

12             THE COURT:  Right.  And after that about drug

13   quantities, you know, with the minimums, at least one kilo

14   kind of thing --

15             MS. DOMINGUEZ:  And does that include, Judge, whether

16   it's within the last ten years?

17             THE COURT:  What do you mean?

18             MS. DOMINGUEZ:  One of the overt acts.

19             MR. RUHNKE:  It's in the Statute.

20             THE COURT:  It's in the instructions.

21             MS. DOMINGUEZ:  It's in the instructions.

22             THE COURT:  I am making a simple verdict, as simple

23   as you can make it.  By the way, now that you talk -- now that

24   you mention that, the count that was dismissed, 28 --

25             MS. DOMINGUEZ:  Yes, sir.

```
 1            THE COURT:  After 28, there was a special finding.
 2            MS. DOMINGUEZ:  Right.  We are in the process of
 3  redacting the Indictment where we are not --
 4            THE COURT:  I have it redacted already.
 5            MS. DOMINGUEZ:  Oh, you have it already.
 6            THE COURT:  Yes.
 7            MS. DOMINGUEZ:  We were going to go change it to
 8  conform to the Indictments that are left in -- the counts that
 9  are left in the Indictment.
10            THE COURT:  It's here.
11            MS. DOMINGUEZ:  Okay.
12            MR. RUHNKE:  But the informants special findings --
13            MS. DOMINGUEZ:  Has to be altered as well.
14            THE COURT:  Right, because rather than Count 28, it
15  would be Count 19.
16            MS. DOMINGUEZ:  Right.
17            THE COURT:  But those findings, the jury has to be
18  asked that whether they find it is that; is that correct?
19            MR. RUHNKE:  No, not at all.
20            MS. MATEO:  Two to 28 --
21            MS. DOMINGUEZ:  Two to 28, so it would be two to
22  19.
23            MR. RUHNKE:  But the notice of special findings is
24  not something that gets presented to the jury.  The notice of
25  special findings is simply what I think -- roughly, Ring
```

```
 1    versus Arizona --
 2              MS. DOMINGUEZ:  Correct.
 3              MR. RUHNKE:  -- requires for a valid Indictment.  So
 4    those should come out.  They serve no function.
 5              MS. MATEO:  We left them.
 6              MR. RUHNKE:  They shouldn't have been --
 7              THE COURT:  You don't have to submit that to the
 8    jury.
 9              MR. RUHNKE:  No.
10              THE COURT:  Those questions, whether he was 18,
11    whether he was this, whether he was the other.
12              MS. DOMINGUEZ:  My understanding is that's in the
13    penalty phase.  In the other death penalty case they left it
14    in, but it wasn't included in the verdict form.
15              MR. RUHNKE:  It should not be in there.  It contains
16    a lot of very prejudicial language.
17              THE COURT:  Well, I --
18              MR. RUHNKE:  I know, but it's not just a harmless
19    left over.  It is -- sorry.
20              THE COURT:  Excuse me.  RICO is drugs.  That's a
21    different story.
22              MR. RUHNKE:  That's a different story.
23              COURTROOM DEPUTY:  It goes from Count 19 to 29.
24              THE COURT:  That's fine.  The first one you were
25    thinking of, that stays, because that's drugs.
```

```
1              COURTROOM DEPUTY:  Yes.

2              THE COURT:  I understand.

3              MR. REBOLLO:  Can I see the Indictment as it remains?

4              THE COURT:  I haven't reviewed it, but that's what

5      it --

6              COURTROOM DEPUTY:  And we added the victims' names.

7              MS. DOMINGUEZ:  We added the victims' name, yes.

8              MR. REBOLLO:  Okay.

9              THE COURT:  The victims' names that appear with

10     numbers, we added their real names, because it doesn't make

11     sense to have a 17, 18, 16.

12             MR. RUHNKE:  Yes.  But I think the Government, if

13     they checked with the Capital Case Unit, would find that

14     should come out.

15             MS. MATEO:  I just sent an e-mail to verify that.

16             MR. RUHNKE:  Because the jury doesn't make any

17     findings on that.

18             MS. DOMINGUEZ:  It is for penalty.

19             MS. MATEO:  It is for penalty.

20             THE COURT:  Okay.  The way I had done it in the

21     verdict, not knowing these things, was to ask a yes or no to

22     these things.  But okay, I'll leave it out.

23             MR. RUHNKE:  Yes.  Because I noticed there was no

24     discussion in the instructions about that.

25             THE COURT:  No.  No.  No.
```

```
 1              MR. RUHNKE:  So I assumed it was gone.

 2              THE COURT:  It just came to attention when I prepared

 3    the verdict form.

 4              MS. DOMINGUEZ:  It would still have to be redacted

 5    for penalty in any event.

 6              THE COURT:  I thought of that, but I was not sure.

 7              MS. MATEO:  Can you e-mail us a copy of the redacted

 8    Indictment?

 9              COURTROOM DEPUTY:  Sure.

10              THE COURT:  We'll get you a copy.  Sure.

11              MS. MATEO:  I appreciate it.

12              THE COURT:  Let us review it and make sure we didn't

13    leave anything out, and tomorrow morning you'll get a copy.

14              MR. RUHNKE:  We'll discuss whether the motion for

15    special findings has any basis on penalty, but it really

16    doesn't.  It's just enough with Ring versus Arizona to allege

17    the finding --

18              MS. DOMINGUEZ:  The jury has to make a finding of

19    certain --

20              MR. RUHNKE:  Actually, this is taken -- completely

21    taken over by notice of aggravating factors.

22              MS. DOMINGUEZ:  Right.  It's the same inquiry as the

23    over 18.

24              MR. RUHNKE:  But there's a lot more to it.

25              MR. REBOLLO:  28 is out.
```

```
1              THE COURT:  28 is out.

2              MR. REBOLLO:  All right.

3              COURTROOM DEPUTY:  Uh-huh.

4              THE COURT:  Because I was not aware of that.

5              MR. AGUAYO:  So the counts that remain would be One,

6     Two to 19, 29 to --

7              MS. DOMINGUEZ:  -- 42 --

8              COURTROOM DEPUTY:  41.

9              MS. DOMINGUEZ:  -- 41 would be out.

10             MR. AGUAYO:  Yes.

11             MS. DOMINGUEZ:  And 46 is out.

12             THE COURT:  What do you want to do with the

13    forfeiture counts?  This is what I've done in other cases.

14    Let me tell you what I do.  What I do is we stipulate usually.

15    I hate to have a jury decide forfeiture on -- first of all,

16    these people have nothing to forfeit --

17             MR. RUHNKE:  Yes, I know.

18             THE COURT:  -- to begin with, so this is just an

19    exercise in futility.  That's the first thing.  And drugs,

20    narcotics are forfeited by law.  You don't even have to have a

21    finding, okay?

22             So what I usually ask the parties to do, and I

23    usually get this kind of stipulation, is that if there is a

24    conviction, then I enter a forfeiture order, a general

25    forfeiture order, you know, which is going to be a piece of
```

1    paper that means nothing, because Alexis nor the other guy

2    have anything.

3            MR. RUHNKE:  Actually, my most common experience is

4    the government says this guy has nothing and dismisses the

5    forfeiture.

6            THE COURT:  Well, to dismiss the forfeiture really --

7            MS. DOMINGUEZ:  Judge, I know.  I agree.  I

8    understand fully.

9            THE COURT:  I mean, why should we bother with this or

10   send the jury -- some judges, for example, get a guilty

11   verdict and send the jury back again with instructions of

12   forfeiture.  It's just like saying sign here, you know.  It's

13   like saying now that you found him guilty --

14           MR. RUHNKE:  In a case of a high rolling fraud artist

15   or stock hedge fund owner, that's one thing.

16           THE COURT:  Should we forget about the forfeiture

17   thing?

18           MS. DOMINGUEZ:  I have no objection to that.

19           THE COURT:  Because it makes no sense.  If there was

20   money involved here, but there's nothing.  Or if there's

21   money, it should be stashed in some sort of --

22           MS. DOMINGUEZ:  In the stable.

23           THE COURT:  No.  In some sort of stainless steel can

24   buried somewhere.  But we're never going to get it.  So settle

25   forfeiture --

1          MR. RUHNKE:  Your Honor, do you want to discuss the

2     collateral estoppel?

3          MS. DOMINGUEZ:  We agree on special findings.  We got

4     a confirmation from CCU that they do not go back.

5          THE COURT:  Let me look at the case a minute so we

6     can discuss it.  Okay.

7          MR. RUHNKE:  Yes.

8          COURTROOM DEPUTY:  So, Counsel, is it 46 that's out?

9          MS. MATEO:  46; is that's correct?  Erick Delgado.

10         COURTROOM DEPUTY:  And 52, right.

11         MR. AGUAYO:  52 is out, too.

12         MS. DOMINGUEZ:  And 42.

13         MS. MATEO:  She already has 42 out.

14         MR. RUHNKE:  Judge, if you're looking at Pelullo, the

15    relevant pages are 889 to 90.

16         THE COURT:  889.

17         MR. RUHNKE:  To 90.  I can never find the pages in

18    these Westlaw printouts, because they bury them.

19         MS. DOMINGUEZ:  They're buried in the text.

20         MR. AGUAYO:  41.

21         MS. MATEO:  42's gone, so it would be 43 to 45.  46

22    is gone.  Then 47 to 51.

23         THE COURT:  Let me find it in the headnotes, see if I

24    find the topic in the headnotes.

25         You're talking about defendant's prior conviction by

1    jury fraud cannot be used as a collateral estoppel?  That's

2    what you're talking about?

3              MR. RUHNKE:  Yes.

4              THE COURT:  Let me find this.  This is actually --

5    15, 16, 17.

6              MR. REBOLLO:  So you ended up dismissing 11 counts.

7              MS. DOMINGUEZ:  No, more.  12 plus the forfeiture.

8              MR. AGUAYO:  Ah, plus forfeiture.

9              MR. REBOLLO:  20 through 28, 22 through 26.

10             MS. MATEO:  And 52.

11             MR. REBOLLO:  Oh, that's right.  That's the

12   forfeiture.

13             MS. MATEO:  No, 52 is felon in possession for

14   November 4th.

15             MS. DOMINGUEZ:  Because we didn't sit that

16   cooperator.  We cut the witnesses in half from what -- more

17   than half.

18             MR. REBOLLO:  Half.

19             MS. DOMINGUEZ:  It was like 126 witnesses were listed

20   when I came into this case.

21             MR. REBOLLO:  You filed a motion with 295 names.  Did

22   you --

23             MS. DOMINGUEZ:  Oh, well --

24             THE COURT:  I would have to read this case

25   completely.  I can't just --

1          MR. RUHNKE:  I can tell you briefly.

2          THE COURT:  Yes.  Give me your take on it.

3          MR. RUHNKE:  In Pelullo, the District Court charged

4   that as a matter of law, the conduct was established because

5   there was a prior conviction.  The Third Circuit reversed that

6   saying -- calling it offensive collateral estoppel, as

7   improper.

8          In the Tocco case, which the -- which the Government

9   cited in its discussion of this issue, the Sixth Circuit

10  distinguished Pelullo because in the Tocco case, the Court had

11  instructed -- had not given it conclusive effect, and that was

12  the distinction.  And that's why the Government, when they

13  filed their papers, said that the fact of a conviction is a

14  circumstance that the jury's certainly entitled to take into

15  account.

16         And in fact, as Your Honor said in the instruction,

17  in and of itself it may be sufficient to establish the murder.

18  Where I think the Court said that they went awry in Pelullo

19  was to say it's absolutely, as a matter of law, established.

20  And that's my take on these cases.

21         THE COURT:  Okay.

22         MR. RUHNKE:  So that's my take on them.

23         THE COURT:  What is your understanding?

24         MS. DOMINGUEZ:  I haven't read the case, Judge, but I

25  will.

1          THE COURT:  Under the cases you cite.

2          MS. DOMINGUEZ:  Our cases, my understanding is,

3     Judge, that clearly the sentence comes in as evidence that

4     this person pled, accepted the charge, has a conviction, plead

5     guilty for this murder.  What I do agree with the Court on and

6     I do agree with counsel is it does not definitively prove that

7     it is in fact in furtherance of the racketeering activity.

8          THE COURT:  Right.

9          MS. DOMINGUEZ:  That would have to depend on other

10    evidence.  But I do believe the case law sustains the notion

11    these convictions cannot be collaterally attacked when they

12    were never done so in local court.  So they do prove the

13    murder, that the defendant plead guilty to this murder.  They

14    don't necessarily prove that it's an overt act in furtherance

15    of the conspiracy.

16         THE COURT:  Well, I will have to read the Pelullo

17    case carefully.  It was tried twice from what I saw here.

18         MR. RUHNKE:  Right.  It's a major Brady case in the

19    Third Circuit.

20         THE COURT:  Right.  It was tried twice, and there was

21    some sort of preclusive effect arising from the first trial as

22    to this issue of collateral estoppel.

23         MR. RUHNKE:  And it's a racketeering act which is

24    different than what we have.  We don't have racketeering acts,

25    because we don't have a substantive RICO charge.

1          THE COURT:  But I think I should study it carefully
2     and let you know in the morning.
3          MR. RUHNKE:  Okay.
4          THE COURT:  I have to sit down and read the case from
5     tip to toe and try to understand.
6          MR. RUHNKE:  And whatever you rule, we'll be guided
7     by.
8          THE COURT:  And I'll let you know of course.
9          MR. RUHNKE:  Thank you.
10          THE COURT:  Other than the Pelullo case and knowing
11     that you will not want the collateral thing in there, is the
12     language offensive?  It's okay, the language, or --
13          MR. RUHNKE:  Other than the Pelullo case.  If Your
14     Honor was to say it's one circumstance, but not conclusive on
15     the issue, something like that.
16          THE COURT:  How is that again?  Let me go to 45.
17          MR. RUHNKE:  The fact that Mr. Candelario plead
18     guilty to these charges is certainly strong evidence that he's
19     guilty of the charges, but is not conclusive on that issue.
20     Something like that.  I know we're right back to where we
21     started.
22          MS. DOMINGUEZ:  There is tension between the circuits
23     here.
24          MR. RUHNKE:  Yes, there is a split in the circuits
25     sort of on this.

1          THE COURT:  What I am completely convinced is that

2     you need the -- you have to argue, and of course you have to

3     argue against the relationship between those convictions and

4     the enterprise.

5          MS. DOMINGUEZ:  Correct.

6          MR. RUHNKE:  That I think we're both agreeing on.

7          THE COURT:  You have to convince the jury of that.

8          MS. DOMINGUEZ:  Absolutely.

9          THE COURT:  The jury has to understand that.

10          MS. DOMINGUEZ:  Judge, there's one additional matter

11     I wanted to raise with respect to the charge contained on page

12     20 of the proposed instructions in connection with the pattern

13     of racketeering activity.

14          THE COURT:  Page 20?

15          MS. DOMINGUEZ:  Correct.  Judge, you define murder

16     under the Puerto Rico Penal Code.

17          THE COURT:  In very general terms.

18          MS. DOMINGUEZ:  Correct.  Correct.  And murder with

19     premeditation as being first degree murder.

20          THE COURT:  Yes.

21          MS. DOMINGUEZ:  I just want to note that each of the

22     12 convictions that Alexis has are for second degree murder.

23          THE COURT:  It doesn't matter.

24          MS. DOMINGUEZ:  It doesn't matter?

25          THE COURT:  Because if you see, I said it here

1    somewhere.  Let me see if I find it.  When I discussed the

2    other part, I said it.  I said it here somewhere that what --

3    it doesn't really matter what kind of murder.  I'm pretty sure

4    I said it.

5          MS. DOMINGUEZ:  Okay.

6          THE COURT:  I am aware of what you're saying, yes.

7    Where was it?  I think I saw it, and I think I put it in.

8          MR. RUHNKE:  It defines second degree murder.  I

9    mean --

10          THE COURT:  Let me make a note here, murder versus --

11   murder two versus murder one.  I know what you mean.  I

12   remember having said somewhere that the important thing is

13   murder, as long -- even if it's only second degree, malice

14   aforethought, killing of human with malice aforethought, that

15   is murder.

16          MR. RUHNKE:  I think you said that immediately after

17   this.

18          THE COURT:  I think I said it immediately after it.

19   I think it's there somewhere, but I'll check it out.

20          What else?

21          MR. RUHNKE:  What page was that, Maria?

22          MS. DOMINGUEZ:  Twenty.

23          Well, you do say it is defined in the Puerto Rico

24   Penal Code as intentionally causing the death of a human

25   being, without distinguishing first or second degree.

```
 1              THE COURT:  Yes.  Why do we even have to mention
 2    first degree?  What difference does it make?
 3              MS. DOMINGUEZ:  Right.  I'd prefer if we didn't
 4    include it --
 5              THE COURT:  What do you think, Mr. Ruhnke?  It
 6    doesn't make a difference.
 7              MR. RUHNKE:  It does not make a difference.  I don't
 8    object to you changing it.
 9              MS. DOMINGUEZ:  So, Judge, would we eliminate the
10    last sentence where it says the Puerto Rico Penal Code states
11    that murder with premeditation --
12              THE COURT:  Yes.  I think we should eliminate that,
13    and also eliminate the premeditation paragraph that follows.
14              MS. DOMINGUEZ:  Okay.
15              THE COURT:  It's page 21, you see, the killing of a
16    human being with malice is still murder, but not first degree
17    murder.
18              MS. DOMINGUEZ:  Okay.  Perfect.  Perfect.
19              THE COURT:  Then we can leave it.
20              MS. DOMINGUEZ:  Yes, we can leave it.  It's in there.
21    Perfect.
22              THE COURT:  It's okay.  See, it's on page 21 at the
23    top.  I remember I put that in.  Perhaps I should add here
24    something that for purposes of this case, it really doesn't
25    matter -- let me think about this.
```

```
 1              MS. DOMINGUEZ:  Okay.

 2              THE COURT:  Perhaps what we should do is just convert

 3   it into plain murder.  Let me think about it.  I understand

 4   the point.

 5              MR. RUHNKE:  That's everything we had.

 6              MS. DOMINGUEZ:  We have nothing further either.

 7              MR. AGUAYO:  Nor do I.

 8              THE COURT:  Well, Chico has prepared your closing

 9   argument.

10              MR. AGUAYO:  I don't think so, Your Honor.  Chico has

11   been doing a lot of stuff.  And quite frankly, Your Honor, if

12   not for Chico, I don't think I could have gotten through this

13   thing.  So credit where credit is merited.  He's been an

14   extreme help.

15              THE COURT:  Well, let me then go back and check

16   Pelullo, and check all that stuff, and figure out what we're

17   going to do.  Okay.

18              MR. RUHNKE:  Yes.

19              THE COURT:  If something else comes up in the

20   morning, you call me or send me an e-mail, and we'll deal with

21   it.  Okay.

22              MR. RUHNKE:  But we're due at closings at one

23   o'clock.

24              THE COURT:  Right.  But if you discover a major

25   glitch here in the morning, let me know immediately, okay, by
```

1  e-mail or whatever.

2          MR. RUHNKE:  We'll all take a look at it.

3          THE COURT:  Exactly.

4          MR. AGUAYO:  Good evening, Your Honor.

5          (Proceedings concluded.)

6                          *     *     *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  U.S. DISTRICT COURT    )

 2  DISTRICT OF PUERTO RICO)

 3

 4      I certify that this transcript consisting of 129 pages is

 5  a true and accurate transcription to the best of my ability of

 6  the proceedings in this case before the Honorable United

 7  States District Court Judge José Antonio Fusté on March 6,

 8  2013.

 9

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```